SUSAN K. LEADER (SBN 216743)
JOSHUA A. RUBIN (SBN 308421)
**AKIN GUMP STRAUSS HAUER & FELD LLP**
sleader@akingump.com
rubinj@akingump.com
1999 Avenue of the Stars, Suite 600
Los Angeles, CA 90067-6022
Telephone: 310.229.1000
Facsimile: 310.229.1001

Attorneys for Plaintiffs RELEVANT GROUP, LLC, 1541 WILCOX HOTEL LLC, 6516 TOMMIE HOTEL LLC, and 6421 SELMA WILCOX HOTEL LLC

## UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RELEVANT GROUP, LLC, a Delaware limited liability company; 1541 WILCOX HOTEL LLC, a Delaware limited liability company; 6516 TOMMIE HOTEL LLC, a Delaware limited liability company; and 6421 SELMA WILCOX HOTEL LLC, a California limited liability company,<br><br>Plaintiffs,<br><br>v.<br><br>STEPHAN "SAEED" NOURMAND, an individual; MICHAEL B. NOURMAND, an individual; THE SUNSET LANDMARK INVESTMENT LLC, a California limited liability company; NOURMAND & ASSOCIATES, a California corporation; and DOES 1-10,<br><br>Defendants. | Case No. 2:19-cv-05019-ODW (KSx)<br><br>**PLAINTIFFS' OPPOSITION TO THE SUNSET LANDMARK INVESTMENT, LLC'S AND SAEED NOURMAND'S MOTION FOR SANCTIONS**<br><br>Date: November 25, 2019<br>Time: 1:30 p.m.<br>Ctrm: 5D<br>Judge: Hon. Otis D. Wright II |

# **TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ............................................................................1

II. BACKGROUND ...........................................................................2

    A. Defendants Bring CEQA Lawsuits Relating to Wilcox's and Tommie's Hotels to Delay the Projects and Leverage a Multi-Million Dollar Payout and Personal Concessions. .............................................2

    B. Within Months of the Settlement, Defendants Bring Another CEQA Challenge Targeting Another Project Managed by Relevant, Demand a Check, and Threaten that this will be the "Drill" Going Forward. ....3

    C. Defendants Pressure Plaintiffs to Drop their RICO Claims By Fabricating Legal Authority and Seeking Sanctions and Attorneys' Fees in Three Different Courts. ............................................................4

III. LEGAL STANDARD .....................................................................6

IV. PLAINTIFFS' RICO CLAIMS ARE WARRANTED BY EXISTING LAW OR A NONFRIVOLOUS ARGUMENT FOR THE EXTENSION OF LAW. ...............................................................................................7

    A. The FAC Does Not Violate Rule 11 Because Filing Sham Lawsuits for the Purpose of Leveraging Unrelated Concessions Constitutes Extortion under Federal and State Law. ..............................................8

    B. The FAC Does Not Violate Rule 11 Because Plaintiffs Did Not Release Their Future RICO Claims as Part of the Settlement of the Underlying CEQA Lawsuits. ...............................................................10

    C. The FAC Does Not Violate Rule 11 Because Defendants' Conduct Falls Within the Sham Exception to *Noerr-Pennington* . ...................13

    D. The FAC Does Not Violate Rule 11 Because Plaintiff Has Standing to Pursue the RICO Claim. ..............................................................14

    E. The FAC Does Not Violate Rule 11 Because Plaintiffs' RICO Claims are Not Barred by *Res Judicata* ..........................................................16

V. PLAINTIFFS DID NOT MISREPRESENT OR CONCEAL ANY MATERIAL FACTS FROM THEIR COMPLAINT. ...................................17

    A. Plaintiffs Did Not Conceal the Existence of the Settlement Agreements. ..............................................................................17

    B. Plaintiffs Did Not Misrepresent Any Terms of the Settlements. .........18

    C. Plaintiffs Were Not Obligated to Specifically Plead the Existence or Content of Releases that are Not Applicable to Their Claims. ...........18

    D. Plaintiffs Were Not Obligated to Plead Facts Helpful to Defendants. 21

VI.    PLAINTIFFS AND THEIR ATTORNEYS DID NOT BRING THIS
       LAWSUIT FOR AN IMPROPER PURPOSE................................................21

       A.    Because Plaintiffs' Claims are Not Frivolous, Their Subjective
             Motivations are Irrelevant. ....................................................................21

       B.    Plaintiffs' Decision to File Their RICO Claim in Federal Court is Not
             Evidence of an Improper Purpose. ........................................................21

       C.    The Emails from Elias Shokrian do Not Show an Improper Purpose.22

       D.    The Two Press Articles Reporting the RICO Lawsuit are Not
             Evidence of an Improper Purpose. ........................................................24

VII.   THERE IS NO BASIS TO SANCTION PLAINTIFFS FOR FILING THIS
       COMPLAINT PUBLICLY ..............................................................................25

VIII.  CONCLUSION..................................................................................................25

PLAINTIFFS' OPPOSITION TO THE SUNSET LANDMARK INVESTMENT, LLC'S AND SAEED NOURMAND'S
MOTION FOR SANCTIONS

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Burger v. Kuimelis*,
   325 F. Supp. 2d 1026 (N.D. Cal. 2004)........................................................15

*California Architectural Bldg. Prod., Inc. v. Franciscan Ceramics, Inc.*,
   818 F.2d 1466 (9th Cir. 1987) ..............................................................7, 18

*Cassity v. Pitts*,
   995 F.2d 1009 (10th Cir. 1993) ...............................................................20

*Catch Curve, Inc. v. Venali, Inc.*,
   519 F. Supp. 2d 1028 (C.D. Cal. 2007) ......................................................9

*In re Cellular 101, Inc.*,
   539 F.3d 1150 (9th Cir. 2008) .................................................................19

*Chevron Corp. v. Donziger*,
   833 F.3d 74 (2d Cir. 2016) ....................................................................15

*Christian v. Mattel, Inc.*,
   286 F.3d 1118 (9th Cir. 2002) ........................................................6, 8, 12

*Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.*,
   690 F.2d 1240 (9th Cir. 1982) ..............................................................9, 13

*Coates v. United Parcel Servs., Inc.*,
   933 F. Supp. 497 (D. Md. 1996)...............................................................23

*Cobb v. JPMorgan Chase Bank, N.A.*,
   2013 WL 6201414 (N.D. Cal. Nov. 27, 2013) ...........................................15

*Ernest W. Hahn, Inc. v. Codding*,
   615 F.2d 830 (9th Cir. 1980) ....................................................................9

*Flatley v. Mauro*,
   39 Cal. 4th 299 (2006) ........................................................................8, 10

*Gold Glove Prods. v. Handfield*,
   2014 WL 12560617 (C.D. Cal. June 4, 2014) .............................................7

iii

*Gomez v. Toledo*,
446 U.S. 635 (1980)........................................................................................19

*H.J. Inc. v. Nw Bell Tel. Co.*,
492 U.S. 229 (1989)........................................................................................12

*Handeen v. Lemaire*,
112 F.3d 1339 (8th Cir. 1997) .......................................................................15

*Hilton v. Hallmark Cards*,
599 F.3d 894 (9th Cir. 2010) ...........................................................................4

*Holmes v. Sec. Inv'r Prot. Corp.*,
503 U.S. 258 (1992)........................................................................................14

*Hudson v. Moore Bus. Forms, Inc.*,
836 F.2d 1156 (9th Cir. 1987) .........................................................................7

*Hydranautics v. FilmTec Corp.*,
70 F.3d 533 (9th Cir. 1995) ...........................................................................17

*Int'l Techs. Consultants v. Pilkington PLC*,
137 F.3d 1382 (9th Cir. 1998) .......................................................................16

*Just Film, Inc. v. Buono*,
847 F.3d 1108 (9th Cir. 2017) .......................................................................15

*LA MF Holdings SPE, LLC v. Shekhter*,
2017 WL 7411154 (C.D. Cal. June 8, 2017), *aff'd on other grounds* 738
F. App'x 563 (9th Cir. 2018) ...................................................................8, 10

*La Suisse, Societe D'Assurances Sur La Vie v. Kraus*,
2014 WL 3610890 (S.D.N.Y. Jul. 21, 2014)...............................................10

*Larez v. Holcomb*,
16 F.3d 1513 (9th Cir. 1994) ...........................................................................7

*Lauter v. Anoufrieva*,
642 F. Supp. 2d 1060 (C.D. Cal. 2009) .......................................................15

*Levitt v. Yelp! Inc.*,
765 F.3d 1123 (9th Cir. 2014) ...................................................................9, 10

iv

*In re Marsch*,
   36 F.3d 825 (9th Cir. 1994) ................................................................. 23

*Menjivar v. Trophy Props. IV DE, LLC*,
   2006 WL 2884396 (N.D. Cal. Oct. 10, 2006) ....................................... 15

*Moore v. Saniefar*,
   2016 WL 2764768 (E.D. Cal. May 12, 2016) ........................................ 14

*Nat. Immunogenics Corp. v. Newport Trial Grp.*,
   2016 WL 11520711 (C.D. Cal. Aug. 1, 2016) ............................... 8, 12, 13

*Newton v. Thomason*,
   22 F.3d 1455 (9th Cir. 1994) ............................................................... 22

*Noerr-Pennington. Columbia Pictures Indus., Inc. v. Prof'l Real Estate
   Investors, Inc.*,
   944 F.2d 1525 (9th Cir. 1991), *aff'd*, 508 U.S. 49 (1993)...................... 13, 23

*In re Outlaw Lab., LP Litig.*,
   2019 WL 1205004 (S.D. Cal. Mar. 14, 2019) ............................ 9, 11, 12, 13

*ProShipLine Inc. v. Aspen Infrastructures Ltd.*,
   609 F.3d 960 (9th Cir. 2010) ............................................................... 16

*Scottsdale Ins. Co. v. PTB Sales, Inc.*,
   2018 WL 6167912 (C.D. Cal. July 27, 2018)................................... 7, 19, 25

*Snow Ingredients, Inc. v. SnoWizard, Inc.*,
   833 F.3d 512 (5th Cir. 2016) ............................................................. 7, 11

*Sparling v. Hoffman Const. Co., Inc.*,
   864 F.2d 635 (9th Cir. 1988) ............................................................... 15

*Stagner v. Pitts*,
   7 F.3d 1045 (10th Cir. 1993) ............................................................... 20

*Sussman v. Bank of Israel*,
   56 F.3d 450 (2d Cir. 1995) .......................................................... 22, 23, 24

*Thomas v. Baca*,
   308 F. App'x 87 (9th Cir. 2009) ...................................................... 14, 15

v

*Turner v. Cook*,
  362 F.3d 1219 (9th Cir. 2004) ........................................................................ 12

*Turtle Island Restoration Network v. U.S. Dep't of State*,
  673 F.3d 914 (9th Cir. 2012) .......................................................................... 16

*United States v. Enmons*,
  410 U.S. 396 (1973) .................................................................................... 9, 10

*United States v. Koziol*,
  2019 WL 2109639 (C.D. Cal. May 13, 2019) ................................................ 8

*United States v. Tobin*,
  155 F.3d 636 (3d Cir. 1998) ........................................................................... 10

*USS-POSCO Industries v. Contra Costa County Bldg. & Const. Trades Council, AFL-CIO*,
  31 F.3d 800 (9th Cir. 1994) ........................................................................ 9, 13

*Vance v. Terrazas*,
  444 U.S. 252 (1980) ....................................................................................... 19

*Wendelberger v. Deutsche Lufthansa AG*,
  2018 WL 2387858 (N.D. Cal. May 25, 2018) ............................................... 21

*White v. General Motors Corp.*,
  908 F.2d 675 (10th Cir. 1990) .................................................................. 19, 20

*Xcentric Ventures, L.L.C. v. Borodkin*,
  934 F. Supp. 2d 1125 (D. Ariz. 2013) ........................................................... 21

*Matter of Yagman*,
  796 F.2d 1165 (9th Cir. 1986) ......................................................................... 7

**Statutes**

18 U.S.C. § 1961(5) ........................................................................................... 11

18 U.S.C. § 1962 ................................................................................................ 11

RICO .................................................................................................................. 14

**Other Authorities**

Fed. R. Civ. P., Rule 11 ..............................................................................*passim*

vi

## I.    __INTRODUCTION__

Plaintiffs filed this action to enforce their right to be free from sham CEQA lawsuits that Defendant Saeed Nourmand freely admitted he filed, and will continue to file, to extort money from Plaintiffs and other developers.  Defendants carry out this scheme by reflexively filing CEQA lawsuits against new developments regardless of whether the claims have merit.  They then demand that victims pay millions of dollars and accede to demands that are unrelated to, and far exceed, anything Defendants could obtain through a valid CEQA lawsuit.  Defendants have succeeded in these shakedowns because the delay resulting from even a baseless CEQA suit can be financially ruinous.

Defendants' bullying tactics continue in this lawsuit.  Since the initiation of this RICO action, Defendants have lodged an all-fronts attack to pressure Plaintiffs to drop their claims.  Desperate to avoid discovery, Defendants have used questionable and legally-unsupported tactics to squash this action.  In the few months this action has been pending, Defendants have fabricated authority they claimed would subject this case to an anti-SLAPP motion; lied about statements made during meet and confers; and asked two state courts to enjoin this federal action and award Defendants legal fees incurred in this lawsuit.  Continuing this approach, Defendants have filed this Sanctions Motion seeking over $180,000 from Plaintiffs and their counsel.  And in doing so, they have misconstrued and/or ignored binding authority that refutes their arguments.

The Court should reject Defendants' transparent attempt to prevent Plaintiffs from seeking legal recourse.  Far from being frivolous, Plaintiffs' theory that it is extortion to abuse CEQA in order to obtain concessions unrelated to the remedies available in those proceedings—here millions of dollars in "blood money"— is based on Ninth Circuit and California precedent.  Defendants simply ignore this authority or claim (without any of their own authority) that the releases executed in the CEQA actions immunize them from liability for claims that had not yet accrued.

Equally meritless is Defendants' position that Plaintiffs violated Rule 11 by purportedly "concealing" from the Court the settlements and releases reached in two of

1

the sham CEQA lawsuits.  Plaintiffs had no objection to Defendants filing the settlement agreements *in camera*.  Defendants' theory that Plaintiffs should have *affirmatively* disclosed the releases in the body of their pleading relies on the faulty assumption (advanced without any legal support) that these releases are relevant to Plaintiffs' RICO claims.  Defendants fail to cite a single case to support this assumption, much less to support sanctions.  Even if Defendants ultimately prevail, Plaintiffs' arguments for why the releases do not apply are based on existing law and are not frivolous.

Apparently recognizing the weakness of their position, Defendants fixate on two emails sent by a partner of one Plaintiff, which warned Defendants that their family will suffer reputational harm if they continue to engage in extortion.  Although Plaintiffs did not authorize or condone the emails, they do not show that the lawsuit was filed for an "improper purpose."  To the contrary, the emails make clear that the lawsuit was driven by Defendants' act of using CEQA to attempt to extort money from Plaintiffs.  Case law is clear that these types of communications are not sanctionable.  Likewise, Defendants' fabricated story about a "coordinated and concerted press strategy" by Plaintiffs' attorneys is not only demonstrably false, but relies on the incorrect assumption that parties may not speak to the press about their efforts to petition the courts for relief.

The Court should reject Defendants' attempt to avoid responsibility for their extortionate conduct and deny the Sanctions Motion.

## II.   **BACKGROUND**

### A.   **Defendants Bring CEQA Lawsuits Relating to Wilcox's and Tommie's Hotels to Delay the Projects and Leverage a Multi-Million Dollar Payout and Personal Concessions.**

Defendant Sunset Landmark Investment, LLC ("Sunset") sued the City of Los Angeles in March 2016 (the "Wilcox Litigation"), naming Plaintiff 1541 Wilcox Hotel LLC ("Wilcox") as real party in interest.  While the Wilcox Litigation was pending, Sunset sued the City again (the "Tommie Litigation"), relating to a development by 6516 Tommie Hotel LLC ("Tommie").  The petitions in both cases challenged the City's finding that the projects would not have significant environmental impacts.  Declaration

2

of Arthur Friedman ("Friedman Decl."), Ex. 1.  To that end, they sought exclusively injunctive relief (primarily against the City) and attorneys' fees.  *Id.* at pp. 55-57, 35-36.

Following the initiation of these lawsuits, Sunset engaged in settlement discussions with Plaintiff Relevant Group, LLC, the managing entity of Wilcox and Tommie.  During these negotiations, Sunset's representatives made it clear that they would not agree to any settlement that did not include (1) a multi-million dollar payment unrelated to any attorneys' fees incurred in the CEQA lawsuit; (2) changes to the hotel to appease Sunset's owner's aesthetic preferences; and (3) a covenant that Plaintiffs would not bring any challenges to any of Sunset's developments.  Heyman Decl., ¶ 4.  None of these demands were relief Defendants could have obtained if they succeeded in the CEQA action.  Faced with the prospect of costly delays and loss of financing, Wilcox and Tommie ultimately settled and paid Sunset $5.5 million, agreed to make the requested aesthetic changes to the project, and agreed to assist Sunset with its future development proposals.  *Id.* ¶ 5.  To cover their tracks and make their CEQA lawsuit appear legitimate, Defendants also included in these agreements minor environmental concessions.  Finally, the settlements contained releases by which both sides released claims relating to the Wilcox and Tommie Litigations, respectively.[1]

### B. Within Months of the Settlement, Defendants Bring Another CEQA Challenge Targeting Another Project Managed by Relevant, Demand a Check, and Threaten that this will be the "Drill" Going Forward.

Shortly after Sunset settled the Wilcox and Tommie lawsuits, Sunset objected to the proposal of yet another project managed by Relevant, this one owned by 6421 Selma Wilcox Hotel, LLC ("Selma"), which ultimately led to Plaintiffs filing another CEQA

---

[1] In their Motion, Defendants speculate that Wilcox settled because it "knew it was probably going to lose at trial."  Mot. at 7:8-9.  Defendants cite only a tentative ruling in which the court (1) denied the *City's* motion to augment the record and (2) denied *Sunset's* motion for sanctions against the City's counsel.  RJN Ex. 6 at p. 4.  With respect to Tommie, Defendants reference the outcome of a different CEQA petition brought against the City.  Mot. at 8:3-10.  Contrary to Defendants' representations, the trial court found only that the City had not adequately disclosed a threshold for construction noise volume, and remanded to the City to make that determination.  Notably, the Tommie Settlement contains no provisions regarding construction noise.

1   lawsuit in April 2019 (the "Selma Litigation").  Sunset argued in this new action that

2   Wilcox, Tommie, and Selma were all guilty of "piecemealing," in violation of CEQA.

3        When Relevant learned that Sunset was objecting to the Selma project, Relevant's

4   managing partner, Richard Heyman, asked Sunset's owner, Saeed Nourmand, why he

5   filed this new, baseless, challenge.  Heyman Decl., ¶ 7.  Nourmand's response was

6   direct and to the point: "You know the drill.  It's going to take a check to make this go

7   away."  *Id*.  Following that admission, Plaintiffs realized that these sham CEQA lawsuits

8   brought by Sunset to extort exorbitant sums of money were not isolated incidents.  To

9   the contrary, Plaintiffs could expect Defendants to continue filing sham environmental

10  lawsuits to extort monetary payments and non-environmental, personal concessions

11  from competing property owners.  Soon thereafter, Plaintiffs initiated this RICO action.

### C.   Defendants Pressure Plaintiffs to Drop their RICO Claims By Fabricating Legal Authority and Seeking Sanctions and Attorneys' Fees in Three Different Courts.

14       Since Plaintiffs' filing of this action, Defendants have lodged a full-force attack to

15  bully Plaintiffs into dropping their claims.

#### 1.   Defendants' Counsel Fabricates Legal Authority Regarding the Applicability of Anti-SLAPP Motions in Federal Court.

18       During a meet and confer, Defendants' attorneys first threatened to file an anti-

19  SLAPP motion to strike the RICO complaint, despite clear case law that the anti-SLAPP

20  statute does not apply to actions in federal court asserting only federal claims.  *Hilton v.*

21  *Hallmark Cards*, 599 F.3d 894, 901 (9th Cir. 2010) ("[T]he anti-SLAPP statute does not

22  apply to federal law causes of action.").  Defendants' counsel insisted that not only was

23  an anti-SLAPP motion appropriate, but that *this Court in particular* had previously

24  granted anti-SLAPP motions in that context.  Declaration of Joshua Rubin ("Rubin

25  Decl."), ¶ 3.  When Plaintiffs' attorneys asked for this authority, Defendants' counsel

26  responded that she did not have those cases handy because they were the "one thing

27  [she] had forgotten to print out."  *Id*.  Notwithstanding Plaintiffs' counsel's repeated

28  requests, Defendants' attorneys failed to provide Plaintiffs' attorneys with the decisions

by this Court and proceeded to file an anti-SLAPP. *Id.*, ¶ 5. Of course, Defendants' counsel did not provide the requested authority because none existed. The anti-SLAPP motion was the first attempt to manufacture leverage through the threat of recovering attorneys' fees.[2]

        2.    <u>Defendants Forego Refiling the Anti-SLAPP Motion and Instead File this Sanctions Motion, Again Seeking Attorneys' Fees, but this Time from Both Plaintiffs *and* Their Counsel.</u>

On September 6, 2019, during another meet and confer call, Defendants' counsel raised for the first time communications from an undisclosed "representative of Relevant Group" to an undisclosed family member of Saeed Nourmand. Rubin Decl., ¶ 6. Defendants' counsel, Ms. Hipps, said she could not provide further information regarding these communications other than that they were threatening in nature. *Id.* Plaintiffs' counsel asked to see the communications so they could follow up with their client, and stated that they were unaware of any communications between their client and the Nourmand family. *Id.* ¶ 7. Defendants' counsel said they hoped that was the case, and that they had no reason to believe otherwise. *Id.*; Declaration of Susan Leader ("Leader Decl."), ¶ 5 Defendants' counsel agreed to ask their clients if they could share the communications with Plaintiffs' counsel. Rubin Decl., ¶ 7.

Defendants' counsel also noted that one of the emails contained the signature block of Cheryl Bame, whom they understood to be involved with the press associated with the lawsuit. *Id.*, ¶ 8. Plaintiffs' counsel stated that Ms. Bame is a public relations consultant with whom Akin Gump contracts, but who did not perform media outreach for the lawsuit. Plaintiffs' counsel stated that they knew of two articles published concerning the lawsuit, and that Ms. Bame did not engage in any outreach with respect to either publication. *Id.*; Declaration of Cheryl Bame ("Bame Decl."), ¶¶ 3-5, Ex. 1.

---

[2] Although Sunset filed an anti-SLAPP motion in response to Plaintiffs' original complaint, it declined to do so in response to Plaintiffs' first amended complaint.

Three days later, Plaintiffs' counsel Joshua Rubin followed up with Defendants' counsel regarding the communications with a member of Nourmand's family.  Rubin Decl., Ex. 3.  Mr. Rubin stated that he had spoken with his client contact, Richard Heyman, who was unaware of these purported communications, and asked again that Defendants' counsel provide the emails to Plaintiffs' counsel.  *Id.*  Defendants' counsel responded to this email over a week later, on September 17, 2019, when Ms. Hipps sent an email stating that she had not responded earlier because of family health issues.  *Id.*  On a call that day, Ms. Hipps stated that she was not at liberty to disclose the emails.  *Id.*

On September 30, 2019, Defendants served on Plaintiffs this Motion for Sanctions, which seeks more than $180,000 from Plaintiffs and their attorneys.  For the first time, Plaintiffs' counsel learned that these allegedly threatening emails were in fact from Elias Shokrin, who is affiliated with Selma, not Relevant Group.  Heyman Decl., ¶ 3.  Plaintiffs' counsel has never met Mr. Shokrin or had any contact with him.  Rubin Decl., ¶ 11; Leader Decl., ¶ 7.

### 3.    Defendants Seek to Enjoin this Proceeding in Two State Courts.

Concurrent with this Sanctions Motion, Defendants also filed two "motions to enforce settlement" in the Wilcox and Tommie state court actions.  Rubin Decl., Exs. 5, 6.  Defendants not only ask those courts to enjoin this lawsuit, but they seek $50,000 in "sanctions" plus attorneys' fees incurred in litigating those motions *and* for this RICO action.  In total, in an effort to avoid this case proceeding to discovery, Defendants have filed three motions for sanctions in three different courts and seek well over $200,000.

## III.   **LEGAL STANDARD**

To justify the imposition of Rule 11 sanctions, Defendants must do far more than simply establish that they will prevail.  Rather, they must prove that Plaintiffs' claims are not "'warranted by existing law or a good faith argument for an extension, modification or reversal of existing law.'"  *Christian v. Mattel, Inc.*, 286 F.3d 1118 (9th Cir. 2002) (quoting *Golden Eagle Distrib. Corp. v. Burroughs Corp.*, 801 F.2d 1531, 1537 (9th Cir. 1986)).  "The key question in assessing frivolousness is whether a

complaint states an ***arguable claim***—not whether the pleader is correct in his perception of the law." *Hudson v. Moore Bus. Forms, Inc.*, 836 F.2d 1156, 1159 (9th Cir. 1987) (emphasis added); *see California Architectural Bldg. Prod., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1472 (9th Cir. 1987). A defendant seeking sanctions must prove not only that the "RICO claims ultimately fail," but that plaintiffs' claims are "so obviously foreclosed by precedent as to make them ***legally indefensible***." *Snow Ingredients, Inc. v. SnoWizard, Inc.*, 833 F.3d 512, 529 (5th Cir. 2016) (emphasis added).

District courts must "exercise extreme caution in sanctioning attorneys under Rule 11." *Larez v. Holcomb*, 16 F.3d 1513, 1522 (9th Cir. 1994). Sanctions should not be used to "chill an attorney's enthusiasm or creativity in pursuing factual or legal theories." *Matter of Yagman*, 796 F.2d 1165, 1182 (9th Cir. 1986); Fed. R. Civ. P. 11, Advisory Committee Notes, 1993 Amendment (stating that Rule 11 should not be used "to intimidate an adversary into withdrawing contentions that are fairly debatable"). Where disputes as to liability "may be resolved in the ordinary course of litigation," sanctions are inappropriate. *Scottsdale Ins. Co. v. PTB Sales, Inc.*, 2018 WL 6167912, at *2 (C.D. Cal. July 27, 2018); *Gold Glove Prods. v. Handfield*, 2014 WL 12560617, at *2 (C.D. Cal. June 4, 2014) ("Although Plaintiffs' arguments with respect to the issue of substantial similarity did not persuade the Court, they were not clearly frivolous.").

## IV.   PLAINTIFFS' RICO CLAIMS ARE WARRANTED BY EXISTING LAW OR A NONFRIVOLOUS ARGUMENT FOR THE EXTENSION OF LAW.

Plaintiffs' legal theory is straightforward: Defendants reflexively file environmental legal challenges targeting competing developers, without consideration of whether those environmental challenges have merit. Using the threat of costly delay and potential loss of financing as a proverbial "gun to the head," Defendants are able to extract draconian "settlements" from competitors unrelated to the relief available from the CEQA proceeding: namely multi-million dollar payments and changes to the developers' plan that amount to personal, aesthetic concessions to Defendants.

Notably, Defendants do not deny that this is how they operate.  In fact, Defendant Saeed Nourmand bragged about it to Plaintiffs when asked why he filed the most recent lawsuit:  "*You know the drill*.  It's going to take a check to make this go away."  Heyman Decl., ¶ 7.  Nourmand does not deny that he made this statement or that this is how his enterprise functions.  Rather, Defendants take the position that their shakedown is legally protected petitioning activity, and that they are immune from liability because of the releases they secured in connection with dropping the CEQA lawsuits.

Defendants' Sanctions Motion repeats the arguments asserted in their motion to dismiss.  Plaintiffs have already explained in their opposition to that motion why these arguments fail.  In their reply to the motion to dismiss, Defendants largely ignore Plaintiffs' authority.  As explained further below, if any positions are not "warranted by existing law or a good faith argument for an extension, modification or reversal of existing law," it is those advanced by Defendants.  *Christian*, 286 F.3d at 1127.

### A.  The FAC Does Not Violate Rule 11 Because Filing Sham Lawsuits for the Purpose of Leveraging Unrelated Concessions Constitutes Extortion under Federal and State Law.

Contrary to Defendants' assertions, "in the Ninth Circuit, threatening to file costly lawsuits will constitute extortion so long as the threatened lawsuit is a sham."  *Nat. Immunogenics Corp. v. Newport Trial Grp.*, 2016 WL 11520711, at *8 (C.D. Cal. Aug. 1, 2016) (citing *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 939–40 (9th Cir. 2006)).  Sham lawsuits can be extortion under the Hobbs Act.  *P6 LA MF Holdings SPE, LLC v. Shekhter*, 2017 WL 7411154, at *6 (C.D. Cal. June 8, 2017), *aff'd on other grounds* 738 F. App'x 563 (9th Cir. 2018); *United States v. Koziol*, 2019 WL 2109639, at *3 (C.D. Cal. May 13, 2019) (denying bond pending appeal because "the question of whether the Hobbs Act applies to threats of sham litigation is not 'fairly debatable' or 'fairly doubtful'").  The same is true under California law.  *Flatley v. Mauro*, 39 Cal. 4th 299, 331 (2006) (finding extortion as a matter of law where defendant threatened to initiate baseless legal proceedings against plaintiff).

The FAC sufficiently alleges that Defendants' filing of multiple lawsuits was sham. As more fully discussed in Plaintiffs' Opposition to Motion to Dismiss (Dkt. 26), there are two types of sham litigations: (1) a single lawsuit that a plaintiff must allege is objectively baseless *and* subjectively brought for an improper purpose; and (2) serial, reflexive litigation brought for an improper purpose that is sham even if some aspect of the claim has minimal merit. *USS-POSCO Industries v. Contra Costa County Bldg. & Const. Trades Council, AFL-CIO*, 31 F.3d 800, 810-11 (9th Cir. 1994); *Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc*., 690 F.2d 1240, 1254 (9th Cir. 1982) (allegations that "defendants protested rates automatically, without regard to merit or possible success . . . fall within the sham exception as a matter of law"); Dkt. 26 at 4-10.

Plaintiffs have sufficiently alleged serial, reflexive sham litigation. The FAC alleges that Defendants use the legal system reflexively and without regard for the merits of their claims "as a means of directly interfering with the business relations of a competitor. . . ." *Ernest W. Hahn, Inc*. *v. Codding*, 615 F.2d 830, 841 (9th Cir. 1980); *In re Outlaw Lab., LP Litig*., 2019 WL 1205004, at *9 (S.D. Cal. Mar. 14, 2019) (sham alleged where counterdefendant "reflexively and repeatedly mail[ed] demand letters without regard to the individual merit thereof"); *Catch Curve, Inc. v. Venali, Inc*., 519 F. Supp. 2d 1028, 1038 (C.D. Cal. 2007) (sham litigation alleged when plaintiff cited four specific cases as example of the pattern of reflexive litigation); *see* FAC ¶¶ 2, 24, 44-49.[3]

Equally unsupported is Defendants' argument that litigation cannot involve the "wrongful" use of fear. Relying on *United States v. Enmons*, 410 U.S. 396 (1973), and *Levitt v. Yelp! Inc*., 765 F.3d 1123 (9th Cir. 2014), Defendants maintain that the "claim of right" defense precludes this action. But the "claim of right" defense requires that a

---

[3] As an alternative, Plaintiffs have also alleged that the threatened and filed environmental challenges are objectively baseless and have alleged facts in support of that conclusion. FAC ¶¶ 39-40, 61, 65, 67 73-74. Whether a lawsuit is objectively baseless, such that the sham exception applies, "is a question of fact." *In re Outlaw*, 2019 WL 1205004, at *5 *(quoting Clipper Exxpress*, 690 F.2d at 1253-54).

9

defendant have a "lawful claim" for the property it seeks. *Enmons*, 410 U.S. at 400-01; *Levitt*, 765 F.3d at 1133-34. In stark contrast, a defendant that demands property and threatens *unrelated* meritless litigation if that demand is not met is not seeking property for which it has a lawful claim. *P6 LA MF Holdings*, 2017 WL 7411154, at *6 (rejecting argument that "causing economic fear through asserting a lawful right is not extortion"); *Flatley*, 39 Cal. 4th at 331 (threat to pursue claims "unrelated to any alleged injury suffered by" defendant was extortion); *United States v. Tobin*, 155 F.3d 636, 640 (3d Cir. 1998) (no "claim of right" defense where defendant attempted to extort opponent by "threaten[ing] unrelated lawsuits alleging sexual harassment"); *La Suisse, Societe D'Assurances Sur La Vie v. Kraus*, 2014 WL 3610890, at *9 (S.D.N.Y. Jul. 21, 2014) (threatened lawsuits constituted extortion when the suits had "no nexus" to defendant or "the personal payment demanded by him to make them go away").

Here, Defendants had no right to the large monetary payout and non-environmental demands they made in exchange for dropping their sham CEQA challenges, which would only entitle them to injunctive relief and attorneys' fees.[4]

**B.    The FAC Does Not Violate Rule 11 Because Plaintiffs Did Not Release Their Future RICO Claims as Part of the Settlement of the Underlying CEQA Lawsuits.**

Defendants' self-serving theory that settlement of sham environmental suits can release a future RICO claim triggered by the filing of yet another sham lawsuit is legally unsupported. Under Defendants' reasoning, they have devised a foolproof scheme. They file reflexive lawsuits with no regard to their merit, knowing that the delay alone will force their competitors to pay millions of dollars in "blood money" to "settle" their claims. Then, they use the settlements to facilitate their *further* extortion by claiming the releases foreclose any future RICO claim. This cannot be and is not the law.

---

[4] For the same reason, and contrary to Defendants' argument (Mot. at 12:2-4, 8-11), it cannot be sanctionable for Plaintiffs to refer to the settlements as "extortion."

1.   <u>Defendants Cite No Authority for their Position that Settlement of a Sham Lawsuit Can Release Future Claims Triggered by the Filing of a New Lawsuit and Alleging a Pattern of Sham Litigation.</u>

Not surprisingly, Defendants fail to cite a single case in their Motion to Dismiss or Motion for Sanctions for the proposition that a release can bar a claim of a pattern of sham lawsuits, just because some of the claims were settled.  To the contrary, as discussed below, courts have recognized that RICO claims can proceed in these circumstances.[5]

As alleged in the FAC, faced with the possibility of costly delay and potential loss of investors, Plaintiffs Wilcox and Tommie agreed to settlements whereby they paid Sunset millions of dollars in exchange for Sunset dropping its claims.  Heyman Decl., ¶ 5.  Like most settlement agreements, the agreements contained a release of claims.  The scope of the release was expressly limited to claims relating to, arising out of, or stemming from "the Wilcox action" and "the Tommie action," respectively.  While the Wilcox and Tommie Litigations were state court environmental petitions against the City of Los Angeles, Plaintiffs' federal RICO claim was triggered by Defendants filing of a new environmental litigation and is premised on Sunset's *pattern* of filing reflexive, meritless, extortionate CEQA lawsuits.  Each CEQA action constitutes a separate predicate act for the RICO action.  18 U.S.C. §§ 1961(5), 1962 (RICO requires a "pattern of activity").  The releases therefore on their face do not apply to this action.

Far from being "obviously foreclosed by precedent" (*Snow Ingredients*, 833 F.3d at 529), Plaintiffs' theory has been recognized by district courts this Circuit.  In *In re Outlaw*, counterclaimants alleged that Outlaw engaged in racketeering by sending sham demand letters to companies.  *In re Outlaw*, 2019 WL 1205004, at *1.  Notably, some of these companies entered into discussions with Outlaw and settled these claims.  *Id*. at *2.  Some of these companies—including those who had settled with Outlaw—brought RICO claims, alleging that Outlaw had "perfect[ed] a legal 'shakedown' of small-time

---

[5] Defendants' theory would also amount to an improper release of future claims, because the RICO claims were triggered by post-release conduct.  Dkt. 26 at 11-12.

PLAINTIFFS' OPPOSITION TO THE SUNSET LANDMARK INVESTMENT, LLC'S AND SAEED NOURMAND'S MOTION FOR SANCTIONS

1   San Diego convenience stores." *Id*. at *3.  The district court found that

2   counterclaimants stated a valid claim because these demand letters were a sham: "where

3   Counterclaimants have accused Outlaw of ***reflexively*** and ***repeatedly*** mailing demand

4   letters without regard to the individual merit thereof," those lawsuits were a sham and a

5   RICO claim could proceed.  *Id*. at *9 (emphasis added).  The fact that some of the

6   counterclaimants had settled the underlying sham disputes did not foreclose the claims.[6]

7        In *Natural Immunogenics*, dietary supplement companies brought RICO claims

8   against a law firm, alleging a pattern of sham suits filed to extort settlements.  2016 WL

9   11520711, at *1.  Some companies had entered into settlement agreements to resolve

10  these lawsuits.  *Id*. at *8, 9.  The court held that the sham lawsuits amounted to extortion

11  because they were brought "for the improper purpose to extract out-of-court

12  settlements," and therefore were predicate acts.  *Id*. at *5, 8 ("[T]hreatening to file costly

13  lawsuits will constitute extortion so long as the threatened lawsuit is a sham.").

14       That courts in this circuit have recognized RICO claims alleging a pattern of

15  sham suits, even when those suits were settled, is dispositive of this Sanctions Motion.

16  Plaintiffs' legal theory is "warranted by existing law." *Christian*, 286 F.3d at 1127.

17             2.   Plaintiffs' RICO Claims Accrued When Defendants Challenged the
                    Selma Project and Admitted that They had Brought the Lawsuit as
18                  Part of the Same Drill to Recover a "Check."

19       As Defendants' own authority states, a RICO claim requires "at least two acts of

20  racketeering activity" that are related and "*amount to or pose a threat of continued*

21  *criminal activity*." *H.J. Inc. v. Nw Bell Tel. Co.*, 492 U.S. 229, 238-39 (1989) (emphasis

22  added).  A RICO plaintiff "must charge a form of predicate misconduct that 'by its

23  nature projects into the future *with a threat of repetition*.'" *Turner v. Cook*, 362 F.3d

24  1219, 1229 (9th Cir. 2004) (quoting *Religious Tech. Ctr. v. Wollersheim*, 971 F.2d 364,

25  366 (9th Cir. 1992)) (emphasis added).  Thus, Plaintiffs' RICO claims as framed did not

26

27  _____
        [6] Plaintiffs cited *In re Outlaw* in their Opposition to the Motion to Dismiss.
28  Defendants have ignored it both in their Reply to the Motion to Dismiss and in their
    Sanctions Motion.

PLAINTIFFS' OPPOSITION TO THE SUNSET LANDMARK INVESTMENT, LLC'S AND SAEED NOURMAND'S
MOTION FOR SANCTIONS

accrue until Saeed Nourmand made it clear that the sham lawsuits would be repeated each time Plaintiffs submit a development proposal to the city. Certainly, if the claims had not accrued at the time of the settlement, they could not have been released.

### 3. Defendants Ignore Plaintiffs' Allegations about Different Victims of Attempted Extortion who Did Not Sign A Release.

In addition to the extortion of Plaintiffs, the FAC alleges a predicate act in the form of attempted extortion against the owners of the Schrader Hotel. FAC ¶¶ 64-68. This predicate act, which Plaintiffs may rely on in pleading their RICO claim, was not the subject of a release. *Natural Immunogenics*, 2016 WL 11520711, at *1, 9 (plaintiff could allege predicate acts of extortion based on extortion of "similar victims"). Defendants ignore these allegations, but they and Plaintiffs' allegations about the Selma Hotel sufficiently allege two predicate acts that are not foreclosed by the release.

### C. The FAC Does Not Violate Rule 11 Because Defendants' Conduct Falls Within the Sham Exception to *Noerr-Pennington* .

The *Noerr-Pennington* doctrine does not immunize Defendants from liability, because *Noerr-Pennington* does not protect "sham" litigation. Dkt. 26 at 3-10; *Clipper Exxpress*, 690 F.2d at 1255; *In re Outlaw*, 2019 WL 1205004, at *9 (sham alleged where counterdefendant "reflexively and repeatedly mail[ed] demand letters without regard to the individual merit thereof"). The question is whether Defendants' actions as alleged were made "not out of a genuine interest in redressing grievances, but as part of a pattern . . . undertaken essentially for purposes of harassment[.]" *USS-POSCO*, 31 F.3d at 811. That is a question of fact. *Clipper Exxpress*, 690 F.2d at 1253.

As discussed above, Plaintiffs have sufficiently alleged that Defendants' lawsuits were sham under either the serial sham standard or the objectively baseless standard. Section IV.A. These actions were asserted not to obtain genuine results from the courts, but to force Plaintiffs to turn over "a check to make this go away." FAC ¶ 78. Thus, Defendants' conduct is not protected by *Noerr-Pennington*.

### D.    The FAC Does Not Violate Rule 11 Because Plaintiff Has Standing to Pursue the RICO Claim.

Plaintiffs have alleged that each Plaintiff suffered a direct injury, satisfying RICO standing.

Defendants' argument that only Wilcox suffered an injury ignores the fact that the settlement agreements contemplate that Wilcox and Tommie will share the settlement cost.  Dkt. 23-3 (Def.'s RJN), Ex. 15.  Equally unavailing, Defendants claim that the settlement was not caused directly by their extortionate demands, but by "Wilcox's and Tommie's desire to settle."  Mot. at 19.  Not only is this a factual dispute, but the argument could be made in any extortion case, as extortion necessarily involves the use of fear to obtain property from the victim with "consent."

*Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 286 (1992), provides no support for Defendants' argument.  There, the Court considered the RICO standing of the Securities Investor Protection Corporation ("SIPC"), which reimburses customers of broker-dealers that suffer financial losses and cannot reimburse customers.  *Id.* at 262 & n.1-2.  The SIPC sought to bring a RICO action predicated on securities fraud, arguing that it could assert subrogated claims of customers.  *Id.* at 270-71.  The Court rejected that argument, because the customers' losses were not directly caused by the defendants' fraud, but rather by the broker-dealers' inability to repay the customers' funds.  *Id.*  Here, Wilcox and Tommie did not lose money because an intervening party's conduct caused the loss.  Their losses occurred when they paid "blood money" demanded by Defendants to stop the extortion.  Thus, their injuries were proximately caused by Defendants' conduct.

As for Selma, it and the other Plaintiffs have been injured by the extortionate filing of the current CEQA action.  Citing *Thomas v. Baca*, 308 F. App'x 87, 88 (9th Cir. 2009), Defendants argue that attorneys' fees can never be damages in RICO actions. *Thomas* held only that the Ninth Circuit had not yet addressed the question, and the court was simply declining to recognize it in that case.  *See Moore v. Saniefar*, 2016 WL

2764768, at *10 n.5 (E.D. Cal. May 12, 2016) (describing *Thomas* as "declin[ing] to reach the question" of cognizability of attorneys' fees).  Also, *Thomas* is not clear if the fees the plaintiff claimed were incurred in response to the predicate acts that gave rise to the RICO action – which are recoverable under RICO – or if the fees claimed as damages were for litigating the RICO suit itself – which are not recoverable.  *Id.*; *Menjivar v. Trophy Props. IV DE, LLC*, 2006 WL 2884396, at *11-12 (N.D. Cal. Oct. 10, 2006).  Numerous district court decisions in this circuit have recognized attorneys' fees as injuries.  *Cobb v. JPMorgan Chase Bank, N.A.*, 2013 WL 6201414, at *12 (N.D. Cal. Nov. 27, 2013); *Lauter v. Anoufrieva*, 642 F. Supp. 2d 1060, 1085 n.33 (C.D. Cal. 2009); *Burger v. Kuimelis*, 325 F. Supp. 2d 1026, 1035-36 (N.D. Cal. 2004).[7]

Defendants argue that Relevant Group cannot have RICO standing based on their status as a member of other Plaintiffs.  This argument rests on *Sparling v. Hoffman Const. Co., Inc.*, 864 F.2d 635 (9th Cir. 1988), which held that shareholders cannot bring RICO actions for harm to the corporation without "either an injury distinct from that to other shareholders or a special duty between [the defendant] and the [plaintiff] if they are to have standing to assert RICO claims based on injury to the corporation."  *Id.* at 640.

Here, Relevant Group, LLC can show a distinct injury.  As the developer and majority owner of each project, it is the common link between Wilcox, Tommie, and Selma.  Heyman Decl., ¶ 2.  It also is the direct target of Defendants' threats, which extend to its future developments.  *Id.*, ¶ 7.  Moreover, each sham CEQA suit reduced profits that Relevant Group would receive if the hotel was operational.  *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1118-19 (9th Cir. 2017) (plaintiff in class action had standing under RICO despite not having money taken from her account, because she suffered injury to her "business or property," as she "spent time away from her  usual work and

---

[7] Other circuits are in accord.  *Chevron Corp. v. Donziger*, 833 F.3d 74 (2d Cir. 2016); *Handeen v. Lemaire*, 112 F.3d 1339, 1354 (8th Cir. 1997).

paid an assistant to help her research and compile records responding to a fraudulent allegation").

### E.  The FAC Does Not Violate Rule 11 Because Plaintiffs' RICO Claims are Not Barred by *Res Judicata*

Incredibly, Defendants argue without any authority or support that this action is barred by res judicata and thus sanctionable under Rule 11.  Res judicata "applies only where there is '(1) an identity of claims, (2) a final judgment on the merits, and (3) privity between parties.'"  *Turtle Island Restoration Network v. U.S. Dep't of State*, 673 F.3d 914, 917 (9th Cir. 2012) (quoting *Tahoe–Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 322 F.3d 1064, 1077 (9th Cir. 2003)).  Whether "an identity of claims" exists turns on four factors, the fourth being most important:

> "(1) whether rights or interests established in the prior judgment would be destroyed or impaired by prosecution of the second action; (2) whether substantially the same evidence is presented in the two actions; (3) whether the two suits involve infringement of the same right; and (4) whether the two suits arise out of the same transactional nucleus of facts."

*Id.* (quoting *Costantini v. Trans World Airlines*, 681 F.2d 1199, 1201-02 (9th Cir. 1982)).  "Whether two suits arise out of the same transactional nucleus depends upon whether they are related to the same set of facts and . . . could conveniently be tried together." *ProShipLine Inc. v. Aspen Infrastructures Ltd.*, 609 F.3d 960, 968 (9th Cir. 2010).

The Wilcox and Tommie Litigations do not arise out of the same transactional nucleus as this action and could not have been conveniently tried together.  Those cases concerned the City's approval of hotel developments, and were primarily litigated between Sunset and the City.  This case concerns Defendants' pattern of sham CEQA lawsuits to extort money, including a lawsuit after the Wilcox and Tommie cases were settled.  In an analogous case, the Ninth Circuit held that "a claim does not arise from the same transactional nucleus of facts where the claim alleges new conduct 'subsequent to the last date alleged in the prior adjudication.'"  *Int'l Techs. Consultants v. Pilkington PLC*, 137 F.3d 1382, 1388 (9th Cir. 1998) (res judicata does not apply when second case "could not have been brought, because the facts had not yet transpired").

Nor could the cases have been tried together. Because this action is directed, in part, at Defendants' conduct after the prior actions were settled, the RICO claim could not have been asserted during those cases. *Hydranautics v. FilmTec Corp.*, 70 F.3d 533, 536-37 (9th Cir. 1995) (plaintiff could not have asserted antitrust counterclaim during earlier patent infringement case, because the earlier lawsuit was "the wrong which furnishes the basis for antitrust damages").[8]

## V.   PLAINTIFFS DID NOT MISREPRESENT OR CONCEAL ANY MATERIAL FACTS FROM THEIR COMPLAINT.

Throughout their Motion, Defendants make the repeated attack that the FAC fails to reference or sufficiently describe two settlement agreements executed in the Wilcox and Tommie lawsuits. None of Defendants' arguments holds water.

### A.   Plaintiffs Did Not Conceal the Existence of the Settlement Agreements.

Even if Plaintiffs were obligated to disclose that the Wilcox and Tommie suits ended with settlements (which they were not), the FAC does so. The FAC alleges that Wilcox ultimately "agreed to pay Sunset $5.5 million" "to get [Sunset] to drop its claims," and that "[a]s part of ***this agreement***," Plaintiffs "agreed to make the requested design changes . . . and enter[] into a covenant running in favor of Nourmand Enterprise." FAC ¶ 55 (emphasis added). The FAC alleges that the Tommie lawsuit was dismissed pursuant to the same agreement. *Id*. ¶ 62. Although the FAC did not use the term "settlement," that is the only reasonable conclusion that can be drawn from allegations of "agreements" involving payments from one party to another in exchange for dismissing a lawsuit. Settlement, Black's Law Dictionary ("An agreement ending a dispute or lawsuit."). Moreover, Plaintiffs did not object to Defendants filing copies of the settlement agreements under seal. Rubin Decl., Ex. 4.[9]

---

[8] *Hydranautics* analogizes the situation to "a civil claim for malicious prosecution" which "cannot be asserted as a counterclaim to the original suit which furnishes its predicate." 70 F.3d at 536-37.

[9] Defendants' argument that Plaintiffs did not disclose the existence of the settlement agreements is not shared by their co-defendants. Following the filing of this

17

## B. Plaintiffs Did Not Misrepresent Any Terms of the Settlements.

Defendants first accuse Plaintiffs of misrepresenting that Plaintiffs Relevant, Tommie, and Selma made payments to Defendants.  Mot. at 12:2-6.  Yet the FAC does not allege that these Plaintiffs made any payments.  To the contrary, and as acknowledged by Defendants in their Motion, the FAC alleges that the only money paid to any Defendant in this case was by Wilcox.  *Id.* at 12:6-7; FAC ¶ 55.  In other words, Defendants argue that the FAC misrepresents that non-Wilcox Plaintiffs made payments, but then later acknowledge in the same Motion that the FAC alleges that only Wilcox made a payment.  Defendants' argument is thus self-defeating and facially frivolous.

Defendants also take issue with the allegation in the FAC that "Nourmand Enterprise did not demand any action to be taken with respect to the 'environmental issues' at the heart of the litigation."  Mot. at 14:4-9.  That there were some environmental measures contained in the settlement agreements—a point Plaintiffs address in the FAC—does not refute the fact that Defendants' focus in the settlement was on monetary payouts and design changes that were unrelated to the CEQA lawsuits.  Heyman Decl., ¶ 4.  Defendants cannot demonstrate that this statement is "so baseless that sanctions ought to be imposed."  *California Architectural Bldg. Prods.*, 818 F.2d at 1472.

## C. Plaintiffs Were Not Obligated to Specifically Plead the Existence or Content of Releases that are Not Applicable to Their Claims.

The Motion asserts that "at no point did [Plaintiffs] disclose or imply the full releases contained" in the settlement agreements.  Mot. at 12:15-17.  Defendants' argument that disclosure was required blatantly misconstrues relevant authority.

---

action, counsel for Defendant Nourmand & Associates stated that the complaint "referenced" a "Settlement Agreement" and asked to see it.  Rubin Decl., ¶¶ 2, 4 Ex. 1.

PLAINTIFFS' OPPOSITION TO THE SUNSET LANDMARK INVESTMENT, LLC'S AND SAEED NOURMAND'S MOTION FOR SANCTIONS

1.     <u>The Releases Executed in the CEQA Lawsuits Did Not Release
Plaintiffs' Future RICO Claim Based on a Pattern of Sham Lawsuits.</u>

As a threshold matter, Plaintiffs were not obligated to disclose the releases in the

settlement agreements, because those releases are not relevant to Plaintiffs' RICO

claims.  *See supra* Section IV.B.

2.     <u>Even if Defendants were Correct that the Releases Apply, Plaintiffs
Do Not Need to Plead the Existence of Releases.</u>

Even if Defendants' argument that the releases bar Plaintiffs' RICO claims had

merit, that would not justify the heavy imposition of Rule 11 sanctions.  Rule 11 does

not obligate plaintiffs to disclose facts in their complaint simply because *defendants*

*believe* those facts are relevant to plaintiffs' claims.

The argument that a plaintiff's claim has been released is an affirmative defense.

*In re Cellular 101, Inc.*, 539 F.3d 1150, 1155 (9th Cir. 2008).  The Supreme Court has

recognized that plaintiffs are not required to "anticipate" affirmative defenses or plead

around them.  *Gomez v. Toledo*, 446 U.S. 635, 640 (1980); *Vance v. Terrazas*, 444 U.S.

252, 269 n.11 (1980).  Whether a claim is released is a legal question that should be

resolved through regular motion practice, not a sanctions motions.  *Scottsdale Ins. Co.*,

2018 WL 6167912, at *2 (denying Rule 11 motion where disputed issues "may be

resolved in the ordinary course of litigation").

Defendants cite two Tenth Circuit decisions for the proposition that "Courts have

sanctioned plaintiffs who failed to notify the court of a prior release contained in a

settlement."  Mot. at 12:23-28.  Neither case helps Defendants.  In *White v. General

Motors Corp.*, 908 F.2d 675 (10th Cir. 1990), plaintiffs signed a settlement and release

of all employment claims against GM as part of a severance package, but then sued for

breach of contract and wrongful termination without mentioning the releases.  *Id*. at

679.  In affirming sanctions, the Tenth Circuit recognized not only that a release is an

affirmative defense, but that "[a]n attorney ***need not forbear to file her action if she has***

***a colorable argument as to why an otherwise applicable affirmative defense is***

1  *inapplicable in a given situation*."  *Id.* at 682 (emphasis added).  Thus, *White* held that a

2  release need not be disclosed if there is a non-frivolous argument that it does not bar the

3  subject lawsuit.  Because Plaintiffs' argument that the releases do not apply is not

4  frivolous (*supra* Section IV.B), Plaintiffs were not required to disclose them.

5          Likewise inapposite is *Stagner v. Pitts*, 7 F.3d 1045 (Table) (10th Cir. 1993).

6  There, after settling state court actions, beneficiaries of a trust commenced *three*

7  *successive lawsuits* in state and federal court, which "attack[ed] the administration of

8  the trust and s[ought] various trust properties."  *Cassity v. Pitts*, 995 F.2d 1009, 1011

9  (10th Cir. 1993).  The court noted Beneficiaries' "continuing and blatant attempt to

10 collaterally attack and avoid the [state court's] rulings on the validity and administration

11 of the trust."  *Stagner*, 7 F.3d at *6.  That is a far cry from this case, where Plaintiffs

12 *disclosed* both the Wilcox and Tommie lawsuits, which did not involve the subject of

13 this action.

14              3.    <u>If Defendants' Theory Were Correct, Their Own CEQA Petition in
                      the Selma Case Would Be Sanctionable.</u>

15

16          Perhaps the clearest indication Plaintiffs were not required to disclose the releases

17 in their complaint is that, if Defendants' argument were accepted, Defendants

18 themselves would have committed sanctionable conduct when they filed their petition in

19 the Selma Litigation.  Defendants acknowledge that the Selma Litigation alleges that

20 Relevant engaged in improper "piecemealing" by "creat[ing] shell corporations to

21 submit the Selma/Thompson/Tommie hotel projects to the City in piecemeal."  Mot. at

22 9:5-9.  In fact, only last week, Sunset's attorney in the CEQA action sent a letter to the

23 City demanding that the record in that case include documents relating to Wilcox and

24 Tommie.  Friedman Decl., Ex. 2.  The Selma Litigation thus relies on the Wilcox and

25 Tommie developments that were settled and released.  Yet when Sunset filed its CEQA

26 petition, *it failed to disclose the existence of the very same releases it criticizes Plaintiffs*

27 *for omitting*.  Defendants' RJN, Ex. 11.  This blatant hypocrisy exposes this sanctions

28 motion for what it is: an effort to bully Plaintiffs and their attorneys out of court.

### D.   Plaintiffs Were Not Obligated to Plead Facts Helpful to Defendants.

The Motion also argues that it is sanctionable conduct for Plaintiffs to "conceal[] the fact that other Hollywood neighbors also filed CEQA cases" against Plaintiffs.  Mot. at 14:24-26.  This argument is borderline frivolous.  Even if those other lawsuits are relevant to the ultimate determination of whether Sunset's lawsuits were shams, Plaintiffs are not required to allege every fact relevant to their claim.  A pleading is not a discovery disclosure.  *See* Fed. R. Civ. P. 11, Advisory Committee Notes, 1993 Amendment (Rule 11 motions "should not be employed as a discovery device . . .").[10]

## VI.   PLAINTIFFS AND THEIR ATTORNEYS DID NOT BRING THIS LAWSUIT FOR AN IMPROPER PURPOSE.

### A.   Because Plaintiffs' Claims are Not Frivolous, Their Subjective Motivations are Irrelevant.

In the Ninth Circuit, "improper purpose" is an objective test, and the "'subjective evidence of a signor's purpose is to be disregarded.'"  *Xcentric Ventures, L.L.C. v. Borodkin*, 934 F. Supp. 2d 1125, 1142 (D. Ariz. 2013) (quoting *Townsend v. Holman Consulting Corp.*, 929 F.2d 1358, 1362 (9th Cir. 1986)).   In other words, "a court cannot find that a non-frivolous complaint was filed for an improper purpose."  *Wendelberger v. Deutsche Lufthansa AG*, 2018 WL 2387858, at \*5 (N.D. Cal. May 25, 2018).  Because the FAC is supported by facts and legal precedent, Defendants cannot establish that it was objectively brought for an improper purpose.  *Supra* Section IV.

### B.   Plaintiffs' Decision to File Their RICO Claim in Federal Court is Not Evidence of an Improper Purpose.

Even if it were proper for the Court to consider Plaintiffs' and their attorneys' motivations in bringing this action, there is no evidence of an improper purpose.  First, Defendants' argument that improper purpose can be gleaned from "forum shopp[ing]

---

[10] Moreover, as confirmed recently by a court in this district, the fact that a CEQA petition obtained some success does not establish that the lawsuit was not objectively baseless, which is a factual question.  Dkt. 26 at 9 (discussing *Icon* case).  Defendants' arguments that the results of those other CEQA lawsuits "prove[s] that Sunset was not pursuing objectively baseless environmental litigation" is a false statement of the law.

PLAINTIFFS' OPPOSITION TO THE SUNSET LANDMARK INVESTMENT, LLC'S AND SAEED NOURMAND'S MOTION FOR SANCTIONS

their way into federal court" is meritless.  Mot. at 22:22-24.  Although a RICO claim can be asserted in state court, Plaintiffs' counsel elected to file this RICO action in federal court because it is a federal claim.  Leader Decl., ¶ 10.  The RICO action is not a compulsory counterclaim to the CEQA lawsuits.  *Supra* section IV.E.  "Attorneys are not under an affirmative obligation to file an action in the most convenient forum; their only obligation is to file in a proper forum."  *Newton v. Thomason*, 22 F.3d 1455, 1463-64 (9th Cir. 1994); *Sussman v. Bank of Israel*, 56 F.3d 450, 457 (2d Cir. 1995) ("[W]e are skeptical that the commencement of a suit in an inconvenient forum may be the basis of Rule 11 sanctions where venue was not improper.").[11]

### C.  The Emails from Elias Shokrian do Not Show an Improper Purpose.

Defendants rely heavily on two emails from Elias Shokrian to Myra Nourmand.  Mr. Shokrian is a partner of only one of the Plaintiffs (Selma).  Heyman Decl., ¶ 3.  Mr. Shokrian played no role in the decision to sue Defendants, nor has he been involved in the strategic decisions made in this lawsuit.  Leader Decl., ¶ 7.  Plaintiffs' counsel Akin Gump has never had any interaction with Mr. Shokrin.  *Id.*; Rubin Decl., ¶ 11.

Even if the emails could be imputed to Plaintiffs or their counsel, nothing in these emails shows an improper purpose.  In their Motion, Defendants assert that Mr. Shokrian "admitted" in these emails that Plaintiffs "only brought this RICO lawsuit to leverage a dismissal of the Selma Litigation."  Mot. at 23:2-4.  This is a blatant mischaracterization of the email.  Notably, although the email is only one paragraph long, Defendants use ellipses to conceal the following statements by Mr. Shokrian:

- "I guess you didn't have enough money already so you guys have to resort to extortion."

---

[11] Defendants' suggestion that Plaintiffs filed this action to "freeze or delay other court actions" is puzzling, as Plaintiffs have not filed any request that any other action be stayed.  In fact, it was *Defendants* that recently filed motions in state court asking the state court to enjoin *this* lawsuit.  Rubin Decl., Exs. 5, 6.

- ▪ ". . . I guess just like all other extortionists you already have so much money and power that you don't care."

Declaration of M. Nourmand, Ex. A.  ***Nowhere*** in this email does Mr. Shokrian suggest that he did not believe the RICO lawsuit had merit.  *In re Marsch*, 36 F.3d 825, 829 (9th Cir. 1994) (it is "counterproductive to penalize the assertion of non-frivolous substantive claims, even when the motives for those claims are not entirely pure") (quoting *Townsend*, 929 F.2d at 1358).  If anything, the email shows that the lawsuit was motivated by Defendants' extortion.  Likewise, given the fact that the Selma Litigation is an extortionate sham lawsuit, it is sensible that Mr. Shokrian wants that case dropped. Defendants seek to sanction Plaintiffs and their attorneys for an interested party sending an email saying, in so many words, "stop extorting me."  *See Coates v. United Parcel Servs., Inc.*, 933 F. Supp. 497, 501 (D. Md. 1996) (sanctions inappropriate where attorney seeks to "vindicate his client's rights in court").

In *Sussman*, the Second Circuit recognized the chilling effect of awarding sanctions in this context.  In that case, plaintiffs sent letters to defendant Bank of Israel warning that "[i]f this controversy erupts into public view with the filing of our lawsuit . . . it will . . . seriously damage foreign investment in Israel in the future."  *Sussman*, 56 F.3d at 453.  The Second Circuit reversed a sanctions award, holding that that "[m]ere warnings by a party of its intention to assert nonfrivolous claims, ***with predictions of those claims' likely public reception***, are not improper."  *Id*. at 459 (emphasis added). Because "letters airing grievances and threatening litigation if they are not resolved are commonplace," the court refused to recognize an improper purpose based on  "evidence that the plaintiff has given the defendant a warning that the complaint will be filed unless an allegedly tortious lawsuit is withdrawn."  *Id*.[12]

---

[12] Moreover, to the extent that these emails are settlement communications, they are protected by *Noerr-Pennington. Columbia Pictures Indus., Inc. v. Prof'l Real Estate Investors, Inc.*, 944 F.2d 1525, 1528 (9th Cir. 1991), *aff'd*, 508 U.S. 49 (1993) ("A decision to accept or reject an offer of settlement is conduct incidental to the prosecution of the suit[.]").

PLAINTIFFS' OPPOSITION TO THE SUNSET LANDMARK INVESTMENT, LLC'S AND SAEED NOURMAND'S
MOTION FOR SANCTIONS

**D.    The Two Press Articles Reporting the RICO Lawsuit are Not Evidence of an Improper Purpose.**

Defendants finally argue that an improper purpose should be gleaned from the fact of a purported "coordinated and concerted press strategy" led by Cheryl Bame, Akin Gump, and Sheppard Mullin.[13]  Defendants cite to a grand total of two articles (one from Law360.com and the other from The Real Deal) that reported on the filing of the original complaint, as well as a blog entry from a website "ceqadevelopments.com." Akin Gump did not contact any of these publications about the RICO case.  Leader Decl., ¶ 8; Rubin Decl., ¶ 12.  Nor did Cheryl Bame.  Bame Decl., ¶¶ 3-5.  Nor did Sheppard Mullin.  Friedman Decl., ¶ 4.  Equally false is Defendants' counsel's claim that Akin Gump issued a "press release" regarding the lawsuit.  Defendants cite a "media mentions" page on Akin Gump's website that simply references and summarizes the Law360 and Real Deal articles.  Leader Decl., ¶ 9.  This "media mention" was not provided to media outlets and is not a "press release" under any definition.  *See* PRESS RELEASE, Merriam Webster ("An official statement that *gives information to* newspapers, magazines, television news programs, and radio stations."), https://www.merriamwebster.com/dictionary/press%20release (emphasis added).

Moreover, even if Plaintiffs or their attorneys *had* provided information or comment to the press, Defendants do not explain why this is sanctionable.  *See* *Sussman*, 56 F.3d at 460 ( "[A] court's steps to deter attorneys from, or to punish them for, speaking to the press have serious First Amendment implications").[14]

---

[13] Defendants' counsel's declaration supporting the allegation of a "coordinated and concerted press strategy" is riddled with misrepresentations.  To take just one example, Defendants counsel asserts that Plaintiff's counsel Susan Leader stated that Cheryl Bame "works for Akin Gump."  Hipps Decl., ¶ 6(a).   What Ms. Leader actually said is that Akin Gump contracts with Ms. Bame's company to consult on certain matters but that she did not engage in any outreach relating to the subject lawsuit. Leader Decl., ¶ 6; Rubin Decl., ¶ 12; Bame Decl., ¶¶ 3-5 and Ex. 2.

[14] In fact, if Law360 publishing an article about a lawsuit were sufficient for sanctions to be imposed, then Defendants themselves should be sanctioned, as this Motion was also reported by that same publication.  See Rubin Decl., Ex. 7.

24

## VII. THERE IS NO BASIS TO SANCTION PLAINTIFFS FOR FILING THIS COMPLAINT PUBLICLY

Although they do not discuss the issue, Defendants make a passing reference to Plaintiffs violating the confidentiality provision of the settlement agreements. Mot. at 22:24-27. Yet nothing in Rule 11 authorizes a court to award sanctions on the basis of an alleged breach of a confidentiality agreement. *See Scottsdale Ins. Co.*, 2018 WL 6167912, at *2 (declining to do so).

Defendants' confidentiality concerns are also inconsistent with Defendants' argument that Plaintiffs should have disclosed *additional* terms of the settlement agreement. Mot. at 13:1-2 (arguing that it is "patently improper for Plaintiffs to conceal" additional terms from the court). Defendants have themselves disclosed and even quoted provisions of the settlement agreement in their motion to dismiss. *See* Mot. to Dismiss, Dkt. 23-1 at 11:1-5 (quoting portions of the settlement agreement's release provision). Defendants' confidentiality concerns are thus not made in good faith.

## VIII. CONCLUSION

Plaintiffs respectfully request the Court deny Defendants' Sanctions Motion.


Dated: November 4, 2019

**AKIN GUMP STRAUSS HAUER & FELD LLP**
SUSAN K. LEADER
JOSHUA A. RUBIN


By_____/s/ Susan K. Leader_____
Susan K. Leader
Attorneys for Plaintiffs RELEVANT GROUP, LLC, 1541 WILCOX HOTEL LLC, 6516 TOMMIE HOTEL LLC, and 6421 SELMA WILCOX HOTEL LLC