**AKIN GUMP STRAUSS HAUER & FELD LLP**
SUSAN K. LEADER (SBN 216743)
ALI R. RABBANI (SBN 253730)
JOSHUA A. RUBIN (SBN 308421)
BRETT M. MANISCO (SBN 318351)
SLEADER@AKINGUMP.COM
arabbani@akingump.com
rubinj@akingump.com
bmanisco@akingump.com
1999 Avenue of the Stars, Suite 600
Los Angeles, CA 90067-6022
Telephone:   310.229.1000
Facsimile:   310.229.1001

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RELEVANT GROUP, LLC, a Delaware limited liability company; 1541 WILCOX HOTEL LLC, a Delaware limited liability company; 6516 TOMMIE HOTEL LLC, a Delaware limited liability company; and 6421 SELMA WILCOX HOTEL LLC, a California limited liability company,<br><br>                    Plaintiffs,<br><br>          v.<br><br>STEPHAN "SAEED" NOURMAND, an individual; THE SUNSET LANDMARK INVESTMENT LLC, a California limited liability company; NOURMAND & ASSOCIATES, a California corporation; and DOES 1-10,<br><br>                    Defendants. | Case No.:  2:19-cv-05019-ODW (KSx)<br><br>**THIRD AMENDED COMPLAINT FOR:**<br><br>1. **VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(c)**<br>2. **VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(d), BY CONSPIRING TO VIOLATE 18 U.S.C. § 1962(c)**<br>3. **VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(d), BY CONSPIRING TO VIOLATE 18 U.S.C. § 1962(b)**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Relevant Group, LLC; 1541 Wilcox Hotel LLC; 6516 Tommie Hotel LLC; and 6421 Selma Wilcox Hotel LLC (collectively "Plaintiffs") allege as follows:

## SUMMARY OF THE ACTION

1.     This case concerns a criminal enterprise orchestrated by a Los Angeles property developer, his family business run by his son, and his lawyer, in order to punish competitors who refuse to give in to the enterprise's demands for "blood money" and other concessions.  Under the guise of voicing environmental concerns, the enterprise executes a playbook in which it files reflexive, sham litigation for the sole purpose of burdening and delaying developments until the competing developers have no choice but to cave to the enterprise's extortionate demands.  This extortion harms not only the competing developers who are victimized, but also the community at large, which sees new developments in blighted areas delayed for years as the enterprise holds them up for ransom.

2.     The enterprise ("Nourmand Enterprise") is led by patriarch Saeed Nourmand and his closely held company The Sunset Landmark Investment LLC ("Sunset Landmark"), which works in concert with the Nourmand family business, Nourmand & Associates, and Nourmand's attorney, Robert Silverstein, a CEQA lawyer who develops and initiates the sham environmental litigation.  Nourmand Enterprise's goal is clear: to increase Nourmand's own power and the economic reach of his businesses by any means necessary—legal or otherwise.

3.     Dead-set on expanding its reach and influence, Nourmand Enterprise has crossed the line from tough business practices to criminal conduct.  Nourmand Enterprise has decided that any developer wishing to do business in Hollywood must first seek its permission before it can go forward (referred to as "kissing the ring").  Nourmand Enterprise aspires to control not only who is allowed to develop in its domain, but also the aesthetic of those projects that go forward.  When developers stand up to Nourmand Enterprise and refuse to comply with its demands, Nourmand Enterprise switches tactics from pressure to outright extortion.

4.      Specifically, Nourmand Enterprise targets competing developers and initiates (or threatens to initiate) reflexive sham environmental lawsuits for the sole purpose of delaying the development of competing properties.  Instilling fear of severe economic loss, Nourmand Enterprise extracts ransom money and aesthetic concessions from its victims in exchange for their agreement to drop these sham lawsuits.  As Nourmand Enterprise openly admits, its objective in opposing the competing developments is largely unrelated to concern over the purported impact any of the projects could have on the environment.  Instead, Nourmand Enterprise uses the litigation to extort millions of dollars in what has been described as "blood money" from competing developers.  To date, Nourmand Enterprise has extorted millions of dollars from business rivals, and attempted to extort more.

5.      Nourmand and Sunset Landmark know that they cannot execute their scheme alone.  Nourmand's threats to use CEQA to impose devastating delay costs on developers who do not "kiss the ring" would be hollow if he did not have a lawyer able and willing to follow through on the threats and initiate the sham lawsuits.  To that end, Nourmand works in close concert with the Silverstein Law Firm, APC and its principal Robert P. Silverstein (collectively "the Silverstein Firm").   The Silverstein Firm is a frequent player in the CEQA space, and well known for holding up developments, such as the much-anticipated Target store in Hollywood, which was delayed for almost a decade.  Silverstein partners with Nourmand to utilize environmental statutes to delay economically vitalizing developments—often for years—in order to secure rich monetary payouts and personal concessions.

6.      Even with a notorious CEQA lawyer by his side, Nourmand requires additional support to run his extortionate enterprise.  Enter Nourmand & Associates, a well-known and established real estate brokerage founded by Nourmand and owned and operated by Nourmand's son, Michael Nourmand ("Michael").  Although Nourmand has not had a formal role at Nourmand & Associates in years (and thus can feign independence from its operations), he uses a "@nourmand.com" email address housed

on Nourmand & Associates' server and wields immense control over Michael and the other Nourmand & Associates employees.  At Nourmand's request, Michael and Nourmand & Associates lend material support to Nourmand Enterprise by, among other things, drafting key documents in support of Sunset Landmark's CEQA appeals, and attending public hearings to pressure officials to oppose certain development projects, all as part of a the coordinated scheme to impose costs on Plaintiffs as a way of stifling competition.

7.     The combination of Nourmand, Nourmand & Associates, and the Silverstein Firm is a dangerous force.  Although the ultimate goal of Nourmand Enterprise is to expand Nourmand's own power and reach, the enterprise relies on the Silverstein Firm's creativity and greenmail to provide Nourmand Enterprise with a seemingly-legal cover for its extortion.  Indeed, the Silverstein Firm has been involved in each of the acts of extortion and threatened extortion described in this complaint.  The Silverstein Firm acts as Nourmand Enterprise's legal muscle and allows the enterprise to function, initiating the sham CEQA actions that cause massive and often ruinous harm to Nourmand's competing developers.

8.     The primary target of Nourmand Enterprise's scheme is Plaintiff Relevant Group, LLC ("Relevant").  Relevant develops hotels, restaurants, and entertainment venues in urban markets.  Several years ago, Relevant set out to revitalize the Hollywood area with upscale hotels and restaurants.  In 2017, Relevant opened its Dream Hollywood Hotel on the corner of Selma Avenue and Cahuenga Boulevard.  It also received approval from city agencies and begun construction on two additional hotels—the Thompson and Tommie Hotels.  Relevant works closely with local leaders and regulators to ensure that any development projects adhere to the City's environmental standards.

9.     Although the construction of these hotels and other projects in the area would have provided an immediate boost to the local economy, Sunset Landmark, Nourmand & Associates, and the Silverstein Firm automatically and reflexively stood in

1   opposition to both the Thompson and Tommie Hotels.  Of course, this opposition was

2   not the result of a principled disagreement about the developments.  Rather, Nourmand

3   Enterprise was simply executing its playbook and holding those developments hostage

4   until it received the millions of dollars and aesthetic concessions it demanded from

5   Relevant.  Nourmand Enterprise does not hide the fact that the majority of the changes

6   extracted and corresponding "blood money" are unrelated to any recovery to which

7   Sunset Landmark would be entitled under the CEQA statute.  And even though the

8   lawsuits are filed separately, the Silverstein Firm is always at the helm leading the

9   charge.

10      10.    In the past, Nourmand Enterprise was successful in its efforts to extort

11   Relevant.  After months of pursuing its sham litigation, Sunset Landmark agreed to

12   dismiss the claim only after extracting a $5.5 million payout from Relevant.  Tellingly,

13   Sunset Landmark did not demand any significant action with respect to the

14   "environmental issues" at the heart of the litigation, and instead demanded payment of

15   the $5.5 million ransom fee and various other concessions to the development that

16   personally benefitted members of Nourmand Enterprise, including by benefiting the

17   Hollywood Athletic Club, a building out of which both Sunset Landmark and Nourmand

18   & Associates operate.

19      11.    But Nourmand Enterprise's unlawful conduct did not stop there.  Only

20   months after Relevant cut the check, Nourmand Enterprise turned its focus on a new

21   project that Relevant was developing at 6421 Selma Avenue in Hollywood (the "Selma

22   Hotel").  Using the same playbook, Sunset Landmark initiated another frivolous lawsuit

23   to oppose the development, again citing trumped-up and baseless "environmental

24   concerns."  Once again, it was enterprise-member the Silverstein Firm spearheading the

25   litigation.

26      12.    In this instance, however, Nourmand Enterprise realized that it needed

27   additional cover and pretextual justification for its sham lawsuit.  The Silverstein Firm,

28   on behalf of Sunset Landmark, had already filed sham legal challenges to the Thompson

and Tommie Hotels, and Nourmand Enterprise was concerned that its pattern would be exposed, leading to a quick dismissal of their litigation.  For that reason, Plaintiffs are informed and believe that the Silverstein Firm engaged the services of Casey Maddren, with whom the Silverstein Firm had a preexisting relationship, to file his own lawsuit concerning the Selma Hotel.

13.    Plaintiffs are informed and believe that Nourmand Enterprise and Maddren agreed that Maddren would initiate a separate legal action and assert the same sham allegation that Relevant was engaging in "piecemealing" through its development of the Selma Hotel (the "Maddren Litigation").  Although Maddren purportedly initiated the Maddren Litigation pro se, Plaintiffs are informed and believe that Nourmand Enterprise, through the Silverstein Firm, directed the litigation.

14.    Tellingly, even though Maddren is the President and CEO of United Neighborhoods for Los Angeles ("United Neighborhoods"), a self-described "community group" that has previously taken legal action to halt or delay property developments in the neighborhood, Maddren initiated the subject litigation solely in his personal capacity.  On information and belief, Maddren did so because even though the claims are in his name, he was directed by Nourmand Enterprise.  Had Maddren truly believed that Selma Hotel needed further environmental review and/or that it somehow poses an environmental or other threat to the neighborhood, there is no reason why he would not have caused his organization, United Neighborhoods, to initiate the legal action pursuant to its mandate, which relates directly to challenging land use and development.

15.    Relevant was shocked when Sunset Landmark filed a legal challenge to the Selma Hotel.  After all, the ink was barely dry on the $5.5 million check that Relevant had given Sunset Landmark.  When a representative from Relevant attempted to reason with Saeed Nourmand in a meeting that took place at the Dream Hotel on or around March 29, 2018, Nourmand made it crystal clear that the only way for Relevant to move

forward with its project was by paying the requested ransom.  Mr. Nourmand said: "***You know the drill.  It's going to take a check to make this go away.***"

16.     Unfortunately, Relevant is not the only developer that has been victimized by Nourmand Enterprise's extortionate conduct.  Members of Nourmand Enterprise approached another developer in the area (the "Schrader Owners") making the same threats to initiate baseless environmental litigation to grind their project to a halt.  Tellingly, the Silverstein Firm was involved in these threats as well.  The Schrader Owners told Nourmand Enterprise that while it was willing to discuss any legitimate environmental concerns, it would simply sit on the property or forego the development entirely before it would agree to discuss or negotiate what appeared to be Nourmand Enterprise's true, self-interested demands.  Rather than negotiate as to any legitimate changes (and because there were none), Sunset Landmark withdrew its CEQA challenge.  Of course, by doing so, Sunset Landmark revealed it had no genuine motive in seeing any modifications (environmental or otherwise) to the development.  Instead, when it learned that its shake-down of the Schrader Owners would not be possible, Nourmand Enterprise immediately abandoned the plan.

17.     The conduct of Nourmand Enterprise reveals a pattern of coercion, extortion, and other unlawful conduct.  Through its bullying tactics, the enterprise has engaged in a pattern of lucrative racketeering activity, at the expense of Plaintiffs and other developers in the Los Angeles area.  Not only does this scheme of extortion damage the targeted developers, but it also serves as a drain on the City of Los Angeles and the California judicial system, as the City is forced to expend significant resources investigating and defending these meritless claims, and the judicial system is forced to host these sham proceedings until the ransom is paid.  Perhaps most significantly, this extortionate scheme risks delaying or eliminating needed developments that would revitalize the economy in blighted areas in Los Angeles.

18.     Relevant has suffered significant damage as the proximate result of Nourmand Enterprise's conduct.  The amount of damages suffered by Relevant will be

proven at trial, but is believed to be in excess of $100 million.  Nourmand Enterprise's initiation of a lawsuit regarding the Selma Hotel has exposed Relevant to the risk of lost financing—which would jeopardize the entire development—as well as other damages.

## THE PARTIES

### Plaintiffs

19.     Plaintiff Relevant Group, LLC ("Relevant") is a Delaware limited liability company, which operates in Los Angeles, California.

20.     Plaintiff 1541 Wilcox Hotel LLC ("Wilcox") is a Delaware limited liability company, which operates in Los Angeles, California.

21.     Plaintiff 6516 Tommie Hotel LLC ("Tommie") is a Delaware limited liability company, which operates in Los Angeles, California.

22.     Plaintiff 6421 Selma Wilcox Hotel LLC ("Selma") is a California limited liability company, which operates in Los Angeles, California.

23.     Plaintiffs Wilcox, Tommie, and Selma are special purpose entities created for the purpose of developing certain properties in the Hollywood area of Los Angeles. These special purpose entities are all managed by Relevant.  Wilcox was formed for the purpose of developing the Thompson Hotel.  Tommie was formed for the purpose of developing the Tommie Hotel.  Selma was formed for the purpose of developing the hotel located at 6421 Selma Ave.

### Defendants

24.     Defendant The Sunset Landmark Investment LLC ("Sunset Landmark") is a California limited liability company, which operates in Los Angeles, California.

25.     Defendant Stephan "Saeed" Nourmand is an individual who resides in and does business in Los Angeles California.  Saeed Nourmand is a manager and/or member of Sunset Landmark.

26.     Saeed Nourmand is in business with Defendant Nourmand & Associates, a California corporation that functions as a real estate broker.  Although Saeed Nourmand no longer has a formal role at Nourmand & Associates, Nourmand & Associates holds

Saeed Nourmand out as the "founder" of Nourmand & Associates and provides him with an email address from Nourmand & Associates' server with an "@nourmand.com" domain name.  Sunset Landmark and Nourmand & Associates share a registered address as well as employees and officers.  Nourmand & Associates provides material support to Nourmand and Sunset Landmark in connection with Sunset Landmark's filing of sham and extortionate CEQA challenges

27.     Nourmand Enterprise exists separate and apart from the unlawful and extortionate acts of racketeering described in this complaint.

28.     Plaintiffs are unaware of the true names or capacities, whether individual, corporate, associate, or otherwise, of Defendants sued herein as DOES 1 through 10, inclusive, and therefore sue these Defendants by such fictitious names.  Plaintiffs will seek leave of the Court to amend this pleading to set forth the true names and capacities of said Doe Defendants when the same are ascertained.  Plaintiffs are informed and believe, and on that basis allege, that each of the fictitiously named Defendants is responsible in some manner for the occurrences herein alleged, or was acting in concert with, and with the permission, approval, and authorization of, the specifically named Defendants.

**Nonparty Enterprise Members**

29.     The Silverstein Law Firm, APC (the "Silverstein Firm") is a California corporation based in Pasadena, California, which functions as a law firm.  Robert P. Silverstein is the Chief Executive Officer of the Silverstein Firm.  The Silverstein Firm states on its website that it focuses on eminent domain, California Environmental Quality Act (CEQA), planning and zoning, government law, real property litigation, California Public Records Act litigation, Brown Act litigation, and general civil litigation.

30.     Casey R. Maddren is an individual who resides and does business in Los Angeles.

THIRD AMENDED COMPLAINT

## JURISDICTION AND VENUE

31.    This Court has jurisdiction over the subject matter of Plaintiffs' Complaint under 28 U.S.C. § 1331 and § 1337, because it arises under the Racketeering Influenced and Corrupt Practices Act ("RICO"), 18 U.S.C. § 1964(a).

32.    The conduct alleged in this Complaint occurred in interstate commerce, and has substantially affected and will continue to substantially and directly affect interstate commerce.

33.    The Court has personal jurisdiction over the Defendants and venue is proper in the Central District of California because: (1) the Defendants reside and/or conduct business in the State of California and at least one of the Defendants resides and/or conducts business in this District; and (2) substantial parts of the events or omissions giving rise to the claims alleged herein occurred in this District.

## THE ENTERPRISE

### The Enterprise's Playbook: Shake Down Developers for Millions of Dollars by Threatening and Initiating Frivolous Environmental Litigation

34.    For years, Saeed Nourmand, through his and his family's closely-held companies Sunset Landmark and Nourmand & Associates, has organized and orchestrated a criminal enterprise ("Nourmand Enterprise") to engage in a pattern of extortion.  Working in close association with his lawyer at the Silverstein Firm, Nourmand and his companies use the threat of frivolous environmental litigation against competing developers in the Los Angeles area to extort millions of dollars from those developers.  This scheme has proven lucrative, as the enterprise has obtained millions of dollars by holding development projects hostage.

35.    While expressing opposition to a project—either through speaking publicly on the subject or initiating litigation—is lawful, Nourmand Enterprise's pattern of reflexively initiating and pursuing sham litigation regardless of the project's size, merit, or consequence to the residents of Los Angeles is not.  Nourmand Enterprise pursues these frivolous challenges by initiating litigation under the California Environmental

Quality Act ("CEQA").  Nourmand Enterprise's goal in these actions is not to reduce any adverse environmental impact of these developments, but simply to pad its members' own wallets and to secure personal concessions that benefit only its members and their own developments.  In doing so, the enterprise exploits CEQA for monetary profit and gain.  Despite competing developers' expenditure of significant resources to obtain approval on their developments, Defendants have engaged in a pattern of using the threat of subsequent litigation in order to extract what is effectively a ransom payment from their competitors.

36.     CEQA was enacted in 1970 in an effort to ensure that all physical developments were reviewed for significant environmental impact, and to prevent or minimize damage to the environment through development of project alternatives, mitigation measures, and mitigation monitoring.  CEQA requires that local agencies review and ultimately approve development proposals, taking into consideration the goal of preventing or mitigating environmental impact.  In determining whether to approve a project, the City of Los Angeles (the "City") and its agencies are required by law to consider various factors and guidelines.  To this end, the City has adopted California's state-wide CEQA guidelines as its own.  The City has also issued guidance to assist both developers and City staff in assessing the environmental impact of potential developments.  Under both state and local law, no development may be approved that would cause significant environmental effects if there are feasible alternatives or mitigation measures that would lessen those effects.  For that reason, any project approved by the City is necessarily found to have no significant environmental effect.

37.     Although CEQA's objective is laudable, the members of Nourmand Enterprise misuse the legislation for their own monetary (and anti-competitive) gain. For each target it identifies, Nourmand Enterprise delays, opposes and, if necessary, eliminates the project by painting it as environmentally harmful.  After first objecting to the projected development, Defendants then initiate meritless litigation challenging the

City's determination that the project may proceed.  As explained in further detail below, Nourmand has brazenly admitted that the objective of his enterprise is not to address environmental concerns, but to extract money and other competitive advantages from their victims.

38.     This sham litigation results in a huge expenditure of resources not just for competing owners/developers, who are required to respond to hundreds or thousands of pages of drummed up environmental comments and prepare environmental assessments that would not otherwise be required, but also for the residents and taxpayers of Los Angeles, and the judicial system that is forced to expend time and money defending these proceedings.

39.     These actions delay development for years, causing owners/developers to lose financial backing, to incur costs associated with holding undeveloped land for an extended time, and to incur escalating construction costs.  This environmental and zoning opposition bottlenecks the development cycle, resulting in limited development, less competition, less commerce, lower transient occupant tax ("TOT") revenue, and lost rent revenue for the City.

40.     Sham environmental litigation obstructs and in some instances destroys development.  Regardless of the merits (or lack thereof), the mere filing of the lawsuit delays funding, diverts resources, and pushes back the start date for construction, potentially by years.  By filing these lawsuits, Nourmand Enterprise has delayed, and in some instances completely obstructed, development in areas that are in dire need of improvement.  The enterprise then exploits this economic pressure by demanding large sums of money in order to drop their sham claims.

41.     The abusive and extortionate nature of CEQA litigation is well-documented.  For example, a 2018 article published in the Hastings Environmental Law Journal finds that there is "widespread abuse of CEQA lawsuits for nonenvironmental purposes" and that CEQA litigation is often initiated not by citizens truly concerned

about environmental impact, but by "business competitors" or "'bounty hunter' lawyers seeking quick cash settlements."

42.    A detailed 140-page report on CEQA's widespread abuse was published in 2015 by land use and environmental lawyers.[1]  The study reviewed every CEQA lawsuit filed over a three year period and concluded that "CEQA litigation abuse is indeed widespread," and that abusers of CEQA use the statute "to pursue non-environmental objectives," preventing needed development and raising costs on developers and in many cases tax-payers.  The report also noted that individuals who initiate CEQA litigation "often conflate their individual 'environment' (i.e., the view outside their bedroom window) with environmental policies and mandates that require acceptance of neighborhood-scale changes . . . ."

### The Members of the Enterprise and Their Respective Roles in the Enterprise

43.    The above-described playbook is executed by the members of Nourmand Enterprise, acting in concert on behalf of the enterprise.  Nourmand Enterprise is not an incorporated or legal entity.  Rather, it is an informal group that associates in order to effect the common goals of the enterprise: using the threat of frivolous environmental litigation against competing developers in the Los Angeles area to extort millions of dollars and unrelated personal concessions from those developers.

44.    As described further below, these members have associated with each other as Nourmand Enterprise for years.  Each member has a specific role and manner in which it or he contributes to, and works on behalf of, the enterprise.

*Nourmand and Sunset Landmark*

45.    Defendants Nourmand and Sunset Landmark conduct the business of, and are associated with, Nourmand Enterprise.

---

[1] Jennifer L. Hernandez, et al., Holland & Knight LLP, *In the Name of Environment: How Litigation Abuse under the California Environmental Quality Act Undermines California's Environmental, Social, Equity and Economic Priorities – and Proposed Reforms to Protect the Environment from CEQA Litigation Abuse*, (Jul. 15, 2015), *available at* https://issuu.com/hollandknight/docs/ceqa_litigation_abuseissuu.

THIRD AMENDED COMPLAINT

46.    While Defendants Nourmand and Sunset Landmark are members of Nourmand Enterprise, Nourmand Enterprise has an existence separate and apart from Nourmand and Sunset Landmark as well as the other individual members of the enterprise.

47.    Sunset Landmark conducts the business of Nourmand Enterprise through its role as the entity that formally initiates the sham CEQA litigation that is used to extort competing developers into making payments in order to avoid the devastating costs associated with the delay of projects.  Sunset Landmark is also the entity that receives the immediate financial benefit of the extortion payments made by victims.

48.    Nourmand conducts the business of the enterprise through his role as the owner, manager, and principal of Sunset Landmark.  Nourmand is also the ultimate decision-maker as to which competing developers will be targeted.   Nourmand also makes the overt threats telling developers that their projects will continue to be subject to sham litigation until they accede to Nourmand Enterprise's demands, and he leads the "negotiations" with these developers that ultimately lead to multi-million dollar ransom payments.

*Nourmand & Associates*

49.    Defendant Nourmand & Associates conducts the business of, and is associated with, Nourmand Enterprise.

50.    While Defendant Nourmand & Associates is a member of the Nourmand Enterprise, Nourmand & Associates has an existence separate and apart from Nourmand and Sunset Landmark as well as the other individual members of the enterprise.

51.    Nourmand & Associates is a real estate brokerage founded by Nourmand. It is operated by his son Michael Nourmand, and conducts the business of Nourmand Enterprise.  Nourmand & Associates operates out of Sunset Landmark's property, the Hollywood Athletic Club.   Plaintiffs are informed and believe, and on that basis allege, that Nourmand and Associates participates in the decision as to which developers the enterprise will target with sham CEQA lawsuits, and is involved in the "negotiations" of

those claims in which other members of the enterprise make extortionate threats.  In facilitating the business of the Nourmand Enterprise, Nourmand & Associates' employees used "@nourmand.com" email addresses and stated Nourmand & Associates in their email signatures.  Nourmand & Associates also granted Saeed Nourmand the ability to utilize an "@nourmand.com" email address.

52.   Nourmand & Associates played a key role in the initiation of sham CEQA litigation, including by strategically attending public hearings at Nourmand's request in order to support Sunset Landmark's objections, drafting written statements articulating objections to Relevant's projects and otherwise discussing Sunset's strategy in objecting to the projects; and offering its own employees to perform support and administrative functions for Sunset Landmark and Nourmand.

53.   Nourmand & Associates' employees materially assisted Sunset Landmark and Nourmand in their efforts to delay the development of competing properties through the duration of the scheme.  Specifically, Nourmand & Associates' employees, including Chief Financial Officer Mohamad Iravani, participated in the drafting of Nourmand's letters objecting to the projects, reviewing and revising Nourmand's drafts before they were circulated to the City of Los Angeles.  In addition, several meetings between Nourmand and competing developers, including the Schrader Owners and Relevant, were held in Nourmand & Associates' office space, and were organized and coordinated by Nourmand & Associates' employees.  Nourmand requested that several Nourmand & Associates, including to Michael Nourmand, attend a public hearing at Los Angeles City Hall on the development of the Thompson Hotel.  Michael Nourmand, along with other Nourmand & Associates employees, signed the petition opposing the Thompson Hotel at the public hearing.  Nourmand shared Relevant's entitlement plans with Mohamad Iravani and Michael Nourmand.  Nourmand insisted that Michael Nourmand participate in the meeting where Sunset Landmark and Nourmand extorted the $5.5 million ransom payment.

54.     Nourmand & Associates' employees also actively participated in the legal strategy of Nourmand and Sunset's CEQA litigation and extortionate scheme. Nourmand & Associates' Associate Branch Manager and Training Director advised Nourmand and his consultants and attorneys on legal strategies to forestall the development of the competing properties.  Nourmand & Associates' employees also communicated with Nourmand and Sunset Landmark's attorney, Jayesh Patel, about the extortionate scheme, and actively communicated with the Silverstein Firm, a non-party member of the Nourmand Enterprise, about the CEQA litigation.

55.     Third parties routinely communicated with Nourmand & Associates' employees about the extortionate scheme.  For example, Relevant's consultants shared updates of hotel plans in response to Nourmand and Sunset Landmark's demands to Nourmand & Associates' employees, including Michael Nourmand and Mohamad Iravani.  Additionally, Mohamad Iravani spearheaded the enforcement of the $5.5 million extortionate payout against Relevant, having been "instructed" by Defendants Sunset Landmark and Nourmand "to go by the note terms" in enforcing the payout. Third parties, including public accountants, communicated with Iravani about Sunset Landmark's tax obligations arising from the extortionate scheme.  Third parties also conferred with Nourmand and Michael Nourmand to recruit other businesses to oppose the development of Relevant's competing properties.

56.     In this and similar ways, Nourmand & Associates' employees functioned as Nourmand's own recruiting pool through which Nourmand tasked Nourmand & Associates' employees with critical support functions to extort competing developers into making payments avoid the devastating costs associated with the delay of projects. Nourmand & Associates' employees were also actively involved in facilitating Nourmand's overt threats telling Relevant that its projects will continue to be subject to sham litigation until it accedes to Nourmand Enterprise's demands.

THIRD AMENDED COMPLAINT

*The Silverstein Firm*

57.     A key member of the enterprise is the Silverstein Firm, led by attorney Robert P. Silverstein.  The Silverstein Firm has represented Sunset Landmark in most if not all of Sunset Landmark's sham CEQA lawsuits.  Through its role as Sunset Landmark's counsel, the Silverstein Firm conducts the business of Nourmand Enterprise and associates with the other members of Nourmand Enterprise to achieve the enterprise's goals.  The Silverstein Firm is essential to the functioning of Nourmand Enterprise and the enterprise could not achieve its goals without it.

58.     The Silverstein Firm conducts the business of Nourmand Enterprise by formulating the legal theories associated with the sham CEQA lawsuits, filing administrative objections and legal complaints, and exploiting CEQA to cause costly delays to the competing developers.  The Silverstein Firm knows that the CEQA actions it initiates on behalf of Nourmand Enterprise are being promulgated for the sole purpose of extracting large monetary payouts and personal aesthetic concessions to Nourmand and Sunset Landmark.  The Silverstein Firm knows that these payouts and concessions have nothing to do with CEQA or the environment, and are far beyond anything that Sunset Landmark could recover in a CEQA lawsuit.

59.     The Silverstein Firm is no stranger to the use—and abuse—of CEQA.  Silverstein has been described in local publications as "a well-known thorn in the side of development interests in Hollywood" who routinely files legal challenges to local developments, "kill[ing] some and add[ing] to the cost of all."  Others have labeled him a "bounty hunter" who "use[s] the threat of CEQA-based lawsuits to generate cash from developers for things that have nothing to do with the environment."  The Silverstein Firm and the La Mirada Avenue Neighborhood Association ("La Mirada Association")—an organization with which the Silverstein Firm has a close affiliation— have caused the delay of countless projects, most notably a Target on Sunset Boulevard and Western Avenue, which the Silverstein Firm first sued to stop in 2012 and which has only recently begun construction.

60.    Silverstein made headlines in 2013 when a settlement agreement in an environmental lawsuit was leaked, showing a substantial payment of "attorneys' fees" made directly to the Silverstein Firm, along with a six-figure payment to La Mirada Association in the form of a "monitoring fees" that contained *no* requirement the funds be actually used for monitoring or environmental purposes.

61.    The Silverstein Firm takes many claims on contingency, thus securing a direct benefit in the proceeds.

62.    Although the Silverstein Firm is retained to represent Sunset Landmark, the Silverstein Firm independently conducts the business of Nourmand Enterprise and is separate and distinct from Sunset Landmark as a practical and legal matter.  The Silverstein Firm is required by law to conform to ethical rules and is not simply an unquestioning agent of Sunset Landmark or Nourmand.  The rules of professional conduct require that the Silverstein Firm be a distinct entity from its clients and that it maintain its professional independence.  In the context of the attorney-client relationship between Sunset Landmark and the Silverstein Firm, the Silverstein Firm retains control over important functions, such as tactical and strategic litigation decisions.

*Casey Maddren*

63.    In an attempt to avoid detection of the sham nature of their most recent CEQA lawsuit and to bolster their claims, the Silverstein Firm and the other Nourmand Enterprise members have conspired with Casey R. Maddren.  As explained in more detail below, Maddren initiated a CEQA lawsuit against Plaintiffs' most recent development, raising frivolous and meritless objections to the project.  Plaintiffs are informed and believe that although Maddren has represented to the court in that case that he is representing himself, he has received material support from Nourmand Enterprise, including the Silverstein Firm.

64.    Maddren has conducted the business of Nourmand Enterprise by initiating his frivolous lawsuit, which assists and supports the goals of the enterprise.  Nourmand Enterprise believes that if "third parties" initiate CEQA lawsuit alleging similar or

additional violations of the statute, it will lend credence to Sunset Landmark's own filings and make them appear to be meritorious and not shams. Maddren is also not subject to certain legal defenses applicable to Sunset Landmark, making Maddren a useful pawn to pursue certain meritless legal theories concocted by the Silverstein Firm.

## DEFENDANTS' UNLAWFUL CONDUCT

65.     Defendants Nourmand, Sunset Landmark, and Nourmand & Associates have conducted and participated in the conduct of Nourmand Enterprise through a pattern of racketeering activity, namely a series of extortionate sham environmental lawsuits.

### Thompson Project and Litigation

66.     On October 3, 2014, 1541 Wilcox Hotel LLC ("Wilcox") filed an application with the City relating to property owned by Wilcox located at 1523-1541 North Wilcox Avenue, in the Hollywood area of Los Angeles. The proposed project was the creation of a hotel to be called the Thompson Hotel. The proposed project involved the demolition of the existing structures on the project site and the construction of a hotel. The application sought a vesting zone change (to permit residential and commercial use); a height district change to increase the floor area ratio ("FAR") of the property; a zoning administrator's adjustment; and a site plan review.

67.     In March 2015, the City published the first Initial Study and mitigated negative declaration ("MND") regarding the Thompson Hotel project. An Initial Study is a preliminary analysis prepared by and for the City as the lead agency to determine whether an Environmental Impact Report ("EIR") must be prepared, or whether a negative declaration or an MND is sufficient. In its first Initial Study and MND, the City concluded that the Thompson Hotel would not have a significant environmental impact, so an EIR was not required.

68.     Between March and April 2015, Wilcox made various revisions to the Thompson Hotel development plan to address certain comments from the City and residents. After reviewing and analyzing the revised project, the City concluded that its

proposed mitigation measures would reduce any potentially significant adverse environmental effects to a level of insignificance.  Specifically, the City considered approximately 90 different environmental factors, and concluded that the vast majority of those factors either would not be impacted by the proposed project, or that any impact would be less than significant.  For those factors that the City concluded had the potential to be significantly impacted by the project, the City proposed various changes to the project that would mitigate the potential environmental impacts.

69.  Wilcox adopted all of the City's requested mitigation measures in its project, thus eliminating any potential significant environmental impacts identified by the City.

70.  On or around September 10, 2015, the Los Angeles City Planning Commission ("Commission") convened a meeting.  At that meeting, the Commission took various actions with respect to the Thompson Hotel project, including approving a vested zone and height district change, approving a site plan review, and adopting the mitigated negative declaration described above.  The Commission also recommended that the City Council approve these changes and adopt the mitigated negative declaration.  In early February 2016, the City Council followed the Commission's recommendation and approved the project, including the zoning and height district changes sought by Wilcox.  In doing so, the City Council approved the mitigated negative declaration, finding that the project did not pose a risk of significant environmental impact.

71.  Despite the rigorous process by which the City and Commission reviewed and approved Wilcox's proposed development of the Thompson Hotel, Defendants nonetheless saw an opportunity to delay its competitor and extort millions of dollars.  On March 3, 2016, Sunset Landmark initiated a lawsuit against the City of Los Angeles, naming Wilcox as a real party in interest.  The lawsuit alleged that notwithstanding the City's detailed findings, the Thompson Hotel would cause "significant, unmitigable impacts to the environment."  The lawsuit also alleged that the City should have

required a full EIR prior to approval.  Sunset Landmark was represented by Robert P. Silverstein of the Silverstein Firm.

72.     In litigating the CEQA suit, the Silverstein Firm, on behalf of Sunset Landmark, primarily pursued the theory that Wilcox's development plan for the Thompson Hotel exceeded certain "zoning density" requirements allegedly imposed by the 1988 Hollywood Community Plan Revision.  However, this argument was objectively meritless.  The Los Angeles Municipal Code expressly permitted heighted density for projects like the Thompson Hotel that are designated "Regional Commercial."  The Silverstein Firm and Sunset Landmark also advanced the frivolous theory that earlier zoning decisions were "permanent" legislation, and were "not something the City was free to cancel at will."  Of course, any decision by a government body such as the City Council may be subsequently amended or revoked by that same body, so this argument on its face lacked merit.

73.     In the Thompson Hotel litigation, Sunset Landmark further argued that there was a "fair argument" that the Wilcox development plan may have certain environmental impacts, including that the project "may" have construction or operational noise impacts, traffic impacts, and "land use" impacts.  In doing so, Sunset Landmark no doubt sought to exploit CEQA's low threshold standard of review to invalidate this well-studied project.  Sunset Landmark and the Silverstein Firm knew the challenge was frivolous because the administrative record contained no "substantial evidence" in the form of expert analysis (or any other evidence) to support its claims, much less sufficient evidence to contradict the City's detailed findings.

74.     The reason why Sunset Landmark and the Silverstein Firm advanced these meritless arguments is clear: to delay a competing development and unlawfully extort millions of dollars from Wilcox and Relevant to which Defendants were not entitled. Defendants knew that Wilcox was economically dependent on the development of the Thompson Hotel, and it took advantage of that fact.  As described below, Plaintiffs

THIRD AMENDED COMPLAINT

succumbed to the threats, and ultimately paid Defendants millions of dollars in blood money.

75.   Nourmand & Associates participated in the creation of the meritless objections and legal arguments that Sunset Landmark and the Silverstein Firm advanced.

76.   After filing this meritless and sham claim against Wilcox, Nourmand Enterprise, through Nourmand, Sunset Landmark, and Nourmand & Associates, then set out to extract a payment from Wilcox and Relevant.  Although Wilcox was the owner of the property in question and the real party in interest in the CEQA litigation, on information and belief, Nourmand Enterprise believed and understood that any settlement payment would be funded by Relevant, the entity that managed Wilcox.  As explained in more detail below, Nourmand and Sunset Landmark informed representatives of Wilcox and Relevant that even if it agreed to all of its non-monetary demands—which were largely unrelated to the CEQA litigation—it would continue to pursue and litigate these lawsuits unless Wilcox and Relevant agreed to pay Sunset Landmark a significant amount of money.

77.   In subsequent communications between the parties related to the CEQA litigation, Nourmand and Sunset Landmark made it clear that the claimed environmental concerns with the Thompson project were pretextual.  In or around April 2017, Sunset Landmark sent to Plaintiff Relevant a list of "demands" that would need to be met before Sunset Landmark would consider dropping the CEQA litigation.

78.   Tellingly, the vast majority if not all of these demands had nothing to do with any environmental concerns that were raised in Sunset Landmark's CEQA complaint.  The demands included aesthetic changes to the Thompson Hotel development that would only benefit the members of Nourmand Enterprise personally, such as flipping a light well to face the opposite direction so that the bulk of the building would face away from Sunset Landmark's property, and planting hedges between the Thompson property and the Sunset Landmark property.  These demands also included

personal concessions to Sunset Landmark, including the granting of a covenant running with the land in favor of Sunset Landmark and an agreement that Relevant would not oppose any development of Sunset Landmark in the future.

79.     These personal demands—especially the agreement of non-opposition— clearly belied any notion that Sunset Landmark or Nourmand Enterprise subjectively cared about the environmental concerns raised in their CEQA litigation.  Indeed, a covenant by Relevant *not* to challenge Sunset Landmark's future developments would arguably undercut the goals of CEQA by insulating Sunset Landmark from bona fide environmental challenges to its developments.

80.     Most notably, the demands communicated from Sunset Landmark to Relevant included a demand for millions of dollars.  Sunset Landmark *admitted* that this money was unrelated to the amount of legal fees that it had incurred in filing its CEQA appeals and litigating the CEQA lawsuit to that point.  Indeed, Sunset Landmark represented that compensation for attorneys' fees was "not adequate," and demanded additional money on top of the personal concessions and aesthetic changes.

81.     After receiving these demands, a representative from Relevant contacted a representative of Sunset Landmark in order to discuss them.  The representative of Relevant asked the representative from Sunset Landmark how much of the demanded money was for attorneys' fees and how much was "blood money."  In responding, the representative of Sunset Landmark did not disagree that this was "blood money" and acknowledged that the legal fees were only a fraction of what was being demanded.

82.     On other occasions, Nourmand Enterprise and its members made it clear that its objective was primarily, if not exclusively, about extracting a monetary payout. After Sunset Landmark initiated the CEQA appeal, representatives from Relevant met with representatives from Sunset Landmark at the offices of Nourmand & Associates, a member of the enterprise.  This meeting was attended by, among others, Relevant's attorney Guy Maisnik, Sunset Landmark's attorney Jayesh Patel, and Nourmand.  At this meeting, a representative from Relevant commented that it appeared that Sunset

Landmark only cared about money. Nourmand acted offended by this statement, saying that he had not brought the lawsuit in order to recover money. In response, Maisnik asked whether Sunset Landmark would agree to take the money (other than attorneys' fees) off the negotiating table. Tellingly, Nourmand refused.

83. Although Relevant believed that the CEQA litigation was frivolous and a sham, it nonetheless made the decision to try to negotiate a resolution with Nourmand and Sunset Landmark. As the members of Nourmand Enterprise were well aware, Relevant had sourced certain immigrant investors under the EB-5 program, who needed the Thompson Project to go forward with development in order to secure their Visas.

84. In or around May 2017, Relevant responded to Sunset Landmark's list of demands. Relevant agreed to address certain concerns that Sunset Landmark had raised in its CEQA litigation, including reducing the floor area ratio ("FAR") of the building and adopting certain construction and hauling noise mitigation measures. Relevant also agreed to pay Sunset Landmark $1 million, *twice* the amount that Sunset Landmark had indicated it had incurred in attorneys' fees. Yet a representative from Sunset Landmark responded and said that the parties were still "far apart."

85. Following Sunset Landmark's rejection of Relevant's offer, in or around May 2017, Relevant made additional concessions to its development of the Thompson Hotel in an effort to avoid the serious economic consequences that the Thompson Hotel litigation imposed. Specifically, Relevant agreed to several of Sunset Landmark's demands for aesthetic changes to the building, including lowering the planned height of the building and including green hedges. Relevant also reaffirmed its offer to make a monetary payment to Sunset Landmark.

86. Sunset Landmark, through attorney Patel, responded to this offer in or around June 2017. Sunset Landmark's proposed "counter-offer" was not a counter-offer at all. Rather than address Relevant's proposal, Patel on behalf of Sunset Landmark demanded *millions of dollars **more*** than Nourmand Enterprise had previously demanded. Patel also indicated that his client was still demanding that Relevant both

23

further lower the height of the building and change the orientation of the light well on the development to appease Sunset Landmark's desire to have the bulk of the building face away from its property.  Of course, neither the demand for a payout nor the aesthetic changes were in any way related to the CEQA litigation.

87.    In order to escape the untenable legal and financial situation that Sunset Landmark, Nourmand, Nourmand & Associates, the Silverstein Firm, and the other members of Nourmand Enterprise had created, on our around January 8, 2018, Wilcox and Relevant succumbed to Defendants' threats and agreed to pay Sunset Landmark the millions of dollars demanded as well as make the requested design changes.

88.    Specifically, Wilcox agreed to pay Sunset Landmark $5.5 million as a ransom to get Sunset Landmark to drop its claims.  As part of this agreement, and in addition to the $5.5 million payout, Wilcox and Relevant agreed to make the requested design changes, including rotating the direction of the light well, reducing the height of the hotel, and entering into a covenant running in favor of Sunset Landmark.  Sunset Landmark also demanded, and Wilcox agreed, to assist and support Sunset Landmark on any future development proposal for the Sunset Property.  Wilcox and Relevant also agreed to enter into a tie-back agreement related to the construction of the building that would be completely paid for by Wilcox and Relevant.

89.    On information and belief, the Silverstein Firm obtained personal economic benefit from the $5.5 million payment, through the form of a contingency agreement or related arrangement between the Silverstein Firm, Sunset Landmark, and Nourmand.

**Tommie Project and Litigation**

90.    On January 28, 2016, 6516 Tommie Hotel LLC ("Tommie") filed an application with the City relating to property owned by Tommie located at 6516-6526 West Selma Avenue, in the Hollywood area of Los Angeles.  The proposed project involved the construction of a new mixed use hotel consisting of 212 guest rooms and ground and rooftop restaurants.  The application sought a vesting zone change, a height

district change, a site plan review, and a conditional use permit for the on-site sale and dispensing of alcohol.

91.   On December 20, 2016, the City issued an initial study and a proposed MND for the Tommie project.  After analyzing the potential environmental impacts of the project, the City proposed that an MND be adopted because the mitigation measures it proposed would reduce any potential significant adverse environmental effects to a level of insignificance.  Specifically, the City considered approximately 90 different environmental factors, and concluded that the vast majority of those factors either would not be impacted by the proposed project, or that any impact would be less than significant.  For those factors that the City concluded had the potential to be significantly impacted by the proposed project, the City proposed various changes to the project that would mitigate the potential environmental impacts.

92.   On or around January 26, 2017, the Commission held a meeting at which it considered the Tommie project.  The Commission found that, with the imposition of certain mitigation measures, there was no substantial evidence that the project would have a significant effect on the environment, and that those mitigation measures had been made enforceable conditions of the project.  The Commission also approved the Tommie project site plan and conditional use permit for alcohol sale, and recommended that that the City Council adopt the zone and height district changes requested in the application.  On or around May 10, 2017, the City Council followed the recommendation of the Commission and approved the Tommie project MND and the requested zone and height district changes.

93.   Despite the rigorous process by which the City and Commission reviewed Tommie's proposed development and determined that, as modified, it would not pose the risk of a significant environmental impact, members of Nourmand Enterprise nonetheless seized the opportunity to extort millions of dollars in ransom.

94.   On June 9, 2017, Sunset Landmark initiated a lawsuit against the City of Los Angeles and the City Community Redevelopment Agency ("CRA/LA"), naming

Tommie as a real party in interest.  Sunset Landmark was again represented by the Silverstein Firm.

95.    In the lawsuit pertaining to the Tommie Hotel, the Silverstein Firm, on behalf of Sunset Landmark, falsely alleged that the Tommie Hotel development would have a significant negative impact on the environment.  Like the litigation surrounding the Thompson Hotel developments, Sunset Landmark's Tommie Hotel lawsuit was a sham, and was not filed to address environmental concerns.  Nourmand Enterprise's sole desire was to harm a competing project and extort money from Tommie and its owners to which it was not entitled.  The members of Nourmand Enterprise knew that Tommie was economically dependent on the development of the property, and it exploited that fact.  Sunset Landmark and the Silverstein Firm lacked a good faith basis for initiating the lawsuit against the City of Los Angeles concerning the Tommie property.  This is confirmed by the fact that, after filing the lawsuit, Sunset used the increased leverage created by the lawsuit to put further pressure on Plaintiffs to make the monetary and aesthetic concessions to Nourmand Enterprise (unrelated to environmental concerns) that had been previously demanded.

96.    Nourmand & Associates participated in the creation of the meritless objections and legal arguments that Sunset Landmark and the Silverstein Firm advanced both in the administrative entitlement process and in the CEQA action.

97.    Sunset Landmark and the Silverstein Firm ultimately dismissed the Tommie litigation at the same time it dismissed the Thompson Hotel litigation, based on the payment to Sunset Landmark of the $5.5 million ransom.  Thus, Sunset Landmark was able to extract payment from Plaintiffs based on the multiple sham challenges to the projects Relevant was developing.

98.    Not surprisingly, the terms of this payment were divorced from the earlier-touted purported environmental issues with the Tommie Hotel.  The fact that Sunset Landmark dismissed its CEQA litigation regarding the Tommie Hotel without any significant alterations made to the proposed property development demonstrates the

sham nature of the litigation.  The members of Nourmand Enterprise's sole objective in filing the lawsuit was to extort money.  As soon as Plaintiffs agreed to pay Sunset Landmark the millions of dollars demanded, Sunset Landmark immediately dismissed its "environmental" lawsuits.

### **Attempted Extortion of Schrader Hotel Owners**

99.    Nourmand Enterprise has executed its playbook against other developers as well.  Indeed, Plaintiffs are informed and believe that Sunset Landmark and Nourmand have approached other developers and have threatened to file frivolous objections and lawsuits related to their properties unless those developers agreed to pay the monies and/or make the aesthetic concessions demanded by members of Nourmand Enterprise to appease the personal tastes of Nourmand.

100.   For example, Plaintiffs are informed and believe that Sunset Landmark initiated a frivolous and sham CEQA administrative appeal against a competing property on Schrader Boulevard (the "Schrader Owners") in Hollywood that was in the process of seeking approval from the City for development.  Sunset Landmark appealed the Schrader Owner's application to the city on the basis of manufactured and fabricated environmental concerns, including concerns related to FAR density.  Plaintiffs are informed and believe that the Silverstein Firm was involved in developing the frivolous and sham legal theory associated with this administrative appeal.  Sunset Landmark initiated this sham appeal despite having no good faith belief that there were environmental concerns in the Schrader Owners' proposed development that warranted a CEQA litigation.

101.   After initiating this appeal, Sunset Landmark met with the Schrader Owners in order to provide the Schrader Owners with its demands.  Unsurprisingly, these demands were unrelated to the "environmental" concerns raised in the CEQA appeal.

102.   However, unlike the situation with the Thompson and Tommie properties, Nourmand Enterprise's playbook did not work on the Schrader Owners.  Plaintiffs are

THIRD AMENDED COMPLAINT

informed and believe that the Schrader Owners informed Sunset Landmark that unlike other owners/developers, the Schrader Owners did not have any debt on the property, and therefore could afford to simply keep the property undeveloped.  Moreover, while they would be willing to negotiate any legitimate environmental concerns, the Schrader Owners made clear that they would not negotiate any requests from Sunset Landmark unrelated to CEQA.  Instead, the Schrader owners indicated that they would either leave the property undeveloped or just incur the cost and delay associated with the environmental litigation.

103.   Because Nourmand Enterprise realized that it lacked leverage to extort the Schrader Owners, Sunset Landmark dismissed its administrative appeal and Nourmand Enterprise moved on to its next victim.

**Selma Project and Litigation**

104.   Following Plaintiffs' payment of $5.5 million to Sunset Landmark, Plaintiffs believed that they would no longer be targets of Nourmand Enterprise's threats and extortion.  On or around March 19, 2018, Richard Heyman, a member of Selma LLC, sent a text message to Nourmand in which he stated that he was glad the issue was resolved and that "you have now been paid in full."  What Heyman did not know at the time he sent this message, was that far from the issues between them being resolved, Nourmand Enterprise was planning to extort Plaintiffs once again.

105.   This time, the target of Nourmand Enterprise's extortion was Plaintiffs' Selma Hotel development.  Two years earlier, on July 22, 2016, prior to Sunset Landmark's initiation of the litigation against the City involving Tommie, Plaintiff 6421 Selma Wilcox Hotel LLC ("Selma LLC") filed an application to develop a property owned by Selma LLC located at 6421 W. Selma Avenue in the Hollywood area of Los Angeles.  The proposed project was a new 8-story mixed-use building with 114 guest rooms.  Selma LLC's application sought, among other things, a vesting zone change, a height district change, a site plan review, and a conditional use permit for the on-site sale and dispensing of alcohol.

THIRD AMENDED COMPLAINT

106.   On July 12, 2018, the Commission held a public hearing concerning the Selma LLC property.  Approximately one month later, on August 17, 2018, the Commission issued a decision letter in which it recommended an MND, finding that, with mitigation efforts enacted, there was no substantial evidence that the Selma LLC project would have a significant effect on the environment.  In this same letter, the Commission also issued the conditional use permit for the on-site sale and dispensing of alcohol, and recommended that the City grant the requested vesting zone change and height district change.

107.   On November 17, 2018, the Planning and Land Use Management Committee of the Los Angeles City Council convened an additional hearing on the Selma LLC property.  Several months later, on March 5, 2019, the City Council adopted the MND and granted the requested zone and district changes for the Selma LLC property.

108.   Again, Nourmand Enterprise seized on the opportunity to execute its playbook and attempt to extract millions of dollars from Selma LLC by asserting sham legal objections to the project and ultimately filing a sham CEQA lawsuit in April 2019.

109.   Nourmand & Associates participated in the creation of the meritless objections and legal arguments that Sunset Landmark and the Silverstein Firm advanced both in the administrative entitlement process and in the CEQA action.

110.   Notwithstanding the statements made to the contrary by Sunset Landmark in its CEQA complaint, Sunset Landmark was not concerned with the environmental impacts of the Selma LLC project.  To the contrary, Nourmand Enterprise desired to extort money from Selma LLC and its owners to which Defendants were not entitled. Nourmand Enterprise knew that Selma LLC was economically dependent on the development of the property and that it could not risk delaying the project, and it exploited that fact and initiated a lawsuit against the City of Los Angeles concerning the Selma LLC property in order to stop Selma LLC from proceeding with the development.

111.     Several facts further compel the conclusion that the Selma LLC litigation was initiated to extort money from Selma.  Sunset Landmark, the entity that initiated the Selma LLC litigation, and Nourmand (who owns and/or controls Sunset Landmark) owns property (the Hollywood Athletic Club) that abuts the properties that were sought to be developed by Wilcox and Tommie.  Likewise, Nourmand & Associates operates out of the Hollywood Athletic Club.  But the Hollywood Athletic Club does **not** border the property sought to be developed by Selma, which is located on a completely different block.  Thus, even if there were any argument that Sunset Landmark initiated the Thompson and Tommie CEQA lawsuits based on the impact those developments would have on Sunset Landmark, such an argument would not be applicable in the Selma litigation.  Furthermore, although Sunset Landmark and Nourmand have targeted certain developers that they perceives to be potential victims for its extortion scheme, it has ignored certain other developers with virtually identical project descriptions in the same area.  Were Sunset Landmark and Nourmand truly interested in preventing or mitigating environmental impact, they would certainly have objected to these other projects, which would have had similar environmental impact, or initiated litigation to halt their development.

112.     Of course, the reason Nourmand Enterprise had no interest in these other projects is because its scheme is not premised in any way on environmental impact.  Rather, Nourmand Enterprise targets developers that are vulnerable to extortion.

113.     Shortly after Sunset Landmark initiated the appeal concerning the Selma LLC Hotel project, Heyman met with Nourmand.  This meeting took place on or around March 29, 2018 at the Dream Hotel in Hollywood.  This meeting had been scheduled prior to Sunset Landmark's initiation of the Selma LLC appeal.  At that meeting, Heyman asked Nourmand why Sunset Landmark was appealing the Selma project, given that (1) neither Sunset Landmark nor Nourmand owned property abutting the proposed Selma LLC development; (2) there were no justifiable environmental objections to the property development; (3) Sunset Landmark had not objected to, or

1   initiated any litigation regarding, any other similar developments; and (4) Sunset

2   Landmark had just dismissed its lawsuit against Wilcox and Tommie after it received the

3   millions of dollars demanded.

4       114.   In a moment of honesty, Nourmand responded: ***"You know the drill.  It's***

5   ***going to take a check to make this go away."***  Nourmand thus openly admit that the

6   threatened litigation relating to the Selma LLC project was for the sole purpose of

7   extorting money from Selma LLC, and not based on any purported concern regarding

8   the environmental impacts of the Selma LLC property.

9       115.   When Plaintiffs refused to succumb to this renewed extortionate threat, the

10  Silverstein Law Firm, on behalf of Sunset Landmark, initiated a lawsuit on April 2,

11  2019 naming Selma LLC as a real party in interest.  Like the earlier litigation, the

12  lawsuit alleged that notwithstanding the City's detailed findings, the Selma LLC project

13  would cause significant, unmitigable impacts to the environment.  The lawsuit also

14  alleged that the City should have required a full EIR prior to approval.  This lawsuit

15  incorporated the same sham environmental concerns that formed the basis of Sunset

16  Landmark's original appeal.

17      116.   In filing this litigation, however, Nourmand Enterprise had a problem.

18  Sunset Landmark knew that it had already filed two sham lawsuits concerning

19  properties developed by Relevant, and the initiation of a third such lawsuit could risk

20  exposure of the sham and reflexive nature of these lawsuits.  Moreover, the Silverstein

21  Firm had developed a meritless legal theory that through the Selma Hotel development,

22  Relevant had engaged in improper "piecemealing," i.e., that it had developed a large-

23  scale multi-property development but had submitted the project to the City in individual

24  pieces.  This allegation is contrary to reality.  Nourmand Enterprise was concerned that

25  because Sunset Landmark had already settled and released its CEQA claims relating to

26  the Thompson and Tommie Hotels (the two properties alleged to be part of the

27  "piecemealing"), Sunset Landmark might be legally foreclosed from maintaining a

28  CEQA claim against Selma pertaining to piecemealing.

117.   The members of Nourmand Enterprise found a solution to both of these problems.  Plaintiffs are informed and believe that Silverstein had a preexisting close relationship with Maddren, which enabled Silverstein to secure Maddren's services in aid of Nourmand Enterprise.  In exchange, the Silverstein Firm agreed to provide support to Maddren in the form of assistance with drafting legal filings and pleadings.  Plaintiffs are also informed and believe that Maddren may be entitled to a portion of proceeds Sunset Landmark obtains in any settlement with Plaintiffs.

118.   The members of Nourmand Enterprise and Maddren agreed that Maddren would initiate a frivolous and sham CEQA lawsuit similarly challenging the Selma Hotel.  This act would assist Nourmand Enterprise because the filing of this lawsuit would make it appear as though Sunset Landmark's challenge had merit.  Moreover, because Maddren was not a party to the Thompson and Tommie CEQA lawsuits or the settlement of those claims, Maddren would not be vulnerable to an attack that he had released any claim of improper piecemealing.

119.   Two business days before Sunset Landmark filed its CEQA complaint concerning the Selma Hotel, Maddren filed a complaint in Los Angeles Superior Court against the City of Los Angeles, naming Selma LLC as real party in interest (the "Maddren Litigation").

120.   Notably, the Maddren Litigation was filed by Maddren in his personal capacity, notwithstanding the fact that Maddren is the President and CEO of United Neighborhoods.  On its website, United Neighborhoods identifies its "primary areas of focus" as "planning, development, budget/finance, environment/open space, and ethics."  It is revealing that the Maddren Litigation, which alleges that the Selma Hotel will have "adverse impacts on surrounding residential uses," was brought by Maddren personally and not United Neighborhoods.

121.   Indeed, United Neighborhoods had less than a year earlier filed a CEQA lawsuit against the City relating to a different development.[2]   In that lawsuit, United Neighborhoods was represented by counsel.  As President and CEO, Maddren caused United Neighborhoods to initiate that prior litigation, with Maddren verifying United Neighborhood's petition.

122.   If Maddren had a genuine belief that the City violated CEQA in approving the Selma Hotel and that the Selma Hotel would have "adverse impacts on surrounding residential uses," Maddren would have caused United Neighborhoods to retain counsel and initiate a CEQA lawsuit on behalf of the organization.  The fact that Maddren—or others at United Neighborhoods—were unwilling to put the organization's name behind the Maddren Litigation demonstrates the frivolous nature of the litigation, and the fact that Maddren's actions were designed to support his friend Silverstein and the other members of Nourmand Enterprise, rather than being a good faith legal challenge.

123.   Maddren and the other members of Nourmand Enterprise knew that the Maddren Litigation was a sham and that the allegations in the complaint were frivolous and meritless, and Maddren did not have a good faith basis for filing the complaint. Maddren filed the Maddren Litigation in order to assist and contribute to the goals of Nourmand Enterprise to extort Plaintiffs and extract monetary payment and personal concessions.

## FIRST CLAIM FOR RELIEF

**Violation of the Racketeer Influenced and Corrupt Organizations Act,**

**18 U.S.C. § 1962(c)**

**(Against All Defendants)**

124.   Plaintiffs incorporate the allegations contained in Paragraphs 1 through 111, as if fully set forth herein.

---

[2] *United Neighborhoods for Los Angeles, et al. v. City of Los Angeles*, BS174353 (L.A. Super. Ct.).

125.    Relevant Group, LLC; 1541 Wilcox Hotel LLC; 6516 Tommie Hotel LLC; and 6421 Selma Wilcox Hotel LLC, are each a "person" under 18 U.S.C. §§ 1961(3) and 1964(c).

126.    Each of the Defendants is a "person" under 18 U.S.C. §§ 1961(3), 1962(c), and 1962(d).

127.    Defendants Saeed Nourmand, Sunset Landmark Investment, and Nourmand & Associates, along with non-defendant enterprise members the Silverstein Law Firm APC and Casey Maddren, and all of their affiliated entities, agents, and/or any subsidiaries, constitute an "enterprise" engaged in, and whose activities affect, interstate commerce within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c) ("Nourmand Enterprise").  Nourmand Enterprise is an informal association that operates for a common purpose.  To further its goals, Nourmand Enterprise has engaged in a scheme of extorting money from Los Angeles developers by threatening to file or maintain meritless environmental lawsuits relating to the competing developers' projects, unless the developers pay members of Nourmand Enterprise significant money. Nourmand Enterprise exists separate and apart from the pattern of racketeering activity alleged and the Defendants themselves.  The various members of Nourmand Enterprise have agreed to each perform individual roles to carry out the unlawful goals of the enterprise.

128.    In addition to being a member of Nourmand Enterprise, Sunset Landmark itself constitutes an "enterprise" engaged in, and whose activities affect, interstate commerce within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).  Nourmand is a person who conducts the business of Sunset Landmark.

129.    As part of Nourmand Enterprise, each of the Defendants was and is associated with Nourmand Enterprise and has conducted or participated, directly or indirectly, in the management and operation of the affairs of Nourmand Enterprise in relation to Plaintiffs and other developers, including, but not necessarily limited to, owners and developers of certain property located on Schrader Boulevard, through a

pattern of activity unlawful under 18 U.S.C. § 1961(1)(A) and (B), including multiple, repeated, and continuous acts or threats involving extortion and/or attempted extortion, chargeable under 18 U.S.C. § 1951 and California Penal Code §§ 518, 522, 523, 524.

130.   Members of Nourmand Enterprise, including Sunset Landmark Investment, Saeed Nourmand, Nourmand & Associates, and the Silverstein Firm have threatened Plaintiffs and other developers with economic harm and harm to their property by threatening to ruin development plans by bringing baseless lawsuits and challenges for the purpose of delaying and frustrating developments.  These threats have caused developers to lose business partners or financing, as well as incur substantial legal fees to fight the baseless challenges.

131.   Out of a fear of the economic harm that would result from Defendants' pursuit of baseless litigation, and in response to Defendants' extortionate threats, Plaintiffs 1541 Wilcox Hotel LLC and 6516 Tommie Hotel LLC paid Defendants a significant amount of money.

132.   Members of Nourmand Enterprise, including Sunset Landmark Investment, Saeed Nourmand, Nourmand & Associates, the Silverstein Firm, and Casey Maddren, additionally threatened and attempted to extort money from 6421 Selma Wilcox Hotel LLC.  After Sunset Landmark Investment filed a meritless lawsuit related to the Selma Wilcox property, Nourmand stated to a representative of 6421 Selma Wilcox Hotel LLC: "You know the drill.  It's going to take a check to make this go away," demonstrating that the lawsuit was motivated by a desire to extort money from Plaintiffs, rather than a good faith belief in the merit of the lawsuit, or a desire to cure or mitigate any environmental impacts in the 6421 Selma Wilcox development.  Non-defendant enterprise member Casey Maddren contributed to these threats by likewise filing a sham CEQA lawsuit at the direction of, or in connection with, other members of the enterprise including Sunset Landmark, Nourmand & Associates, and the Silverstein Firm.

THIRD AMENDED COMPLAINT

133.   Defendants have carried out their threats by filing sham CEQA lawsuits, and have threatened further sham CEQA litigation unless developers agree to pay Defendants millions of dollars.

134.   Defendants also have raised sham challenges against other developers.  On information and belief, Defendants approached owners and developers of certain property located on Schrader Boulevard, and threatened to initiate meritless CEQA litigation unless those owners paid Defendants significant money.  The only reason such litigation was not initiated is because the owners of the Schrader property were able to stand up to Defendants by credibly informing them that the Schrader owners could afford to allow the property to remain undeveloped.

135.   The threats described above have instilled reasonable fear of economic harm in Plaintiffs and other developers, leading some developers to capitulate to Defendants' demands.

136.   Defendants have employed unlawful means to extort Plaintiffs and other developers, including but not limited to filing sham lawsuits and challenges to various development projects.

137.   Defendants' actions have been for the purpose of seeking unlawful ends. Defendants have no right to demand money from Plaintiffs and other developers.

138.   As a result of their actions, Defendants have obtained property within the meaning of 18 U.S.C. § 1951, including money, as well as the abandonment of Plaintiffs' causes of action pursuant to covenants given to Defendants.

139.   As a result of their actions, Defendants have obtained property and consideration for purposes of California Penal Code § 518, including money, as well as the abandonment of Plaintiffs' causes of action pursuant to covenants given to Defendants.

140.   These acts or threats form a pattern of racketeering activity as they all have occurred within 10 years of one another, are related insofar as they involve the same participants, share the same purpose of forcing developers to cave to the demands made

to enrich Nourmand Enterprise, and employ the same methods, including, but not limited to pursuing sham opposition to and litigation over projects.

141.   Using the threat of injury to Plaintiffs' business interests, including the Thompson, Tommie, and Selma Wilcox projects, Defendants have conspired and attempted to take property from Plaintiffs and other developers.

142.   Defendants' activities described herein were taken knowingly and willfully and have obstructed, delayed, or otherwise affected commerce.

143.   Defendants' conduct was designed to, and has in fact, injured Plaintiffs.  As a direct result of Defendants' unlawful and ongoing threats of extortion in violation of 18 U.S.C. § 1951 and Cal. Penal Code §§ 518, 522, and 524, Plaintiffs have paid money to Defendants, have incurred attorneys' fees and costs in litigating meritless claims, and have lost funding and experienced delays in hotel projects.

## SECOND CLAIM FOR RELIEF

**Violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(d), by Conspiring to Violate 18 U.S.C. § 1962(c)**

**(Against All Defendants)**

144.   Plaintiffs incorporate the allegations contained in Paragraphs 1 through 131, as if fully set forth herein.

145.   Relevant Group, LLC; 1541 Wilcox Hotel LLC; 6516 Tommie Hotel LLC; and 6421 Selma Wilcox Hotel LLC, are each a "person" under 18 U.S.C. §§ 1961(3) and 1964(c).

146.   Each of the Defendants is a "person" under 18 U.S.C. §§ 1961(3), 1962(c), and 1962(d).

147.   Defendants Saeed Nourmand, Sunset Landmark Investment, and Nourmand & Associates, along with non-defendant enterprise member the Silverstein Law Firm APC and Casey Maddren, and all of their affiliated entities, agents, and/or any subsidiaries, constitute Nourmand Enterprise.  Nourmand Enterprise engaged in, and its activities affect, interstate commerce within the meaning of 18 U.S.C.

§§ 1961(4) and 1962(c).  Nourmand Enterprise is an informal association that operates for a common purpose.  To further its goals, Nourmand Enterprise has engaged in a scheme of extorting money from Los Angeles developers by threatening to file or indeed filing meritless environmental lawsuits relating to the developers' projects, unless the developers pay members of the Nourmand Enterprise significant money. Nourmand Enterprise exists separate and apart from the pattern of racketeering activity alleged and the Defendants themselves.

148.   In addition to being a member of Nourmand Enterprise, Sunset Landmark itself constitutes an "enterprise" engaged in, and whose activities affect, interstate commerce within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).  Nourmand is a person who conducts the business of Sunset Landmark.

149.   Each of the Defendants was and is associated with Nourmand Enterprise, and they have all conspired among themselves within the meaning of 18 U.S.C. § 1962(d) to violate 18 U.S.C. § 1962(c).  Specifically, each of the Defendants agreed and intended, and/or adopted the goal of furthering or facilitating the following endeavor: to conduct or participate, directly or indirectly, in the management and operation of the affairs of Nourmand Enterprise in relation to Plaintiffs and other developers, including, but not necessarily limited to, the Thompson, Tommie, and Selma Wilcox projects, through a pattern of activity unlawful under 18 U.S.C. § 1961(1)(A) and (B), including multiple, repeated, and continuous acts or threats involving extortion and/or attempted extortion, chargeable under 18 U.S.C. § 1951 and California Penal Code §§ 518, 522, 523, 524.  Defendants engage in this endeavor with the purpose of obtaining money from Plaintiffs.

150.   Defendants have threatened Plaintiffs and other developers with economic harm and harm to their property by threatening to ruin development plans by bringing baseless lawsuits and challenges for the purpose of delaying and frustrating developments.  These threats have caused developers to lose business partners or financing, as well as incur substantial legal fees to fight the baseless challenges.

151.   Defendants have carried out their threats by filing sham lawsuits, and have threatened further sham CEQA litigation unless developers agree to pay Defendants millions of dollars.

152.   Defendants also have raised sham challenges against other developers.  On information and belief, Defendants approached certain property owners and developers located on Schrader Boulevard, and threatened to initiate meritless CEQA litigation unless those owners paid Defendants significant money.  The only reason this litigation was not initiated is because the owners of the Schrader property were able to stand up to Defendants by credibly informing them that the Schrader owners could afford to allow the property to remain undeveloped.

153.   The threats described above have instilled reasonable fear of economic harm in Plaintiffs and other developers, leading some developers to capitulate to Defendants' demands.

154.   Defendants have employed unlawful means to extort Plaintiffs and other developers, including but not limited to filing sham lawsuits and challenges to various development projects.

155.   Defendants' actions have been for the purpose of seeking unlawful ends. Defendants have no right to demand money from Plaintiffs and other developers.

156.   As a result of their actions, Defendants have obtained property within the meaning of 18 U.S.C. § 1951, including money, as well as the abandonment of Plaintiffs' causes of action pursuant to covenants given to Defendants.

157.   As a result of their actions, Defendants have obtained property and consideration for purposes of Penal Code 518, including money, as well as the abandonment of Plaintiffs' causes of action pursuant to covenants given to Defendants.

158.   These acts or threats form a pattern of racketeering activity as they all have occurred within 10 years of one another, are related insofar as they involve the same participants, share the same objective of forcing developers to cave to the demands made to enrich Nourmand Enterprise, and employ the same methods, including, but not

limited to pursuing sham opposition to and litigation over projects in an effort to hold projects hostage unless Plaintiffs and the other developers accede to Defendants' demands.

159.   Using the threat of injury to Plaintiffs' and other developers' business interests, Defendants have conspired and attempted to take property from Plaintiffs and other developers.

160.   Defendants' activities described herein were taken knowingly and willfully and have obstructed, delayed, or otherwise affected commerce.

161.   Defendants' conduct was designed to, and has in fact, injured Plaintiffs. As a direct result of Defendants' unlawful and ongoing threats of extortion in violation of 18 U.S.C. § 1951 and Cal. Penal Code §§ 518, 522, and 524, Plaintiffs have paid money to Defendants, have incurred attorneys' fees and costs in litigating meritless claims, and have lost funding and experienced delays in hotel projects.

## THIRD CLAIM FOR RELIEF
### Violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(d), by Conspiring to Violate 18 U.S.C. § 1962(b)
### (Against All Defendants)

162.   Plaintiffs incorporate the allegations contained in Paragraphs 1 through 149, as if fully set forth herein.

163.   Relevant Group, LLC; 1541 Wilcox Hotel, LLC; 6516 Tommie Hotel LLC; and 6421 Selma Wilcox Hotel LLC, are each a "person" under 18 U.S.C. §§ 1961(3) and 1964(b).

164.   Each of the Defendants is a "person" under 18 U.S.C. §§ 1961(3), 1962(b), and 1962(d).

165.   Defendants Saeed Nourmand, Sunset Landmark Investment, and Nourmand & Associates, along with non-defendant enterprise member the Silverstein Law Firm APC and Casey Maddren, and all of their affiliated entities, agents, and/or any subsidiaries, constitute Nourmand Enterprise. Nourmand Enterprise engaged in,

1   and its activities affect, interstate commerce within the meaning of 18 U.S.C.

2   §§ 1961(4) and 1962(c). Nourmand Enterprise is an informal association that operates

3   for a common purpose. To further its goals, Nourmand Enterprise has engaged in a

4   scheme of extorting money from Los Angeles developers by threatening to file or

5   indeed filing meritless environmental lawsuits relating to the developers' projects,

6   unless the developers pay members of the Nourmand entity significant money.

7   Nourmand Enterprise exists separate and apart from the pattern of racketeering activity

8   alleged and the Defendants themselves.

9   166.   In addition to being a member of Nourmand Enterprise, Sunset Landmark

10   itself constitutes an "enterprise" engaged in, and whose activities affect, interstate

11   commerce within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c). Nourmand is a

12   person who conducts the business of Sunset Landmark.

13   167.   Each of the Defendants were and are associated with Nourmand Enterprise,

14   and they have all conspired among themselves within the meaning of 18 U.S.C. §

15   1962(d) to violate 18 U.S.C. § 1962(b). Specifically, each of the Defendants agreed and

16   intended, and/or adopted the goal of furthering or facilitating, the following endeavor: to

17   conduct or participate, directly or indirectly, in the management and operation of the

18   affairs of Nourmand Enterprise, and to acquire or maintain, directly or indirectly,

19   interest in Nourmand Enterprise, in relation to Plaintiffs and other developers, including,

20   but not necessarily limited to, the Thompson, Tommie, and Selma Wilcox projects,

21   through a pattern of activity unlawful under 18 U.S.C. § 1961(1)(A) and (B), including

22   multiple, repeated, and continuous acts or threats involving extortion and/or attempted

23   extortion, chargeable under 18 U.S.C. § 1951 and California Penal Code §§ 518, 522,

24   523 524. Defendants engage in this endeavor with the purpose of obtaining money from

25   Plaintiffs.

26   168.   Defendants have threatened Plaintiffs and other developers with economic

27   harm and harm to their property by threatening to ruin development plans by bringing

28   baseless lawsuits and challenges for the purpose of delaying and frustrating

41

developments.  These threats have caused developers to lose business partners or financing, as well as incur substantial legal fees to fight the baseless challenges.

169.   Defendants have carried out their threats by filing sham lawsuits, and have threatened further sham CEQA litigation unless developers agree to pay Defendants millions of dollars.

170.   Defendants also have raised sham challenges against other developers.  On information and belief, Defendants approached certain property owners and developers located on Schrader Boulevard, and threatened that they would initiate meritless CEQA litigation regarding that property, unless those owners paid Defendants significant money.  The only reason this litigation was not initiated is because the owners of the Schrader property were able to stand up to Defendants by credibly informing them that the Schrader owners could afford to allow the property to remain undeveloped.

171.   These threats have instilled reasonable fear in Plaintiffs and other developers of economic harm, leading many developers to capitulate to Defendants' demands.

172.   Defendants have employed unlawful means to extort Plaintiffs and other developers, including but not limited to filing sham lawsuits and challenges to the project.

173.   Defendants' actions have been for the sole purpose of seeking unlawful ends.  Defendants have no right to demand money from Plaintiffs or other developers.

174.   As a result of their actions, Defendants have obtained property within the meaning of 18 U.S.C. § 1951, including money, as well as the abandonment of Plaintiffs' causes of action pursuant to covenants given to Defendants.

175.   As a result of their actions, Defendants have obtained property and consideration for purposes of Penal Code § 518 including money, as well as the abandonment of Plaintiffs' causes of action pursuant to covenants given to Defendants.

176.   Defendants have conspired and attempted to take property from Plaintiffs, including money, as well as the abandonment of Plaintiffs' causes of action pursuant to covenants given to Defendants.

177.   Defendants' activities described herein were taken knowingly and willfully, and have obstructed, delayed, or otherwise affected commerce.

178.   Defendants' conduct was designed to, and has in fact, injured Plaintiffs.  As a direct result of Defendants' unlawful and ongoing threats of extortion in violation of 18 U.S.C. § 1951 and Cal. Penal Code §§ 518, 522, and 524, Plaintiffs have paid money to Defendants, have incurred attorneys' fees and costs in litigating meritless claims, and have lost funding and experienced delays in hotel projects.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs Relevant Group, LLC; 1541 Wilcox Hotel, LLC; 6516 Tommie Hotel LLC; and 6421 Selma Wilcox Hotel LLC respectfully request that the Court issue the following relief:

A.   Defendants and their agents be enjoined from engaging in further extortion and attempted extortion with respect to the Selma Wilcox Hotel project;

B.   Damages against Defendants, jointly and severally, for a sum of money equal to the amount of damages Plaintiffs have sustained or will sustain, in an amount to be proven at trial, but believed to be in excess of $100 million (trebled pursuant to 18 U.S.C. § 1964(c));

C.   Prejudgment interest;

D.   Costs of suit incurred, including all costs, expenses, attorneys' and experts' fees;

E.   Punitive damages; and

F.   Such other relief as the Court deems just and proper.

/ / /

/ / /

/ / /

## **JURY DEMAND**

Plaintiffs demand a trial by jury.


Dated:  September 14, 2021          **AKIN GUMP STRAUSS HAUER &**
                                    **FELD LLP**
                                    Susan K. Leader
                                    Joshua A. Rubin


                                    By:_____*/s/ Susan K. Leader*_____
                                          Susan K. Leader
                                          Attorneys for Plaintiffs