**NORTON ROSE FULBRIGHT US LLP**
JAMES H. TURKEN (BAR NO. 89618)
CHRISTOPHER K. PELHAM (BAR NO. 241068)
NEIL P. THAKOR (BAR NO. 308743)
555 South Flower Street
Forty-First Floor
Los Angeles, CA 90071
Telephone:  (213) 892-9200
Facsimile:  (213) 892-9494
james.turken@nortonrosefulbright.com
neil.thakor@nortonrosefulbright.com
christopher.pelham@nortonrosefulbright.com

Attorneys for Defendants,
STEPHAN "SAEED" NOURMAND,
and THE SUNSET LANDMARK
INVESTMENT LLC

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RELEVANT GROUP, LLC, a Delaware limited liability company; 1541 WILCOX HOTEL LLC, a Delaware limited liability company; 6516 TOMMIE HOTEL LLC, a Delaware limited liability company; and 6421 SELMA WILCOX HOTEL LLC, a California limited liability company, <br><br> Plaintiffs, <br><br> v. <br><br> STEPHEN "SAEED" NOURMAND, an individual; THE SUNSET LANDMARK INVESTMENT LLC, a California limited liability company; and DOES 1-10, <br><br> Defendants. | Case No. 2:19-cv-05019-ODW-KSx <br> *[Hon. Otis D. Wright II]* <br><br> **CORRECTED DECLARATION OF NEIL P. THAKOR IN SUPPORT OF DEFENDANTS STEPHAN "SAEED" NOURMAND AND THE SUNSET LANDMARK INVESTMENT LLC'S MOTION FOR SUMMARY JUDGMENT OR, ALTERNATIVELY, FOR PARTIAL SUMMARY JUDGMENT** <br><br> *[Notice of Motion; Memorandum of Points and Authorities; Request for Judicial Notice; Separate Statement of Undisputed Material Fact and Conclusions of Law; and Declaration of Saeed Nourmand Filed Concurrently Herewith; [Proposed] Order and [Proposed] Judgment Submitted Concurrently Herewith]* <br><br> **Date:  June 13, 2022** <br> **Time:  1:30 p.m.** <br> **Place: Courtroom 5D** <br><br> Complaint Filed: June 10, 2019 <br> TAC Filed:  September 21, 2021 <br> Trial Date:  August 2, 2022 |

107404503.1

Document Prepared on Recycled Paper

## <u>DECLARATION OF NEIL P. THAKOR</u>

I Neil P. Thakor, declare as follows:

1.      I am an attorney at law duly admitted to practice before this Court.  I am an Associate with the law firm of Norton Rose Fulbright US LLP ("NRF"), counsel of record for defendants Stephan "Saeed" Nourmand and The Sunset Landmark Investment LLC ("Sunset") (collectively, "S Defendants").   I have personal knowledge of the matters stated herein and if called upon to testify as a witness, I could and would competently testify thereto.

2.      On March 8, 2022, Grant King sat for deposition.  A true and correct copy of excerpts from the March 8, 2022 Grant King deposition is attached here as **<u>Exhibit A</u>**.

3.      On March 29, 2022, Andrew Shayne sat for deposition.  A true and correct copy of excerpts from the March 29, 2022 Andrew Shayne deposition is attached here as **<u>Exhibit B</u>**.

4.      On April 1, 2022 Matt Hinks sat for deposition.  A true and correct copy of excerpts from the April 1, 2022 Matt Hinks deposition is attached here as **<u>Exhibit C</u>**.

5.      On April 15, 2022 Casey Maddren sat for deposition.  A true and correct copy of excerpts and exhibits from the rough transcript of the April 15, 2022, Casey Maddren deposition is attached here as **<u>Exhibit D</u>**.  A final transcript has not yet been made available.

6.      On April 20, 2021, Bruce Rothman sat for deposition.  A true and correct copy of excerpts from the April 20, 2021, Bruce Rothman deposition is attached here as **<u>Exhibit E</u>**.

7.      On March 18, 2022 Guy Maisnik sat for deposition.  A true and correct copy of excerpts from the March 18, 2022 Guy Maisnik deposition is attached here as **<u>Exhibit F</u>**.

8.      Attached as **<u>Exhibit G</u>** is a true and correct copy of the homepage of

- 1 -

Document Prepared on Recycled Paper

Plaintiff Relevant Group, LLC's website, at https://www.relevantgroup.com/, last accessed on May 9, 2022.

9. Attached as **Exhibit H** is a true and correct copy of the January 8, 2018 settlement agreement for the Wilcox/Thompson Hotel Litigation, Los Angeles Superior Court Case No. BS160807.

10. Attached as **Exhibit I** is a true and correct copy of the January 8, 2018 settlement agreement for the Tommie Hotel Litigation, Los Angeles Superior Court Case No. BS169821.

11. Attached here as **Exhibit J** is a true and correct copy of an email chain between Guy Maisnik and Jayesh Patel from June 2017 to July 2017. This email chain was authenticated and introduced as an exhibit at the Maisnik transcript.

12. Attached hereto as **Exhibit K** is an email chain between Guy Maisnik and Jay Patel from August 17 to August 22 that was introduced and authenticated during the Maisnik deposition.

13. Attached hereto as **Exhibit L** is an email chain between Guy Maisnik and Jay Patel from August 23 to September 17 that was introduced and authenticated during the Maisnik deposition.

14. Attached hereto as **Exhibit M** is an email chain between Guy Maisnik and Jay Patel from September 25, 2017 to October 14, 2017 that was authenticated and introduced during the Maisnik deposition.

15. Attached here as **Exhibit N** is a true and correct copy of an letter sent from Robert Silverstein to Matt Hinks on April 21, 2017. This letter was authenticated and introduced during the deposition of Matt Hinks.

16. Attached here as **Exhibit O** is a true and correct copy of an letter sent from Robert Silverstein to Matt Hinks on May 3, 2017. This letter was authenticated and introduced during the deposition of Matt Hinks.

17. Attached hereto as **Exhibit P i**s a true and correct copy of a May 6, 2015 email from Grant King to Scott Campbell which was introduced and authenticated

- 2 -

DOCUMENT PREPARED ON RECYCLED PAPER

during the deposition of Grant King.

18.     Attached hereto as **Exhibit Q** is a true and correct copy of a October 6, 2016 email from Laurie Goldman to Scott Cambell, Richard Heyman, and Grant King which was introduced and authenticated during the deposition of Grant King.

19.     Attached hereto as **Exhibit R** is a true and correct copy of a December 12, 2016 email from Laurie Goldman to Richard Heyman which was introduced and authenticated during the deposition of Grant King.

20.     Attached hereto as **Exhibit S** is a true and correct copy of text messages between Stephan "Saeed" Nourmand and Richard Heyman in April of 2017.  These texts were produced by Plaintiffs in discovery.

21.     Attached hereto as **Exhibit T** is a true and correct copy of text messages between Stephan "Saeed" Nourmand and Richard Heyman in March of 2018.  These texts were produced during discovery and partially quoted in the Third Amended Complaint.

22.     Attached here to as **Exhibit U** is a true and correct copy of an email from John Tronson to Stephan Saeed Nourmand on March 17, 2015.

23.     Attached hereto as **Exhibit V** is a true and correct copy of a May 3, 2020 email chain between Robert Silverstein and Stephan Saeed Nourmand that was produced in connection with a Court Order.

24.     Attached as **Exhibit W** is a true and correct copy of excerpts from Plaintiff Relevant Group, LLC's Supplemental Responses to Sunset's First Set of Interrogatories, dated December 17, 2021.

25.     Attached as **Exhibit X** is a true and correct copy of excerpts from Plaintiff 1541 Wilcox Hotel, LLC's Supplemental Responses to Sunset's First Set of Interrogatories, dated December 17, 2021.

26.     Attached as **Exhibit Y** is a true and correct copy of excerpts from Plaintiff 6516 Tommie Hotel, LLC's Supplemental Responses to Sunset's First Set of Interrogatories, dated December 17, 2021.

Document Prepared
on Recycled Paper

27.    Attached as **<u>Exhibit Z</u>** is a true and correct copies of excerpts that Plaintiff 6421 Selma Wilcox, LLC's Supplemental Responses to Sunset's First Set of Interrogatories, dated December 17, 2021.

I declare under penalty of perjury under the laws of the United States of America and the State of California that foregoing is true and correct and that this Declaration is executed on this 10th day of May, 2022, at Los Angeles, California.

*Neil P. Thakor*
_____
Neil P. Thakor

DOCUMENT PREPARED ON RECYCLED PAPER

# Exhibit A

CONFIDENTIAL

```
 1            IN THE UNITED STATES DISTRICT COURT

 2          FOR THE CENTRAL DISTRICT OF CALIFORNIA

 3

 4

 5   RELEVANT GROUP, LLC, a Delaware)

 6   limited liability company;     )

 7   et al.,    )

 8                  Plaintiffs,     )

 9       VS.                        )  NO. 2:19-CV-05019

10   STEPHEN "SAEED" NOURMAND, an   )

11   individual, et al.,            )

12                  Defendants.     )

13   _____)

14

15            C O N F I D E N T I A L

16   DEPOSITION OF:

17              GRANT KING

18              TUESDAY, MARCH 8, 2022

19              9:28 A.M.

20

21

22   REPORTED BY:

23              Sari M. Knudsen

24              CSR No. 13109

25
```

Page 1

CONFIDENTIAL

```
 1   BY MR. THAKOR:                                    10:19:34

 2       Q    When did that change occur?             10:19:35

 3       A    It occurred probably sometime in 2013.  10:19:46

 4       Q    And what was the reason behind the shift 10:19:57

 5   from building one hotel to trying to build multiple 10:20:01

 6   hotels?                                           10:20:02

 7       MS. LEADER:  Objection.  Lacks foundation.   10:20:04

 8   Objection.  Calls for speculation.               10:20:05

 9       THE WITNESS:  Because we were -- successfully 10:20:07

10   funded the first project.                        10:20:11

11   BY MR. THAKOR:                                   10:20:11

12       Q    So if I'm understanding your answer     10:20:13

13   correctly, you had success with the first hotel.  So 10:20:16

14   you thought let's build more.  Is that fair?     10:20:19

15       A    Yeah.  And there was a lot of opportunity 10:20:20

16   in and around Hollywood.                         10:20:25

17       Q    When you say the first project was      10:20:28

18   successfully funded, was that funded through EB5  10:20:32

19   funding?                                         10:20:33

20       A    Correct.                                10:20:34

21       Q    And what was the name of that project?  10:20:38

22       A    That was called Dream Hotel.            10:20:39

23       Q    And where is the Dream located -- Dream 10:20:42

24   Hotel located?                                   10:20:42

25       A    It's at 6417 Selma Avenue.              10:20:56
```

Page 51

| | | |
|---|---|---|
| 1 | are proposing. | 10:50:16 |
| 2 | Q    Has that project been approved by the City? | 10:50:22 |
| 3 | A    No.  It has not. | 10:50:24 |
| 4 | Q    Has it been submitted to the City? | 10:50:27 |
| 5 | A    Yes.  It has. | 10:50:31 |
| 6 | Q    Has there been a notice in public comment | 10:50:34 |
| 7 | issued for the project? | 10:50:38 |
| 8 | A    We are just -- we are just filing our EIR | 10:50:43 |
| 9 | here in the coming weeks. | 10:50:45 |
| 10 | Q    Have you received any objections at the | 10:50:52 |
| 11 | City level with respect to the Morrison Hotel? | 10:50:59 |
| 12 | A    No. | 10:50:59 |
| 13 | MS. LEADER:  Objection.  Vague as framed. | 10:51:01 |
| 14 | THE WITNESS:  No. | 10:51:02 |
| 15 | BY MR. THAKOR: | 10:51:02 |
| 16 | Q    No? | 10:51:03 |
| 17 | A    No. | 10:51:04 |
| 18 | Q    And that includes from Sunset Landmark? | 10:51:06 |
| 19 | A    No. | 10:51:11 |
| 20 | Q    That includes from Saeed Nourmand? | 10:51:15 |
| 21 | A    No. | 10:51:16 |
| 22 | Q    That includes Nourmand & Associates? | 10:51:18 |
| 23 | A    No. | 10:51:21 |
| 24 | Q    That includes from any client being | 10:51:22 |
| 25 | represented by Robert Silverstein? | 10:51:25 |

Page 60

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | A     There was some EB5 funding on it, on the | 10:56:46 |
| 2 | project. | 10:56:50 |
| 3 | Q     When Relevant Group was seeking approval | 10:56:54 |
| 4 | for the Barclay project at the City level, did it | 10:56:59 |
| 5 | receive any CEQA objections? | 10:57:00 |
| 6 | A     I have no idea.  I'm not aware of that. | 10:57:09 |
| 7 | Q     And were you personally involved in the | 10:57:19 |
| 8 | Barclay project? | 10:57:23 |
| 9 | A     On fundraising side. | 10:57:25 |
| 10 | Q     And were you generally kept abreast of what | 10:57:30 |
| 11 | was going on with the City approval of the project? | 10:57:37 |
| 12 | A     I -- I -- I don't remember if I was | 10:57:39 |
| 13 | updated.  But that would be a Richard department. | 10:57:45 |
| 14 | Q     You said earlier in this deposition that | 10:57:47 |
| 15 | you and Richard communicate daily.  Right? | 10:57:50 |
| 16 | A     We do. | 10:57:51 |
| 17 | Q     Well, did Richard ever tell you that anyone | 10:57:53 |
| 18 | objected to the Barclay Hotel or -- excuse me -- | 10:57:58 |
| 19 | that the Barclay project? | 10:58:00 |
| 20 | A     I don't remember him saying that, no. | 10:58:04 |
| 21 | Q     Did Richard ever tell you that Saeed | 10:58:07 |
| 22 | Nourmand objected to the Barclay project? | 10:58:11 |
| 23 | A     I don't remember him saying that, no. | 10:58:13 |
| 24 | Q     Do you remember him mentioning Sunset | 10:58:15 |
| 25 | Landmark objecting to the Barclay project at all? | 10:58:23 |

Page 64

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | off the record) | 10:59:38 |
| 2 | MS. LEADER:  Now I'm hopelessly confused. | 10:59:48 |
| 3 | BY MR. THAKOR: | 10:59:48 |
| 4 | Q    Any reference to 1066 or 1066 Broadway | 10:59:54 |
| 5 | refer to 1060 Broadway. | 10:59:56 |
| 6 | Right? | 10:59:57 |
| 7 | A    1060 Broadway. | 10:59:58 |
| 8 | Q    I'll try to get that right. | 11:00:00 |
| 9 | Do you have any recollection of whether | 11:00:05 |
| 10 | Relevant Group went to the City of Los Angeles to | 11:00:06 |
| 11 | prove any entitlement work for that project? | 11:00:11 |
| 12 | A    I can't remember.  I don't recall. | 11:00:13 |
| 13 | Q    Are there any other projects that Relevant | 11:00:20 |
| 14 | Group is developing in downtown Los Angeles? | 11:00:24 |
| 15 | A    Currently? | 11:00:24 |
| 16 | Q    Ever.  Has ever developed in downtown Los | 11:00:26 |
| 17 | Angeles. | 11:00:27 |
| 18 | A    We have three residential projects we are | 11:00:29 |
| 19 | developing. | 11:00:29 |
| 20 | Q    Currently? | 11:00:30 |
| 21 | A    Currently. | 11:00:31 |
| 22 | Q    So three residential projects you are | 11:00:33 |
| 23 | currently developing.  We talked about Morrison, | 11:00:36 |
| 24 | Barclay and Broadway? | 11:00:38 |
| 25 | A    Uh-huh. | 11:00:39 |

Page 66

| | | |
|---|---|---|
| 1 | Q    Other than those three residential projects | 11:00:41 |
| 2 | and those three we just discussed, is there any | 11:00:43 |
| 3 | other project that Relevant Group has developed in | 11:00:45 |
| 4 | downtown L.A.? | 11:00:46 |
| 5 | A    There was a permit for the housing project | 11:00:52 |
| 6 | on Skid Row on 5th Street that we're proposing. | 11:00:58 |
| 7 | Q    Currently? | 11:01:01 |
| 8 | A    Currently. | 11:01:02 |
| 9 | Q    And for these three residential | 11:01:07 |
| 10 | developments that you had mentioned in downtown | 11:01:09 |
| 11 | L.A., did you need to go to the City for approval | 11:01:11 |
| 12 | for those projects? | 11:01:13 |
| 13 | A    We did. | 11:01:14 |
| 14 | Q    Did you get that approval? | 11:01:15 |
| 15 | A    We are in the process of all three. | 11:01:21 |
| 16 | Q    Did -- to your knowledge, did you receive | 11:01:25 |
| 17 | any CEQA objection to any of those three? | 11:01:28 |
| 18 | MS. LEADER:  Objection.  Lacks foundation as | 11:01:30 |
| 19 | framed. | 11:01:30 |
| 20 | THE WITNESS:  We did receive a CEQA objection. | 11:01:35 |
| 21 | BY MR. THAKOR: | 11:01:35 |
| 22 | Q    Okay.  So let me break up those three | 11:01:39 |
| 23 | developments. | 11:01:40 |
| 24 | A    Okay. | 11:01:40 |
| 25 | Q    We'll take them one at a time. | 11:01:42 |

Page 67

CONFIDENTIAL

| | | | |
|---|---|---|---|
| 1 | A | Okay. | 11:01:43 |
| 2 | Q | So can you first identify the first | 11:01:45 |
| 3 | residential development in downtown L.A. just so we | | 11:01:49 |
| 4 | have -- | | 11:01:49 |
| 5 | A | 121 3rd Street. | 11:01:52 |
| 6 | Q | What is the second? | 11:01:53 |
| 7 | A | 845 Olive. | 11:01:54 |
| 8 | Q | And third? | 11:01:56 |
| 9 | A | 1200 Olive. | 11:01:59 |
| 10 | Q | Got it.  And you said a moment ago that you | 11:02:02 |
| 11 | received a CEQA objection.  Did you receive a CEQA | | 11:02:06 |
| 12 | objection to all three? | | 11:02:08 |
| 13 | A | No. | 11:02:08 |
| 14 | Q | Which of these projects did you receive a | 11:02:10 |
| 15 | CEQA objection to? | | 11:02:11 |
| 16 | A | On 3rd Street.  121 3rd. | 11:02:14 |
| 17 | Q | Do you know who the CEQA objection was | 11:02:16 |
| 18 | filed by? | | 11:02:16 |
| 19 | A | Yes, I do. | 11:02:17 |
| 20 | Q | Who? | 11:02:17 |
| 21 | A | The Carpenters Union. | 11:02:19 |
| 22 | Q | The Carpenters Union.  Do you know if the | 11:02:22 |
| 23 | Carpenters Union is in any way affiliated -- | | 11:02:25 |
| 24 | A | And it was an appeal.  Not a lawsuit.  So I | 11:02:28 |
| 25 | want to make sure that's clear too. | | 11:02:30 |

Page 68

CONFIDENTIAL

| | | | |
|---|---|---|---|
| 1 | A | As part of the team, yes, I do. | 11:06:21 |
| 2 | Q | We had talked about one of those hotels a | 11:06:23 |
| 3 | moment ago.  That was the Dream One Hotel? | | 11:06:27 |
| 4 | A | Dream, yeah. | 11:06:28 |
| 5 | Q | Was that the first hotel you had developed | 11:06:32 |
| 6 | in Hollywood? | | 11:06:34 |
| 7 | A | Yes, it was. | 11:06:48 |
| 8 | Q | Did you have to seek approval from the City | 11:06:57 |
| 9 | of Los Angeles for the Dream Hotel? | | 11:07:01 |
| 10 | A | We did. | 11:07:04 |
| 11 | Q | Did you obtain that approval? | 11:07:04 |
| 12 | A | We did. | 11:07:10 |
| 13 | Q | Did you receive any CEQA appeals for the | 11:07:13 |
| 14 | Dream Hotel? | | 11:07:15 |
| 15 | A | No. | 11:07:18 |
| 16 | Q | None whatsoever? | 11:07:18 |
| 17 | A | None. | 11:07:23 |
| 18 | Q | And that includes from Sunset Landmark. | 11:07:25 |
| 19 | Right? | | 11:07:25 |
| 20 | A | Right. | 11:07:26 |
| 21 | Q | And Saeed Nourmand.  Right? | 11:07:29 |
| 22 | A | Right. | 11:07:29 |
| 23 | Q | And Nourmand & Associates.  Right? | 11:07:32 |
| 24 | A | Right. | 11:07:32 |
| 25 | Q | Was the Dream One Hotel funded by EB5 | 11:07:42 |

Page 72

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | are asking with respect to Citizen Use. | 11:11:04 |
| 2 | MR. THAKOR:  Yes, that's correct. | 11:11:10 |
| 3 | THE WITNESS:  I think you would have to ask | 11:11:14 |
| 4 | Mr. Maddren that. | 11:11:15 |
| 5 | BY MR. THAKOR: | 11:11:15 |
| 6 | Q    Actually, my question is a little | 11:11:19 |
| 7 | different. | 11:11:19 |
| 8 | I'm asking if you are aware of the basis | 11:11:21 |
| 9 | that Mr. Maddren asserted in the CEQA appeal? | 11:11:26 |
| 10 | A    No. | 11:11:30 |
| 11 | Q    Do you remember ever reading Mr. Maddren's | 11:11:31 |
| 12 | CEQA appeal to Citizen? | 11:11:36 |
| 13 | A    I did not. | 11:11:41 |
| 14 | Q    So it's fair to say that you do not have | 11:11:42 |
| 15 | any opinions as to the merits of Mr. Maddren's CEQA | 11:11:48 |
| 16 | appeal of Citizen? | 11:11:51 |
| 17 | MS. LEADER:  Objection.  Lacks foundation. | 11:11:53 |
| 18 | THE WITNESS:  I don't understand the question. | 11:11:54 |
| 19 | BY MR. THAKOR: | 11:11:54 |
| 20 | Q    Do you have an opinion as to the merit of | 11:11:57 |
| 21 | Mr. Maddren's CEQA appeal to Citizen project? | 11:12:01 |
| 22 | A    No, I don't have an opinion. | 11:12:07 |
| 23 | Q    Okay.  So we had talked about Mr. Maddren's | 11:12:09 |
| 24 | CEQA appeal to the Citizen project.  Did you receive | 11:12:12 |
| 25 | any other CEQA appeals? | 11:12:15 |

Page 75

CONFIDENTIAL

| | | | |
|---|---|---|---|
| 1 | A | On Citizen? | 11:12:16 |
| 2 | Q | Yes. | 11:12:17 |
| 3 | A | No. | 11:12:18 |
| 4 | Q | And that includes from any of the | 11:12:20 |
| 5 | | defendants.  Right? | 11:12:24 |
| 6 | A | That's correct. | 11:12:29 |
| 7 | Q | Okay.  What is Tao Group? | 11:12:39 |
| 8 | A | That's a hospitality group. | 11:12:42 |
| 9 | Q | And is the Tao Group affiliated at all with | 11:12:47 |
| 10 | | Relevant? | 11:12:48 |
| 11 | A | They manage our Dream Hotel F&B programs. | 11:12:54 |
| 12 | Q | What does F&B mean? | 11:12:55 |
| 13 | A | Food and beverage. | 11:13:01 |
| 14 | Q | So the -- is -- is there a -- is the Tao | 11:13:10 |
| 15 | | Group affiliated with any property other than Dream | 11:13:13 |
| 16 | | One? | 11:13:14 |
| 17 | | MS. LEADER:  Objection.  Vague as framed. | 11:13:17 |
| 18 | | Essentially calls for a legal conclusion. | 11:13:19 |
| 19 | | THE WITNESS:  They are -- there's Tao | 11:13:22 |
| 20 | | Restaurant.  There's Beauty & Essex, and there's | 11:13:25 |
| 21 | | Highlight Room. | 11:13:27 |
| 22 | | BY MR. THAKOR: | 11:13:27 |
| 23 | Q | Got it.  Lets go through each one of those. | 11:13:30 |
| 24 | A | Okay. | 11:13:30 |
| 25 | Q | Let's talk about Tao Restaurant.  What is | 11:13:33 |

Page 76

| | | |
|---|---|---|
| 1 | Tao Restaurant? | 11:13:34 |
| 2 | A    It's an Asian concept. | 11:13:41 |
| 3 | Q    High-end restaurant.  Is that fair? | 11:13:44 |
| 4 | A    Fair. | 11:13:46 |
| 5 | Q    And it was developed by Relevant Group? | 11:13:49 |
| 6 | A    You should ask my man.  He's a frequenter | 11:13:52 |
| 7 | of there. | 11:13:52 |
| 8 | Q    Is that true? | 11:13:53 |
| 9 | A    That's what he said. | 11:13:54 |
| 10 | Q    Do you know him? | 11:13:56 |
| 11 | A    No. | 11:13:57 |
| 12 | THE VIDEOGRAPHER:  No. | 11:13:58 |
| 13 | MS. LEADER:  So the record is clear, Mr. King | 11:14:01 |
| 14 | was gesturing at the videographer who he did not | 11:14:05 |
| 15 | know prior to today.  But evidently he enjoys the | 11:14:07 |
| 16 | food at the restaurant. | 11:14:08 |
| 17 | MR. THAKOR:  I'm sure it's delicious. | 11:14:10 |
| 18 | THE WITNESS:  Yes. | 11:14:11 |
| 19 | BY MR. THAKOR: | 11:14:11 |
| 20 | Q    Did you develop or did Relevant Group | 11:14:13 |
| 21 | develop the Tao Restaurant? | 11:14:15 |
| 22 | A    We did. | 11:14:15 |
| 23 | Q    Did you have to go through the City of L.A. | 11:14:17 |
| 24 | to gain approval for that restaurant? | 11:14:19 |
| 25 | A    We did. | 11:14:22 |

Page 77

| 1 | Q    Did you receive any CEQA appeals to the | 11:14:24 |
| 2 | development of that restaurant? | 11:14:27 |
| 3 | A    Not that I'm aware of. | 11:14:29 |
| 4 | Q    And so you are not aware of the | 11:14:31 |
| 5 | defendants -- any of the defendants filing a CEQA | 11:14:34 |
| 6 | appeal to the Tao Restaurant? | 11:14:38 |
| 7 | A    Not that I'm aware of. | 11:14:41 |
| 8 | Q    You had mentioned Beauty & Essex? | 11:14:44 |
| 9 | A    Uh-huh. | 11:14:44 |
| 10 | Q    What is Beauty & Essex? | 11:14:47 |
| 11 | A    That is a restaurant. | 11:14:50 |
| 12 | Q    Another high-end restaurant? | 11:14:53 |
| 13 | A    A high end. | 11:14:54 |
| 14 | Q    Is Beauty & Essex a restaurant that | 11:14:56 |
| 15 | Relevant Group developed? | 11:14:57 |
| 16 | A    It is. | 11:15:01 |
| 17 | Q    Did the Beauty & Essex Restaurant have to | 11:15:06 |
| 18 | go through the City of L.A. to gain approval? | 11:15:09 |
| 19 | A    It did. | 11:15:10 |
| 20 | Q    Did -- was there any CEQA appeal filed | 11:15:13 |
| 21 | against the Beauty & Essex project? | 11:15:15 |
| 22 | A    Not that I'm aware of. | 11:15:16 |
| 23 | Q    And that includes any of the defendants. | 11:15:20 |
| 24 | Is that right? | 11:15:23 |
| 25 | A    Yes. | 11:15:24 |

Page 78

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | Q    One thing I forgot to ask about the Tao | 11:15:27 |
| 2 | Restaurant.  Was that being funded by EB5 funding? | 11:15:30 |
| 3 | A    Yes.  Partial. | 11:15:32 |
| 4 | Q    And when you say "partial," explain that. | 11:15:36 |
| 5 | How does Relevant Group make the decision | 11:15:42 |
| 6 | to have -- strike that.  We'll get into EB5 funding | 11:15:47 |
| 7 | later.  We'll save that question. | 11:15:49 |
| 8 | A    Okay. | 11:15:51 |
| 9 | Q    Okay.  So you had mentioned a third project | 11:15:55 |
| 10 | besides the Tao Restaurant and Beauty & Essex but I | 11:15:58 |
| 11 | didn't write it down.  Do you remember it? | 11:16:00 |
| 12 | A    Highlight Room. | 11:16:02 |
| 13 | Q    Highlight Room.  Yes.  And Highlight Room | 11:16:05 |
| 14 | is in Hollywood? | 11:16:06 |
| 15 | A    It's on the rooftop of Dream. | 11:16:08 |
| 16 | Q    You say it's on the rooftop of Dream.  Did | 11:16:10 |
| 17 | you need to get approval from the City of | 11:16:12 |
| 18 | Los Angeles specifically for the Highlight Room? | 11:16:14 |
| 19 | A    No.  It was in the entitlements originally. | 11:16:18 |
| 20 | Q    I see. | 11:16:20 |
| 21 | Are there any other projects other than | 11:16:27 |
| 22 | what we've discussed that Relevant Group has | 11:16:29 |
| 23 | developed in Hollywood? | 11:16:38 |
| 24 | A    Those are the ones that are developed, yes. | 11:16:42 |
| 25 | Q    Are there any projects that Relevant Group | 11:16:44 |

Page 79

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | is currently developing other than what we've just | 11:16:49 |
| 2 | discussed in Hollywood? | 11:16:51 |
| 3 | A    Yes, there is. | 11:16:51 |
| 4 | Q    Can you list those projects. | 11:16:54 |
| 5 | A    The only other one is the Schrader project. | 11:17:00 |
| 6 | Q    So Relevant -- the Schrader project, is | 11:17:04 |
| 7 | that the Schrader Hotel? | 11:17:05 |
| 8 | A    Correct. | 11:17:06 |
| 9 | Q    So Relevant Group is developing the | 11:17:07 |
| 10 | Schrader Hotel? | 11:17:09 |
| 11 | A    We are trying to. | 11:17:13 |
| 12 | Q    And what happened? | 11:17:15 |
| 13 | MS. LEADER:  Objection.  Vague and -- | 11:17:18 |
| 14 | THE WITNESS:  We haven't got funding yet. | 11:17:21 |
| 15 | BY MR. THAKOR: | 11:17:21 |
| 16 | Q    What is your relationship with Bruce | 11:17:41 |
| 17 | Rothman, if any? | 11:17:44 |
| 18 | A    I know him. | 11:17:45 |
| 19 | Q    How? | 11:17:49 |
| 20 | A    I know him because we -- we purchased the | 11:17:51 |
| 21 | Schrader property from him. | 11:17:55 |
| 22 | Q    When did you purchase that property? | 11:17:57 |
| 23 | MS. LEADER:  Objection. | 11:18:00 |
| 24 | MR. THAKOR:  Yeah.  Yeah.  I got you. | 11:18:01 |
| 25 | Q    When did Relevant purchase that property? | 11:18:05 |

Page 80

| | | | |
|---|---|---|---|
| 1 | A | I can't remember the exact date. | 11:18:08 |
| 2 | Q | Was it within the last year? | 11:18:16 |
| 3 | A | It was a little bit before that.  It was | 11:18:18 |
| 4 | after their entitlements. | | 11:18:21 |
| 5 | Q | When you say "after those entitlements," | 11:18:24 |
| 6 | what do you mean by that?  Do you mean after the | | 11:18:27 |
| 7 | City approval process? | | 11:18:28 |
| 8 | A | Yes. | 11:18:36 |
| 9 | Q | To your knowledge, has -- has there any | 11:18:47 |
| 10 | been -- strike that. | | 11:18:48 |
| 11 | To your knowledge, has there been any | | 11:18:50 |
| 12 | lawsuit filed contesting the City's approval of the | | 11:18:55 |
| 13 | Schrader Hotel? | | 11:18:56 |
| 14 | A | No.  Not that I'm aware of. | 11:18:59 |
| 15 | Q | And that includes from any of the | 11:19:01 |
| 16 | defendants.  Right? | | 11:19:04 |
| 17 | A | Correct. | 11:19:24 |
| 18 | Q | Earlier you had testified that your first | 11:19:38 |
| 19 | foray into building a hotel in Hollywood was with | | 11:19:41 |
| 20 | the Dream Hotel.  Right? | | 11:19:43 |
| 21 | A | Correct. | 11:19:43 |
| 22 | Q | And you said you started that process in | 11:19:46 |
| 23 | 2013.  Is that right? | | 11:19:48 |
| 24 | A | 2007. | 11:19:50 |
| 25 | Q | 2007.  That's right. | 11:19:58 |

Page 81

CONFIDENTIAL

```
 1    Nourmand?                                          2:01:51

 2        MS. LEADER:  Objection.  Vague.                2:01:54

 3        THE WITNESS:  I can't remember the first name. 2:01:59

 4    BY MR. THAKOR:                                     2:01:59

 5        Q    You had said earlier that you first started 2:02:17

 6    developing the Dream Hotel in 2007.  Right?        2:02:21

 7        A    Correct.                                  2:02:22

 8        Q    From 2007 to 2015, did Relevant Group ever 2:02:27

 9    compete with Sunset Landmark Investment?           2:02:29

10        MS. LEADER:  Objection.  Calls for -- it's vague 2:02:37

11    as framed and calls for speculation as to Sunset   2:02:40

12    Landmark Investment.                               2:02:41

13        THE WITNESS:  Define "compete."                2:02:43

14    BY MR. THAKOR:                                     2:02:43

15        Q    What do you think that word means?        2:02:46

16        A    It would compete in a similar business.   2:02:49

17        Q    And what is a similar business to --      2:02:51

18        A    The Dream Hotel.                          2:02:52

19        Q    -- to the Thompson Hotel project?         2:02:56

20        A    What is similar?                          2:02:57

21        Q    Yeah.                                     2:02:57

22        A    The Dream Hotel.                          2:02:59

23        Q    And why is that similar?                  2:03:01

24        A    They are both boutique hotels.            2:03:03

25        Q    Can you give me some examples of other    2:03:08
```

Page 159

CONFIDENTIAL

```
 1    competing buildings to the Thompson Hotel project?    2:03:12

 2        A    I would call the W Hotel a competitor.  I    2:03:16

 3    would say the Roosevelt is a competitor.             2:03:22

 4        Q    Anything else?                               2:03:26

 5        A    Hotels that are similar in the -- in the    2:03:29

 6    immediate vicinity are competitors, I would say.     2:03:33

 7        Q    Are you aware if Saeed Nourmand owns a       2:03:38

 8    hotel?                                               2:03:40

 9        A    No.                                          2:03:43

10        Q    No, you are not aware one way or another or  2:03:46

11    no, you know he doesn't own a hotel?                 2:03:48

12        A    I'm not aware that he owns a hotel.          2:03:52

13        Q    Are you aware of the type of business that   2:03:55

14    Sunset Landmark Investment is?                       2:03:57

15        MS. LEADER:  Objection to the extent it calls     2:04:00

16    for speculation.  Vague as framed.                   2:04:04

17        THE WITNESS:  Not really aware.  No.              2:04:07

18    BY MR. THAKOR:                                        2:04:18

19        Q    Remember a moment ago -- actually, not a     2:04:21

20    moment ago.                                          2:04:22

21             At the beginning of this deposition, we      2:04:24

22    were talking about how you were converting apartment  2:04:26

23    complexes into commercial buildings.  Right?          2:04:30

24        A    Uh-huh.                                      2:04:30

25        Q    And some of those commercial buildings had   2:04:32
```

Page 160

CONFIDENTIAL

```
 1   in this e-mail?                                    2:58:44

 2       MS. LEADER:  Objection.  Calls for speculation.  2:58:46

 3       THE WITNESS:  No.  It had to do with him        2:58:48

 4   extorting us.                                       2:58:49

 5   BY MR. THAKOR:                                      2:58:49

 6       Q    Uh-huh.  And when Ms. Goldman says "Don't  2:58:53

 7   think Saeed appealed this project either."  Do you  2:58:57

 8   have any understanding of why she would be sending  2:58:59

 9   you an e-mail about that?                           2:59:01

10       MS. LEADER:  Objection.  Calls for speculation.  2:59:02

11       THE WITNESS:  You would have to ask her.        2:59:03

12   BY MR. THAKOR:                                      2:59:03

13       Q    Was Relevant Group keeping track of the    2:59:08

14   number of CEQA lawsuits that either Saeed or Sunset 2:59:13

15   Landmark Investment had filed?                      2:59:17

16       MS. LEADER:  Objection.  Vague as to time.      2:59:19

17       THE WITNESS:  I don't believe we were.          2:59:20

18   BY MR. THAKOR:                                      2:59:20

19       Q    So sitting here today, you can't tell us   2:59:30

20   how many CEQA lawsuits Mr. Nourmand or Sunset       2:59:34

21   Landmark has filed other than the properties you've 2:59:36

22   been involved in.  Right?                           2:59:40

23       A    That's correct.                            2:59:40

24       Q    You can't say whether or not Sunset        2:59:42

25   Landmark has a history of extorting developers.     2:59:45
```

Page 187

CONFIDENTIAL

```
 1   Right?                                                2:59:48

 2       A    Not with conviction, no, I can't.            3:00:08

 3       Q    Okay.  Let's turn to the Tommie project.     3:00:20

 4   We're going to basically go through the same set of   3:00:22

 5   questions.  Let's start with the design.              3:00:24

 6            Are you aware if the Tommie Hotel project     3:00:27

 7   changed at all?                                        3:00:28

 8       MS. LEADER:  Objection.  Vague as to time.         3:00:31

 9       THE WITNESS:  I don't really -- I don't have a     3:00:35

10   recollection of that changing.                         3:00:38

11   BY MR. THAKOR:                                          3:00:38

12       Q    And that includes in connection with the      3:00:44

13   settlement Relevant Group entered into with Sunset.    3:00:48

14   Right?                                                  3:00:50

15       A    I'm not 100 percent clear on any re-designs   3:00:54

16   that happened on Tommie.                                3:00:56

17       Q    So you can't say one way or another whether   3:00:59

18   there were any re-designs on Tommie.  Is that fair?    3:01:03

19       A    That's fair.                                  3:01:06

20       Q    The vendors that we had discussed with        3:01:07

21   respect to the Thompson Hotel project, generally       3:01:11

22   speaking were the same vendors working on the Tommie   3:01:14

23   Hotel project?                                          3:01:15

24       MS. LEADER:  Objection.  Overbroad.                3:01:16

25   ///                                                     3:01:19
```

Page 188

```
 1          THE WITNESS:  I believe he was, you know,        5:10:44

 2    bringing members of the company to hearings.  We       5:10:47

 3    believe that he was using the infrastructure of        5:10:49

 4    Nourmand & Associates, conducting meetings.  So that   5:10:53

 5    was our belief.                                        5:10:54

 6    BY MR. THAKOR:                                         5:10:54

 7          Q    And what was that belief based on?          5:10:57

 8          A    I just told you.                            5:10:59

 9          Q    You had said you were told by someone that  5:11:02

10    Nourmand & Associates members attended a hearing.      5:11:05

11    You just testified that about infrastructure of        5:11:08

12    Nourmand & Associates being similar to Sunset          5:11:11

13    Landmark.  Now I'm asking you with respect to your     5:11:13

14    recent answer, what is that belief based on?           5:11:17

15          MS. LEADER:  I'll object to the extent that      5:11:19

16    question -- the preface of that question misstates     5:11:23

17    testimony.  But you can answer.                        5:11:25

18          THE WITNESS:  That's what we were told.          5:11:26

19    BY MR. THAKOR:                                         5:11:26

20          Q    By who?                                     5:11:28

21          A    I don't recall.                             5:11:29

22          Q    Okay.  So I'm going to show you a couple    5:11:44

23    e-mails.  I believe this is Exhibit 8.                 5:11:51

24              (Whereupon Defendants' Exhibit 8            5:11:51

25              was marked for identification)              5:11:52
```

Page 272

```
 1    BY MR. THAKOR:                                     5:11:52

 2        Q    Do you recognize this e-mail?            5:12:13

 3        A    No.                                      5:12:20

 4        Q    It's an e-mail from Scott Campbell to Saeed   5:12:23

 5    Nourmand.  Right?                                  5:12:25

 6        A    Appears that way.                         5:12:26

 7        Q    Do you recognize any of the text of that   5:12:29

 8    e-mail?                                            5:12:29

 9        A    Not really.                               5:12:36

10        MS. LEADER:  Counsel, can I ask, has this     5:12:38

11    document been produced in litigation?  I don't see a   5:12:40

12    bates number on it.                                5:12:41

13        MR. THAKOR:  Yeah.  I'm also positive it has   5:12:44

14    been produced.  I don't understand why there's no   5:12:46

15    bates.  But I can -- I'm sure I can provide you    5:12:48

16    after the fact.                                    5:12:49

17        MS. LEADER:  Can you just represent on the    5:12:50

18    record that it has been produced?                  5:12:52

19        MR. THAKOR:  Well, you know, I haven't        5:12:55

20    actually -- I can't verify that right now.  But if   5:12:58

21    you give me five minutes at a break, I can do a   5:13:01

22    quick search and figure it out.                    5:13:04

23            And if it's not produced, we'll produce it.   5:13:08

24        Q    This is -- we have previously talked about   5:13:13

25    Scott Campbell.  Right?  Do you remember that?     5:13:20
```

Page 273

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | A     Uh-huh. | 5:13:23 |
| 2 | Q     Was Mr. Campbell ever instructed by | 5:13:25 |
| 3 | Relevant Group to reach out to Mr. Nourmand to | 5:13:30 |
| 4 | discuss the objections Mr. Nourmand had to the | 5:13:34 |
| 5 | Thompson Hotel project? | 5:13:35 |
| 6 | MS. LEADER:  Objection.  It's vague as framed. | 5:13:37 |
| 7 | Also lacks foundation.  You can answer. | 5:13:42 |
| 8 | THE WITNESS:  I don't remember the context of | 5:13:47 |
| 9 | his involvement other than he worked with Saeed as | 5:13:52 |
| 10 | an agent and he worked for Laurie Goldman. | 5:13:57 |
| 11 | BY MR. THAKOR: | 5:13:57 |
| 12 | Q     Do you have any understanding of how | 5:14:00 |
| 13 | Mr. Campbell got this information about the Thompson | 5:14:05 |
| 14 | Hotel project? | 5:14:06 |
| 15 | MS. LEADER:  Objection.  Vague as framed.  Are | 5:14:08 |
| 16 | you asking about the information in this document? | 5:14:10 |
| 17 | MR. THAKOR:  Yes. | 5:14:12 |
| 18 | MS. LEADER:  Do you want him to read the | 5:14:13 |
| 19 | document? | 5:14:17 |
| 20 | BY MR. THAKOR: | 5:14:17 |
| 21 | Q     If you need to. | 5:14:19 |
| 22 | A     Sure. | 5:14:19 |
| 23 | MS. LEADER:  If you are going to ask him that | 5:14:22 |
| 24 | document, I think he needs to read the document. | 5:14:44 |
| 25 | THE WITNESS:  Okay. | 5:16:07 |

Page 274

```
1    BY MR. THAKOR:                                    5:16:07

2        Q    Do you have any understanding of how     5:16:09

3    Mr. Campbell got the information that he's relaying  5:16:11

4    to Mr. Nourmand in this document?                 5:16:20

5        MS. LEADER:  And I would instruct you not to  5:16:23

6    speculate.  He's asking if you know.              5:16:25

7        THE WITNESS:  No, I don't know.               5:16:27

8    BY MR. THAKOR:                                    5:16:27

9        Q    You don't have any recollection of asking  5:16:31

10   Mr. Campbell to reach out to Mr. Nourmand?        5:16:35

11       MS. LEADER:  Objection.  Lacks foundation.    5:16:36

12   Assumes facts.                                    5:16:38

13       THE WITNESS:  I don't recall.                 5:16:39

14   BY MR. THAKOR:                                    5:16:39

15       Q    Do you know who -- if you know, do you know  5:16:45

16   who drafted the points in this e-mail?            5:16:48

17       MS. LEADER:  Objection.  Calls for speculation.  5:16:54

18       THE WITNESS:  No.  I don't.                   5:16:55

19   BY MR. THAKOR:                                    5:16:55

20       Q    Okay.  I'm going to show you the next    5:17:09

21   e-mail.  This is No. 9.  Sorry.                   5:17:13

22            (Whereupon Defendants' Exhibit 9         5:17:13

23            was marked for identification).          5:17:13

24       THE WITNESS:  Is this for me?                 5:17:26

25       MR. THAKOR:  Oh, yeah.  Sorry.                5:17:27
```

Page 275

```
 1      Q    Do you recognize this e-mail chain?        5:17:43

 2      A    Not really.                                5:17:44

 3      Q    Do you see that you are on some of these   5:17:46

 4  e-mails?                                            5:17:49

 5      A    I see my name here.                        5:17:51

 6      Q    In fact, you -- you are responding in part 5:17:56

 7  of this chain.  Right?                              5:17:57

 8      MS. LEADER:  Objection.  Vague as framed.  I    5:18:05

 9  don't see one -- one line e-mail from Mr. King.     5:18:11

10      THE REPORTER:  I only see one one line e-mail   5:18:14

11  from Mr. King.                                      5:18:23

12      THE WITNESS:  Uh-huh.                           5:18:25

13  BY MR. THAKOR:                                      5:18:25

14      Q    Why was it -- well, let's go e-mail by     5:18:28

15  e-mail.                                             5:18:29

16           The first e-mail at the bottom of the chain 5:18:32

17  is from Laurie Goldman which says "Don't e-mail     5:18:35

18  Saeed.  He does not read e-mails.  Only texts."     5:18:39

19           Do you see that?                           5:18:43

20      A    Let's see.                                 5:18:44

21      MS. LEADER:  These are the original e-mail      5:18:46

22  thread.                                             5:18:48

23      THE WITNESS:  Okay.                             5:18:49

24  BY MR. THAKOR:                                      5:18:49

25      Q    Why was it that Relevant Group was trying  5:18:54
```

Page 276

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | meetings prior to the filing of the original | 5:23:09 |
| 2 | Thompson CEQA hearing. | 5:23:11 |
| 3 | BY MR. THAKOR: | 5:23:11 |
| 4 | Q    Who set up that meeting? | 5:23:16 |
| 5 | A    Which meeting?  This meeting? | 5:23:20 |
| 6 | Q    The meeting in 2015 that you were referring | 5:23:23 |
| 7 | to earlier. | 5:23:24 |
| 8 | A    I'm not sure. | 5:23:34 |
| 9 | Q    Do you see in your -- strike that.  Let's | 5:23:57 |
| 10 | just go onto the next exhibit. | 5:23:59 |
| 11 | Here you go.  And Dale, I don't have a copy | 5:24:07 |
| 12 | for you.  Because I accidentally wrote on the extra | 5:24:09 |
| 13 | copy. | 5:24:21 |
| 14 | (Whereupon a discussion was held | 5:24:21 |
| 15 | off the record) | 5:24:21 |
| 16 | (Whereupon Defendants' Exhibit 10 | 5:24:21 |
| 17 | was marked for identification) | 5:24:21 |
| 18 | BY MR. THAKOR: | 5:24:26 |
| 19 | Q    Do you generally recognize this e-mail? | 5:24:37 |
| 20 | A    Yeah.  I can see it's from me. | 5:24:56 |
| 21 | Q    And I want you to take a look at the | 5:24:58 |
| 22 | e-mails behind your response.  Because we are going | 5:25:04 |
| 23 | to start at the bottom. | 5:25:10 |
| 24 | A    Where do you want me to start? | 5:25:12 |
| 25 | Q    On the May 4, 2015 e-mail from Greg | 5:25:19 |

Page 281

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | "He probably thinks it's unfortunate | 5:43:31 |
| 2 | that we didn't listen to him." | 5:43:33 |
| 3 | Do you see that? | 5:43:39 |
| 4 | A    Yes.  I see that. | 5:43:39 |
| 5 | Q    What are you referring to there? | 5:43:48 |
| 6 | A    I don't remember the context that came | 5:43:52 |
| 7 | before this.  So... | 5:43:53 |
| 8 | Q    Do you have any understanding of what you | 5:43:56 |
| 9 | mean by "He probably thinks it's unfortunate that we | 5:44:01 |
| 10 | didn't listen to him"? | 5:44:02 |
| 11 | MS. LEADER:  Hang on one second. | 5:44:10 |
| 12 | Okay.  You can answer. | 5:44:13 |
| 13 | THE WITNESS:  I -- like I said, I don't remember | 5:44:16 |
| 14 | the context of the conversation.  So it's hard for | 5:44:19 |
| 15 | me to comment. | 5:44:21 |
| 16 | BY MR. THAKOR: | 5:44:21 |
| 17 | Q    So sitting here today, you have no | 5:44:25 |
| 18 | understanding one way or another as to what you | 5:44:27 |
| 19 | meant by the statement "He probably thinks it's | 5:44:29 |
| 20 | unfortunate that we didn't listen to him"? | 5:44:44 |
| 21 | A    Yes.  I'm not -- I don't recall. | 5:44:50 |
| 22 | Q    All right.  Next e-mail. | 5:44:53 |
| 23 | (Whereupon Defendants' Exhibit 13 | 5:44:53 |
| 24 | was marked for identification) | 5:44:53 |
| 25 | /// | 5:44:53 |

Page 292

CONFIDENTIAL

```
 1   BY MR. THAKOR:                                           5:44:53

 2       Q    Do you recognize this e-mail?                   5:45:09

 3       A    It appears as a --                              5:45:19

 4       MS. LEADER:  He's just asking yes or no if           5:45:21

 5   you --                                                   5:45:22

 6       THE WITNESS:  Continuing -- yes.  I'm looking at     5:45:25

 7   it.  I see what it is.  Yeah.                            5:45:27

 8   BY MR. THAKOR:                                           5:45:27

 9       Q    It's an e-mail chain between you, Laurie        5:45:30

10   Goldman and Richard Heyman.  Right?                      5:45:33

11       A    Correct.                                        5:45:34

12       Q    About the same draft e-mail we were just       5:45:35

13   discussing?                                              5:45:35

14       A    Appears that way.                               5:45:40

15       Q    And you can see that Laurie Goldman is also    5:45:45

16   providing comments to the draft e-mail.  Right?         5:45:48

17       MS. LEADER:  Objection.  Document speaks for        5:45:50

18   itself.  Calls for speculation.                         5:45:54

19       THE WITNESS:  Appears that way.                     5:45:58

20   BY MR. THAKOR:                                           5:45:58

21       Q    Why is it that Ms. Goldman was involved in     5:46:04

22   editing this e-mail?                                     5:46:06

23       MS. LEADER:  Objection.  Calls for speculation.     5:46:13

24       THE WITNESS:  I can't remember.  Maybe she was a    5:46:25

25   good writer.                                             5:46:27
```

Page 293

CONFIDENTIAL

```
 1   BY MR. THAKOR:                                      5:46:27

 2      Q    So you can't remember one way or another?   5:46:30

 3      A    No, I can't.                                 5:46:32

 4      Q    You see she makes a suggestion that she      5:46:35

 5   thinks a lawyer should review before you send.      5:46:38

 6           Do you know if a lawyer reviewed this draft  5:46:41

 7   e-mail when it was sent to Mr. Nourmand?             5:46:46

 8      A    No.  I don't recall.                         5:46:48

 9      Q    You can't say one way or another?            5:46:51

10      A    No, I can't.                                 5:46:58

11      Q    Do you remember having an opinion on         5:47:00

12   whether or not a lawyer needed to review that draft  5:47:02

13   e-mail?                                              5:47:02

14      A    No.                                          5:47:06

15      Q    Do you remember Mr. Heyman having any        5:47:08

16   opinion about whether a lawyer needed to review that 5:47:11

17   draft e-mail?                                        5:47:12

18      A    No.                                          5:47:14

19      Q    All right.  Next e-mail.  Here you go.       5:47:22

20           Do you recognize this e-mail?               5:47:39

21      A    I see it.                                    5:47:47

22           (Whereupon Defendants' Exhibit 14            5:47:47

23           was marked for identification)               5:47:49

24   BY MR. THAKOR:                                       5:47:49

25      Q    When you say "I see it," are you saying      5:47:54
```

Page 294

```
 1   that you don't recognize it --                    5:47:56

 2        A    I don't remember it, but I'm reading it  5:47:58

 3   now.                                               5:48:01

 4        Q    So at the bottom e-mail is an e-mail from  5:48:03

 5   Scott Campbell to Richard Heyman and Grant King    5:48:07

 6   talking about communicating with Saeed about      5:48:10

 7   Richard's proposal.  Do you see that?             5:48:12

 8        MS. LEADER:  Just going to object to the     5:48:14

 9   characterization of the document.                  5:48:19

10   BY MR. THAKOR:                                     5:48:19

11        Q    Do you see that?                         5:48:20

12        A    I'm seeing it right now.  I'm reading it.  5:48:33

13   Okay.                                              5:48:51

14        Q    Do you have any recollection of instructing  5:48:52

15   Mr. Campbell to have Saeed reach out to Richard    5:48:56

16   directly?                                          5:48:56

17        MS. LEADER:  Hang on one second.  Objection.  5:49:05

18   Lacks foundation as framed.                        5:49:14

19        THE WITNESS:  I don't recall.                 5:49:15

20   BY MR. THAKOR:                                     5:49:15

21        Q    Do you remember ever being told that Saeed  5:49:25

22   was reticent about reaching out to Relevant Group to  5:49:29

23   discuss his concerns?                              5:49:31

24        MS. LEADER:  Objection.  Lacks foundation.    5:49:36

25        THE WITNESS:  I don't recall.                 5:49:37
```

Page 295

CONFIDENTIAL

1           I, SARI M. KNUDSEN, CSR NO. 13109, in and

2    for the State of California, do hereby certify:

3           I am the deposition officer that

4    stenographically recorded the testimony in the

5    foregoing deposition;

6           Prior to being examined, the deponent was

7    first duly sworn by me;

8           The foregoing transcript is a true record of

9    the testimony given;

10           Before completion of the deposition, review

11    of the transcript was requested.  If requested, any

12    changes made by the deponent (and provided to the

13    reporter) during the period allowed are appended

14    hereto.

15

16    Dated the 28th day of March, 2022.

17

18

19

20

21    SARI M. KNUDSEN, CSR NO. 13109

22

23

24

25

                                            Page 336

Exhibit B

```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE CENTRAL DISTRICT OF CALIFORNIA

 3

 4

 5   RELEVANT GROUP, LLC, a Delaware)

 6   limited liability company;      )

 7   et al.,                         )

 8                  Plaintiffs,      )

 9        VS.                        )  NO. 2:19-CV-05019

10   STEPHEN "SAEED" NOURMAND, an    )      ODW-Ksx

11   individual, et al.,             )

12                  Defendants.      )

13   _____)

14

15

16   DEPOSITION OF:

17               ANDREW SHAYNE

18               TUESDAY, MARCH 29, 2022

19               10:32 A.M.

20

21

22   REPORTED BY:

23               Sari M. Knudsen

24               CSR No. 13109

25
```

Page 1

| | | |
|---|---|---|
| 1 | BY MR. THAKOR: | 12:25:09 |
| 2 | Q   Is -- does that refresh your recollection | 12:25:12 |
| 3 | as to you pulling this document on that date? | 12:25:17 |
| 4 | MS. LEADER:  Objection.  Lacks foundation. | 12:25:19 |
| 5 | THE WITNESS:  I mean, my team probably pulled | 12:25:22 |
| 6 | it.  I wouldn't say I pulled it. | 12:25:25 |
| 7 | BY MR. THAKOR: | 12:25:25 |
| 8 | Q   So let's -- is there any reason to doubt | 12:25:28 |
| 9 | that this balance sheet is not a fair and accurate | 12:25:31 |
| 10 | copy of the balance sheet for 1541 Wilcox LLC? | 12:25:36 |
| 11 | A   No. | 12:25:37 |
| 12 | MS. LEADER:  So the record is clear, he's | 12:25:39 |
| 13 | testifying that he thinks it is a fair and accurate | 12:25:42 |
| 14 | copy.  I think there was a double negative in the | 12:25:46 |
| 15 | question. | 12:25:46 |
| 16 | MR. THAKOR:  Appreciate that. | 12:25:47 |
| 17 | Q   So let's go through some of these terms. | 12:25:50 |
| 18 | The first question I have is under | 12:25:55 |
| 19 | "checking and savings," there's a figure $403,000. | 12:26:00 |
| 20 | A   Yes. | 12:26:03 |
| 21 | Q   How did Wilcox Hotel LLC get that money? | 12:26:11 |
| 22 | MS. LEADER:  Objection.  To the extent it calls | 12:26:13 |
| 23 | for speculation.  It's vague as framed. | 12:26:16 |
| 24 | THE WITNESS:  It may have gotten it from EB5 or | 12:26:21 |
| 25 | it may have gotten it from HRC or VCG or HRC Wilcox. | 12:26:32 |

Page 78

| | | |
|---|---|---|
| 1 | different things.  You are telling me what the delay | 2:38:06 |
| 2 | is.  And I'm asking what is causing the delay.  I | 2:38:10 |
| 3 | understand the delay was a year and a half.  But | 2:38:13 |
| 4 | what is causing that delay? | 2:38:14 |
| 5 |     MS. LEADER:  I'm going to object that it's asked | 2:38:16 |
| 6 | and answered. | 2:38:16 |
| 7 |     THE WITNESS:  The lawsuit. | 2:38:20 |
| 8 | BY MR. THAKOR: | 2:38:20 |
| 9 |     Q    Anything else? | 2:38:30 |
| 10 |     A    Not that I can recall. | 2:38:46 |
| 11 |     Q    Okay.  You said one of the risks associated | 2:38:49 |
| 12 | with the lawsuit is that you wouldn't be able to | 2:38:53 |
| 13 | spend your EB5 funding.  Right? | 2:38:57 |
| 14 |     A    Well, we wouldn't be able to spend it and | 2:39:00 |
| 15 | open and create the jobs.  Risk is not creating the | 2:39:03 |
| 16 | jobs.  It has to be spent and you have to create | 2:39:06 |
| 17 | jobs. | 2:39:07 |
| 18 |     Q    Were you spending the money during the | 2:39:08 |
| 19 | pendency of the lawsuit? | 2:39:13 |
| 20 |     MS. LEADER:  Objection.  Vague as framed. | 2:39:16 |
| 21 | Overbroad.  And potentially calls for speculation. | 2:39:21 |
| 22 |     THE WITNESS:  I'd have to go back and look. | 2:39:24 |
| 23 | BY MR. THAKOR: | 2:39:24 |
| 24 |     Q    And the only way to find out is by looking | 2:39:26 |
| 25 | at the general ledger? | 2:39:27 |

Page 125

| | | |
|---|---|---|
| 1 | A    Yeah. | 2:39:32 |
| 2 | Q    Is there a timeline or -- strike that. | 2:39:37 |
| 3 | Is there -- what happens if you don't meet | 2:39:46 |
| 4 | EB5 timelines? | 2:39:48 |
| 5 | MS. LEADER:  Hang on.  It's vague.  It's an | 2:39:51 |
| 6 | incomplete hypothetical.  Overbroad. | 2:39:53 |
| 7 | THE WITNESS:  They don't get their visas. | 2:40:01 |
| 8 | BY MR. THAKOR: | 2:40:01 |
| 9 | Q    Let's say that the project is completed | 2:40:07 |
| 10 | three years after the projected timeline. | 2:40:12 |
| 11 | Can they get their visas three years down | 2:40:15 |
| 12 | the line? | 2:40:16 |
| 13 | MS. LEADER:  Objection.  It's vague and it's an | 2:40:17 |
| 14 | incomplete hypothetical.  Calls for speculation. | 2:40:21 |
| 15 | THE WITNESS:  I don't know. | 2:40:22 |
| 16 | BY MR. THAKOR: | 2:40:22 |
| 17 | Q    Did all the EB5 investors in the Thompson | 2:40:29 |
| 18 | Hotel get their visas? | 2:40:31 |
| 19 | A    No. | 2:40:33 |
| 20 | Q    Some didn't? | 2:40:35 |
| 21 | A    Not that I believe. | 2:40:37 |
| 22 | Q    And -- well, first of all, how many | 2:40:40 |
| 23 | investors did get their visas? | 2:40:42 |
| 24 | MS. LEADER:  Objection to the extent it calls | 2:40:44 |
| 25 | for speculation. | 2:40:45 |

Page 126

```
 1    Master LP?                                  3:03:00

 2       A    I don't think so.                   3:03:01

 3       Q    And did Relevant Hospitality Fund ever have  3:03:04

 4    any ownership interest in 6516 Tommie Hotel  3:03:05

 5    Holdings?                                   3:03:07

 6       MS. LEADER:  Objection that it calls for  3:03:09

 7    speculation.                                3:03:10

 8       THE WITNESS:  No.                        3:03:11

 9       MR. THAKOR:  Had a profit interest, I think.  3:03:16

10    BY MR. THAKOR:                              3:03:16

11       Q    What does that mean?               3:03:18

12       A    Profit interest is exactly what it says it  3:03:22

13    is.                                         3:03:22

14       Q    Shares in the profits?             3:03:24

15       A    Shares in the profits but no ownership.  3:03:30

16       Q    And you are saying that Relevant   3:03:32

17    Hospitality Fund I LP has a profit interest in 6516  3:03:36

18    Tommie Hotel LLC?                           3:03:39

19       A    I believe so.                      3:03:41

20       Q    And what is Relevant Fund -- Relevant  3:03:45

21    Hospitality Fund I LP?                      3:03:48

22       A    It's a fund.                       3:03:49

23       Q    Does it have profit interest in other  3:03:51

24    projects?                                   3:03:51

25       A    Yes.                               3:03:52
```

Page 131

| | | |
|---|---|---|
| 1 | Q    What other projects? | 3:03:54 |
| 2 | A    I think it has a profit interest in | 3:03:56 |
| 3 | Morrison Hotel LLC, Schrader Hotel LLC, and I | 3:04:13 |
| 4 | believe Barclay Hotel LLC. | 3:04:16 |
| 5 | Q    And those are all projects developed by | 3:04:17 |
| 6 | Relevant Group? | 3:04:19 |
| 7 | A    Yes. | 3:04:22 |
| 8 | Q    Who owns Relevant Hospitality Fund? | 3:04:26 |
| 9 | A    Investors. | 3:04:27 |
| 10 | Q    EB5 investors? | 3:04:29 |
| 11 | A    No. | 3:04:31 |
| 12 | Q    What type of investors? | 3:04:32 |
| 13 | MS. LEADER:  Objection.  Vague as framed. | 3:04:34 |
| 14 | THE WITNESS:  I don't know what you mean by what | 3:04:36 |
| 15 | "type." | 3:04:37 |
| 16 | BY MR. THAKOR: | 3:04:37 |
| 17 | Q    Are they investing in Relevant Hospitality | 3:04:40 |
| 18 | Fund with a cash investment? | 3:04:44 |
| 19 | A    Yes.  Cash. | 3:04:46 |
| 20 | Q    And debt investment? | 3:04:54 |
| 21 | A    Not to my knowledge. | 3:04:56 |
| 22 | Q    In exchange for the cash, the investors get | 3:04:58 |
| 23 | equity in Relevant Hospitality Fund? | 3:05:01 |
| 24 | A    Yes. | 3:05:10 |
| 25 | Q    Okay.  Exhibit 7. | 3:05:12 |

Page 132

```
 1   BY MR. THAKOR:                                        3:45:14

 2       Q    Yes, that Selma had loaned to Wilcosel that  3:45:20

 3   amount of money?                                      3:45:21

 4       A    Lent or some kind of offset was created.     3:45:25

 5   Something.  I think I remember that there was some    3:45:29

 6   rents that were collected by Wilcosel that needed to  3:45:34

 7   be remitted to Selma Wilcox.                          3:45:40

 8       Q    This entity 6421 Dream 2 LP, what is that?   3:45:47

 9       A    That's the EB5 entity.                       3:45:48

10       Q    That's where all the --                      3:45:53

11       A    EB5 is raised.                               3:45:55

12       Q    And that's the entity that signed any        3:45:57

13   agreements relating to the EB5 funding?               3:46:00

14       A    Yes.                                         3:46:01

15       Q    What about 6421 Dream 2 holdings?            3:46:04

16       A    A holding company for -- for this project.   3:46:18

17       Q    And so 6421 Dream 2 holdings, that owns the  3:46:23

18   Selma Hotel and the underlying land?                  3:46:25

19       A    It owns a portion of it.  It owns a portion  3:46:30

20   of it.  Yeah.                                         3:46:31

21       Q    Who owns the other portion?                  3:46:33

22       A    Wilcosel.                                     3:46:49

23       Q    Exhibit 10                                   3:47:31

24       THE REPORTER:  9.                                 3:47:32

25       MR. THAKOR:  Exhibit 9.                           3:47:33
```

                                              Page 162

1         I, SARI M. KNUDSEN, CSR NO. 13109, in and

2    for the State of California, do hereby certify:

3         I am the deposition officer that

4    stenographically recorded the testimony in the

5    foregoing deposition;

6         Prior to being examined, the deponent was

7    first duly sworn by me;

8         The foregoing transcript is a true record of

9    the testimony given;

10        Before completion of the deposition, review

11   of the transcript was requested.  If requested, any

12   changes made by the deponent (and provided to the

13   reporter) during the period allowed are appended

14   hereto.

15

16   Dated the 12th day of April, 2022.

17

18

19

20

21        SARI M. KNUDSEN, CSR NO. 13109

22

23

24

25

                                           Page 268

Exhibit C

```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE CENTRAL DISTRICT OF CALIFORNIA

 3

 4

 5   RELEVANT GROUP, LLC, a Delaware)

 6   limited liability company;      )

 7   et al.,                        )

 8                  Plaintiffs,     )

 9       VS.                        )  NO. 2:19-CV-05019

10   STEPHAN "SAEED" NOURMAND, an   )      ODW-Ksx

11   individual, et al.,            )

12                  Defendants.     )

13   _____)

14

15

16   DEPOSITION OF:

17            MATTHEW HINKS, ESQ.

18            FRIDAY, APRIL 1, 2022

19            10:10 A.M.

20

21

22   REPORTED BY:

23            Sari M. Knudsen

24            CSR No. 13109

25
```

Page 1

| | | |
|---|---|---|
| 1 | A    I believe I received a letter. | 11:20:00 |
| 2 | Q    Okay.  And do you remember talking with any | 11:20:06 |
| 3 | other representatives of Sunset between the time | 11:20:09 |
| 4 | that you talked to Mr. Silverstein at Mosk and then | 11:20:12 |
| 5 | the time at which he sent you a letter? | 11:20:16 |
| 6 | A    Any representatives of Sunset? | 11:20:17 |
| 7 | Q    Uh-huh. | 11:20:19 |
| 8 | A    I don't recall, no. | 11:20:20 |
| 9 | Q    Okay.  So I think I have the letter that | 11:20:26 |
| 10 | you are referencing.  If you don't mind, we'll show | 11:20:28 |
| 11 | it to you. | 11:20:29 |
| 12 | If you can help me, Michelle. | 11:20:31 |
| 13 | MS. LEADER:  This will be Exhibit 2, counsel. | 11:20:34 |
| 14 | MR. PELHAM:  Yeah. | 11:20:45 |
| 15 | MS. LEADER:  I'm going to give this one to the | 11:21:10 |
| 16 | witness if you have one for me too. | 11:21:12 |
| 17 | MR. PELHAM:  Yeah.  I do. | 11:21:14 |
| 18 | MS. LEADER:  Thank you. | 11:21:17 |
| 19 | (Whereupon Defendants' Exhibit 2 | 11:21:17 |
| 20 | was marked for identification) | 11:21:17 |
| 21 | THE WITNESS:  Okay. | 11:21:49 |
| 22 | BY MR. PELHAM: | 11:21:49 |
| 23 | Q    Okay.  So is this the -- is this the letter | 11:21:53 |
| 24 | that you had just referred to, Mr. Hinks, as -- in | 11:21:57 |
| 25 | terms of the correspondence that you exchanged with | 11:21:59 |

Page 52

| | | |
|---|---|---|
| 1 | Mr. Silverstein after that meeting at Stanley Mosk? | 11:22:03 |
| 2 | A    This is the letter that I was making | 11:22:04 |
| 3 | reference to, yes. | 11:22:05 |
| 4 | Q    Okay.  And so does the date on the top of | 11:22:09 |
| 5 | this letter roughly correspond with your | 11:22:11 |
| 6 | recollection of events that is April 21, 2017? | 11:22:14 |
| 7 | A    The has no meaning to me whatsoever. | 11:22:18 |
| 8 | Q    Understood.  Okay. | 11:22:19 |
| 9 | Do you see the interlineations, this | 11:22:23 |
| 10 | handwriting on the letter, Mr. Hinks? | 11:22:25 |
| 11 | A    I do see it, yes. | 11:22:26 |
| 12 | Q    Is that your handwriting? | 11:22:28 |
| 13 | A    Doesn't look like it. | 11:22:29 |
| 14 | Q    Okay.  Do you know who made that | 11:22:33 |
| 15 | handwriting? | 11:22:34 |
| 16 | MS. LEADER:  Objection to the extent it calls | 11:22:38 |
| 17 | for speculation.  But if you know. | 11:22:39 |
| 18 | THE WITNESS:  I don't know. | 11:22:40 |
| 19 | BY MR. PELHAM: | 11:22:40 |
| 20 | Q    Okay. | 11:22:50 |
| 21 | What was your reaction to this letter when | 11:22:54 |
| 22 | you received it from Mr. Silverstein? | 11:22:56 |
| 23 | MS. LEADER:  Objection.  Lacks foundation as | 11:22:59 |
| 24 | framed and vague. | 11:23:01 |
| 25 | THE WITNESS:  My reaction?  I don't recall.  I | 11:23:05 |

Page 53

```
 1    Mr. Silverstein, Mr. Patel, Mr. Maisnik.          11:46:06

 2          Had that meeting yet occurred?              11:46:07

 3       MS. LEADER:  And Mr. Nourmand?  Are you talking 11:46:12

 4    about that meeting?                               11:46:13

 5       MR. PELHAM:  Yeah.  I didn't name every player. 11:46:15

 6       MS. LEADER:  I just want to make sure we are   11:46:17

 7    talking about the same meeting.                   11:46:18

 8       MR. PELHAM:  Yeah.  Same meeting.              11:46:20

 9       THE WITNESS:  My best recollection was the     11:46:22

10    course of events was there was the exchange of    11:46:24

11    correspondence and then the meeting took place.   11:46:26

12    BY MR. PELHAM:                                    11:46:26

13       Q    Okay.  So let me -- I think I have -- let's 11:46:33

14    mark what I think is your response back.          11:46:35

15          So Michelle, can you help me hand that out.  11:46:59

16       A    You can just hand it to me.               11:47:24

17          (Whereupon Defendants' Exhibit 3            11:47:24

18          was marked for identification)              11:48:01

19    BY MR. PELHAM:                                    11:48:01

20       Q    Okay.  So is this -- let's -- we'll refer  11:48:06

21    to this as Exhibit 3.                             11:48:08

22          Is this the letter that you sent back to    11:48:09

23    Mr. Silverstein following that phone call,        11:48:12

24    Mr. Hinks?                                        11:48:12

25       A    Well, this is the letter -- this is a     11:48:16
```

Page 72

| | | |
|---|---|---|
| 1 | letter that I sent to Mr. Silverstein, yes.  Now | 11:48:20 |
| 2 | that I've read the letter in terms of the sequence | 11:48:23 |
| 3 | of events, now I don't recall.  Because this makes | 11:48:27 |
| 4 | reference to a discussions that we had.  So the | 11:48:30 |
| 5 | letter may have come after the meeting. | 11:48:32 |
| 6 | Q    Okay.  But it -- okay. | 11:48:34 |
| 7 | But this letter came -- you do recall this | 11:48:38 |
| 8 | letter came after the phone call that you had with | 11:48:39 |
| 9 | Mr. Silverstein where you used the phrase "blood | 11:48:43 |
| 10 | money"? | 11:48:43 |
| 11 | A    Yes. | 11:48:45 |
| 12 | Q    Okay.  So in this letter, Mr. Hinks, if we | 11:48:51 |
| 13 | go to the reference to issue 12 -- | 11:48:58 |
| 14 | A    Yeah. | 11:48:58 |
| 15 | Q    You -- and just to -- for the record, | 11:49:03 |
| 16 | Mr. Hinks, you drafted this letter.  Right? | 11:49:07 |
| 17 | A    I did draft the letter. | 11:49:08 |
| 18 | Q    Okay.  So on page 2 of the exhibit, you | 11:49:15 |
| 19 | wrote | 11:49:15 |
| 20 | "We discussed last week an amount of | 11:49:17 |
| 21 | money that my client is willing to pay to | 11:49:19 |
| 22 | resolve the litigation and the terms of | 11:49:21 |
| 23 | that monetary offer." | 11:49:23 |
| 24 | Do you remember what that amount was that | 11:49:25 |
| 25 | you are referencing here? | 11:49:31 |

Page 73

1          I, SARI M. KNUDSEN, CSR NO. 13109, in and

2     for the State of California, do hereby certify:

3          I am the deposition officer that

4     stenographically recorded the testimony in the

5     foregoing deposition;

6          Prior to being examined, the deponent was

7     first duly sworn by me;

8          The foregoing transcript is a true record of

9     the testimony given;

10          Before completion of the deposition, review

11     of the transcript was requested.  If requested, any

12     changes made by the deponent (and provided to the

13     reporter) during the period allowed are appended

14     hereto.

15

16     Dated the 18th day of April, 2022.

17

18

19

20

21          SARI M. KNUDSEN, CSR NO. 13109

22

23

24

25

                                        Page 161

Exhibit D

1  WITNESS:  CASEY MADDREN

2  DATE:  4-15-22

3  CASE:  RELEVANT GROUP VS STEPHAN "SAEED" NOURMAND

4  JOB #5171442

5

6

7       R O U G H   T R A N S C R I P T

8

9  THIS DRAFT IS UNEDITED AND UNCERTIFIED AND MAY

10  CONTAIN UNTRANSLATED STENO, AN OCCASIONAL REPORTER'S

11  NOTES, A MISSPELLED PROPER NAME, AND/OR NONSENSICAL

12  ENGLISH WORD COMBINATIONS.  AS SUCH, THIS DRAFT IS

13  ONLY INTENDED FOR THE PURPOSE OF AUGMENTING

14  COUNSEL'S NOTES AND IS NOT INTENDED TO BE USED OR

15  CITED IN ANY COURT PROCEEDING PURSUANT TO CODE OF

16  CIVIL PROCEDURE SECTION 2025.540(b).  ALL SUCH

17  ENTRIES WILL BE CORRECTED ON THE FINAL CERTIFIED

18  TRANSCRIPT UPON ITS DELIVERY TO YOU IN ACCORDANCE

19  WITH OUR STANDARD DELIVERY TERMS OR ON AN EXPEDITED

20  BASIS, SHOULD YOU DESIRE FASTER DELIVERY.

21

22

23     THE VIDEOGRAPHER:  Good morning.  We are going

24  on the record at 10:11 A.M. on April 15, 2022.

53

12    A    No.

13    Q    Your CEQA lawsuit, do you recall there was

14 an order from the court on your petition about

15 January of 2021?  Does that sound right?

16    A    That sounds right.

17    Q    And do you recall you had three causes of

18 action.  Correct?

19    A    Yes.

20    Q    And the court denied your petition as to

21 each of those?

22    A    Yes.

23    Q    Can we take a five-minute break.  I just

24 want to check my outline.  Go off the record.

25    THE VIDEOGRAPHER:  Okay.  Going off the record.

92

1 The time is 1:31 P.M.

2    (Whereupon a recess was taken)

3    THE VIDEOGRAPHER:  Back on the record.  Time is

4 1:36 P.M.

5    MR. TALPAS:  Thank you, Mr. Maddren for your

6 time today.  Plaintiff have no further questions at

7 this time.

54

8      THE VIDEOGRAPHER:  Anybody else?

9      MR. THAKOR:  I do have a few questions.  This is

10  Neil Thakor on behalf of Defendant Sunset Landmark

11  LLC and Saeed Nourmand.

12

13                      EXAMINATION

14

15  BY MR. THAKOR:

16      Q   Mr. Maddren, thank you so much for taking

17  the time to be with us today.  Just have a few

18  questions.  First I just want to start with your --

19  your relationship with Saeed Nourmand, if any.

20          How do you know Mr. Nourmand?

21      A   I don't know him.

22      Q   You don't know him at all?

23      A   Personally, no.  I've never met him.

24      Q   Have you ever spoken to him?

25      A   No.

93

1      Q   Has he ever paid you any money?

2      A   No.

3      Q   Have you received any money from Sunset

4  Landmark LLC?

5     A   No.

6     Q   Have you ever spoken with someone who is an

7  agent of Sunset Landmark LLC?

8     A   If you include the people at the

9  Silverstein firm, I've spoken with them.

10    Q   Uh-huh.  And outside of Mr. Wright and

11  Mr. Silverstein, do you remember having any

12  conversation at all with anyone else from Sunset

13  Landmark LLC?

14    A   No.

15    Q   Are you aware of allegations in this

16  complaint?

17    A   I've read the complaint.  I mean, I don't

18  understand the legalese.  But I understand in

19  general, yes, what the allegations are.

20    Q   And do you understand that Relevant Group

21  is alleging that you are a co-conspirator of Saeed

22  Nourmand?

23    A   Yes.

24    Q   And what are your thoughts on that

25  allegation.

94

Exhibit E

1              UNITED STATES DISTRICT COURT

2          FOR THE CENTRAL DISTRICT OF CALIFORNIA

3

4    RELEVANT GROUP, LLC, a      )
     Delaware, limited          )
5    Liability company; 1541    )
     WILCOX HOTEL LLC, a        )
6    Delaware limited liability)
     Company; 6516 TOMMIE HOTEL)
7    LLC, a Delaware limited    )   No. 2:19-cv-05019-ODW
     liability company; and     )      (KSx)
8    6421 SELMA WILCOX HOTEL    )
     LLC, a California limited  )
9    liability company,         )
              Plaintiffs,       )
10                              )
          vs.                   )
11                              )
     STEPHAN "SAEED" NOURMAND, )
12   an individual; THE SUNSET  )
     LANDMARK INVESTMENT LLC, a)
13   California limited         )
     liability company; and     )
14   DOES 1-10,                 )
                                )
15            Defendants.       )

16

17

18          REMOTE VIDEOTAPED DEPOSITION OF

19                  BRUCE ROTHMAN

20                  APRIL 20, 2021

21

22

23   Reported by:
     Susan Myong
24   CSR 13365
     Job No.  10081612

25

```
 1              THE WITNESS:  Okay.  We're good.
 2              MS. LEADER:  Yeah, it seems fine.
 3         Q.   Okay.  So I believe you testified that
 4    Relevant Group has never had any ownership or
 5    association with Koar group; correct?
 6         A.   Correct.
 7         Q.   And is the same true for its principals
 8    such as Richard Heyman and Grant King?
 9         A.   Correct.
10         Q.   Or any of the principals or members of
11    Relevant Group?
12         A.   There have never been any other members of
13    Koar other than Laurent and me.
14         Q.   Okay.  And Koar doesn't have any
15    association or affiliation with Relevant Group;
16    correct?
17         A.   No.
18         Q.   And they never have; correct?
19         A.   Correct.
20         Q.   Now I want to ask you some questions about
21    a property located on 1600 through 1616 1/2 North
22    Schrader Boulevard and 6533 Selma Avenue which is
23    sometimes referred to as the property associated
24    with the Schrader Hotel project.
25              Are you familiar with that property?
```

1    A.   Yes.

2    Q.   Okay.  And just for ease so I don't have to

3    list out those numbers and the whole names, if I

4    refer to that property as the Schrader Hotel project

5    or development, will you understand what I'm

6    referring to?

7    A.   Yes.

8    Q.   At some point did Koar acquire the property

9    located at 1600 North Schrader that would become the

10   site for the proposed Schrader Hotel project?

11   A.   An entity affiliated with Koar purchased

12   that property.

13   Q.   And was that entity affiliated with Koar

14   known as 1600 Hudson, H-u-d-s-o-n, LLC?

15   A.   Correct.

16   Q.   And was 1600 Hudson LLC wholly owned by

17   Koar?

18   A.   No.

19   Q.   And who were the other owners?

20   A.   If I recall correctly 1600 Hudson LLC is

21   owned by Creative Property Development, LLC.

22   Q.   Creative Property Development, LLC?

23   A.   Yes.

24   Q.   And is that entity associated with Koar?

25   A.   Yes.

1    Q.   And what is that association?

2    A.   Koar is one of the members and the other

3    member, I don't recall him.

4    Q.   Is Koar --

5    A.   The exact name.  Okay.

6    Q.   Is Koar the principal owner or principal

7    member?

8    A.   It's managing member.

9    Q.   Okay.  So the record's good, Koar is the

10   managing member of Creative Property Development,

11   LLC which owns 1600 Hudson LLC.

12   A.   Correct.

13   Q.   If during the course of your deposition

14   today, if I refer to Koar owning -- having ownership

15   in the Schrader Hotel project or seeking

16   entitlements for the Schrader Hotel project, can we

17   agree that you understand I'm referring to the

18   ownership structure you just described with 1600

19   Hudson LLC being owned by Creative Property

20   Development, LLC of which Koar is the managing

21   member?

22   A.   Correct.

23   Q.   And when did 1600 Hudson purchase the

24   property that was designated for the Schrader Hotel

25   project?

**Bruce Rothman**

1       A.    I think it was in circa 2018, maybe 2017.

2       Q.    And was it one purchase or was it -- was

3    the property purchased in piecemeal?

4       A.    Piecemeal.

5       Q.    And how many pieces were there --

6       A.    Two.

7       Q.    -- at the property?

8             Sorry.  So there were two pieces of

9    property that 1600 Hudson LLC acquired that

10   became -- that was ultimately designated for the

11   Schrader Hotel project?

12      A.    Yes.

13      Q.    And can you describe those two pieces of

14   property for me?

15      A.    Well, the first property was the parking

16   lot on the corner.

17      Q.    Okay.  Can you tell me what the cross

18   streets are for that parking lot?

19      A.    Schrader and Selma.

20      Q.    And who did Koar acquire that parking lot

21   from?

22      A.    It was a family trust.  I don't recall

23   their name.

24            And then the second property, which was the

25   apartment building just north on Schrader, that we

1    Q.   Okay.  And how is it inaccurate?

2    A.   Well, the tenants formed kind of an

3    informal association, hired a lawyer, and I spoke to

4    that lawyer several times, met with their tenant

5    representative, and met with several of the tenants,

6    you know, personally.

7    Q.   And so it's not fair to say that the

8    developer failed to meet with any of the tenants at

9    this apartment complex.

10            MR. PATEL:  Objection.  It misstates the

11   document.

12            THE WITNESS:  I don't think it's accurate

13   and candidly I don't think it's required by any law.

14   BY MS. LEADER:

15   Q.   So I think you said this earlier, but

16   correct me if I'm wrong, you don't recall because

17   you ultimately had meetings with Sunset Landmark's

18   representative Mr. Nourmand; correct?

19   A.   Yes.

20   Q.   And also with Mr. Patel, his counsel?

21   A.   Yes.

22   Q.   But not counsel for purposes of the CEQA

23   challenges; right?

24   A.   Correct.

25   Q.   I think you said -- you testified that you

1      Q.   Mr. Nourmand?

2      A.   Yes.

3      Q.   And also not with CEQA counsel but his --

4   but another lawyer he works with, Mr. Patel?

5      A.   Yes.

6      Q.   Okay.  I'm going to mark as the next

7   exhibit in order, I believe, an e-mail that was

8   produced by or in connection with the subpoena that

9   was issued in this matter.

10            (Exhibit 12 was marked for

11            identification and attached hereto.)

12   BY MS. LEADER:

13      Q.   And before we -- and this is a -- for the

14   record, a September, October 2018 e-mail thread or

15   appears to be, sir, a September 2000 -- September

16   through October e-mail thread between you, sir, and

17   Mr. Patel relating to a meeting.

18            And if you could take a second to review

19   this e-mail thread and tell me if having reviewed

20   it, if you can confirm this is an e-mail exchange

21   that you had with Mr. Patel on the dates reflected

22   on what we've marked as Exhibit 12 to your

23   deposition.

24      A.   Confirmed.

25      Q.   Okay.  And let's look at the first e-mail

1   on the thread, which means you'd have to go to the

2   last page of the document.  So we're on page 5.  And

3   it's dated September 11, 2018.

4          And just to kind of set the stage here a

5   bit, this is four days after Sunset Landmark sent

6   its letter to the City Council objecting to the

7   Schrader Hotel project and noting, you know, as part

8   of its objections, that its association or its --

9   what it understood to be its association with

10  Relevant Group; is that right?

11      A.   Yes.

12      Q.   Okay.  And the first e-mail on this thread,

13  it's from Mr. Patel and it's to you, sir, and I

14  think your partner at Koar, Mr. Opman.  It copies

15  Mr. Nourmand.

16          Do you see that?

17      A.   Yes.

18      Q.   Okay.  And I assume that is your e-mail

19  address, sir, as it's reflected in the e-mail at

20  Koar LLC?

21      A.   Yes.

22      Q.   Okay.  And do you recall receiving this

23  e-mail?

24      A.   Yes.

25      Q.   Okay.  Now, prior to this point in time

1    Q.    Okay.  Mr. Patel continues to write,

2    there's a conference room we could use in the

3    bungalows at the back of the parking lot in the

4    Nourmand & Associates office.

5          Do you see that?

6    A.    Yes.

7    Q.    And did you in fact meet with Mr. Nourmand

8    and Mr. Patel at Nourmand & Associates office?

9    A.    Yes.

10   Q.    Okay.  And had you -- do you have any

11   understanding as to why the meeting was at

12   Nourmand & Associates?

13   A.    Don't know the exact reason.  I presume it

14   was for convenience.

15   Q.    Okay.  And did you understand Mr. Nourmand

16   to be associated with Nourmand & Associates?

17   A.    Yes.

18   Q.    And did you have an understanding as to

19   what that association was?

20   A.    I assumed he owned the company.

21         MR. PATEL:  Move to strike as speculation.

22   BY MS. LEADER:

23   Q.    And did you indeed meet with Mr. Nourmand

24   and Mr. Patel on -- to the best your memory on this

25   date at Nourmand & Associates office?

1    knowledge?

2        A.   Don't recall.

3        Q.   And would you describe the meeting as

4    formal or informal?

5        A.   I think it started off, you know, formally

6    and then, you know, as time went on it became much

7    less formal and more of just a discussion of, you

8    know, four people trying to figure out the best path

9    forward.

10       Q.   Okay.

11       A.   It's very cordial.

12       Q.   And so meeting lasted about an hour.  And

13   at this point in time, I mean, you knew going to the

14   meeting that Sunset Landmark had advanced a number

15   of objections to the Schrader Hotel project; right?

16       A.   Yes.

17       Q.   And we also know that a focal point of

18   those objections was Relevant Group's purported

19   association with the project; correct?

20       A.   Yes.

21       Q.   At this point in time though, October 4,

22   2018, Relevant Group didn't have any association

23   whatsoever with the project; right?

24       A.   Correct.

25       Q.   And even though even prior to that time

1      Q.   And do you recall that after these points

2    were communicated, there was a shift to kind of

3    focusing on -- you said there was an issue relating

4    to the rooftop.

5      A.   Correct.

6      Q.   Okay.  And to your memory -- and I'm going

7    to delve more into the rooftop in a moment.  But to

8    your memory was that the only objection or concern

9    Sunset Landmark expressed at this meeting relating

10   to the Schrader Hotel project?

11     A.   That's the only one I remember.

12     Q.   Okay.  And so as you sit here today in the

13   hour meeting, you don't recall concerns being

14   expressed about the fact that, you know, there would

15   be alcohol served or the project density or some of

16   the other objections we saw on the filings earlier

17   today?

18     A.   Well, the -- I think the issue was with

19   regard to the rooftop, you know, that Mr. Nourmand

20   was, you know, concerned that we would try to seek

21   modifications to certain conditions that the City

22   was requiring with regard to our operation of the

23   rooftop.  And I think he was generally -- agreed,

24   you know, with the restrictions with regard to hours

25   of operation when you could serve alcohol, who you

 1   could serve the alcohol to, et cetera, and he just

 2   wanted to make sure that we didn't go in and try and

 3   change those.

 4       Q.   So -- and I just want to make sure I'm

 5   understanding your testimony correctly.  So at that

 6   meeting, your understanding was that Mr. Nourmand's

 7   concern to the Schrader Hotel project that he

 8   articulated to you was not with what was agreed to

 9   with respect to the use of the rooftop for the

10   Schrader Hotel project but with -- you know, he

11   didn't want Schrader -- he didn't want Koar seeking

12   any modifications to that approval in terms of when

13   alcohol would be served and the hours of operation;

14   is that generally accurate?

15       A.   Yes.

16       Q.   So in other words, the conditions that were

17   set forth in the Mitigated Negative Declaration, you

18   understood Mr. Nourmand to be saying he was okay

19   with those but he wanted to make sure that after the

20   project was constructed, Koar wasn't going to go

21   back and try to change any of those conditions;

22   correct?

23       A.   Correct.

24       Q.   And was that the -- as you sit here today,

25   the only concern relating to the Schrader Hotel

1   project that you recall discussing with Mr. Nourmand

2   and Mr. Patel at this October 4, 2018 meeting?

3       A.   Yes.

4       Q.   Okay.  And what did you say, if you recall,

5   or what did your partner say in response to this

6   concern that Mr. Nourmand expressed -- either he

7   expressed or his counsel, Mr. Patel, expressed that

8   you know, everything's okay with the Mitigated

9   Negative Declaration but we don't want to see Koar

10  go back and try to get this modified in any way

11  relating to the use of the rooftop, what was your

12  response to that concern?

13      A.   We agreed with him that it would be

14  inappropriate for us to go back and seek changes to

15  those agreed upon conditions.

16      Q.   And did you assure Mr. Nourmand that Koar

17  was not going to go back and try to change the

18  conditions it had already agreed to with the City

19  regarding the use of the rooftop deck?

20      A.   We agreed.  And we said we would sign some

21  type of documents to that effect.  And for some

22  reason that document, you know, was never drafted or

23  signed.  But, you know, even without the document,

24  we would have lived up to that agreement.

25      Q.   In other words, you were fine moving

1    A.   Correct.

2    Q.   And there wasn't any CEQA litigation

3    demanding that a full EIR report be prepared by

4    Sunset Landmark; correct?

5    A.   Correct.

6         MS. LEADER:  I think I'm done.

7         MR. PATEL:  Okay.  Ready to continue?  Are

8    you good to continue or do you need a break?

9         THE WITNESS:  No, I'm good.

10        MR. PATEL:  Okay.  All right.

11

12                       EXAMINATION

13   BY MR. PATEL:

14   Q.   Let's pick up where we -- kind of where we

15   left off.  If you could just have Exhibit 12 in

16   front of you.  Let's talk a little bit about that,

17   please.

18        (A discussion was held off the record.)

19        MR. PATEL:  All righty.  Thanks.

20   Q.   Let's start from the beginning of the

21   e-mail chain if we could, Mr. Rothman.  I know

22   you've covered this, but I'm focused in particular

23   on a sentence in the original September 11th e-mail

24   to you which I feel odd talking about myself but in

25   which I write to you, "I apologize for the delay in

1    Q.    Okay.  And you understand that the

2    objections that are made -- generally understand

3    that the objections that are made to a project that

4    are filed with the City need to be comprehensive in

5    order not to waive any objections; right?

6          MS. LEADER:  Objection.  Lacks foundation,

7    assumes facts, and calls for legal conclusion.

8          THE WITNESS:  I'm not aware of the

9    technicalities.

10   BY MR. PATEL:

11   Q.    Okay.  Let me ask it a little bit

12   differently, the same concept, and that is in your

13   experience with respect to rejections that are made

14   to a development project proposed to the City of

15   Los Angeles, are you aware of any mechanism by which

16   objections that are not asserted are automatically

17   waived?

18   A.    I'm not familiar with that concept.

19   Q.    Okay.  I take it you rely on CEQA counsel

20   to guide you through that process.

21   A.    Yes.

22   Q.    Okay.  Was Sunset Landmark the only entity

23   that objected to the 1600 Schrader project?

24   A.    No.

25   Q.    There were other people objecting to it

**Page 110**

1    too; correct?

2        A.    Yes.

3        Q.    Were the objections different than the ones

4    that were filed on behalf of Sunset Landmark?

5        A.    We didn't prepare a matrix of appellant and

6    of the objections that they were asserting.

7        Q.    Okay.

8        A.    But I don't believe the three appeals we

9    got were entirely consistent.

10       Q.    Okay.  Did you meet with the other

11   appellants?

12       A.    Yes.

13       Q.    Did you resolve their concerns?

14       A.    Yes.

15       Q.    And I take it that none of those appellants

16   filed a CEQA challenge; correct?

17       A.    No.

18       Q.    No, I'm not correct or, no, they didn't

19   file?

20       A.    No, they did not.

21       Q.    Okay.

22             What's the status of the 1600 Schrader

23   project now?

24       A.    Don't know.

25       Q.    Okay.  You sold it at some point?

Bruce Rothman

Relevant Group, LLC. vs.
Stephan Saeed Nourmand

1                    REPORTER'S CERTIFICATE

2

3            I, SUSAN MYONG, Certified Shorthand

4    Reporter No. 13365 in and for the State of

5    California, do hereby certify:

6            That, prior to being examined, the witness

7    named in the foregoing deposition was by me placed

8    under oath to testify to the truth;

9            That said deposition was taken down by me

10   in shorthand at the time and place therein named and

11   thereafter reduced to typewriting through

12   computer-aided transcription;

13           That said deposition is a true, correct,

14   and complete transcript of said proceedings taken to

15   the best of my ability.

16           I further certify that I am not interested

17   in the event of the action.

18           The dismantling, unsealing, or unbinding of

19   the original transcript will render the Reporter's

20   Certificate null and void.

21           Further, that if the foregoing pertains to
     the original transcript of a deposition in a federal
22   case, before completion of the proceedings, review of
     the transcript [ X ] was [   ] was not requested.
23           WITNESS MY HAND this 11th day of May, 2021.

24           _____

25           SUSAN MYONG, CSR No. 13365

**Page 125**

# Exhibit F

```
 1            IN THE UNITED STATES DISTRICT COURT

 2          FOR THE CENTRAL DISTRICT OF CALIFORNIA

 3

 4

 5   RELEVANT GROUP, LLC, a Delaware)

 6   limited liability company;    )

 7   et al.,                       )

 8                  Plaintiffs,    )

 9       VS.                       )  NO. 2:19-CV-05019

10   STEPHEN "SAEED" NOURMAND, an  )     ODW-Ksx

11   individual, et al.,           )

12                  Defendants.    )

13   _____)

14

15

16   DEPOSITION OF:

17            GUY MAISNIK, ESQ.

18            FRIDAY, MARCH 18, 2022

19            9:13 A.M.

20

21

22   REPORTED BY:

23            Sari M. Knudsen

24            CSR No. 13109

25
```

Page 1

| 1 | then we won't get into the contents of the | 11:43:19 |
| 2 | conversation. | 11:43:20 |
| 3 |    THE WITNESS:  Fair enough. | 11:43:21 |
| 4 |     Yes. | 11:43:22 |
| 5 | BY MR. THAKOR: | 11:43:22 |
| 6 |    Q   Okay.  So just to be clear, you have a very | 11:43:26 |
| 7 | vague understanding of the conversations that | 11:43:27 |
| 8 | occurred prior to the City's approval process about | 11:43:30 |
| 9 | the Thompson Hotel, but that's based on | 11:43:32 |
| 10 | communications with your client and you are claiming | 11:43:36 |
| 11 | attorney-client privilege? | 11:43:38 |
| 12 |    A   Correct. | 11:43:38 |
| 13 |    Q   And on that basis, you are refusing to | 11:43:39 |
| 14 | disclose any understanding you have of those | 11:43:42 |
| 15 | conversations outside of what Mr. Patel told you? | 11:43:45 |
| 16 |    A   Correct. | 11:43:46 |
| 17 |    Q   Okay.  Are you aware of any efforts made by | 11:43:59 |
| 18 | Relevant Group to reach out to Sunset Landmark about | 11:44:01 |
| 19 | the Tommie Hotel prior to the Tommie Hotel being | 11:44:05 |
| 20 | approved? | 11:44:06 |
| 21 |    A   Same answer that you just gave me.  I mean | 11:44:12 |
| 22 | same answer as to all of them. | 11:44:14 |
| 23 |    Q   I see.  And that same answer includes a | 11:44:16 |
| 24 | refusal based on attorney-client privilege? | 11:44:18 |
| 25 |    A   Yes. | 11:44:20 |

Page 105

| | | |
|---|---|---|
| 1 | MR. BISH:  Well, I think what he -- there's -- | 11:44:23 |
| 2 | if -- to the extent the understanding is from | 11:44:26 |
| 3 | nonprivileged communications, have at it.  But to | 11:44:30 |
| 4 | the extent the understanding is from a privileged | 11:44:32 |
| 5 | communication, that's where the privilege is. | 11:44:35 |
| 6 | BY MR. THAKOR: | 11:44:35 |
| 7 | Q    Do you have any understanding of any | 11:44:36 |
| 8 | efforts made by Relevant Group to reach out to | 11:44:38 |
| 9 | Sunset Landmark about the Tommie Hotel that isn't | 11:44:42 |
| 10 | based on a privileged conversation? | 11:44:43 |
| 11 | A    Only from my discussions with Jayesh. | 11:44:47 |
| 12 | Q    And is that true also with respect to the | 11:44:50 |
| 13 | Selma Wilcox Hotel? | 11:44:58 |
| 14 | MR. BISH:  Objection.  It's vague. | 11:44:59 |
| 15 | THE WITNESS:  I refer to Thompson and Tommie if | 11:45:02 |
| 16 | that's okay.  So whatever those two -- the formal | 11:45:04 |
| 17 | names that you are using, just make sure we are | 11:45:07 |
| 18 | using the same nomenclature.  So yes as to Thompson. | 11:45:12 |
| 19 | Thompson and Tommie were -- in my view were treated | 11:45:14 |
| 20 | together as really one even though they are | 11:45:20 |
| 21 | separates projects. | 11:45:23 |
| 22 | BY MR. THAKOR: | 11:45:23 |
| 23 | Q    Why is that? | 11:45:24 |
| 24 | A    Well, it just --- it was my involvement in | 11:45:26 |
| 25 | dealing with the settlement.  You had to settle them | 11:45:31 |

Page 106

| 1 | both. | 11:45:34 |
|---|---|---|
| 2 | Q    So I'm just a little confused.  Why would | 11:45:38 |
| 3 | you have to settle both of them? | 11:45:39 |
| 4 | A    That was my charge.  Just to get them both | 11:45:42 |
| 5 | settled so they can proceed. | 11:45:44 |
| 6 | Q    What do you mean that was your charge? | 11:45:46 |
| 7 | A    So -- I'm sorry.  Go ahead. | 11:45:46 |
| 8 | MR. BISH:  Caution you -- caution on -- you | 11:45:50 |
| 9 | know, you -- obviously you can say that you were | 11:45:53 |
| 10 | involved in the settlement process.  But let's -- I | 11:45:56 |
| 11 | wouldn't -- I would caution you to avoid privileged | 11:45:58 |
| 12 | discussion about -- | 11:45:59 |
| 13 | THE WITNESS:  Yes. | 11:46:00 |
| 14 | MR. BISH:  -- about what you were told. | 11:46:03 |
| 15 | THE WITNESS:  Yeah.  I treat them together | 11:46:04 |
| 16 | because they were both -- I was dealing with both of | 11:46:08 |
| 17 | them at the same time.  And they were -- it was all | 11:46:16 |
| 18 | wrapped up into one -- one overall settlement. | 11:46:22 |
| 19 | BY MR. THAKOR: | 11:46:22 |
| 20 | Q    Okay.  I believe this is Exhibit 3. | 11:46:48 |
| 21 | (Whereupon Defendants' Exhibit 3 | 11:46:48 |
| 22 | was marked for identification) | 11:46:48 |
| 23 | BY MR. THAKOR: | 11:46:48 |
| 24 | Q    Do you recognize this document? | 11:47:23 |
| 25 | We're going to read it together for the | 11:47:28 |

Page 107

| | | |
|---|---|---|
| 1 | record.  But can you confirm this is an e-mail from | 11:47:32 |
| 2 | you? | 11:47:32 |
| 3 | A    Yes.  This is from me. | 11:47:34 |
| 4 | Q    It's an e-mail chain between you and Jayesh | 11:47:37 |
| 5 | Patel? | 11:47:38 |
| 6 | A    It looks like it. | 11:47:39 |
| 7 | Q    And you can see from the bottom right-hand | 11:47:42 |
| 8 | corner, there's a bates stamp with your name on it. | 11:47:44 |
| 9 | Does that indicate to you that you produced this | 11:47:46 |
| 10 | document? | 11:47:47 |
| 11 | A    No.  I don't recall putting that bates | 11:47:51 |
| 12 | stamp there. | 11:47:52 |
| 13 | Q    Do you think that this document was | 11:47:53 |
| 14 | included in your production? | 11:47:56 |
| 15 | A    It's -- it's quite possible. | 11:47:58 |
| 16 | Q    Is there any reason for you to believe that | 11:48:00 |
| 17 | this document is not an authentic copy of -- | 11:48:04 |
| 18 | A    I haven't read it word for word and | 11:48:06 |
| 19 | compared it with what is in my file word for word. | 11:48:10 |
| 20 | So based upon my review of it, it would appear that | 11:48:14 |
| 21 | this comes from me. | 11:48:15 |
| 22 | Q    Let's go to the bottom, the beginning of | 11:48:20 |
| 23 | the chain. | 11:48:24 |
| 24 | A    On the first page. | 11:48:26 |
| 25 | Q    On the last page.  We're going to go | 11:48:38 |

Page 108

| | | |
|---|---|---|
| 1 | chronologically. | 11:48:39 |
| 2 | A    Okay. | 11:48:40 |
| 3 | Q    Okay.  So do you see on Maisnik-001637, | 11:48:53 |
| 4 | there's an e-mail from an Elise Justin? | 11:48:58 |
| 5 | A    Uh-huh.  Yes.  Sorry. | 11:48:59 |
| 6 | Q    And it looks like Ms. Justin is your legal | 11:49:02 |
| 7 | secretary.  Right? | 11:49:04 |
| 8 | A    Yes. | 11:49:04 |
| 9 | Q    And in that e-mail, she's attempting to set | 11:49:07 |
| 10 | up a meeting to discuss the Thompson Hotel.  Right? | 11:49:14 |
| 11 | A    Yes. | 11:49:15 |
| 12 | Q    Okay. | 11:49:16 |
| 13 | You then reply and say "Matt Hinks is my | 11:49:21 |
| 14 | partner.  I'm general corporate counsel to the | 11:49:24 |
| 15 | developer of the Thompson Hotel." | 11:49:25 |
| 16 | Is that a reference to Relevant Group? | 11:49:31 |
| 17 | A    Yes. | 11:49:32 |
| 18 | Q    Okay.  And when you say "Our client | 11:49:35 |
| 19 | believes a meeting with you directly might be more | 11:49:37 |
| 20 | productive," what did you mean by that? | 11:49:42 |
| 21 | A    So let me just clarify. | 11:49:43 |
| 22 | Q    Please. | 11:49:45 |
| 23 | A    You know, I was representing the owner of | 11:49:47 |
| 24 | that property.  That was my representation.  I'm | 11:49:53 |
| 25 | representing the developer on that property, | 11:49:56 |

Page 109

| | | |
|---|---|---|
| 1 | whatever their formal name was. | 11:49:59 |
| 2 | Q    So for Thompson, that would be 1541 Wilcox | 11:50:03 |
| 3 | Hotel LLC? | 11:50:05 |
| 4 | A    If that's what it is, yes. | 11:50:06 |
| 5 | Q    The special purpose entity? | 11:50:07 |
| 6 | A    The entity that was designed for this | 11:50:11 |
| 7 | project, correct. | 11:50:11 |
| 8 | Q    Okay.  Any other clarifications or context | 11:50:14 |
| 9 | you want to add? | 11:50:15 |
| 10 | A    No.  Not at this time. | 11:50:16 |
| 11 | Q    Okay.  So this sentence here "Our client | 11:50:19 |
| 12 | believes a meeting with you directly might be more | 11:50:20 |
| 13 | productive," what is that referring to? | 11:50:33 |
| 14 | A    I'm sorry.  It speaks for itself.  I'm not | 11:50:37 |
| 15 | certain what you mean. | 11:50:38 |
| 16 | Q    Well -- | 11:50:39 |
| 17 | A    I don't know how much further I can clarify | 11:50:40 |
| 18 | this. | 11:50:41 |
| 19 | Q    Sure.  When you say "might be more | 11:50:42 |
| 20 | productive," productive to what? | 11:50:47 |
| 21 | A    Than doing this over the phone or through | 11:50:49 |
| 22 | e-mails. | 11:50:50 |
| 23 | Q    And what is "this?  "Doing this"?  What are | 11:50:53 |
| 24 | you referring to? | 11:50:54 |
| 25 | A    Settling their dispute. | 11:50:57 |

Page 110

| | | |
|---|---|---|
| 1 | Q    Is it fair to say in this e-mail your | 11:50:58 |
| 2 | client is asking Sunset to settle? | 11:51:01 |
| 3 | MR. BISH:  Object to form. | 11:51:03 |
| 4 | THE WITNESS:  I do not know. | 11:51:04 |
| 5 | MR. BISH:  Vague.  Lacks foundation. | 11:51:07 |
| 6 | BY MR. THAKOR: | 11:51:07 |
| 7 | Q    That was the goal of this meeting.  Right? | 11:51:09 |
| 8 | To reach a settlement? | 11:51:10 |
| 9 | MR. BISH:  Object to form. | 11:51:12 |
| 10 | THE WITNESS:  The goal of the meeting would be | 11:51:18 |
| 11 | to cause the lawsuit to be dismissed. | 11:51:22 |
| 12 | BY MR. THAKOR: | 11:51:22 |
| 13 | Q    Through a settlement.  Right? | 11:51:26 |
| 14 | A    However that happens. | 11:51:28 |
| 15 | Q    How else would that happen? | 11:51:30 |
| 16 | A    Don't know. | 11:51:30 |
| 17 | Q    Now, this e-mail was sent on June 15, 2017. | 11:51:39 |
| 18 | Were you aware of any other settlement discussions | 11:51:44 |
| 19 | that had taken place before this e-mail? | 11:51:47 |
| 20 | MR. BISH:  You can answer it yes or no. | 11:51:55 |
| 21 | THE WITNESS:  Possibly. | 11:52:04 |
| 22 | BY MR. THAKOR: | 11:52:04 |
| 23 | Q    And why do you say that? | 11:52:17 |
| 24 | A    Matt Hinks might have been in | 11:52:19 |
| 25 | communications with another lawyer.  Or maybe it's | 11:52:25 |

Page 111

| | | |
|---|---|---|
| 1 | Mr. Silverstein in an attempt to resolve the | 11:52:31 |
| 2 | litigation. | 11:52:35 |
| 3 | Q    Prior to sending this e-mail, did you have | 11:52:37 |
| 4 | conversations with Mr. Hinks about his conversations | 11:52:40 |
| 5 | with Mr. Silverstein? | 11:52:42 |
| 6 | MR. BISH:  Object to form.  And you can answer | 11:52:44 |
| 7 | that one yes or no. | 11:52:46 |
| 8 | THE WITNESS:  I don't believe we did. | 11:52:51 |
| 9 | BY MR. THAKOR: | 11:52:51 |
| 10 | Q    Well, how is it that you received the | 11:53:03 |
| 11 | charge, as you put it, to settle this? | 11:53:10 |
| 12 | A    I was asked to get involved. | 11:53:12 |
| 13 | Q    By who? | 11:53:15 |
| 14 | A    By a client.  I won't go any further than | 11:53:18 |
| 15 | that.  It's privileged. | 11:53:29 |
| 16 | Q    Okay.  If we can go up to -- strike that. | 11:53:37 |
| 17 | At the time you sent this e-mail to set up | 11:53:40 |
| 18 | this meeting, did you believe that your client was | 11:53:48 |
| 19 | being extorted? | 11:53:49 |
| 20 | MR. BISH:  Object to form.  It's vague. | 11:53:54 |
| 21 | THE WITNESS:  I don't know. | 11:53:55 |
| 22 | BY MR. THAKOR: | 11:53:55 |
| 23 | Q    You don't know if you believed that at this | 11:53:58 |
| 24 | time? | 11:53:58 |
| 25 | A    I don't know.  Yes.  I do not know at this | 11:54:00 |

Page 112

| | | |
|---|---|---|
| 1 | time whether I believe that.  Possibly.  And in the | 11:54:06 |
| 2 | possibility that it was this time, can you tell me | 11:54:09 |
| 3 | why you would have believed that then? | 11:54:13 |
| 4 | A    Well, I think you are asking me, if I'm not | 11:54:17 |
| 5 | mistaken, why I would think that would be the case | 11:54:27 |
| 6 | in this particular matter altogether or just at this | 11:54:31 |
| 7 | particular time? | 11:54:31 |
| 8 | Q    At this particular time. | 11:54:32 |
| 9 | A    I don't know.  I'd have to go back and look | 11:54:34 |
| 10 | at the file to refresh my memory. | 11:54:38 |
| 11 | Q    I mean up until this point, you were | 11:54:40 |
| 12 | involved in the litigation.  Right? | 11:54:42 |
| 13 | A    Correct. | 11:54:52 |
| 14 | Q    Okay.  So then it looks like you eventually | 11:54:58 |
| 15 | had a meeting on June 21.  Do you remember that | 11:55:05 |
| 16 | meeting at all? | 11:55:09 |
| 17 | MR. BISH:  Object to form.  It's vague. | 11:55:12 |
| 18 | THE WITNESS:  If there's no -- let's see.  Maybe | 11:55:18 |
| 19 | it's referenced in one of these e-mails.  One | 11:55:22 |
| 20 | second. | 11:55:35 |
| 21 | And you are saying I met with them on the | 11:55:36 |
| 22 | 21st. | 11:55:37 |
| 23 | BY MR. THAKOR: | 11:55:37 |
| 24 | Q    Yeah.  So if you look at Maisnik_001635, | 11:55:43 |
| 25 | there's an e-mail from June 23, 2017. | 11:55:46 |

Page 113

```
 1       A    What --                              11:55:49

 2       MR. BISH:  Are you asking if he recalls the   11:55:50

 3    meeting or if he recalls it was on the 21st?    11:55:53

 4       MR. THAKOR:  We are going to set the foundation  11:55:55

 5    first.                                        11:55:55

 6       MR. BISH:  Okay.                           11:55:58

 7       THE WITNESS:  It says                      11:55:58

 8              "I enjoyed meeting you.  You both   11:56:00

 9          personally and professionally."         11:56:02

10          Okay.  So it had to have happened before --  11:56:05

11    BY MR. THAKOR:                                11:56:05

12       Q    You see how it says Wednesday?        11:56:06

13       A    It says                               11:56:08

14              "Thank you for meeting with me on   11:56:09

15          Wednesday."                             11:56:10

16          Wednesday.                              11:56:10

17       Q    And Friday was June 23.  Right?       11:56:13

18       A    Yes.                                  11:56:14

19       Q    And so does that refresh your recollection  11:56:16

20    that there was a meeting that took place on June 21,  11:56:18

21    two days before?                              11:56:20

22       A    It must have.  But I don't remember it.  I  11:56:23

23    don't know.                                   11:56:23

24       Q    Do you have any recollection of that  11:56:25

25    meeting?                                      11:56:27
```

Page 114

| | | |
|---|---|---|
| 1 | A    I had had -- I recall one meeting that we | 11:56:30 |
| 2 | had at Nourmand's brokerage offices. | 11:56:35 |
| 3 | Q    You don't remember when that meeting took | 11:56:38 |
| 4 | place? | 11:56:39 |
| 5 | A    I don't remember the day. | 11:56:40 |
| 6 | Q    And you can't say -- was this -- strike | 11:56:43 |
| 7 | that. | 11:56:44 |
| 8 | This meeting that you are referring to, was | 11:56:45 |
| 9 | this the first time that you had met Jayesh in | 11:56:49 |
| 10 | person? | 11:56:52 |
| 11 | A    I don't recall.  It's possible. | 11:56:55 |
| 12 | Q    Do you remember the meeting where you met | 11:56:59 |
| 13 | Mr. Nourmand for the first time in person? | 11:57:02 |
| 14 | A    Yes.  At his offices.  But I don't remember | 11:57:05 |
| 15 | when that was. | 11:57:06 |
| 16 | Q    I see.  So you remember two meetings.  One | 11:57:08 |
| 17 | in Nourmand & Associates' office and one in | 11:57:11 |
| 18 | Mr. Nourmand's office? | 11:57:16 |
| 19 | A    I think you just said the same thing. | 11:57:18 |
| 20 | Q    Sure.  Let me try it.  Strike that. | 11:57:20 |
| 21 | The meeting in which you first met | 11:57:26 |
| 22 | Mr. Nourmand, Saeed Nourmand, is that separate from | 11:57:31 |
| 23 | the meeting you were talking about earlier that | 11:57:33 |
| 24 | occurred at the Nourmand & Associates brokerage | 11:57:35 |
| 25 | offices? | 11:57:36 |

Page 115

| | | | |
|---|---|---|---|
| 1 | A | No. | 11:57:37 |
| 2 | Q | It's the same meeting? | 11:57:38 |
| 3 | A | Same meeting. | 11:57:39 |
| 4 | Q | Got it. | 11:57:40 |
| 5 | | And you can see from the second sentence in | 11:57:47 |
| 6 | | your e-mail, it talks about meeting Mr. Patel | 11:57:53 |
| 7 | | personally and professionally on Wednesday.  Right? | 11:57:56 |
| 8 | A | Uh-huh. | 11:57:57 |
| 9 | Q | And so does that refresh your recollection | 11:57:58 |
| 10 | | that on June 21 was the first time you met | 11:58:01 |
| 11 | | Mr. Patel? | 11:58:02 |
| 12 | A | It doesn't unfortunately. | 11:58:04 |
| 13 | Q | Uh-huh.  Do you remember meeting Mr. Patel | 11:58:06 |
| 14 | | without Saeed Nourmand present? | 11:58:10 |
| 15 | A | I do not remember.  It's possible. | 11:58:12 |
| 16 | Q | So the next sentence says | 11:58:20 |
| 17 | | "Your candor and approach were | 11:58:22 |
| 18 | | refreshing and it will help move these | 11:58:25 |
| 19 | | discussions in the right direction for | 11:58:26 |
| 20 | | both parties." | 11:58:30 |
| 21 | | Do you remember Mr. Patel's candor and | 11:58:35 |
| 22 | | approach that you are referring to here? | 11:58:41 |
| 23 | A | Yes.  Generally. | 11:58:43 |
| 24 | Q | And why did you say that statement? | 11:58:47 |
| 25 | A | He expressed a desire on behalf of his | 11:58:52 |

Page 116

| | | |
|---|---|---|
| 1 | client that they want to reach a settlement and | 11:58:54 |
| 2 | make -- and reach a deal so this lawsuit can be | 11:59:00 |
| 3 | terminated. | 11:59:01 |
| 4 | Q    And how did he express that desire? | 11:59:04 |
| 5 | A    I can't remember specifically. | 11:59:05 |
| 6 | Q    But the way he expressed it, you found | 11:59:08 |
| 7 | refreshing? | 11:59:08 |
| 8 | A    Well, keep in mind that I am -- I'm trying | 11:59:12 |
| 9 | to create a relationship here.  So those words are | 11:59:14 |
| 10 | sincere but I'm expressing them because it's | 11:59:17 |
| 11 | important to have a good relationship with the other | 11:59:20 |
| 12 | negotiator in order to reach a -- reach a successful | 11:59:25 |
| 13 | conclusion, if possible. | 11:59:27 |
| 14 | But yeah.  He didn't come off as a hard | 11:59:31 |
| 15 | core litigator.  He came off as somebody trying to | 11:59:34 |
| 16 | make a deal. | 11:59:35 |
| 17 | Q    How would you describe a hard core | 11:59:37 |
| 18 | litigator? | 11:59:37 |
| 19 | A    Someone who is unyielding, unwilling to | 11:59:51 |
| 20 | negotiate or at least gives the appearance of one. | 11:59:54 |
| 21 | I mean, it's just one of style actually as opposed | 11:59:57 |
| 22 | to one of substance.  At least in my opinion.  I've | 12:00:02 |
| 23 | seen hard core litigators that come off very tough, | 12:00:07 |
| 24 | very difficult, but we do reach an agreement much | 12:00:10 |
| 25 | more easier than some of the ones that have a style | 12:00:14 |

Page 117

```
 1    like this that we don't reach an agreement.        12:00:21

 2        Q    What else can you remember about your      12:00:45

 3    conversation with Mr. Patel that you found          12:00:47

 4    refreshing?                                         12:00:47

 5        A    He was pleasant to deal with.              12:00:52

 6        Q    Anything else?                             12:00:53

 7        A    He's likable.                              12:00:53

 8        Q    Anything else?                             12:01:00

 9        A    No.                                        12:01:01

10        Q    Did you think he was making unreasonable   12:01:02

11    demands?                                            12:01:05

12        A    Yes.                                       12:01:07

13        Q    Was he making any demands?                 12:01:08

14        A    At some point.  Not -- I can't recall if it 12:01:15

15    was this day or any other day.                      12:01:17

16        Q    I'm talking about this day.                12:01:18

17        A    I can't tell you for sure.                 12:01:23

18        Q    Can you remember anything that Mr. Patel   12:01:25

19    said?                                               12:01:27

20        A    Are we talking about the meeting in the    12:01:29

21    offices?                                            12:01:29

22        Q    I'm talking about the meeting referred to  12:01:31

23    in the e-mail.                                      12:01:32

24        A    I just don't remember specifically.  And I 12:01:35

25    don't remember -- if that was the role, if that was 12:01:38
```

Page 118

```
 1        Q    Did you ever report back to -- well, strike    12:25:52
 2   that.                                                     12:25:53
 3             Earlier, you had said that you were -- or       12:26:09
 4   at least I think you said this -- that you were           12:26:12
 5   unaware of any efforts by Relevant Group to reach         12:26:18
 6   out to Sunset Landmark regarding the Thompson Hotel       12:26:21
 7   project.  Is that still true?                             12:26:24
 8        A    When timing-wise?                               12:26:26
 9        Q    Prior to City approval.                         12:26:27
10        A    I mean, I wasn't involved.                      12:26:28
11        Q    So you can't say one way or another whether     12:26:32
12   or not Sunset Landmark was even consulted?                12:26:34
13        A    Well, again, I can only tell you what I         12:26:40
14   received from Jayesh.  I couldn't tell you the            12:26:42
15   timing of when that occurred.                             12:26:44
16        Q    Did you -- and you don't have to tell me        12:26:47
17   the substance of what you reported.  But I just want      12:26:49
18   to know if there's a communication that exists.  Did      12:26:52
19   you ever report to your client what happened in this     12:26:56
20   meeting?                                                  12:26:57
21        MR. BISH:  You can answer that yes or no.            12:26:58
22        THE WITNESS:  I won't -- I won't communicate.        12:27:01
23        MR. BISH:  You can answer that yes or no.            12:27:02
24        THE WITNESS:  What do you mean?                      12:27:03
25        MR. BISH:  You can say whether or not there was      12:27:04
```

Page 137

| | | |
|---|---|---|
| 1 | Do you see that? | 1:44:31 |
| 2 | A    Yes. | 1:44:33 |
| 3 | Q    What do you mean by that? | 1:44:37 |
| 4 | A    I think he -- our goal was to mediate a | 1:44:40 |
| 5 | dispute between these parties and we were trying to | 1:44:43 |
| 6 | bring them together and the goal is for us to work | 1:44:48 |
| 7 | together to accomplish that. | 1:44:51 |
| 8 | Q    And it sounds like Mr. Patel had said that | 1:44:55 |
| 9 | first and you agreed with the statement? | 1:44:56 |
| 10 | A    I think so. | 1:44:58 |
| 11 | MR. BISH:  Let me -- | 1:44:59 |
| 12 | THE WITNESS:  Sorry. | 1:45:01 |
| 13 | MR. BISH:  Belated objection to form. | 1:45:07 |
| 14 | BY MR. THAKOR: | 1:45:07 |
| 15 | Q    Okay.  So I'm going to show you -- I think | 1:45:20 |
| 16 | this is Exhibit 4. | 1:45:22 |
| 17 | THE REPORTER:  Yes. | 1:45:36 |
| 18 | (Whereupon Defendants' Exhibit 4 | 1:45:36 |
| 19 | was marked for identification) | 1:45:36 |
| 20 | BY MR. THAKOR: | 1:45:36 |
| 21 | Q    So outside of the handwritten notations, do | 1:45:40 |
| 22 | you recognize this document? | 1:45:41 |
| 23 | A    I think so.  Yes. | 1:45:42 |
| 24 | Q    Is this the Silverstein letter you were | 1:45:45 |
| 25 | referring to before with the, quote, unquote, | 1:45:47 |

Page 150

| 1 | same thing each time. | 2:08:43 |
| 2 | Q It sounds like you two were getting along | 2:08:45 |
| 3 | very well. | 2:08:46 |
| 4 | MR. BISH: Object to form. It's vague. Just | 2:08:47 |
| 5 | slow down for a minute. | 2:08:49 |
| 6 | THE WITNESS: Yes. | 2:08:50 |
| 7 | BY MR. THAKOR: | 2:08:50 |
| 8 | Q Would you agree that you and Jayesh got | 2:08:53 |
| 9 | along pretty well during this entire settlement | 2:08:55 |
| 10 | negotiation process? | 2:08:57 |
| 11 | MR. BISH: Object to form. It's vague. | 2:08:59 |
| 12 | THE WITNESS: Yes. | 2:09:00 |
| 13 | BY MR. THAKOR: | 2:09:00 |
| 14 | Q Okay. So let's go to the next e-mail. And | 2:09:11 |
| 15 | it looks like from August 21 to August 22, you're | 2:09:24 |
| 16 | trying to set up a meeting? | 2:09:33 |
| 17 | A Yes. | 2:09:34 |
| 18 | (Whereupon Defendants' Exhibit 5 | 2:09:34 |
| 19 | was marked for identification) | 2:09:34 |
| 20 | BY MR. THAKOR: | 2:09:34 |
| 21 | Q And Mr. Patel offers what he calls a Hail | 2:09:38 |
| 22 | Mary. Do you see that? | 2:09:41 |
| 23 | A I don't see Hail Mary. | 2:09:43 |
| 24 | Q Yeah, it's a little buried. So it's | 2:09:46 |
| 25 | August 22, 2017 at 9:39. It's the second to last | 2:09:49 |

Page 170

| | | |
|---|---|---|
| 1 | A    Which e-mail? | 2:25:17 |
| 2 | Q    The e-mail we're looking at. | 2:25:21 |
| 3 | A    Which one? | 2:25:22 |
| 4 | Q    Any of them. | 2:25:23 |
| 5 | A    Any of them? | 2:25:24 |
| 6 | Q    Any of the ones with the subject "checking | 2:25:26 |
| 7 | in." | 2:25:36 |
| 8 | MR. BISH:  Same objections.  It's vague. | 2:25:44 |
| 9 | THE WITNESS:  My concern never changed.  I don't | 2:25:47 |
| 10 | think there's anything in particular in these | 2:25:49 |
| 11 | e-mails that made me any more concerned than any of | 2:25:53 |
| 12 | the other e-mails in this -- and the status of the | 2:25:58 |
| 13 | negotiations.  I was very concerned about whether or | 2:26:06 |
| 14 | not this was going to get resolved. | 2:26:08 |
| 15 | BY MR. THAKOR: | 2:26:09 |
| 16 | Q    Okay.  This is the next e-mail. | 2:26:37 |
| 17 | We are going to go chronologically again. | 2:26:46 |
| 18 | This is just the top e-mail. | 2:26:47 |
| 19 | A    Okay. | 2:26:47 |
| 20 | Q    Just some foundational questions. | 2:26:49 |
| 21 | This again is an e-mail chain between you | 2:26:52 |
| 22 | and Mr. Patel? | 2:26:52 |
| 23 | A    Okay. | 2:26:53 |
| 24 | (Whereupon Defendants' Exhibit 6 | 2:26:53 |
| 25 | was marked for identification) | 2:26:54 |

Page 183

| | | |
|---|---|---|
| 1 | BY MR. THAKOR: | 2:26:54 |
| 2 | Q    Do you agree with that statement? | 2:26:55 |
| 3 | A    I don't disagree.  I assume it's correct. | 2:26:58 |
| 4 | Q    No reason to suggest why this e-mail is not | 2:27:00 |
| 5 | authentic? | 2:27:02 |
| 6 | A    I have no reason to think that. | 2:27:03 |
| 7 | Q    So let's go to the first e-mail and I think | 2:27:13 |
| 8 | the first e-mail is from you on August 23, 2017? | 2:27:16 |
| 9 | A    Yes. | 2:27:17 |
| 10 | Q    So this is the Wednesday after -- the next | 2:27:21 |
| 11 | day after the last e-mail chain? | 2:27:23 |
| 12 | A    Yes. | 2:27:24 |
| 13 | Q    And you are asking if he's around? | 2:27:26 |
| 14 | A    Yes. | 2:27:27 |
| 15 | Q    Why are you asking that? | 2:27:36 |
| 16 | A    Wanted to see if he had time to talk. | 2:27:39 |
| 17 | Q    To talk about settling? | 2:27:40 |
| 18 | MR. BISH:  Object to form. | 2:27:41 |
| 19 | THE WITNESS:  I presume. | 2:27:43 |
| 20 | BY MR. THAKOR: | 2:27:43 |
| 21 | Q    And Mr. Patel says "Can't talk today. | 2:27:51 |
| 22 | Let's talk tomorrow." | 2:27:53 |
| 23 | Do you agree with that? | 2:27:54 |
| 24 | A    Yeah. | 2:27:55 |
| 25 | Q    Okay.  So let's go to August 24. | 2:28:08 |

Page 184

| | | |
|---|---|---|
| 1 | If you know. | 2:31:33 |
| 2 | THE WITNESS:  Faintly, but I couldn't tell you | 2:31:37 |
| 3 | what it was about or what it was concerning. | 2:31:42 |
| 4 | Something that might have been ruled in favor of | 2:31:44 |
| 5 | Sunset but I just don't remember what it was or what | 2:31:48 |
| 6 | its merits were or what its weight or value was. | 2:31:52 |
| 7 | BY MR. THAKOR: | 2:31:52 |
| 8 | Q    So the only thing you can remember about | 2:31:54 |
| 9 | that ruling is that during your settlement meeting, | 2:31:59 |
| 10 | there was a favorable ruling in favor of Sunset? | 2:32:15 |
| 11 | MR. BISH:  Objection.  Misstates testimony. | 2:32:17 |
| 12 | Vague.  Lacks foundation. | 2:32:18 |
| 13 | THE WITNESS:  Yeah.  I guess -- I really have a | 2:32:21 |
| 14 | very faint memory of that part of it.  I just wasn't | 2:32:24 |
| 15 | involved. | 2:32:24 |
| 16 | BY MR. THAKOR: | 2:32:24 |
| 17 | Q    Uh-huh.  Give me everything you can | 2:32:26 |
| 18 | remember.  Even if it's faint. | 2:32:28 |
| 19 | A    I think I've given it to you.  I just don't | 2:32:31 |
| 20 | have much more than that. | 2:32:33 |
| 21 | Q    I want to show you -- keep that e-mail in | 2:32:35 |
| 22 | front of you.  I just want to show you the ruling | 2:32:37 |
| 23 | itself. | 2:32:53 |
| 24 | THE REPORTER:  This is Exhibit 7. | 2:32:55 |
| 25 | (Whereupon Defendants' Exhibit 7 | 2:32:55 |

Page 188

| | | |
|---|---|---|
| 1 | of from an extortionist standpoint. | 5:02:02 |
| 2 | Q    Let's talk about the business. | 5:02:07 |
| 3 | MS. SCHAUS:  Do you mind if we take a quick | 5:02:09 |
| 4 | restroom break?  Very brief. | 5:02:11 |
| 5 | MR. THAKOR:  Sure. | 5:02:11 |
| 6 | THE WITNESS:  I'm fine. | 5:02:12 |
| 7 | MR. BISH:  I think she wants one. | 5:02:15 |
| 8 | MS. SCHAUS:  If we can just take -- | 5:02:16 |
| 9 | THE WITNESS:  No.  No.  I said I'm fine with you | 5:02:18 |
| 10 | taking it. | 5:02:20 |
| 11 | THE VIDEOGRAPHER:  We are now off the record. | 5:02:21 |
| 12 | Time is 5:02 P.M. | 5:02:44 |
| 13 | (Whereupon a recess was taken) | 5:03:07 |
| 14 | THE VIDEOGRAPHER:  We are now on the record. | 5:13:09 |
| 15 | The time is 5:13 P.M. | 5:13:11 |
| 16 | BY MR. THAKOR: | 5:13:11 |
| 17 | Q    Okay.  Mr. Maisnik, we are back on the | 5:13:17 |
| 18 | record.  Prior to the break, I handed you a map of | 5:13:22 |
| 19 | Hollywood. | 5:13:23 |
| 20 | Do you have the map in front of you? | 5:13:24 |
| 21 | A    I do. | 5:13:25 |
| 22 | Q    Now, other than the notations on the map, | 5:13:27 |
| 23 | do you recognize the area depicted on the map? | 5:13:30 |
| 24 | A    I do. | 5:13:31 |
| 25 | Q    What area is that? | 5:13:34 |

Page 267

| | | |
|---|---|---|
| 1 | A     Hollywood. | 5:13:35 |
| 2 | (Whereupon Defendants' Exhibit 14 | 5:13:35 |
| 3 | was marked for identification) | 5:13:36 |
| 4 | BY MR. THAKOR: | 5:13:36 |
| 5 | Q     Would this be part of that Hollywood Hotel | 5:13:37 |
| 6 | District we were discussing earlier? | 5:13:39 |
| 7 | A     I don't know what the parameters are of the | 5:13:45 |
| 8 | Hollywood Hotel District.  But it wouldn't surprise | 5:13:48 |
| 9 | me that this is in that district if that is the | 5:13:52 |
| 10 | case. | 5:13:53 |
| 11 | Q     Because there is a bunch of hotels.  Right? | 5:13:55 |
| 12 | A     Looks like a district to me. | 5:13:59 |
| 13 | Q     And do you see the notations on the map | 5:14:01 |
| 14 | with respect to buildings? | 5:14:03 |
| 15 | A     I do. | 5:14:05 |
| 16 | Q     First, do you think that those notations | 5:14:07 |
| 17 | are accurate?  Do they look accurate to you? | 5:14:09 |
| 18 | MR. BISH:  Object to form.  Vague. | 5:14:13 |
| 19 | THE WITNESS:  I don't know.  I'm assuming -- I | 5:14:15 |
| 20 | don't know.  Actually, I haven't studied this | 5:14:17 |
| 21 | carefully enough.  But -- | 5:14:21 |
| 22 | BY MR. THAKOR: | 5:14:21 |
| 23 | Q     Is there any building reflected on this map | 5:14:26 |
| 24 | that you are not familiar with? | 5:14:28 |
| 25 | A     Yeah.  It looks right from what I can | 5:15:13 |

Page 268

| | | |
|---|---|---|
| 1 | recall. | 5:15:20 |
| 2 | Q   And you're familiar with these buildings | 5:15:22 |
| 3 | noticed on the map.  Right? | 5:15:25 |
| 4 | MR. BISH:  Objection.  Vague. | 5:15:25 |
| 5 | THE WITNESS:  When you say "familiar," I know | 5:15:27 |
| 6 | the addresses. | 5:15:28 |
| 7 | BY MR. THAKOR: | 5:15:28 |
| 8 | Q   The names? | 5:15:29 |
| 9 | A   Where they look.  I know what -- we've | 5:15:31 |
| 10 | called them a lot of different things over the | 5:15:34 |
| 11 | years.  But... | 5:15:35 |
| 12 | Q   But I think you just referenced something | 5:15:36 |
| 13 | I'm going to ask them.  You said "We called them a | 5:15:40 |
| 14 | lot of things"? | 5:15:41 |
| 15 | A   My team.  Because sometimes Dream Hotel, | 5:15:43 |
| 16 | you know, we called it something else at one time. | 5:15:49 |
| 17 | Q   How many of these buildings are owned by | 5:15:54 |
| 18 | Relevant? | 5:15:55 |
| 19 | MR. BISH:  Object to form.  Calls for | 5:15:56 |
| 20 | speculation. | 5:16:01 |
| 21 | THE WITNESS:  None. | 5:16:03 |
| 22 | BY MR. THAKOR: | 5:16:03 |
| 23 | Q   How many of these buildings were developed | 5:16:05 |
| 24 | by Relevant? | 5:16:06 |
| 25 | MR. BISH:  Object to form.  Calls for legal | 5:16:07 |

Page 269