1
**WILSON SONSINI GOODRICH & ROSATI**
**Professional Corporation**
2 SUSAN K. LEADER, State Bar No. 216743
sleader@wsgr.com
3 ALI R. RABBANI, State Bar No. 253730
arabbani@wsgr.com
4 CONOR TUCKER, State Bar No. 318075
ctucker@wsgr.com
5 633 West Fifth Avenue, Suite 1550
Los Angeles, California 90071-2027
6 Telephone:  (323) 210-2900
Facsimile:   (323) 974-7329
7
**WILSON SONSINI GOODRICH & ROSATI**
8 **Professional Corporation**
DALE R. BISH, State Bar No. 235390
9 dbish@wsgr.com
CHARLES A. TALPAS, State Bar No. 308505
10 ctalpas@wsgr.com
650 Page Mill Road
11 Palo Alto, California 94304-1050
Telephone:  (650) 493-9300
12 Facsimile:   (650) 565-5100

13 Attorneys for Plaintiffs Relevant Group,
LLC; 1541 Wilcox Hotel LLC; 6516
14 Tommie Hotel LLC; and 6421 Selma
Wilcox Hotel LLC
15
UNITED STATES DISTRICT COURT
16
CENTRAL DISTRICT OF CALIFORNIA
17

| | |
|---|---|
| 18 RELEVANT GROUP LLC, a Delaware limited liability company; 6516 19 TOMMIE HOTEL LLC, a Delaware limited liability company; and 6421 20 SELMA WILCOX HOTEL LLC, a California limited liability company, | Case No.: 2:19-cv-05019-ODW-KS |
| | **PLAINTIFFS' OPPOSITION TO DEFENDANTS SUNSET LANDMARK AND SAEED NOURMAND'S MOTION FOR SUMMARY JUDGMENT** |
| 21            Plaintiffs, | |
| 22       v. | Date:      June 13, 2022 |
| 23 STEPHAN "SAEED" NOURMAND, an individual; THE SUNSET 24 LANDMARK INVESTMENT LLC, a California limited liability company; 25 NOURMAND & ASSOCIATES, a California corporation; and DOES 1-10, 26 inclusive, | Time:      1:30 p.m. Dept:      Courtroom 5D, Fifth Floor Before:    Hon. Otis D. Wright II |
| 27            Defendants. | |
| 28 | |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................... 1

BACKGROUND ..................................................................................... 2

    A.    The Nourmand Family and Its Business Organization ...................... 3

    B.    The Relevant Group ......................................................................... 4

    C.    Plaintiffs' Projects .......................................................................... 4

    D.    The Legal Proceedings .................................................................... 6

ARGUMENT .......................................................................................... 8

I.    PLAINTIFFS' RICO CLAIMS ARE NOT PRECLUDED AS A MATTER OF LAW ................................................................................ 8

    A.    Hobbs Act Extortion Is Always a Predicate Act Under RICO ........... 8

    B.    Sham Litigation Is Not Privileged Under California Law ................. 10

II.    THERE IS A GENUINE DISPUTE OF FACT REGARDING WHETHER DEFENDANTS PURSUED "SHAM" LITIGATION ........... 10

    A.    *USS-POSCO* Is the Applicable Legal Standard ........................... 10

        1.    Plaintiffs' Projects Compete with Defendants' Businesses .............................................................. 11

        2.    Between 2015 and 2019, Defendants Reflexively Challenged Each of Plaintiffs' Projects ................... 12

    B.    Defendants Initiated Challenges "Without Regard to the Merits" ......................................................................................... 13

        1.    Defendant' Legal Filings Were Not Made "Out of a Genuine Interest in Redressing" Environmental Grievances ................................................................ 14

        2.    Defendants Cannot Refute Evidence of Subjective Motive ..................................................................... 16

        3.    Defendants' Track Record of Success Was Abysmal ............. 16

    C.    There Is a Disputed Issue of Fact Even Under the Inapplicable "Probable Cause" Standard in *Professional Real Estate Investors* ............................................................................ 19

III.   WHETHER DEFENDANTS' CONDUCT WAS "WRONGFUL" UNDER THE HOBBS ACT IS A DISPUTED QUESTION OF FACT ........................................................................... 20

    A.   Plaintiffs Can Establish the "Wrongful" Element Based on Defendants' "Sham" CEQA Challenges ............................... 21

    B.   Plaintiffs' Do Not Need to Establish the "Wrongful" Element Based on a Theory of "Sham" Litigation ............................ 21

IV.   THE SETTLEMENT AGREEMENTS DO NOT BAR CLAIMS ............. 22

V.   RELEVANT HAS STANDING .................................................. 24

VI.   DEFENDANTS' ARGUMENTS REGARDING SCHRADER AND MADDREN ARE NOT A BASIS FOR SUMMARY JUDGMENT ......................................................................... 25

CONCLUSION ................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adickes v. S. H. Kress & Co.*,
398 U.S. 144 (1970)..................................................................23, 25

*Bhakta v. Bhakta*,
2022 WL 301552 (9th Cir. Feb. 1, 2022) ..................................24

*Cal. Motor Transp. Co. v. Trucking Unlimited*,
404 U.S. 508 (1972)..................................................................11, 14

*Calabrese v. CSC Holdings, Inc.*,
2004 WL 3186787 (E.D.N.Y. July 19, 2004)...................................10

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986).........................................................................8

*Chevron Corp. v. Donzinger*,
974 F. Supp. 2d 362 (S.D.N.Y. 2014), *aff'd*,
833 F.3d 74 (2d Cir. 2016) .......................................................10, 21

*Chevron Corp. v. Pennzoil Co.*,
974 F.2d 1156 (9th Cir. 1992) ......................................................16

*City of Columbia v. Omni Outdoor Advert., Inc.*,
499 U.S. 365 (1991).............................................................13, 14, 16

*Clicks Billiards Inc. v. Sixshooters, Inc.*,
251 F.3d 1252 (9th Cir. 2001) .........................................................8

*Collier v. Town of Harvard*,
1997 WL 33781338 (D. Mass. Mar. 28, 1997) ................................22

*Columbia Pictures Television, Inc. v. Krypton Broad. of Birmingham, Inc.*,
259 F.3d 1186 (9th Cir. 2001) ......................................................16

*CSX Transp., Inc. v. Gilkison*,
2012 WL 5906716 (N.D. W. Va. Nov. 26, 2012) ............................19

*Deck v. Engineered Laminates*,
349 F.3d 1253 (10th Cir. 2003) .......................................................9

*Elemary v. Phillip Holzmann A.G.*,
2008 WL 11389164 (D.D.C. Aug. 18, 2008)................................23, 24

*First Pacific Bancorp, Inc. v. Bro*,
847 F.2d 542 (9th Cir. 1988) ..........................................................9

*Hanover 3201 Realty, LLC v. Vill. Supermarkets, Inc.*,
    806 F.3d 162 (3d Cir. 2015) ...................................................................*passim*

*Hasbro, Inc. v. Sweetpea Ent., Inc.*,
    2014 WL 12561624 (C.D. Cal. Mar. 18, 2014)....................................16

*Howard v. America Online Inc.*,
    208 F.3d 741 (9th Cir. 2000) .........................................................23, 24

*I.S. Joseph Co. v. J. Lauritzen A/S*,
    751 F.2d 265 (8th Cir. 1984) ...................................................................9

*Kaiser Found. Health Plan, Inc. v. Abbott Laboratories, Inc.*,
    552 F.3d 1033 (9th Cir. 2009) ...............................................................18

*Kim v. Kimm*,
    884 F.3d 98 (2d Cir. 2018) .......................................................................9

*La Suisse, Societe D'Assurances Sur La Vie v. Kraus*,
    2014 WL 3610890 (S.D.N.Y. July 21, 2014).......................................10, 21, 22

*Leocal v. Ashcroft*,
    543 U.S. 1 (2004)....................................................................................10

*Nissan Fire & Marine Ins. Co. v. Fritz Cos.*,
    210 F.3d 1099 (9th Cir. 2000) ..........................................................23, 25

*Pro. Real Estate Invs., Inc. v. Columbia Pictures Indus., Inc.*,
    508 U.S. 49 (1993)..................................................................................19

*Raney v. Allstate Ins. Co.*,
    370 F.3d 1086 (11th Cir. 2004) ...............................................................9

*Religious Tech. Ctr. v. Wollersheim*,
    971 F.2d 367 (9th Cir. 1992) ...................................................................10

*Richards v. Cnty. of Los Angeles*,
    2017 WL 7411159 (C.D. Cal. Mar. 31, 2017)......................................10

*Snow Ingredients, Inc. v. SnoWizard, Inc.*,
    833 F.3d 512 (5th Cir. 2016) ...................................................................9

*United States v. Avenatti*,
    2020 WL 70951 (S.D.N.Y. Jan 6, 2020) ...............................................22

*United States v. Irali*,
    503 F.2d 1295 (7th Cir. 1974) ................................................................22

*United States v. Koziol*,
    993 F.3d 1160 (9th Cir. 2021), *cert. denied*,
    142 S. Ct. 1372 (2022).................................................................8, 9, 20, 21

-iv-

*United States v. Middlemiss*,
   217 F.3d 112 (2d Cir. 2000) ...................................................................22

*United States v. Philips*,
   586 F. Supp. 1118 (N.D. Ill. 1984)..........................................................22

*United States v. Rubio*,
   321 F.3d 517 (5th Cir. 2003) ...................................................................22

*United States v. Senak*,
   477 F.2d 304 (7th Cir. 1973) ...................................................................22

*United States v. Tobin*,
   155 F.3d 636 (3rd Cir. 1998) ...................................................................22

*United States v. Villalobos*,
   748 F.3d 953 (9th Cir. 2014) ...................................................................20

*USS-POSCO Indus. v. Contra Costa Cnty. Bldg. & Constr. Trades
   Council, AFL-CIO*,
   31 F.3d 800 (9th Cir. 1994) ............................................................*passim*

*Vemco, Inc. v. Camardella*,
   23 F.3d 129 (6th Cir. 1994) .......................................................................9

*Waugh Chapel S., LLC v. United Food & Com. Workers Union Local 27*,
   728 F.3d 354 (4th Cir. 2013) ............................................................11, 15

*Wilkie v. Robbins*,
   551 U.S. 537 (2007)...................................................................................9

**Statutes**

18 U.S.C. § 1951 ...............................................................................................20

18 U.S.C. § 1961 .................................................................................................9

Cal. Civ. Code § 47 ...........................................................................................10

# **INTRODUCTION**

Defendants portray Saeed Nourmand and his closely-held business, Sunset Landmark ("Sunset"), as concerned Hollywood neighbors, lawfully petitioning the City of Los Angeles to address the environmental concerns of Plaintiffs' hotel projects.  In reality, the evidence demonstrates that Defendants weaponized CEQA to extort millions of dollars and other costly concessions from Plaintiffs, which were unrelated to—much less recoverable in—any of the filed CEQA lawsuits.

Though Nourmand sat at the helm, he and Sunset did not act alone.  In concert with their general counsel, Jayesh Patel, their outside counsel, Robert Silverstein, and with support from the family-run business, Nourmand & Associates ("N&A"), Defendants automatically and reflexively initiated legal challenges to any project that they believed to be associated with Plaintiffs, regardless of the merits, to exact concessions they could not get (and did not seek) in these suits.

Defendants' intention to leverage CEQA to extort millions of dollars in "blood money" and other costly concessions from Plaintiffs is clear.  One needs look no further than the settlement agreements themselves, and the "negotiations" of those agreements, to make this determination.  This evidence includes:

- When Relevant's counsel told Silverstein his demand for payment was "blood money" unrelated to attorneys' fees, Silverstein did not disagree;
- Defendants' refusal to discuss the CEQA litigation or the relief sought in the CEQA petitions when Sunset made its settlement demands;
- Silverstein's threat to find other ways to challenge the projects even if the City prepared a full EIR, which was the relief sought in court;
- Defendants' exclusion of the City from any settlement meetings;
- Defendants' failure to request any further environmental analysis;
- Sunset's CEQA counsel had no role in drafting the settlement agreements;
- Sunset's demand that Plaintiffs actively *support* future developments on *Sunset's* property; and

- Sunset's representation to its tax advisors that the $5.5 million payout related to "economic harm" to its property, not environmental impacts.

SGI109, 110, 111, 112, 113, 114, 115.[1]

Relevant had no choice but to accede to Defendants' demands. Delaying construction would impede Plaintiffs' ability to secure financing, threatened to ruin their reputation, and presented substantial risk to their investors. A win at trial for the City would also be pyrrhic: Defendants made clear that they would appeal that ruling and continue to manufacture challenges until Plaintiffs folded. While Sunset asserts privilege over their subjective motives behind the legal challenges and settlement structure, the record makes the extortion clear.

Of course, Defendants are not the only litigants who have weaponized CEQA for an improper purpose. But unlike other sham CEQA petitioners, this was not a one-off proposition. Not content with the millions of dollars in "blood money" extorted in connection with the Thompson and Tommie projects, months later Defendants filed virtually identical challenges against Plaintiffs' Selma project (and the Schrader project when they believed it was associated with Relevant). In an infamous lunch meeting, Nourmand told Relevant point blank: "You know the drill. It's going to take a check to make it go away." This demand belies any notion that Defendants filed legal claims out of genuine interest for the environment.

Defendants' motion should be denied.

## **BACKGROUND**

Plaintiffs take this opportunity to correct Defendants' incomplete characterization of the parties and projects at issue in this litigation.

---

[1] "SGI" refers to Plaintiffs' Statement of Genuine Issues of Material Fact filed concurrently herewith. References to Paragraphs 1 through 81 refer to the Defendants' statements of undisputed fact (and, where disputed, Plaintiffs' evidence in response). Paragraphs 82 through 121 refer to additional material facts submitted by Plaintiffs. *See* ECF Nos. 48, 125. "Thakor Decl." refers to the Declaration of Neil Thakor filed in support of Defendants' Motion, ECF Nos. 127-1, 127-2. "Kaufman Decl." is the declaration of Granville Kaufman, which is filed concurrently with Plaintiffs' Opposition. "Sunset RJN" refers to the Request for Judicial Notice filed in support of Defendants' Motion, ECF Nos. 127-3-127-7. "Thomas Report" refers to Exhibit A to the Declaration of Tina Thomas filed concurrently with Plaintiffs' Opposition.

### A.   The Nourmand Family and Its Business Organization

Nourmand is a wealthy businessman who founded N&A over forty years ago. ECF No. 124-2 ¶ 3.  Although Nourmand purportedly "retired" several years ago, his wife—Myra Nourmand—is the majority shareholder and sole director of N&A, which continues to tout itself as a family-run business, and Nourmand continues to use N&A employees and resources for his own purposes. *Id.* ¶¶ 6, 14.

Nourmand's closely-held company, Sunset, owns five contiguous parcels of land in Hollywood, at the northeast corner of Sunset Boulevard and Schrader Boulevard (the "Sunset Property"). *Id.* ¶ 2.  In their Motion, Defendants suggest that the Sunset Property buildings are just "office space" that do not compete with Plaintiffs' hotels.  Mot. at 15.  The evidence will show that the Sunset Property includes more than just "office space."  The Sunset Property includes a parking lot, a nightclub, an outdoor courtyard and multiple structures, including a nine-story building known as the Hollywood Athletic Club ("HAC").  SGI80, 89.

The HAC is a former hotel that, today, is used as an event space for weddings, banquets, business meetings and conferences.  SGI90.  The night club—known as Boulevard3 during the relevant time period—has 13,900 square feet of indoor floor space, a dance hall and an outdoor courtyard with a full liquor license, live entertainment, and an occupancy load of 900 persons.  SGI91.  Nourmand was an owner of Boulevard3 and personally received $10,000 to $60,000 in profits from the nightclub *in addition* to the $45,000 in rent Boulevard3 paid to Sunset.  SGI92.

Another parcel on the Sunset Property is currently used as a parking lot, but Nourmand has long wanted to develop it.  SGI94.  Finally, the Sunset Property includes a low-income residential "triplex" in the back of the parking lot that Sunset is seeking to demolish.  SGI89.

Nourmand exerts influence and control over N&A staff as he sees fit.   For example, N&A employees manage the Sunset Property, file his taxes, schedule his meetings, print his documents and respond to his ad hoc requests, while they sit in

1  N&A offices, use N&A office equipment, and communicate over N&A email
2  servers.  ECF No. 124-2 ¶¶ 6, 14; ECF No. 123-6 ¶¶ 2-3; ECF No. 123-8 ¶ 2.

3  **B.    The Relevant Group**

4          Founded in 2007 by Richard Heyman and Grant King, Relevant Group, LLC
5  ("Relevant") has helped revitalize Hollywood by building high-end boutique hotels
6  and restaurants.  SGI82.  When the 2008 market crash forced their first hotel project
7  (the "Dream") into foreclosure, and no investor would touch their projects, King
8  took his last $70,000 and flew to China.  SGI82.  He spent years learning Mandarin
9  and raising capital through the EB-5 investment program.  *Id.*  Under the program,
10 each EB-5 investor contributes capital to a specific project, which must create ten
11 local jobs per investor.  In return, the foreign investors can earn permanent residency
12 visas, but—if the jobs do not materialize or are delayed—investors cannot receive
13 their visas.  When he returned to the United States, Relevant repurchased the Dream
14 and turned it into a major success.  SGI67.  Since then, Relevant has continued to
15 revitalize Hollywood through its high-end hotels, upscale restaurants and vibrant
16 nightlife.  And, importantly, local jobs.  While Relevant contributes capital to each
17 project entity, along with loan guarantees and other financial commitments (SGI84-
18 86), EB-5 investors are at the heart of many projects.  The need to create jobs as
19 planned puts unique pressure on Relevant to meet project timelines.  SGI107.

20 **C.    Plaintiffs' Projects**

21         After Dream, Relevant's next project was 1541 Wilcox Hotel, which is known
22 as the Thompson Hollywood and operated by the high-end Thompson brand of
23 boutique hotels (the "Thompson" project).  Relevant contributed $10M in "key
24 money" and $5M in equity to the project entity and raised funds from EB-5 investors.
25 SGI83-84.  By February 2015, Relevant had generated community support for the
26 Thompson project, and the City issued notices for an initial public hearing scheduled
27 for March 18, 2015.

28         Allen Shamooilian—who owns a building next to the Sunset Property, all on

the same block as 1541 Wilcox—received the notice and asked Nourmand for his thoughts on the Thompson project. SGI93. As their early emails make clear, Shamooilian and Nourmand did not want the project to go forward on the same block where they intended to develop their own land one day. SGI94. With no basis to object on purely self-interested grounds, Nourmand began to craft pretextual arguments about environmental impacts *before* he ever saw the environmental study. SGI10, 95. Nourmand also directed N&A employees to help him oppose the project. ECF No. 123-9 ¶¶ 4-9.

Nourmand and Mohamad Iravani (CFO of N&A) then met with Relevant to express their "concerns" about the Thompson project. SGI105. During that meeting, Nourmand demanded that Relevant: (1) eliminate the proposed night club; (2) move the second-story pool deck and increase the setback with the Sunset Property; and (3) reduce the height of the building. Thakor Decl. Ex. U. The demands not only jeopardized the financial viability of the project (*id.*) but would benefit Nourmand and his family businesses.

Nourmand knew that he could make the demands because Relevant was vulnerable to project delays by virtue of the EB-5 funding structure. SGI107. As part of his pressure campaign, Sunset retained The Silverstein Law Firm ("TSLF"), a firm with a reputation for causing delay through never-ending objections, scattershot pleadings, and vexatious litigation tactics.

TSLF has delivered on that reputation. Since being retained in 2016, TSLF has filed a never-ending series of objections, appeals and motions designed to harass and burden Relevant. SGI97, 101-104, 117. At one point, Silverstein told Relevant's land use counsel that he would always be able to find "something" to challenge. SGI110. In other words, if Relevant won in court, Silverstein would appeal; if the City prepared an EIR (the relief sought in the litigation, SGI99), Silverstein would challenge that too. Plaintiffs' only option to avoid further delay was to settle.

### D.     The Legal Proceedings

Over the next several years, Sunset initiated a series of legal proceedings against Relevant's projects: (1) object at the initial public hearing; (2) object at the City Planning Commission ("CPC") hearing; (3) appeal to the Planning and Land Use Management ("PLUM") Committee; (4) object at the City Council hearing; (5) sue the City in Superior Court; and (6) appeal.

In their moving papers, Defendants suggest that they were selective in their opposition to Plaintiffs' projects.  Nonsense.  With respect to the five other projects listed in Defendants' brief, they either were approved by the City *before* Nourmand learned about Relevant (and its financial vulnerability) or were not projects that Sunset could challenge (though they still tried to challenge some).  *See* SGI120.

_Administrative Objections and Appeals_.    For each project, TSLF filed voluminous objections the day before public hearings.  Most submissions were copy and pasted from prior objections—as a highlighted comparison makes clear (Thomas Report at 63-129)—and included the same colorful language, describing each project as a "noise generating," "alcohol-soaked 'Animal House' party hotel."  *Id.*

All told, Defendants' objections included "more than 4,000 pages" in dozens of letters to City agencies, typically submitted right before a public hearing.  *Id.* at 15.  TSLF's tactics belie any genuine interest in influencing decisionmakers; rather, this was a pattern designed to harass and impose onerous administrative burdens on Relevant and the City through vexatious filings.  *Id.* at 16-17.  "There is no legitimate explanation for repeatedly submitting voluminous comments that the agency cannot possibly read before the hearing, especially when many of the objections are reflexively repetitive and not specific to the actual project that the agency is tasked with evaluating."  *Id.* at 16.

Notably, Sunset *never* prevailed in the administrative process: its boilerplate arguments were rejected over and over by each agency that heard them.  *Id.* at 4, 15-17.  Relevant was *never* required to prepare an EIR for *any* project.  SGI98.

*CEQA Litigation*.   After losing at City administrative proceedings, Sunset reflexively filed petitions for writs of mandamus (the "Petitions") in California Superior Court.   Sunset RJN Exs. 8, 9, 11.   The Petitions all sought equitable relief that would require the City to set aside the MNDs and enjoin construction of the projects pending preparation of an EIR.   *See, e.g.*, *id.* Ex. 8 at 236.   The evidence will show that no court has *ever* ordered the preparation of an EIR for *any* Relevant projects.   SGI100.   When courts reached the merits, they rejected the overwhelming majority of challenges—describing many as meritless or lacking any evidentiary support—and they expressly allowed construction to continue while the City "clarified" clerical issues.   *See* Sunset RJN Exs. 14, 19 at 586.   Those outcomes are a flat rejection of the relief sought.

*The Building Permit Appeals*.   TSLF also challenged Plaintiffs' building permits.   SGI101.   In 2016, *after* the City approved the Thompson project and *while* litigation was pending, TSLF challenged the issuance of a demolition permit, even though the work—demolition of the prior structure—had already been performed. *Id.*   LADBS denied the appeal as a procedurally improper "re-do," rejecting all the same boilerplate arguments.   SGI102.   TSLF then appealed *that* denial to the Central Area Planning Commission, where Sunset lost again.   SGI103.

*The Section 1222 Letter*.   TSLF, Maddren, and others working in concert with Defendants, also applied further pressure by raising the same boilerplate arguments made in their CEQA challenges to federal, state and local prosecutors.   SGI104. They also accused Relevant of bribing City officials.   *Id.*   Their intent was to create fear of a "potential investigation," which would cause the City to "think twice" before granting further approvals for Relevant projects.   *Id.*   Not surprisingly, the prosecutors never commenced an investigation into the wild allegations.

In sum, Defendants' legal challenges have failed at every turn, including before the LADBS, the Planning Department, the CPC, the PLUM Committee, City Council, in the Superior Court, and three separate prosecutorial offices.

## **ARGUMENT**

Defendants bear the burden of demonstrating an absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Evidence in opposition must be viewed in the light most favorable to Plaintiffs, and all reasonable inferences drawn in Plaintiffs' favor. *Clicks Billiards Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). Defendants primarily argue that this motion can be decided as a matter of law—either on their *Noerr-Pennington* affirmative defense or regarding RICO—predicate acts. Defendants are wrong on the law, and they obscure significant disputes of fact. None of Defendants' remaining scattershot arguments would preclude trial: significant disputes of material fact exist and, regardless, none of those ancillary issues would resolve the whole controversy.

## I.   PLAINTIFFS' RICO CLAIMS ARE NOT PRECLUDED AS A MATTER OF LAW

### A.   Hobbs Act Extortion Is Always a Predicate Act Under RICO

Defendants insist that RICO claims cannot be predicated on Hobbs Act extortion, where the underlying conduct "at issue occurred in litigation." Mot. at 11-13. According to Defendants, the Ninth Circuit adopted this categorical preclusion in *United States v. Koziol*, a non-RICO case. Mot. at 11-12. Not so.

The defendant-appellant in *Koziol* argued that his Hobbs Act conviction had to be vacated because out-of-circuit cases—the same ones cited by Defendants (Mot. at 11-12)—hold that threats of litigation cannot constitute extortion under the Hobbs Act. 993 F.3d 1160, 1173-74 (9th Cir. 2021), *cert. denied*, 142 S. Ct. 1372 (2022). The Ninth Circuit rejected that argument: "there is no statutory, constitutional, or policy basis to exclude categorically threats of sham litigation from liability under the Hobbs Act." *Id.*

While Defendants admit that—under the actual holding of *Koziol*—litigation conduct is not categorically "immune" under the Hobbs Act (Mot. at 11), they nonetheless contend that *Koziol* "recognized" and "approved" a categorical

-8-

preclusion immunizing litigation conduct in the context of civil RICO cases predicated on Hobbs Act extortion. Mot. at 11-12. Defendants are again wrong.

First, the out-of-circuit cases that Defendants claim *Koziol* "cited with approval" (Mot. at 12) merely held, under the particular facts therein, that the plaintiffs had failed to plead any predicate acts of extortion (Hobbs Act or otherwise), not that Hobbs Act extortion is somehow defined differently in the civil RICO context.[2] *See, e.g.*, *Vemco, Inc. v. Camardella*, 23 F.3d 129, 134 (6th Cir. 1994); *I.S. Joseph Co. v. J. Lauritzen A/S*, 751 F.2d 265, 266-67 (8th Cir. 1984); *Deck v. Engineered Laminates*, 349 F.3d 1253, 1258 (10th Cir. 2003); *Raney v. Allstate Ins. Co.*, 370 F.3d 1086, 1088 (11th Cir. 2004). Nothing in *Koziol*'s analysis suggests that the Ninth Circuit believed it could have adopted a different interpretation of the same statutory language in criminal versus civil cases.

Moreover, the *Koziol* court made clear that such an interpretation would be inconsistent with prior Ninth Circuit case law, including the civil RICO case *First Pacific Bancorp, Inc. v. Bro*, 847 F.2d 542 (9th Cir. 1988): "[E]ven if we accept Koziol's characterization of these cases, the conclusion that threats of sham litigation can never amount to extortion is simply not supported by our decision in *First Pacific Bancorp*." 993 F.3d at 1173. Simply put, it is a question of fact. *Id.* at 1187 ("[W]e must consider the circumstances of such threats to determine if the means used were 'wrongful' under the Act, or if the ends were 'wrongful' because the defendant sought property to which he knew he had no lawful claim").

Further, their argument strains credulity as a matter of statutory interpretation. The RICO statute expressly "defines 'racketeering activity' to include '***any act*** which is indictable under' the Hobbs Act." *Wilkie v. Robbins*, 551 U.S. 537, 563 (2007) (emphasis added) (quoting 18 U.S.C. § 1961(1)(A)-(B)). Based on

---

[2] Other cases cited do not even purport to interpret the Hobbs Act extortion provision: *Kim v. Kimm*, 884 F.3d 98, 103 (2d Cir. 2018) (addressing only mail-fraud, wire-fraud, and obstruction of justice predicate offenses under RICO); *Snow Ingredients, Inc. v. SnoWizard, Inc.*, 833 F.3d 512, 524 (5th Cir. 2016) (addressing obstruction of justice and witness tampering predicate acts).

fundamental principles of statutory interpretation, Hobbs Act extortion, as incorporated into the RICO statute, cannot mean something different in the context of civil versus criminal cases. *See Leocal v. Ashcroft*, 543 U.S. 1, 11 n.8 (2004) (a single statute with civil and criminal applications receives a single interpretation).

Their argument is also belied by numerous federal courts that have recognized civil RICO claims predicated on Hobbs Act extortion where the underlying conduct involves litigation activity, including: *Chevron Corp. v. Donzinger*, 974 F. Supp. 2d 362, 581-88 (S.D.N.Y. 2014) (misconduct in litigation meant to instill economic fear and induce payment violated the Hobbs Act and was therefore racketeering), *aff'd*, 833 F.3d 74 (2d Cir. 2016); *La Suisse, Societe D'Assurances Sur La Vie v. Kraus*, 2014 WL 3610890, at *10 (S.D.N.Y. July 21, 2014) (lawsuits constituted extortion for RICO purposes where defendants did not have a legitimate claim to the proceeds of policyholder lawsuits they filed in order to extract personal payouts); and *Calabrese v. CSC Holdings, Inc.*, 2004 WL 3186787, at *6-7 (E.D.N.Y. July 19, 2004) (baseless legal threats were predicate acts of extortion under RICO).

### B.   Sham Litigation Is Not Privileged Under California Law

The California litigation privilege (Cal. Civ. Code § 47(b)) does not immunize extortion based on litigation activity.  It is "settled precedent" that the California litigation privilege does not bar RICO claims: "the Ninth Circuit and district courts have held that the litigation privilege does not apply to RICO claims."  *Richards v. Cnty. of Los Angeles*, 2017 WL 7411159, at *4 (C.D. Cal. Mar. 31, 2017) (citing *Religious Tech. Ctr. v. Wollersheim*, 971 F.2d 367, 364 n.10 (9th Cir. 1992)).

## II.   THERE IS A GENUINE DISPUTE OF FACT REGARDING WHETHER DEFENDANTS PURSUED "SHAM" LITIGATION

### A.   *USS-POSCO* Is the Applicable Legal Standard

The Court has already held that *USS-POSCO* is controlling where, as here, Plaintiffs contend that Defendants filed a "series of improper lawsuits."  ECF No. 39 at 7-8 (citing *USS-POSCO Indus. v. Contra Costa Cnty. Bldg. & Constr. Trades*

*Council, AFL-CIO*, 31 F.3d 800, 810-11 (9th Cir. 1994)); ECF No. 114 at 5 (same). "[T]he question is not whether any one [suit] ha[d] merit" but "whether they [were] brought pursuant to a policy of starting legal proceedings without regard to the merits and for the purpose of injuring a market rival." ECF No. 39 at 7 (quoting *USS-POSCO*, 31 F.3d at 810-11).

Under *USS-POSCO*, "the legal success of an occasional sham suit is irrelevant." *Id.*; *USS-POSCO*, 31 F.3d at 811 ("[E]ven a broken clock is right twice a day"). Courts focus on whether defendants acted out of "genuine interest in redressing a grievances" or engaged in a pattern of harassing legal claims. *See USS-POSCO*, 31 F.3d at 810-11. "In deciding whether there was such a policy of filing petitions with or without regard to merit, a court should perform a holistic review that may include looking at the defendant's filing success—i.e., win-loss percentage—as circumstantial evidence of the defendants' subjective motivations." *Hanover 3201 Realty, LLC v. Vill. Supermarkets, Inc.*, 806 F.3d 162, 180 (3d Cir. 2015). "[O]ther signs of bad-faith litigation [may] be probative of an abuse of the adjudicatory process." *Waugh Chapel S., LLC v. United Food & Com. Workers Union Local 27*, 728 F.3d 354, 364 (4th Cir. 2013) (quoting *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 513 (1972)).

Defendants seeks to revisit the Court's prior holdings applying *USS-POSCO* because they claim "there is zero evidence" that the parties are "market rivals" or that "Defendants maintained a policy of reflexively filing CEQA lawsuits." Mot. at 15. Defendants are wrong.

### 1. *Plaintiffs' Projects Compete with Defendants' Businesses*

Defendants contend that "Sunset owns five parcels that are being used as commercial *office* space" and claim "it is undisputed that those parcels do not compete with hotels." Mot. at 15. That argument is disingenuous at best. Although there is office space on the Sunset Property (e.g., N&A's Hollywood branch office), it is undisputed that the Sunset Property includes other businesses, such as the HAC

and a night club (formerly Boulevard3).  Both compete with Plaintiffs.  SGI80.

As discussed above, the Hollywood Athletic Club competes with Plaintiffs' hotels and restaurants in that both host weddings, banquets and business events.  *See supra* p.3.  Likewise, Defendants' nightclub competes with Plaintiffs' hotels and restaurants, including rooftop bars.  *Id.*  It is no coincidence that Nourmand objected to bars and nightclubs on hotel rooftops or that in every objection to every hotel, Sunset argued that Hollywood does not need another "alcohol-soaked party hotel."

Further, there is ample evidence that Nourmand opposed Plaintiffs' projects to preserve his ability to develop empty parcels on the Sunset Property.  SGI10, 94. Defendants deny they have such plans—a factual dispute for the jury.

## 2.  *Between 2015 and 2019, Defendants Reflexively Challenged Each of Plaintiffs' Projects*

Starting in 2015, Defendants pursued a clear pattern of filing reflexive legal challenges against each of Plaintiffs' hotel projects, until 2019 when this RICO suit was filed.  In those four years, Sunset initiated legal challenges against Relevant's three hotel projects (Thompson, Tommie and Selma) and a fourth hotel (Schrader) it believed to be associated with Relevant.  SGI2, 97, 117.  That alone is a sufficient pattern under applicable law.  ECF No. 39 at 7-9 (finding three actions sufficient); *Hanover*, 806 F.3d at 181 (holding four actions a sufficient pattern or series).

But Defendants campaign of reflexive legal challenges extended beyond filing suits.  Defendants repeatedly challenged each project at every administrative level. *Supra* p.6.  Defendants challenged building permits for work that had already been completed and attempted to prevent the City from reviewing future permit applications (*supra* p.7), directed neighborhood organizations to submit letters to prosecutors calling for an investigation (*id.*), and threatened to challenge any future EIRs prepared by Plaintiffs (*supra* p.5).

A cursory scan of the objection letters shows how reflexive the filings became. *See* Thomas Report at 63-129.  TSLF recycled boilerplate arguments—regardless of

1   the project at issue—from one objection to the next, "copying and pasting" the same
2   generic material over and over. *Id.* at 38. Many objections aired generic grievances
3   about the City's approval process rather than the actual project.

4         Then, when the City rejected Sunset's challenges (usually by unanimous vote)
5   and approved Plaintiffs' projects, Sunset reflexively filed suit using the same
6   template and "scattershot" approach, alleging significant impacts under every
7   environmental impact category listed in the CEQA Guidelines Checklist, without
8   any supporting allegations. *Id.* at 11, 17-18. Once filed, TSLF resorted to its familiar
9   scorched earth tactics, including claiming to be unaware of changes to the design of
10  the project that were made at its client's bequest, to delay and harass Plaintiffs and
11  the City. *Id.* at 18-23. This is a clear pattern of reflexive legal challenges.

12        In their Motion, Defendants suggest they were selective in challenging only a
13  handful of Relevant's projects. Mot. at 15-16. Nonsense. Defendants effectively
14  had no opportunity to challenge four of the other projects noted in the Motion: the
15  Dream was approved before Defendants ever learned about Relevant (and its
16  particular vulnerability to delay); the two restaurants had been approved in 2015 and
17  only need a permit for alcohol sales; and the City did not hold a hearing regarding
18  the downtown Morrison Hotel prior to this lawsuit. SGI120.

19        With respect to the fifth, the Citizen News project, TSLF and Maddren
20  (members of the Nourmand Enterprise and who were almost certainly acting on
21  Nourmand's behalf) *wanted* to appeal but missed the hearing. SGI121. Once they
22  realized their mistake, TSLF and Maddren tried, unsuccessfully, to find someone
23  who had timely objected so they could still pursue a challenge. *Id.*

24  **B.    Defendants Initiated Challenges "Without Regard to the Merits"**

25        Under *USS-POSCO*, courts must determine whether the challenges were
26  initiated "without regard to the merits." ECF No. 39 at 7. The critical inquiry under
27  *USS-POSCO* is whether the Defendants' challenges were "brought to redress any
28  actual grievances" under CEQA. *See Hanover*, 806 F.3d at 181 (citing *City of*

-13-

1   *Columbia v. Omni Outdoor Advert., Inc.*, 499 U.S. 365, 380 (1991)).  They were not.

2   ### 1.    *Defendant' Legal Filings Were Not Made "Out of a Genuine*
3   ### *Interest in Redressing" Environmental Grievances*

4   Defendants abused the administrative and judicial processes, the "classic
5   example" of sham litigation under *USS-POSCO*.  *See Omni Outdoor*, 499 U.S. at
6   380 (a pattern of "objections" brought simply "to impose expense and delay" is the
7   "classic example" of a sham); *Cal. Motor*, 404 U.S. at 513 ("[A] pattern of baseless,
8   repetitive claims may emerge which leads the factfinder to conclude that the
9   administrative and judicial processes have been abused.").

10  *Defendants' pretextual "environmental" concerns*.  Defendants decided to
11  challenge the Thompson project before seeing the environmental study that they
12  later sought to invalidate.  SGI95.  Their objections included generic and scattershot
13  arguments without any realistic chance of success.  Thomas Report at 13-17.  Later
14  filings simply parroted voluminous, unsuccessful prior objections, totaling
15  thousands of pages and filed on the eve of hearings.  *Id.*  In its Petitions, Sunset failed
16  to allege evidence of any specific environmental impacts, and instead recited all of
17  the "impact categories listed" in CEQA guidelines.  *Id.* at 17-18.  Recognizing the
18  baselessness of these claims, Sunset abandoned most of its allegations during the
19  course of litigation, never even attempting to support them in briefing.  *Id.*

20  *Defendants' self-interested concerns*.  Defendants acknowledged to the City
21  and Relevant that they were trying to protect their own commercial development
22  opportunities in the future.  SGI10, 94.  In settlement, they demanded concessions
23  that would benefit their business interests, not the environment or public at large.
24  Thakor Decl. Ex. J.  This included securing agreement from Plaintiffs to forgo
25  CEQA challenges to *Sunset's* future developments.  *Id.* Exs. H at 116, I at 144.

26  *Defendants used the suits to extort unlawful gains*.  During settlement
27  negotiations, Defendants demanded over a dozen concessions that they could not get
28  (and did not seek) through a CEQA action.  Thakor Decl. Ex. N.  This included an

-14-

extraordinary monetary payment of $5.5 million, ***none*** of which was attorneys' fees (the only monetary award available to CEQA litigants) (*id.* Exs. H at 116, I at 144), and all of which was claimed for tax purposes as "economic harm" (SGI115).  The settlements did not include typical CEQA provisions, such as mitigation efforts or an EIR.  Thomas Report at 33-35.  And when Relevant sought to develop another property, Defendants dropped the environmental pretext altogether and, instead, told Plaintiffs: "You know the drill.  It will take a check to make this go away."  SGI116.

<u>Defendants ignored other projects and targeted Plaintiffs because they were</u> <u>vulnerable</u>.    Defendants ignored the much larger and environmentally-caustic Crossroads project.  SGI118.  That *eight-acre* development included multiple hotels and commercial buildings (which would result in much more traffic than Plaintiffs' projects) went unchallenged because Nourmand was negotiating a lucrative deal with Crossroads to develop the Sunset Property.  SGI118-119.    Knowing that Plaintiffs' EB-5 investment strategy could be derailed by delay, Defendants doubled down on delay.  They challenged building permits (even for work that was *already completed*).  SGI101.  Defendants' lawyer said he would just "find something else to challenge" even if Relevant agreed to an EIR.  SGI110.  Evidence at trial will show this "consistently vexatious" activity is "inconsistent with any apparent environmental motive or interest in the public good."  Thomas Report at 3.  And they initially objected to the Schrader project, believing it was owned by Plaintiffs. SG117; Sunset RJN Ex. 7 at 145.  But they withdrew their appeal, asking nothing in return, once they learned Relevant was not involved and the project was not vulnerable to delay.  SGI59.

Defendants "indiscriminately filed (or directed) a series of legal proceedings without regard for the merits and for the purpose of violating federal law."  *Waugh Chapel*, 728 F.3d at 364.  Defendants' voluminous, boilerplate objections and filings, often submitted on the eve of public hearings, "tend to support a finding that the filings were not brought to redress any actual grievances."  *Hanover*, 806 F.3d

at 181 (citing *Omni Outdoor*, 499 U.S. at 380).

## 2. Defendants Cannot Refute Evidence of Subjective Motive

Defendants broadly invoked the attorney-client privilege and attorney-work product to withhold communications and block testimony regarding Defendants' motives, their views on the merits, and whether they employed vexatious litigation tactics to delay the proceedings. ECF No. 123-13 at 586-624; *e.g.*, Kaufman Decl. Ex. 38 at 410-11, 419-20 (tr. 46:8-47:1, 126:5-127:22); *id.* Ex. 37 at 384-85, 406 (tr. 34:4-35:15, 175:3-16). Having broadly asserted privilege on these topics, Defendants are now estopped from offering any contrary testimony. *See Columbia Pictures Television, Inc. v. Krypton Broad. of Birmingham, Inc.*, 259 F.3d 1186, 1196 (9th Cir. 2001) (citing *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1162 (9th Cir. 1992)) (affirming exclusion of evidence where defendant asserted attorney-client privilege at deposition); *Hasbro, Inc. v. Sweetpea Ent., Inc.*, 2014 WL 12561624, at *2 (C.D. Cal. Mar. 18, 2014) (barring party from testifying at trial as to matters claimed to be privileged during deposition). Thus, Defendants cannot establish that their purported petitioning activity resulted from "genuine interest" in CEQA or "good faith advocacy." Plaintiffs' evidence regarding Defendants' subjective intent is therefore uncontroverted. It clearly establishes a material issue of fact as to whether Defendants held "a genuine interest in obtaining redress" or whether they were using vexatious litigation to protect their own business interests.

## 3. Defendants' Track Record of Success Was Abysmal

Defendants' "win-loss" ratio does support their motion. Defendants had an abysmal batting average, contrary to their revisionist view of history. Mot. at 16.

*City Approval Process*. Despite dozens of objections and thousands of pages, Defendants *never* prevailed before any of the administrative bodies tasked with approving Plaintiffs' hotel projects. SGI97-98. Their 4,000 plus pages of boilerplate objections and nuisance-type arguments never swayed any City officials who voted, overwhelmingly, to approve each and every project at CPC, PLUM Committee, and

City Council hearings.  *Id.*  There is no basis for Defendants to claim success.

*Building Permit Appeals*.  Defendants never prevailed in challenging building permits for Plaintiffs' projects.  SGI102-103.  After challenging the building permits for Thompson at LADBS, Defendants appealed to the Central Area Planning Commission where they lost (again), receiving sharp criticism for the procedurally improper challenge.  SGI103.

*Superior Court Petitions*.   Between 2016 and 2019, Sunset filed three Petitions challenging Plaintiffs' hotel projects.  In each Petition, Defendants sought injunctive and equitable relief to set aside the applicable MNDs and to order the City to prepare an EIR for each project.  *See, e.g.*, Sunset RJN Ex. 8 at 236.  No court has *ever* ordered an EIR (the only outcome that could be considered successful). SGI100.  Every court that reached the merits of Sunset's claims (or similar claims) expressly allowed Relevant to proceed with construction pursuant to the applicable MND.  *See, e.g.*, Sunset RJN Exs. 14 (modifying injunction to allow construction to continue), 19 at 586.  The intermediate rulings Defendants cite (*see* Mot. at 16) cannot change the actual outcomes on the merits of those cases.  In *Thompson*, the court issued a tentative order on the City's motion to augment the administrative record.  Sunset RJN Ex. 27.  The *tentative* ruling only impacted the City's exhaustion defense, not the merits of the Petition.  The *Thompson* court never granted any relief sought in the Petition or required an EIR to proceed.  SGI100.

In *Tommie*, the court never reached the merits of Sunset's Petition, but Defendants claim they were validated by a ruling in a different proceeding.  Mot. at 16.  Even if the decision in *Elle Farmer* is relevant to Defendants' win-loss record (and it is not), the interlocutory order was no victory for the petitioner.  The *Elle Farmer* court did not order the City to prepare an EIR and instead ordered an interlocutory remand so the City could make a clarification to the MND, and Relevant proceeded with construction.  Sunset RJN Ex. 14.  That is not a win for CEQA petitioners by any definition.

In *Selma*, the court flatly rejected the overwhelming number of Sunset's and Maddren's claims, describing many as meritless and wholly lacking evidentiary support.  Sunset RJN Ex. 19.  On the two arguments that Defendants claim victory, the court remanded those issues to the City, again for "clarif[ication]," and allowed construction to proceed.  *Id.* at 586.  Tellingly, Sunset (not Relevant) *appealed* the order it now calls a win.  Sunset RJN Ex. 5 at 78.  And lost on appeal.  *Id.*

Based on what a reasonable CEQA litigant would view as a positive outcome, Sunset is not "batting 1.000."  In reality, they are still searching for a hit.  They certainly have not shown a lack of a dispute; summary judgment should be denied.

But even if they had a respectable batting average (they do not), that would not resolve the issue.  A litigant's "win-loss percentage" is only "circumstantial evidence" regarding whether "there was such a policy of filing petitions with or without regard to merit."  *Hanover*, 806 F.3d at 180-81.  Manufactured in hindsight, it does not, as Defendants suggest, "often ***resolve[]*** " the issue.  Mot. at 16 (emphasis added).  Defendants' own cases explain that such a ***retrospective*** view is wrong: "The inquiry in such cases is ***prospective***: Were the legal filings made, not out of a genuine interest in redressing grievances, but as part of a pattern or practice of successive filings undertaken essentially for purposes of harassment?"  *Kaiser Found. Health Plan, Inc. v. Abbott Laboratories, Inc.*, 552 F.3d 1033, 1046 (9th Cir. 2009) (emphasis added) (quoting *USS-POSCO*, 31 F.3d at 810-11).[3]  Thus, a "win-loss" ratio is probative only as to subjective intent where a litigant's past success *may* shed light on the merits of *prospective* filings.  *See Hanover*, 806 F.3d at 180-81.  Defendants' win-loss percentage at the times it filed (and continued to file) its voluminous and boilerplate objections was consistently terrible.

---

[3] The result in *Kaiser* is distinguishable.  The defendant in that case, Abbott, unquestionably had a "genuine interest" in protecting its patent portfolio, whereas in this case, Defendants' purported interests in the environment was just a pretextual sham to harass Relevant and extract extortionate payments not available under CEQA.  At a minimum, whether Defendants harbored any "genuine interest" in redressing CEQA violations is a disputed question for the jury.

C.   **There Is a Disputed Issue of Fact Even Under the Inapplicable "Probable Cause" Standard in *Professional Real Estate Investors***

In their Motion, Defendants urge the Court to apply the "probable cause" standard under *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.*, 508 U.S. 49, 60-61 (1993) ("*PREI*").   Mot. at 17-19.   As discussed above, the *PREI* standard is inapplicable in cases where, as here, there is a pattern of initiating challenges without regard for the merits.   But even if *PREI* did apply (it does not), there would still be disputed issues of material fact under both prongs.

Under the two-step *PREI* test, courts first determine whether the underlying claims was objectively baseless.   *See* ECF No. 39 at 7.   Objective baselessness is a question of fact.   *See CSX Transp., Inc. v. Gilkison*, 2012 WL 5906716, at *7 (N.D. W. Va. Nov. 26, 2012) (denying summary judgment under *PREI*).   Courts may decide "probable cause" as a matter of law only if "there is no dispute over the predicate facts of the underlying legal proceeding."   *PREI*, 508 U.S. at 63.

The parties and their experts vigorously disagree whether Sunset's claims were "objectively baseless."   In the portion of their Motion that points to the "specifics of each case," Defendants distort the facts and outcome of the underlying suits.   In *Thompson*, Defendants say their Superior Court briefs cited "contrary expert analysis on noise (Acentech) and traffic (Caltrans)" without acknowledging: (i) that Acentech's analysis predated substantial project changes (including many additional mitigation measures and noise conditions) and a revised version of the MND, all of which were never analyzed by Acentech; and (ii) that Caltrans only requested the City to send it the errantly-omitted traffic study but never submitted any comments on the traffic study it received.   *See* Thomas Report at 24-25.

Defendants next point to the *Thompson* court's tentative ruling, which held that a single PowerPoint showing a changed rooftop configuration could not be included in the administrative record to support the City's argument that Sunset failed to exhaust its administrative remedies by not objecting to the rooftop

configuration.  Sunset RJN Ex. 27.  Defendants claim, without explanation, that the tentative ruling somehow "vindicates" Sunset's due process claims, which alleged that the City's *entire* approval process is unconstitutional.  That is absurd and, in any event, Nourmand was aware of the new configuration because *he himself* requested those changes to the rooftop.  SGI68.[4]

In *Tommie* and *Selma*, Defendants claim success based on the interlocutory remand orders requiring the City to make clarifications to the applicable MNDs.  Mot. at 19.  As explained above, the matters that needed technical clarification were so minor and insignificant that no party would have contemplated them *ex ante*, let alone considered them "favorable relief."  *Supra* pp.17-18.

## III.    WHETHER DEFENDANTS' CONDUCT WAS "WRONGFUL" UNDER THE HOBBS ACT IS A DISPUTED QUESTION OF FACT

Defendants argue, in effect, that Plaintiffs must prove the "wrongful" element in order to establish Hobbs Act extortion.  Mot. at 20-21.  Fair enough.  Aside from their conclusion that the underlying CEQA litigations had objective merit, a hotly disputed question of fact, Defendants do not identify what undisputed facts will prevent Plaintiffs from establishing the "wrongful" element.

Extortion is "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right."  18 U.S.C. § 1951(b)(2).  The analysis considers whether the "means" used were wrongful and whether the "ends" demanded were wrongful.  *Koziol*, 993 F.3d at 1176.  Both can be considered, but a finding of wrongful ends is sufficient.  Wrongful means can be sufficient when inherently wrongful (outside of narrow circumstances in the labor context).  *Id.* at 1168-70 (summarizing the "means-ends framework"); *United States v. Villalobos*, 748 F.3d 953, 956-57 (9th Cir. 2014)

---

[4] With respect to the recent Sacramento Superior Court decision (Mot. at 18-19), that holding *confirms* the City's position in the Superior Court, i.e., that the City *does* have the authority to increase density limits consistent with the Hollywood Redevelopment Plan so long as it does so through valid zoning action (e.g., removing the existing "D" designations) as opposed to using a generic policy of granting density bonuses.

1    (same); *Chevron*, 974 F. Supp. 2d at 579 (same).

2          With respect to "wrongful ends," the element "may be supplied by (1) the lack

3    of a plausible claim of entitlement to the property demanded, *or* (2) the lack of a

4    good faith belief of entitlement, *or* (3) the lack of a nexus between the threat and the

5    claim of right." *Chevron*, 974 F. Supp. 2d at 579.

6          **A.    Plaintiffs Can Establish the "Wrongful" Element Based on**

7                  **Defendants' "Sham" CEQA Challenges**

8          As explained above, there are many issues of disputed facts that will

9    ultimately decide whether Defendants' CEQA challenges were a "sham," which—

10   under the Ninth Circuit—can establish that Defendants had no "lawful claim" of

11   right. *See Koziol*, 993 F.3d at 1170.  However, there are several other reasons that

12   finding "wrongfulness" does not depend on a "sham" finding.

13         **B.    Plaintiffs' Do Not Need to Establish the "Wrongful" Element**

14                 **Based on a Theory of "Sham" Litigation**

15         Under certain factual circumstances, where purported petitioning activity has

16   no nexus to the extortionate demand, the "chilling" concerns of *Noerr-Pennington*

17   do not apply, and courts have found extortion without making any "sham"

18   determination at all.  This is one of those cases.

19         Courts have recognized a species of extortionate conduct, where the litigation

20   activity at issue is "different in kind" from extortion based on threats of "frivolous

21   litigation." *Kraus*, 2014 WL 3610890, at *9-10.  In these cases, the "wrongful"

22   element under the Hobbs Act is not premised on the extortionist asserting "sham"

23   legal claims (as in, e.g., *Koziol*).  Instead, the extortionist's conduct is "wrongful"

24   under the Hobbs Act because the legal claims have "no nexus to [the extortionist] or

25   the personal payment demanded by him to make them go away." *Id.*

26         Here, Plaintiffs have shown ample evidence to create a triable issue of fact

27   regarding the lack of a nexus between: (1) the purported petitioning activity, e.g.,

28   petitioning the City and then filing a writ of mandamus against the City to compel

further environmental study; and (2) <u>the property demanded from Plaintiffs</u>, i.e., millions of dollars in personal payments and other personal concessions.  If there was no nexus between the two, then Defendants had no other "lawful claim" to Plaintiffs' property (money or aesthetic changes to its projects), then this case squarely fits into the "no nexus" category of extortion.[5]  *See Kraus*, 2014 WL 3610890, at *9-10 (insurance brokers initiated suits on behalf of policyholders against the insurance carrier then tried to negotiate a payment to themselves, rather than the policyholders); *United States v. Avenatti*, 2020 WL 70951, at *8-9 (S.D.N.Y. Jan 6, 2020) (lawyer-defendant demanded that Nike hire him to conduct a $25M "internal investigation," as a condition to settling claims with lawyer-defendant's client); *United States v. Tobin*, 155 F.3d 636, 640 (3rd Cir. 1998) (defendant "threatened unrelated lawsuits alleging sexual harassment" rather than action to enforce oral contract).

Plaintiffs have therefore established a triable issue of fact regarding the "wrongful" element of the Hobbs Act.

## IV.    THE SETTLEMENT AGREEMENTS DO NOT BAR CLAIMS

Defendants repeat the same argument they earlier made (and the Court rejected, ECF No. 31 at 5-6) that the extortionate settlement agreements preclude "asserting <u>any</u> claims related to the Thompson and Tommie lawsuits at all" (Mot. at 23).  The Court should reject the argument again.

First, Defendants have not satisfied their initial burden on summary judgment

---

[5] Plaintiffs' extortion claim does not rest on "fear" alone.  Defendants also violated the Hobbs Act by acting "under color of official right."  Courts recognize "quasi-official" capacities similar to Defendants' use of a "private attorney general" statute to pursue personal benefit rather than public interests.  *See United States v. Philips*, 586 F. Supp. 1118 (N.D. Ill. 1984) (court appointed guardian ad-litem); *United States v. Senak*, 477 F.2d 304 (7th Cir. 1973) (court appointed public defender). Courts also find extortion based on control, influence or compelled government power in administrative or regulatory processes. *See United States v. Middlemiss*, 217 F.3d 112, 117-19 (2d Cir. 2000) (misuse of control or influence over public officials); *United States v. Irali*, 503 F.2d 1295 (7th Cir. 1974) (misuse of perceived ability to obtain liquor license); *United States v. Rubio*, 321 F.3d 517 (5th Cir. 2003) (misuse of perceived influence over prosecutor); *Collier v. Town of Harvard*, 1997 WL 33781338, at *5, *8 (D. Mass. Mar. 28, 1997) (misuse of influence over municipal planning board).

to negate an essential element of Plaintiffs' claim or show an absence of a material dispute of fact. *See Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099 (9th Cir. 2000). Defendants concede that the mere existence of a release does not prove that Defendants' extortionate acts are within its scope, even on their reading. Mot. at 24.

Yet, Defendants cite no facts, much less undisputed material facts, suggesting which extortionate acts they claim are released and which were not. They do not cite any facts demonstrating which acts of extortion were completed prior to execution of the releases, which California law requires. *Cf.* ECF No. 121-1 at 5-7. They do not, as *Howard v. America Online Inc.* contemplates, point to facts showing that the pattern of racketeering was complete, known to plaintiffs, and actionable prior to the releases. 208 F.3d 741, 748 (9th Cir. 2000). They do not cite any extrinsic evidence regarding the meaning of the release. And Defendants obscure the intrinsic evidence: the releases, by their terms, only apply to claims against one defendant (Sunset) stemming from allegations in the two underlying actions. Thakor Decl. Exs. H at 119, I at 146. Defendants never explain how the releases apply to anyone other than Sunset, much less to "<u>any</u> claims" (including future claims) stemming from the CEQA suits "at all." As one district court held in a similar case: "[Defendant], who points to no evidence supporting his contention that [Plaintiff's] civil RICO claim falls within the 1994 release's scope, has not met [its] burden" on summary judgment. *Elemary v. Phillip Holzmann A.G.*, 2008 WL 11389164, at *4 (D.D.C. Aug. 18, 2008).

Second, the evidence does not support Defendants' interpretation of the releases. For example, Defendants admit that they did not threaten to continue filing CEQA suits against Plaintiffs prior to execution of the releases. Kaufman Decl. Ex. 56 at 589 (tr. 172:6-16); *id.* Ex. 36 at 373 (tr. 410:3-25). As *Howard* acknowledges, a "pattern" under RICO requires a showing of predicates ***and*** "the threat of continuing activity." 208 F.3d at 746 (quotation omitted). When the releases were

executed, Defendants' own testimony thus demonstrates that a "pattern" had not been established. Because Plaintiffs' RICO suit was not actionable, it could not be released. *See Elemary*, 2008 WL 11389164, at *4.

*Howard* does not support Defendants. *Howard* addresses *res judicata* of a release entered as part of a final judgment, 208 F.3d at 747, but these releases are analyzed under contract principles (not *res judicata*). *Bhakta v. Bhakta*, 2022 WL 301552, at *1 (9th Cir. Feb. 1, 2022). Those principles render the releases unenforceable as interpreted by Defendants. *See* ECF No. 121-1 at 5-6. Further, *Howard* is distinguishable, as the predicate acts were themselves subject to a final resolution on the merits in previous litigation. 208 F.3d at 748. Defendants' extortionate acts and RICO violations could not have been previously litigated. The extortionate scheme was not completed until (at least) the settlement agreements were signed and a pattern had not yet developed.

Even if the Court disagrees with Plaintiffs' and finds the releases enforceable, whether the release apply to Defendants' conduct is a matter for the jury.

## V.   RELEVANT HAS STANDING

Defendants argue Relevant lacks standing because it did not suffer any direct harm from Plaintiffs' conduct. As a threshold matter, Defendants are wrong about the relationship between Plaintiffs. Relevant is directly involved with every aspect of these properties, has an equity stake in the project entities, funds shortfalls in capital, backstops and indemnifies losses, and its principals are the individuals are personal guarantors of the members who were subject to the extortion. SGI84-86.

Relevant is not some mere "shareholder or limited partner" with a passive investment in the underlying suit. The cases cited by Defendants are inapplicable. And Relevant was of course injured by Defendants' pattern of extortion against three of its hotels. "But for" Defendants' conduct, Relevant would not have been obligated to fund the tens of millions in additional funds necessary to complete its projects, its portfolio of hotel properties would be worth more, and its equity stake

would be worth considerably more with a lower cost basis.

## VI.    DEFENDANTS' ARGUMENTS REGARDING SCHRADER AND MADDREN ARE NOT A BASIS FOR SUMMARY JUDGMENT

*Schrader*.   Defendants argue that Plaintiffs cannot establish a claim for extortion with respect to the Schrader project, suggesting that testimony by one of Schrader's principals indicated he, in Defendants' words, "did not feel . . . pressur[ed]. Mot. at 21-22.  That was not his testimony, and Defendants completely ignore that Schrader's *other* principal—Laurent Opman—recognized Nourmand's "business plan" was to "make money off his neighbors." SGI59.  Defendants cannot manufacture a lack of dispute through selective citation.   Moreover, Defendants confuse the significance of the Schrader to Plaintiffs' claims.  Defendants reflexively initiated proceedings against Schrader support the "sham" pattern (*supra* pp.12-13); however, the Schrader episode, by itself, was not an independent predicate act.  It was an overt act in furtherance of their attempt to extort Plaintiffs again, increasing pressure on Plaintiffs to write another "check" to make Defendants go away.

*Maddren*.  Plaintiffs have showed sufficient evidence for a reasonable jury to conclude that Maddren acted in concert with TSLF in furtherance of the Nourmand Enterprise.  *Supra* p.7.  That is plainly a disputed issue of fact.  In any event, Defendants have not attempted to explain why the absence of Maddren's conduct would negate an essential element of Plaintiffs' claim, as is their burden to show on summary judgment.  *See Adickes*, 398 U.S. at 157; *Nissan Fire*, 210 F.3d 1099.

## CONCLUSION

Because there are genuine and triable issues of disputed material fact, Defendants' Motion should be denied.

Dated:  May 23, 2022        WILSON SONSINI GOODRICH & ROSATI
                           Professional Corporation

                           By:  s/Susan K. Leader
                           Susan K. Leader

                           Attorneys for Plaintiffs

-25-