**WILSON SONSINI GOODRICH & ROSATI**
**Professional Corporation**
SUSAN K. LEADER, State Bar No. 216743
sleader@wsgr.com
ALI R. RABBANI, State Bar No. 253730
arabbani@wsgr.com
CONOR TUCKER, State Bar No. 318075
ctucker@wsgr.com
633 West Fifth Avenue, Suite 1550
Los Angeles, CA 90071-2027
Telephone:   (323) 210-2900
Facsimile:   (866) 974.7329

**WILSON SONSINI GOODRICH & ROSATI**
**Professional Corporation**
DALE R. BISH, State Bar No. 235390
dbish@wsgr.com
CHARLES A. TALPAS, State Bar No. 308505
ctalpas@wsgr.com
650 Page Mill Road
Palo Alto, CA 94304-1050
Telephone:   (650) 493-9300
Facsimile:   (650) 565-5100

Attorneys for Plaintiffs
Relevant Group, LLC, 1541 Wilcox Hotel
LLC, 6516 Tommie Hotel LLC, and 6421
Selma Wilcox Hotel LLC

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RELEVANT GROUP, LLC, a Delaware limited liability company; 1541 WILCOX HOTEL LLC, a Delaware limited liability company; 6516 TOMMIE HOTEL LLC; a Delaware limited liability company; and 6421 SELMA WILCOX HOTEL LLC, a California limited liability company,<br><br>Plaintiffs,<br><br>v.<br><br>STEPHAN "SAEED" NOURMAND, an individual; THE SUNSET LANDMARK INVESTMENT LLC, a California limited liability company; NOURMAND & ASSOCIATES, a California corporation; and DOES 1-10,<br><br>Defendants. | Case No.: 2:19-cv-05019-ODW (KSx)<br><br>**DECLARATION OF TINA THOMAS IN SUPPORT OF PLAINTIFFS' OPPOSITIONS TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**<br><br>Date:      June 13, 2022<br>Time:      1:30 p.m.<br>Place:     Courtroom 5D<br>Judge:    Hon. Otis D. Wright II |

# DECLARATION OF TINA THOMAS

I, Tina Thomas, declare as follows:

1.      I am an attorney at law licensed in the State of California, and I am the founding partner of the law firm of Thomas Law Group ("TLG").  TLG has been retained by counsel for Plaintiffs Relevant Group, LLC, 1541 Wilcox Hotel LLC, 6516 Tommie Hotel LLC, and 6421 Selma Wilcox Hotel LLC (collectively, "Plaintiffs") in the above-captioned matter.  I submit this declaration in support of Plaintiffs' Oppositions to Defendants' Motions for Summary Judgment.

2.      Attached hereto as **Exhibit A** is a true and correct copy of my May 9, 2022 Expert Report in this matter, which I prepared to provide an objective evaluation of the objections and challenges made in administrative proceedings and lawsuits filed by Defendants The Sunset Landmark Investment LLC and Saeed Nourmand against Plaintiffs, each of which involved claims made under the California Environmental Quality Act (CEQA).  If called upon to do so, I am prepared to opine on the subject matter contained therein.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in Sacramento, California this 23rd day of May, 2022.

_____
Tina Thomas

# EXHIBIT A

# T|L|G   Thomas Law Group

TINA A. THOMAS
·
AMY R. HIGUERA
CHRISTOPHER J. BUTCHER
ANDREW M. SKANCHY
Senior Counsel
·
SAMUEL D. BACAL-GRAVES
DUSTIN D. PETERSON

455 CAPITOL MALL, SUITE 801
SACRAMENTO, CA 95814

ONE KAISER PLAZA, SUITE 875
OAKLAND, CA 94612

Telephone: (916) 287-9292 Facsimile: (916) 737-5858
www.thomaslaw.com

NICHOLAS S. AVDIS
Of Counsel

I, Tina Thomas, have prepared this report to provide an objective evaluation of the objections and challenges made in administrative proceedings and lawsuits filed  by The Sunset Landmark Investment, LLC and Saeed Normand (collectively, Sunset), including through the Silverstein Law Firm in representation of Sunset, and against Relevant Group LLC and its affiliates 1541 Wilcox Hotel, LLC; 6516 Tommie Hotel, LLC; and 6421 Selma Wilcox Hotel, LLC (collectively, Relevant), each of which involved claims made under the California Environmental Quality Act (CEQA). I am an attorney whose practice has focused on CEQA for 43 years. My experience and accolades are documented in detail in Appendix A. I am recognized as a longtime CEQA practitioner in the state of California.

Section I of the report identifies the documents considered in preparing this report. Section II discusses CEQA practice generally – its mechanics and purposes, concepts applicable to these cases, and how the law can be misused or abused. Section III evaluates the conduct of Sunset throughout these matters, during both the administrative and judicial processes.

Based on review of the documents and extensive knowledge of CEQA administrative processes and litigation, the conduct of Sunset has been consistently vexatious – intended to harass, delay, and obstruct – at nearly every opportunity in all three cases. Their conduct has been inconsistent with any apparent environmental motive or interest in the public good. There is only one reasonable explanation for their actions and decisions: that they sought to incapacitate the three hotel projects at the center of the three cases. And the evident motive for this campaign of obstruction was to coerce a personally enriching settlement from Relevant. Sunset did this without regard to the merits of the cases they filed, and with the knowledge that a CEQA lawsuit can delay a development project for years while it is litigated, thereby putting the project's financing at risk, regardless of whether the suit has merit. As such, developers might settle even a clearly meritless CEQA suit simply to resolve it quickly because, as described below, the judicial process is lengthy and costly. Here, Sunset succeeded in extracting such a settlement, to the tune of $5.5 million in cash paid directly to Sunset along with other costly concessions intended to benefit Sunset's adjoining property.

Sunset's conduct permits only one explanation: Sunset and their attorneys exploited California's environmental laws to extract a personally enriching settlement from Relevant, armed with neither legitimate motives nor legitimate legal arguments, but only the threat of meritless, obstructionist litigation. And it seems they succeeded – demanding and receiving a settlement

T | L | G   Thomas Law Group

from Relevant so outside the bounds of CEQA and so outrageous as to truly shock any CEQA practitioner or those who pursue CEQA actions in good faith for the benefit of the public.

# I.     **Documents Considered**

In preparing this report, documents from the following sources were reviewed to understand the facts and circumstances surrounding the three lawsuits filed by Sunset:

### *Publicly available City of Los Angeles records of administrative proceedings*

Each of the three hotel projects was approved by the City of Los Angeles (City). From these administrative approval proceedings, I considered staff reports, comments submitted by the public as well as Sunset, and other relevant documents. These documents are publicly available online from the websites of various departments of the City of Los Angeles.

### *Administrative Records*

To resolve a CEQA suit on the merits, an Administrative Record of the public agency's approval process must be prepared. This Administrative Record contains essentially all of the documents and communications generated or held by the agency relevant to the approval process. Though many of the documents that comprise the Administrative Records in the three cases are also available online, portions of the certified Administrative Records were considered for the Thompson and Selma approvals, as well as the draft Administrative Record in the Tommie case, which settled prior to certification.

### *Online dockets and court filings*

The Los Angeles County Superior Court and the California Second District Court of Appeal maintain online records of cases and court filings. To consider the litigation proceedings, the online dockets of the cases were considered. Additionally, filings and court orders were downloaded from the court websites and considered.

### *Settlement agreements*

The two settlement agreements which resolved the Tommie and Thompson cases were considered.

### *Deposition Transcripts*

Lastly, a draft transcript of a May 4, 2022 deposition of Stephen Saeed Nourmand, a transcript of an April 15, 2022 deposition of Casey Maddren, and a transcript of an April 20, 2021 deposition of Bruce Rothman were considered.

A list of those documents considered is provided as Appendix B

**T|L|G**   Thomas Law Group

## II.   CEQA Overview

*Purposes of CEQA*

The fundamental mandate of CEQA is that the public and decision makers be informed of the environmental consequences of actions subject to CEQA before they are considered for approval by a public agency. Unlike many other environmental laws, such as those passed for the protection of air, water, and species, CEQA is largely procedural in nature. It does not itself establish limits on the magnitude of environmental impacts; it merely requires that those impacts be adequately evaluated and disclosed. "The purpose of CEQA is not to generate paper, but to compel government at all levels to make decisions with environmental consequences in mind." (*Bozung v. Local Agency Formation Com.* (1975) 13 Cal.3d 263, 283 superseded by statute on other grounds.)

Private parties, both individuals and organizations, may file lawsuits to enforce CEQA's mandates.  Such lawsuits may include allegations that environmental review was inadequate, that an agency's conclusions were unsupported, or that the law's procedural mandates were not complied with.

When a CEQA suit raises legitimate environmental issues, a court has substantial discretion to apply a remedy it deems proper. Courts will typically issue orders that command the agency to rescind project approvals and/or environmental review, and mandate that the project not proceed until errors are corrected. (Pub. Resources Code, § 21168.9(a); see *POET, LLC v. State Air Resources Bd.* (2013) 218 Cal.App.4th 681, 759 ["Directing an agency to void its approval of the project is a typical remedy for a CEQA violation"].)   In very rare cases a court may issue an interlocutory remand, sending the matter back to the agency for clarification or correction of minor, usually technical defects without the need for more severe measures. Interlocutory remand is not accounted for in Public Resources Code section 21168.9, CEQA's remedies statute. In addition, monetary damages are not available in CEQA suits. (See *Hecton v. People ex rel. Dept. of Transportation* (1976) 58 Cal.App.3d 653, 656; Pub. Resources Code, § 21168.9.)

As the California Supreme Court has said, "[CEQA's] rules regulating the protection of the environment must not be subverted into an instrument for the oppression and delay of social, economic, or recreational development and advancement." (*Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 576; see also Cal. Code Regs., tit. 14 (CEQA Guidelines), § 15003(j) [same].) The law is designed to prevent such abuse. "Patently, there is legislative concern that CEQA challenges, with their obvious potential for financial prejudice and disruption, must not be permitted to drag on to the potential serious injury of the real party in interest." (*Board of Supervisors v. Superior Court* (1994) 23 Cal.App.4th 830, 837.) Yet it is widely recognized that "CEQA review is subject to manipulation and elongation that may verge on abuse of the process." (*Schellinger Brothers v. City of Sebastopol* (2009) 179 Cal.App.4th 1245, 1270.) As such, "[a]llegations that the public agency failed in its duty to make an adequate environmental assessment must be expeditiously resolved, and CEQA contains a number of procedural provisions evidencing legislative intent that the public interest is not served unless

CEQA challenges are promptly filed and diligently prosecuted." (*Nacimiento Regional Water Management Advisory Com. v. Monterey County Water Resources Agency* (2004) 122 Cal.App.4th 961, 965.) In short, lawsuits that subvert CEQA into a tool for oppression and delay of projects, particularly as a means to extract personally enriching settlement, are inconsistent with the law's environmental aims, its express provisions, and with the legislature's intent. Here it is clear that Sunset engaged in such "manipulation and elongation" of the CEQA process solely for a personally enriching settlement and not for any evident environmental purpose.

### *Pertinent CEQA standards and concepts*

Because the three cases here involved common CEQA forms and concepts – mitigated negative declarations, the "fair argument" standard of review, and "substantial evidence" – this report discusses the import of each, as well as other relevant CEQA issues.

#### *Mitigated Negative Declarations*

Negative declarations are a form of environmental review under CEQA available when an agency finds, based on an initial study of a project, that it will not have any potentially significant impacts. Because the conclusion is founded on an initial study of the impacts, negative declarations are more abbreviated in both substance and procedure than an environmental impact report (EIR), the more robust form of CEQA review.

A mitigated negative declaration (MND) refers to a negative declaration in which the conclusion that the project would have no significant impact relies on the adoption of mitigation measures. For instance, if development of an industrial plant might have significant air pollutant emissions, but the approving agency requires legally binding obligations or "mitigation" and those mitigation measures ensure that the project's emissions will be less than significant, then the project *with the mitigation measures* will not have a potentially significant effect. Presuming no other impact is potentially significant as mitigated, an MND would be appropriate for the project.

#### *"Fair Argument" Standard of Review*

In litigation over the adequacy of an MND, courts apply the "fair argument" standard of review. Under this test, "whenever it can be fairly argued on the basis of substantial evidence that the project may have significant environmental impact[,]" an MND will be set aside and the agency will be required to prepare the more robust environmental review – an EIR. (*No Oil, Inc. v. Los Angeles* (1974) 13 Cal.3d 68, 75.) The fair argument standard sets a "low threshold" for a petitioner (the party that files the suit) because the agency's conclusion is founded only upon initial study, not more substantial, in-depth analysis. (*Pocket Protectors v. City of Sacramento* (2004) 124 Cal.App.4th 903, 928.) Further, a petitioner need not show that the project *would* cause a significant impact, only that it *may*. An agency is not meant to weigh evidence about whether a significant impact might occur – only if there is no substantial evidence at all that one would occur is an MND proper. (*Save Agoura Cornell Knoll v. City of Agoura Hills* (2020) 46 Cal.App.5th 665, 689-690.) Thus, a petitioner with substantial evidence

T|L|G   Thomas Law Group

demonstrating that a project may cause a significant environmental impact will prevail under the fair argument standard, even if there is also substantial evidence that the project will not. (*Ibid*.) In other words, the court defers to the project opponents' evidence and not to the agency's evidence when reviewing an agency's decision to rely on a negative declaration or MND. Even when the city determines an MND is appropriate , the burden remains with the petitioner to produce substantial evidence supporting a fair argument that the project may have significant impacts.

*"Substantial Evidence"*

A fair argument that a significant impact may occur must be supported by "substantial evidence" to prevail. The term has a defined meaning within CEQA and the concept is further clarified by case law. The fundamental rule is that "substantial evidence includes fact, a reasonable assumption predicated upon fact, or expert opinion supported by fact" but does not include "argument, speculation, unsubstantiated opinion or narrative, evidence that is clearly inaccurate or erroneous, or evidence of social or economic impacts that do not contribute to, or are not caused by, physical impacts on the environment." (Pub. Resources Code, § 21080(e); see also Pub. Resources Code, § 21082.2(c).)

The classic example of substantial evidence is a scientific or expert report. Presuming its methodology is sound, the conclusions of such a report will represent substantial evidence. (See, e.g., *Save Agoura Cornell Knoll v. City of Agoura Hills* (2020) 46 Cal.App.5th 665, 689.) Thus, project opponents will often commission experts to independently evaluate a project with which they have concerns. If the expert reports show a potential for significant impacts and yet the agency adopted an MND, then the project opponent will have a viable case under CEQA.

On the other hand, as indicated above, speculation and unsubstantiated opinion are not substantial evidence. As such, only in limited circumstances – "when the personal observations and experiences directly relate to and inform on the impact of the project under consideration" – will public comments themselves constitute substantial evidence. (*Newtown Preservation Society v. County of El Dorado* (2021) 65 Cal.App.5th 771, 791.) For instance, when aesthetics is a cognizable CEQA impact category, which is not always the case, public observation may constitute substantial evidence. (*Ocean View Estates Homeowners Assn., Inc. v. Montecito Water Dist.* (2004) 116 Cal.App.4th 396, 402.) Again, commissioning a scientific study, analysis or report of an issue (such as traffic, air or noise etc.), founded on sound methodology, is the surest way to develop substantial evidence.

*Parking and Aesthetic Impacts*

Appendix G to the CEQA Guidelines is an environmental checklist form, which identifies types of impacts generally evaluated under CEQA. One of its categories is aesthetics. While parking is not specifically addressed in Appendix G some cases have suggested that parking capacity is relevant to CEQA analysis. However, under SB 743, the "adequacy of parking for a project shall not support a finding of significance," and neither aesthetic nor parking impacts are cognizable

for "a residential, mixed-use residential, or employment center project on an infill site within a transit priority area." (Pub. Resources Code, § 21099(b)(3), (d)(1).) An employment center project means "a project located on property zoned for commercial uses with a floor area ratio of no less than 0.75 and that is located within a transit priority area." (Pub. Resources Code, § 21099(a)(1).) A transit priority area means the site is within a half mile of a major transit stop. (Pub. Resources Code, § 21099(a)(7).)

All three hotel projects at issue here were on sites with "C4" zoning, which permits commercial uses as well as mixed-use developments. The three hotels all exceeded a floor area ratio of 0.75. Finally, the sites are all within a transit priority area, indeed nearly all of Los Angeles is. (See Los Angeles Map of Transit Priority Areas, available at: https://planning.lacity.org/eir/1020SoFigueroa/FEIR/files/Appx%20F%20-%20LA%20Planning%20ZI%20File%20No.%202452.pdf.) The three hotel projects met the criteria under Public Resources Code section 21099, subdivision (d) such that neither aesthetic nor parking impacts were to be considered significant impacts on the environment.

*Administrative Approval Process*

For projects requiring discretionary approval from a public agency, environmental review must be conducted prior to issuance of any such approval. Often a project will require multiple approvals, sometimes referred to as "entitlements." All three hotel projects at issue here required multiple approvals and entitlements. Further, municipalities often have multi-tier approval processes. One administrative body may initially review an application and make a recommendation to another administrative body within the agency. The second body may have authority to consider and approve a proposal, but their decision may be appealable, which can elevate the approval to a third administrative body. Further, different entitlements for the same project may need to be considered by different administrative bodies. In sum, administrative processes can be complicated – frequently requiring multiple approvals in front of several agency bodies.

Often, agency considerations will require public hearings. The hearing body will publicly post their agenda for a given hearing in advance. This agenda may list dozens of different items the body will consider during the given hearing, and will often provide staff reports explaining the items, along with any other associated documents. The public then has an opportunity to offer comment to the hearing body. They can submit written comments – most commonly by emailing them to the staff of the hearing body – or they have an opportunity to speak in front of the hearing body at the hearing itself. The public can urge the body to approve or deny an item, or to require project changes.

Though usually a hearing body will accept written comments up to and including the day of the hearing, commenters who seek to affect the outcome of the hearing typically submit their comments earlier to ensure adequate time for agency consideration. Project opponents may offer ways in which the project could be environmentally improved, or simply urge the body to deny the project.

Indeed, submission of comments is a legal requirement for parties who wish to litigate if they disagree with an agency's final action. Under a legal doctrine known as "exhaustion of administrative remedies," if a CEQA petitioner did not alert the agency to what they allege are legal defects during the administrative approval process, then there is a risk they will not be able to raise those arguments in court. A primary purpose of the doctrine "is to ensure public agencies are given the opportunity to decide matters within their expertise, respond to objections, and correct any errors before the courts intervene." (*Bridges v. Mt. San Jacinto Community College Dist.* (2017) 14 Cal.App.5th 104, 115.) Thus, both as a practical matter and consistent with the purpose of this legal doctrine, aggrieved parties will submit comment letters to an agency for their consideration. The comments need not be exhaustive, but should reasonably apprise the agency of the commenter's concerns. The statute and case law also allow project opponents to rely on comments made by others, as Sunset did in this matter. (See Pub. Resources Code, § 21177(a).)

However, the opportunity for comment afforded to the public is also subject to misuse and abuse. Agencies typically do not restrict how long a comment letter might be, or prevent commenters from attaching exhibits, attachments, or appendices to the letters they draft. Thus, a malicious commenter – one bent on delay alone – might submit lengthy comments with multiple, large attachments. A comment letter that is dozens of pages might not always indicate ill intent, but a voluminous comment letter submitted the day of or day before the hearing is often an indication that a project opponent seeks delay rather than project improvement.

Thus, common traits that may identify such malicious commenters are: (1) comments that are large – dozens or even over a hundred pages in length; and (2) comments that are submitted shortly before a hearing – one or two days before, or even on the morning of the hearing – such that adequate time is not available for the agency to respond.

*Litigation under CEQA*

CEQA disputes are meant to be resolved expediently. As noted above, the law is not intended to be "be subverted into an instrument for the oppression and delay of social, economic, or recreational development and advancement." (*Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 576.) Thus, there are a number of provisions intended to promote quick resolution of CEQA litigation. For example, CEQA suits are subject to short statutes of limitations – 30 days when challenging an MND. (Pub. Resources Code, § 21167(b).) Further, once the suit is commenced, the petitioner must request a hearing within 90 days. (Pub. Resources Code, § 21167.4(a).) Additionally, all courts must give a CEQA action preference over all other CEQA actions "so that the [case] shall be quickly heard and determined." (Pub. Resources Code, § 21167.1(a).) Further, in sizable counties with a population over 200,000, superior courts must designate CEQA judges, in the same manner that some courts have designated traffic or family court judges, "[t]o ensure that [CEQA cases] may be quickly heard and determined" in the trial court. (Pub. Resources Code, § 21167.1(b).) Los Angeles County has a dedicated bench of "CEQA" judges.

T|L|G   Thomas Law Group

Nonetheless, CEQA cases take time, particularly if appealed. And even if the developer comes back with an EIR, vexatious litigants can find other mechanisms to further delay the project.

I conducted a survey of CEQA cases in the Second District, which encompasses Los Angeles County, where these three suits were filed, evaluating case duration. The study is attached to this report as Appendix C. Based on this study the average CEQA case lasts 34 months in total before resolution at the Court of Appeal. However, there is a significant range. Some cases are resolved expediently, as the law intends. Multiple cases resolved at the Court of Appeal in under 2 years from when the case was filed. But the opposite is true as well. Even eliminating outliers where a case went dormant or was otherwise nonrepresentative we still identified multiple cases lasting more than 4 years.

The differences are even more stark when viewing the duration of trial court proceedings, which have the greatest potential for vexatious delay tactics. Average trial court duration was found to be 16 months. While some cases were resolved in the trial court in under 9 months, the longest case spent more than 4 years in the trial court alone.

As the survey demonstrates it is possible for CEQA cases to resolve quickly, as CEQA intends. But there is also significant potential for malfeasance if delay is the goal.

*Interlocutory Remand*

Interlocutory remand is extremely unusual in CEQA cases. It allows the agency to correct identified technical defects expediently and without the risk of new litigation. It is particularly noteworthy when employed by a trial court judge given that a Supreme Court concurring opinion joined by two justices, including the Chief Justice, wrote separately in a non-CEQA case that the holding as to the availability of interlocutory remand generally was not extended to CEQA cases. (*Voices of the Wetlands v. State Water Resources Control Bd.* (2011) 52 Cal.4th 499, 539-540 (conc. opn. of Werdegar, J.).)  Thus, if litigation ends with an interlocutory remand, that is a strong indication that the merits of the challenge, if any, were particularly weak.

**Mechanics of vexatious and malicious CEQA litigation**

It is common knowledge among CEQA practitioners that self-interested parties with motivations irrelevant to environmental protection file CEQA suits to extract concessions, armed with the threat of crippling delay.

The filing of a CEQA lawsuit does not prevent proceeding with development under the challenged entitlements. However, should a developer choose to proceed with construction despite pending CEQA litigation, they do so at the risk that "the project can be modified, torn down, or eliminated to restore the property to its original condition" under a court order. (*Woodward Park Homeowners Assn. v. Garreks, Inc.* (2000) 77 Cal.App.4th 880, 889.) Because of this, financing entities generally will not permit construction to proceed while CEQA litigation is pending, regardless of its merits. If the project is delayed for a long period, the

financing may entirely disappear. As such, delay itself, regardless of whether a case has merit, is the threat employed by malicious CEQA litigants – victory by attrition. This becomes a win-win for business competitors – either they extract a monetary settlement or they cripple the competition.

Malicious CEQA suits are identifiable because they share similar traits. Though not all such suits will contain each of these hallmarks, if a suit demonstrates multiple characteristics described below, then it is likely the petitioner's intentions are malicious rather than environmentally-motivated.

- Voluminous comment letters with excessive exhibits
- Comments submitted shortly before hearings, leaving little to no time for agency consideration
- Ignoring agency responses to administrative comments/appeals
- Scattershot pleadings
- Petitioner requesting to prepare the Administrative Record and delaying preparation
- Numerous preliminary motions, ex parte motions, requests for extensions
- Inclusion of meritless claims or claims that are not specific to the actual proposed project
- Arguments that non-environmental issues are cognizable under CEQA
- Settlement demands/agreements with terms far outside of what could be achieved in the writ of mandate proceeding, especially those that do not protect the environment and/or are personally enriching to petitioner (see discussion above regarding available remedies under the CEQA statute.)

Malicious lawsuits are well-documented in commentary and literature on CEQA, as is the fact that they are contrary to CEQA's environmental aims. For example, two papers published by CEQA practitioner Jennifer Hernandez studied each CEQA case filed in state superior courts over two separate periods of time. The first paper studied all cases filed between 2010-2012. (Hernandez, Friedman, & DeHerrera, *In the Name of the Environment: How litigation abuse under the California Environmental Quality Act Undermines California's Environmental, Social Equity and Economic Priorities – and Proposed Reforms to Protect the Environment from CEQA Litigation Abuse* (2015).) One of its central conclusions was that CEQA suits overwhelmingly targeted infill development and not greenfield development, which generally poses more environmental concerns. (*Id*. at p. 13.) Hernandez attributed this in part to the practice of suits filed "to delay or derail a competing project" and parties filing suits to extract non-environmental concessions such as project labor agreements or cash settlements. (*Id*. at p. 19.) "Private sector competitive abuse of CEQA often garners the strongest political criticisms, but is part of a systematic approach to advance competitive business objectives with unconventional tactics." (*Id*. at p. 24.) The paper also highlighted the egregious practices of "'Greenmail' and 'Bounty Hunter Lawyers'":

> "Numerous lawsuits filed by entities with community-sounding names were attributed to lawyers that used CEQA to extract monetary, non-environmental, confidential settlements from agency and/ or private project sponsors. Several media stories have

named two lawyers, including a Southern California lawyer who filed the largest number of CEQA lawsuits during the study period, as engaging in 'greenmail' – using environmental laws to extract monetary settlements for private gain. There are also reported allegations of widespread violations of state and federal tax laws by dozens of the non-profit CEQA petitioners organizations formed by, and sharing the same address, relatives and colleagues of, the lawyer filing the highest number of CEQA lawsuits during the study period."

(Hernandez, Friedman, & DeHerrera, *supra*, p. 24.)

A footnote to the above-quoted passage provides a link to a news story titled "Leaked Settlement Shows How NIMBYs 'Greenmail' Developers[,]"[1] which describes a CEQA settlement allegedly involving Robert Silverstein of the Silverstein Law Firm. According to the story, the CEQA suit settled with cash payments to both Silverstein and the petitioner in that case totaling $340,000.

Jennifer Hernandez updated her study in 2018, with three more years of case data: 2013-2015. (Jennifer Hernandez, *In the Name of the Environment, The Sequel, California Environmental Quality Act Lawsuits and California's Housing Crisis*, 24 Hastings Envt'l L.J. 21 (2018).) The updated study found that little had changed. "Because of the uncertainty in CEQA's requirements, the time (3 to 5 years, with some examples extending to 9 and 10 years) required to complete the trial and appellate court proceedings, and the extreme consequences of an adverse judicial outcome that vacates project approvals, once a CEQA lawsuit is filed it becomes very difficult for a public or private project to access project financing (bank loans or equity investors) or grant funding." (Hernandez, *supra*, at p. 43.) "'[O]ften just filing a CEQA lawsuit is the equivalent of an injunction because lenders will not provide funding where there is pending litigation. This is fundamentally unfair.'" (*Id*. at p. 44 [notably quoting Clem Shute speech when accepting lifetime achievement award from environmental section of State Bar].)

Hernandez and her co-authors are not alone in highlighting these issues. Another recent law review article noted that, "[p]ublic agencies and developers are all too familiar with CEQA mercenaries—lawyers or organizations that nitpick CEQA documents, looking to extract money or concessions in exchange for an agreement not to use CEQA as a cudgel against the project." (Michelle Oullette and Ali Tehrani, *The Lord's Work: An Overview of CEQA's Judicial Remedies and Recommendations for Reform*, 25 Hastings W.-N.W. J. Env. L. & Pol'y 85, 85.) This article also discussed the widespread political consensus as to the problem: "as noted by former Governors George Deukmejian, Pete Wilson, and Gray Davis: 'CEQA lawsuits are frequently filed only to extract concessions not related to the environment, or for the purpose of opposing a project for reasons having nothing to do with environmental protection.'" (*Ibid*. quoting George Deukmejian, Pete Wilson & Gray Davis, Keep California Green and Golden

---

[1] Cited news story available at: https://la.curbed.com/2013/1/3/10295162/leaked-settlement-shows-how-nimbys-greenmail-developers-1

with CEQA Reforms, SAN DIEGO UNION TRIBUNE (July 12, 2012), https://perma.cc/H9AN-Q8KV.)

CEQA practitioner Art Coon maintains a blog on the Miller Starr Regalia law firm website titled "CEQA Developments." He too has repeatedly highlighted malicious CEQA tactics. "While reasonable minds may differ as to the desirability of recognizing business competitors' standing in specific cases, most would probably condemn extortionate lawsuits seeking to leverage the inherent expense and delay of litigation to gain a benefit *wholly unavailable* under the substantive law even if the plaintiff prevails." (Coon, *CEQA Standing Reform: Could Statutory Standing Requirements Feasibly Be Tightened to Bar Anti-Competitive Lawsuits Motivated By Economic Rather Than Environmental Concerns?*, https://www.ceqadevelopments.com/2012/12/12/ceqa-standing-reform-could-statutory-standing-requirements-feasibly-be-tightened-to-bar-anti-competitive-lawsuits-motivated-by-economic-rather-than-environmental-concerns/.)

Thus, CEQA commentary and literature has thoroughly documented the phenomenon of malicious CEQA suits filed to derail or delay a project and to extract personally enriching settlements, condemning it as contrary to the aims of environmental protection.

## III.   **Evaluation of Sunset Conduct**

**Sunset Administrative conduct**

I have reviewed the administrative approval process of the three hotel projects at issue, as well as the comments submitted by Sunset. As discussed above, a single voluminous or last minute comment letter might indicate an ill intent. When a party files more than one such comment letter, the agency can be reasonably certain of this. Sunset filed nearly 30 such comment letters between the three projects. The following table shows the most noteworthy Sunset comments and other administrative filings:

| Sunset Administrative Filings | |
|---|---|
| **Hearing** | **Sunset Actions** |
| Thompson | |
| 1/11/16 Planning and Land Use Management Committee (PLUM) hearing | 18-page comment letter submitted day before hearing |
| 2/3/16 City Council (CC) hearing | Email 4 days before hearing requesting it be continued for 60 days |
| Tommie | |

T|L|G   Thomas Law Group

| | |
|---|---|
| 1/26/17 City Planning Commission (CPC) hearing | 797-page comment letter submitted day before hearing |
| | 2-page comment letter submitted day of hearing |
| 3/1/17 CPC hearing officer hearing (acting as Advisory Agency) | 799-page comment letter submitted day of hearing |
| 4/25/17 PLUM hearing | 854-page comment letter submitted day of hearing |
| 5/2/17 CC hearing | 15-page comment letter submitted day of hearing |
| 5/5/17 CC hearing (1st continuance) | 4-page comment letter submitted day before hearing demanding it be postponed |
| 5/10/17 CC hearing (2nd continuance) | 43-page comment letter submitted day of hearing |
| Selma | |
| 3/28/18 CPC hearing officer hearing (acting as Advisory Agency and on behalf of CPC) | 841-page comment letter submitted 5 days before hearing |
| 6/14/18 CPC hearing | 11-page comment letter submitted 2 days before hearing |
| 7/12/18 CPC hearing (1st continuance) | 7-page comment letter submitted 10 days before hearing demanding remand for further environmental review |
| | 2-page comment letter submitted day of hearing |
| | Sunset files 43-page appeal demanding remand for further environmental review |
| 11/27/18 PLUM hearing | 841-page comment letter submitted 26 days before hearing |
| | 2-page comment letter submitted day before hearing asking to delay hearing |

**T|L|G**  Thomas Law Group

| | 468-page comment letter submitted day of hearing |
|---|---|
| N/A | 308-page Casey Maddren letter to Los Angeles District Attorney, California Attorney General, and US Attorney requesting criminal investigation of both Relevant and City officials[2] |
| 2/26/19 CC hearing | 3-page comment letter submitted day before hearing demanding to postpone |
| | 26-page comment letter submitted day of hearing |
| 3/5/19 CC hearing (1st continuance) | 4-page comment letter submitted 4 days before hearing, demanding hearing be continued again |
| | 7-page comment letter submitted day of hearing stating the City must take the item off the agenda |

As shown in this table, through the administrative process of the three projects, Sunset submitted more than 4,000 pages of comments, the overwhelming majority of which were submitted immediately before a hearing. Thirteen comment letters were submitted on the same day as a hearing or the day before. The average length of those 13 last-minute comments was 297 pages. Seven comments were more than 300 pages in length. The longest was 841 pages in length. And as time passed, the letters increasingly focused on continuing and rescheduling approval hearings.

At one of the PLUM hearings on the Selma hotel, a project for which Sunset had submitted over 1,300 pages of comments, hearing Vice Chair Englander noted that Sunset was submitting hard copies of their comments. Englander requested of Sunset's attorney, "[j]ust in the interest of the

---

[2] According to the transcript of a deposition of Casey Maddren, this letter was in fact drafted by an attorney representing Sunset – Daniel Wright – and sent to Maddren to be submitted on his behalf. (April 15, 2022 Deposition of Casey Maddren Transcript (Maddren Deposition), p. 28:11-14.) In fact, Maddren expressed that he did not know why the letter was sent to the District Attorney, California Attorney General, and the U.S. Attorney. (Maddren Deposition, p. 33:5-11.) Sunset's apparent intent in drafting the letter was to "conceive of ways in which the City Council and Mayor could get nervous about future investigations." (Maddren Deposition, p. 28:6-7; see also *Id*., p. 32:20-24 [acknowledging letter's intent "to make City officials nervous"].) Ghost-writing comment letters to disguise their authors and intent is further evidence of Sunset's ill-intent towards Relevant with respect to these projects.

environment, if you could double-side these next time, that would be great." (November 27, 2018 PLUM Appeal Transcript, pp. 24:25-25:2.) Sunset's attorney refused unless Englander promised to read them. (*Id*., p. 25:3-4.) Sunset had submitted a 468-page comment letter earlier that day, supplementing their 841-page comment letter submitted prior to the hearing.

Sunset even sought to insert itself into the issuance of building and demolition permits for the Thompson Hotel, raising the same frivolous arguments it raised elsewhere. The City informed Sunset that its arguments didn't relate to building permits but to the rezoning and other discretionary entitlements. (Los Angeles Department of Building and Safety (LADBS) September 2, 2016 Determination , p. 4 ["To the extent that [Sunset] claims that these [demolition permits] and the Pending Permit Applications should be revoked or their applications suspended because they are somehow based on the land use entitlements that Planning and City Council approved, LADBS lacks authority to invalidate such entitlements"].) Sunset persisted though, taking the issue to the Central Area Planning Commission (CAPC), which voted to deny its appeal in May 2017.

> "The appellant is in fact requesting LADBS to act as the Court and override land use entitlements which the City has not advised LADBS to halt. If LADBS took such action, it would represent an abuse of LADBS's jurisdiction. [¶] LADBS has no authority to arbitrarily override or void approved land use entitlements and Section 11.02 of the Municipal Code does not empower LADBS with such authority. It is not the role of LADBS, after discretionary land use entitlements have been granted, to independently refuse to grant a permit or suspend action on a pending permit that complies with the entitlement. LADBS is not tasked with revisiting a land use entitlement and nullifying it or amending it. [¶]…. [U]ntil any interpretation is deemed incorrect in Court per the appellant's lawsuit, there is no legal basis for LADBS to revoke a permit or suspend review of a pending permit."

(CAPC Letter of Determination, pp. 20-21.)

The pattern of voluminous and late-submitted comment letters filed by Sunset with respect to Relevant projects, particularly when viewed with its frivolous attempt to block building permits, shows an unambiguous goal to delay approval as long as possible. There is no legitimate explanation for repeatedly submitting voluminous comments that the agency cannot possibly read before the hearing, especially when many of the objections are reflexively repetitive and not specific to the actual project that the agency is tasked with evaluating.

It is noteworthy that in initial comments on the Thompson hotel, Sunset cited to a noise study commissioned by someone else regarding the initial design of the Thompson. Even though Sunset challenged the redesigned hotel (which had added enclosed features) Sunset never commissioned its own study and failed to update this earlier analysis to evaluate the revised plans. This indicates that Sunset or its lawyers understood that CEQA requires substantial evidence for a meritorious claim yet from that point forward they never again prepared, commissioned, or otherwise developed any substantial evidence.

T|L|G   Thomas Law Group

It is also noteworthy that other parties filed administrative appeals, in addition to Sunset. However, the environmental and neighborhood organizations concerned with project impacts were satisfied by project changes incorporated in response to comments. The fact that no environmental or community organization filed a suit despite submitting environmental comments during the administrative process indicates there was no legitimate environmental concern.

Lastly, it is clear that Sunset raised these administrative challenges solely to delay construction and exploit funding vulnerabilities. When it appeared the delay itself would not injure a development of another nearby hotel project Sunset abandoned identical claims without any settlement agreement. Sunset filed an administrative appeal with respect to the Schrader Hotel, another hotel close by, raising identical arguments as it did in its comment letters on Relevant projects. (August 10, 2018 Appeal Application.) Saeed Nourmand and an attorney for Sunset met with Bruce Rothman, a principal of the company developing the Schrader Hotel, on October 4, 2018 to discuss the appeal. (April 20, 2021 Deposition of Bruce Rothman Transcript (Rothman Deposition), pp. 82:23-83:14.) Rothman informed them that Relevant was not involved in the Schrader Hotel. (Rothman Deposition, p. 84:12-86:18.) Rothman also informed Sunset that, unlike Relevant, the Schrader Hotel would be self-funded. (Rothman Deposition, pp. 86:2-87:16 ["we had, you know, the ability to spend money and time to deal with the appeal"].) Though until that point Sunset had raised the same CEQA arguments it had with respect to Relevant projects, upon learning that delay could not be leveraged to extract personally-enriching settlement, Sunset immediately dropped the administrative appeal, asking only that the Shrader Hotel comply with the conditions already imposed on it by the City – nothing further. (Rothman Deposition, p. 89:1-91:24.) As Sunset's conduct with respect to the Schrader Hotel makes clear, their strategy was to delay the Relevant projects by exploiting funding vulnerabilities in order to extract personally enriching settlement. When it became clear that Sunset would not receive such a settlement from the Schrader Hotel, Sunset abandoned their pretextual environmental arguments under CEQA, withdrawing their administrative appeal after the Rothman meeting. (February 7, 2019 PLUM Committee Appeal Response, p. 1.)

**Pleadings**

Each of the petitions filed by Sunset in the three cases raised CEQA claims. However, the claims were essentially identical, providing no notice of how Sunset alleged CEQA had been violated. For instance, the Thompson petition alleged:

> "The record contains substantial evidence to support a fair argument that the Project may cause significant, unmitigable impacts to the environment, including but not limited to land use, transportation, traffic operational, circulation, emergency response times, parking, pedestrian safety, noise, air quality and health risks, historic resources, shade/shadow, public services, cumulative impacts and growth inducing impacts, and further, that the City also illegally piecemealed the Project, in violation of CEQA."

T|L|G   Thomas Law Group

(Thompson Petition, ¶ 29.) This merely recites the legal standard and essentially repeats the impact categories listed in CEQA Guidelines Appendix G. The other petitions made essentially identical allegations. Nothing in the petitions identified how such impacts would occur or the evidence to support such a claim. Nor did Sunset make any arguments related to most of these impact categories in briefing. The petitions merely repeated legal standards and concepts without any attempt to apply them to the facts of each case.

A CEQA petitioner whose goal is to prevail in a case challenging an MND comes armed with substantial evidence. They contract with experts, undertake studies, and articulate why the facts of the case at hand establish a CEQA violation. Through three lawsuits, Sunset did none of this. They reflexively raised copy/paste arguments to delay and obstruct, and without any support or regard for their merits.

**Pretrial Conduct**

A CEQA case largely focuses on whether the agency's actions were supported on the basis of the record before it at the time of decision. For a court to evaluate this, a record "of proceedings relating to the subject of the action" must initially be prepared, commonly referred to as the Administrative Record (AR). A typical AR in a CEQA case in which the agency prepared an MND may be thousands of pages, sometimes tens of thousands of pages. The AR generally includes every relevant non-privileged document produced through the administrative process. This includes not only official public documents but also the internal emails of agency staff about the project. Before briefing on the merits commences, the AR must be prepared then certified by the agency.

When a CEQA suit is filed, the petitioner can either allow the agency to prepare the AR or elect to prepare it themselves. Whichever they choose, the agency must collect typically thousands of documents. The agency itself must then remove any privileged documents – those that are attorney/client privileged, for instance. Typically, irrelevant documents and duplicates are also removed. A complete AR will contain all of the documents, organized by category, Bates-stamped and accompanied by an AR index which lists each document and its location.

Regardless of who prepares the AR, the agency and petitioner must inevitably work together. They must reach understandings on numerous issues that arise along the way, such as whether particular documents warrant inclusion or whether documents are relevant or duplications. Sometimes the parties will disagree. Typically, those disputes can be resolved informally between them. When intractable, the parties will submit the issue to the court for resolution, each making a case for their position.

By statute, the AR must be prepared and certified for accuracy by the agency within 60 days of service of the request for its preparation. (Pub. Resources Code, § 21167.6(b)(1).) When the size of the AR "renders infeasible compliance with that time limit" the parties may agree to extend that time limit. (Pub. Resources Code, § 21167.6(c).) Courts will generally approve of those

extensions. However, the 60-day time limit is a good guideline, particularly for cases involving MNDs, which generally have more limited ARs than EIR cases.

Large agencies, such as the City of Los Angeles, are often well-equipped to prepare the AR, as they have IT departments and ample staff to review the thousands of documents. However, there are legitimate reasons a petitioner might elect to prepare the AR. Most commonly, even though statute requires whoever prepares the AR to "strive to do so at a reasonable cost in light of the scope of the record" (Pub. Resources Code, § 21167.6(f)), some petitioners believe that preparing the AR themselves will save money. The labor of government employees is not inexpensive, and petitioners might also doubt the efficiency of agency staff. Because the prevailing party in the litigation may recover the costs it incurred in AR preparation, saving money on AR preparation can limit the petitioner's risk of having to pay large sums should they lose the case.

However, preparation of the AR also presents opportunities for a malicious petitioner to delay. Typically, such a petitioner will elect to prepare the record themselves. After doing so they will undertake a campaign of obstruction and unreasonable demands. They will force the parties to submit dispute after dispute to the court for resolution. These disputes may include overbroad document requests, multiple document requests, disputes over whether documents are duplicated or relevant, demands for information about privileged documents, demands that the court review allegedly privileged documents in camera, and more. As with merits, a petitioner may even prevail on certain points raised. But whether or not they prevail on these pretrial disputes is irrelevant – their goal is to delay and obstruct, drawing out the litigation as long as possible.

Here, Sunset's conduct bears all the hallmarks of such a goal.

### *Thompson Case Pretrial Conduct*

Sunset filed the Thompson case on March 3, 2016. (Thompson Petition, p. 1.) Sunset initially requested that the City prepare the AR, but a little over a month later sent the City a letter electing to prepare it themselves. (December 15, 2016 Sunset Motion to Compel, p. 3:8, *Id.*, Wright Decl., Exhibit 1 [letter to City requesting to prepare AR].) The City prepared a master control set of documents and transmitted them to Sunset 12 days later. (*Id.*, p. 3:12-13.) The City and Sunset then conferred on search terms to be used to gather emails from the City computers. (December 29, 2016 City Ex Parte Application, p. 4:5-8.) The City's Information Technology Agency provided the emails to the City's outside counsel in late July 2016 and they in turn provided the relevant, non-privileged emails and attachments, including redacted portions of email chains which contained both privileged and non-privileged emails, to Sunset on September 30, 2016. (*Id.*, p. 4:8-20.) The City also included a privilege log of withheld communications. (*Ibid.*)

On November 16, 2016, the trial court judge ordered that the AR be certified within the month – by December 16, 2016. (December 29, 2016 City Ex Parte Application, p. 5:7-8.) The deadline was not met because Sunset had not provided the City with the full Bates-stamped AR including

emails and other necessary documents or a legally adequate AR index. (*Id.*, p. 5:8-11.) Sunset did, however, file a motion to compel additional documents on the day before the deadline. (December 15, 2016 Sunset Motion to Compel.)

The motion asked that the City be required to provide additional detail about the privileged documents, provide any emails withheld on relevancy grounds, and asked to undertake discovery related to record preparation that had occurred up to that point by deposing City staff who provided the records. (December 15, 2016 Sunset Motion to Compel, p. 1:10-20.) The motion also asked for modification of the briefing schedule to allow time for the dispute to be resolved before the merits briefing. (*Id.*, p. 1:21-25.) When the City was unable to secure relevant declarations of City staff due to December holidays, the City asked Sunset to modify the briefing schedule for the motion. (December 29, 2016 City Ex Parte Application, Leisy Decl., p. 8:10-18.) Sunset refused unless the City agreed to modify the merits briefing and hearing schedule. (*Id.*, p. 8:20-22.) The City asked the court to grant the request, and it did so without extending the merits hearing. (December 29, 2016 Order Granting City's Ex Parte Application, p. 1:16-17.) The City eventually certified the AR more than 10 months[3] after the case was filed (January 19, 2017 Notice of Certification), and the Court denied Sunset's motion to compel in its entirety. (March 21, 2017 Order Denying Petitioner's Motion to Compel, p. 2:22.) But this was not the end of the pre-hearing motions.

In the intervening months, Sunset had amended their petition to, among other things, include three additional causes of action. (June 3, 2016 First Amended Petition, pp. 43:14-49:11.) Following a successful motion for judgment on the pleadings filed by the City, Sunset amended the petition again. (January 20, 2017 Second Amended Petition.) The City again filed a motion for judgment on the pleadings, and the Court found that the second amended petition failed to cure the defects. (March 2, 2017 Notice of Ruling Granting Respondents' Motion for Judgment on the Pleadings as to the 6th and 7th Causes of Action in the Second Amended Petition for Writ of Mandate, Exhibit A, p. 2 ["Plaintiff fails to allege facts demonstrating that any sort of mandate exists requiring the City to adopt the administrative hearing rules as desired"].) The Court also noted that the claims were likely barred by res judicata and/or collateral estoppel. (*Ibid.*)

With these issues resolved, all in favor of the City in every respect, merits briefing began. However, three days before briefing was due to be completed – i.e., when Sunset's reply brief was due – Sunset filed an ex parte application to allow for supplemental briefing on a "changed project issue" and asked for further continuance. (May 9, 2017 Sunset Ex Parte Application for Order Allowing Supplemental Briefing and For Short Continuance of Trial Date.) The Court continued the decision on Sunset's ex parte application. (May 9, 2017 Minute Order.) Sunset then filed their reply brief. (May 12, 2017 Sunset Reply Brief.) The ex parte hearing was continued again (May 16, 2017 Minute Order), and Sunset filed a document titled "Chronology Re: Inadequate Disclosure of Significantly Modified Project" a day before the continued hearing purporting to be in support of the ex parte application. (May 18, 2017 Sunset Chronology RE:

---

[3] Some of this duration was due to delays related to the Information Technology Agency search for relevant emails.

Inadequate Disclosure of Significantly Modified Project.) The following day, the Court granted the request for supplemental briefing, and continued the merits hearing until July 20, 2017. (May 19, 2017 Minute Order.)

At the same hearing, the Court also directed the City to file a noticed motion to augment the AR because a powerpoint presentation from one of the administrative hearings relevant to the "changed project" issue had been omitted from the AR.[4] (June 2, 2017 Motion to Augment the Administrative Record, p. 2:18-28.) More than a month later, Sunset opposed the Motion to Augment the Record (in a 163-page court filing) and the Court chose to resolve the motion at the merits hearing. (July 7, 2017 Opposition to City's Motion to Augment the Administrative Record.) Shortly thereafter, the parties believed the case would settle and the hearing was continued on that basis. (See October 12, 2017 Sunset Memo Re Settlement Status.)

The matter did in fact settle, in January 2018 – roughly 22 months after the suit was filed.

### Tommie Case Pretrial Conduct

Sunset filed the Tommie Case on June 9, 2017. No litigation events occurred prior to its dismissal following settlement in January 2018.

### Selma Case Pretrial Conduct

Sunset filed their lawsuit challenging the Selma Hotel on April 2, 2019, electing to prepare the AR themselves. (April 3, 2019 Sunset Notice of Election to Prepare the Record.) By June 2019, apparently due to Sunset's delays up to that point, the City and Relevant offered to waive costs related to preparation of the AR, even if they prevailed, if Sunset would permit the City to prepare the AR. (November 5, 2019 Sunset Motion Re Determination of Scope of the Administrative Record, Wright Decl., Exh. 4, p. 4-1.) Sunset's response described the City as being in "an unnecessary rush to certification." (*Id*., p. 4-17.) The City replied, documenting that the firm representing Sunset engaged in a "pattern and practice of abusing the administrative record preparation process to improperly delay resolution of CEQA lawsuits[,]"including in the Thompson case. (*Id*., pp. 4-19—4-20.) Deputy City Attorney John Fox stated, "the City will not allow your firm to hijack the administrative record preparation process to improperly delay the resolution of this litigation." (*Id*., p. 4-20.)

Undeterred, Sunset continued to delay preparation of the AR until early November 2019 when they unilaterally scheduled a hearing date for a noticed motion to determine the scope of the AR without first meeting and conferring with the City. (November 11, 2019 City Opposition to Sunset's Motion Re Determination of Scope of the Administrative Record, p. 8:1-3.) The essence of the motion, which Sunset subsequently filed, was that Sunset believed other projects were connected to the Selma hotel, though allegedly relevant documents were not included in the AR

---

[4] Apparently it was Saeed Nourmand, owner of Sunset, who may have requested these changes. (May 4, 2022 Saeed Nourmand Deposition Draft Transcript (Nourmand Deposition), pp. 47:2-19; 48:23-49:20.)

because Sunset had failed to include the documents with their (thousands of pages of) comments on administrative hearings. (November 5, 2019 Sunset Motion Re Determination of Scope of the Administrative Record.) Briefing on the motion commenced and the Court resolved the motion on December 3, 2019, denying in full the "plethora of documents sought to be included in the administrative record," referring to it variously as an "unbridled expansion" and a "tremendous expansion" of the AR Sunset was seeking. (December 3, 2019 Order Re Motion to Determine the Scope of the Administrative Record, pp. 5:24, 6:20, 7:18.)

Eventually, the City filed a notice of certification of the AR, bypassing Sunset's delay tactics. (January 24, 2020 Notice of Certification.) Sunset responded with a motion to compel, filed three days later (January 27, 2020 Sunset Motion to Compel), and an objection to the certification filed two days after that (January 29, 2020 Sunset Objection to the City's Usurpation of and Certification of the Administrative Record as "Complete"). The motion sought to compel the City to produce a privilege log, lodge withheld documents for *in camera* inspection, and produce any documents found not privileged for inclusion in the AR. (January 27, 2020 Sunset Motion to Compel, p. 6:9-14.) The Court agreed to inspect the documents *in camera*, and agreed with the City that they were in fact privileged. (March 12, 2020 Court Order.) So again, for the third time, Sunset was unsuccessful in its motions to expand the scope of the AR.

Nonetheless, one day after the Court agreed to review the privileged documents *in camera*, Sunset filed yet another motion, this one to augment the AR. (February 25, 2020 Motion to Augment and Notice of Lodging Flash Drive Containing Documents Which the City Failed to Include in the Administrative Record.) Sunset demanded that still more documents be added to the AR – documents that were cited and URL-linked in administrative comment letters and emails related to prior projects. (February 25, 2020 Motion to Augment, p. 1:8-27.) Again, this required further briefing to resolve the new motion. However, the COVID-19 pandemic began shortly thereafter. This necessitated multiple continuances despite completion of the briefing on the motion to augment in late March 2020. (March 26, 2020 Sunset Reply in Support of Motion to Augment.) Following the continuances, the Court scheduled the hearing for August 24, 2020 (May 5, 2020 Minute Order) almost one and a half years after filing of the Petition.

When the City proposed a briefing schedule on the merits, Sunset objected. (May 11, 2020 Sunset Objection to Request for Order Setting Briefing Schedule.) Rather than propose an alternative schedule, Sunset asked the Court to set a case management conference at which it could then set a briefing schedule to commence after the hearing on the motion to augment – then scheduled for August 14, 2020 – and a hearing to occur 30 days after the reply on the merits. (*Id*., p. 9:3-13.) Following further discussion, the parties eventually agreed to commencement of a merits briefing schedule in late July. (July 27, 2020 Stipulation and Order Setting Briefing Schedule.) Sunset then filed a 62-page notice of new appellate court decision improperly including argument and quotation. (August 3, 2020 Sunset Notice of New Appellate Court Decision Applicable to Motion to Augment the Administrative Record, pp. 2-3.) Sunset followed this with what it termed a "Supplemental Reply" in support of its motion to augment, filed days before the hearing on the motion. (August 7, 2020 Sunset Supplemental Reply in Support of Motion to Augment.)

T|L|G   Thomas Law Group

The Court sustained the City's objections to the supplemental reply, which Sunset had not obtained leave of the Court to file, as well as to the notice of new appellate decision, finding it irrelevant. (August 18, 2020 Order Re Motion to Augment the Administrative Record, p. 3:20-25, fn. 1.) As to the files with which Sunset sought to augment the AR, the Court found that emails and attachments Sunset obtained through a California Public Records Act (PRA) request should not be included "for the same reasons articulated in [the Court's] ruling on [Sunset]'s motion to establish the scope of the administrative record" – resolved 8 months prior. (*Id.*, p. 6:13-14.) It also rejected Sunset's attempt to include an email from before the Selma hotel's application had been submitted. (*Id.*, pp. 7:13-8:6.) The Court did say that one group of documents Sunset sought could be included – documents cited in administrative comments which provided URLs – and directed Sunset to assist in locating them. (*Id.*, p. 5:12-13.)

The City certified a supplemental AR with those additional documents and merits briefing commenced. (August 28, 2020 Notice of Certification.) But before the scheduled merits hearing on January 6, 2021, Sunset made one final attempt to derail the case, filing a 179-page *ex parte* application to continue the imminent trial date "because facts have come to light that the [AR] may be deficient" based on a PRA request Sunset's attorneys had filed in another matter. (December 16, 2020 Sunset Ex Parte Application, p. 2:2-8.) The Court denied Sunset's request in full. (December 17, 2020 Minute Order.)

The merits hearing was finally conducted on January 6, 2021, as discussed further below. Sunset filed a post-judgment motion objecting to the order of interlocutory remand. (February 1, 2021 Sunset Objection to Interlocutory Writ and Order of Remand.) The case was resolved at the trial court level in early February 2021 (February 8, 2021 City Notice of Entry of Interlocutory Writ and Order of Remand), more than 22 months after it had been filed.

While some of the delay can be attributed to the pandemic, there can be no doubt that 22 months is a long time in which to resolve a CEQA case at the trial level. At this point, Relevant was 4 years, six months from the initial filing of their project application with the City in July 2016, and still had to face an appeal process.

**Merits**

Generally, ill-intentioned CEQA actions lack merit or are argued without regard to the merits. This does not mean that every argument raised necessarily lacks merit – however, when multiple arguments are raised that are not supported by any evidence in the record, a conclusion may be drawn that the suit is pursued without regard to its merits. (See *Sierra Club v. West Side Irrigation Dist.* (2005) 128 Cal.App.4th 690, 703 [A party's "failure to raise any facts to suggest [environmental] impacts exposes a possible intent to use CEQA simply to create delay."].)

T|L|G   Thomas Law Group

***Thompson Case* – The Sunset Landmark Investment, LLC v. City of Los Angeles (No. BS160807)**

*Noise*

In arguing that the Thompson Project could have significant noise impacts resulting from its operation (e.g., from the restaurant, hotel patrons, etc.) Sunset relied on the Acentech noise study, discussed above, that had been prepared during the administrative process. However, after that study was prepared the project was significantly modified by Relevant. Sunset offered no updated study or other evidence that evaluated the Project's noise with the changes. The MND's analysis was supported by a noise study prepared by Pomeroy Environmental Services evaluating the project as modified. Because Sunset offered no evidence evaluating the modified Project's noise, and instead simply opined that the Pomeroy analysis was wrong, they had no substantial evidence to support their position.

Sunset also argued that construction noise would be significant. In doing so, they did not dispute the quantitative analysis of the MND, but rather claimed that the City should have used a different metric to evaluate its significance based on a non-binding CEQA guide. This same argument was also rejected in the Selma litigation. In a related case where an MND's analysis provided no substantial evidence supporting the selected threshold, discussed further below, the Court issued an interlocutory remand for the City to clarify the record. An agency has significant discretion to adopt significance thresholds, and the City was not required to use the non-binding guide cited by Sunset. (See CEQA Guidelines, § 15064(b)(1) ["An ironclad definition of significant effect is not always possible because the significance of an activity may vary with the setting"]; *King & Gardiner Farms, LLC v. County of Kern* (2020) 45 Cal.App.5th 814, 884 ["it is the responsibility of lead agencies to choose the thresholds of significance to be applied to a project's noise impacts"].)

Thus, Sunset provided no facts, let alone substantial evidence, or defensible legal arguments supporting their noise arguments.

*Traffic*

Sunset's argument that the Project could cause significant traffic impacts was premised on two emails from the California Department of Transportation (Caltrans) to the City about the MND. The first email stated that Caltrans had not received the traffic study supporting the MND and requested to review it. The City provided the traffic study to Caltrans the following day. (Thompson AR, 35157.) Caltrans sent a follow up email the following day observing that freeway ramp intersections were not evaluated and stating that they would send more feedback "later today or tomorrow" – but the record showed no further comment. On this basis, Sunset argued that the impact had not been adequately evaluated. However, they did not address the substance of the traffic study or hire a consultant to independently evaluate the Project's traffic impacts. Nothing in Caltrans' email indicates a significant impact, nor does the email itself fall within the definition of "substantial evidence" as it includes no analysis. Rather, the email simply

poses a question to the City. Caltrans' silence is telling and it can be assumed that their silence meant they had no further comment. Indeed, "[t]his lack of comment, like Sherlock Holmes's 'dog in the night-time' which tellingly failed to bark (2 Doyle, *Silver Blaze*, in The Annotated Sherlock Holmes (Baring-Gould ed. 1967) pp. 277, 280), was in itself evidence." (*Gentry v. City of Murrieta* (1995) 36 Cal.App.4th 1359, 1380.) It is implausible to believe that a hotel project of this size (approximately 200 hotel rooms) would have substantial impacts on the freeway onramps for Highway 101, which as discussed in the MND would be less than 52 vehicles during peak hours where the freeway was experiencing peak volumes of 12,800 vehicles per hour. (Thompson MND, pp. 4-125, 4-143 ["This amount of traffic is below the threshold needed for further evaluation of freeway segments"].) As such, Sunset identified no substantive defects in the traffic analysis or evidence indicating such defects.

Sunset also argued that the City failed to adequately consult with Caltrans on the basis of a statutory obligation to do so for "a project of statewide, regional, or areawide significance." (Pub. Resources Code, § 21092.4(a).) The term is defined to include, among other things, "a proposed hotel/motel development of **more than 500 rooms**." (CEQA Guidelines, § 15206(b)(2)(D) [emphasis added].) The Thompson hotel proposed only **200 rooms**. Sunset's only response (they did not cite or address the definition in opening briefing) was that the list was not exclusive. They did not make any affirmative argument for why the Project fit within the definition. Thus, they failed to make any reasonable argument for why the project required such consultation. Further, as the emails evidenced, the City did consult with Caltrans, providing them with relevant documents and inviting their comment. Though Sunset made much of the initially omitted appendix, they offered no explanation for why this was a cognizable CEQA issue. Sunset's attorneys raised a similar argument in another case, *El Mercado De L.A. v. City of L. A.* (Super. Ct. L. A. County, 2019, No. 173115), which was rejected by the Court ("Petitioners show no prejudice from the City's failure to attach the appendices").

As such, both of Sunset's traffic arguments lacked merit on their face.

*Land Use*

Sunset made a number of related arguments with respect to land use impacts, based on their theory that the Project's proposed density was inconsistent with the City's land use plans. Among the entitlements approved for the Project was one that removed the "D" designation from the site's zoning. This was required for the project to be constructed at its proposed density. Sunset did not dispute that the Project was consistent with the zoning as amended, but rather argued that the City was barred from removing the density limitation and that it was a permanent designation. They offered no legitimate argument to support this assertion, instead simply reciting the history and motivation for its imposition in the 1980s under a rezoning program undertaken at that time. The City's authority to control zoning is a fundamental power of municipal governments in California and one city council cannot bind the next city council, a concept that is understood by any seasoned land use practitioner Sunset offered no reason why that power was constrained as suggested here. (See *Neighbors in Support of Appropriate Land Use v. County of Tuolumne* (2007) 157 Cal.App.4th 997, 1009 ["Cities and counties

unquestionably have the power to rezone and their decisions to do so are entitled to great deference"].) That the site had been rezoned in 1988 did not prevent it from being rezoned again at a later date.

Sunset also argued that the Project was inconsistent with various land use plans but offered no evidence of this, and essentially ignored the City's extensive findings of consistency in their briefing. Findings are the roadmap of agency decision-making and are generally one of the first documents reviewed by the Court to assess whether an agency has properly determined consistency. (*Harrington v. City of Davis* (2017) 16 Cal.App.5th 420, 443.) Instead, Sunset largely relied on the Project's inconsistency with the "D" designation – which was removed from the site's zoning by operation of the entitlements requested and no longer applicable.

Sunset argued that the "D" designation could not be removed because it was CEQA mitigation adopted for the 1988 Hollywood Community Plan (HCP). Sunset's attorneys copied this argument in another case. In *AIDS Healthcare Found. V. City of L.A.* (Super. Ct. L.A. County, 2018, No. BS161771) (*AIDS Healthcare Foundation*) the Silverstein Law Firm argued, as they did here, that the "D" designation was a CEQA mitigation measure adopted for the HCP. The Court expressly rejected this:

> "The HCP does not identify the [Q] Condition or D Limitation as *CEQA* mitigation measures. Nor does it identify the environmental effects that those restrictions purport to mitigate. On the other hand, the Municipal Code is clear that [Q] Conditions and D Limitations are zoning classifications. As such, these matters are within the scope of the City's police powers to remove or make changes to them. (See *Lockard v. City of Los Angeles* (1949) 33 Cal.2d 453, 460, 202 P.2d 38 ['It is well settled that a municipality may divide land into districts and prescribe regulations governing the uses permitted therein, and that zoning ordinances, when reasonable in object and not arbitrary in' operation, constitute a justifiable exercise of police power.'].)"

(*AIDS Healthcare Foundation*, *supra*, p. 26.)

This holding was affirmed on appeal. (*Aids Healthcare Found. v. City of Los Angeles* (Aug. 29, 2019, No. B292816) [2019 Cal. App. Unpub. LEXIS 5799 at *28-30] ["We independently conclude that the D limitation and [Q] qualification on the Sunset parcel and Selma parcel, respectively, were not initially adopted as CEQA mitigation measures."].)

Sunset also argued in various ways that the Project was inconsistent with past land use plans and documents (e.g., a map from the time of adoption of two plans in the mid-1980's). They offered no reason why those documents were binding on the Project or relevant to the Court's review.

Sunset also argued that the density exceeded what is permitted in the C4 zone. As the City explained, sites designated as "Regional Commercial" in the C4 zone may be developed at densities permitted in the R5 zone. (See Los Angeles Zoning Code Manual and Commentary, Fourth Edition, p. 223, at < https://www.ladbs.org/docs/default-source/publications/information-

bulletins/zoning-code/zoning-code-manual-and-commentary.pdf?sfvrsn=101beb53_27>.) Sunset also did not raise this particular issue at the administrative level, failing to exhaust their administrative remedies. Instead, Sunset asked the Court to consider arguments made by another commenter to have notified the City as to the issue, but also argued that those comments should be construed liberally and not technically because the commenter was not an attorney.

Lastly, Sunset argued that a variance was required because one had originally been requested for the proposed rooftop restaurant. The developer had initially sought a variance because the original design of the restaurant would have allowed rooftop outdoor eating/drinking areas. The zoning code required a variance for the restaurant if it was not "wholly within an enclosed building." Ultimately the Project was modified so that the restaurant included a roof and walls enclosing it, thus eliminating the need for a variance. Sunset's only response was an argument that a wall could open for ventilation, which in its view rendered the restaurant an outdoor eating area. Sunset provided no textual or other support for this interpretation or argument that the City's interpretation – that a building with four walls and a roof is "enclosed" – was unreasonable. (*Residents Ad Hoc Stadium Com. v. Board of Trustees* (1979) 89 Cal.App.3d 274, 291 [it may be assumed that a project will be constructed as approved].) As with their noise arguments, Sunset erroneously argued that features of the original design, even though subsequently modified, created a basis for concluding that the modified Project would have impacts.

In sum, the City approved entitlements necessary for the project to be developed as proposed, amending the site's zoning to ensure project consistency with the zoning code as required by law. This is entirely routine. Sunset's numerous arguments were mistaken and meritless attempts to fabricate inconsistencies. Further, a city's interpretation of its own zoning ordinance "is entitled to great weight unless it is clearly erroneous or unauthorized." (*Anderson First Coalition v. City of Anderson* (2005) 130 Cal.App.4th 1173, 1193.) Sunset made no effort to establish that the City's interpretations of its zoning code were either erroneous or unauthorized.

*Findings*

Sunset's final argument was that the CRA/LA, an independent agency associated with the City who issued project approvals, failed to make adequate findings about transit proximity and authority to remove the "D" designation. With respect to the "D" designation, Sunset provided no legal authority that required any finding to be made. By the time CRA/LA considered its approval, the "D" designation had already been removed. As to transit, the CRA/LA made extensive findings, as did City staff. Sunset's argument was premised on CRA/LA having only found the Project to be a "reasonable distance" from a transportation facility and not that it was within "reasonable proximity" to it. The argument is patently absurd and ignores the hard facts – that the site was one half mile from a major transit station, regardless of the terminology.

Again, Sunset provided no facts, let alone substantial evidence, or defensible legal arguments supporting their findings arguments.

T|L|G   Thomas Law Group

***Tommie Case*** **– The Sunset Landmark Investment, LLC v. City of Los Angeles (No.
BS160807)**

The case Sunset filed over the Tommie Hotel settled before any briefing was filed. As discussed
above, the petition filed in the case provided no information about legal or factual CEQA
theories Sunset intended to advance and instead simply stated, as to the City:

> "The record contains substantial evidence to support a fair argument that the Project may
> cause significant, unmitigable impacts to the environment, including but not limited to
> land use, transportation, traffic operational, circulation, emergency response times,
> parking, pedestrian safety, noise, air quality and health risks, greenhouse gases, historic
> resources, shade/shadow, public services, cumulative impacts and growth inducing
> impacts, and further, that the City also illegally piecemealed and/or allowed Real Party to
> piecemeal the whole of the Project, in violation of CEQA."

 (Tommie Petition, ¶ 83.)

Such a vague allegation could include any CEQA argument—meritorious or not.

I understand the Tommie Project was subject to a second CEQA lawsuit in *Lauren Farmer v.
City of Los Angeles* (Case No. BS169855) (Farmer case). Petitioners in the Farmer case raised
arguments related to noise, consistency with land use plans, GHG emissions, traffic impacts, and
air quality. The trial court issued an interlocutory remand as to one issue, for the City to "clarify
its analysis and findings regarding the Project's potential construction and operational noise
impacts." It found that the Tommie MND failed to explain why the City did not use the non-
binding CEQA Guide suggested noise threshold. The remand order also enjoined project
construction; however, after balancing the equities and relative hardships, the trial court shortly
thereafter lifted the injunction for construction activities to the extent they complied with noise
monitoring protocols established in the order. The Farmer case then settled before the Court
ruled on the merits of any clarification.

The Farmer trial court decision indicates that the MND was legally adequate, with one potential
minor technical issue that could be remedied by interlocutory remand. No substantive changes
were required, only administrative clarification and no writ was ever issued. Further, the
injunctive relief originally included in the remand order was modified such that construction
activities were allowed to continue, indicating that no significant impacts were anticipated if
project construction were to proceed. This is another strong indication that the Court believed the
MND would be adequate as revised. As case law says, requiring a severe remedy for "a minor
CEQA sin or two" is unwarranted. (*Dusek v. Redevelopment Agency* (1985) 173 Cal.App.3d
1029, 1044 ["in the spirit of CEQA we will not participate in the waste of more valuable
resources; here, time, paper and energy"].) As such, whatever Sunset would have argued in their
litigation over the Tommie Project, it is likely their only remedy would have been to delay the
Project further.

T|L|G   Thomas Law Group

*Selma Case* – **The Sunset Landmark Investment, LLC v. City of Los Angeles (No.
19STCP01027) and Related Case – Casey Maddren v. City of Los Angeles (No.
19STCP00988)**

*Air Quality/TACs*

An environmental consulting firm, Soil/Water/Air Protection Enterprise (SWAPE), filed a
comment at the administrative level arguing that the City should have prepared a health risk
assessment to evaluate the impact of toxic air pollutants (TACs) that might be generated by
construction equipment. (January 11, 2021 Ruling on Submitted Matter (Selma Ruling), p. 6.) In
support of that argument, SWAPE prepared a technical study of those risks. (*Ibid*.) Sunset cited
to SWAPE's technical study as substantial evidence of a fair argument the project may have air
quality impacts. (*Ibid*.; Sunset Opening Brief, pp. 11:20-12:18.) While essentially every
development project has some level of emissions from construction equipment including trucks,
the Court found SWAPE's study provided the necessary substantial evidence of a fair argument
to meet the low threshold fair argument standard of review. (Selma Ruling, p. 7.) But the Court
issued only an interlocutory remand for the City to clarify the issue rather than issuing a writ
ordering revocation of approvals or ordering further environmental review. (Selma Ruling, p. 53
["[I]t appears that that City could remedy these deficiencies. Accordingly, the court will remand
for further proceedings and for the City to make specific findings to clarify the Project's baseline
and resolve the issue of the impact on air quality."].)

Thus, in repeating SWAPE's argument and relying on SWAPE's technical study, Sunset only
succeeded in delaying the project on a minor, technical point. The City was granted additional
opportunity to further develop the record to support their conclusion. That one of the various
arguments Sunset copied from other administrative commenters had potential merit shows only
that even a broken clock is right twice a day. (*Int'l Longshore & Warehouse Union v. ICTSI Or.,
Inc.* (9th Cir. 2017) 863 F.3d 1178, 1187; See also May 18, 2020 Order Granting in Part
Defendants' Motions to Dismiss and Denying Motion for Sanctions, p. 7:16-17.)

*GHGs*

Sunset argued that the City misapplied three factors to be considered in a CEQA document's
GHG analysis. (Selma Ruling, p. 14.) As to the first factor, whether the project would increase
GHG emissions compared to existing conditions, the MND quantitatively analyzed this. Sunset
provided nothing additional. (*Id*., pp. 14-15.) Though emissions would increase, as the MND
disclosed, the Court found that this alone did not support a finding of significance without
additional context. (*Id*., p. 15.) Sunset made no attempt to provide any such context or evidence
supporting its position. (See Sunset Opening Brief, p. 13:9-21.)

With respect to the second factor, Sunset argued that the City should have used a South Coast
Air Quality Management District threshold of significance because the City had routinely
applied it. (Selma Ruling, p. 15.) But again, they did not provide sufficient evidence to support

this assertion, nor even explain why a threshold's use for different projects would have been relevant. (*Ibid.)*

As to the third factor, consistency with GHG-reduction plans, the Court surveyed the MND's extensive discussion of this consistency. (Selma Ruling, pp. 16-19.) Though Sunset argued that the MND failed to discuss SB 32, which set a statewide GHG reduction target, the MND's evaluation of consistency with the preceding executive order (EO B-30-15) setting that same target was sufficient to address the target. (*Id*., pp. 17-19.)

Thus, Sunset failed to raise any meritorious argument with respect to any of the GHG impact factors.

*Noise*

As to noise impacts to sensitive receptors, Sunset repeated similar arguments to the one raised in the Thompson litigation regarding the non-binding CEQA guide. (Sunset Opening Brief, p. 16:28-31.) As discussed above, the Court rejected these arguments because a city has discretion to apply thresholds that are appropriate to a particular project and the non-binding CEQA guide Sunset preferred was not binding. (Selma Ruling, p. 25 ["The Guide is non-binding and offers only recommendations"]; See also CEQA Guidelines, § 15064.7(b) [As an alternative to relying on published thresholds, "[l]ead agencies may also use thresholds on a case-by-case basis as provided in Section 15064(b)(2)"].) Sunset argued that the City should have identified all sensitive receptors within 500 feet of the project site as part of that analysis in addition to evaluating the noise impacts. (Sunset Opening Brief, pp. 16:33-17:10.) But Sunset provided no evidence showing that this "would serve any meaningful function" according to the Court. (Selma Ruling, p. 23.) Nor did they provide any evidence for their bald assertion that the City had "cherry-picked" the locations at which it had tested noise impacts. (*Ibid*.) Instead of undertaking their own noise analysis, "Sunset's contention rest[ed] on speculation as to what the Project's noise impacts might be with respect to [other] facilities." (*Id*., p. 24.) Sunset also relied on public comments about other Relevant-developed hotels in place of substantial evidence. (*Ibid*.) As the Court noted, there was no factual foundation in the record for these complaints and dire predictions are not substantial evidence. (*Ibid*.) Sunset's arguments about operational noise also relied on "public skepticism" and failed for the same reasons. (Sunset Opening Brief, p. 18:20; Selma Ruling, p. 25.) Though Sunset cited to a comment submitted by an acoustical consulting firm, the comment merely expressed a vague opinion without specificity or analysis and, according to the Court, did not "rise to the dignity of substantial evidence." (Selma Ruling, p. 25.)

Thus, though they raised multiple arguments to challenge the noise analysis, these again ignored the substance of the MND's analysis and attempted to invent defects unsupported by any substantial evidence.

*Transportation*

CEQA mandates that formulation of the details of mitigation measures cannot be deferred unless
the agency commits to the measure, establishes performance standards the mitigation will
achieve, and identifies potential actions it could include. (CEQA Guidelines, § 15126.4(a)(1).)
Here, the MND required a Transportation Demand Management Plan as mitigation for traffic
impacts that met these three criteria. (Selma Ruling, p. 27.) Sunset argued that the measure was
improper but made no plausible argument why this measure was defective in their opening brief.
(*Ibid*.; Sunset Opening Brief, p. 19:1-13.) They raised "a bevy of new arguments" in reply, but
the Court stated that it "would not countenance Sunset's blatant sandbagging which, in this case,
entails raising a point in its moving papers and addressing the real substance of the point and the
City's likely counterresponses in reply." (Selma Ruling, p. 27.)

The Court also found none of the new arguments raised in the reply to have merit. (Selma
Ruling, pp. 27-29.) With respect to one of them, an argument that CEQA Guidelines section
15126.4, subdivision (a)(1)(B) establishing standards for mitigation deferral was inapplicable to
MNDs, the Court noted that the argument contradicted Sunset's own arguments. (*Id*., pp. 27-28.)
The Court found that Sunset had itself relied on section 15126.4 and had offered "no legal basis"
for their argument that the mitigation was deficient except for citing to that provision. (*Id*., p.
28.) And again, Sunset relied solely on non-expert public comment which, as the Court found,
does not constitute substantial evidence on technical matters. (*Id*., p. 29 [finding again that the
"opinion does not rise to the dignity of substantial evidence"].)

*Parking*

Sunset argued that various information about parking had been erroneously omitted from the
MND. However, as the Court stated, "Sunset fail[ed] to explain in its opening brief why any of
this information [was] 'required.' Sunset also fail[ed] to develop these points in any reasonable
manner." (Selma Ruling, p. 30.) It also failed to exhaust its administrative remedies. (*Id*., pp. 30-
32.)

Lastly, though not addressed by the Court, under SB 743 parking impacts are not cognizable as
significant impacts under CEQA for infill projects such as the Selma Hotel. (Pub. Resources
Code, § 21099(d)(1).) Thus, even if Sunset had adequately exhausted and briefed on these points,
it could not have prevailed.

*Public Services*

Briefing filed by Maddren, who had filed a related suit also resolved in the Selma Ruling, argued
that the MND inadequately evaluated crime rates. (Selma Ruling, p. 34.) As the Court explained,
"black-letter law" holds that crime itself is not a CEQA impact. (*Id*., p. 36.) Thus, Maddren's
arguments related to crime and social impacts were not cognizable under CEQA. Further,
Maddren's argument had a "major flaw" in that it was erroneously based on the standard
applicable to EIRs, not MNDs. (*Id*., p. 34.) In contrast to an EIR, an initial study, on which an

MND is based, "is neither intended nor required to include the level of detail included in an EIR." (CEQA Guidelines, § 15063(a)(3).) Thus, Maddren's reliance on EIR case law was misplaced. Here, the MND complied with the applicable standards and no argument was raised that it did not. (*Id*., p. 35 [The MND "complies with these basic information requirements"].) Maddren also contended that the identified mitigation would be ineffective but offered no substantial evidence to support this contention. (*Ibid*.)

*Internal Piecemealing*

During the approval process for the Selma Project, a community member commented that the project raised potential piecemealing issues. (Selma AR 13362, 26224 [City staff emails discussing possible piecemealing].) CEQA requires environmental review to evaluate the whole of an action. A project cannot be split into multiple, smaller projects for such review. Here, the City had previously approved the Tao restaurant on the site. The restaurant was issued building permits in 2015, though it required a conditional use permit (CUP) for alcohol sales. (Selma Ruling, p. 40.) An MND was prepared for approval of the CUP, but construction of the restaurant itself proceeded in the meantime, including the issuance of a building permit for 3 levels of subterranean parking. (*Ibid*.) In response to the comments on Selma, the City prepared a new MND which incorporated a second baseline for analysis – before the CUP approval. (*Id*., p. 44.) Thus, the analysis using this second baseline would evaluate not only the impacts of the hotel alone but also the impacts associated with the Tao project.

Sunset repeated the arguments that these prior approvals were, along with the Selma hotel, part of one large project for the site. (Sunset Opening Brief, p. 20:26-35.) In briefing, the City and Relevant argued that each project had independent utility. (Opposition Brief, p. 19:14-22.) However, it noted that the dual baseline cured any potential piecemealing defect. (*Id*., p. 20:13-14.) Sunset responded that the dual baseline was improper and confusing. Not so. The trial court upheld the use of a dual baseline, finding Sunset's argument to be "without merit." The Supreme Court has expressly stated that the use of multiple baselines does not violate CEQA. The Court issued an interlocutory remand for the City to correct a technical defect in the dual baseline analysis – it needed to include the development of the subterranean parking, which had been ministerially approved prior to the Tao MND, and the analysis did not make clear that it had.

*External Baseline*

Lastly, Sunset argued that the City had piecemealed environmental review by evaluating it separate from the "Hollywood Hotel District" to which it purportedly belonged. (Selma Ruling, p. 46.) In support of this argument, Sunset provided "no explanation" as to how the established piecemealing test was satisfied. (*Id*. at p. 48.) The only evidence they offered purporting to show the various hotels were related such as to require unified environmental review was marketing brochures, found by the Court to have "limited evidentiary value." (*Ibid*.) Thus, again, neither Sunset nor Maddren provided any substantial evidence supporting their claims.

T|L|G   Thomas Law Group

*CUP Validity*

Maddren also argued that a CUP issued to Relevant for alcohol sales was invalid, arguing that the area was oversaturated with establishments selling liquor. (Selma Ruling, p. 51.) The Court found that "Maddren does not even attempt to prove" that there was substantial evidence undermining the City's findings though. (*Id.*, p. 52.) It also upheld the adequacy of the City's findings, concluding that "Maddren's challenge to the CUP is without merit." (*Id.*, p. 53.)

*Appeal*

Recognizing the Court had rejected its arguments, Sunset attempted to appeal the trial court's interlocutory remand. An interlocutory remand is not appealable by definition, but Sunset pursued one nonetheless in an attempt to prevent expeditious correction of the issues Petitioner had complained of, and instead subject the City and developer to a lengthy appeal.

The Court of Appeal found that the order Sunset attempted to appeal from, "on its face is not a final appealable order. The principles applicable to that determination have been stated many times." (Order Dismissing Appeal, p. 4.) Further, it rejected each of the three cases Sunset relied on as not supporting their argument. (See, e.g., *Id.*, p. 7 ["Contrary to Sunset's contention, *Charter High School* is not 'directly on point,' or on point at all"].)

**Settlements**

Like all civil litigation, settlement is common in CEQA cases. In a typical CEQA case, the petitioner has filed suit with environmental motivations. As such, if settlement is reached, it will be on terms reflecting those environmental aims. Typical CEQA settlement agreements include provisions for:

- Mitigation
- Further environmental review
- Funding for environmental offsets
- Project changes to address environmental concerns

Settlements may also compensate a petitioner for attorney's fees incurred up to that point. These common provisions track remedies a petitioner could reasonably secure under CEQA. (Pub. Resources Code, § 21168.9.)

***Relevant/Sunset Settlement Agreements***

The Relevant and Sunset settlement agreements related to the Thompson and Tommie cases bear little resemblance to a typical CEQA settlement agreement. Both state expressly that the intent of the respective suits was "to address, *inter alia*, a diminution in value to the Sunset Property." There is no mention of any concern regarding the projects' impacts on the environment – only how the projects would impact Sunset. Economic impacts such as diminution in property values

T|L|G   Thomas Law Group

are not environmental impacts under CEQA. (See CEQA Guidelines, § 15064(e) ["Economic… changes resulting from a project shall not be treated as significant effects on the environment."].)

*Cash Payment*

The most striking feature of the agreements, to put it mildly, is the payment term, requiring a $5.5 million payment to Sunset.

Monetary payment can be a part of a CEQA settlement, most frequently to compensate a petitioner for attorney fees, although the agreements here expressly state that each party is to bear its own attorney fees, so this does not explain any portion of the payment. A petitioner may ask for money for specific environmental purposes (mitigation, monitoring, additional analysis, purchase of conservation property for species protection), but there is no requirement of a similar nature here. Cash payments that are not for an environmental or other identified purpose are highly unusual in CEQA settlements since they could not be secured through the suit itself. (*Hecton v. People ex rel. Dept. of Transportation* (1976) 58 Cal.App.3d 653, 656 [Damages are not available in CEQA suits].) While cash payments are unusual, a $5.5 million cash payment is unprecedented. Even a modest cash payment would raise immediate red flags – a payment of this staggering amount is purely extortionate. (See Coon, *Standing Against Environmental Injustice: Some Thoughts on Facing the Need for CEQA Litigation Reform* <https://www.ceqadevelopments.com/2017/07/18/2699/> [Illustrating abusive and unlawful CEQA petitioner tactics with story about a petitioner demanding "a six-figure sum approaching half a million dollars" – less than 10% of this settlement].)

*Covenant running with the land in favor of Sunset*

In addition, both settlement agreements required covenants favoring Sunset. There is no effort to couch these in environmental terms – they relate to issues solely for Sunset's benefit. For instance, Sunset was to be provided a "hotline" phone number with which they could "call in the event noise level issues need to be addressed on an immediate basis." They also address aesthetic features of the projects, particularly in the Thompson agreement, which are not environmental impacts in this context under CEQA. (Pub. Resources Code, § 21099(d)(1); see also *Bowman v. City of Berkeley* (2004) 122 Cal.App.4th 572, 592 "But we do not believe that our Legislature in enacting CEQA, any more than Congress in enacting NEPA, intended to require an EIR where the sole environmental impact is the aesthetic merit of a building in a highly developed area.")

The agreements also contained multiple features controlling the aesthetic appearance and operations of Relevant hotels for the personal benefit of Sunset. These included terms restricting Relevant hotel staffing, hours of operation, signage, and other non-environmental factors. While noise can be an impact under CEQA, the noise-related concessions were to benefit Sunset and its adjacent property. Any superficial relation of these demands to legitimate CEQA impact categories is controverted by the fact that Sunset demanded these features to benefit Sunset personally. Further, Sunset's petitions did not ask for relief in the form of any of these concessions. Nor could they have received such relief. These personally enriching modifications

are beyond the remedies available in CEQA litigation. (See Pub. Resources Code, § 21168.9; see also *Bowman v. City of Berkeley* (2004) 122 Cal.App.4th 572, 586 ["obstruction of a few private views in a project's immediate vicinity is not generally regarded as a significant environmental impact"]; *Mira Mar Mobile Community v. City of Oceanside* (2004) 119 Cal.App.4th 477, 492-494.)

*Non-Opposition Clause*

Both agreements also have a clause stating that Relevant would not oppose any development of Sunset's in the future, and that Relevant affirmatively "take reasonable actions requested by Sunset to assist and support Sunset with the City of Los Angeles on any future development proposal for the Sunset Property." Such a clause benefits only Sunset with no value to the public or to the environment.

The demand that Relevant give up the right to challenge a Sunset Project, particularly before knowing the nature of such future projects, is highly unusual. It also runs contrary to CEQA's purposes. If Sunset undertakes a project with potential environmental impacts and inadequate CEQA review, then obviously that should be challengeable on the basis of environmental impacts to a neighboring property owner.

*Omitted Terms*

Finally, we note that Sunset did not demand any terms to address their purported environmental concerns. Sunset's briefing in Thompson complained of construction noise, traffic impacts at freeway ramps, various alleged land use inconsistencies, and purported defects in CEQA findings. Likewise, Nourmand personally expressed similar concerns as motivation for the suit, and also expressed concern over the adequacy of utilities infrastructure and emergency and police services. (Nourmand Deposition, p. 80:12-14.) Yet in settling these cases Sunset did not demand any mitigation for these alleged impacts.

**Sunset Reflexive Arguments**

As discussed above, throughout their conduct at the administrative and judicial levels Sunset raised a number of arguments over and over again without regard to the facts of the case in front of them. The following are examples of these reflexive copy/paste arguments. Their repetitions are too numerous to list, and only a sampling of each cited below.

**"D" zoning designation cannot be removed**

As discussed above, Sunset repeatedly raised the meritless argument that the respective parcels could not be rezoned to remove a "D" zoning designation. The petitions articulate no cognizable legal theory why the City could not rezone in this manner. Nor, as discussed below, did Sunset's briefing articulate any plausible theory. On the contrary, it is clear that the City, through its

Planning Commission and City Council, had the authority to redesignate the zoning for the applicable parcels. Further, as discussed above, the *AIDS Healthcare Foundation* case rejected this very argument, yet Sunset persisted in asserting it. Sunset's copy/paste of this argument for its Selma comment letters was particularly egregious because *Selma did not propose to remove its "D" designation*. Nonetheless, Sunset continued to press this argument without regard to the facts of the case. Examples include:

<u>Thompson</u>
November 3, 2015 Appeal from CPC
January 11, 2016 Comment Letter to PLUM
First Amended Petition, ¶¶ 156-167
Opening Brief, pp. 13:13-16:17, 18:8-20:3, 23:23-25:3
<u>Tommie</u>
January 25[5], 2017 Comment Letter to CPC, pp. 6-13
January 26, 2017 Comment Letter to CPC, pp. 1-2
February 15, 2017 Appeal to PLUM, p. 2
April 25, 2017 Comment Letter to PLUM, pp. 11-18
May 2, 2017 Comment Letter to CC, pp. 2-3
Petition, ¶¶ 106-123
<u>Selma</u>
March 23, 2018 Comment Letter to Hearing Officer, pp. 3-5
June 12, 2018 Comment Letter to CPC, pp. 2-4

***Room Density***

As discussed above Sunset repeatedly argued that this municipal code provision prevented the hotels from being developed at the densities proposed. Though their argument ignored the City's Zoning Manual they nonetheless continued to make it for each project no matter the facts of the case. Examples include:

<u>Thompson</u>
Opening Brief, p. 20:4-23
<u>Tommie</u>
January 25, 2017 Comment Letter to CPC, pp. 4-6
January 26, 2017 Comment Letter to CPC, pp. 2
February 15, 2017 Appeal to Plum, pp. 2-3

---

[5] Unlike most of its comment letters, in a March 1, 2017 letter to Planning Department staff Sunset simply attached its January 25, 2017 comment letter rather than copy/pasting its contents into a letter with a new date, as was their typical practice.

T|L|G   Thomas Law Group

April 25, 2017 Comment Letter to PLUM, pp. 8-11
Petition, ¶¶ 88-104
<u>Selma</u>
March 23, 2018 Comment Letter to Hearing Officer, p. 3

***Hollywood requires CRA/LA to prepare a global transportation plan for any density increases***

Sunset also repeatedly demanded that the City needed to first adopt a comprehensive transportation plan for Hollywood without any legitimate basis or connection to the actual projects that were before the City. The MNDs had all evaluated transportation impacts, including cumulative transportation impacts, and Sunset articulated no plausible defects. Examples include:

<u>Thompson</u>
Opening Brief, p. 16:10-14
<u>Tommie</u>
Petition, ¶ 118
January 25, 2017 Comment Letter to CPC, pp. 13-14.
January 26, 2017 Comment Letter to CPC, p. 2
April 25, 2017 Comment Letter to PLUM, pp. 18-20
<u>Selma</u>
March 23, 2018 Comment Letter to Hearing Officer, p. 3

***Allegations of various "due process" and fair hearing violations***

Sunset also reflexively argued that almost every action the City took deprived the public of its constitutional and statutory rights to a hearing. These arguments too lacked any foundation. Sunset repeatedly demanded – and often was granted – continuances and delays in administrative proceedings. Each hearing was properly noticed and the public given ample opportunity to comment. And Sunset and its counsel not only availed themselves of these opportunities, they abusively exploited them. The City made appropriate efforts to ensure open public participation. Examples of these reflexive arguments include:

<u>Thompson</u>
Petition, ¶¶ 66-109
Opening Brief, p. 26:17-29:5
<u>Selma</u>
July 12, 2018 Comment Letter to CPC
November 26, 2018 Comment Letter to PLUM
November 27, 2018 Comment Letter to PLUM, pp. 3-6

**T|L|G**  Thomas Law Group

February 25, 2019 Comment Letter to CC
February 26, 2019 Comment Letter to CC, pp. 4-11
March 1, 2019 Comment Letter to CC
March 5, 2019 Comment Letter to CC
May 4, 2017 Comment Letter to CC

***GHG Thresholds***

Lastly, Sunset raised an issue with GHG thresholds in Selma. While they did not raise this in objection to the prior hotels, they appear to have copied it from the briefing in the Farmer case regarding the Tommie hotel.

As the above examples show, Sunset habitually and reflexively raised numerous arguments without regard to their merits and without regard to the facts of the particular cases.

**Comparison of Comments**

To illustrate the extent to which Sunset reflexively raised these arguments, attached to this report as Appendix D, are comment letters submitted by Sunset on the Relevant projects, as well as a comment on the Schrader hotel. The letters are highlighted to show repetitions from comments on prior hotel projects.

The first is a comment Sunset submitted on the Tommie Hotel on January 25, 2017. The highlighted portions show repetitions from Sunset's prior August 11, 2016 comment letter on the Thompson Hotel. The second letter is Sunset's March 23, 2018 comment on the Selma Hotel (which the Silverstein firm called "Tao Hotel"). The highlighted portions show repetitions from Sunset's April 25, 2017 comment letter on the Tommie Hotel. The third letter is a July 13, 2018 comment letter Sunset submitted on the Schrader hotel. The highlighted portions show repetitions from Sunset's March 23, 2018 comment letter on the Selma Hotel. For convenience the letters are reproduced without their attachments.[6]

As these comments show, from one project to the next, Sunset merely copy/pasted its comment letters with little to no change, reflexively raising the same arguments no matter the facts.

## IV.  <u>Conclusion</u>

In sum, Sunset's conduct throughout these three cases shows all the hallmarks of ill intent. They reflexively raised meritless arguments. Their conduct at every stage, in every case, was designed to delay and obstruct. And, as the settlement agreements show, their motive was not

---

[6] With attachments these three Sunset comment letters alone would be well over a thousand pages in length.

T|L|G  Thomas Law Group

environmental protection, nor public benefit, but personal enrichment. Their pattern of conduct permits no other reasonable explanation.


**Statement of Compensation**

Thomas Law Group (TLG) is being compensated at an hourly rate of $900.00 for my time and an hourly rate of $600.00 for the Associates at TLG working under my supervision. TLG's compensation is not contingent upon the opinions I reach, or the outcome of this matter.

**Reservation of Rights**

It is my understanding that additional information may become available in this litigation. Accordingly, I reserve the right to review such additional information and to revise or supplement my opinions based on any such later produced information, if necessary.

Best Regards,

Tina Thomas

Appendix A: Tina Thomas bio and experience

Appendix B: List of documents considered

Appendix C: TLG Study of CEQA case duration in the Second District

Appendix D: Sunset comment comparison

# APPENDIX A

**T|L|G   Thomas Law Group**

| | | |
|---|---|---|
| TINA A. THOMAS | 455 CAPITOL MALL, SUITE 801<br>SACRAMENTO, CA 95814 | ONE KAISER PLAZA, SUITE 875<br>OAKLAND, CA 94612 | NICHOLAS S. AVDIS<br>Of Counsel |

AMY R. HIGUERA
CHRISTOPHER J. BUTCHER
ANDREW M. SKANCHY
Senior Counsel

———

SAMUEL D. BACAL-GRAVES
DUSTIN D. PETERSON

Telephone: (916) 287-9292 Facsimile: (916) 737-5858
www.thomaslaw.com

# Tina A. Thomas

tthomas@thomaslaw.com

## SUMMARY OF QUALIFICATIONS

Tina Thomas is an attorney with over 42 years of experience, specializing in environmental, land use, and natural resource litigation, including compliance with the California Environmental Quality Act, National Environmental Policy Act, Subdivision Map Act, and the California Endangered Species Act.

Much of Tina's practice is focused on infill and mixed-use development throughout California, where she serves as legal counsel for numerous cutting-edge projects that incorporate smart growth principles. Serving as legal counsel for these projects, Tina represents both developers and governmental agencies, helping them navigate the complex environmental review and entitlement processes.

While Tina's role as legal counsel includes helping clients navigate the complex environmental review process and representing them in CEQA litigation lawsuits, much of her work extends beyond the traditional role of attorney, shaping not only land use legislation, but also the way it is practiced and understood. Tina is one of the original authors of the Guide to the California Environmental Quality Act, a text that served as a leading reference on CEQA cited frequently by the courts, and has also participated in drafting CEQA legislation over the past three decades. For example, in 2007/2008, she played an extensive role in the passage of California Senate Bill 375, authored by then-Senator Darrell Steinberg, which encourages smart growth and infill development through regional transportation planning to reduce greenhouse gas emissions.

Tina received a B.A. from Stephens College in 1975 and a Juris Doctor from the University of San Diego in 1979. She has been an attorney in good standing with the State Bar of California since 1979. Prior to forming Thomas Law Group in 2012, Tina was a founding partner at Remy, Thomas, Moose & Manley, LLP (RTTM), and served as managing partner for 23 years. At RTTM, approximately 90% of the firm's work consisted of environmental and/or land use issues with a strong emphasis on the California Environmental Quality Act. The firm's clients were divided among cities, counties, regional and state agencies and developers. The firm also represented non-profit organizations such as Loaves & Fishes and Avondale Glen Elder Neighborhood Association (AGENA).

Tina is a member of the Environmental Law section of the California Lawyers Association, and was named Distinguished Attorney" in 2005 by the Sacramento Bar Association. Tina and/or her firm has been the subject of a number of articles, prizes, and awards, detailed in further detail below.

An extensive list of Tina's qualifications, publications, licensures, and experience follows:

## EDUCATION

Stephens College, B.A., 1975
University of San Diego, Juris Doctor, 1979

## LICENSURE

State Bar of California, Active Member, #88796, 1979-Present

## PUBLICATIONS

Tina Thomas, *Annual Review of CEQA Cases* for the UCLA Extension, 36th Annual Land Use Law & Planning Conference: Updates, Trends & Assessments (2022)

Tina Thomas, *Annual Review of CEQA Cases* for the UCLA Extension, 35th Annual Land Use Law & Planning Conference: Updates, Trends & Assessments (2021)

Tina Thomas, *Annual Review of CEQA Cases* for the UCLA Extension, 34th Annual Land Use Law & Planning Conference: Updates, Trends & Assessments (2020)

Tina Thomas, *Annual Review of CEQA Cases* for the UCLA Extension, 33rd Annual Land Use Law & Planning Conference: Updates, Trends & Assessments (2019)

Tina Thomas, *Annual Review of CEQA Cases* for the UCLA Extension, 32nd Annual Land Use Law & Planning Conference: Updates, Trends & Assessments (2018)

Tina Thomas, *Annual Review of CEQA Cases* for the UCLA Extension, 31st Annual Land Use Law & Planning Conference: Updates, Trends & Assessments (2017)

Tina Thomas, *Annual Review of CEQA Cases* for the UCLA Extension, 30th Annual Land Use Law & Planning Conference: Updates, Trends & Assessments (2016)

Tina Thomas (Ed.), *CEQA Updates Blog: Keeping You Up-To-Date On The California Environmental Quality Act*, https://www.thomaslaw.com/blog/ (2012-ongoing)

Exhibit A
42

# EXPERIENCE

***Thomas Law Group***
Founder, 2012- Present

Represent public and private clients in all phases of land use entitlement and permitting, from the administrative stage through project approvals and litigation. Assist clients in matters relating to environmental, land use, and natural resource litigation, including compliance with the California Environmental Quality Act, National Environmental Policy Act, Subdivision Map Act, California Endangered Species Act, and the Williamson Act.

***Remy, Thomas, Moose and Manley, LLP***
Of Counsel, 2010-2011

***Remy, Thomas, Moose and Manley, LLP***
Managing Partner, 1982-2005

Remy, Thomas and Moose, LLP was founded in 1982.  Approximately 90% of the firm's work consisted of environmental and/or land use issues with a strong emphasis on the California Environmental Quality Act.  The firm's clients were divided among cities, counties, regional and state agencies and developers. The firm also represented non-profit organizations such as Loaves & Fishes and Avondale Glen Elder Neighborhood Association (AGENA).

***Remy and Associates***
Associate Attorney, 1979-1982

# CIVIC ACTIVITIES AND ACCOLADES

**The John Burton Advocate for Youth, Board of Directors (2006-Present).**  The Foundation plays a significant advocacy role for foster youth at both the state and local level.  Additionally, the JBAY provides important resources and support to homeless and foster youth in the State of California.

**Sacramento Food Bank Services, Member Emeritus (1989-Present).**  The Sacramento Food Bank Services provides not only food and shelter, but reading services to Sacramento's underprivileged.  In addition to raising funds for the maintenance and operation of the Food Bank, I handle, on a pro-bono basis, most of their land use and advocacy work for establishment of their housing program and reading center.  Additionally, I worked at the Food Bank for three years distributing food on a weekly basis.

**Meristem, Board Member (2018- Present).**  Meristem serves young adults on the autism spectrum by helping them develop practical life skills, increase social capacity, and transition to employment and independence.

**Steinberg Institute, Board Member (2018 – Present).**  The Steinberg Institute was founded by Sacramento Mayor and former state Senate President Pro Tem Darrell Steinberg, the Institute is an independent nonprofit organization dedicated to advancing sound public policy and inspiring

Exhibit A
43

leadership on issues of brain health.  The Institute has successfully advocated for a number of legislative changes affecting brainhealth.

**Loaves & Fishes**.  I represented Loaves & Fishes, on a pro-bono basis, in a complaint filed by the City of Sacramento against Loaves & Fishes.  The matter, which received national press, was settled in July, 1997.  I continue to represent Loaves & Fishes on a number of planning entitlement issues.

**Drafting Senate Bill 375.**  I worked closely with Senator Steinberg in drafting SB 375 and in advocating for SB 375 with various interest groups for Senator Steinberg in support of the passage of the bill.  Since the bill became law, I have worked with the City of Sacramento, SACOG, and MTC to implement SB 375, including preparing both SACOG's and MTC's sustainable communities strategies and preparation of the EIRs for these plans at a level of detail that allows local agencies to benefit from the CEQA provisions of SB 375.

In addition to the planning and entitlement work I performed for both Loaves & Fishes and the Sacramento Food Bank I have provided extensive pro bono legal work, generally related to planning, for Francis House, WEAVE, Cottage Housing, Union Gospel Mission, Wind Youth Services and Avondale Glen Elder Neighborhood Association.

Additionally, my firm and/or I have been the subject of the following articles, prizes and awards:

> Joshua's House Hospice – Hero for the Homeless – Sacramento – 2021
> High Five Award – First 5 – Sacramento – February 2019
> Lawyer of the Year Award Recipient – Best Lawyers Publication – July 2018
> Northern California Super Lawyer Award – Super Lawyers Magazine – July 2018
> Environment Analysis Document Merit Award – AEP 2018
> Woman of Influence – Sacramento Commercial Real Estate Women 2018
> Outstanding Leadership Award – Avondale-glen Elder Neighborhood Assoc. 2012
> Beacon of Hope Honoree – Cottage Housing, Inc. - 2012
> Powerful & Influential 100 – Sacramento Magazine - 2008
> 50 Most Powerful People – Sacramento Magazine - 2006
> Distinguished Attorney – Sacramento Lawyer, SCBA - November/December 2005
> Downey Allen Justice Award - Sacramento County Bar - April 1999
> Women Who Mean Business - Sacramento Business Journal - September 1998

## PUBLISHED DECISIONS
### (Partial Listing)

*Southwest Regional Council of Carpenters v. City of Los Angeles* (2022) 76 Cal.App.5th 1154

*Center for Biological Diversity v. Department of Fish and Wildlife* (2017) 17 Cal.App.5th 1245

*Mission Bay Alliance v. Office of Community Investment and Infrastructure* (2016) 6 Cal.App.5th 160

*Bay Area Citizens v. Association of Bay Area Governments* (2016) 248 Cal.App.4th 966

Exhibit A
44

*Center for Biological Diversity v. Department of Fish and Wildlife* (2016) 1 Cal.App.5th 452

*East Sacramento Partnership for a Livable City v. City of Sacramento* (2016) 5 Cal.App.5th 281

*Center for Biological Diversity v. Department of Fish and Wildlife* (2015) 62 Cal.4th 204

*North Coast Rivers Alliance v. Marin Municipal Water District Board of Directors* (2013) 216 Cal.App.4th 614

*Pocket Protectors v. City of Sacramento* (2004) 124 Cal.App.4th 903

*Riverwatch v. County of San Diego* (1999) 76 Cal.App.4th 1428

*Chaparral Greens v. City of Chula Vista* (1996) 50 Cal.App.4th 1134

*Western States Petroleum Association v. Superior Court* (1995) 9 Cal.4th 559

*Sacramento County v. Local Agency Formation Commission* (1992) 3 Cal.4th 903

*City of Sacramento v. State Water Resources Control Board* (1992) 2 Cal.App.4th 960

*Oro Fino Gold Mining Corporation v. County of El Dorado* (1990) 225 Cal.App.3d 872

*Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553

*Baily v. County of El Dorado* (1985) 162 Cal.App.3d 94

*Environmental Planning and Information Council v. Superior Court* (1985) 36 Cal.3d 188

*Environmental Council of Sacramento v. County of Sacramento* (1982) 135 Cal.App.3d 428

*Environmental Planning and Information Council v. County of El Dorado* (1982) 131 Cal.App.3d 350

*Perley v. Board of Supervisors* (1982) 137 Cal.App.3d 424

*Rural Landowners Association v. City of Lodi* (1982) 143 Cal.App.3d 1013

*Sutter Sensible Planning, Inc. v. County of Sutter* (1981) 122 Cal.App.3d 813

Exhibit A
45

# APPENDIX B

| DOCUMENTS CONSIDERED |
|---|
| **Court documents** |
| ***THE SUNSET LANDMARK INVESTMENT LLC VS CITY OF LOS ANGELES ET AL*** (Tommie) **Case No. BS169821** |
| 06/09/2017 – VERIFIED PETITION FOR WRIT OF MANDAMUS |
| ***THE SUNSET LANDMARK INVESTMENT LLC VS CITY OF LOS ANGELES ET AL*** (Thompson) **Case No. BS160807** |
| 7/26/2017 – NOTICE OF CONTINUANCE OF TRAIL AND OF HEARING ON RESPONDENTS MOTION TO AUGMENT ADMINSITRATIVE RECORD |
| 07/21/2017 - NOTICE OF LODGING OF BINDERS CONTAINING ALL FILED DOCUMENTS FROM JUNE 16, 2017 THROUGH PRESENT |
| 07/14/2017 - PETITIONER SUNSET LANDMARK INVESTMENT'S SUPPLEMENTAL REPLY TRIAL BRIEF; ETC. - |
| 07/13/2017 - CITY RESPONDENTS' REPLY IN SUPPORT OF MOTION TO AUGMENT THE ADMINISTRATIVE RECORD OF PROCEEDINGS - |
| 07/07/2017 - PETITIONER SUNSET LANDMARK INVESTMENT'S NOTICE OF LODGING OF MAY 19, 2017 TRANSCRIPT OF EX PARTE HEARING ON CHANGED PROJECT ISSUE AND SUPPLEMENTAL BRIEFING - |
| 07/07/2017 - PETITIONER SUNSET LANDMARK INVESTMENT'S OPPOSITION TO CITY'S MOTION TO AUGMENT THE ADMINISTRATIVE RECORD OF PROCEEDINGS; DECLARATION OF ROBERT P. SILVERSTEIN - |
| 06/30/2017 - DECLARATION OF OLIVER NETBURN IN SUPPORT OF RESPONDENTS' AND REAL PARTY IN INTEREST'S JOINT SUPPLEMENTAL OPPOSITION BRIEF |
| 06/16/2017 - PETITIONER SUNSET LANDMARK INVESTMENT'S SUPPLEMENTAL TRIAL BRIEF RE CHANGED PROJECT; DECLARATION OF DANIEL E. WRIGHT - |
| 06/02/2017 - CITY RESPONDENTS' NOTICE OF MOTION AND MOTION TO AUGMENT THE ADMINISTRATIVE RECORD OF PROCEEDINGS; MEMORANDUM TN SUPPORT THEREOF - |
| 05/19/2017 – COURT ORDER APPOINTING COURT APPROVED RESPORTER AS OFFICIAL REPORTER PRO TEMPORE |
| 05/18/2017 - PETITIONER'S SUNSET LANDMARK INVESTMENT'S CHRONOLOGY RE: INADEQUATE DISCLOSURE OF SIGNIFICANTLY MODIFIED PROJECT - |
| 05/15/2017 - PETITIONER'S SUNSET LANDMARK INVESTMENT, LLC'S NOTICE OF LODGING OF: 1) TRIAL NOTEBOOK 2) COMPLETE ADMINISTRATIVE RECORD ON FLASH DRIVE (AR000001 - AR048177; CRA/LA AR 00001 - 01398); ETC. - |
| 5/12/ 2017 -PETITIONER'S SUPPLEMENTAL REQUEST FOR JUDICIAL NOTICE |
| 5/12/2017 – PETITIONERS SUNSET LANDMARK INVESTMENTS REPLY BRIEF IN SUPPORT OF PETITION FOR WRIT OF MANDATE |
| 5/9/2017 - EX PARTE APPLICATION FOR ORDER ALLOWING SUPPLEMENTAL BRIEFING AND FOR SHORT CONTINUANCE OF TRIAL DATE; ETC. 1-41 |
| 4/24/2017 – RESPONDENTS AND REAL PARTY IN INTERESTS JOINT OPPOSITION BRIEF FO THE PEITION FOR WRIT OF MANDATE |
| 3/28/2017- NOTICE OF ENTRY OF ORDER DENYING PETITIONERS MOTION TO COMPEL |

| |
|---|
| 3/28/2017 – PETITIONERS SUNSET LANDMARK'S MEMORANDUM OF PPOINTS AND AUTHORITIES IN SUPPORT OF PETITION FOR WRIT OF MANDATE |
| 3/21/2017 - ORDER DENYING PEITIONERS MOTION TO COMPEL |
| 3/20/2017- PEITIONERS OBJECTION TO CITYS PROPOSED ORDER ON MOTION TO COMPEL |
| 3/2/2017 - LETTER TO THE JUDGE |
| 3/2/2017 -NOTICE OF RULING GRANTING CITY RESPONDENTS' MOTION FOR JUDGMENT ON THE PLEADINGS AS TO THE 6TH AND 7TH CAUSES OF ACTION IN THE SECOND AMENDED PETITION FOR WRIT OF MANDAMUS |
| 2/21/2017 - Minute Order |
| 2/21/2017 -REQUEST FOR ENTRY OF DEFAULT - |
| 2/17/2017 - PETITIONER'S STATUS REPORT FOR FEBRUARY 21, 2017 HEARINGS ON MOTION TO COMPEL ETC. |
| RESPONDENTS REPLY BRIEF IN SUPPORT OF MOTION FOR JUDGEMENT ON THE PLEADINGS AS TO PETITIONERS SIXTH AND SEVENTH CAUSES OF ACTION IN THE SECOND AMENDED PETITION |
| 2/14/2017 - PETITIONER'S OPPOSITION TO CITY'S MOTION FOR JUDGMENT ON THE PLEADINGS AS TO PETITIONER'S SIXTH AND SEVENTH CAUSES OF ACTION IN THE SECOND AMENDED PETITION; ETC. |
| 2/6/2017 - CITY RESPONDENTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR JUDGMENT ON THE PLEADINGS AS TO PETITIONER'S SIXTH AND SEVENTH CAUSES OF ACTION IN THE SECOND AMENDED PETITION 1-21 |
| 2/6/2017 - DECLARATION OF ANDREA K. LEISY IN SUPPORT OF CITY RESPONDENTS' REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION FOR JUDGMENT ON THE PLEADINGS AS TO THE SIXTH AND SEVENTH CAUSES OF ACTION |
| 2/6/2017 - PROOF OF SERVICE FOR CITY RESPONDENTS' MOTION FOR JUDGMENT ON THE PLEADINGS AND SUPPORTING DOCUMENTS 1-4 |
| 2/3/2017 - Minute Order - |
| 1/25/2017 - REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PETITIONER'S MOTION ETC. 1-24 |
| 1/24/2017 - RESPONDENTS CRA/LA AND THE CRA/LA GOVERNING BOARD'S NOTICE OF CERTIFICATION AND CERTIFICATION OF ADMINISTRATIVE RECORD OF PROCEEDINGS |
| 1/20/2017 - SECOND AMENDED VERIFIED PETITION FOR WRIT OF MANDAMUS AND COMPLAINT FOR DECLARATORY RELIEF |
| 1/18/2017 - DECLARATION OF BONNIE THORNE IN SUPPORT OF CITY RESPONDENTS' OPPOSITION TO PETITIONER'S MOTION TO COMPEL |
| 12/29/2016 - RESPONDENT CITY OF LOS ANGELES' EX PARTE APPLICATION FOR AN ORDER CONTINUING HEARING DATE AND BRIEFING ON PETITIONER'S MOTION TO COMPEL; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF ANDREA K. LEISY |
| 12/29/2016 - ORDER GRANTING RESPONDENT CITY OF LOS ANGELES' EX PARTE APPLICATION AND CONTINUING THE HEARING DATE AND BRIEFING ON PETITIONER'S MOTION TO COMPEL 1-5 |

12/29/2016 - PETITIONER'S OPPOSITION TO CITY'S EX PARTE APPLICATION FOR ORDER GRANTING THE CITY AN EXTENSION TO FILE ITS OPPOSITION TO PETITIONER'S MOTION TO COMPEL AND CONTINUANCE OF HEARING ON THE MOTION; DECLARATION OF DANIEL E. WRIGHT

12/15/2016 - NOTICE OF MOTION AND MOTION TO: 1) COMPEL THE CITY'S PRODUCTION OF DOCUMENTS FOR INCLUSION IN THE ADMINISTRATIVE RECORD; 1-195

12/12/2016 - RESPONDENTS' REPLY BRIEF IN SUPPORT OF MOTION FOR JUDGMENT ON THE PLEADINGS AS TO PETITIONER'S SIXTH CAUSE OF ACTION 1-13

12/9/2016 - RESPONDENTS' REPLY BRIEF IN SUPPORT OF MOTION FOR JUDGMENT ON THE PLEADINGS AS TO PETITIONER'S SIXTH CAUSE OF ACTION 1-11

12/9/2016 – DECLARATION OF ANDREA LEISY IN SUPPORT OF RESPONDENTS SUPPLEMENTA REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION FOR JUDGEMENT ON THE PLEADINGS

12/5/2016 -PETITIONER'S OPPOSITION TO CITY OF LOS ANGELES' MOTION FOR JUDGMENT ON THE PLEADINGS; DECLARATIONS OF GEORGE ABRAIIAMS AND STEPHAN SAEED NOURMAND 1-28

11/18/2016 - RESPONDENTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR JUDGMENT ON THE PLEADINGS AS TO PETITIONER'S SIXTH CAUSE OF ACTION

11/18/2016 - RESPONDENTS' NOTICE OF MOTION AND MOTION FOR JUDGMENT ON THE PLEADINGS AS TO PETITIONER'S SIXTH CAUSE OF ACTION 1

6/3/2016 - FIRST AMENDED VERIFIED PETITION FOR WRIT OF MANDAMUS AND COMPLAINT FOR DECLARATORY RELIEF

3/03/2016 – VERIFIED PETITION FOR WRIT OF MANDAMUS AND COMPLAINT FOR DECLARATORY RELIEF

### *THE SUNSET LANDMARK INVESTMENT LLC VS CITY OF LOS ANGELES ET AL* (Selma) Case No. B312217

6/10/2021 - Appellate Order Dismissing Appeal - APPELLATE ORDER DISMISSING APPEAL ;B312217, NA03/26/21;

2/1/2021 - Objection - OBJECTION [PETITIONER THE SUNSET LANDMARK INVESTMENT'S] TO THE CITY'S [PROPOSED] INTERLOCUTORY WRIT AND ORDER OF REMAND

1/11/2021 – RULING ON SUBMITTED MATTER, SUPERIOR COURT OF CA, CIVIL DIVISION

12/17/2020 - Notice - NOTICE RESPONDENTS' NOTICE OF ENTRY OF ORDER DENYING PETITIONER'S EX PARTE APPLICATION FOR AN ORDER CONTINUING OR VACATING THE TRIAL DATE

12/16/2020 - Opposition - OPPOSITION TO PETITIONER'S EX PARTE APPLICATION

12/16/2020 - Ex Parte Application - EX PARTE APPLICATION PETITIONER THE SUNSET LANDMARK INVESTMENT, LLC'S EX PARTE APPLICATION FOR AN ORDER CONTINUING OR VACATING THE TRIAL DATE; WRIGHT DECLARATION (INCLUDDING RE EX PARTE NOTICE)

| |
|---|
| 12/16/2020 - Declaration - DECLARATION OF PHELAN IN SUPPORT OF RESPONDENTS' OPPOSITION TO PETITIONER'S EX PARTE APPLICATION |
| 11/6/2020 - Reply - REPLY PETITIONER THE SUNSET LANDMARK INVESTMENT'S REPLY TRIAL BRIEF IN SUPPORT OF PETITION FOR WRIT OF MANDAMUS [RESPONSE TO CITY'S OPPOSITION] |
| 11/6/2020 - Reply - REPLY PETITIONER THE SUNSET LANDMARK INVESTMENT'S REPLY IN SUPPORT OF ITS REQUEST FOR JUDICIAL NOTICE |
| 11/5/2020 - Notice of Lodging - NOTICE OF LODGING OF THE ADMINISTRATIVE RECORD OF PROCEEDINGS AND THE SUPPLEMENTAL ADMINISTRATIVE RECORD OF PROCEEDINGS |
| 10/23/2020 - Notice of Lodging - NOTICE OF LODGING NOTICE OF LODGING OF RESPONDENTS' OPPOSITION BRIEF TO CASEY MADDREN'S OPENING BRIEF |
| 10/16/2020 - Declaration - DECLARATION DECLARATION OF KATHRYN RAMIREZ IN SUPPORT OF RESPONDENTS' OBJECTION TO PETITIONER'S OPENING BRIEF FOR NONCOMPLIANCE WITH CALIFORNIA RULES OF COURT RULE 2.108(1) |
| 10/16/2020 - Notice of Joinder - NOTICE OF JOINDER (NAME EXTENSION) RESPONDENTS' JOINDER IN REAL PARTY IN INTEREST'S OPPOSITION TO THE SUNSET LANDMARK INVESTMENT, LLC'S OPENING BRIEF |
| 10/16/2020 - Brief - BRIEF REAL PARTY IN INTEREST'S OPPOSITION BRIEF |
| 9/16/2020 - Memorandum of Points & Authorities - MEMORANDUM OF POINTS & AUTHORITIES [OPENING] |
| 8/18/2020 - Minute Order - MINUTE ORDER (RULING ON SUBMITTED MATTER) |
| 8/18/2020 - Order - ORDER FINAL ORDER RE: PETITIONER'S MOTION TO AUGMENT |
| 8/14/2020 - Minute Order - MINUTE ORDER (HEARING ON MOTION TO COMPEL MOTION TO SUPPLEMENT THE ADMINIST...) |
| 8/11/2020 - Objection - OBJECTION TO PETITIONER'S SUPPLEMENTAL REPLY AND SUPPLEMENTAL WRIGHT DECLARATION IN SUPPORT OF PETITIONER'S MOTION TO AUGMENT THE ADMINISTRATIVE RECORD |
| 8/07/2020 - Reply - REPLY PETITIONER THE SUNSET LANDMARK INVESTMENT, LLC'S SUPPLEMENTAL REPLY IN SUPPORT OF ITS MOTION TO AUGMENT THE ADMINISTRATIVE RECORD; SUPPLEMENTAL WRIGHT DECLARATION |
| 8/06/2020 - Objection - OBJECTION RESPONDENTS' OBJECTION TO PETITIONER'S NOTICE OF NEW APPELLATE COURT DECISION APPLICABLE FOR MOTION TO AUGMENT THE ADMINISTRATIVE RECORD |
| 8/18/2020 - Certificate of Mailing for - CERTIFICATE OF MAILING FOR (RULING ON SUBMITTED MATTER) OF 08/18/2020 |
| 8/03/2020 - Notice - NOTICE PETITIONER SUNSET LANDMARK INVESTMENTS, LLC'S NOTICE OF NEW APPELLATE COURT DECISION APPLICABLE TO MOTION TO AUGMENT THE ADMINISTRATIVE RECORD |
| 5/11/2020 - Objection - OBJECTION PETITIONER THE SUNSET LANDMARK INVESTMENT, LLC'S OBJECTION TO RESPONDENT'S & REAL PARTY IN INTEREST'S REQUEST FOR ORDER SETTING BRIEFING SCHEDULE; REQUEST FOR CASE MANAGEMENT CONFERENCE TO RESET TRIAL DATE & SET A BRIEFING SCHEDULE; WRIGHT |

| |
|---|
| 3/26/2020 - Reply - REPLY PETITIONER THE SUNSET LANDMARK INVESTMENT, LLC'S REPLY IN SUPPORT OF MOTION TO AUGMENT ADMINISTRATIVE RECORD; DECLARATIONS OF VERONICA LEBRON AND SIEGLINDE KRUSE; SUPPLEMENTAL DECLARATION OF DANIEL E. WRIGHT |
| 3/24/2020 - Notice - NOTICE OF ATTEMPT TO COMPLY WITH THE COURT'S MARCH 12, 2020 MINUTE ORDER |
| 3/16/2020 - Opposition - OPPOSITION RESPONDENTS' OPPOSITION TO PETITIONER'S MOTION TO AUGMENT THE ADMINISTRATIVE RECORD |
| 3/16/2020 - Declaration - DECLARATION OF MORGAN L. HECTOR IN SUPPORT OF RESPONDENT CITY'S OPPOSITION TO MOTION TO AUGMENT |
| 3/12/2020 - Minute Order - MINUTE ORDER (COURT ORDER) |
| 2/25/2020 - Notice of Lodging - NOTICE OF LODGING PETITIONER THE SUNSET LANDMARK INVESTMENT, LLC'S NOTICE OF LODGING FLASH DRIVE CONTAINING DOCUMENTS WHICH THE CITY FAILED TO INCLUDE IN THE ADMINISTRATIVE RECORD |
| 2/25/2020 - Motion to Augment - MOTION TO AUGMENT PETITIONER THE SUNSET LANDMARK INVESTMENT, LLC'S NOTICE OF MOTION AND MOTION TO AUGMENT THE ADMINISTRATIVE RECORD; DECLARATION OF DANIEL E. WRIGHT |
| 2/24/2020 - Order Appointing Court Approved Reporter as Official Reporter Pro Tempore |
| 2/14/2020 - Order - ORDER RE MOTION TO COMPEL DOCUMENTS WITHHELD UNDER DELIBERATIVE PROCESS CLAIM 1-8 |
| 2/24/2020 - Minute Order - MINUTE ORDER (HEARING ON MOTION TO COMPEL MOTION TO COMPEL DOCUMENTS) |
| 2/24/2020 - Joinder to Motion - JOINDER TO MOTION NOTICE OF JOINDER & JOINDER IN SUPPORT OF PETITIONER SUNSET LANDMARK LLC'S MOTION TO COMPEL DOCUMENTS WITHHELD UNDER DELIBERATIVE PROCESS CLAIM, PRODUCTION OF PRIVILEGE LOG & LODGING OF DOCUMENTS FOR IN-CAMERA REVIEW, |
| 2/14/2020 - Reply - REPLY PETITIONER THE SUNSET LANDMARK INVESTMENT, LLC'S REPLY IN SUPPORT OF MOTION TO COMPEL DOCUMENTS WITHHELD UNDER DELIBERATIVE PROCESS CLAIM 1-17 (17 pages total) |
| 2/7/2020 - Declaration - DECLARATION OF JOHN W. FOX IN SUPPORT OF RESPONDENTS' OPPOSITION TO PETITIONER'S MOTION TO COMPEL |
| 1/29/2020 - Objection - OBJECTION PETITIONER THE SUNSET LANDMARK INVESTMENT, LLC'S OBJECTION TO THE CITY'S USURPATION OF AND CERTIFICATION OF THE ADMINISTRATIVE RECORD AS "COMPLETE" |
| 1/27/2020 - Motion to Compel - MOTION TO COMPEL DOCUMENTS WITHHELD UNDER DELIBERATIVE PROCESS CLAIM AND PRODUCTION OF A PRIVILEGE LOG AND LODGING OF DOCUMENTS FOR IN-CAMERA INSPECTION 1-129 ( |
| 1/24/2020 - Notice - NOTICE OF CERTIFICATION AND CERTIFICATION OF ADMINISTRATIVE RECORD OF PROCEEDINGS |
| 12/3/2019 - Order - ORDER RE MOTION TO DETERMINE THE SCOPE OF THE ADMINISTRATIVE RECORD |
| 12/3/2019 - Certificate of Mailing for - CERTIFICATE OF MAILING FOR (RULING ON SUBMITTED MATTER) OF 12/03/2019 |

| |
|---|
| 12/3/2019 - Minute Order - MINUTE ORDER (RULING ON SUBMITTED MATTER) |
| 11/21/2019 - Reply - REPLY PETITIONER'S REPLY IN SUPPORT OF MOTION RE DETERMINATION OF SCOPE OF THE ADMINISTRATIVE RECORD; SUPPLEMENTAL WRIGHT DECLARATION 1-115 |
| 11/15/2019 - Opposition - OPPOSITION RESPONDENTS' OPPOSITION TO PETITIONER'S MOTION RE: DETERMINATION OF SCOPE OF THE ADMINISTRATIVE RECORD |
| 11/5/2019 - Motion re: - MOTION RE: DETERMINATION OF SCOPE OF THE ADMINISTRATIVE RECORD |
| 11/4/2019 - Amended Complaint - FIRST AMENDED PETITION |
| 5/23/2019 - Opposition - OPPOSITION TO PETITIONER'S NOTICE OF ACTION TO RESPONSIBLE AGENCIES |
| 5/07/2019 - Notice - NOTICE OF ACTION TO RESPONSIBLE AGENCIES |
| 4/03/2019 - Notice - NOTICE OF ELECTION TO PREPARE THE RECORD |
| 04/02/019 – VERIFIED PETITION FOR WRIT OF MANDAMUS |
| ***LAUREN ELLE FARMER ET AL VS CITY OF LOS ANGELES ET AL***  Case No: **BS169855** |
| 1/15/2019 - Notice of Ruling |
| 1/7/2019 - Ex Parte Application - Ex Parte Application TO FURTHER MODIFY INJUNCTION REGARDING PROJECT CONSTRUCTION PENDING INTERLOCUTORY REMAND 1-3 |
| 12/21/2018 - Order - Order Modifying Injunction Regarding Project Construction Pending Interlocutory Remand |
| 12/20/2018 - Opposition - Opposition to Real Parties' Proposed Modified Injunction Pending Interlocutory Remand |
| 12/19/2018 - Order - Interlocutory Order for Remand to City |
| 10/9/2018 - Reply - Reply in Support of Supplemental Briefing |
| 9/28/2018 - Brief - Respondents' and Real Party in Interest's Supplemental Brief |
| 9/28/2018 - Brief - Brief on Remedy and Supplemental Issues |
| 8/27/2018 - Legacy Document - LEGACY DOCUMENT TYPE: Stipulation and Order |
| 6/8/2017 - VERIFIFD PETITION FOR WRIT OF MANDATE |
| ***RELEVANT GROUP ET AL VS. STEPHAN "SAEED" NOURMAND ET AL.  CASE NO. 2:19-CV-05019-ODW-KSx*** |
| 5/18/2020 - ORDER GRANTING IN PART DEFENDANTS' MOTIONS TO DISMISS AND DENYING MOTION FOR SANCTIONS |
| 5/03/2022 - DEFENDANT THE SUNSET LANDMARK INVESTMENT LLC'S SUPPLEMENTAL RESPONSE TO PLAINTIFF 1541 WILCOX HOTEL LLC'S FIRST SET OF INTERROGATORIES; |
| 5/03/2022 - DEFENDANT THE SUNSET LANDMARK INVESTMENT LLC'S SUPPLEMENTAL RESPONSE TO PLAINTIFF 6421 SELMA WILCOX HOTEL LLC'S FIRST SET OF INTERROGATORIES; |
| 5/03/2022 - DEFENDANT THE SUNSET LANDMARK INVESTMENT LLC'S SUPPLEMENTAL RESPONSE TO PLAINTIFF RELEVANT GROUP, LLC'S SECOND SET OF INTERROGATORIES; |

5/03/2022 - DEFENDANT THE SUNSET LANDMARK INVESTMENT LLC'S SUPPLEMENTAL RESPONSE TO PLAINTIFF 6516 TOMMIE HOTEL LLC'S FIRST SET OF INTERROGATORIES;

9/14/2021 - THIRD AMENDED COMPLAINT

## CEQA Literature and Commentary

Hernandez, Friedman, & DeHerrera, *In the Name of the Environment: How litigation abuse under the California Environmental Quality Act Undermines California's Environmental, Social Equity and Economic Priorities – and Proposed Reforms to Protect the Environment from CEQA Litigation Abuse* (2015)

James Brasuell, Leaked Settlement Shows how NIMBYs "Greenmail" Developers, Curbed Los Angeles (January 3, 2013) https://la.curbed.com/2013/1/3/10295162/leaked-settlement-shows-how-nimbys-greenmail-developers-1

Jennifer Hernandez, *In the Name of the Environment, The Sequel, California Environmental Quality Act Lawsuits and California's Housing Crisis* , 24 Hastings Envt'l L.J. 21 (2018)

Michelle Oullette and Ali Tehrani, *The Lord's Work: An Overview of CEQA's Judicial Remedies and Recommendations for Reform* , 25 Hastings W.-N.W. J. Env. L. & Pol'y 85

George Deukmejian, Pete Wilson & Gray Davis, Keep California Green and Golden with CEQA Reforms, SAN DIEGO UNION TRIBUNE (July 12, 2012)

Art Coon, CEQA Standing Reform: Could Statutory Standing Requirements Feasibly Be Tightened to Bar Anti-Competitive Lawsuits Motivated By Economic Rather Than Environmental Concerns?, https://www.ceqadevelopments.com/2012/12/12/ceqa-standing-reform-could-statutory-standing-requirements-feasibly-be-tightened-to-bar-anti-competitive-lawsuits-motivated-by-economic-rather-than-environmental-concerns/

Art Coon, Standing Against Environmental Injustice: Some Thoughts on Facing the Need for CEQA Litigation Reform, https://www.ceqadevelopments.com/2017/07/18/2699/

## Depositions

April 15, 2022 Deposition of Casey Maddren Transcript

April 20, 2021 Deposition of Bruce Rothman Transcript

May 4, 2022 Deposition of Stephen Saeed Nourmand Draft Transcript

August 12, 2016 Sunset Request for Modification of Building Ordinances

## Online Dockets of Second District CEQA Cases

Online court docket of *Save the Plastic Bag Coalition v. City of Manhattan Beach* (2010) 181 Cal.App.4th 521

Online court docket of *Friends of Glendora v. City of Glendora* (2010) 182 Cal.App.4th 573

Online court docket of *Goodrich v. City of L.A.* , (Mar. 10, 2010, No. B216421) 2010 Cal. App. Unpub. LEXIS 1707

Online court docket of *Concerned Residents of Hancock Park v. City of L.A.* , (Sep. 22, 2010, No. B208439) 2010 Cal. App. Unpub. LEXIS 7542

Online court docket of *San Conservancy v. City of Oxnard* (Mar. 17, 2011, No. B220512) 2011 Cal. App. Unpub. LEXIS 1966

Online court docket of *City of S. Pasadena v. L.A. County Metro. Transp. Auth.* (Mar. 22, 2011, No. B221118) 2011 Cal. App. Unpub. LEXIS 2093

Online court docket of *Santa Monica Baykeeper v. City of Malibu* (2011) 193 Cal.App.4th 1538

Online court docket of *Save Our Neighborhood Group v. City of Lancaster* (June 21, 2011, No. B225087) 2011 Cal. App. Unpub. LEXIS 4612

Online court docket of *Santa Clarita Organization for Planning the Environment v. City of Santa Clarita* (2011) 197 Cal.App.4th 1042

Online court docket of *Cal. Cmtys. v. S. Coast Air Quality Mgmt. Dist.* (July 19, 2011, No. B226692) 2011 Cal. App. Unpub. LEXIS 5322

Online court docket of *City of L.A. v. Cal. Dep't of Toxic Substances Control* (July 27, 2011, Nos. B223380, B223396) 2011 Cal. App. Unpub. LEXIS 5571

Online court docket of *City of Oxnard v. Cal. Coastal Comm'n* (Aug. 17, 2011, No. B227835) 2011 Cal. App. Unpub. LEXIS 6209

Online court docket of *Ross v. California Coastal Com.* (2011) 199 Cal.App.4th 900

Online court docket of *NRDC v. Cal. DOT* (Nov. 22, 2011, No. B228048) 2011 Cal. App. Unpub. LEXIS 8987

Online court docket of *Protect Our Vill. v. City of Santa Barbara* (Dec. 1, 2011, No. B226571) 2011 Cal. App. Unpub. LEXIS 9247

Online court docket of *Bedford v. Santa Barbara Cty.* (Feb. 2, 2012, No. B228958) 2012 Cal. App. Unpub. LEXIS 886

Online court docket of *Quartz Hill Cares v. City of Lancaster* (Mar. 15, 2012, No. B227957) 2012 Cal. App. Unpub. LEXIS 2026

Online court docket of *Neighbors for Smart Rail v. Exposition Metro Line Contructions Authority*, 204 Cal.App.4th 1480

Online court docket of *Van De Kamps Coalition v. Board of Trustees of Los Angeles Community College Dist.* (2012) 206 Cal.App.4th 1036

Online court docket of *W.M. Barr & Co., Inc. v. South Coast Air Quality Management Dist.* (2012) 207 Cal.App.4th 406

Online court docket of *City of Maywood v. Los Angeles Unified School Dist.* (2012) 208 Cal.App.4th 362

Online court docket of *Saunders v. City of Los Angeles* (Sep. 25, 2012, No. B232415) 2012 Cal. App. Unpub. LEXIS 6965

Online court docket of *Chung v. City of Monterey Park* (2012) 210 Cal.App.4th 394

Online court docket of *Coastal Defender v. City of Manhattan Beach* (Dec. 6, 2012, No. B239096) 2012 Cal. App. Unpub. LEXIS 8919

Online court docket of *Central Basin Municipal Water Dist. v. Water Replenishment Dist. of Southern California* (2012) 211 Cal.App.4th 943

Online court docket of *Save Cuyama Valley v. County of Santa Barbara* (2013) 213 Cal.App.4th 1059

Online court docket of *City of Duarte v. City of Azusa* (Feb. 19, 2013, No. B235097) 2013 Cal. App. Unpub. LEXIS 1195

Online court docket of *CREED-21 v. City of Glendora* (Feb. 19, 2013, No. B241147) 2013 Cal. App. Unpub. LEXIS 1193

Online court docket of *County of Los Angeles v. City of Los Angeles* (2013) 214 Cal.App.4th 643

Online court docket of *La Neighbors United v. City of L.A.* (Mar. 18, 2013, No. B238769) 2013 Cal. App. Unpub. LEXIS 1939

| |
|---|
| Online court docket of *Venturans for Responsible Growth v. City of San Buenaventura* (June 20, 2013, No. B242008) 2013 Cal. App. Unpub. LEXIS 4331 |
| Online court docket of *Communidad en Accion v. Los Angeles City Council* (2013) 219 Cal.App.4th 1116 |
| Online court docket of *Naples Coalition v. Cty. of Santa Barbara* (Jan. 28, 2014, No. B245728) 2014 Cal. App. Unpub. LEXIS 619 |
| Online court docket of *Highland Park Heritage Trust v. City of Los Angeles* (Feb. 18, 2014, No. B242930) 2014 Cal. App. Unpub. LEXIS 1110 |
| Online court docket of *Scivally v. City Council* (Apr. 7, 2014, No. B242267) 2014 Cal. App. Unpub. LEXIS 2440 |
| Online court docket of *Ventura Foothil Neighbors v. County of Ventura* (2014) 232 Cal.App. 4th 429 |
| Online court docket of *Santa Clarita Org. for Planning v. City of Santa Clarita* (Dec. 18, 2014, No. B250487) 2014 Cal. App. Unpub. LEXIS 8998 |
| **Administrative Documents** |
| **Thompson Hotel** |
| 2021.9.14 *Third Amended Complaint* (Relevant Group, LLC v. Stephan "Saeed" Nourmand et al. Case No.: 2:19-cv-05019-ODW (KSx)) |
| 2015.3 *Thompson AR 61-279*, City Published Mitigated Negative Declaration |
| 2015.3.10 *Thompson AR 42861-42865*, Emails between City Officials and Stephan Nourmand |
| 2015.9.10 *Thompson AR 1240-1278*, Department of City Planning Recommendation Report |
| 2015.4.10 *Thompson AR 4151-4185*, Emails between City Planners and Stephan Nourmand |
| 2015.8.17 *Thompson AR 4215-4442*, 1541 Wilcox Hotel Mitigated Negative Declaration |
| 2015.9.9 *Thompson AR 4527-4528*, Stephan Nourmand Letter to City Planning |
| 2015.11.3 *Thompson AR 4781-4794*, Sunset Appeal of Planning Commission Decision |
| 2016.1.11 *Thompson AR 43031-43038*, Mayor's Staff Emails discussing Stephan Nourmand |
| 2016.1.11 *Thompson AR 23993*, Email from Sunset to City |
| 2016.1.11 *Thompson AR 4927-4944*, Letter from Sunset to City Council |
| 2016.1.12 File No. 15-1320 PLUM hearing applicant extension request https://cityclerk.lacity.org/lacityclerkconnect/index.cfm?fa=ccfi.viewrecord&cfnumber=15-1320 |
| 2016.1.26 *File No. 15-1320 PLUM Appeal Findings* |
| 2016.1.29 *Thompson AR 11539-11541*, Sunset Letter to City Council |
| 2016.2.3 *City Council Motion 9A* |
| 2016.2.4 *Thompson AR 2-3*, Notice of Decision |
| 2016.5.5 *Minutes of the Regular Meeting of the CRA/LA* |
| 2016.1.26 *PLUM Appeal Transcript* |
| 2016.8.11 *RE: Appeal by Sunset Landmark Investment, LLC*, Sunset Letter to Building and Safety |
| 2016.9.2 *Report on Appeal from LADBS Determination to the Director of Planning Pursuant to L.A.M.C. 12.26K* |
| 2016.10.3 *Notification of Los Angeles Department of Building and Safety Determination* |
| 2017.5.31 *Central Planning Area Commission Letter of Determination* |
| **Tommie Hotel** |
| 2016.12.20 *Tommie AR 132-338*, Proposed Mitigate Negative Declaration |
| 2017.1.8 *Tommie AR 2430*, Sunset Letter RE: Request for Notice |

| |
|---|
| 2017.1.25 *Tommie AR 2469-3265* , Sunset Letter to City Planning Commission |
| 2017.1.26 *Tommie AR 3266-3267* , Sunset Letter to City Planning Commission |
| 2017.1.26 *Tommie AR 1239-1268* , Department of City Planning Recommendation Report |
| 2017.3.1 *Tommie AR 1655-1676* , Planning Department Vesting Tentative Tract Map Staff Report |
| 2017.2.1 *Los Angeles City Planning Commission Letter of Determination* |
| 2017.3.15 *Sunset Planning Commission Decision Appeal* |
| 2017.3.1 *Tommie AR 3311-4109* , Sunset Letter to City Planning Department |
| 2017.4.24 *Tommie AR 5119-5134* , Letter to Sunset from Environmental Consultants |
| 2017.4.25 *Tommie AR 4281-5134* , Letter from Sunset to PLUM Committee |
| 2017.4.25 PLUM Sunset Appeal Denial File No. 08-0887-S1, 08-0887-S1 (CFMS) (lacity.org) |
| 2017.5.2 *Tommie AR 5453-5467* , Sunset Letter to City Council |
| 2017.5.4 *Tommie AR 5468-5471* , Sunset Letter to City Clerk |
| 2017.5.10 *Tommie AR 5525-5567* , Sunset Letter to City Council |
| 2017.5.12 *Tommie AR 1-4* , Notice of Determination |
| **Selma Hotel** |
| 2017.12.19 *Selma AR 72-371* , Mitigated Negative Declaration |
| 2016.8.15 *Selma AR 13362-13365,* City Emails |
| 2016.8.30 *Selma AR 26224* , City Emails |
| 2018.3.28 *Selma AR 7690-7713* , Sunset Letter to Planning Commission Hearing Officer |
| 2018.3.26 *Selma AR 8650-8651* , Maddren Letter to Hearing Officer |
| 2018.6.14 *Selma AR 2217-2280* , Planning Department Staff Report |
| 2018.6.10 *Selma AR 8839-8842* , Maddren Letter to Planning Commission |
| 2018.6.12 *Selma AR 8890-8906* , Sunset Letter to Planning Commission |
| 2018.6.14 *Department of City Planning Recommendation Report* |
| 2018.7.2 *Selma AR 8970-8976* , Sunset Letter to Planning Commission |
| 2018.7.12 *Selma AR 9036-9037* , Sunset Letter to Planning Commission |
| 2018.7.12 *Selma AR 2741-2782* , Department of City Planning Recommendation Report |
| 2018.8.30 *Southwest Regional Council of Carpenters Appeal Application for CPC-2016-2601-VZC-HD-CUB-ZAA-SPR* |
| 2018.8.31 *Selma AR 9379-9441* , Maddren Appeal Application of Planning Commission Decision |
| 2018.9.5 *Unite Here Local 11 Appeal Application for CPC-2016-2601-VZC-HD-CUB-ZAA-SPR* |
| 2018.9.6 *Sunset Appeal Application of Planning Commission Decision for CPC-2016-2601-VZC-HD-CUB-ZAA-SPR* |
| 2018.10.24 *Selma AR 21090* , Maddren Email Requesting Postponement |
| 2018.11.1 Sunset Letter to Submit Letters to Council File No.18-0873, 18-0873 (CFMS) (lacity.org) |
| 2018.11.21 *City Letter to File* |
| 2018.11.26 *Selma AR 6520-6521* , Maddren Letter to PLUM |
| 2018.11.26 *Selma Wilcox Response to Appeals* |
| 2018.11.26 *Selma AR 10983-10984* , Sunset Letter to PLUM |
| 2018.11.27 *PLUM Appeal Denial File No. 18-0873* |
| 2018.11.27 *Selma AR 4668-4692* , PLUM Appeal Transcript |
| 2018.11.27 *Selma AR 11066-11533* , Sunset Letter to PLUM |
| 2019.1.14 *Selma AR 7272-7579* , Maddren 1222 Letter |
| 2019.2.22 *Selma AR 11884-11886* , City Letter to File |

| | |
|---|---|
| 2019.2.24 *Selma AR 11936-11938* , Maddren Letter to City Council | |
| 2019.2.25 *Selma AR 11939-11941* , Sunset Letter to City Council | |
| 2019.2.26 *Selma AR 11942-11967* , Sunset Letter to City Council | |
| 2019.3.1 *Selma AR 11989-11992* , Sunset Letter to City Council | |
| 2019.3.5 *Selma AR 12012-12018* , Sunset Letter to City Council | |
| 2019.3.6 *Selma AR 2-11* , Notice of Determination | |
| 2019.3.22 *Selma AR 12021-12024* , Maddren Letter to City Clerk | |
| **Schrader Hotel** | |
| 2018.7.13 *Comment Letter* | |
| 2018.8.13 *Administrative Appeal Application* | |
| 2019.2.7 *Planning Appeal Response for Shrader to City Council File No. 18-1235* | |
| **Settlement Agreements** | |
| 2018.1.8 Thompson Settlement Agreement | |
| 2018.1.8 Tommie Settlement Agreement | |

# APPENDIX C

# T|L|G  Thomas Law Group

TINA A. THOMAS

AMY R. HIGUERA
CHRISTOPHER J. BUTCHER
ANDREW M. SKANCHY
Senior Counsel

SAMUEL D. BACAL-GRAVES
DUSTIN D. PETERSON

455 CAPITOL MALL, SUITE 801
SACRAMENTO, CA 95814

ONE KAISER PLAZA, SUITE 875
OAKLAND, CA 94612

NICHOLAS S. AVDIS
Of Counsel

Telephone: (916) 287-9292 Facsimile: (916) 737-5858
www.thomaslaw.com

## CEQA Case Duration Table Methodology

To evaluate typical CEQA case duration in California's Second Appellate District, the following table reflects a survey of 33 CEQA cases that reached a decision in the Second District during the 4-year period between January 1, 2010 and December 31, 2014. This window of time was chosen to exclude cases that may have been extended due to the COVID-19 pandemic, and therefore might be unrepresentative of a typical CEQA case.

The table reflects all of the cases during the 4-year period for which data is available from the trial court. San Luis Obispo County Superior Court does not have adequate online court records. Thus, only cases from the remaining counties in the Second Appellate District – Los Angeles, Ventura, and Santa Barbara – are included. Further, the following types of cases were omitted from the data for being unrepresentative of how long a CEQA case, when filed, can be expected to last if pursued on appeal:

- Cases already fully litigated that went to the Court of Appeal solely over an issue with compliance with a ruling;
- Cases that were otherwise a result of a previous remand from the appellate court;
- Cases that did not go through the entire CEQA litigation process for procedural reasons or went dormant at the trial court level for some period of time; and
- Cases that were on appeal of an order for preliminary injunction.

Case duration through appeal in the survey is measured from when a CEQA petition is filed in the trial court until a final action is issued for the immediate subsequent appeal. The final action on appeal is typically the date when the Court of Appeal issues the remittitur. The clerk of the Court of Appeal must issue a remittitur immediately after the Supreme Court denies review, or the period for granting review expires, or the court dismisses review, unless the California Supreme Court grants review of the appeal. (See California Rules of Court, Rule 8.272(b).) For cases in which the Supreme Court granted review, and thus in which no remittitur was issued immediately following the Court of Appeal proceedings, duration is measured to when the Supreme Court granted review.

As used in the table below:

**T|L|G**  Thomas Law Group

- "Total Case Duration" refers to the duration between when a petition was filed and a remittitur was issued by the Court of Appeal, as discussed above.
- "Trial Court Case Duration" refers to the duration between when a petition was filed and the date that the appeal was filed.
- "Time at Court of Appeal Before Hearing" refers to the duration between when an appeal is filed and when the first appellate hearing on the appeal occurred.

| 2nd District CEQA Case Length Table | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Superior Court Case # | Appellate Court Case # | Case Caption | Date Petition Filed | Date Appeal Filed | Date of First Appellate Hearing | Date of Final Action on Appeal | Total Trial Court Case Duration (in Calendar Days) | Total Time at Court of Appeal Before Hearing (in Calendar Days) | Total Case Duration (in Calendar Days) |
| BS116362 LA Superior Ct. | B215788 Court of Appeal, 2nd Dist. Div. 5 (depub.) 181 Cal.App.4th 521 | Save the Plastic Bag Coalition v. City of Manhattan Beach (2010) 181 Cal.App.4th 521 | 8/12/2008 | 4/24/2009 | 12/9/2009 | 4/22/2010 | 255 | 229 | 618 |
| BS113466 LA Superior Ct. | B215114 Court of Appeal, 2nd Dist. Div. 1 (pub.) | Friends of Glendora v. City of Glendora (2010) 182 Cal.App.4th 573 | 2/27/2008 | 3/20/2009 | 1/27/2010 | 5/6/2010 | 387 | 313 | 799 |
| BS106960 LA Superior Ct. | B208439 Court of Appeal, 2nd Dist. Div. 3 (nonpub.) | Concerned Residents of Hancock Park v. City of L.A., 2010 Cal. App. Unpub. LEXIS 7542 (other issues besides CEQA) | 1/19/2007 | 6/5/2008 | 7/8/2009 | 11/22/2010 | 503 | 398 | 1,403 |
| BS113498 LA Sup. Ct. | B216090 Court of Appeal, 2nd Dist. Div. 3 (nonpub.) | L.A. By-Products Co. v. City of L.A., 2011 Cal. App. Unpub. LEXIS 281 | 2/29/2008 | 4/28/2009 | 11/10/2010 | 3/15/2011 | 424 | 561 | 1,110 |
| 56-2009-00338672-CU-WM-VTA Ventura County Sup. Ct. | B220512 Court of Appeal, 2nd Dist. Div. 6 (nonpub.) | San Conservancy v. City of Oxnard, 2011 Cal. App. Unpub. LEXIS 1966 | 3/2/2009 | 11/24/2009 | 12/15/2010 | 5/18/2011 | 267 | 386 | 807 |
| 1305851 Santa Barbara County Sup. Ct. | B221118 Court of Appeal, 2nd Dist. Div. 6 (nonpub.) | City of S. Pasadena v. L.A. County Metro. Transp. Auth., 2011 Cal. App. Unpub. LEXIS 2093 | 8/27/2008 | 12/17/2009 | 2/9/2011 | 5/26/2011 | 477 | 419 | 1,002 |
| BS120033 Los Angeles Sup. Ct. | B222776 Court of Appeal 2nd Dist Div 4 (pub.) | Santa Monica Baykeeper v. City of Malibu (2011) 193 Cal.App.4th 1538 | 4/8/2009 | 3/4/2010 | 3/17/2011 | 6/6/2011 | 330 | 378 | 789 |
| BS121501 Los Angeles Sup. Ct. | B225087 Court of Appeal 2nd Dist. Div. 3 (nonpub.) | Save Our Neighborhood Group v. City of Lancaster, 2011 Cal. App. Unpub. LEXIS 4612 | 7/2/2009 | 6/14/2010 | 5/11/2011 | 8/24/2011 | 347 | 331 | 783 |
| BS118344 Los Angeles Sup. Ct. | B224242 Court of Appeal 2nd Dist Div 2 (pub.) | Santa Clarita Organization for Planning the Environment v. City of Santa Clarita (2011) 197 Cal.App.4th 1042 | 12/22/2008 | 4/30/2010 | 6/27/2011 | 9/26/2011 | 494 | 423 | 1,008 |
| BS111277; BS116431 BS111322 Los Angeles Sup. Ct. | B223380 c/w B223396 Court of Appeal 2nd Dist. Div. 7 (nonpub.) | City of L.A. v. Cal. Dep't of Toxic Substances Control ,2011 Cal. App. Unpub. LEXIS 5571 | 10/1/2007 | 3/25/2010 | 6/29/2011 | 9/26/2011 | 906 | 461 | 1,456 |
| BS122248 Los Angeles Sup. Ct. | B227835 Court of Appeal 2nd Dist. Div. 4 (unpub.) | City of Oxnard v. Cal. Coastal Comm'n, 2011 Cal. App. Unpub. LEXIS 6209 | 8/20/2009 | 10/4/2010 | 8/12/2011 | 10/18/2011 | 410 | 312 | 789 |
| BS118974 Los Angeles Sup. Ct. | B225796 Court of Appeal 3nd Dist Div 5 (pub.) | Ross v. California Coastal Com. (2011) 199 Cal.App.4th 900 | 2/6/2009 | 7/12/2010 | 6/20/2011 | 1/20/2012 | 521 | 343 | 1,078 |
| BS122539 Los Angeles Sup. Ct. | B228048 Court of Appeal 2nd Dist. Div. 7 (nonpub.) | NRDC v. Cal. DOT, 2011 Cal. App. Unpub. LEXIS 8987 | 9/14/2009 | 10/7/2010 | 9/9/2011 | 1/25/2012 | 388 | 337 | 863 |
| 1302894 Santa Barbara Sup. Ct. | B226571 Court of Appeal 2nd Dist. Div. 6 (nonpub.) | Protect our Vill. V. City of Santa Barbara, 2011 Cal. App. Unpub. LEXIS 9247 | 9/22/2008 | 8/11/2010 | 10/27/2011 | 2/16/2012 | 688 | 442 | 1,242 |
| 1313465 Santa Barbara Sup. Ct. | B228958 Court of Appeal 2nd Dist. Div. 6 (nonpub.) | Bedford v. Santa Barbara City., 2012 Cal. App. Unpub. LEXIS 886 | 3/9/2009 | 11/16/2010 | 1/11/2012 | 4/5/2012 | 617 | 421 | 1,123 |
| BS122336 Los Angeles Sup. Ct. | B227957 Court of Appeal 2nd Dist. Div. 3 (nonpub.) | Quartz Hill Cares v. City of Lancaster, 2012 Cal. App. Unpub. LEXIS 2026 | 8/26/2009 | 10/1/2010 | 12/13/2011 | 5/15/2012 | 401 | 438 | 993 |
| BS125233 Los Angeles Sup. Ct. | B232655 Court of Appeal 2nd Dist. Div. 2 | Neighbors for Smart Rail v. Exposition Metro Line Contructions Authority, 204 Cal.App.4th 1480 | 3/5/2010 | 4/25/2011 | 3/23/2012 | 8/8/2012 | 416 | 333 | 887 |
| BS127359 Los Angeles Sup. Ct. | B233892 Court of Appeal 2nd Dist. Div. 1 | W.M. Barr & Co., Inc. v. South Coast Air Quality Management Dist. (2012) 207 Cal.App.4th 406 | 7/15/2010 | 6/15/2011 | 4/18/2012 | 8/28/2012 | 335 | 308 | 775 |
| BS125872 Los Angeles Sup. Ct. | B233739 Court of Appeal 2nd Dist. Div. 7 | City of Maywood v. Los Angeles Unified School Dist. (2012) 208 Cal.App.4th 362 | 4/12/2010 | 6/13/2011 | 6/8/2012 | 12/7/2012 | 427 | 361 | 970 |
| BS115435; BS117832 Los Angeles Sup. Ct. | B232415 Court of Appeal 2nd Dist. Div. 5 (nonpub.) | Saunders v. City of Los Angeles, 2012 Cal. App. Unpub. LEXIS 6965 | 6/20/2008 | 4/12/2011 | 7/27/2012 | 11/28/2012 | 1026 | 472 | 1,622 |
| BS129746 Los Angeles Sup. Ct. | B233859 Court of Appeal 2nd Dist. Div. 3 | Chung v. City of Monterey Park (2012) 210 Cal.App.4th 394 | 12/21/2010 | 5/19/2011 | 7/17/2012 | 12/26/2012 | 149 | 425 | 736 |
| BS132163 Los Angeles Sup. Ct. | B239096 Court of Appeal 2nd Dist. Div. 3 (nonpub.) | Coastal Defender v. City of Manhattan Beach, 2012 Cal. App. Unpub. LEXIS 8919 | 5/27/2011 | 2/8/2012 | 11/13/2012 | 2/6/2013 | 257 | 279 | 621 |

Exhibit A
61

| Superior Court Case # | Appellate Court Case # | Case Caption | Date Petition Filed | Date Appeal Filed | Date of First Appellate Hearing | Date of Final Action on Appeal | Total Trial Court Case Duration (in Calendar Days) | Total Time at Court of Appeal Before Hearing (in Calendar Days) | Total Case Duration (in Calendar Days) |
|---|---|---|---|---|---|---|---|---|---|
| BS129817 Los Angeles Sup. Ct. | B235039 Court of Appeal 2nd Dist. Div. 8 | Central Basin Municipal Water Dist. v. Water Replenishment Dist. of Southern California (2012) 211 Cal.App.4th 943 | 12/29/2010 | 8/8/2011 | 10/30/2012 | 2/14/2013 | 222 | 449 | 778 |
| 1272650 Santa Barbara Sup. Ct. | B233318 Court of Appeal 2nd Dist. Div. 6 | Save Cuyama Valley v. County of Santa Barbara (2013) 213 Cal.App.4th 1059 | 10/31/2008 | 5/26/2011 | 11/14/2012 | 4/12/2013 | 937 | 538 | 1,624 |
| BS127709 Los Angeles Sup. Ct. | B235097 Court of Appeal 2nd Dist. Div. 4 (nonpub.) | City of Duarte v. City of Azusa, 2013 Cal. App. Unpub. LEXIS 1195 | 8/3/2010 | 8/5/2011 | 12/11/2012 | 4/25/2013 | 367 | 494 | 996 |
| BS131065 Los Angeles Sup. Ct. | B241147 Court of Appeal 2nd Dist. Div. 4 (nonpub.) | CREED-21 v. City of Glendora, 2013 Cal. App. Unpub. LEXIS 1193 | 3/21/2011 | 5/10/2012 | 2/14/2013 | 4/25/2013 | 416 | 280 | 766 |
| BS129518 Los Angeles Sup. Ct. | B238769 Court of Appeal 2nd Dist. Div. 4 (nonpub.) | La Neighbors United v. City of L.A., 2013 Cal. App. Unpub. LEXIS 1939 | 12/9/2010 | 1/27/2012 | 1/17/2013 | 5/22/2013 | 414 | 356 | 895 |
| 56-2011-00402390-CU-WM-OXN Ventura Sup. Ct. | B242008 Court of Appeal 2nd Dist. Div. 6 (nonpub.) | Venturans for Responsible Growth v. City of San Buenaventura, 2013 Cal. App. Unpub. LEXIS 4331 | 8/15/2011 | 6/19/2012 | 5/8/2013 | 8/20/2013 | 309 | 323 | 736 |
| BS126853 Los Angeles Sup. Ct. | B240554 Court of Appeal 2nd Dist. Div 8 | Communidad en Accion v. Los Angeles City Council (2013) 219 Cal.App.4th 1116 | 6/10/2010 | 4/12/2012 | 6/27/2013 | 12/31/2013 | 672 | 441 | 1,300 |
| 1304044 Santa Barbara Sup. Ct. | B245728 Court of Appeal 2nd Dist. Div. 6 (nonpub.) | Naples Coalition v. Cty. Of Santa Barbara, 2014 Cal.App. Unpub. LEXIS 619 | 11/20/2008 | 12/13/2012 | 1/15/2014 | 4/8/2014 | 1484 | 398 | 1,965 |
| BS133020 Los Angeles Sup. Ct. | B242930 Court of Appeal 2nd Dist. Div 2 (nonpub.) | Highland Park Heritage Trust v. City of Los Angeles, 2014 Cal. App. Unpub. LEXIS 1110 | 7/26/2011 | 7/20/2012 | 1/30/2014 | 6/3/2014 | 360 | 559 | 1,043 |
| BS133948 Los Angeles Sup. Ct. | B242267 Court of Appeal 2nd Dist. Div. 7 (nonpub.) | Scivally v. City Council, 2014 Cal. App. Unpub. LEXIS 2440 | 10/3/2011 | 6/28/2012 | 2/6/2014 | 6/9/2014 | 269 | 588 | 980 |
| BS132487 Los Angeles Sup. Ct. | B250487 Court of Appeal 2nd Dist. Div. 8 (nonpub.) | Santa Clarita Org. for Planning v. City Santa Clarita, 2014 Cal. App. Unpub. LEXIS 8998 | 6/10/2011 | 7/24/2013 | 9/30/2014 | 2/19/2015 | 775 | 433 | 1,350 |

| | |
|---|---|
| Average Total Case Duration | 1027 days (≈34 months) |
| Longest Total Case Duration | 1965 days (≈65 months) |
| Average Trial Court Case Duration | 492 days (≈16 months) |
| Longest Trial Court Case Duration | 1484 days (≈49 months) |
| Average Time at Court of Appeal Before Hearing | 401 days (≈13 months) |
| Longest Time at Court of Appeal Before Hearing | 588 Days (≈19 months) |

Exhibit A

62

# APPENDIX D

FILE COPY

# THE SILVERSTEIN LAW FIRM

*A Professional Corporation*

215 NORTH MARENGO AVENUE, 3RD FLOOR
PASADENA, CALIFORNIA 91101-1504

PHONE: (626) 449-4200  FAX: (626) 449-4205

DAN@ROBERTSILVERSTEINLAW.COM
WWW.ROBERTSILVERSTEINLAW.COM

RECEIVED
CITY OF LOS ANGELES

JAN 2 6 2017

CITY PLANNING DEPT.
AREA PLANNING COMMISSION

January 25, 2017

**ITEM No. 8 (To Record Only)**

City Planning Commission
Department of City Planning
City of Los Angeles
200 N. Spring Street, Room 532
Los Angeles, CA 90012

> **Re:** Objections to the Site Plan Review, Zone Change, District Change, Conditional Use Permit, Mitigated Negative Declaration and all other entitlements for the Tommie Hotel Project located at 6516-6526 W. Selma Avenue, Los Angeles; CPC-2016-270-VZC-HD-CUB-SPR; ENV-2016-4313-MND

Honorable Commissioners:

## I.  INTRODUCTION.

This firm and the undersigned represent The Sunset Landmark Investments, LLC (hereinafter "Sunset Landmark").  Please keep this office on the list of interested persons to receive timely notice of all hearings and determinations related to the proposed approval of an eight-story mixed-use building at 6516-6526 W. Selma Avenue, commonly known as the Tommie Hotel Project ("Project").  Sunset Landmark adopts and incorporates by reference all Project objections raised by themselves and all others during the environmental review and land use entitlement processes.

## II.  THE CITY PLANNING COMMISSION MUST DENY ALL APPLICATIONS FOR TOMMIE HOTEL BECAUSE THE PROJECT AS PROPOSED IS UNLAWFUL.

Sunset Landmark Investments respectfully submits this letter and accompanying exhibits, demanding that the City Planning Commission deny all above-referenced applications submitted by the owner/applicant for construction of a hotel at 6516-6526 W. Selma Avenue ("Project") for the following reasons:

# ORIGINAL

CPC-2016-270-VZC-HD -- 2741

Exhibit A

64

AR002469

Los Angeles City Planning Commission
January 26, 2016
Page 2 of 18

(1)   The City appears to rely upon a facially invalid Zoning Administrator Interpretation of LAMC 12.22 A18 (**Exhibit 1** [Summary of Zoning Administrator Interpretation dated May 18, 2000]) to claim the authorized number of hotel rooms is 212.  Thus, the Project as proposed is unlawful because it proposes a project more than 104 hotel rooms which is the undisclosed lawful number of permitted rooms.

(2)   The Project as proposed is inconsistent with the permanent "D" Development Limitation of 2:1 Floor Area Ratio ("FAR") imposed on the site as part of the General Plan Consistency Case 86-835-GPC and applicable City ordinances (**Exhibit 2** [Hollywood General Plan Consistency Proceedings]).  Having imposed this 2:1 FAR limit in 1988 to protect the Hollywood community from negative environmental impacts as part of an extensive General Plan Consistency process (**Exhibit 3** [Ordinance 165660]), the City has no authority under Government Code Section 65860(d) to remove the permanent "D" Development Limitation until:

   a.   The City demonstrates that the negative impacts of overdense development on Hollywood's deficient infrastructure have been mitigated to the maximum extent feasible as part of a lawful comprehensive community planning process (and then comprehensively adjust the 1988 General Plan Consistency Program density restrictions in accordance with the comprehensive review); or

   b.   The City reduces density on other land in the Community Plan area on a 1 to 1 basis for each parcel of land it purports to increase density (in order to maintain the density limit imposed in the 1988 Hollywood Community Plan and Hollywood General Plan Consistency Program); or

   c.   The City demonstrates compliance with the required enactment of the Transportation Plan identified in the 1988 Hollywood Community Plan Revision process and the 1986/2003 Hollywood Redevelopment Plan process to provide a substitute mitigation to the density restrictions imposed on this parcel in 1988.

CPC-2016-270-VZC-HD -- 2742

AR002470

Los Angeles City Planning Commission
January 26, 2016
Page 3 of 18

Because the City proposes to erase the FAR density limit without complying with any of these requirements so as to avoid cumulative negative impacts in raising density without protecting the Hollywood community with equally effective mitigation measures, its action is unlawful and cannot be approved.

(3)     The former redevelopment agency, its lawful successor CRA/LA, and the Los Angeles City Council have violated their duties imposed by the Hollywood Redevelopment Plan in failing to adopt the mandatory Transportation Plan that must be in place before the CRA/LA has legal authority to authorize any increase on this property above 2:1 FAR. We have confirmed with CRA/LA that it never completed and the City Council never enacted the Transportation Plan required by the Hollywood Redevelopment Plan before increases in density would be allowed. Because the Hollywood Redevelopment Plan was adopted by City Ordinance Nos. 161202 and 175236, any project approved without the mandatory Transportation Plan violates City Ordinances 161202 and 175236. (**Exhibit 4** [Ordinances Incorporating Hollywood Redevelopment Plan as City Law].) Therefore, this Project as proposed, is unlawful.

## III.     RELEVANT FACTS AND BACKGROUND.

The Project site sits within a portion of the Hollywood Community Plan specifically planned and zoned in the 1980s to comply with the mandate of Government Code Section 65860, subdivision (d) ("AB 283"). AB 283 required the City to make its zoning consistent with its General Plan land use designations.

The land use densities adopted in the 1988 Hollywood Community Plan were less dense than the land use densities allowed in the 1973 Hollywood Community Plan. To make its zoning consistent with the 1988 Hollywood Community Plan, the City Council adopted numerous ordinances, including Ordinance No. 165660, to limit density and height because the area was so distant from high capacity transit. (**Exhibit 3.**) The City Planning Recommendation Report misunderstands or ignores the 2:1 FAR limitation placed on the Project site (via the 1990 Ordinance No. 165660 to restrict these parcels using a "D" Development Limitation), which was specifically imposed to avoid City-acknowledged areawide significant environmental impacts if development was allowed to proceed at the densities under the City's 1946 Zoning ordinance and its 1973 Hollywood Community Plan.

CPC-2016-270-VZC-HD -- 2743

AR002471

Los Angeles City Planning Commission
January 26, 2016
Page 4 of 18

Under the City's Hollywood General Plan Consistency Program, the widespread use of "D" Development Conditions like the one imposed on the Tommie Hotel parcel were determined by the City Council to be necessary to bring the City's 1988 Hollywood Community Plan and zoning into conformity, as mandated by Government Code Section 65860(d) and the settlement agreement in litigation brought to enforce the City's mandatory duty to make its zoning consistent with its General Plan. The City made express findings that the "D" Development limitations were imposed to avoid environmental impacts – thus, the mitigation of impacts was incorporated into the City's zoning rules in order to make the mitigation measure legally enforceable.

## IV. THE LAWFUL NUMBER OF HOTEL ROOMS IS SET BY THE MUNICIPAL CODE AT 200 SQUARE FEET PER LOT AREA WHICH WORKS OUT TO NOT MORE THAN 104 ROOMS.

The number of hotel rooms permitted by the express language of the municipal code is rounded up to no more than 104. The math is simple: Divide the lot size of 20,736 square feet by 200 sf per unit = 103.68. These facts are verifiable.

Nowhere in the environmental review documents or the Planning Recommendation report is there a complete, honest, and open explanation of the staff's "logic" and math showing how it determined that 212 hotel rooms was permissible. The Planning staff's obscuring of the basis telegraphs that even City staff lack confidence in the legality of a May 18, 2000 Zoning Administrator Interpretation of the zoning code. As summarized at page 222 of the LADBS Zoning Manual, the Zoning Administrator claims without any credible basis that a reference in LAMC 12.22-A.18 to R5 land uses are permissible. Closer examination of this "interpretation" reveals that it is a fabrication. The ZAI is unlawful because the Zoning Administrator has undertaken to re-write the Municipal Code, which is a power only held by the City Council.

The plain language of Section 12.22-A,18 does not authorize R5 residential density for a mixed use project in the regional center commercial land use designation. The first portion of LAMC Section 12.22-A,18 provides:

"18. Developments Combining Residential and Commercial Uses. Except where the provisions of Section 12.24.1 of this Code apply, notwithstanding any other provision of this chapter to the contrary, the following uses shall be permitted in the following

CPC-2016-270-VZC-HD -- 2744

Los Angeles City Planning Commission
January 26, 2016
Page 5 of 18

zones subject to the following limitations:  (Amended by Ord. No. 163,679, Eff. 7/18/88.)

(a)   Any use permitted in the R5 Zone on any lot in the CR, C1, C1.5, C2, C4 or C5 Zones provided that such lot is located within the Central City Community Plan Area or within an area designated on an adopted community plan as "Regional Center" or "Regional Commercial".  Any combination of R5 uses and the uses permitted in the underlying commercial zone shall also be permitted on such lot."  (Emphasis added.)

The express language applies only to permitted **uses**, not to permitted residential dwelling unit density expressed in lot area regulation.  It is silent as to residential dwelling unit density.  Thus, the "theory" that LAMC Section 12.22-A,18 "allows" R5 residential dwelling unit **density** is incorrect, and omission of any reference to it by City staff has the effect of misleading the public.

The undisclosed Zoning Administrator Interpretation of LAMC Section 12.22-A,18 is void as contrary to the plain language of the law.  If the City Planner is relying on a May 18, 2000 Zoning Administrator Interpretation of LAMC 12.22-A as the basis to allow a doubling of residential dwelling unit density in the Tommie Hotel, that reliance is unlawful.  The Interpretation reads as follows:

"One question related to density that arises is whether to apply R5 lot area requirements or R3 / R4 lot area requirements as referenced in the lot area requirements of C zones.  In the enforcement of this section, the Zoning Administrator has determined that the lot area requirements of the R5 zone are to be applied to projects subject to this section.  **Although it is not explicitly stated in the section**, the last sentence of the section **implies** applying area requirements of R5 zone, not R3 or R4 zone.  This interpretation has been confirmed by the Office of Zoning Administrator who reviewed the original staff report for the ordinance."  (Emphasis added.)

CPC-2016-270-VZC-HD -- 2745

Los Angeles City Planning Commission
January 26, 2016
Page 6 of 18

While the Zoning Administrator may possess the authority to clarify an ambiguity in a municipal code provision, he or she has no authority to re-write a City ordinance. Only the City Council has that authority.

The City Planning staff appears to have relied upon this improper Zoning Administrator Interpretation as a pretense to double the residential dwelling unit density for the Tommie Hotel than that authorized in the LAMC Sections 12.14 and 12.16. The May 18, 2000 Zoning Administrator Interpretation is void because it violates **the plain language of LAMC Section 12.22**, which only addresses authorized uses on commercially zoned lots when they include a residential component. While the Zoning Administrator may have authority to make reasonable interpretations of language used by the City Council, he or she has no authority to devise "interpretations," untethered to any fair reading of a municipal code provision. If this is not true, then the Zoning Administrator just became a Los Angeles super legislature to re-write City Council laws. Of course, this is not lawful behavior.

For the foregoing reasons, the City has failed to proceed in accordance with law, and cannot approve the Tommie Hotel to allow 212 hotel rooms when only 104 are permissible under the LAMC.

V.    **THE CURRENT ZONING OF THE TOMMIE HOTEL WAS ENACTED UNDER THE COMPREHENSIVE GENERAL PLAN CONSISTENCY PROGRAM AS A DOWNZONING MITIGATION MEASURE AND THEREFORE SUCH MITIGATION MEASURE CANNOT BE MODIFIED BY SIMPLE REPEAL, AS THE CITY HAS DONE.**

Since 1971, the Legislature has required in Government Code Section 65860(a) that all general law cities and counties make their zoning consistent with the adopted general plan. In this way, the Legislature sought to ensure that real planning occurred for the future development of cities and counties, and that the zoning actually implemented it.

Although this law did not apply to charter cities, most of them voluntarily undertook to make their zoning consistent with their general plan – except one. Los Angeles' 1946 zoning code had densities far in excess of the capability of the City's infrastructure to hold it – 10 million people. The City's first community plans concluded after environmental review that the infrastructure could only support between 4 and 5 million residents.

CPC-2016-270-VZC-HD -- 2746

Exhibit A
69

AR002474

Los Angeles City Planning Commission
January 26, 2016
Page 7 of 18

The City Council refused to downzone to make its zoning law consistent with the density its community plans said could realistically be accommodated. Thus, the City Council during the mid- and late-1970s continued to allow developers to construct projects consistent with the 1946 zoning, but grossly inconsistent with the general plans of the City.

A.    **The Legislature In 1979 Mandated That Los Angeles Make Its Zoning Ordinances (Codes) Consistent With Its General Plans.**

Responding to calls for intervention, the State Legislature in Assembly Bill 283 ("AB 283") amended Government Code section 65860 to add subdivision (d) that applied to the City of Los Angeles:

> "(a)    **County or city zoning ordinances shall be consistent with the general plan of the county or city** by January 1, 1974.  A zoning ordinance shall be consistent with a city or county general plan only if: (i) The city or county has officially adopted such a plan, and (ii) The various land uses authorized by the ordinance are compatible with the objectives, policies, general land uses, and programs specified in such a plan.

> * * *

> (d)    **Notwithstanding Section 65803, this section shall apply in a charter city of 2,000,000 or more population to a zoning ordinance adopted prior to January 1, 1979, which zoning ordinance shall be consistent with the general plan of such city by July 1, 1982.**" (Emphasis added)

Subdivision (d) required the City to make all of its zoning ordinances (municipal code provisions) and zoning maps consistent with its adopted general plan no later than 1981, and then after amendment, 1982.  The City instead sued the State of California claiming that the act was unconstitutional.

After the City won in the trial court, the State prevailed in the Court of Appeal and the California Supreme Court denied review.  Thus, the Court of Appeal's decision in

CPC-2016-270-VZC-HD -- 2747

AR002475

Los Angeles City Planning Commission
January 26, 2016
Page 8 of 18

City of Los Angeles v. State of California (1982) 138 Cal.App.3d 526 made the consistency requirement between general plans and zoning ordinances a mandatory duty of the City.

B.   **Center For Law In The Public Interest Sues To Force City To Comply With The State Consistency Requirement Of AB 283 (Government Code § 65860(d)).**

Because the Court of Appeal decision did not order the City to comply with state law, the City continued to drag its feet in commencing proceedings to downzone properties to make all zoning ordinances and maps conform with City general plans. The Center for Law In The Public Interest then initiated litigation seeking a writ of mandate to force the City to comply with the state law. In Federation of Hillside and Canyon Associations et al. v. City of Los Angeles (C 526616), the Superior Court quickly issued a writ ordering the City to make its zoning code consistent within 120 days. For reasons not relevant to the issues in this case, the City ultimately entered into a stipulated judgment with the Federation and other plaintiffs to take longer to complete the project under a court-appointed monitor to oversee the consistency process and report back to the Court – a process which ended up taking more than a decade.

C.   **The Hollywood Community Plan Zoning Map Was Made Consistent With The Hollywood Community Plan In Case Numbers 83-368 and 86-835-GPC And Supported With Recirculation Of The Original Hollywood Community Plan EIR (EIR No. CPC-1070-GP/ZC) and the Hollywood Redevelopment Plan EIR (SCH No. 85052903).**

As the City carried out the AB 283 consistency process under the supervision of a court monitor, it complied with CEQA by recirculating the Hollywood Community Plan EIR in May 1988 and the January 1986 Hollywood Redevelopment Plan EIR in May 1988. The General Plan Consistency Program, as explained under oath by the City's former Planning Director, was necessary to significantly reduce the City's zoning density to conform with its 35 community plans. (**Exhibit 2** [Hollywood General Plan Consistency Proceedings; Declaration of Cal Hamilton].) From spring of 1988 to early 1990, the City carried out the Hollywood General Plan Consistency Program to bring itself in compliance with Government Code Section 65680(d) and the Hillside Federation settlement agreement. (**Exhibit 2.**) The downzoning of the Hollywood Community Plan, in the form of changes to the Community Plan and imposition of permanent "D" Development and "Q" Qualified Conditions, were expressly required as a mitigation measure to avoid infrastructure failures across the Hollywood Community Plan area –

CPC-2016-270-VZC-HD -- 2748

AR002476

Los Angeles City Planning Commission
January 26, 2016
Page 9 of 18

until the CRA and City implemented a Transportation Plan.  (Id.)  Documents of the City and CRA acknowledge that these reductions in density were required **until such time as the Transportation Plan was enacted**.  (Exhibit 2.)

A similar process was carried out for every community plan across the City until 200,000 lots were downzoned to protect the City's residents from serious negative impacts of deficient public services infrastructure to support the overly-intense City zoning map densities dating back to 1946.

The subject properties for the Tommie Hotel (SubArea 90) were expressly down zoned as to FAR to 2:1, as set in Ordinance 165,660.  (**Exhibit 3**.)  In downzoning these lots, the City was made findings relied upon by the public and the monitoring court in the Hillside Federation litigation that it would enforce the mitigation measure of downzoning by incorporating the changes into zoning, including the zoning changes now in place on the Project Site for the Tommie Hotel.  These limits of density remain in place and binding today because, incredibly, 30 years later neither the former CRA, nor its successor agency, nor the City, ever enacted the promised Transportation Plan to provide the required planning framework and infrastructure to enable increases in authorized density.  The record in this case is devoid of any evidence the Transportation Plan was ever enacted, and it fact we have verified with CRA/LA it was never enacted.

Our Court of Appeal, in a case against the City of Los Angeles over its General Plan Framework, made quite clear that when the City adopts mitigation measures to implement a general plan, it has a duty to make sure they are carried out:

"CEQA requires the agency to find, based on substantial evidence, that the mitigation measures are 'required in, or incorporated into, the project' . . . ([Public Resources Code] § 21081; [CEQA Guidelines, § 15901, subd. (b).)  In addition, the agency 'shall provide that measures to mitigate or avoid significant effects on the environment are fully enforceable through permit conditions, agreements, or other measures.' ([Public Resources Code] § 21081.6, subd. (b))(fn.4) and must adopt a monitoring program to ensure that the mitigation measures are implemented.  ([Public Resources Code] § 21081.6, subd. (a)). The purpose of these requirements is to ensure that feasible mitigation measures *will actually*

CPC-2016-270-VZC-HD -- 2749

AR002477

Los Angeles City Planning Commission
January 26, 2016
Page 10 of 18

*be implemented* as a condition of development, and not merely adopted and then neglected or disregarded. (See [Public Resources Code § 21002.1, subd. (b).)(fn. 5)"

[Footnote 4 by the Court]: "A public agency shall provide that measures to mitigate or avoid significant effects on the environment are fully enforceable through permit conditions, agreements, or other measures. Conditions of project approval may be set forth in referenced documents which address required mitigation measures or, in the case of the adoption of a plan, policy, regulation, or other public project, incorporating the mitigation measures into the plan, policy, regulation, or project design." (§ 21081.6, subd. (b).) **In the context of this statute, to incorporate mitigation measures into a project means to amend the project so that the mitigation measures necessarily will be implemented, such as by reducing the scope of the project or requiring that mitigation measures be implemented as a condition of the project.** (See Guidelines, § 15126.4, subd. (a)(1)(A), and former § 15126, subd. (c), both distinguishing mitigation measures proposed by the project proponent from those 'required as conditions of approving the project.')"

[Footnote 5 by the Court]: "'Each public agency shall mitigate or avoid the significant effects on the environment of projects that it carries out or approves whenever it is feasible to do so.' (§ 21002.1, subd. (b).)" <u>Federation of Hillside and Canyon Associations v. City of Los Angeles</u> (2000) 83 Cal.App.4th 1252, 1260-1261 (italic emphasis by the Court, bold and underline emphasis added.)

Based upon this precedent, there can be no serious claim by the City that it does not have a legal duty to assure full implementation of the Hollywood Community Plan General Plan Consistency Program in order to protect the health, safety and

CPC-2016-270-VZC-HD -- 2750

Exhibit A

73

AR002478

Los Angeles City Planning Commission
January 26, 2016
Page 11 of 18

environmental welfare of the community. That includes maintaining the permanent D Limitation until alternative mitigation measures are comprehensively evaluated and imposed to protect the Hollywood community.

**D.** **Because The FAR Restrictions Were Adopted Environmental Mitigation Measures To Avoid Significant Impacts, The City Council May Not Amend Or Delete These Mitigation Measure Enactments Without Full Disclosure And Analysis In An EIR, As Well As A Comprehensive Planning Process That Accounts For The Potential Cumulative Negative Impacts Of Ignoring General Plan Consistency Program Measures.**

This case, like many cases in Hollywood recently, poses the question of whether the City may bring its Hollywood Community Plan and zoning into consistency with the density projections underlying the Plan for a moment in time (1988), and then begin an incremental parcel by parcel removal of the density limits imposed as a mitigation measure to comply with the Community Plan's density limits. The answer is obvious: such modification of community-wide mitigation may not be removed or changed without a new comprehensive general plan and zoning consistency process such as what occurs in association with amendment of an entire community plan. Nor, of course, has any proper or adequate level of disclosure and analysis of this type been provided in the instant MND, further rendering it deficient and in violation of CEQA.

This conclusion is supported by two important limitations on the City Council's authority. First, parcel-based general plan amendments were prohibited as part of the 1969 City Charter amendments to the Planning Department provisions. These critical Charter amendments were enacted by the People to: (1) enforce the comprehensive planning goals of the People in having a meaningful General Plan, and (2) eliminate the very parcel-based rezoning scam that led to the conviction of a City Councilmember for bribery.

Second, the adoption of the City's General Plan Consistency recommendations for Hollywood was a comprehensive set of recommended reductions in permitted FAR, height, and uses intended to enforce the density planned for in the 1988 Hollywood Community Plan. These critical reductions in density, collectively brought Hollywood's zoning density into consistency with its general plan density.

It is still unclear how quickly after the City certified to the Court in the Hillside Federation case that the City's general plan consistency was "complete" that it began to

CPC-2016-270-VZC-HD -- 2751

Los Angeles City Planning Commission
January 26, 2016
Page 12 of 18

quietly allow developers to apply for general plan amendments and zoning changes to change that reduced density zoning without maintaining the protective effect of the density limits until alternative plans, like the Transportation Plan of the CRA, were in place..

Parcel-by-parcel, the City is asserting it has the authority to simply rezone every parcel in the City without regard to whether the present zoning, FAR limits, permanent "D" or "Q" conditions were imposed as a mitigation measure of the City's General Plan Consistency Program. The Palladium Project, the Columbia Square Project, 5901 Sunset Project, the Wilcox Hotel (the same applicant as the Tommie Hotel) and many other projects within a short distance from the Tommie Hotel all include rezoning that purported to lawfully wipe out General Plan Consistency mitigation measures imposed on those lots. Incredible density increases are being authorized, including as proposed in this Project, without disclosure in the MND or the Staff Recommendation Report to the public or analysis of the potential negative cumulative impact on the Hollywood General Plan Consistency Program.

In essence, the City has embarked on a giant expansion of density in Hollywood without even bothering to lawfully complete a Hollywood Community Plan Update that analyzed it and justified changes to the current limitations imposed on many parcels of land in the Hollywood Community Plan area.

In recent years, the City undertook to revise and update the Hollywood Community Plan. Unfortunately, the City Planning Department's environmental review and planning process for that comprehensive planning activity went off the rails. The trial court, the Hon. Allan Goodman, found the City's planning and environmental review process for the Hollywood Community Plan Update ("HCPU") was "fatally flawed". Multiple groups sued the City over the HCPU because it used demonstrably false and inflated population projections to try to justify massive increases in density. Additionally, the City failed to properly conduct environmental analysis related to the HCPU.

Accordingly, neither in the EIR for the now rescinded HCPU, nor in the EIR or MND for individual projects where the City proposes to wipe out protective mitigation measures of the General Plan Consistency Program, including the MND in this case, has the City ever analyzed and accounted for its incremental increases in density without regard to the potential negative impacts on the community. The City has simply presumed it can do it because no one has previously objected to it.

CPC-2016-270-VZC-HD -- 2752

AR002480

Los Angeles City Planning Commission
January 26, 2016
Page 13 of 18

Appellant here, and the community represented by this appeal, strenuously object.
The City could only remove General Plan Consistency Program mitigation down zoning
as part of the next comprehensive update of its Hollywood Community Plan, and only if
it does so in full compliance with CEQA.  That clearly has not yet happened.  In the
alternative, assuming that a parcel-based general plan amendment is lawful, which it is
not, then any rezoning that upzones parcel(s) in the Hollywood Community Plan area
could only be lawful if the City Council downzones other parcel(s) to maintain the
cumulative protective balance of the General Plan Consistency Program.  With each
unmitigated parcel-by-parcel removal of a General Plan Consistency Program mitigation
zoning provision, the City has engaged in an extremely serious and unaccounted for
densification of the Hollywood Community Plan area that is inconsistent with the density
for which it is currently planned.

**VI.   THE FORMER REDEVELOPMENT AGENCY'S FAILURE TO PREPARE
A TRANSPORTATION PLAN MEANS THAT NO INCREASES IN
DEVELOPMENT DENSITY CAN BE GRANTED UNDER THE "D"
DEVELOPMENT LIMITATION.**

Even if the "D" Development Limitation remained in place on the Tommie Hotel
property, its density could not be properly increased because the former redevelopment
agency and the Los Angeles City Council have failed for 30 years to prepare a
transportation plan.  As written in plain language and as explained in a letter from CRA
in August 1988, the intent of all the reductions in density adopted as part of the
Consistency Program was to keep them in place until the Transportation Plan was
completed.  Thus, the program intent was expressly acknowledged by the CRA itself.

Since 1986, when the Hollywood Redevelopment Plan was first approved, the
former redevelopment agency committed to developing and adopting a Transportation
Plan.  This critical plan has never been completed.  Nonetheless, the former
redevelopment agency, and now the CRA/LA, have begun approving development
permits in the Redevelopment Plan area without knowing whether or not the cumulative
impact of development has reach critical thresholds.  The Redevelopment Plan EIR
specifically concluded that Hollywood would have unacceptable levels of traffic service
when average FAR for the entire Plan area reached 2:1.  We now possess evidence that
the City has reached the 2:1 density which obligates CRA/LA to immediately commence
a plan to reduce the impacts on the infrastructure of Hollywood.  CRA/LA refuses to
acknowledge that the 2:1 threshold has been reached and is shirking its duties under the
Hollywood Redevelopment Plan that would entitle any owner to access to land use
benefits of the Plan.

CPC-2016-270-VZC-HD -- 2753

Exhibit A
76

AR002481

Los Angeles City Planning Commission
January 26, 2016
Page 14 of 18

Under the Plan, the former redevelopment agency, and now the CRA/LA, are required to prepare a plan for how to constrain and protect Hollywood's transportation infrastructure if average FAR reached 2:1. Recently, Barron McCoy of the CRA/LA gave a letter to the City of Los Angeles claiming that development activity has not yet reached 2:1, but his letter was unsupported with any evidence. It was bold assertion with no supporting evidence, substantial or otherwise, behind it. If the CRA/LA cannot show its math, it has no credible evidence to support proceeding to approve any more increases in development such as the Tommie Hotel, until such time as it proves it.

We understand that the former redevelopment agency, and the CRA/LA, have not submitted any of the required transportation monitoring reports to the City for years. In the absence of an adopted and enforceable Transportation Plan, and ongoing noncompliance with monitoring commitments of the former redevelopment agency, there would be no valid basis for the CRA/LA allow any increase in density, or even to clear an otherwise by right building permit.

By approving Land Use Entitlements for the Tommie Hotel project, the City would violate the General Plan Consistency limitation placed on the property because the Project cannot be approved without a completed CRA/LA Transportation Plan. The permanent "D" Development Limitation cannot be removed from this parcel of land without the City and CRA/LA satisfying all of its requirements, including a completed Transportation Plan. Since 1986, the former redevelopment agency had failed to complete and enact the Transportation Specific Plan to avoid significant impacts from increased density development – an ongoing violation being carried forward by the CRA/LA – the Tommie Hotel site may only be developed to a density of 2:1. Having approved the Project with a density nearly two times the authorized density, the City Planning Commission would violate law if it approved this Project.

**VII.    THE MND IS NOT AN APPROPRIATE ENVIRONMENTAL CLEARANCE DOCUMENT TO SUPPORT PROJECT APPROVAL BECAUSE IT IS DEFICIENT ON NUMEROUS GROUNDS.**

The City proposes to use a deficient mitigated negative declaration ("MND") for its environmental clearance document to approve the Tommie Hotel Project ("Project").

In City Planning Case No. 86-835 GPC [General Plan Consistency], the City prepared and/or recirculated an EIR for the Hollywood Community Plan in support of the consistency program. (**Exhibit 2**.) At various times in 1988-1990, the City approved resolutions and enacted ordinances to impose PERMANENT "D" Development

CPC-2016-270-VZC-HD -- 2754

AR002482

Los Angeles City Planning Commission
January 26, 2016
Page 15 of 18

Limitations of Subarea Map parcels throughout the Hollywood Community Plan and Redevelopment Plan area.

In Ordinance 165,660 dated May 6, 1990, as part of AB 283 compliance under City Planning Case 86-835- GPC, the City enacted the ordinance that imposed the permanent "D" Development Limitation on the Tommie Hotel property, which was located within Subarea 90 on the General Plan Consistency map. (**Exhibit 2**.) LAMC Section 12.32 regarding D Development conditions expressly provides that "D" Development Limitations are permanent.

The City's supporting EIR for these actions (Hollywood Plan Revision Environmental Impact Report (SCH NO. 87-112504)) concluded that without reductions in authorized density to mitigate or avoid significant environmental impacts, the City's infrastructure in Hollywood would suffer overwhelming impacts that endangered public health and safety (including police and fire response times). The imposition of the AB 283 "D" Development Limitation on the Tommie Hotel site, and many parcels in Hollywood, was intended to avoid environmental impacts from over-dense development, unless and until the CRA completed a Transportation Plan to avoid those significant impacts. That the former redevelopment agency would be responsible for balancing the infrastructure issues through the Transportation Plan was summarized in a Next Steps Hollywood Community Plan Revision memo made public in the midst of the planning process. This memo explains that it was necessary to limit development by right to reduced densities which the CRA called "practical buildout", or 36 million square feet of development, instead of the "theoretical buildout" of the zoning from the City's 1946 zoning code, which would have allowed 88 million square feet.

Hollywood Heritage's testimony on the MND in this case placed the City on notice that it could not remove the permanent "D" Development Limitation until such time as the CRA/LA (successor agency to the former redevelopment agency) prepared the Transportation Plan it committed to complete in the 1986 Hollywood Redevelopment Plan, and supported it with new environmental analysis showing that the adopted Transportation Plan solved the risks of environmental harm that had justified imposition of the permanent "D" Development Limitation in the first place.

Accordingly, the "D" Development Limitation cannot be removed by the City Council as it purported to do in this case, and substituted with a new CONDITIONAL "Q" condition. The permanent "D" Development Limitation, given that it was imposed to avoid significant environmental harm from over-dense development, and that it was required to be imposed in order to bring the City into compliance with Government Code

CPC-2016-270-VZC-HD -- 2755

AR002483

Los Angeles City Planning Commission
January 26, 2016
Page 16 of 18

Section 65680(d) under a legal settlement, means that it cannot be removed until the CRA/LA completes and adopts a Transportation Plan that eliminates the potential environmental harm from development at a FAR greater than the 2:1 imposed on this parcel.

None of this critical land use history was included in either the Project Description or the Land Use analysis of the MND materials. In fact, due to its complexity, and because the Project as proposed grossly violates the 2:1 FAR limit imposed by the "D" Development Limitation under the General Plan Consistency program, the City, and now CRA/LA, must prepare an EIR to explain these complexities and provide the public an opportunity for participation in the CEQA process.

Accordingly, the MND fails to properly disclose and analyze the proper Project description or disclose, analyze and mitigate the land use impacts of the proposed Project, which nearly doubles the authorized FAR, and more than doubles the authorized number of hotel rooms.

An additional reason the MND is not a sufficient environmental clearance document for the Project is construction noise. The MND engaged in an untenable claim that construction activity noise and vibration, which will occur a few feet from residential apartment and office buildings abutting the Project site, would not be significant. On projects much smaller than this proposed 9-story hotel building, full EIRs are routinely required because there is no way construction noise can be feasibly reduced beneath the threshold of significance. If there is a fair argument, supported by expert opinion, that there may be a significant impact, countervailing evidence of the City or developer cannot overcome the requirement to prepare an EIR. The City, and now the CRA/LA, will fail to proceed in accordance with law if the CRA/LA approves the Tommie Hotel OPA without first complying with CEQA by preparing or requiring preparation of an EIR prior to consideration of any approvals for the Project.

A strong presumption in favor of requiring preparation of an Environmental Impact Report ("EIR") is built into the California Environmental Quality Act ("CEQA"). This presumption is reflected in what is known as the "fair argument" standard, under which an agency must prepare an EIR whenever substantial evidence in the record supports a fair argument that a project may have a significant effect on the environment. Laurel Heights Improvement Ass'n v. Regents of the Univ. of Cal. (1993) 6 Cal.4th 1112, 1123; No Oil, Inc. v. City of Los Angeles (1974) 13 Cal.3d 68, 75.

CPC-2016-270-VZC-HD -- 2756

Los Angeles City Planning Commission
January 26, 2016
Page 17 of 18

Under CEQA and the CEQA Guidelines, if a project may cause a significant effect
on the environment, then the lead agency must prepare an EIR.  Pub. Res. Code §§
21100, 21151.  A project "may" have a significant effect on the environment if there is a
"reasonable probability" that it will result in a significant impact.  No Oil, Inc. v. City of
Los Angeles, supra, 13 Cal.3d at 83 n. 16.  If any aspect of the project may result in a
significant impact on the environment, an EIR must be prepared even if the overall effect
of the project is beneficial.  CEQA Guidelines § 15063(b)(1).

The fair argument test is a "low threshold" test for requiring the preparation of an
EIR.  No Oil., supra, 13 Cal.3d at 84.  This standard reflects a preference for requiring an
EIR to be prepared, and a preference for resolving doubts in favor of environmental
review.  Mejia v. City of Los Angeles (2005) 130 Cal.App.4th 322, 332.

CEQA Guidelines Section 15384(a) defines "substantial evidence" as "enough
relevant information and reasonable inferences from this information that a fair argument
can be made to support a conclusion, even though other conclusions might also be
reached . . . ." (Emphasis added.)  Under Pub. Res. Code Sections 21080(e), 21082.2(c),
and CEQA Guidelines Sections 15064(f)(5) and 15384, facts, reasonable assumptions
predicated on facts, and expert opinions supported by facts can constitute substantial
evidence.

An agency must prepare an EIR whenever it can be fairly argued on the basis of
substantial evidence that a project may have a significant environmental impact.  If there
is substantial evidence both for and against preparing an EIR, then the agency must
prepare the EIR.

Another reason the MND is not a sufficient environmental clearance document for
the Project is operational noise.  The Project includes a massive outdoor party space
around its rooftop swimming pool, including a restaurant area with walls that retract to
open the restaurant, bars, and party spaces to the open air.  The proximity of the rooftop
area to residential properties abutting the Project site subjects the adjoining sensitive
receptors to constant noise intrusion into their apartments.  The MND failed to fully
disclose and analyze the potential impacts of noise from large outdoor eating and
drinking areas.  There is a fair argument that operational noise will impose significant
noise impacts on the adjoining residential properties, thus again, requiring preparation of
an EIR.

CPC-2016-270-VZC-HD -- 2757

AR002485

Los Angeles City Planning Commission
January 26, 2016
Page 18 of 18

## VIII.  <u>CONCLUSION.</u>

     For the reasons set forth herein and in the attached exhibits the Tommie Hotel
Project as proposed is unlawful and cannot be approved today.

                Very truly yours,

                DANIEL WRIGHT
                    FOR
           THE SILVERSTEIN LAW FIRM, APC

DEW:jr
cc:    Client

CPC-2016-270-VZC-HD -- 2758

Exhibit A
81

Conformed Copy

# THE SILVERSTEIN LAW FIRM

*A Professional Corporation*

215 NORTH MARENGO AVENUE, 3RD FLOOR
PASADENA, CALIFORNIA 91101-1504

PHONE: (626) 449-4200   FAX: (626) 449-4205

DAN@ROBERTSILVERSTEINLAW.COM
WWW.ROBERTSILVERSTEINLAW.COM

March 23, 2018

**VIA HAND DELIVERY**



RECEIVED
CITY OF LOS ANGELES
MAR 23 2018
CITY PLANNING
PROJECT PLANNING

May Sirinopwongsagon
Planning Commission Hearing Officer
Los Angeles Advisory Agency
Department of City Planning
200 N. Spring Street, Room 621
Los Angeles, CA  90012

   **Re:**   TAO HOTEL - Objections to the Site Plan Review, Zone Change, Height
District Change, Conditional Use Permit-Alcohol, Mitigated Negative
Declaration and all other entitlements for the Selma Wilcox Hotel Project
located at 6421-6429 W. Selma Ave. and 1600-1604 N. Wilcox Ave;
CPC-2016-2601-VZC-HD-CUB-ZAA-SPR; VTT-74406; ENV-2016-2602-
MND and related cases.

   NOTE: In a separate, but coordinated cover letter, we attach a single copy of the
voluminous exhibits that support this Project comment letter for the record.  This Project
comment letter (original and 3 copies) will be submitted without multiple reproduction of
the Exhibits, and reference can be made to the record for the supporting documentation.

Dear Ms. Sirinopwongsagon and Advisory Agency:

**I.**   **INTRODUCTION.**

   This firm and the undersigned represent The Sunset Landmark Investments, LLC
(hereinafter "Sunset Landmark").  Please keep this office on the list of interested persons
to receive timely notice of all hearings and determinations related to the proposed
approval of an eight-story hotel at 6421-6429 W. Selma Avenue and 1600-1604 N.
Wilcox Avenue, commonly known as the Selma Wilcox Hotel Project ("Tao Hotel" or
"Project").  Pursuant to Public Resources Code Section 21167(f), provide a copy of each
and every Notice of Determination issued by the City in connection with this Project.
Sunset Landmark adopts and incorporates by reference all Project objections raised by
themselves and all others during the environmental review and land use entitlement
processes.

CPC-2016-2601 – 1981

Exhibit A
82

AR 007690

Department of City Planning
March 23, 2018
Page 2 of 24

**II.**     **CITY COUNCIL MUST DENY ALL APPLICATIONS FOR TAO HOTEL BECAUSE THE PROJECT AS PROPOSED IS UNLAWFUL.**

Sunset Landmark Investments respectfully submits this letter and accompanying exhibits, demanding that the City Council deny all above-referenced applications submitted by the owner/applicant for the following reasons:

(1)   The entire concept for the Tao Hotel is to create an over-developed, nuisance-generating, "party hotel" as part of a whole line of similar projects developed by the same developer for the purpose of injecting foreign investment money into a place where none of this was planned, and for which the infrastructure is not designed to support. The developer asks for the "sun, the moon, and the stars" when there is not a hint that the scope of this request is appropriate.

(2)   The City relies upon facially invalid interpretations of LAMC 12.22 A18 and 12.12 C4 (**Exhibit 1** [Summary of Zoning Administrator Interpretation dated May 18, 2000 and Zoning Engineer Memo dated February 10, 2009]) to claim that R5 zone density is permitted on commercially zoned lots in Regional Center Commercial land use designations across the City, including Hollywood, and, even more incredibly, that the authorized residential unit density limit is "unlimited" as to hotel rooms because City Council failed to specify a guest room limit in LAMC 12.12 C. Based upon these ludicrous interpretations, that are injecting more than double unit density into Regional Commercial Centers across the City without any textual support in the LAMC sections cited, and without environmental review of the cumulative impacts, the City claims the Tao Hotel can have 114 rooms. Thus, the Project as proposed is unlawful because it proposes a project more than 104 hotel rooms which is the lawful number of guest rooms in the C4 or C2 zone in which this site lies. The hotel will therefore be a monster building, twice the size the City planned for in the Hollywood Community Plan, the Hollywood Redevelopment Plan, and the City's zoning.

(3)   The Project as proposed is inconsistent with the permanent "D" Development Limitation of 2:1 Floor Area Ratio ("FAR") imposed on the site as part of the General Plan Consistency Case 86-835-GPC and applicable City ordinances (**Exhibit 2** [Hollywood General Plan/Zoning

CPC-2016-2601 – 1982                    Exhibit A                    AR 007691
83

Department of City Planning
March 23, 2018
Page 3 of 24

Consistency Program]).  Having imposed this 2:1 FAR limit in 1988 to protect the Hollywood community from negative environmental impacts as part of an extensive General Plan Consistency process (**Exhibit 3** [Ordinance 165660]), the City has no authority under Government Code Section 65860 or CEQA to remove the permanent "D" Development Limitation until:

a.   The City demonstrates that the negative impacts of overdense development on Hollywood's deficient infrastructure have been mitigated to the maximum extent feasible as part of a lawful comprehensive community planning process (and then comprehensively adjust the 1988 General Plan Consistency Program density restrictions in accordance with the comprehensive review of the community planning process); or

b.   The City reduces density on other land in the Community Plan area on a 1 to 1 basis for each parcel of land it purports to increase density (in order to maintain the density limit imposed in the 1988 Hollywood Community Plan and Hollywood General Plan Consistency Program). Such a Floor Area Transfer Program was authorized in the Hollywood Community Plan Section 511, but was never implemented by the former redevelopment agency or its successor agency, CRA/LA; or

c.   The City demonstrates compliance with the required enactment of the Transportation Plan identified in the 1988 Hollywood Community Plan Revision process and the 1986/2003 Hollywood Redevelopment Plan process, and guaranteed by the City in Ordinance 165660 to provide a substitute mitigation to the 2:1 FAR density restriction imposed on these parcels in 1988.

The FAR limit of 2:1 was imposed as a CEQA mitigation measure as part of a comprehensive planning process that occurred in conjunction with the 1988 Hollywood Community Plan Revision **and** the 1988 Hollywood General Plan Consistency Program.  As extensively documented in **Exhibit 2,** there is no reasonable dispute that a comprehensive downzoning of Hollywood occurred in 1988 because significant negative impacts would occur if the City's 1946 zoning densities were allowed to be constructed

Department of City Planning
March 23, 2018
Page 4 of 24

without limitation -- which is what the City is doing on a parcel by parcel based now.

Based upon this zoning history, the Tao Hotel Project is actually asking for a rezoning that authorizes a taller and larger building than allowed by law. The City and Developer, once again presume the City can just enact a new ordinance and it will override Ordinance 165,660 that imposed the 2:1 FAR "D" Development Limitation.

Because the City proposes to erase the FAR density limit without complying with any of these requirements so as to avoid cumulative negative impacts in raising density without protecting the Hollywood community with equally effective mitigation measures, its action is unlawful and cannot be approved. Napa Citizens for Honest Government v. Napa County Board of Supervisors (2001) 91 Cal.App.4th 342, 358-359 ("We therefore hold that a governing body must state a legitimate reason for deleting an earlier adopted mitigation, and must support that statement of reason with substantial evidence. If no legitimate reason for the deletion has been stated, or if the evidence does not support the governing body's finding, the land use plan, as modified by the deletion or deletions, is invalid and cannot be enforced.") See also Federation of Hillside & Canyon Associations v. City of Los Angeles (2000) 83 Cal.App.4th 1252 , 1261 (City must assure that mitigation measures "will actually be implemented as a condition of development, and not merely adopted and then neglected or disregarded.")

The City may not replace the 2:1 FAR density limit of Ordinance 165,660 without a valid reason. Such a valid reason would be that the long awaited Transportation Plan mitigation has been enacted, or a valid new community plan process that includes proper cumulative impact review has been completed. Neither of those things have occurred due to the City's ongoing neglect of the force of law of its general plan.

(4)  The former redevelopment agency, its lawful successor CRA/LA, and the Los Angeles City Council have violated their duties imposed by the Hollywood Redevelopment Plan, and cited in Ordinance 165,660 as a valid basis to modify the mitigation measure of the 2:1 FAR limit imposed in 1988, by failing to adopt the mandatory Transportation Plan that must be in place before the CRA/LA has legal authority to authorize any increase on

Department of City Planning
March 23, 2018
Page 5 of 24

this property above 2:1 FAR.  We have confirmed with CRA/LA that it never completed and the City Council never enacted the Transportation Plan required by the Hollywood Redevelopment Plan before increases in density would be allowed.  Because the Hollywood Redevelopment Plan was adopted by City Ordinance Nos. 161202 and 175236, any project approved without the mandatory Transportation Plan violates City Ordinances 161202 and 175236.  (**Exhibit 6 [Ordinances Incorporating Hollywood Redevelopment Plan as City Law]**.)  CRA/LA has been sued by Hollywood Heritage for CRA/LA's more than three decade dereliction of duty to complete any of the implementing programs of the Hollywood Redevelopment Plan.  This significantly includes failure to complete and adopt a protective and mitigating Transportation Plan.  Therefore, this Project as proposed at nearly double the authorized FAR, is unlawful.

(5)     The MND prepared by the City for the Tao Hotel is fatally flawed and cannot support a project approval.  The MND failed to accurately disclose and analyze the current zoning, FAR, height, and residential density elements of the Project in the project description and the land use sections of the MND.  Moreover, the MND failed to adequately analyze air quality, land use, noise, traffic, and greenhouse gas emissions.

(6)     This is the fifth alcohol-soaked "Animal House" party hotel proposed by the same developer group within a few hundred feet of each other – yet the City Environmental Review Unit acts as if they are unrelated.  This piecemealing of what has been touted in the media as a "new hotel district" by the developer somehow is allowed to roll out bit-by-bit and piece-by-piece without the comprehensive review CEQA requires.  Even more astounding is the fact the City actually approved an MND for a piece of this building in 2015 without requiring review of even the whole building.  This is professional environmental review malpractice.  It used to be that the City enforced CEQA to prevent developer fraudulent applications of pieces of a larger project.  Arviv Enterprises v. South Valley Area Planning Commission (2002) 101 Cal.App.4th 1333.  Now the City colludes to ignore and openly defy CEQA's duties.

For all of these basic reasons, most of them fundamental planning concepts apparently thrown out the window by the City Planning Director and his employees, the City Planning Commission and Advisory Agency must exercise restraint by not

CPC-2016-2601 – 1985

AR 007694

Department of City Planning
March 23, 2018
Page 6 of 24

rubberstamping another planning disaster in Hollywood fueled by greed and foreign investors with no stake in the integrity of the City's planning processes.

III.   **RELEVANT FACTS AND BACKGROUND.**

The Project site sits within a portion of the Hollywood Community Plan specifically planned and zoned in the 1980s to comply with the mandate of Government Code Section 65860, subdivision (d) ("AB 283"). AB 283 required the City to make its zoning consistent with its General Plan land use designations.

The land use densities adopted in the 1988 Hollywood Community Plan were less dense than the land use densities allowed in the City's 1946 Zoning Ordinance. To make its zoning consistent with the 1988 Hollywood Community Plan, the City Council adopted numerous ordinances, including Ordinance No. 165660, to limit density and height because the area was so distant from high capacity transit.  (**Exhibits 2 & 3.**) The City staff, as it has done for four previous hotel projects by this developer, ignores the 2:1 FAR limitation placed on the Project site (via the 1990 Ordinance No. 165660 to restrict these parcels using a "D" Development Limitation), which was specifically imposed to avoid City-acknowledged area wide significant environmental impacts if development was allowed to proceed at the densities under the City's 1946 Zoning ordinance and its 1973 Hollywood Community Plan.

Under the City's Hollywood General Plan Consistency Program, the widespread use of "D" Development Conditions like the one imposed on the Tao Hotel parcel were determined by the City Council to be necessary to bring the City's 1988 Hollywood Community Plan and zoning into conformity, as mandated by Government Code Section 65860(d) and the settlement agreement in litigation brought to enforce the City's mandatory duty to make its zoning consistent with its General Plan.  The City made express findings that the "D" Development limitations were imposed to avoid environmental impacts – thus, the mitigation of impacts was incorporated into the City's zoning rules and general plan in order to make the mitigation measure legally enforceable.

Now the developer asks the City to override Ordinance No. 165,660, just like it purported to do on this developer's other projects in the vicinity.  In accordance with the Napa and Hillside Federation cases cited above, the City has to show it has a valid basis to allow a density increase when the long-delayed CRA/LA transportation plan required in Ordinance 165,660 as a mitigation measure has never been completed.  The developer offers no legitimate basis to take the proposed action.  The entire project concept is a

CPC-2016-2601 – 1986

AR 007695

Department of City Planning
March 23, 2018
Page 7 of 24

giant noise-generating party hotel proposed next to sensitive receptors who have already
bitterly complained about the nuisance noise from the other hotel of this developer.

IV.   **THE LAWFUL NUMBER OF HOTEL ROOMS IS SET BY THE
MUNICIPAL CODE AT 200 SQUARE FEET OF LOT AREA WHICH IS
MUCH LESS THAN THE 114 ROOMS PROPOSED BY THE
DEVELOPER.**

The number of hotel rooms permitted by the express language of LAMC Sections
12.16 or 12.14 is set forth.  The math is simple:  Divide the appropriate lot size square
feet by 200 sf per unit equals the authorized number of hotel rooms.  These facts are
verifiable.  At the moment, the lawful number of units cannot be determined because it
appears that the developer has engaged in some kind of piecemeal scheme to count lot
area of another building that is not part of this project.  Further study of this highly
improper process requires the Advisory Agency and Planning Hearing Officer to sever
the two projects and count only the lot area where the Tao Hotel is proposed.

Nowhere in the environmental review documents is there a complete, honest, and
open explanation of the staff's "logic" and math showing how it determined that 114
hotel rooms was permissible.  The Planning staff's obscuring of the basis of their
decision telegraphs that even City staff lacks confidence in the legality of a May 18, 2000
Zoning Administrator Interpretation of the zoning code and the February 10, 2009
Zoning Engineer memo.  As summarized at page 222 of the LADBS Zoning Manual, the
Zoning Administrator claims without any credible basis that a reference in LAMC 12.22-
A.18 to R5 land uses are permissible.  Closer examination of this "interpretation" reveals
that it is a fabrication.  The ZAI is unlawful because the Zoning Administrator has
undertaken to re-write the Municipal Code, which is a power only held by the City
Council.

Additionally, because of the

The plain language of Section 12.22-A,18 does not authorize R5 residential
density for a mixed use project in the regional center commercial land use designation.
The first portion of LAMC Section 12.22-A,18 provides:

"18.   Developments Combining Residential
and Commercial Uses.  Except where the provisions of
Section 12.24.1 of this Code apply, notwithstanding
any other provision of this chapter to the contrary, the

Department of City Planning
March 23, 2018
Page 8 of 24

> following uses shall be permitted in the following
> zones subject to the following limitations:  (Amended
> by Ord. No. 163,679, Eff. 7/18/88.)
>
> (a)   Any use permitted in the R5 Zone on any
> lot in the CR, C1, C1.5, C2, C4 or C5 Zones provided
> that such lot is located within the Central City
> Community Plan Area or within an area designated on
> an adopted community plan as "Regional Center" or
> "Regional Commercial".  Any combination of R5 uses
> and the uses permitted in the underlying commercial
> zone shall also be permitted on such lot."  (Emphasis
> added.)

The express language applies only to permitted **uses**, not to permitted residential
dwelling unit density expressed in lot area regulation.  It is silent as to residential
dwelling unit density.  Thus, the "theory" that LAMC Section 12.22-A,18 "allows" R5
residential dwelling unit **density** is incorrect, and omission of any reference to it by City
staff has the effect of misleading the public.

Even more damning however is the fact that LAMC Section 12.22C, where one
would expect to find exceptions stated for lot area residential unit densities, is silent on
the question of whether R5 density ought to be allowed in commercially zoned lots in
Regional Center land use designations.  Silence in no way can be interpreted by a City
official as authority to provide for such an exception – especially one which would more
than double hotel room densities without any environmental review or notice to anyone.

The undisclosed Zoning Administrator Interpretation of LAMC Section 12.22-
A,18(a) is void as contrary to the plain language of the law.  If the City Planner is relying
on a May 18, 2000 Zoning Administrator Interpretation of LAMC 12.22-A as the basis to
allow a R5 zone residential unit density in the Tao Hotel, that reliance is unlawful.  The
Interpretation reads as follows:

> "One question related to density that arises is whether to
> apply R5 lot area requirements or R3 / R4 lot area
> requirements as referenced in the lot area requirements of C
> zones.  In the enforcement of this section, the Zoning
> Administrator has determined that the lot area requirements
> of the R5 zone are to be applied to projects subject to this

CPC-2016-2601 – 1988

AR 007697

Department of City Planning
March 23, 2018
Page 9 of 24

> section.  **Although it is not explicitly stated in the section**, the last sentence of the section **implies** applying area requirements of R5 zone, not R3 or R4 zone.  This interpretation has been confirmed by the Office of Zoning Administrator who reviewed the original staff report for the ordinance." (Emphasis added.)

While the Zoning Administrator may possess the authority to clarify an ambiguity in a municipal code provision, he or she has no authority to re-write a City ordinance. Only the City Council has that authority.  There is no lawful basis to "interpret" LAMC Section 12.22A18(a) related to authorized "uses" as permitting R5 residential unit density which if it was allowed as the Zoning Administrator claims, the exception would be written into LAMC Section 12.22C – Lot Area.

Stacking one misreading of the LAMC on top of another the City is also relying upon the City's Zoning Manual, page 66, which asserts that because LAMC Section 12.12C4, related to rules for the R5 Zone, is silent as to minimum lot area per hotel guest room, it must be interpreted to mean guest room density is "unlimited."  This contention is contrary to basic principles for the construction of a law or ordinance.  If the residential unit density for R5 zones was "unlimited", it would say so – it would not be silent. Omission means no authority is granted.  If the omission is a mistake, then the proper action of the Zoning Administrator or Zoning Engineer would be to refer the problem to the City Planning Commission for review and enactment of a legislative amendment. The Zoning Engineer does not possess the legislative power of the City Council – especially when releasing unlimited density into thousands of acres of Regional Center Commercial land would have huge environmental impacts.

Additionally, for any code provision to permit "unlimited" density is inconsistent with the entire concept of having a General Plan. The purpose of the General Plan is to determine anticipated future population, and plan for that growth by allocating where in the City the densities are needed and appropriate to meet the expected demand within the planning time frame.  To suggest that any part of a zoning code, which implements the density limits of a General Plan, can allow "unlimited" density, is to create a giant loophole that would encourage abusive project applications such as the over dense, noise generating, party hotel that Tao Hotel is destined to become.

The City Planning staff appears to have relied upon the improper Zoning Administrator and Zoning Engineer Interpretations as a pretense to more than double the residential dwelling unit density for the Tao Hotel above that authorized in the LAMC

Department of City Planning
March 23, 2018
Page 10 of 24

Sections 12.14 and 12.16. The May 18, 2000 Zoning Administrator Interpretation and the February 10, 2009 Zoning Engineer memo are void because they violate **the plain language of LAMC Section 12.22A18(a) and the absence of an exception in LAMC Section 12.22 C**. And even if this were so, under no circumstances may a City staff member seize upon the absence of a residential unit density limit in LAMC Section 12.12 C4 to "mean" the sky's the limit. That is not how zoning ordinances work. While the Zoning Administrator or Zoning Engineer may have authority to make reasonable interpretations of language <u>actually</u> used by the City Council, he or she has no authority to devise "interpretations," untethered to any fair reading of a municipal code provision. If this is not true, then the Zoning Administrator and Zoning Engineer just became a Los Angeles super legislature to re-write City Council laws. Of course, this is not lawful behavior.

VI.   **THE CURRENT ZONING OF THE TAO HOTEL WAS ENACTED UNDER THE COMPREHENSIVE GENERAL PLAN CONSISTENCY PROGRAM AS A DOWNZONING MITIGATION MEASURE AND THEREFORE SUCH MITIGATION MEASURE CANNOT BE MODIFIED BY SIMPLE REPEAL, AS THE DEVELOPER HAS ASKED THE CITY TO DO AGAIN AND AGAIN.**

Since 1971, the Legislature has required in Government Code Section 65860(a) that all general law cities and counties make their zoning consistent with the adopted general plan. In this way, the Legislature sought to ensure that real planning occurred for the future development of cities and counties, and that the zoning actually implemented it.

Although this law did not apply to charter cities, most of them voluntarily undertook to make their zoning consistent with their general plan – except one. Los Angeles' 1946 zoning code had densities far in excess of the capability of the City's infrastructure to hold it – 10 million people. The City's first community plans concluded after environmental review that the infrastructure could only support between 4 and 5 million residents.

The City Council refused to downzone to make its zoning law consistent with the density its community plans said could realistically be accommodated. Thus, the City Council during the mid- and late-1970s continued to allow developers to construct projects consistent with the 1946 zoning, but grossly inconsistent with the general plans of the City.

Department of City Planning
March 23, 2018
Page 11 of 24

A. **The Legislature In 1979 Mandated That Los Angeles Make Its Zoning Ordinances (Codes) Consistent With Its General Plans.**

Responding to calls for intervention, the State Legislature in Assembly Bill 283 ("AB 283") amended Government Code section 65860 to add subdivision (d) that applied to the City of Los Angeles:

> "(a)   **County or city zoning ordinances shall be consistent with the general plan of the county or city** by January 1, 1974.  A zoning ordinance shall be consistent with a city or county general plan only if: (i) The city or county has officially adopted such a plan, and (ii) The various land uses authorized by the ordinance are compatible with the objectives, policies, general land uses, and programs specified in such a plan.
>
> * * *
>
> (d)   **Notwithstanding Section 65803, this section shall apply in a charter city of 2,000,000 or more population to a zoning ordinance adopted prior to January 1, 1979, which zoning ordinance shall be consistent with the general plan of such city by July 1, 1982.**"  (Emphasis added)

Subdivision (d) required the City to make all of its zoning ordinances (municipal code provisions) and zoning maps consistent with its adopted general plan no later than 1981, and then after amendment, 1982.  The City instead sued the State of California claiming that the act was unconstitutional.

After the City won in the trial court, the State prevailed in the Court of Appeal and the California Supreme Court denied review.  Thus, the Court of Appeal's decision in City of Los Angeles v. State of California (1982) 138 Cal.App.3d 526 made the consistency requirement between general plans and zoning ordinances a mandatory duty of the City.

Department of City Planning
March 23, 2018
Page 12 of 24

**B.**      **Center For Law In The Public Interest Sues To Force City To Comply With The State Consistency Requirement Of AB 283 (Government Code § 65860(d)).**

Because the Court of Appeal decision did not order the City to comply with state law, the City continued to drag its feet in commencing proceedings to downzone properties to make all zoning ordinances and maps conform with City general plans. The Center for Law In The Public Interest then initiated litigation seeking a writ of mandate to force the City to comply with the state law. In Federation of Hillside and Canyon Associations et al. v. City of Los Angeles (C 526616), the Superior Court quickly issued a writ ordering the City to make its zoning code consistent within 120 days. For reasons not relevant to the issues in this case, the City ultimately entered into a stipulated judgment with the Federation and other plaintiffs to take longer to complete the project under a court-appointed monitor to oversee the consistency process and report back to the Court – a process which ended up taking more than a decade.

**C.**      **The Hollywood Community Plan Zoning Map Was Made Consistent With The Hollywood Community Plan In Case Numbers 83-368 and 86-835-GPC And Supported With Recirculation Of The Original Hollywood Community Plan EIR (EIR No. CPC-1070-GP/ZC) and the Hollywood Redevelopment Plan EIR (SCH No. 85052903).**

As the City carried out the AB 283 consistency process under the supervision of a court monitor, it complied with CEQA by recirculating the Hollywood Community Plan EIR in May 1988 and the January 1986 Hollywood Redevelopment Plan EIR in May 1988. The General Plan Consistency Program, as explained under oath by the City's former Planning Director, was necessary to significantly reduce the City's zoning density to conform with its 35 community plans. (**Exhibit 2** [Hollywood General Plan Consistency Proceedings; Declaration of Cal Hamilton].) From spring of 1988 to early 1990, the City carried out the Hollywood General Plan Consistency Program to bring itself in compliance with Government Code Section 65680(d) and the Hillside Federation settlement agreement. (**Exhibit 2.**) The downzoning of the Hollywood Community Plan, in the form of changes to the Community Plan and imposition of permanent "D" Development and "Q" Qualified Conditions, were expressly required as a mitigation measure to avoid infrastructure failures across the Hollywood Community Plan area – until the CRA and City implemented a Transportation Plan. (Id.) Documents of the City and CRA acknowledge that these reductions in density were required **until such time as the Transportation Plan was enacted. (Exhibit 2.)**

CPC-2016-2601 – 1992                    Exhibit A                    AR 007701
                                          93

Department of City Planning
March 23, 2018
Page 13 of 24

A similar process was carried out for every community plan across the City until 200,000 lots were downzoned to protect the City's residents from serious negative impacts of deficient public services infrastructure to support the overly-intense City zoning map densities dating back to 1946.

The subject properties for the Tao Hotel (SubArea 90) were expressly down zoned as to FAR to 2:1, as set in Ordinance 165,660. (**Exhibit 3**.) In downzoning these lots, the City was made findings relied upon by the public and the monitoring court in the Hillside Federation litigation that it would enforce the mitigation measure of downzoning by incorporating the changes into zoning, including the zoning changes now in place on the Project Site for the Tao Hotel. These limits of density remain in place and binding today because, incredibly, 30 years later neither the former CRA, nor its successor agency, nor the City, ever enacted the promised Transportation Plan to provide the required planning framework and infrastructure to enable increases in authorized density. The record in this case is devoid of any evidence the Transportation Plan was ever enacted, and it fact we have verified with CRA/LA it was never enacted. In fact, Hollywood Heritage has sued the CRA/LA for non-performance and completion of any of the Hollywood Redevelopment Plan implementing programs, including the never completed Transportation Plan.

Our Court of Appeal, in a case against the City of Los Angeles over its General Plan Framework, made quite clear that when the City adopts mitigation measures to implement a general plan, it has a duty to make sure they are carried out:

> "CEQA requires the agency to find, based on substantial evidence, that the mitigation measures are 'required in, or incorporated into, the project' . . . ([Public Resources Code] § 21081; [CEQA] Guidelines, § 15901, subd. (b).) In addition, the agency 'shall provide that measures to mitigate or avoid significant effects on the environment are fully enforceable through permit conditions, agreements, or other measures.' ([Public Resources Code] § 21081.6, subd. (b))(fn.4) and must adopt a monitoring program to ensure that the mitigation measures are implemented. ([Public Resources Code] § 21081.6, subd. (a)). The purpose of these requirements is to ensure that feasible mitigation measures *will actually be implemented* as a condition of development, and not

Department of City Planning
March 23, 2018
Page 14 of 24

merely adopted and then neglected or disregarded.
(See [Public Resources Code § 21002.1, subd. (b).).(fn.
5)"

[Footnote 4 by the Court]:  "A public agency
shall provide that measures to mitigate or avoid
significant effects on the environment are fully
enforceable through permit conditions, agreements, or
other measures.  Conditions of project approval may
be set forth in referenced documents which address
required mitigation measures or, in the case of the
adoption of a plan, policy, regulation, or other public
project, incorporating the mitigation measures into the
plan, policy, regulation, or project design." (§
21081.6, subd. (b).)  **In the context of this statute, to
incorporate mitigation measures into a project
means to amend the project so that the mitigation
measures necessarily will be implemented, such as
by reducing the scope of the project or requiring
that mitigation measures be implemented as a
condition of the project.**  (See Guidelines, § 15126.4,
subd. (a)(1)(A), and former § 15126, subd. (c), both
distinguishing mitigation measures proposed by the
project proponent from those 'required as conditions of
approving the project.')"

[Footnote 5 by the Court]:  "'Each public
agency shall mitigate or avoid the significant effects
on the environment of projects that it carries out or
approves whenever it is feasible to do so.' (§ 21002.1,
subd. (b).)"  Federation of Hillside and Canyon
Associations v. City of Los Angeles (2000) 83
Cal.App.4th 1252, 1260-1261 (italic emphasis by the
Court, bold and underline emphasis added.)

Based upon this precedent, there can be no serious claim by the City that it does
not have a legal duty to assure full implementation of the Hollywood Community Plan
General Plan Consistency Program in order to protect the health, safety and
environmental welfare of the community.  That includes maintaining the permanent D

CPC-2016-2601 – 1994

AR 007703

Department of City Planning
March 23, 2018
Page 15 of 24

Limitation until alternative mitigation measures are comprehensively evaluated and
imposed to protect the Hollywood community.

**D.**    **Because The FAR Restrictions Were Adopted Environmental
Mitigation Measures To Avoid Significant Impacts, The City Council
May Not Amend Or Delete These Mitigation Measure Enactments
Without Full Disclosure And Analysis In An EIR, As Well As A
Comprehensive Planning Process That Accounts For The Potential
Cumulative Negative Impacts Of Ignoring General Plan Consistency
Program Measures.**

This case, like many cases in Hollywood recently, poses the question of whether
the City may bring its Hollywood Community Plan and zoning into consistency with the
density projections underlying the Plan for a moment in time (1988) (what would be
called "paper consistency'), and then begin an incremental parcel by parcel removal of
the density limits imposed as a mitigation measure to comply with the Community Plan's
density limits. The answer is obvious: such modification of community-wide mitigation
may not be removed or changed without a new comprehensive general plan and zoning
consistency process such as what occurs in association with amendment of an entire
community plan. Nor, of course, has any proper or adequate level of disclosure and
analysis of this type been provided in the instant MND, further rendering it deficient and
in violation of CEQA.

This conclusion is supported by two important limitations on the City Council's
authority. First, parcel-based general plan amendments were prohibited as part of the
1969 City Charter amendments to the Planning Department provisions. These critical
Charter amendments were enacted by the People to: (1) enforce the comprehensive
planning goals of the People in having a meaningful General Plan, and (2) eliminate the
very parcel-based rezoning scam that led to the conviction of a City Councilmember for
bribery.

Second, the adoption of the City's General Plan Consistency recommendations for
Hollywood was a comprehensive set of recommended reductions in permitted FAR,
height, and uses intended to enforce the density planned for in the 1988 Hollywood
Community Plan. These critical reductions in density, collectively brought Hollywood's
zoning density into consistency with its general plan density.

It is still unclear how quickly after the City certified to the Court in the Hillside
Federation case that the City's general plan consistency was "complete" that it began to

Department of City Planning
March 23, 2018
Page 16 of 24

quietly allow developers to apply for general plan amendments and/or zoning changes to change that reduced density zoning without maintaining the protective effect of the density limits until alternative plans, like the Transportation Plan of the CRA, were in place.

Parcel-by-parcel, the City is asserting it has the authority to simply rezone every parcel in the City without regard to whether the present zoning, FAR limits, permanent "D" or "Q" conditions were imposed as a mitigation measure of the City's General Plan Consistency Program.  The Palladium Project, the Columbia Square Project, 5901 Sunset Project, the Dream, Wilcox and Selma Hotels (the same applicant as the Tao Hotel) and many other projects within a short distance from the Tao Hotel, all include rezoning that purported to lawfully wipe out General Plan Consistency mitigation measures imposed on those lots.  Incredible density increases are being authorized, including as proposed in this Project, without disclosure in the MND or the Staff Recommendation Report to the public or analysis of the potential negative cumulative impact on the Hollywood General Plan Consistency Program.

In essence, the City has embarked on a giant expansion of density in Hollywood without even bothering to lawfully complete a Hollywood Community Plan Update that analyzed it and justified changes to the current limitations imposed on many parcels of land in the Hollywood Community Plan area.

In recent years, the City undertook to revise and update the Hollywood Community Plan.  Unfortunately, the City Planning Department's environmental review and planning process for that comprehensive planning activity went off the rails.  The trial court, the Hon. Allan Goodman, found the City's planning and environmental review process for the Hollywood Community Plan Update ("HCPU") was "fatally flawed".  Multiple groups sued the City over the HCPU because it used demonstrably false and inflated population projections to try to justify massive increases in density.  Additionally, the City failed to properly conduct environmental analysis related to the HCPU.

Accordingly, neither in the EIR for the now rescinded HCPU, nor in the EIR or MND for individual projects where the City proposes to wipe out protective mitigation measures of the General Plan Consistency Program, including the MND in this case, has the City ever analyzed and accounted for its incremental increases in density without regard to the potential negative impacts on the community.  The City has simply presumed it can do it because no one has previously objected to it.

Department of City Planning
March 23, 2018
Page 17 of 24

Our client and many other community organizations strenuously object. The City could only remove General Plan Consistency Program mitigation down zoning as part of the next comprehensive update of its Hollywood Community Plan, and only if it does so in full compliance with CEQA. That clearly has not yet happened. In the alternative, assuming that a parcel-based general plan amendment is lawful, which it is not, then any rezoning that upzones parcel(s) in the Hollywood Community Plan area could only be lawful if the City Council downzones other parcel(s) to maintain the cumulative protective balance of the General Plan Consistency Program. Such a density transfer program was contemplated in Section 511 of the Hollywood Redevelopment Plan, but like the 30 year absence of an adopted Transportation Plan, the redevelopment agency nor CRA/LA ever completed a Density Transfer program in Hollywood. With each unmitigated parcel-by-parcel removal of a General Plan Consistency Program mitigation zoning provision, the City has engaged in an extremely serious and unaccounted for densification of the Hollywood Community Plan area that is inconsistent with the density for which it is currently planned.

**VII.  THE FORMER REDEVELOPMENT AGENCY'S FAILURE TO PREPARE A TRANSPORTATION PLAN MEANS THAT NO INCREASES IN DEVELOPMENT DENSITY CAN BE GRANTED UNDER THE "D" DEVELOPMENT LIMITATION.**

Even if the "D" Development Limitation remained in place on the Tao Hotel property, its density could not be properly increased because the former redevelopment agency and the Los Angeles City Council have failed for 30 years to prepare a Transportation Plan intended as a substitute mitigation measure. As written in plain language and as explained in a letter from CRA in August 1988, the intent of all the reductions in density adopted as part of the Consistency Program was to keep them in place until the Transportation Plan was completed. Thus, the program intent was expressly acknowledged by the CRA itself.

Since 1986, when the Hollywood Redevelopment Plan was first approved, the former redevelopment agency committed to developing and adopting a Transportation Plan. This critical plan has never been completed and it has been sued over the failure to do so twice. Nonetheless, the former redevelopment agency, and now the CRA/LA, has begun approving development permits in the Redevelopment Plan area without knowing whether or not the cumulative impact of development has reach critical thresholds. The Redevelopment Plan EIR specifically concluded that Hollywood would have unacceptable levels of traffic service when average FAR for the entire Plan area reached 2:1. We now possess evidence that the City has reached the 2:1 density which obligates

Department of City Planning
March 23, 2018
Page 18 of 24

CRA/LA to immediately commence a plan to reduce the impacts on the infrastructure of Hollywood. CRA/LA refuses to acknowledge that the 2:1 threshold has been reached and is shirking its duties under the Hollywood Redevelopment Plan that would entitle any owner to access the land use benefits of the Plan.

Under the Plan, the former redevelopment agency, and now the CRA/LA, was required to prepare a plan for how to constrain and protect Hollywood's transportation infrastructure if average FAR reached 2:1. Recently, Barron McCoy of the CRA/LA gave a letter to the City of Los Angeles claiming that development activity has not yet reached 2:1, but his letter was unsupported with any evidence. It was bold assertion with no supporting evidence, substantial or otherwise, behind it. If the City and the CRA/LA cannot show their math, they have no credible evidence to support proceeding to approve any more increases in development such as the Tao Hotel, until such time as they can prove it.

We understand that the former redevelopment agency, and the CRA/LA, has not submitted any of the required transportation monitoring reports to the City for years. In the absence of an adopted and enforceable Transportation Plan, and ongoing noncompliance with monitoring commitments of the former redevelopment agency, there would be no valid basis for the City or CRA/LA to allow any increase in density.

The developer's attorneys in the other cases by the developer tried to skirt this issue by claiming that since the 1988 Hollywood Community Plan and the Hollywood General Plan/Zoning Consistency Program were adopted, the Metrorail Red Line was added as a transportation improvement. The Hollywood Community Plan, Hollywood Redevelopment Plan and the Hollywood General Plan/Zoning Consistency Program all took into account the planned subway improvement. (**Exhibit 2**.) It is shown on the maps and zoning was put in place to encourage the greatest density immediately adjacent to the stations. The Red Line is a "red herring" of the developer's attorneys. All plans acknowledged that the former redevelopment agency was required to undertake and develop major street improvements, improve traffic management systems, carry out transportation demand management initiatives, in order to avoid system failure at average FAR densities above 2:1 throughout the Hollywood core. The utter failure to complete a transportation plan lies at the feet of the former redevelopment agency and the Los Angeles City Council. No one should be distracted by the waving of a Red Line subway map by the developer's attorneys. They cannot make excuses for the City and redevelopment agency's failures.

Department of City Planning
March 23, 2018
Page 19 of 24

By approving Land Use Entitlements for the Tao Hotel project, the City would violate the General Plan/Zoning Consistency Program's limitation placed on the property because the Project cannot be approved for FAR above 2:1 without a completed CRA/LA Transportation Plan. The permanent "D" Development Limitation cannot be removed from this parcel of land without the City and CRA/LA satisfying all of its requirements, including a completed Transportation Plan. Since 1986, the former redevelopment agency had failed to complete and enact the Transportation Specific Plan to avoid significant impacts from increased density development – an ongoing violation being carried forward by the CRA/LA – the Tao Hotel site may only be developed to a density of 2:1. Having approved the Project with a density nearly two times the authorized density, the City Council would violate law if it approved this Project as currently proposed.

## VIII.   THE MITIGATED NEGATIVE DECLARATION VIOLATES CEQA. BECAUSE THERE IS NO SHOWING THAT SIGNIFICANT IMPACTS ARE NOT POSSIBLE, AN EIR IS REQUIRED.

The City has chosen to prepare a mitigated negative declaration ("MND") for the Tao Hotel project, just like it did for the Wilcox Hotel, the Selma Hotel, and a chunk of the proposed Tao Hotel. The choice blatantly and unquestionably violates the California Environmental Quality Act ("CEQA"), found at Public Resources Code § 21000, *et seq.*, because the evidence in the MND shows that the Project will likely have a significant impact in several areas examined herein.

An MND may only be used for a project where the public agency can demonstrate that, with the mitigation measures incorporated in the MND, "*clearly no* significant effect on the environment would occur, and [] there is *no* substantial evidence in light of the whole record before the public agency that the project, as revised, *may* have a significant impact on the environment." (CEQA § 21064.5, emphasis added; Guidelines § 15070 (b), 15369.5.) Thus, the MND here must show "clearly" that there is *no* substantial evidence that the Tao Hotel may cause a significant impact on the environment in Hollywood. The City must prepare an EIR if there is any substantial evidence in the record that would support a fair argument that a significant impact is possible, regardless of any other evidence in the record. Parker Shattuck Neighbors v. Berkeley City Council (2013) 222 Cal.App.4th 768,776; Friends of "B" Street v. City of Hayward (1980) 106 Cal.App.3d 988, 1002. The determination of whether a fair argument exists is a question of law. Sierra Club v. County of Sonoma (1992) 6 Cal.App.4th 1307, 1319.

CPC-2016-2601 – 1999

Exhibit A
100

AR 007708

Department of City Planning
March 23, 2018
Page 20 of 24

A strong presumption in favor of requiring preparation of an Environmental Impact Report ("EIR") is built into CEQA. This presumption is reflected in what is known as the "fair argument" standard, under which an agency must prepare an EIR whenever substantial evidence in the record supports a fair argument that a project may have a significant effect on the environment. Laurel Heights Improvement Ass'n v. Regents of the Univ. of Cal. (1993) 6 Cal.4th 1112, 1123; No Oil, Inc. v. City of Los Angeles (1974) 13 Cal.3d 68, 75.

Under CEQA and the CEQA Guidelines, if a project may cause a significant effect on the environment, then the lead agency must prepare an EIR. Pub. Res. Code §§ 21100, 21151. A project "may" have a significant effect on the environment if there is a "reasonable probability" that it will result in a significant impact. No Oil, Inc. v. City of Los Angeles, supra, 13 Cal.3d at 83 n. 16. If any aspect of the project may result in a significant impact on the environment, an EIR must be prepared even if the overall effect of the project is beneficial. CEQA Guidelines § 15063(b)(1).

The fair argument test is a "low threshold" test for requiring the preparation of an EIR. No Oil., supra,13 Cal.3d at 84. This standard reflects a preference for requiring an EIR to be prepared, and a preference for resolving doubts in favor of environmental review. Mejia v. City of Los Angeles (2005) 130 Cal.App.4th 322, 332.

CEQA Guidelines Section 15384(a) defines "substantial evidence" as "enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached . . . ." (Emphasis added.) Under Pub. Res. Code Sections 21080(e), 21082.2(c), and CEQA Guidelines Sections 15064(f)(5) and 15384, facts, reasonable assumptions predicated on facts, and expert opinions supported by facts can constitute substantial evidence.

An agency must prepare an EIR whenever it can be fairly argued on the basis of substantial evidence that a project may have a significant environmental impact. If there is substantial evidence both for and against preparing an EIR, then the agency must prepare the EIR.

There is substantial evidence in the MND, considered together with its technical appendices, showing the possibility that the Tao Hotel will cause a significant adverse impact on the environment in several topic areas. Substantial evidence supports a fair argument that there will in fact be a significant effect as to construction noise. Further, the MND fails to show "clearly" that there will be no significant impact on air quality,

Department of City Planning
March 23, 2018
Page 21 of 24

greenhouse gas emissions, land use, and cumulative traffic.  The evidence in the City's own CEQA document shows conclusively that a full environmental impact report is required for this Project.  Gentry v. City of Murietta (1995) 36 Cal.App.4th 1359, 1399-1400 ("an agency may adopt a negative declaration only if there is no substantial evidence that the project '*may*' have a significant effect on the environment."  [Emphasis in original.])

A. **The Project Description is Deficient and Masks Potential Significant Impacts.**

The City did not provide a full and accurate Project description for the MND circulated to the public for review.  Nowhere does the MND disclose that the Project as proposed conflicted with the current C4 or proposed C2 zoning limitations on residential unit density (number of hotel rooms).  And while it begrudgingly acknowledged that there was a "D" Development Limitation that restricted the FAR to 2:1, there was no disclosure to the public and decision makers that the City committed in 1988 to the density limit on the Project site unless or until a density transfer program was created under Hollywood Redevelopment Plan Section 511, or a Transportation Plan was created under Section 518.1 thereof. In fact, none of the terms of Ordinances 165,660 are described that would have illustrated that the current law does not allow anything close to the massive size of the Tao Hotel.

Additionally, the MND's use of not one but two baselines is an open admission that the City's MND for the "Tao Restaurant and Retail Project" was nothing but analysis of a chunk of an overall project that was required, at a minimum, to be analyzed in the same environmental document.  Under what theory did the City approve an MND for a partial complete building, and then issued building permits for it when an application for another piece of the same building was to be later sought?  What kind of three card Monte game is the City playing with the public and those whose lives are affected by this Project?

It is time for the City Hearing officers to stop signing their names to facially invalid environmental review documents, and require this development scam to prepare a full EIR for all of his known and unknown hotel aspirations.

"Where an agency fails to provide an accurate project description, or fails to gather information and undertake an adequate environmental analysis in its initial study, a negative declaration is inappropriate."  Nelson v. County of Kern (2010) 190 Cal.App.4th 252, 267 (emphasis added).

Department of City Planning
March 23, 2018
Page 22 of 24

"An accurate and complete project description is necessary for an intelligent evaluation of the potential environmental impacts of the agency's action." City of Redlands v. County of San Bernardino (2002) 96 Cal.App.4th 398, 406.  Only through an accurate view of the project may affected outsiders and public decision-makers balance the proposal's benefit against its environmental cost, consider mitigation measures, assess the advantage of terminating the proposal . . . and weigh other alternatives in the balance.' [Citations omitted]."  Center for Sierra Nevada Conservation v. County of El Dorado (2012) 202 Cal.App.4th 1156, 1171.

Here, in violation of CEQA, the City's project description fails to include the full zoning history of the site, including the fact that Ordinance 165,660 imposed the 2:1 FAR limit as an adopted mitigation measure for the Hollywood Community Plan and Hollywood General Plan/Zoning Consistency Program EIRs.  The project description also omits the City's "logic" in applying a May 2000 Zoning Administrator Interpretation and February 2009 Zoning Engineer memo to enable the reviewing public to comprehend that the Project involved a building with more than twice the number of hotel rooms as allowed by the correctly applied zoning code for the applicable commercial zoning. If the City is relying on a Zoning Interpretation, it must be cited and appended to the environmental review documents instead of gaslighting the public by pretending this reality does not exist.

On more than one occasion, when the City or CEQA consultants for developers have no answer regarding violations of land use laws of the City, they simply omit the analysis.  This was done here.  By purposely omitting key aspects of the zoning history and various interpretations it relied upon, such omissions led to a fatally flawed analysis of other issues in the MND.

**B.**     **The MND's Land Use Analysis Fails To Disclose Significant Land Use Impacts.**

In City Planning Case No. 86-835 GPC [General Plan Consistency], the City prepared and/or recirculated an EIR for the Hollywood Community Plan in support of the consistency program.  **(Exhibit 2.)**  At various times in 1988-1990, the City approved resolutions and enacted ordinances to impose PERMANENT "D" Development Limitations of Subarea Map parcels throughout the Hollywood Community Plan and Redevelopment Plan area.

In Ordinance 165,660 dated May 6, 1990, as part of AB 283 compliance under City Planning Case 86-835- GPC, the City enacted the ordinance that imposed the

Department of City Planning
March 23, 2018
Page 23 of 24

permanent "D" Development Limitation on the Tao Hotel property, which was located
within Subarea 90 on the General Plan Consistency map. (**Exhibit 2**.) LAMC Section
12.32 regarding D Development conditions expressly provides that "D" Development
Limitations are permanent (until revised in the next community plan revision process).

The City's supporting EIR for these actions (Hollywood Plan Revision
Environmental Impact Report (SCH NO. 87-112504)) concluded that without reductions
in authorized density to mitigate or avoid significant environmental impacts, the City's
infrastructure in Hollywood would suffer overwhelming impacts that endangered public
health and safety (including police and fire response times). The imposition of the AB
283 "D" Development Limitation on the Tao Hotel site, and many parcels in Hollywood,
was intended to avoid environmental impacts from over-dense development, unless and
until the CRA completed a Transportation Plan to avoid those significant impacts. That
the former redevelopment agency would be responsible for balancing the infrastructure
issues through the Transportation Plan was summarized in a "Next Steps Hollywood
Community Plan Revision" memo made public in the midst of the planning process.
This memo explains that it was necessary to limit development by right to reduced
densities which the CRA called "practical buildout", or 36 million square feet of
development, instead of the "theoretical buildout" of the zoning from the City's 1946
zoning code, which would have allowed 88 million square feet. (**Exhibit 2.**)

The City has been on notice that it could not remove the permanent "D"
Development Limitation until such time as the CRA/LA (successor agency to the former
redevelopment agency) prepared the Transportation Plan it committed to complete in the
1986 Hollywood Redevelopment Plan, and supported it with new environmental analysis
showing that the adopted Transportation Plan solved the risks of environmental harm that
had justified imposition of the permanent "D" Development Limitation in the first place.

Accordingly, the "D" Development Limitation cannot be removed by the City
Council as it proposes to do in this case, and substituted with a new CONDITIONAL "Q"
condition and "D" Development Limitation. The permanent "D" Development
Limitation, given that it was imposed to avoid significant environmental harm from over-
dense development, and that it was required to be imposed in order to bring the City into
compliance with Government Code Section 65680(d) under a legal settlement, means that
it cannot be removed until the CRA/LA completes and adopts a Transportation Plan that
eliminates the potential environmental harm from development at a FAR greater than the
2:1 imposed on this parcel.

CPC-2016-2601 – 2003

Department of City Planning
March 23, 2018
Page 24 of 24

None of this critical land use history was included in either the Project Description or the Land Use analysis of the MND materials. In fact, due to its complexity, and because the Project as proposed grossly violates the 2:1 FAR limit imposed by the "D" Development Limitation under the General Plan/Zoning Consistency program, the City, and now CRA/LA, must prepare an EIR to explain these complexities and provide the public an opportunity for participation in the CEQA process.

Accordingly, the MND fails to properly disclose and analyze the proper Project description or disclose, analyze and mitigate the land use impacts of the proposed Project, which nearly doubles the authorized FAR, and more than doubles the authorized number of hotel rooms.

## C. CONCLUSION REGARDING ENVIRONMENTAL REVIEW.

In sum, the MND fails on multiple grounds, and as to multiple types of environmental effects, to meet the test for a mitigated negative declaration. It has failed to show no possibility of a significant impact on the environment as to air quality, noise and vibration, greenhouse gas emissions, and traffic. An EIR is clearly required.

## IX.    SUMMATION.

The Tao Hotel is an ill-conceived, noise generating nuisance "party hotel" that should have never come out of a Planning Department conference room. Multiple deliberate misconstructions of the LAMC are used to unlawfully increase the residential unit density, FAR, and height of the building. There is no legitimate basis to approve this Project as proposed. Given the numerous hotels of the same developer in the immediate vicinity, it is time for the City to acknowledge that this multi-hotel project must be analyzed comprehensively in a full EIR.

Very truly yours,

*Daniel Wright*

DANIEL WRIGHT
FOR
THE SILVERSTEIN LAW FIRM, APC

DEW:vl
cc:    Client

CPC-2016-2601 – 2004

# THE SILVERSTEIN LAW FIRM
*A Professional Corporation*

215 NORTH MARENGO AVENUE, 3RD FLOOR
PASADENA, CALIFORNIA 91101-1504

PHONE: (626) 449-4200  FAX: (626) 449-4205

DAN@ROBERTSILVERSTEINLAW.COM
WWW.ROBERTSILVERSTEINLAW.COM

July 13, 2018

**VIA EMAIL mindy.nguyen@lacity.org,**
**cpc@lacity.org,**
**james.k.williams@lacity.org**

Mindy Nguyen
Planning Commission Hearing Officer
Los Angeles Advisory Agency
Department of City Planning
200 N. Spring Street, Room 621
Los Angeles, CA  90012

**VIA EMAIL jason.hernandez@lacity.org**

Jason Hernandez
Tract Case Planner
200 N. Spring St., Room 621
Los Angeles, CA  90012

**Re:**   Objections to the Site Plan Review, Zone Change, Height District Change, Conditional Use Permit-Alcohol, Mitigated Negative Declaration and all other entitlements for the Schrader Hotel Project located at 1600-1616 1/2 N. Schrader Boulevard and 6533 Selma Avenue; VTT-74521; CPC-2016-3750-VZC-HD-MCUP-ZAA-SPR; ENV-2016-3751-MND;  and related <u>cases.</u>

Dear Ms. Nguyen, Mr. Hernandez, and Advisory Agency:

## I.    <u>INTRODUCTION.</u>

This firm and the undersigned represent The Sunset Landmark Investments, LLC (hereinafter "Sunset Landmark").  Please keep this office on the list of interested persons to receive timely notice of all hearings and determinations related to the proposed approval of an eleven-story hotel at 1600-1616 1/2 N. Schrader Boulevard and 6533 Selma Avenue, commonly known as the Schrader Hotel Project ("Schrader Hotel" or "Project").  Pursuant to Public Resources Code Section 21167(f), provide a copy of each and every Notice of Determination issued by the City in connection with this Project.  Sunset Landmark adopts and incorporates by reference all Project objections raised by themselves and all others during the environmental review and land use entitlement processes.

Susan Myong CSR 13365
Bruce Rothman
4/20//21
**8**

Department of City Planning
July 13, 2018
Page 2 of 24

## II. CITY COUNCIL MUST DENY ALL APPLICATIONS FOR SCHRADER HOTEL BECAUSE THE PROJECT AS PROPOSED IS UNLAWFUL.

Sunset Landmark Investments respectfully submits this letter and accompanying exhibits, demanding that the City Council deny all above-referenced applications submitted by the owner/applicant for the following reasons:

(1) The entire concept for the Schrader Hotel is to create an over-developed, nuisance-generating, "party hotel" as part of a whole line of similar projects within a few hundred feet of this Project for the purpose of creating an overbuilt hotel district where none of this was planned, and for which the infrastructure is not designed to support. The developer asks for the "sun, the moon, and the stars" when there is not a hint that the scope of this request is appropriate.

(2) The City relies upon facially invalid interpretations of LAMC 12.22 A18 and 12.12 C4 (**Exhibit 1** [Summary of Zoning Administrator Interpretation dated May 18, 2000 and Zoning Engineer Memo dated February 10, 2009]) to claim that R5 zone density is permitted on commercially zoned lots in Regional Center Commercial land use designations across the City, including Hollywood, and, even more incredibly, that the authorized residential unit density limit is "unlimited" as to hotel rooms because City Council failed to specify a guest room limit in LAMC 12.12 C. Based upon these ludicrous interpretations, that are injecting more than double unit density into Regional Commercial Centers across the City without any textual support in the LAMC sections cited, and without environmental review of the cumulative impacts, the City claims the Schrader Hotel can have 198 rooms. Thus, the Project as proposed is unlawful because it proposes a project more than 132 hotel rooms which is the lawful number of guest rooms in the C4 or C2 zone in which this site lies. The hotel will therefore be a an oversized monolith far larger than the size the City planned for in the Hollywood Community Plan, the Hollywood Redevelopment Plan, and the City's zoning.

(3) The Project as proposed is inconsistent with the permanent "D" Development Limitation of 2:1 Floor Area Ratio ("FAR") imposed on the site as part of the General Plan Consistency Case 86-835-GPC and applicable City ordinances (**Exhibit 2** [Hollywood General Plan/Zoning

Department of City Planning
July 13, 2018
Page 3 of 24

Consistency Program]).  Having imposed this 2:1 FAR limit in 1988 to protect the Hollywood community from negative environmental impacts as part of an extensive General Plan Consistency process (**Exhibit 3** [Ordinance 165660]), the City has no authority under Government Code Section 65860 or CEQA to remove the permanent "D" Development Limitation until:

a.  The City demonstrates that the negative impacts of overdense development on Hollywood's deficient infrastructure have been mitigated to the maximum extent feasible as part of a lawful comprehensive community planning process (and then comprehensively adjust the 1988 General Plan Consistency Program density restrictions in accordance with the comprehensive review of the community planning process); or

b.  The City reduces density on other land in the Community Plan area on a 1 to 1 basis for each parcel of land it purports to increase density (in order to maintain the density limit imposed in the 1988 Hollywood Community Plan and Hollywood General Plan Consistency Program). Such a Floor Area Transfer Program was authorized in the Hollywood Community Plan Section 511, but was never implemented by the former redevelopment agency or its successor agency, CRA/LA; or

c.  The City demonstrates compliance with the required enactment of the Transportation Plan identified in the 1988 Hollywood Community Plan Revision process and the 1986/2003 Hollywood Redevelopment Plan process, and guaranteed by the City in Ordinance 165660 to provide a substitute mitigation to the 2:1 FAR density restriction imposed on these parcels in 1988.

The FAR limit of 2:1 was imposed as a CEQA mitigation measure as part of a comprehensive planning process that occurred in conjunction with the 1988 Hollywood Community Plan Revision **and** the 1988 Hollywood General Plan Consistency Program.  As extensively documented in **Exhibit 2**, there is no reasonable dispute that a comprehensive downzoning of Hollywood occurred in 1988 because significant negative impacts would occur if the City's 1946 zoning densities were allowed to be constructed

Department of City Planning
July 13, 2018
Page 4 of 24

without limitation – which is what the City is doing on a parcel by parcel based now.

Based upon this zoning history, the Schrader Hotel Project is actually asking for a rezoning that authorizes a taller and larger building than allowed by law.  The City and Developer, once again presume the City can just enact a new ordinance and it will override Ordinance 165,660 that imposed the 2:1 FAR "D" Development Limitation.

Because the City proposes to erase the FAR density limit without complying with any of these requirements so as to avoid cumulative negative impacts in raising density without protecting the Hollywood community with proper environmental review and equally effective mitigation measures, its action is unlawful and cannot be approved as proposed.  Napa Citizens for Honest Government v. Napa County Board of Supervisors (2001) 91 Cal.App.4th 342, 358-359 ("We therefore hold that a governing body must state a legitimate reason for deleting an earlier adopted mitigation, and must support that statement of reason with substantial evidence.  If no legitimate reason for the deletion has been stated, or if the evidence does not support the governing body's finding, the land use plan, as modified by the deletion or deletions, is invalid and cannot be enforced.")  See also Federation of Hillside & Canyon Associations v. City of Los Angeles (2000) 83 Cal.App.4th 1252, 1261 (City must assure that mitigation measures "will actually be implemented as a condition of development, and not merely adopted and then neglected or disregarded.")

The City may not replace the 2:1 FAR density limit of Ordinance 165,660 without a valid reason. Such a valid reason would be that the long awaited Transportation Plan mitigation has been enacted, or a valid new community plan process that includes proper cumulative impact review has been completed.  Neither of those things have occurred due to the City's ongoing neglect of the force of law of its general plan.

(4)     The former redevelopment agency, its lawful successor CRA/LA, and the Los Angeles City Council have violated their duties imposed by the Hollywood Redevelopment Plan, and cited in Ordinance 165,660 as a valid basis to modify the mitigation measure of the 2:1 FAR limit imposed in 1988, by failing to adopt the mandatory Transportation Plan that must be in place before the CRA/LA has legal authority to authorize any increase on

Department of City Planning
July 13, 2018
Page 5 of 24

this property above 2:1 FAR.  We have confirmed with CRA/LA that while a Transportation Plan was proposed by the former redevelopment agency, the City Council refused to enact the Transportation Plan required by the Hollywood Redevelopment Plan because it proposed to pay for needed infrastructure improvement with fees on real estate development. Enactment of the proposed Transportation Plan was mandatory before increases in density would be allowed by the City.  Because the Hollywood Redevelopment Plan was adopted by City Ordinance Nos. 161202 and 175236, any project approved that exceeds the FAR limits imposed as mitigation measures without the mandatory Transportation Plan in place also violates City Ordinances 161202 and 175236.  (**Exhibit 4** [Ordinances Incorporating Hollywood Redevelopment Plan as City Law].)  CRA/LA has been sued by Hollywood Heritage for CRA/LA's more than three decade dereliction of duty to complete and implement any of the mandatory programs of the 1986 and 2003 Hollywood Redevelopment Plan.  This significantly includes failure to complete and adopt a protective and mitigating Transportation Plan.  Therefore, this Project as proposed at an FAR exceeding 2:1, is unlawful.

(5)   The MND prepared by the City for the Schrader Hotel is fatally flawed and cannot support a project approval.  The MND failed to accurately disclose and analyze the current zoning, FAR, height, and residential density elements of the Project in the project description and the land use sections of the MND.  In fact, the land use section contains a significant inconsistency: while it proposes to enact a new "D" Development Limitation on the project at footnote 42 it inconsistently claims the Project will seek a Disposition and Development Agreement with the CRA/LA to exceed the 2:1 FAR limit.  This is an admission that Ordinance No. 165,660 governs the maximum FAR at the property, however, because the Transportation Plan required by law has never been adopted by CRA/LA or the City, the CRA/LA lacks authority to enter into a Disposition and Development Agreement to permit excess density.  Therefore, the Land Use section of the MND fails to disclose and analyze a significant negative land use impact because the Project does not comply with Ordinance No. 165,660.

(6)   This is the another alcohol-soaked "Animal House" party hotel proposed within a few hundred feet the Dream Hotel and the Tao Hotel – yet the City Environmental Review Unit acts as if they are unrelated.  The MND

Department of City Planning
July 13, 2018
Page 6 of 24

expressly states that the applicant has an existing set of relationships with
the owner group for the Dream Hotel and Tao Hotel.

For all of these basic reasons, most of them fundamental planning concepts
apparently thrown out the window by the City Planning Director and his employees, the
City Planning Commission and Advisory Agency must exercise restraint by not
rubberstamping another planning disaster in Hollywood fueled by greed of investors with
no stake in the integrity of the City's planning processes.

## III.   **RELEVANT FACTS AND BACKGROUND.**

The Project site sits within a portion of the Hollywood Community Plan
specifically planned and zoned in the 1980s to comply with the mandate of Government
Code Section 65860, subdivision (d) ("AB 283").  AB 283 required the City to make its
zoning consistent with its General Plan land use designations.

The land use densities adopted in the 1988 Hollywood Community Plan were less
dense than the land use densities allowed in the City's 1946 Zoning Ordinance.  To make
its zoning consistent with the 1988 Hollywood Community Plan, the City Council
adopted numerous ordinances, including Ordinance No. 165,660, to limit density and
height because the area was so distant from high capacity transit.  (**Exhibits 2 & 3.**)  The
City staff, as it has done for the Dream Hotel and Tao Hotel ignores the 2:1 FAR
limitation placed on the Project site (via the 1990 Ordinance No. 165,660 to restrict these
parcels using a "D" Development Limitation), which was specifically imposed to avoid
City-acknowledged area wide significant environmental impacts if development was
allowed to proceed at the densities under the City's 1946 Zoning ordinance and its 1973
Hollywood Community Plan.

Under the City's Hollywood General Plan Consistency Program, the widespread
use of "D" Development Conditions like the one imposed on the Schrader Hotel parcel
were determined by the City Council to be necessary to bring the City's 1988 Hollywood
Community Plan and zoning into conformity, as mandated by Government Code Section
65860(d) and the settlement agreement in litigation brought to enforce the City's
mandatory duty to make its zoning consistent with its General Plan.  The City made
express findings that the "D" Development limitations were imposed to avoid
environmental impacts – thus, the mitigation of impacts was incorporated into the City's
zoning rules and general plan in order to make the mitigation measure legally
enforceable.

Department of City Planning
July 13, 2018
Page 7 of 24

Now the developer asks the City to override Ordinance No. 165,660, just like it purported to do on similar hotel projects in the vicinity. In accordance with the Napa and Hillside Federation cases cited above, the City has to show it has a valid basis to allow a density increase when the long-delayed CRA/LA transportation plan required in Ordinance No. 165,660 as a mitigation measure has never been completed. The developer offers no legitimate basis to take the proposed action. The entire project concept is a giant noise-generating party hotel completely surrounded by residential sensitive receptors who have already bitterly complained about the nuisance noise from the Dream Hotel linked to this project site.

## IV.   THE LAWFUL NUMBER OF HOTEL ROOMS IS 132 ROOMS: MUCH LESS THAN THE 198 ROOMS PROPOSED BY THE DEVELOPER.

The number of hotel rooms permitted by the express language of LAMC Sections 12.16 or 12.14 is set forth. The math is simple: Divide the lot size square feet by 200 sf per unit equals the authorized number of hotel rooms. These facts are verifiable. According to ZIMAS, the sum of the four lots that comprise the total project area (including the existing apartment) is 26,439.9 square feet. Divide that number by 200 square feet, and the maximum number of units is 132.

The actual dimension of the lots where the hotel will be built is 14,299.8. Divide that number by 200 square feet, and the maximum number of units is 72.

Nowhere in the environmental review documents is there a complete, honest, and open explanation of the staff's "logic" and math showing how it determined that 198 hotel rooms was permissible. The Planning staff's obscuring of the basis of their decision telegraphs that even City staff lacks confidence in the legality of a May 18, 2000 Zoning Administrator Interpretation of the zoning code and the February 10, 2009 Zoning Engineer memo. As summarized at page 222 of the LADBS Zoning Manual, the Zoning Administrator claims without any credible basis that a reference in LAMC 12.22-A.18 to R5 land uses are permissible. Closer examination of this "interpretation" reveals that it is a fabrication. The ZAI is unlawful because the Zoning Administrator has undertaken to re-write the Municipal Code, which is a power only held by the City Council.

Department of City Planning
July 13, 2018
Page 8 of 24

The plain language of Section 12.22-A,18 does not authorize R5 residential density for a mixed use project in the regional center commercial land use designation. The first portion of LAMC Section 12.22-A,18 provides:

"18.   Developments Combining Residential and Commercial Uses.  Except where the provisions of Section 12.24.1 of this Code apply, notwithstanding any other provision of this chapter to the contrary, the following uses shall be permitted in the following zones subject to the following limitations:  (Amended by Ord. No. 163,679, Eff. 7/18/88.)

(a)   Any use permitted in the R5 Zone on any lot in the CR, C1, C1.5, C2, C4 or C5 Zones provided that such lot is located within the Central City Community Plan Area or within an area designated on an adopted community plan as "Regional Center" or "Regional Commercial".  Any combination of R5 uses and the uses permitted in the underlying commercial zone shall also be permitted on such lot."  (Emphasis added.)

The express language applies only to permitted **uses**, not to permitted residential dwelling unit density expressed in lot area regulation.  It is silent as to residential dwelling unit density.  Thus, the "theory" that LAMC Section 12.22-A,18 "allows" R5 residential dwelling unit **density** is incorrect, and omission of any reference to it by City staff has the effect of misleading the public.

Even more damning however is the fact that LAMC Section 12.22C, where one would expect to find exceptions stated for lot area residential unit densities, is silent on the question of whether R5 density ought to be allowed in commercially zoned lots in Regional Center land use designations.  Silence in no way can be interpreted by a City official as authority to provide for such an exception – especially one which would more than double hotel room densities without any environmental review or notice to anyone.

The undisclosed Zoning Administrator Interpretation of LAMC Section 12.22-A,18(a) is void as contrary to the plain language of the law.  If the City Planner is relying on a May 18, 2000 Zoning Administrator Interpretation of LAMC 12.22-A as the basis to

Department of City Planning
July 13, 2018
Page 9 of 24

allow a R5 zone residential unit density in the Schrader Hotel, that reliance is unlawful.
The Interpretation reads as follows:

> "One question related to density that arises is whether to
> apply R5 lot area requirements or R3 / R4 lot area
> requirements as referenced in the lot area requirements of C
> zones.  In the enforcement of this section, the Zoning
> Administrator has determined that the lot area requirements
> of the R5 zone are to be applied to projects subject to this
> section.  **Although it is not explicitly stated in the section**,
> the last sentence of the section **implies** applying area
> requirements of R5 zone, not R3 or R4 zone.  This
> interpretation has been confirmed by the Office of Zoning
> Administrator who reviewed the original staff report for the
> ordinance."  (Emphasis added.)

While the Zoning Administrator may possess the authority to clarify an ambiguity
in a municipal code provision, he or she has no authority to re-write a City ordinance.
Only the City Council has that authority.  There is no lawful basis to "interpret" LAMC
Section 12.22A18(a) related to authorized "uses" as permitting R5 residential unit density
which if it was allowed as the Zoning Administrator claims, the exception would be
written into LAMC Section 12.22C – Lot Area.

Stacking one misreading of the LAMC on top of another the City is also relying
upon the City's Zoning Manual, page 66, which asserts that because LAMC Section
12.12C4, related to rules for the R5 Zone, is silent as to minimum lot area per hotel guest
room, it must be interpreted to mean guest room density is "unlimited."  This contention
is contrary to basic principles for the construction of a law or ordinance.  If the residential
unit density for R5 zones was "unlimited", it would say so – it would not be silent.
Omission means no authority is granted.  If the omission is a mistake, then the proper
action of the Zoning Administrator or Zoning Engineer would be to refer the problem to
the City Planning Commission for review and enactment of a legislative amendment.
The Zoning Engineer does not possess the legislative power of the City Council –
especially when releasing unlimited density into thousands of acres of Regional Center
Commercial land would have huge environmental impacts.

Additionally, for any code provision to permit "unlimited" density is inconsistent
with the entire concept of having a General Plan. The purpose of the General Plan is to
determine anticipated future population, and plan for that growth by allocating where in

Department of City Planning
July 13, 2018
Page 10 of 24

the City the densities are needed and appropriate to meet the expected demand within the planning time frame.  To suggest that any part of a zoning code, which implements the density limits of a General Plan, can allow "unlimited" density, is to create a giant loophole that would encourage abusive project applications such as the over dense, noise generating, party hotel that Schrader Hotel is destined to become.

The City Planning staff appears to have relied upon the improper Zoning Administrator and Zoning Engineer Interpretations as a pretense to more than double the residential dwelling unit density for the Schrader Hotel above that authorized in the LAMC Sections 12.14 and 12.16.  The May 18, 2000 Zoning Administrator Interpretation and the February 10, 2009 Zoning Engineer memo are void because they violate **the plain language of LAMC Section 12.22A18(a) and the absence of an exception in LAMC Section 12.22 C**.  And even if this were so, under no circumstances may a City staff member seize upon the absence of a residential unit density limit in LAMC Section 12.12 C4 to "mean" the sky's the limit.  That is not how zoning ordinances work.  While the Zoning Administrator or Zoning Engineer may have authority to make reasonable interpretations of language <u>actually</u> used by the City Council, he or she has no authority to devise "interpretations," untethered to any fair reading of a municipal code provision.  If this is not true, then the Zoning Administrator and Zoning Engineer just became a Los Angeles super legislature to re-write City Council laws.  Of course, this is not lawful behavior.

## VI.   THE CURRENT ZONING OF THE SCHRADER HOTEL WAS ENACTED UNDER THE COMPREHENSIVE GENERAL PLAN CONSISTENCY PROGRAM AS A DOWNZONING MITIGATION MEASURE AND THEREFORE SUCH MITIGATION MEASURE CANNOT BE MODIFIED BY SIMPLE REPEAL, AS THE DEVELOPER HAS ASKED THE CITY TO DO AGAIN AND AGAIN.

Since 1971, the Legislature has required in Government Code Section 65860(a) that all general law cities and counties make their zoning consistent with the adopted general plan.  In this way, the Legislature sought to ensure that real planning occurred for the future development of cities and counties, and that the zoning actually implemented it.

Although this law did not apply to charter cities, most of them voluntarily undertook to make their zoning consistent with their general plan – except one.  Los Angeles' 1946 zoning code had densities far in excess of the capability of the City's infrastructure to hold it – 10 million people.  The City's first community plans concluded

Department of City Planning
July 13, 2018
Page 11 of 24

after environmental review that the infrastructure could only support between 4 and 5
million residents.

The City Council refused to downzone to make its zoning law consistent with the
density its community plans said could realistically be accommodated.  Thus, the City
Council during the mid- and late-1970s continued to allow developers to construct
projects consistent with the 1946 zoning, but grossly inconsistent with the general plans
of the City.

A.   **The Legislature In 1979 Mandated That Los Angeles Make Its Zoning
Ordinances (Codes) Consistent With Its General Plans.**

Responding to calls for intervention, the State Legislature in Assembly Bill 283
("AB 283") amended Government Code section 65860 to add subdivision (d) that applied
to the City of Los Angeles:

"(a)   **County or city zoning ordinances shall
be consistent with the general plan of the county or
city** by January 1, 1974.  A zoning ordinance shall be
consistent with a city or county general plan only if: (i)
The city or county has officially adopted such a plan,
and (ii) The various land uses authorized by the
ordinance are compatible with the objectives, policies,
general land uses, and programs specified in such a
plan.

* * *

(d)   **Notwithstanding Section 65803, this
section shall apply in a charter city of 2,000,000 or
more population to a zoning ordinance adopted
prior to January 1, 1979, which zoning ordinance
shall be consistent with the general plan of such city
by July 1, 1982.**"  (Emphasis added)

Subdivision (d) required the City to make all of its zoning ordinances (municipal
code provisions) and zoning maps consistent with its adopted general plan no later than
1981, and then after amendment, 1982.  The City instead sued the State of California
claiming that the act was unconstitutional.

Exhibit A
116

Department of City Planning
July 13, 2018
Page 12 of 24

After the City won in the trial court, the State prevailed in the Court of Appeal and the California Supreme Court denied review.  Thus, the Court of Appeal's decision in City of Los Angeles v. State of California (1982) 138 Cal.App.3d 526 made the consistency requirement between general plans and zoning ordinances a mandatory duty of the City.

**B.** **Center For Law In The Public Interest Sues To Force City To Comply With The State Consistency Requirement Of AB 283 (Government Code § 65860(d)).**

Because the Court of Appeal decision did not order the City to comply with state law, the City continued to drag its feet in commencing proceedings to downzone properties to make all zoning ordinances and maps conform with City general plans.  The Center for Law In The Public Interest then initiated litigation seeking a writ of mandate to force the City to comply with the state law.  In Federation of Hillside and Canyon Associations et al. v. City of Los Angeles (C 526616), the Superior Court quickly issued a writ ordering the City to make its zoning code consistent within 120 days.  For reasons not relevant to the issues in this case, the City ultimately entered into a stipulated judgment with the Federation and other plaintiffs to take longer to complete the project under a court-appointed monitor to oversee the consistency process and report back to the Court – a process which ended up taking more than a decade.

**C.** **The Hollywood Community Plan Zoning Map Was Made Consistent With The Hollywood Community Plan In Case Numbers 83-368 and 86-835-GPC And Supported With Recirculation Of The Original Hollywood Community Plan EIR (EIR No. CPC-1070-GP/ZC) and the Hollywood Redevelopment Plan EIR (SCH No. 85052903).**

As the City carried out the AB 283 consistency process under the supervision of a court monitor, it complied with CEQA by recirculating the Hollywood Community Plan EIR in May 1988 and the January 1986 Hollywood Redevelopment Plan EIR in May 1988.  The General Plan Consistency Program, as explained under oath by the City's former Planning Director, was necessary to significantly reduce the City's zoning density to conform with its 35 community plans.  (**Exhibit 2** [Hollywood General Plan Consistency Proceedings; Declaration of Cal Hamilton].)  From spring of 1988 to early 1990, the City carried out the Hollywood General Plan Consistency Program to bring itself in compliance with Government Code Section 65680(d) and the Hillside Federation settlement agreement.  (**Exhibit 2**.)  The downzoning of the Hollywood Community Plan,

Department of City Planning
July 13, 2018
Page 13 of 24

in the form of changes to the Community Plan and imposition of permanent "D" Development and "Q" Qualified Conditions, were expressly required as a mitigation measure to avoid infrastructure failures across the Hollywood Community Plan area – until the CRA and City implemented a Transportation Plan.  (Id.)  Documents of the City and CRA acknowledge that these reductions in density were required **until such time as the Transportation Plan was enacted**.  (**Exhibit 2**.)

A similar process was carried out for every community plan across the City until 200,000 lots were downzoned to protect the City's residents from serious negative impacts of deficient public services infrastructure to support the overly-intense City zoning map densities dating back to 1946.

The subject properties for the Schrader Hotel were expressly down zoned as to FAR to 2:1, as set forth in Ordinance No. 165,660.  (**Exhibit 3**.)  In downzoning these lots, the City was made findings relied upon by the public and the monitoring court in the Hillside Federation litigation that it would enforce the mitigation measure of downzoning by incorporating the changes into zoning, including the zoning changes now in place on the Project Site for the Schrader Hotel.  These limits of density remain in place and binding today because, incredibly, 30 years later neither the former CRA, nor its successor agency, nor the City, ever enacted the promised Transportation Plan to provide the required planning framework and infrastructure to enable increases in authorized density.  The record in this case is devoid of any evidence the Transportation Plan was ever enacted, and it fact we have verified with CRA/LA it was never enacted.  In fact, Hollywood Heritage has sued the CRA/LA for non-performance and completion of any of the Hollywood Redevelopment Plan implementing programs, including the never completed Transportation Plan.

Our Court of Appeal, in a case against the City of Los Angeles over its General Plan Framework, made quite clear that when the City adopts mitigation measures to implement a general plan, it has a duty to make sure they are carried out:

"CEQA requires the agency to find, based on substantial evidence, that the mitigation measures are 'required in, or incorporated into, the project' . . . ([Public Resources Code] § 21081; [CEQA] Guidelines, § 15901, subd. (b).)  In addition, the agency 'shall provide that measures to mitigate or avoid significant effects on the environment are fully enforceable through permit conditions, agreements, or

Department of City Planning
July 13, 2018
Page 14 of 24

other measures.' ([Public Resources Code] § 21081.6, subd. (b))(fn.4) and must adopt a monitoring program to ensure that the mitigation measures are implemented. ([Public Resources Code] § 21081.6, subd. (a)). The purpose of these requirements is to ensure that feasible mitigation measures *will actually be implemented* as a condition of development, and not merely adopted and then neglected or disregarded. (See [Public Resources Code § 21002.1, subd. (b).)(fn. 5)"

[Footnote 4 by the Court]: "A public agency shall provide that measures to mitigate or avoid significant effects on the environment are fully enforceable through permit conditions, agreements, or other measures.  Conditions of project approval may be set forth in referenced documents which address required mitigation measures or, in the case of the adoption of a plan, policy, regulation, or other public project, incorporating the mitigation measures into the plan, policy, regulation, or project design." (§ 21081.6, subd. (b).)  **In the context of this statute, to incorporate mitigation measures into a project means to amend the project so that the mitigation measures necessarily will be implemented, such as by reducing the scope of the project or requiring that mitigation measures be implemented as a condition of the project.**  (See Guidelines, § 15126.4, subd. (a)(1)(A), and former § 15126, subd. (c), both distinguishing mitigation measures proposed by the project proponent from those 'required as conditions of approving the project.')"

[Footnote 5 by the Court]: "'Each public agency shall mitigate or avoid the significant effects on the environment of projects that it carries out or approves whenever it is feasible to do so.' (§ 21002.1, subd. (b).)" Federation of Hillside and Canyon Associations v. City of Los Angeles (2000) 83

Department of City Planning
July 13, 2018
Page 15 of 24

Cal.App.4th 1252, 1260-1261 (italic emphasis by the Court, bold and underline emphasis added.)

Based upon this precedent, there can be no serious claim by the City that it does not have a legal duty to assure full implementation of the Hollywood Community Plan General Plan Consistency Program in order to protect the health, safety and environmental welfare of the community.  That includes maintaining the permanent D Limitation until alternative mitigation measures are comprehensively evaluated and imposed to protect the Hollywood community.

D.  **Because The FAR Restrictions Were Adopted Environmental Mitigation Measures To Avoid Significant Impacts, The City Council May Not Amend Or Delete These Mitigation Measure Enactments Without Full Disclosure And Analysis In An EIR, As Well As A Comprehensive Planning Process That Accounts For The Potential Cumulative Negative Impacts Of Ignoring General Plan Consistency Program Measures.**

This case, like many cases in Hollywood recently, poses the question of whether the City may bring its Hollywood Community Plan and zoning into consistency with the density projections underlying the Plan for a moment in time (1988) (what would be called "paper consistency'), and then begin an incremental parcel by parcel removal of the density limits imposed as a mitigation measure to comply with the Community Plan's density limits.  The answer is obvious:  such modification of community-wide mitigation may not be removed or changed without a new comprehensive general plan and zoning consistency process such as what occurs in association with amendment of an entire community plan.  Nor, of course, has any proper or adequate level of disclosure and analysis of this type been provided in the instant MND, further rendering it deficient and in violation of CEQA.

This conclusion is supported by two important limitations on the City Council's authority.  First, parcel-based general plan amendments were prohibited as part of the 1969 City Charter amendments to the Planning Department provisions.  These critical Charter amendments were enacted by the People to:  (1) enforce the comprehensive planning goals of the People in having a meaningful General Plan, and (2) eliminate the very parcel-based rezoning scam that led to the conviction of a City Councilmember for bribery.

Department of City Planning
July 13, 2018
Page 16 of 24

Second, the adoption of the City's General Plan Consistency recommendations for Hollywood was a comprehensive set of recommended reductions in permitted FAR, height, and uses intended to enforce the density planned for in the 1988 Hollywood Community Plan.  These critical reductions in density, collectively brought Hollywood's zoning density into consistency with its general plan density.

It is still unclear how quickly after the City certified to the Court in the Hillside Federation case that the City's general plan consistency was "complete" that it began to quietly allow developers to apply for general plan amendments and/or zoning changes to change that reduced density zoning without maintaining the protective effect of the density limits until alternative plans, like the Transportation Plan of the CRA, were in place.

Parcel-by-parcel, the City is asserting it has the authority to simply rezone every parcel in the City without regard to whether the present zoning, FAR limits, permanent "D" or "Q" conditions were imposed as a mitigation measure of the City's General Plan Consistency Program.  The Palladium Project, the Columbia Square Project, 5901 Sunset Project, the Dream and Tao Hotels and many other projects within a short distance from the Schrader Hotel, all include rezoning that purported to lawfully wipe out General Plan Consistency mitigation measures imposed on those lots.  Incredible density increases are being authorized, including as proposed in this Project, without disclosure in the MND or the Staff Recommendation Report to the public or analysis of the potential negative cumulative impact on the Hollywood General Plan Consistency Program.

In essence, the City has embarked on a giant expansion of density in Hollywood without even bothering to lawfully complete a Hollywood Community Plan Update that analyzed it and justified changes to the current limitations imposed on many parcels of land in the Hollywood Community Plan area.

In recent years, the City undertook to revise and update the Hollywood Community Plan.  Unfortunately, the City Planning Department's environmental review and planning process for that comprehensive planning activity went off the rails.  The trial court, the Hon. Allan Goodman, found the City's planning and environmental review process for the Hollywood Community Plan Update ("HCPU") was "fatally flawed".  Multiple groups sued the City over the HCPU because it used demonstrably false and inflated population projections to try to justify massive increases in density.  Additionally, the City failed to properly conduct environmental analysis related to the HCPU.

Department of City Planning
July 13, 2018
Page 17 of 24

Accordingly, neither in the EIR for the now rescinded HCPU, nor in the EIR or MND for individual projects where the City proposes to wipe out protective mitigation measures of the General Plan Consistency Program, including the MND in this case, has the City ever analyzed and accounted for its incremental increases in density without regard to the potential negative impacts on the community.  The City has simply presumed it can do it because no one has previously objected to it.

Our client and many other community organizations strenuously object.  The City could only remove General Plan Consistency Program mitigation down zoning as part of the next comprehensive update of its Hollywood Community Plan, and only if it does so in full compliance with CEQA.  That clearly has not yet happened.  In the alternative, assuming that a parcel-based general plan amendment is lawful, which it is not, then any rezoning that upzones parcel(s) in the Hollywood Community Plan area could only be lawful if the City Council downzones other parcel(s) to maintain the cumulative protective balance of the General Plan Consistency Program.  Such a density transfer program was contemplated in Section 511 of the Hollywood Redevelopment Plan, but like the 30 year absence of an adopted Transportation Plan, the redevelopment agency nor CRA/LA ever completed a Density Transfer program in Hollywood.  With each unmitigated parcel-by-parcel removal of a General Plan Consistency Program mitigation zoning provision, the City has engaged in an extremely serious and unaccounted for densification of the Hollywood Community Plan area that is inconsistent with the density for which it is currently planned.

## VII.  THE FORMER REDEVELOPMENT AGENCY'S FAILURE TO PREPARE A TRANSPORTATION PLAN MEANS THAT NO INCREASES IN DEVELOPMENT DENSITY CAN BE GRANTED UNDER THE "D" DEVELOPMENT LIMITATION.

Even if the "D" Development Limitation remained in place on the Schrader Hotel property, its density could not be properly increased because the former redevelopment agency and the Los Angeles City Council have failed for 30 years to enact a Transportation Plan intended as a substitute mitigation measure.  As written in plain language and as explained in a letter from CRA in August 1988, the intent of all the reductions in density adopted as part of the Consistency Program was to keep them in place until the Transportation Plan was completed.  Thus, the program intent was expressly acknowledged by the CRA itself.

Since 1986, when the Hollywood Redevelopment Plan was first approved, the former redevelopment agency committed to developing and adopting a Transportation

Department of City Planning
July 13, 2018
Page 18 of 24

Plan.  This critical plan has never been completed and it has been sued over the failure to do so twice.  Nonetheless, the former redevelopment agency, and now the CRA/LA, has begun approving development permits in the Redevelopment Plan area without knowing whether or not the cumulative impact of development has reach critical thresholds.  The Redevelopment Plan EIR specifically concluded that Hollywood would have unacceptable levels of traffic service when average FAR for the entire Plan area reached 2:1.  We now possess evidence that the City has reached the 2:1 density which obligates CRA/LA to immediately commence a plan to reduce the impacts on the infrastructure of Hollywood.  CRA/LA refuses to acknowledge that the 2:1 threshold has been reached and is shirking its duties under the Hollywood Redevelopment Plan that would entitle any owner to access the land use benefits of the Plan.

Under the Plan, the former redevelopment agency, and now the CRA/LA, was required to prepare a plan for how to constrain and protect Hollywood's transportation infrastructure if average FAR reached 2:1.  Recently, Barron McCoy of the CRA/LA gave a letter to the City of Los Angeles claiming that development activity has not yet reached 2:1, but his letter was unsupported with any evidence.  It was unsubstantiated opinion with no supporting evidence, substantial or otherwise, behind it.  If the City and the CRA/LA cannot show their math, they have no credible evidence to support proceeding to approve any more increases in development such as the Schrader Hotel, until such time as they can prove it.

We understand that the former redevelopment agency, and the CRA/LA, has not submitted any of the required transportation monitoring reports to the City for years.  In the absence of an adopted and enforceable Transportation Plan, and ongoing noncompliance with monitoring commitments of the former redevelopment agency, there would be no valid basis for the City or CRA/LA to allow any increase in density.

The developer's attorneys in the other cases by the developer tried to skirt this issue by claiming that since the 1988 Hollywood Community Plan and the Hollywood General Plan/Zoning Consistency Program were adopted, the Metrorail Red Line was added as a transportation improvement.  The Hollywood Community Plan, Hollywood Redevelopment Plan and the Hollywood General Plan/Zoning Consistency Program all took into account the planned subway improvement.  (**Exhibit 2**.)  It is shown on the maps and zoning was put in place to encourage the greatest density immediately adjacent to the stations.  The Red Line is a "red herring" of the developer's attorneys.  All plans acknowledged that the former redevelopment agency was required to undertake and develop major street improvements, improve traffic management systems, carry out transportation demand management initiatives, in order to avoid system failure at average

Department of City Planning
July 13, 2018
Page 19 of 24

FAR densities above 2:1 throughout the Hollywood core.  The utter failure to complete a transportation plan lies at the feet of the former redevelopment agency and the Los Angeles City Council.  No one should be distracted by the waving of a Red Line subway map by the developer's attorneys.  They cannot make excuses for the City and redevelopment agency's failures.

By approving Land Use Entitlements for the Schrader Hotel project, the City would violate the General Plan/Zoning Consistency Program's limitation placed on the property because the Project cannot be approved for FAR above 2:1 without a completed CRA/LA Transportation Plan.  The permanent "D" Development Limitation cannot be removed from this parcel of land without the City and CRA/LA satisfying all of its requirements, including a completed Transportation Plan.  Since 1986, the former redevelopment agency had failed to complete and enact the Transportation Specific Plan to avoid significant impacts from increased density development – an ongoing violation being carried forward by the CRA/LA – the Schrader Hotel site may only be developed to a density of 2:1.  Having approved the Project with a density much higher than the authorized density, the City Council would violate law if it approved this Project as currently proposed.

VIII.   **THE MITIGATED NEGATIVE DECLARATION VIOLATES CEQA. BECAUSE THERE IS NO SHOWING THAT SIGNIFICANT IMPACTS ARE NOT POSSIBLE, AN EIR IS REQUIRED.**

The City has chosen to prepare a mitigated negative declaration ("MND") for the Schrader Hotel project, just like it did for the Dream Hotel and the Tao Hotel.  The choice blatantly and unquestionably violates the California Environmental Quality Act ("CEQA"), found at Public Resources Code § 21000, *et seq*., because the evidence in the MND shows that the Project will likely have a significant impact in several areas examined herein, including significant negative land use impacts.

An MND may only be used for a project where the public agency can demonstrate that, with the mitigation measures incorporated in the MND, "*clearly no* significant effect on the environment would occur, and [] there is *no* substantial evidence in light of the whole record before the public agency that the project, as revised, *may* have a significant impact on the environment."  (CEQA § 21064.5, emphasis added; Guidelines § 15070 (b), 15369.5.)  Thus, the MND here must show "clearly" that there is *no* substantial evidence that the Schrader Hotel may cause a significant impact on the environment in Hollywood.  The City must prepare an EIR if there is any substantial evidence in the record that would support a fair argument that a significant impact is possible, regardless

Department of City Planning
July 13, 2018
Page 20 of 24

of any other evidence in the record.  Parker Shattuck Neighbors v. Berkeley City Council
(2013) 222 Cal.App.4[th] 768,776; Friends of "B" Street v. City of Hayward (1980) 106
Cal.App.3d 988, 1002.  The determination of whether a fair argument exists is a question
of law. Sierra Club v. County of Sonoma (1992) 6 Cal.App.4th 1307, 1319.

A strong presumption in favor of requiring preparation of an Environmental
Impact Report ("EIR") is built into CEQA.  This presumption is reflected in what is
known as the "fair argument" standard, under which an agency must prepare an EIR
whenever substantial evidence in the record supports a fair argument that a project may
have a significant effect on the environment.  Laurel Heights Improvement Ass'n v.
Regents of the Univ. of Cal. (1993) 6 Cal.4th 1112, 1123; No Oil, Inc. v. City of Los
Angeles (1974) 13 Cal.3d 68, 75.

Under CEQA and the CEQA Guidelines, if a project may cause a significant effect
on the environment, then the lead agency must prepare an EIR.  Pub. Res. Code §§
21100, 21151.  A project "may" have a significant effect on the environment if there is a
"reasonable probability" that it will result in a significant impact.  No Oil, Inc. v. City of
Los Angeles, supra, 13 Cal.3d at 83 n. 16.  If any aspect of the project may result in a
significant impact on the environment, an EIR must be prepared even if the overall effect
of the project is beneficial.  CEQA Guidelines § 15063(b)(1).

The fair argument test is a "low threshold" test for requiring the preparation of an
EIR.  No Oil., supra,13 Cal.3d at 84.  This standard reflects a preference for requiring an
EIR to be prepared, and a preference for resolving doubts in favor of environmental
review.  Mejia v. City of Los Angeles (2005) 130 Cal.App.4th 322, 332.

CEQA Guidelines Section 15384(a) defines "substantial evidence" as "enough
relevant information and reasonable inferences from this information that a fair argument
can be made to support a conclusion, even though other conclusions might also be
reached . . . ." (Emphasis added.)  Under Pub. Res. Code Sections 21080(e), 21082.2(c),
and CEQA Guidelines Sections 15064(f)(5) and 15384, facts, reasonable assumptions
predicated on facts, and expert opinions supported by facts can constitute substantial
evidence.

An agency must prepare an EIR whenever it can be fairly argued on the basis of
substantial evidence that a project may have a significant environmental impact.  If there
is substantial evidence both for and against preparing an EIR, then the agency must
prepare the EIR.

Department of City Planning
July 13, 2018
Page 21 of 24

There is substantial evidence in the MND, considered together with its technical appendices, showing the possibility that the Schrader Hotel will cause a significant adverse impact on the environment in several topic areas.  Substantial evidence supports a fair argument that there will in fact be a significant effect as to construction noise.  Further, the MND fails to show "clearly" that there will be no significant impact on air quality, greenhouse gas emissions, land use, and cumulative traffic.  The evidence in the City's own CEQA document shows conclusively that a full environmental impact report is required for this Project.  Gentry v. City of Murietta (1995) 36 Cal.App.4th 1359, 1399-1400 ("an agency may adopt a negative declaration only if there is no substantial evidence that the project '*may*' have a significant effect on the environment."  [Emphasis in original.])

A.  **The Project Description is Deficient and Masks Potential Significant Impacts.**

The City did not provide a full and accurate Project description for the MND circulated to the public for review.  Nowhere does the MND disclose that the Project as proposed conflicted with the current C4 or proposed C2 zoning limitations on residential unit density (number of hotel rooms).  And while it begrudgingly acknowledged that there was a "D" Development Limitation that restricted the FAR to 2:1, there was no disclosure to the public and decision makers that the City committed in 1988 to the density limit on the Project site unless or until a density transfer program was created under Hollywood Redevelopment Plan Section 511, or a Transportation Plan was created under Section 518.1 thereof. In fact, none of the terms of Ordinance No.165,660 are described in full detail that would have illustrated that the current law does not allow anything close to the massive size of the Schrader Hotel.

"Where an agency fails to provide an accurate project description, or fails to gather information and undertake an adequate environmental analysis in its initial study, a negative declaration is inappropriate."  Nelson v. County of Kern (2010) 190 Cal.App.4th 252, 267 (emphasis added).

"An accurate and complete project description is necessary for an intelligent evaluation of the potential environmental impacts of the agency's action."  City of Redlands v. County of San Bernardino (2002) 96 Cal.App.4th 398, 406.  Only through an accurate view of the project may affected outsiders and public decision-makers balance the proposal's benefit against its environmental cost, consider mitigation measures, assess the advantage of terminating the proposal . . . and weigh other alternatives in the balance.'  [Citations omitted]."  Center for Sierra Nevada Conservation v. County of El Dorado (2012) 202 Cal.App.4th 1156, 1171.

Department of City Planning
July 13, 2018
Page 22 of 24

Here, in violation of CEQA, the City's project description fails to include the full zoning history of the site, including the fact that Ordinance No. 165,660 imposed the 2:1 FAR limit as an adopted mitigation measure for the Hollywood Community Plan and Hollywood General Plan/Zoning Consistency Program EIRs. The project description also omits the City's "logic" in applying a May 2000 Zoning Administrator Interpretation and February 2009 Zoning Engineer memo to enable the reviewing public to comprehend that the Project involved a building with more than twice the number of hotel rooms as allowed by the correctly applied zoning code for the applicable commercial zoning. If the City is relying on a Zoning Interpretation, it must be cited and appended to the environmental review documents instead of gaslighting the public by pretending this reality does not exist.

On more than one occasion, when the City or CEQA consultants for developers have no answer regarding violations of land use laws of the City, they simply omit the analysis. This was done here. By purposely omitting key aspects of the zoning history and various interpretations it relied upon, such omissions led to a fatally flawed analysis of other issues in the MND.

B.    **The MND's Land Use Analysis Fails To Disclose Significant Land Use Impacts.**

In City Planning Case No. 86-835 GPC [General Plan Consistency], the City prepared and/or recirculated an EIR for the Hollywood Community Plan in support of the consistency program. (**Exhibit 2**.) At various times in 1988-1990, the City approved resolutions and enacted ordinances to impose PERMANENT "D" Development Limitations of Subarea Map parcels throughout the Hollywood Community Plan and Redevelopment Plan area.

In Ordinance No. 165,660 dated May 6, 1990, as part of AB 283 compliance under City Planning Case 86-835- GPC, the City enacted the ordinance that imposed the permanent "D" Development Limitation on the Schrader Hotel property, which was located within Subarea 90 on the General Plan Consistency map. (**Exhibit 2**.) LAMC Section 12.32 regarding D Development conditions expressly provides that "D" Development Limitations are permanent (until revised in the next community plan revision process).

The City's supporting EIR for these actions (Hollywood Plan Revision Environmental Impact Report (SCH NO. 87-112504)) concluded that without reductions in authorized density to mitigate or avoid significant environmental impacts, the City's

Department of City Planning
July 13, 2018
Page 23 of 24

infrastructure in Hollywood would suffer overwhelming impacts that endangered public health and safety (including police and fire response times).  The imposition of the AB 283 "D" Development Limitation on the Schrader Hotel site, and many parcels in Hollywood, was intended to avoid environmental impacts from over-dense development, unless and until the CRA completed a Transportation Plan to avoid those significant impacts.  That the former redevelopment agency would be responsible for balancing the infrastructure issues through the Transportation Plan was summarized in a "Next Steps Hollywood Community Plan Revision" memo made public in the midst of the planning process.  This memo explains that it was necessary to limit development by right to reduced densities which the CRA called "practical buildout", or 36 million square feet of development, instead of the "theoretical buildout" of the zoning from the City's 1946 zoning code, which would have allowed 88 million square feet. (**Exhibit 2**.)

     The City has been on notice that it could not remove the permanent "D" Development Limitation until such time as the CRA/LA (successor agency to the former redevelopment agency) prepared the Transportation Plan it committed to complete in the 1986 Hollywood Redevelopment Plan, and supported it with new environmental analysis showing that the adopted Transportation Plan solved the risks of environmental harm that had justified imposition of the permanent "D" Development Limitation in the first place.

     Accordingly, the "D" Development Limitation cannot be removed by the City Council as it proposes to do in this case, without full disclosure and analysis, and substituted with a new CONDITIONAL "Q" condition and "D" Development Limitation. The permanent "D" Development Limitation, given that it was imposed to avoid significant environmental harm from over-dense development, and that it was required to be imposed in order to bring the City into compliance with Government Code Section 65680(d) under a legal settlement, means that it cannot be removed until the CRA/LA completes and adopts a Transportation Plan that eliminates the potential environmental harm from development at a FAR greater than the 2:1 imposed on this parcel, or rationalizes some other lawful basis to modify to existing "D" Development Limitation.

     None of this critical land use history was included in either the Project Description or the Land Use analysis of the MND materials.  In fact, due to its complexity, and because the Project as proposed grossly violates the 2:1 FAR limit imposed by the "D" Development Limitation under the General Plan/Zoning Consistency program, the City, and now CRA/LA, must prepare an EIR to explain these complexities and provide the public an opportunity for participation in the CEQA process.

Department of City Planning
July 13, 2018
Page 24 of 24

Accordingly, the MND fails to properly disclose and analyze the proper Project description or disclose, analyze and mitigate the land use impacts of the proposed Project, which nearly doubles the authorized FAR, and violates the authorized number of hotel rooms.

### C. CONCLUSION REGARDING ENVIRONMENTAL REVIEW.

In sum, the MND fails on multiple grounds, and as to multiple types of environmental effects, to meet the test for a mitigated negative declaration. An EIR is clearly required.

### IX.  SUMMATION.

The Schrader Hotel is an ill-conceived, noise generating nuisance "party hotel" that should have never come out of a Planning Department conference room. Multiple deliberate misconstructions of the LAMC are used to unlawfully increase the residential unit density, FAR, and height of the building. There is no legitimate basis to approve this Project as proposed. Given the numerous hotels in the immediate vicinity being developed by a developer linked to the applicant in this case, it is time for the City to acknowledge that this multi-hotel project must be analyzed comprehensively in a full EIR.

Very truly yours,

Daniel Wright

DANIEL WRIGHT
FOR
THE SILVERSTEIN LAW FIRM, APC

DEW:vl

Attachments: Exhibits