**WILSON SONSINI GOODRICH & ROSATI**
**Professional Corporation**
SUSAN K. LEADER, State Bar No. 216743
sleader@wsgr.com
ALI R. RABBANI, State Bar No. 253730
arabbani@wsgr.com
CONOR TUCKER, State Bar No. 318075
ctucker@wsgr.com
633 West Fifth Avenue, Suite 1550
Los Angeles, California 90071-2027
Telephone:  (323) 210-2900
Facsimile:   (323) 974-7329

**WILSON SONSINI GOODRICH & ROSATI**
**Professional Corporation**
DALE R. BISH, State Bar No. 235390
dbish@wsgr.com
CHARLES A. TALPAS, State Bar No. 308505
ctalpas@wsgr.com
650 Page Mill Road
Palo Alto, California 94304-1050
Telephone:  (650) 493-9300
Facsimile:   (650) 565-5100

Attorneys for Plaintiffs Relevant Group,
LLC; 1541 Wilcox Hotel LLC; 6516
Tommie Hotel LLC; and 6421 Selma
Wilcox Hotel LLC

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RELEVANT GROUP LLC, a Delaware limited liability company; 6516 TOMMIE HOTEL LLC, a Delaware limited liability company; and 6421 SELMA WILCOX HOTEL LLC, a California limited liability company, | Case No.: 2:19-cv-05019-ODW-KS **PLAINTIFFS' OPPOSITION TO DEFENDANT NOURMAND & ASSOCIATES' MOTION FOR SUMMARY JUDGMENT** |
| Plaintiffs, | Date:      June 13, 2022 Time:     1:30 p.m. Dept:     Courtroom 5D, Fifth Floor Before:   Hon. Otis D. Wright II |
| v. | |
| STEPHAN "SAEED" NOURMAND, an individual; THE SUNSET LANDMARK INVESTMENT LLC, a California limited liability company; NOURMAND & ASSOCIATES, a California corporation; and DOES 1-10, inclusive, | |
| Defendants. | |

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................. 1

BACKGROUND ................................................................................... 4

    A.    The Initial Meeting Between Defendants and Relevant ..................... 5

    B.    N&A Develops Pretextual Environmental and Legal Challenges ........ 5

    C.    The March 2015 Public Hearing and Petition ..................................... 6

    D.    Enforcement of the Settlement Agreement .......................................... 8

    E.    N&A's False Declarations and Discovery Responses .......................... 8

ARGUMENT ..................................................................................... 10

I.    SUMMARY JUDGMENT IS INAPPROPRIATE HERE GIVEN THE NUMEROUS ISSUES OF DISPUTED MATERIAL FACTS .......... 10

II.    N&A PARTICIPATED IN AND DIRECTED ITS EMPLOYEES TO PARTICIPATE IN SHAM LEGAL CHALLENGES AND EXTORTION ....................................................................................... 10

III.    N&A'S ACTIVITY IS NOT IMMUNIZED BY THE FIRST AMENDMENT OR *NOERR-PENNINGTON* ................................... 14

    A.    N&A Ignores *USS-POSCO*, Which Is Controlling ........................... 15

    B.    There Are Disputed Issues of Material Fact Even Under the Inapplicable *PREI* Standard ............................................................. 16

    C.    *Noerr-Pennington* Does Not Apply Where the Petitioning Activity Has "No Nexus" to the Extortionate Demand ...................... 19

    D.    N&A's Arguments Regarding the Number of Predicate Acts Fail ........................................................................................................ 21

IV.    N&A AGREED TO PARTICIPATE IN THE PREDICATE ACTS .......... 22

CONCLUSION .................................................................................. 24

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Aydin Corp. v. Loral Corp.*,
  718 F.2d 897 (9th Cir. 1983) .................................................................... 21

*Brady v. Dairy Fresh Products, Co.*,
  974 F.2d 1149 (9th Cir. 1992) .................................................................. 12

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) .................................................................................. 10

*Clicks Billiards Inc. v. Sixshooters, Inc.*,
  251 F.3d 1252 (9th Cir. 2001) .................................................................. 10

*Cohen v. Brown*,
  173 Cal. App. 4th 302 (2009) ................................................................... 21

*Cohen v. Trump*,
  200 F. Supp. 3d 1063 (S.D. Cal. 2016) .................................................... 13

*Collier v. Town of Harvard*,
  1997 WL 33781338 (D. Mass. Mar. 28, 1997) ........................................ 16

*CSX Transp., Inc. v. Gilkison*,
  2012 WL 5906716 (N.D. W. Va. Nov. 26, 2012) .................................... 18

*Hanover 3201 Realty, LLC v. Village Supermarkets, Inc.*,
  806 F.3d 162 (3d Cir. 2015) ..................................................................... 17

*Kaiser Found. Health Plan, Inc. v. Abbott Laboratories, Inc.*,
  552 F.3d 1033 (9th Cir. 2009) .................................................................. 16

*Kong v. Lopez*,
  2019 WL 1751826 (C.D. Cal. Feb. 15, 2019) ............................................ 3

*La Suisse, Societe D'Assurances Sur La Vie v. Kraus*,
  2014 WL 3610890 (S.D.N.Y. July 21, 2014) .................................... 19, 20

*New West L.P. v. City of Joliet*,
  491 F.3d 717 (7th Cir. 2007) .................................................................... 18

*Pineda v. Saxon Mortg. Servs., Inc.*,
  2008 WL 5187813 (C.D. Cal. Dec. 10, 2018) ......................................... 23

*Pro. Real Estate Invs. Inc. v. Columbia Pictures Indus., Inc.*,
  508 U.S. 49 (1993) ....................................................................... 15, 16, 18

*Reves v. Ernst & Young*,
  507 U.S. 170 (1993) .................................................................................. 10

-ii-

*Rickards v. Canine Eye Registration Found., Inc.*,
   783 F.2d 1329 (9th Cir. 1986) ............................................................ 16

*Salinas v. United States*,
   522 U.S. 52 (1997) ............................................................................ 22

*Stenehjem v. Sareen*,
   226 Cal. App. 4th 1405 (2014) ........................................................ 21

*In re Terazosin Hydrochloride Antitrust Litig.*,
   335 F. Supp. 2d 1336 (S.D. Fla. 2004) ............................................ 18

*Theme Promotions, Inc. v. News Am. Mktg. FSI*,
   546 F.3d 991 (9th Cir. 2008) ............................................................ 18

*United States v. Avenatti*,
   2020 WL 70951 (S.D.N.Y. Jan 6, 2020) .................................... 19, 20

*United States v. Fiander*,
   547 F.3d 1036 (9th Cir. 2008) .......................................................... 22

*United States v. Koziol*,
   993 F.3d 1160 (9th Cir. 2021),
   *cert. denied*, 142 S. Ct. 1372 (2022) ........................................ 18, 19

*United States v. Middlemiss*,
   217 F.3d 112 (2d Cir. 2000) ............................................................ 13

*United States v. Shryock*,
   342 F.3d 948 (9th Cir. 2003) ............................................................ 13

*United States v. Tille*,
   729 F.2d 615 (9th Cir. 1984) ............................................................ 23

*United States v. Tobin*,
   155 F.3d 636 (3rd Cir. 1998) ............................................................ 19

*United States v. Viola*,
   35 F.3d 37 (2d Cir. 1994) ................................................................ 14

*USS-POSCO Indus. v. Contra Costa Cnty. Bldg. & Constr. Trades
   Council, AFL-CIO*,
   31 F.3d 800 (9th Cir. 1994) ..............................................3, 15, 16, 21

*Walter v. Drayson*,
   538 F.3d 1244 (9th Cir. 2008) .......................................................... 13

**Statutes**

18 U.S.C. § 1951 ...................................................................................... 18

18 U.S.C. § 1962 ................................................................................ 22, 23

# **INTRODUCTION**

Nourmand & Associates ("N&A") moves for summary judgment primarily on the basis that it has no meaningful connection to, or involvement with, Saeed Nourmand, Sunset, or other members of the enterprise. The evidence disproves this contention or, at a minimum, creates a triable issue. N&A, Saeed Nourmand, and Sunset are deeply intertwined, and the only uncertainty about their involvement is the result of long-running obfuscation by N&A. In its Motion for ("Motion" or "Mot.") N&A continues to deny that it had any knowledge of or played any role in the underlying events of the litigation. In assessing the credibility of N&A's position, the Court must examine the inconsistent (and later proven inaccurate) statements N&A has made both to the Plaintiffs and to this Court.

As the Court will recall, at the outset of this litigation, N&A denied that it shares any employees or officers with Sunset (ECF No. 44 ¶ 28), but discovery quickly showed that to be false, as several people, including N&A's Chief Financial Officer and longtime Controller, were in fact working for both entities. ECF No. 88 at 7. In this same time frame, N&A's President and Custodian of Records, Michael Nourmand, declared under oath that after a "diligent search," N&A was unable to locate *any* non-privileged documents in response to any of the thirty-four requests in Plaintiffs' subpoena (other than one email that had already been publicly filed by Defendants with the Court). ECF No. 79-24. Of course, that also proved to be false, as not only did Defendant Saeed Nourmand use his N&A email account for doing Sunset's work, but he sent hundreds of emails to N&A employees on their "nourmand.com" email accounts.

Unfortunately, and in spite of this Court's admonishment that Defendants had failed to "adequately communicate the extent and nature of N&A's involvement in the underlying CEQA litigation," Defendants *continue* to play hide the ball regarding N&A's involvement in the misconduct at issue. Although almost the entirety of Sunset's production and privilege log resides on the N&A server, N&A purports to

be blissfully ignorant of what was going on, claiming none of those communications was sent on its watch.[1]  When deposed, Michael Nourmand was unable to recall why he sent emails on behalf of his father, Saeed Nourmand, to N&A managers and employees directing them to show up at a hearing challenging one of Plaintiffs' projects.  He also couldn't remember why, if he is pro-development, he (along with other N&A managers and employees) signed a petition to the City of Los Angeles opposing Plaintiffs' project.  The only thing he claimed to know clearly is that while his father is listed on N&A's website under "management" as the "founder," he no longer has any role whatsoever with N&A.

Michael Nourmand was even less equipped to answer questions in his capacity as the President and Person Most Knowledgeable at N&A regarding the topics designated in Plaintiffs' notice, including N&A's noticeably sparse discovery responses.  When asked basic questions as to whose email accounts were searched for responsive documents and/or what search terms were used, Mr. Nourmand testified that he had no knowledge.  When asked what information was provided to either N&A's IT consultant or lawyers to ensure proper searches were conducted, N&A's counsel instructed him not to answer.  Not surprisingly, Mr. Nourmand also could not explain how it was that Defendant Sunset, a purportedly *completely separate entity from N&A* without *any access or control over the N&A server*, had entries on its privilege log that were exclusively sent to or from N&A employees on their N&A email accounts.  This does not include the hundreds of emails set to or by Saeed Nourmand's N&A email account.[2]  The only logical explanation (and the one that comports with common sense) for why Sunset's emails are all housed on N&A's server is that the entities are intertwined; that Saeed Nourmand retains

---

[1] Sunset did not have its own email server until after the filing of this lawsuit.

[2] Although Defendants repeatedly claim that Saeed Nourmand's almost exclusive use of his N&A email account in doing work for Sunset was an oversight and that since that time his email account was partitioned from the server, Michael Nourmand as the President of N&A did not know what it meant to partition an email account from the server, much less what actually happened to ensure his father's emails were actually collected and reviewed.  Balitzer Decl. Ex. 15 at 152-56.

control of N&A; and, that Defendants made the strategic decision whose email accounts from N&A to search, what to produce, and when to claim privilege.

Likewise, N&A's self-serving claim—that its employees acted on their own, and the organization itself had no involvement—is pure fiction. Whether Saeed Nourmand (versus his wife and children) "owns" N&A or not, he continues to exercise control over the "family run" organization and to use N&A's employees to do his bidding. N&A would have the Court believe that its employees volunteer their time to help the firm's founder; that the N&A management team, each on their own accord, decided to attend a public hearing about a hotel project miles away from where they live; and, that a legally-trained N&A agent wanted to spend her personal time performing legal research and drafting arguments about zoning laws. N&A's declarations in support of its Motion, like its discovery responses, are not entitled to any weight. In any event, these are precisely the sort of disputed material facts that are inappropriate to resolve on summary judgment. *Kong v. Lopez*, 2019 WL 1751826, at *1 (C.D. Cal. Feb. 15, 2019) ("On summary judgment, the Court can neither determine the credibility of the competing declarations nor weigh the evidence presented.").

Apart from the factual dispute about its role in the underlying events, N&A's Motion is based on a misunderstanding of the law. N&A ignores the Court's prior holdings (that *USS-POSCO* controls) and instead seeks summary judgment under an inapplicable legal standard. Rather than engage with the *USS-POSCO* standard, N&A says the Court must find the underlying lawsuits were "objectively baseless" as a prerequisite to examining subjective intent. That is wrong. Even if it were the law—and it is not—there are substantial issues of disputed fact regarding the objective merits of the underlying CEQA claims. Finally, Plaintiffs' claims are not necessarily dependent on the "sham" litigation exception at all given the lack of nexus between the narrow relief that Defendants sought (preparation of an EIR) and

the shocking demands ($5.5 million and tens of millions in costly design changes) that Defendants extracted.

N&A's motion should be denied.

## BACKGROUND

The Court is familiar with the facts and background of Plaintiffs' legal theory against the Nourmand Enterprise. Because N&A insists that it had nothing to do with the enterprise, the following is a description of its history, structure, and involvement in the underlying legal challenges.

N&A is a family-run business founded by Saeed Nourmand in the 1970s. ECF No. 123-5 (S. Nourmand Decl.) ¶ 3. At various times, Saeed Nourmand has erroneously claimed he "sold" N&A to his son, Michael Nourmand ten years ao. SGI76.[3] In fact, it is Saeed Nourmand's wife, Myra Nourmand, who has been the majority shareholder and sole director of N&A for more than a decade. SGI82.

N&A initially operated out of its offices in Beverly Hills and Brentwood. SGI80. In 2012, N&A opened a Hollywood branch office on the Sunset Property. SGI81. Michael Nourmand does not have a personal office in Hollywood (his offices are in Brentwood and Beverly Hills), but Saeed Nourmand does. SGI80, 83. Saeed Nourmand uses N&A employees, offices, and other resources (e.g., emails, printers, office meeting space) as he sees fit. ECF No. 123-4 (M. Nourmand Decl.) ¶¶ 8, 14; ECF No. 123-6 (DeCastro Decl.) ¶¶ 3, 4; ECF No. 123-7 (Gould Decl.) ¶ 3; ECF No. 123-9 (Cole Decl.) ¶ 4; SGI83.

---

[3] "SGI" refers to Plaintiffs' Statement of Genuine Issues of Material Fact filed concurrently herewith. References to Paragraphs 1 through 73 refer to the Defendants' statements of undisputed fact (and, where disputed, Plaintiffs' evidence in response). Paragraphs 74 through 102 refer to additional material facts submitted by Plaintiffs in accordance with the orders of this Court. *See* ECF Nos. 48, 125. "Schaus Decl." refers to the Declaration of Elizabeth Schaus filed in support of Defendants' Motion, ECF No. 123-13. Because the exhibits were not consecutively numbered, pincites to the Shaus Declaration correspond to the ECF page numbers. "Balitzer Decl." is the declaration of Stephanie Balitzer, which is filed concurrently with Plaintiffs' Opposition. "Thomas Report" refers to Exhibit A to the Declaration of Tina Thomas, ECF No. 137-3.

### A.   The Initial Meeting Between Defendants and Relevant

In early 2015, Saeed Nourmand learned about a proposed hotel project adjacent to the Sunset Property.  He indicated his interest in meeting with the developer (Relevant) and insisted that Michael Nourmand attend the meeting as well.  SGI84; Schaus Decl. Ex. O at 558.  Because Michael Nourmand was unavailable, the original meeting was postponed.  SGI85; Schaus Decl. Ex. O at 574. When the parties rescheduled the meeting, and Michael Nourmand was still not available to attend, Saeed Nourmand brought N&A's Controller, Mohamad Iravani instead.  SGI85; Schaus Decl. Ex. O at 573.

This was a critical meeting.  During this meeting, Defendants demanded that Relevant make a series of changes to the proposed hotel–changes that had nothing to do with any *bona fide* environmental concerns.  Schaus Decl. Ex. O at 531. Rather, the changes would benefit Saeed Nourmand, Sunset, and N&A's offices, which are located across the parking lot from the Thompson project and adjacent to the Tommie project. *Id.*; SGI10; ECF No. 123-5 (S. Nourmand Decl.) ¶ 15.

On March 17, 2015, Nourmand learned that Relevant had agreed to many of the changes that Defendants demanded in the initial meeting, which were made in the hopes that Saeed Nourmand would support, or at least not oppose, the project. Schaus Decl. Ex. O at 531.  Because he was not interested in design changes alone, Saeed Nourmand decided instead to ratchet up the pressure and did so using N&A employees and resources.

### B.   N&A Develops Pretextual Environmental and Legal Challenges

After the initial meeting, Saeed Nourmand began using N&A employees to help him challenge the proposed hotel.  First, Carolyn Rae Cole—a lawyer by training who worked as an agent at N&A and is now the broker of record and Secretary of N&A—helped conduct legal research and develop arguments against the project.  ECF No. 123-9 (Cole Decl.) ¶¶ 2, 4; Schaus Decl. Ex. O at 533-35.  In her declaration, Cole vaguely states she has never provided legal advice or legal

services "as part of [her] independent contractor relationship" and "no one at N&A has ever asked or instructed [her] to [do so]." ECF No. 123-9 (Cole Decl.) ¶ 5. But Cole's emails refute this contention. On March 3, 2015, Sarah Gould (a N&A employee) forwarded the Thompson plans to Cole, whose first (and candid) reaction was: "Why me?" Schaus Decl. Ex. O at 551. Gould replied: "Not sure. *Please stand by for directions. Per Saeed.*" *Id.* (emphasis added). A reasonable inference—indeed the only reasonable inference—a factfinder could draw from this unscripted response was that N&A was directing her to perform work on Saeed Nourmand's behalf.

After receiving her directions from Saeed, Cole, who is not a land-use lawyer, spent weeks researching potential objections and developing the principal objection that permeated each and every challenge Defendants made to Plaintiffs' projects (or projects they believed to be associated with Plaintiffs). Schaus Decl. Ex. O at 577, 581. Specifically, Cole suggested that Saeed/Sunset argue that a "D Limitation" in a decades-old ordinance—a purely legislative zoning act—was somehow a "permanent" restriction on the subject property. SGI95. Although the argument is frivolous to CEQA practitioners (Thomas Report at 36-37), Plaintiffs have spent years having to respond to this same baseless argument for each of its projects.

On September 2, 2015, another N&A employee—Rachelle DeCastro—drafted a letter for Saeed Nourmand that mirrors the arguments developed by Cole. SGI96. DeCastro's boss, Iravani, forwarded the letter to Saeed Nourmand and helped him finalize the letter to submit to the City, putting the entire series of legal challenges into motion. *Id.*

## C. The March 2015 Public Hearing and Petition

After the initial meeting, Saeed Nourmand began using N&A employees to help him challenge the proposed hotel. On March 11, 2015, Sarah Gould—who was both a N&A employee and Saeed Nourmand's personal assistant—emailed N&A's management team that "Per Saeed's request he would like all of you to attend the

Wilcox Hotel's public hearing" on March 18, 2015.  ECF No. 123-7 (Gould Decl.) ¶¶ 2, 3; Schaus Decl. Ex. O at 525.  Although several of the recipients did not work or live in Hollywood (SGI89) they all worked for and reported to Michael Nourmand, who was copied.  Schaus Decl. Ex. O at 525.  When Michael Nourmand replied, he did not clarify that the "request" was unrelated to their N&A duties or that their attendance was optional.  *Id.* at 528.  Rather, Michael Nourmand adopted and reinforced the directive from the top: "I spoke to my dad and he would like to have 15 people at this Public Hearing.  Who can join us?"  *Id.*  Not surprisingly, most of the recipients attended the hearing as requested.  *See* ECF Nos. 123-10, 123-11, 123-12; Schaus Decl. Ex. O at 554.  The N&A office managers also forwarded Michael Nourmand's email to the firm's real estate agents and canceled a regularly-scheduled meeting in the Brentwood office so that they could attend the hearing "on Saeed's behalf."  Schaus Decl. Ex. O at 523.  Iravani attended the public hearing "at Saeed's request."  ECF No. 123-8 (Iravani Decl.) ¶ 9(d).

Once there, the N&A (and Sunset) employees were asked to sign a petition advocating in favor of the relief sought by Saeed:

> I hereby object to the proposed 162 foot high proposed Hotel at 1541 Wilcox Avenue on the grounds that it is out of character with the neighborhood, will cast shadows **on our properties**, will make the traffic even worse **in our neighborhood** and will be a noise and parking nuisance with its proposed nightclub, bar and restaurant and will contribute to the already intolerable late night foot and car traffic **on our largely residential streets** late into the night.

Schaus Decl. Ex. O at 554 (emphasis added).  Because many were not actually concerned, and several of the N&A employees did not even live or work in Hollywood, the petition was—at best—misleading.  SGI89.  And while N&A's declarants now say they were participating solely in their individual capacity, it is telling that *all* seven of the N&A attendees listed N&A's Hollywood office address,

not their home addresses, on the Petition.  Schaus Decl. Ex. O at 554.  Regardless of these employees' new claim that each was participating voluntarily in his or her individual capacity, a reasonable jury could easily conclude this petition was a sham on behalf of Saeed, submitted to deceive City officials into thinking there was broad based neighborhood opposition.

### D.    Enforcement of the Settlement Agreement

In May 2018—after Relevant had capitulated to the $5.5 million payment— Saeed Nourmand looked to Iravani, N&A CFO and Controller, to enforce its terms. SGI92.  Iravani collected the initial payment and, when Defendants believed Relevant was late with one of its payments, Iravani was responsible for "strictly" enforcing the settlement agreement according to its terms.  *Id.*  Although Defendants argue that none of the settlement proceeds went to N&A's account, Defendants refused to produce any documentation regarding the use of those funds.  Sunset did, however, produce records showing that Iravani not only had the settlement agreements (in his N&A email account) but also helped Sunset claim that the money was intended to compensate Sunset for economic loss, and therefore not taxable.[4]

### E.    N&A's False Declarations and Discovery Responses

N&A's persistent false declarations and discovery responses all underscore that N&A was intertwined with Saeed Nourmand, and that its current assertions are likely as false as its prior ones.  At the outset of this case, Plaintiffs propounded written discovery requests on N&A, including requests for documents that "relate to Relevant Group or any projects developed by Relevant Group," "the Thompson Hotel Project," "the negotiation, drafting, and execution of the Thompson Settlement Agreement and the Tommie Settlement Agreement," or "Relevant Group's payment

---

[4] Early in the litigation, Defendants disingenuously claimed that N&A did not have, and that Sunset could not share, the settlement agreements with N&A because it would violate the confidentiality clauses.  Balitzer Decl. Ex. 28.  Discovery confirmed that the settlement agreements were, in fact, provided to N&A's CFO and were residing the entire time on N&A's servers.

of money to Sunset Landmark pursuant to the Thompson Settlement Agreement." ECF No. 79-24 (N&A Resp. to Relevant Subpoena, Request Nos. 1, 4, 26, 27).

For each of these requests, N&A responded that "it does not have any such documents because such documents have never existed." *Id.* On March 26, 2021, Michael Nourmand signed a sworn verification that he had "reviewed the Subpoena" and that a "thorough search has been made for the documents" and that "based on the information provided to us for identification, responsive documents are attached" (*id.*), which consisted of a *single* email, which had already been filed by the Defendants in this action. In supplemental responses dated May 5, 2021, N&A maintained the same substantive responses but added for the first time that: "emails to and from snournand@nourmand.com are the property of Saeed Nourmand, not [N&A]." ECF No. 79-29 (N&A Suppl. Resp. to Relevant Subpoena). Defendants later claimed that Saeed Nourmand's emails were somehow "partitioned" from the N&A server and therefore not accessible by N&A. Balitzer Decl. Exs. 26, 27.

Those representations and responses were false. Almost every email produced by Defendants, and almost every entry on Sunset's privilege log, are located on N&A's emails servers. Michael Nourmand was personally copied on emails that included Thompson hotel drawings, requests to meet with Relevant, emails to N&A employees about public hearings for Thompson and Tommie, and other plainly responsive documents. *See, e.g.*, Schaus Decl. Ex. O at 525-32, 537-48, 556. Other N&A employees received copies of the settlement agreement, drafts of Saeed Nourmand's correspondence to the City, and the discussions regarding Carolyn Rae Cole's legal research. When questioned about these emails in his capacity as N&A's corporate representative, Michael Nourmand's repetitive explanation was: "Later there was additional information and questions . . . as the president of Nourmand & Associates those e-mails have been subsequently provided." *See* Balitzer Decl. Ex. 15 at 162 (tr. 113:5-17).

# **ARGUMENT**

## **I. SUMMARY JUDGMENT IS INAPPROPRIATE HERE GIVEN THE NUMEROUS ISSUES OF DISPUTED MATERIAL FACTS**

The motion must be denied unless N&A can demonstrate there is not a single genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The evidence must be viewed in the light most favorable to Plaintiffs, and all reasonable inferences drawn in Plaintiffs' favor. *Clicks Billiards Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001).

Under this controlling standard, the Motion must be denied. Far from being the only possible interpretation of the evidence, N&A's factual assertions are flatly contradicted by the weight of that evidence. Viewed in the light most favorable to Plaintiffs, and drawing all inferences in favor of Plaintiffs' claims, there is (at a minimum) a triable issue on N&A's *Noerr-Pennington* affirmative defense and its claim of noninvolvement in the RICO-predicate acts.

## **II. N&A PARTICIPATED IN AND DIRECTED ITS EMPLOYEES TO PARTICIPATE IN SHAM LEGAL CHALLENGES AND EXTORTION**

N&A's principal argument—that it was not sufficiently involved in the underlying CEQA litigation matters—was previously rejected by the Court. ECF No. 114 at 8-9 (denying N&A's motion to dismiss). As the Court held, the following allegations regarding N&A's involvement in the Nourmand Enterprise were sufficient to satisfy the standard articulated in *Reves v. Ernst & Young*, 507 U.S. 170, 177-79 (1993):

- "Relevant alleges N&A participates in the enterprise's targeting process, engages in negotiations with targeted victims, and provides resources and support to other members of the enterprise. (TAC ¶¶ 51-52.)"; and

- "N&A's employees allegedly directed the enterprise's strategy and led efforts 'to delay the development of competing properties,' 'advised Nourmand and his consultants and attorneys on legal strategies,' and 'spearheaded' enforcement of the enterprise's demands." (¶¶ 53-55.)."

ECF No. 114 at 8-9. Because evidence supports each of Plaintiffs' allegations as to N&A's participation in the events, the outcome of this Motion must be the same.

As explained above, there is ample evidence that N&A employees were involved from the outset, when Iravani (N&A CFO) accompanied Nourmand to communicate the initial set of extortionate demands to Relevant. SGI85; Schaus Decl. Ex. O at 531. Thereafter, Cole (N&A Agent) provided legal input to Sunset attorney Fred Gaines and performed her own legal research to develop some of the most vexatious pretextual arguments that were recycled over and over in TSLF objections regarding Relevant's projects. SGI94, 95. N&A management and staff, including Iravani and DeCastro, reduced those objections to writing for Nourmand, and gathered information for Sunset's general counsel to include in the PLUM Committee appeal for the Thompson project. SGI56, 96. N&A management and staff, including President Michael Nourmand, also attended public hearings and signed a misleading petition to give the appearance of broad-based community opposition. Schaus Decl. Ex. O at 554.

At all relevant times, N&A allowed Nourmand and Sunset to use its Hollywood office, along with its equipment and IT infrastructure, to support enterprise activities. ECF No. 123-4 (M. Nourmand Decl.) ¶¶ 8, 14; ECF No. 123-6 (DeCastro Decl.) ¶¶ 3, 4; ECF No. 123-7 (Gould Decl.) ¶ 3; ECF No. 123-9 (Cole Decl.) ¶ 4; SGI83. Nourmand often directed N&A staff to carry out the day-to-day activities of the enterprise. N&A staff kept the enterprise informed and on task by monitoring documents related to Relevant projects during the City's approval process, including notices of public hearings, project plans and drawings, determination notices and appeal deadlines. SGI91. N&A made its staff available

to Saeed Nourmand whenever he needed meetings scheduled, information gathered, correspondences sent, or materials produced in connection with enterprise activities. ECF No. 123-4 (M. Nourmand Decl.) ¶¶ 8, 14; ECF No. 123-6 (DeCastro Decl.) ¶¶ 3, 4; ECF No. 123-7 (Gould Decl.) ¶ 3.

After Plaintiffs capitulated to Nourmand's demands in early 2018, N&A's CFO, Iravani, served as the enterprise's collections agent and facilitated the payments.  ECF No. 123-8 (Iravani Decl.) ¶ 9(f); SGI47, 48, 92.  He also worked with N&A's tax advisors at Deloitte to make sure that Nourmand and Sunset would not have to pay taxes on the extortion proceeds received that year.  SGI92.

This evidence supports the very allegations that the Court cited as satisfying the *Reeves* standard.  *See* ECF No. 114 at 8-9.  Not only could a factfinder reasonably infer that those allegations are true—all that is required to defeat summary judgment—the support for those allegations is overwhelming.

N&A argues that, even if its employees were involved, the organization itself is not responsible, under principles of *respondeat superior*, for the individual acts of its employees.  Mot. at 3, 23.  That argument is a red herring.  Plaintiffs are not seeking to hold N&A liable for the rogue acts of its employees under any "respondeat superior" theory.  Rather, N&A—the organization—is liable because it either directed or willingly allowed Nourmand to direct N&A's employees and use its resources in aid of the unlawful scheme.  This support came from the highest levels of the organization—its CEO and CFO—and N&A's cases where executives were not involved, such as *Brady v. Dairy Fresh Products, Co.*, 974 F.2d 1149 (9th Cir. 1992), are easily distinguishable.

Regardless, there is a material dispute of fact as to whether N&A's own proposed test for *respondeat superior* is satisfied.  N&A contends that Plaintiffs must show benefit to the employer and that the employees' actions were within the scope of their employment.  Mot. at 23.  As discussed above, N&A (and its owners) certainly benefited and a jury could conclude that part of an N&A employee's duties,

-12-

in this family-run business, is responding to and assisting the firm's founder.

N&A then argues its role, if any, was extremely limited and not essential to the success of the enterprise. Mot. at 19-22. On the contrary, a jury could find that N&A's participation included essential aspects of the scheme, including (1) creating the impression of public opposition at City Hall (which pressured Relevant to agree to the initial changes to Thompson), (2) researching, developing, and drafting baseless arguments that Sunset subsequently used to initiate dozens of legal proceedings, (3) hosting meetings to make extortionate demands, (4) the participation of its officers in those meetings; and (5) collecting the proceeds of the extortionate scheme on behalf of the enterprise. *See supra* pp. 5-9.

As discussed below, it does not matter whether N&A itself actually filed the underlying CEQA lawsuits or communicated the extortionate demands as N&A argues throughout its Motion. Mot. at 22. N&A's participation in the enterprise helped its co-defendants do so and to apply additional pressure using its organizational structure and significant resources. That is enough under RICO. *See United States v. Shryock*, 342 F.3d 948, 985-86 (9th Cir. 2003) (sufficient participation in enterprise based on service as "a messenger between incarcerated members and members on the street"); *United States v. Middlemiss*, 217 F.3d 112, 119 (2d Cir. 2000) (holding defendant sufficiently involved in extortion scheme based on his help in drafting documents, collecting extortionate payments from victim, and denying knowledge of coconspirator's participation); *Cohen v. Trump*, 200 F. Supp. 3d 1063, 1071-72 (S.D. Cal. 2016) (finding an issue of material fact as to the conduct element of RICO where defendant "reviewed" the precise "marketing materials" that "form[ed] the basis of the fraud alleged by Plaintiff").

N&A argues that it was not in the enterprise' "chain of command" and is therefore not liable under RICO for the acts of others, citing *Walter v. Drayson*, 538 F.3d 1244 (9th Cir. 2008) and *United States v. Viola*, 35 F.3d 37 (2d Cir. 1994). Mot. at 20-21. Unlike the lawyer in *Walter* and the deliveryman in *Viola*, the record

makes clear that N&A *was* consulted in the decision-making process and affirmatively directed its employees to engage in the predicate acts. Defendants' own declarations make clear, for example, that Saeed Nourmand consulted Michael Nourmand about the projects because "I wanted to be sure that N&A was not concerned about how it might be impacted by Plaintiffs' projects as Sunset Landmark's tenant." ECF No. 123-5 (S. Nourmand Decl.) ¶ 15. Michael Nourmand, and others at N&A, then pressured N&A employees and agents to attend a public hearing and oppose the projects. That pressure worked.

N&A plainly benefited from several of the costly design concessions that Relevant was forced to make in settling the CEQA suits. For example, the N&A offices on the Sunset Property are adjacent to the Tommie Hotel and across the parking lot from the Thompson Hotel—both of which now have larger setbacks (e.g., further away from N&A's offices) and remodeled features (e.g., a relocated pool, no west-facing balconies) that benefit the property owned by Sunset and occupied by N&A. Schaus Decl. Ex. C at 119, Ex. E at 193-94. And while Defendants refused to produce documents showing the ultimate use of the settlement funds, including whether any proceeds flowed to N&A, there is an obvious inference that a $5.5 million payment would benefit Myra Nourmand (N&A's majority shareholder and sole director) who presumably would share in or benefit from any payment to her husband and his closely-held entities. SGI82, 97.

Accordingly, there is sufficient evidence for the jury to conclude that N&A did assist in the direction of the enterprise.

## III.   N&A'S ACTIVITY IS NOT IMMUNIZED BY THE FIRST AMENDMENT OR *NOERR-PENNINGTON*

N&A also seeks summary judgment on its *Noerr-Pennington* affirmative defense. Mot. at 12-16. Because N&A's arguments mirror the arguments made in Sunset and Saeed Nourmand's Motion, they fail for the same reasons as well.

### A.    N&A Ignores *USS-POSCO*, Which Is Controlling

The Court has already held that *USS-POSCO* is controlling law where, as is the case here, Defendants filed a "series of improper lawsuits."  ECF No. 39 at 7-8 (citing *USS-POSCO Indus. v. Contra Costa Cnty. Bldg. & Constr. Trades Council, AFL-CIO*, 31 F.3d 800, 810-11 (9th Cir. 1994)); ECF No. 114 at 5 (same).  N&A cites *USS-POSCO* in passing (Mot. at 14, 19) and otherwise ignores the Court's prior holding that *USS-POSCO* controls.

Instead, N&A's argument is based entirely on the inapplicable case *Professional Real Estate Investors Inc. v. Columbia Pictures Industries, Inc.*, 508 U.S. 49, 60-61 (1993) ("*PREI*"), which predates *USS-POSCO* and applies where there is only *one* improper lawsuit versus a *series* of sham litigation.  Mot. at 12-13.  Citing the wrong standard, N&A argues that "Plaintiffs bear the burden of proving that Defendants lacked probable cause to bring the alleged shame [*sic*] lawsuits."  Mot. at 14.  N&A then uses this strawman to argue that Plaintiffs "have failed to articulate plainly how the any [*sic*] of the cases lack merit."  Mot. at 16.

Here, Plaintiffs have established facts that would satisfy the requirements of *USS-POSCO*.  As the Court held, "[t]he question is not whether any one [suit] ha[d] merit" but "whether they [were] brought pursuant to a policy of starting legal proceedings without regard to the merits and for the purpose of injuring a market rival."  ECF No. 39 at 7 (quoting *USS-POSCO*, 31 F.3d at 810-11).  And, as set forth in Plaintiffs' Opposition to Sunset/Saeed Nourmand's Motion, there is ample evidence by which a reasonable jury can find that Sunset's legal challenges were initiated "without regard to the merit."

N&A's erroneous legal analysis stems from its misunderstanding that whether the underlying suits "are evaluated individually or as [a] series does not change the *Noerr-Pennington* analysis."  Mot. at 19.  That is wrong.  Under *PREI*, the underlying lawsuit must be "objectively baseless" in hindsight whereas under *POSCO*, the inquiry "is **prospective**: Were the legal filings made, not out of a

genuine interest in redressing grievances, but as part of a pattern or practice of successive filings undertaken essentially for purposes of harassment?"   *Kaiser Found. Health Plan, Inc. v. Abbott Laboratories, Inc.*, 552 F.3d 1033, 1046 (9th Cir. 2009) (emphasis added).

N&A does not even attempt to conduct that analysis, and thus its motion must fail.  Given N&A's lack of argument under *USS-POSCO*, Plaintiffs will not repeat arguments on the evidence from its other briefing.  However, it is worth noting that N&A's participation in the legal proceedings is especially egregious.  Michael Nourmand testified that he had no concerns or issues with the Thompson and, on the contrary, generally supports development.  SGI102.  He likewise confirmed that N&A, the organization, has never opposed any other development.  Balitzer Decl. Ex. 15 at 151 (tr. 58:2-11).  Indeed, there is no credible evidence that any of the N&A employees who attended the hearing and signed the Petition did so out of any genuine concern for the environment, or out of concern for a neighborhood where many of them do not live or work.  SGI87, 89.  Because the Petition submitted to City officials was not submitted in good faith or for proper petitioning activity, it finds no solace under the First Amendment.   *See Rickards v. Canine Eye Registration Found., Inc.*, 783 F.2d 1329, 1334 (9th Cir. 1986) ("This kind of [petitioning activity] deserves all the chilling effect the law allows."); *Collier v. Town of Harvard*, 1997 WL 33781338, at *1-3, *8 (D. Mass. Mar. 28, 1997) (defendant's misuse of influence over municipal board to extort an easement from a neighbor seeking zoning approvals was "extortion" and "cannot be classified as 'activity covered by the First Amendment's guarantee of the right to petition government for redress of grievances").

### B.    There Are Disputed Issues of Material Fact Even Under the Inapplicable *PREI* Standard

Even if this case was subject to the *PREI* test—and it is not—there are significant questions of fact regarding the merits of the underlying CEQA suits.  For

example, Plaintiffs will offer expert opinion from Tina Thomas, a CEQA practitioner with 40 years of relevant experience, who explains that the underlying legal challenges–at the City level and in Superior Court—were objectively baseless. Indeed, N&A's "petitioning activity" was particularly baseless given that its employees were directed to attend a hearing regarding a project that did not impact them and to sign a false Petition designed to mislead public officials.

N&A then repeats many of the arguments made by Sunset and Saeed Nourmand that interim rulings on procedural issues and an interlocutory order allowing the City to "clarify" the administrative records means that Sunset prevailed and that its claims were objectively reasonable. Mot. at 17-18. In her report, Tina Thomas explains why none of these interim rulings somehow validate Sunset's vexatious litigation and run contrary to the purpose of CEQA. Thomas Report at 28-29, 32-33. In any event, courts have rejected similar arguments in the past. For example, in *Hanover 3201 Realty, LLC v. Village Supermarkets, Inc.*, the Third Circuit held that requiring an additional environmental "survey" or correcting a "technical deficiency" in a permit application was too minor to qualify as a successful outcome under *Noerr-Pennington*. 806 F.3d 162, 182 (3d Cir. 2015). The court "liken[ed] this to ***hitting a single in the second inning***." *Id.* (emphasis added).

In addition, Plaintiffs will offer expert testimony from Richard Grassetti who regularly advises cities on the adequacy of environmental studies under CEQA. Balitzer Decl. Ex. 31. As Grassetti opines, the level of technical analysis regarding environmental impacts reflected in the environmental studies and administrative records for Relevant's hotel projects was equivalent to what would be included in an EIR. *Id.* His testimony undermines the notion that Defendants' petitioning activity—ostensibly to ensure that environmental impacts were sufficiently studied pursuant to an EIR—were likely to result in any new information or analysis to aid the public. And while Defendants offer competing expert opinions, this

disagreement represents a quintessential issue of fact that cannot be resolved through summary judgment.  *See, e.g.*, *CSX Transp., Inc. v. Gilkison*, 2012 WL 5906716, at *7 (N.D. W. Va. Nov. 26, 2012) (denying summary judgment under the *PREI* exception standard).

Nor do the settlement agreements support Defendants' argument that the Sunset claims had merit and several of the cases cited by N&A make Plaintiffs' point.  In *New West* and *Terazosin,* the litigants settled on terms the party could have obtained at trial "on the merits" of its underlying claim.  *New West L.P. v. City of Joliet*, 491 F.3d 717 (7th Cir. 2007); Brief of Defendants-Appellees, *New West L.P. v. City of Joliet*, No. 06-3665, 2007 WL 610933 (7th Cir. Feb. 2, 2007) (parties settled debt collection case for monetary payment); *In re Terazosin Hydrochloride Antitrust Litig.*, 335 F. Supp. 2d 1336, 1358 n.13 (S.D. Fla. 2004) (party "filed suit and receives the relief sought").  *Theme Promotions* involved a single threatened litigation (not a campaign of sham legal filings) and the court did not base its analysis on a tangential settlement, but on an independent analysis that showed the suit was "meritorious."  *Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1008 (9th Cir. 2008).

Here, Defendants extracted millions of dollars and concessions to which they had no legal entitlement.  But the Court can also address this issue as a matter of law.  Defendants' arguments are unsupportable under *Koziol.*  That position would have relieved Koziol of liability simply because the victim consented to the settlement.  But the means-ends framework in *Koziol* looks not to whether the victim signed papers, but whether the defendant had a lawful claim to the property it received.  *United States v. Koziol*, 993 F.3d 1160, 1176 (9th Cir. 2021), *cert. denied*, 142 S. Ct. 1372 (2022).  If Defendants' are correct that consent to a contract eliminates Hobbs Act liability, it would read reads an entire phrase ("with his consent") out of the statute.  *See* 18 U.S.C. § 1951(b)(2).  Finally, as explained in

Plaintiffs' separate motion, ECF No. 121-1, Defendants' argument is contrary to California law.  Independently, it must therefore be rejected.

Thus, even under the inapplicable standard that N&A argues in its Motion, there are numerous issues of material fact that preclude summary judgment under its *Noerr-Pennington* affirmative defense.  The Motion must be denied.

## C.   *Noerr-Pennington* Does Not Apply Where the Petitioning Activity Has "No Nexus" to the Extortionate Demand

Defendants' arguments under *Noerr-Pennington* fail for a reason independent from "sham litigation":  the money extorted by the enterprise lacks a "nexus" to the claims asserted by N&A.  Courts have repeatedly held that, where the "petitioning activity" has no nexus to the extortionate demand, the "chilling" concerns of *Noerr-Pennington* do not apply.  *See, e.g.*, *La Suisse, Societe D'Assurances Sur La Vie v. Kraus*, 2014 WL 3610890, at *9-10 (S.D.N.Y. July 21, 2014); *United States v. Tobin*, 155 F.3d 636, 640 (3rd Cir. 1998); *United States v. Avenatti*, 2020 WL 70951, at *8-9 (S.D.N.Y. Jan 6, 2020).   In these cases, the "wrongful" element is not premised on "sham" legal claims (as in, e.g., *Koziol*).   Instead, the extortionist's conduct is "wrongful" under the Hobbs Act because the legal claims have "no nexus to [the extortionist] or the personal payment demanded by him to make them go away."  *Kraus*, 2014 WL 3610890, at *9-10.

One example is *Kraus*, where the extortionists were insurance brokers who sold Swiss Life policies to policyholders in New York.  While the underlying lawsuits were brought nominally on behalf of policyholders, the brokers attempted to negotiate a payment for themselves in exchange for the withdrawal of all policyholder lawsuits.  *Id.*  The court explained that when the extortion (i.e., payment to the brokers) has "no nexus" to the relief sought in the lawsuit (i.e., payment to policyholders) then there is no need to consider whether the litigation was frivolous or sham.  *Id.*  Under such facts, the court found that there was "no risk of a 'chilling effect'" by "holding Kraus and Caruso liable for RICO damages."  *Id.*  The Court

1   held that Kraus and Caruso violated the Hobbs Act, without making any sham
2   finding.  *Id.*

3       The same rationale applies here.  The enterprise's lawsuits were brought
4   purportedly on behalf of the residents of the City of Los Angeles—in the shoes of a
5   "private attorney general"—seeking to set aside the City's MND and require a full
6   EIR.  But the extortionate demands had nothing to do with requiring an EIR.  Rather,
7   Defendants sought personal profit and costly design changes to hotel projects that
8   would solely benefit *them*.

9       A recent example with particular resonance in this district involves the lawyer
10  Michael Avenatti.  *Avenatti*, 2020 WL 70951.  In that case, Avenatti's client operated
11  a youth basketball league funded by Nike.  The partnership between Nike and
12  Avenatti's client soured after the client refused to continue making illicit payments
13  to youth basketball players on behalf of Nike.  In "settlement discussions," Avenatti
14  demanded that Nike pay $1.5M to settle his client's claims *and* agree to retain
15  Avenatti to conduct an internal investigation, which Avenatti said would cost $15M
16  to $25M.

17      Avenatti argued that because he was trying to settle his client's claims, he was
18  being charged solely for litigation-related conduct, which should be protected
19  conduct.  *Id.* at *8.  "Avenatti argues that '[c]ourts have largely exempted [litigation-
20  related] threats from the extortion statutes as a matter of law because, by its very
21  nature, litigation is inherently threatening and poses a risk of economic loss to all
22  parties.'"  *Id.* at *8 n.1.  The court rejected the argument.

23      In doing so, the court did not conduct any *Noerr-Pennington* analysis because
24  it was not necessary under the "no nexus" line of cases.  In any event, the court
25  explained "whether or not 'there is a nexus between his alleged threats' and that
26  'plausible claim of right,' are questions for the jury."  *Id.* at *9 (alterations adopted)
27  (citation omitted).

28

The decisions reflect the rule that litigation activity, including "settlement negotiations," can constitute extortion if there is "no nexus" between the legal claims and the property demanded.[5] Here, Plaintiffs have shown ample evidence to create a triable issue of fact regarding the lack of a nexus between Defendants' purportedly protected petitioning activity (i.e., suing under CEQA to compel an EIR) and the property demanded from Plaintiffs ($5.5 million in cash plus costly design changes to Plaintiffs' property to benefit Defendants).

### D.   N&A's Arguments Regarding the Number of Predicate Acts Fail

N&A makes several scattershot arguments in bullet form to suggest Plaintiffs cannot establish more than two predicate acts. Mot. at 12. As explained above, that Defendants extracted extortionate settlement agreements does not mean the underlying *Thompson* and *Tommie* litigation matters were not sham. Defendants filed those cases "without regard for the merit" of the claims and never obtained the relief they were seeking, i.e., an EIR for the projects. So too with *Selma Wilcox*. Plaintiffs will establish the Petition was initiated "without regard for the merit," which is a *prospective* test under *USS-POSCO* (and why *Aydin Corp. v. Loral Corp.*, 718 F.2d 897 (9th Cir. 1983), decided before *USS-POSCO*, is inapplicable).

Defendants confuse the significance of the Schrader episode to Plaintiffs' claims. That Defendants reflexively initiated proceedings against Schrader support the "sham" pattern; however, the Schrader episode, by itself, was not an independent predicate act. It was an overt act in furtherance of their attempt to extort Plaintiffs again, increasing pressure on Plaintiffs to write another "check" to make Defendants go away. Thomas Report at 17. With respect to Maddren, there is plainly a disputed issue of fact as to whether Maddren "filed his lawsuit entirely on his own" or whether he did so in coordination with Sunset and its counsel. *Id*. at 15 n.2.

---

[5] *Cohen v. Brown*, 173 Cal. App. 4th 302 (2009) and *Stenehjem v. Sareen*, 226 Cal. App. 4th 1405 (2014) are other illustrative examples of litigation-related extortion that falls within this category under California law.

Finally, Defendants' reflexive and entirely unsuccessful challenges at the City level *are* predicate acts. The Court has already held that "[t]he sham litigation exception is not limited to formal litigation and includes pre-suit legal activity." ECF No. 114 at 5-6.

## IV.   N&A AGREED TO PARTICIPATE IN THE PREDICATE ACTS

In its final argument, N&A argues it did not conspire to violate RICO. Mot. at 25. N&A cites *Salinas v. United States*, 522 U.S. 52 (1997), in which the Supreme Court held that a defendant who was acquitted of a substantive racketeering violation under 18 U.S.C. § 1962(c) could nonetheless be charged with a conspiracy under 18 U.S.C. § 1962(d). A conspiracy violation under subsection (d) merely requires that the defendant "knew about and agreed to facilitate" the substantive racketeering scheme. *United States v. Fiander*, 547 F.3d 1036, 1040-41 (9th Cir. 2008) (citing and applying *Salinas*).

Here, there is enough evidence for a reasonable jury to infer that N&A was "aware of the essential nature and scope of the enterprise" and agreed to facilitate the scheme by virtue of (1) its senior officers attending meetings where extortionate demands were made, (2) directing its employees to attend a public hearing and sign a misleading Petition in opposition to put pressure on the developer to make concessions, (3) collecting payment and enforcing the terms of the settlement agreement on behalf of the enterprise. *See Salinas*, 522 U.S. at 65 ("One can be a conspirator by agreeing to facilitate only some of the acts leading to the substantive offense.").

When Saeed Nourmand sought to use N&A, including its employees and substantial resources, to facilitate the scheme, N&A had a choice. Michael Nourmand could have told his father "no" or he could have told his employees that they were under no obligation to perform services for Saeed Nourmand. Instead, Michael Nourmand encouraged N&A employees to attend the public hearing and object to a hotel that was outside the field of N&A's business and of no moment to

any of the employees under his control. *Supra* pp. 6-8. N&A likewise made the decision to allow Saeed Nourmand to use its employees and offices as his own—whether for organizing meetings, conducting legal research, collecting settlement funds, or reporting his taxes. *Supra* pp. 11-12. In doing so, N&A agreed, for purposes of RICO, to participate in the enterprise's affairs and facilitate its unlawful scheme. *See United States v. Tille*, 729 F.2d 615, 619 (9th Cir. 1984) (Section 1962(d) does not require "proof that a defendant agreed to commit personally two predicate offenses," only that the defendant agreed to "participate in the conduct of an enterprise's affairs, where its affairs are conducted through a pattern of racketeering activity").

N&A also suggests, in its introduction, that the "new characterization" of predicate acts in Plaintiffs' discovery responses were not previously in the TAC. Mot. at 2 (citing *Pineda v. Saxon Mortg. Servs., Inc.*, 2008 WL 5187813 (C.D. Cal. Dec. 10, 2018)). Not only is *Pineda* inapposite (it is an order on the pleadings) but any alleged prejudice is, once again, a problem of N&A's own making. The discovery that N&A takes issue with were responses to interrogatories that N&A served 30 days before the close of fact discovery. *See* Schaus Decl. Ex. N at 519 (responses dated May 2, 2022, which is the fact-discovery cutoff set by the Court). As the Court previously found, "N&A apparently made a unilateral decision not to participate in discovery while its Motion to Dismiss was under submission. . . . That N&A is now purportedly out of time appears to be a crisis of its own making for which ex parte relief is not available." ECF No. 114 at 9. In any event, N&A was clearly aware that pre-suit activity was part of the case because, even when the Court denied N&A's motion to dismiss, it expressly noted that "[t]he sham litigation exception is not limited to formal litigation and includes pre-suit legal activity." *Id.* at 5-6. Plaintiffs cannot claim prejudice or unfair surprise under these circumstances.

## **CONCLUSION**

For the reasons set above, N&A has failed to establish that there is no disputed issue of material fact and, accordingly, its Motion should be denied.

Dated:  May 23, 2022

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

By:  *s/Susan K. Leader*
Susan K. Leader

Attorneys for Plaintiffs