1   **NORTON ROSE FULBRIGHT US LLP**
    JAMES H. TURKEN (BAR NO. 89618)
2   CHRISTOPHER K. PELHAM (BAR NO. 241068)
    NEIL P. THAKOR (BAR NO. 308743)
3   555 South Flower Street
    Forty-First Floor
4   Los Angeles, CA 90071
    Telephone:  (213) 892-9200
5   Facsimile:  (213) 892-9494

6   Attorneys for Defendant Sunset Landmark
    Investment, LLC
7

8

9   **WILSON SONSINI GOODRICH & ROSATI**
    **Professional Corporation**
10  SUSAN K. LEADER, State Bar No. 216743
    sleader@wsgr.com
11  ALI R. RABBANI, State Bar No. 253730
    arabbani@wsgr.com
12  CONOR TUCKER, State Bar No. 318075
    ctucker@wsgr.com 633 West Fifth Avenue, Suite
13  1550
    Los Angeles, CA 90071-2027
14  Telephone: (323) 210-2900
    Facsimile:  (866) 974.7329

15  Attorneys for Plaintiffs

16              IN THE UNITED STATES DISTRICT COURT
                FOR THE CENTRAL DISTRICT OF CALIFORNIA
17

| | |
|---|---|
| 18  RELEVANT GROUP, LLC, a Delaware limited liability company; 1541 WILCOX HOTEL LLC, a Delaware limited liability company; 6516 TOMMIE HOTEL LLC, a Delaware limited liability company; and 6421 SELMA WILCOX HOTEL LLC, a California limited liability company,<br><br>              Plaintiffs,<br><br>      v.<br><br>STEPHEN "SAEED" NOURMAND, an individual; THE SUNSET LANDMARK INVESTMENT LLC, a California limited liability company; and DOES 1-10,<br><br>              Defendants. | Case No. 2:19-cv-05019-ODW-KSx<br><br>**DISCOVERY MOTION**<br><br>**REDACTED VERSION OF JOINT STIPULATION RE: OMNIBUS PRIVILEGE ISSUES**<br><br>Date: June 9, 2022;<br>Time: 1:30 p.m.<br>Place: Courtroom 580<br><br>Complaint Filed: June 10, 2019<br>TAC Filed:  Sept. 14, 2021<br>Final Pre-Trial Conference: Aug. 8, 2022<br>Discovery cut-off: May 2, 2022.<br>Trial date:  August 30, 2022 |

## <u>TABLE OF CONTENTS</u>

SUNSET'S INTRODUCTORY STATEMENT ........................................................ 3

PLAINTIFFS' INTRODUCTORY STATEMENT ................................................. 5

NOURMAND & ASSOCIATES' INTRODUCTORY STATEMENT .................... 7

I.    SUNSET'S WAIVER GROUND 1: PLAINTIFFS HAVE IMPLIEDLY WAIVED PRIVILEGE BY PLACING ATTORNEY-CLIENT COMMUNICATIONS AND PLAINTIFFS' BELIEFS AT ISSUE ......................... 8

   A.    SUNSET'S POSITION ........................................................................ 8

     1.    Legal Standard On Implied Waiver ......................................... 9

     2.    Plaintiffs Took An Affirmative Act of Filing This Lawsuit ...................... 10

     3.    Plaintiffs Put At Issue Privileged Communications Relating To CEQA Actions and Settlement Communication ................................ 10

     4.    The Withheld Communications Are Vital To Defendants' Ability To Defend Against The Claim That Plaintiffs' Fear Was "Reasonable" ............... 11

   B.    PLAINTIFFS' POSITION ............................................................... 13

     1.    Plaintiffs Have Not Put Privileged Information at Issue. ......................... 15

     2.    No Implied Waiver Has Occurred. ......................................... 21

     3.    The withheld communications are not "vital" to Defendants .................... 25

II.   SUNSET'S WAIVER GROUND 2: PLAINTIFFS VOLUNTARILY DISCLOSED PRIVILEGED COMMUNICATIONS WITH THEIR ATTORNEYS REGARDING SETTLEMENT NEGOTIATIONS ........................ 27

   A.    SUNSET'S POSITION ...................................................................... 27

   B.    PLAINTIFFS' POSITION ............................................................... 29

     1.    Background: Sunset and Relevant settlement negotiations ...................... 30

     2.    Defendants cannot show, as they must to prove voluntary waiver, that Plaintiffs disclosed privileged or protected information. ................................. 31

     3.    Defendants' requested scope of waiver is overly broad and would constitute reversible error. ......................................... 35

III.  SUNSET'S WAIVER GROUND 3: PLAINTIFFS WAIVED PRIVILEGE OVER COMMUNICATIONS DISCLOSED TO THIRD PARTIES ..................... 38

   A.    SUNSET'S POSITION ...................................................................... 38

     1.    Plaintiffs Have Not Demonstrated That The Third Parties Are The Functional Equivalent of An Employee ................................ 38

     2.    Plaintiffs Do Not Share a Common Interest Privilege with the Third Parties ............................................................... 41

   B.    PLAINTIFFS' POSITION ............................................................... 43

     1.    Communications with Agents of Plaintiffs' Counsel are Privileged ........ 43

     2.    Communications with Plaintiffs' Consultants are Privileged .................... 46

     3.    Communications with Principals of Geolo Capital are Privileged ............ 51

     4.    Communications with Laurent Opman are Protected by the Common Interest Doctrine ................................................... 52

- 1 -

IV.   SUNSET'S WAIVER GROUND 4: PLAINTIFFS UNREASONABLY DELAYED IN PRODUCING A PRIVILEGE LOG ................................. 53
 A.   SUNSET'S POSITION ...................................................... 53
  1.   Facts Relevant To Delay ............................................ 53
  2.   Plaintiffs' Unreasonably Delayed, At Time Intentionally, In Producing A Privilege Log. ....................................................... 54
 B.   PLAINTIFFS' POSITION .................................................. 56
V.   Plaintiffs Request That Defendants Supplement Their Privilege Log ............. 60
 A.   Defendants' Responses to Discovery Claiming Privilege ........................... 60
 B.   Plaintiffs' Statement ...................................................... 66
 C.   Sunset's Statement ...................................................... 70
VI.   THE COURT SHOULD CONSISTENTLY RESOLVE THE ISSUE OF WHETHER AGENTS WAIVE PRIVILEGE ACROSS ALL PARTIES ............... 71
 A.   Defendants' Privilege Log Entries Including its Agents ........................... 71
 B.   Plaintiffs' Contentions ................................................... 72
 C.   Sunset's Contentions .................................................... 73
VII.   PLAINTIFFS REQUEST AND DEFENDANTS HAVE AGREED TO PROVIDE THE DEPOSITION OF S. NOURMAND FROM A PRIOR CASE. ..... 76
 A.   Defendants' Responses to Discovery Claiming Privilege ........................... 76
 B.   Plaintiffs' Statement ...................................................... 77
 C.   Sunset's Statement ...................................................... 78
VIII.   CONCLUDING STATEMENTS ............................................. 78
 A.   SUNSET'S CONCLUDING STATEMENT ................................ 78
 B.   PLAINTIFFS' CONCLUDING STATEMENT ............................. 79

## JOINT STIPULATION RE: OMNIBUS PRIVILEGE ISSUES

Pursuant to Federal Rule of Civil Procedure 37 and Local Civil Rule 37-2, and this Court's order (ECF No. 136). Plaintiffs Relevant Group LLC, Wilcox Hotel LLC, Tommie Hotel LLC, and Selma Wilcox Hotel LLC ("Plaintiffs"); Defendants Stephan "Saeed" Nourmand, The Sunset Landmark Investment LLC (collectively "Sunset') and Defendant Nourmand & Associates ("N&A") submit the following Joint Stipulation in connection with the Parties' discovery disputes outlined herein. [1]

## SUNSET'S INTRODUCTORY STATEMENT

Plaintiffs have impliedly waived the attorney-client privilege. Plaintiffs are claiming that they were extorted by Sunset's CEQA lawsuits and settlement communications which caused them to develop a "reasonable fear" which forced them into a settlement. When describing the story of the alleged extortion in the Third Amended Complaint, Plaintiffs heavily quoted its own lawyer's self-serving description of Sunset's settlement communications as "blood money." These affirmative actions, among others, have put at issue what Plaintiffs learned about the CEQA suits and settlement communications from its lawyers. There is no other way for Defendants to test Plaintiffs' assertion that they settled with Sunset because they "reasonably feared" that Sunset's purportedly meritless CEQA litigations could actually harm them.

In addition, Sunset is also entitled to privileged communications disclosed to twelve third-parties. Although Plaintiffs have claimed these third-parties are either a functional equivalent of an employee or share a common interest, Plaintiffs have not

---

[1] Defendants' exhibits are labeled with Arabic numerals and may be found attached to the Declaration of Neil Thakor filed concurrently herewith. Unless otherwise stated, an exhibit with an Arabic numeral refers to those attached to the Thakor Declaration. Plaintiffs' exhibits are labeled with letters from the alphabet and may be found attached to the Declaration of Stephanie Balitzer filed concurrently herewith. Unless otherwise stated, an exhibit with letter from the alphabet refers to those attached to the Balitzer Declaration.

made a factual showing supporting those conclusions.  In fact, the facts that are on the record show that privilege was waived. As just example, Plaintiffs have withheld 64 communications with Scott Campbell, a person Plaintiffs believed to be an agent of Defendant Nourmand & Associates – a purported extorter – on the basis he is a "functional employee" of Plaintiffs.

It is these factual differences that distinguish Sunset's position on third-party waiver from Plaintiffs' position. Contrary to Plaintiffs' assertions, Sunset is not taking any inconsistent positions regarding privilege by withholding privileged communications that included Rachel DeCastro, Sarah Gould, and Mohamad Iravani. As shown below, these individuals were included on privileged communications to perform purely ministerial functions like send messages, keep records, and pay legal bills.  There is nothing improper or inconsistent about that position.

Finally, Sunset has been prejudiced by Plaintiffs' delay in producing a privilege log until just before the discovery cut off.  While Plaintiffs raise issues in this joint stipulation with Sunset's privilege log, the key distinction is prejudice. Sunset provided a privilege log in June of 2021, and then supplemented it twice based on meet and confer efforts.  And while Sunset intends to revise its privilege log to remove erroneous entries of documents already produced, those errors do not prejudice Plaintiffs.  On the other hand, the delay until March 15, 2022 to produce any privilege log prejudiced Sunset's ability to seek relief before the discovery cut off and use such documents in connection with a motion for summary judgment.

For these reasons, more fully explained as Grounds 1-4 below, Plaintiffs have waived the attorney client privileged with respect to communications with its CEQA lawyers relating to the underlying litigations, settlement communications, or communications disclosed to third-parties.  On the other hand, Sunset is largely willing to stipulate to the relief requested in Plaintiffs' portion of the joint stipulation with the exception of the requested adoption of a "bright line" rule on third-party waiver.

## PLAINTIFFS' INTRODUCTORY STATEMENT

Defendants submit this smash-and-grab motion related to Plaintiffs' privilege log at the tail end of discovery, with summary fully judgment briefed and submitted to the Court.  Now, with trial in August, Defendants attempt to upend the case with sweeping claims of waiver that undercut many of the agreements and understandings made between the parties in discovery.  Plaintiffs do not put privileged material at issue in their claims and have diligently asserted privilege throughout discovery—including in written responses and at deposition.  In connection with its substantial document production, Plaintiffs provided a privilege log in a time frame and a manner that was consistent with the Parties' agreements.

The timing of Defendants' implied waiver argument is particularly egregious because it is based on allegations in a Complaint that was filed almost exactly three years ago.  If Defendants truly believed that Plaintiffs' allegations implicitly waived the privilege, Defendants should have raised this issue at the outset of the discovery when the parties negotiated the scope of the requests for the production and what communications ought to be logged on a privilege log.  Not only would a waiver of this nature have far-reaching ramifications for this case, but for any case where a party believes they are being extorted through vexatious litigation and seeks to consult a lawyer. Courts recognize the paramount importance of full and fair consultation between clients and attorneys and only find implied waiver in very narrow circumstances.  Those circumstances are not present here. Plaintiffs' claim does not put the content of its legal advice at issue and Defendants do not need the information to defend their case.  Moreover, from a public policy perspective, a finding of waiver under these circumstances could have a chilling effect on the ability of victims of extortion to seek legal advice.  The very nature of the extortion (alleged by Plaintiffs) is a Hobbesian choice: succumb or take enormous risk to your

business.  In such circumstances, it is critical that parties know they can obtain legal advice in confidence without having to waive that privilege to seek redress.

Defendants' contention as to both "implied" and "voluntary" waiver is ill-founded and contradicted by positions Defendants have taken in their own discovery responses.  For example, although Plaintiffs' subjective views of the merits of the CEQA litigation are *not* at issue in any claim or defense, Defendants' subjective views of the merits *are at issue* because of their *Noerr-Pennington* affirmative defense.  Under controlling implied waiver law, Defendants had a choice: waive and allow discovery into the merits, or claim privilege and be precluded.  Defendants chose to both claim the CEQA suits had merit and yet claim privilege when Plaintiffs attempted to probe as to the basis for this position.  Yet, ironically, Defendants now argue that Plaintiffs must be forced to waive privilege for facts Plaintiffs are not required to prove and that are not central to Plaintiffs' case.  This is not the law.  Defendants' strategic attempt to try and derail this case from trial ought not be countenanced by this Court.  Plaintiffs have sought to resolve the issues between the parties, including by proposing redactions to the two sentences at issue in the claim of selective waiver and/or by discussing a mutual stipulation precluding evidence from both parties regarding their subjective view on the merits of the CEQA cases at trial. Defendants' refusal, without explanation, to entertain these options is telling. Defendants' motions should be denied.

Separately, Plaintiffs raised three additional issues for the Court.  *First*, Plaintiffs request that the Court order Defendants to provide a supplemental privilege log and verify that no further non-privileged documents exist responsive to Plaintiffs' discovery requests.  Defendants have refused to provide a supplemental privilege log, despite their agreements to do so after stating they are withholding documents based on privilege.  *Second*, Plaintiffs moved to compel production of the transcript of a previous deposition of Mr. S. Nourmand.  Defendants conceded.  *Third*, Plaintiffs ask the Court to craft a consistent rule regarding the privilege status

of agents for this case.  S-Defendants have taken the position throughout discovery that presence of their agents and independent contractors on otherwise privileged communications does *not* waive privilege. Now, they argue that Plaintiffs' virtually identical claims waive privilege.  Plaintiffs' agents (experts and consultants assisting Plaintiffs and their attorneys throughout the administrative and pre-litigation process) do not waive privilege.  But Defendants their inconsistent positions, if applied unilaterally only to Plaintiffs, threatens the "dignity of the judicial process." *Bradley v. Harcourt, Brace & Co.*, 104 F.3d 267, 272 (9th Cir. 1996).  The Court's ruling on this issue be applied consistently to both parties.

## NOURMAND & ASSOCIATES' INTRODUCTORY STATEMENT

This discovery dispute addresses Plaintiffs' waiver of the attorney-client privilege regarding communications with their lawyers and third parties relating to the underlying CEQA lawsuits and corresponding settlement agreements which are the subject of Plaintiffs' RICO claims. N&A is not and cannot be part of the instant discovery dispute because N&A was not a party to the underlying CEQA lawsuits, did not negotiate, sign or receive any consideration from the settlement agreements, and did not retain counsel with respect to the lawsuits or settlement agreements. Thus, N&A does not have any relevant privileged communications.

Regardless, N&A is not obligated to provide any further discovery responses, documents, depositions or a privilege log. There are no grounds to do so, and Plaintiffs failed to timely meet and confer or initiate any such a discovery dispute. Since N&A supplementally responded to a subpoena over a year ago, Plaintiffs have never raised a discovery dispute with N&A. After N&A became a party to the action, Plaintiffs did not serve N&A with any document requests.

Nevertheless, in a recent meet and confer email and in their Joint Statement, Plaintiffs address their positions to defendants collectively, including N&A. Plaintiffs attack the S Defendants' assertion of the attorney-client privilege over a number of communications, including emails that reside on N&A's email server.

Almost all of these emails include Saeed Nourmand, who left N&A over a decade ago, but kept his @nourmand.com email address for ease and continuity to conduct his personal affairs and perform his separate work for Sunset Landmark. As part of its response to the subpoena, N&A turned over Saeed's email account and several other potentially privileged emails to counsel for Saeed and Sunset Landmark, who reviewed the communications, asserted the attorney-client privilege where appropriate, and produced a privilege log. To the extent the Court is inclined to grant any relief to Plaintiffs, to the extent it involves N&A even tangentially, such relief should not extend beyond the Sunset Landmark privilege log.

I.    **SUNSET'S WAIVER GROUND 1: PLAINTIFFS HAVE IMPLIEDLY WAIVED PRIVILEGE BY PLACING ATTORNEY-CLIENT COMMUNICATIONS AND PLAINTIFFS' BELIEFS AT ISSUE**

A.    **SUNSET'S POSITION**

Plaintiffs are suing Defendants for extortion.  Plaintiffs allege that Defendants' initiated a series of meritless CEQA lawsuits challenging Plaintiffs' Hollywood hotels "for the purpose of delaying and frustrating [the] developments." ECF No. 89 at 130.  These CEQA lawsuits instilled a "fear of severe economic loss" in Plaintiffs due to delays in the project allegedly caused by the CEQA lawsuits.  *Id*. at  40.  As a result, Plaintiffs claim they were forced to settle the CEQA lawsuits despite Plaintiffs' subjective belief that the lawsuits were meritless.  *Id*. at  4, 83, 131.[2]

As a result of these allegations, Plaintiffs have impliedly waived privilege over communications with their CEQA attorneys relating to: (1) the merits of the

_____

[2] Although not included in the TAC, Plaintiffs also allege that Sunset made extortionate threats to Plaintiffs lawyers such as that even if Sunset lost the CEQA litigation, it would "appeal that ruling and continue to manufacture challenges until Plaintiffs folded."  See e.g., ECF No. 137, Plaintiff's Opposition To Sunset Defendants' Motion For Summary Judgment, 1:22:23.

CEQA lawsuits; and (2) the purported settlement demands by Sunset to Plaintiffs' attorneys. [3]

### 1.   Legal Standard On Implied Waiver

"Where a party raises a claim which in fairness requires disclosure of the protected communication, the [attorney-client] privilege may be implicitly waived." *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1162 (9th Cir.1992).  In examining implied waiver, the Ninth Circuit uses the three-prong *Hearn* test which evaluates whether: "(1) the party asserts the privilege as a result of some affirmative act, such as filing suit; (2) through this affirmative act, the asserting party put the privileged information at issue; and (3) allowing the privilege would deny the opposing party access to information that is vital to its defense." *Home Indem. Co. v. Lane Powell Moss & Miller*, 43 F.3d 1322, 1326 (9th Cir. 1995) (citing *Hearn v. Rhay*, 68 F.R.D. 574, 581 (E.D. Wash. 1975)). [4]

Under the *Hearn* test, the actual use of attorney-client information in prosecuting or defending the action is not necessary to effect an implied waiver.  *In re Lidoderm Antitrust Litig.*, No. 14-MD-02521-WHO, 2016 WL 4191612, at *4 (N.D. Cal. Aug. 9, 2016).  Instead, a party will waive privilege "if he asserts a factual claim the truth of which can only be assessed by examination of a privileged communication."  *Id.*  The key principle in the implied waiver doctrine is "fairness" in defending against the claim implicating privilege. *Phelps v. MC Commc'ns, Inc.*, No. 2:11-CV-00423-PMP, 2013 WL 3944268, at *20 (D. Nev. July 22, 2013).

As a result, Courts have found waiver when party asserts a claim or defense that puts at issue knowledge of the law and litigation process. *See e.g.*, *United*

---

[4] Attorney work product doctrine is also subject to implied waiver.  *See Holmgren v. State Farm Mut. Auto. Ins. Co.*, 976 F.2d 573, 577 (9th Cir. 1992); *Dexcom, Inc. v. AgaMatrix, Inc.*, No. CV 16-5947-SJO (ASX), 2018 WL 10323723 at *4-5 (C.D. Cal. May 30, 2018).

1 *States v. Bilzerian*, 926 F.2d 1285, 1292 (2nd Cir. 1991); *Phelps,* WL 3944268, at

2 \*20; *United States v. Exxon Corp.*, 94 F.R.D. 246, 249 (D.D.C. 1981).

3     Courts have also found waiver when a party puts at issue the reasons for

4 entering into a settlement agreement.  *In re Lidoderm Antitrust Litig.*, 2016 WL

5 4191612, at \*1 ("party cannot testify to its subjective beliefs about the reasons for

6 entering into the settlement and preclude its adversaries from discovering the

7 content of the lawyers' advice…"); *Pitney-Bowes, Inc. v. Mestre*, 86 F.R.D. 444, 447

8 (S.D.Fla.1980) (by injecting the issue of the parties' intent in entering into certain

9 contracts into the case, plaintiff waived attorney-client privilege; the benefit of

10 piercing the privilege far outweighed any injury to attorney-client relationship where

11 issue of parties' mental state directly raised by plaintiff); *accord State–Wide Capital*

12 *Corp. v. Superior Bank FSB*, 2000 WL 20705, at \*2 (S.D.N.Y. Jan. 11, 2000).

13     As shown below, each of the prongs of the *Hearn* test exist here, and fairness

14 requires an implied waiver of privilege over Plaintiffs' communications with its

15 CEQA lawyers regarding (1) the merits of the CEQA actions (and the ability to

16 defeat the CEQA actions without settling); and (2) the settlement negotiations as

17 well as the reasons for entering the into the settlements, with S-Defendants.

18        2.   <u>Plaintiffs Took An Affirmative Act of Filing This Lawsuit</u>

19     The first prong of the *Hearn* test is met because Plaintiffs took an affirmative

20 act of suing S-Defendants for extortion.

21        3.   <u>Plaintiffs Put At Issue Privileged Communications Relating To</u>

22              <u>CEQA Actions and Settlement Communication</u>

23     The second prong of the *Hearn* test is also met because Plaintiffs' extortion

24 claims against Defendants put at issue their communications with their CEQA

25 attorneys.

26     Extortion includes a state of mind element for the victim.  Plaintiffs must prove

27 that Defendants' CEQA lawsuits and settlement communications instilled a "fear" in

28 them that was "reasonable" under the circumstances. *United States v. Marsh*, 26 F.3d

1496, 1500 (9th Cir. 1994). This requires establishing that Plaintiffs' had a subjective belief that "that [Sunset] had the power to harm [Plaintiffs]" with its purportedly frivolous CEQA lawsuits. *United States v. Capo*, 817 F.2d 947, 951 (2d Cir. 1987).

The "reasonable fear" element of extortion necessarily puts at issue Plaintiffs' communications with their CEQA lawyers, particularly because it requires an analysis of the circumstances. In addition, beyond just the elements of extortion, Plaintiffs have put at issue their subjective beliefs about the litigation directly in the TAC, which Plaintiffs' CFO and part-owner, Andrew Shayne, said was based on privileged communications. ECF No. 89 at 83 ("Although Relevant believed that the CEQA litigation was frivolous and a sham, it nonetheless made the decision to try to negotiate a resolution with Nourmand and Sunset Landmark."); Thakor Decl., Ex. 4 ("Shayne Tr.") 151:13-16 ("So the only thing you are relying on in coming to the conclusion that the CEQA petition was baseless is your counsel's advice? A: Yes."). Accordingly, the second prong of the *Hearn* test is met as well.

        4.    <u>The Withheld Communications Are Vital To Defendants' Ability To Defend Against The Claim That Plaintiffs' Fear Was "Reasonable"</u>[5]

The third prong of *Hearn* is also met because Plaintiffs' communications with their CEQA lawyers are vital to Sunset's ability to defend against Plaintiffs' extortion claim for several reasons.

First, Plaintiffs' assertion that it was extorted into settling the CEQA lawsuits necessarily implicates Plaintiffs' knowledge about CEQA and the litigation process in general. All of Plaintiffs' assertions regarding why it feared the CEQA litigations

---

[5] In the criminal context, sham litigation extortion cases almost always rely on the testimony or impressions of the victim's attorney. See e.g., *United States v. Mitov*, 460 F.3d 901, 908 (7th Cir. 2006) ("Steven Japp's reasonable fear of economic harm is intertwined with that of his attorney, Richard Schultz"); *United States v. Koziol*, 993 F.3d 1160, 1183 (9th Cir. 2021), cert. denied, 142 S. Ct. 1372, 212 L. Ed. 2d 328 (2022) (victim's attorney testifying a trial).

1   – that it could not start construction while a CEQA lawsuit was pending, that defeating

2   CEQA litigations at trial will not alleviate any delay, and S-Defendants could drag

3   out the purported delay with appeals – implicate the advice Plaintiffs were given by

4   its two high powered law firms, Jeffer Mangels and Sheppard Mullin. *In re Lidoderm*

5   *Antitrust Litig*., 2016 WL 4191612, at *7 (assertion of "subjective beliefs about the

6   inherent uncertainties in patent litigation and timeframes for trial court and appellate

7   decisions generally" resulted in implied waiver); see Shayne Tr. 136-142, 149-151;

8   Thakor Decl., Ex. 2 ("King Tr."), 224-226; Thakor Decl., Ex. 3 ("Maisnik Tr."), 167-

9   169, 257-259; Thakor Decl., Ex. 6 ("Heyman Tr."), 198-199.

10       In addition, there is no other source of information available to test whether the

11   Plaintiffs' purported fear of Defendants' CEQA lawsuits was reasonable.  Without

12   the privileged communication, Sunset would have to rely exclusively on Plaintiffs'

13   characterization of their state of mind. *United States v. Amlani*, 169 F.3d 1189, 1196

14   (9th Cir. 1999) (finding implicit waiver when government would be forced to rely

15   almost exclusively on defendants characterization of events without access to

16   privileged communications).

17       Second, privileged communications with Plaintiffs' lawyers are vital to testing

18   Plaintiffs' assertion that it was extorted into settling with Sunset, particularly in light

19   of the fact that the settlement agreements, which were drafted by counsel for both

20   parties, contained a no duress and reliance on counsel provisions.[6] *In re Lidoderm*

21   *Antitrust Litig*., 2016 WL 4191612, at *1; *Synalloy Corp. v. Gray*, 142 F.R.D. 266,

22   270 (D.Del.1992) (attorney negotiated agreements, when client asserted fraudulent

23   misrepresentation and rescission of the agreement, it waived its right to prevent

24   disclosure of communications which might show the parties intent in entering the

25   agreements).

26

27   _____

28   [6] In deposition, Plaintiffs' counsel, Guy Maisnik, testified he lied when signing a no duress provision, because Sunset allegedly had a gun to Plaintiffs head in which the "trigger" in the analogy was not settling.  Maisnik Tr., 258-289.

Third, Defendants are entitled to discovery of communications indicating how Plaintiffs learned – and came to fear – the purported threats and demands purportedly made by Sunset's lawyers to Plaintiffs' lawyers.  Nearly all of the inflammatory allegations in the TAC – "blood money", "kiss the ring" – come directly from Plaintiffs lawyers. Maisnik Tr., 133-135. Moreover, in discovery Plaintiffs have further alleged that Sunset's lawyers made other inflammatory statements like that even if Plaintiffs won at trial, Sunset would "appeal that ruling and continue to manufacture challenges until Plaintiffs folded." see e.g., ECF No. 137, 1:22:23. Plaintiffs have indicated that their lawyers will testify at trial about these purportedly extortionate threats and demands.  The only way for Sunset to test the veracity of these statements, and whether they caused fear in Plaintiffs, is to discover what Plaintiffs' lawyers told Plaintiffs about these purportedly extortionate threats.

In sum, the only way Defendants can assess whether Plaintiffs had a reasonable fear from the CEQA lawsuits and settlement communications is by reviewing the communications Plaintiffs had with their lawyers regarding the CEQA claims and settlement.  As a result, the Court should compel the production of the following entries which relate to either the CEQA litigations or settlement communications: 1-23, 25-65, 68-83, 88-90, 92, 96-115, 117-152, 159-238, 243-328, 330-375, 377-387, 391-407, 413-414, 416, 419, 424, 425, 429-452, 454, 456-459, 461-467, 473, 475, 480, 482-507, 514-558, 560-566, 568-589, 594-615.

## B.   **PLAINTIFFS' POSITION**

There is a strong judicial preference against piercing the attorney client privilege because doing so would undercut the public's confidence that they can freely consult legal counsel for candid advice.  *See, e.g.*, *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981) ("[P]urpose [of the privilege] is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice. The privilege recognizes that sound legal advice or advocacy serves public ends and that

such advice or advocacy depends upon the lawyer's being fully informed by the client."). That is especially true in cases, like here, where a party believes it is being extorted by the filing of reflexive legal actions. It is not the law that a client waives his or her privilege simply by claiming predicate acts of extortion based on sham litigation filings. Rather, the question is whether the *party* puts its privileged communications at issue in *its claims*. Finding otherwise would have punitive and chilling implication to those seeking help from counsel in the midst of being extorted—the Court should decline setting that dangerous precedent here.

As a threshold matter, Defendants' last-minute effort to obtain a broad waiver of privilege is untimely and inappropriate. The thrust of Defendants' argument is that Plaintiffs' allegations, contained in a complaint initially filed June 10, 2019 (*see* ECF No. 1), waive privilege. Defendants had *three years* to litigate these issues and made the tactical decision not to raise them. Discovery is now complete. Summary judgment motions are briefed and submitted. ECF Nos. 121, 123, 124, 158 (vacating hearing and submitting motions on the papers). The trial date is set. Facing trial on the merits of Plaintiffs' claims in August, Defendants have thrown a hail-Mary pass for broad subject matter waiver over the merits and settlement negotiations related to the underlying litigations. Separate and apart from the motion's lack of merit, it is quite simply too late. The motion should be denied.

Even if the Court reaches Defendants' argument, implied waiver is a narrow doctrine that is used sparingly. Courts find that an implied waiver may occur only if a party's claims or defenses put the *content* of legal advice at issue and fairness requires that the opposing party be given an opportunity to examine the content of that legal advice. *Kaiser Found. Health Plan, Inc. v. Abbott Labs., Inc.*, 552 F.3d 1033, 1043 (9th Cir. 2009). Implied waiver is not applicable here. To create an argument of implied waiver, Defendants mischaracterize Plaintiffs' case and the required elements of proof. For instance, Defendants distort elements of *Plaintiffs'* Hobbs Act claim (which does not require proof of Plaintiffs' subjective views of the

merits of underlying CEQA litigation) with *Defendants' Noerr-Pennington* affirmative defense.  This is a red herring.

Defendants' *Noerr-Pennington* affirmative defense is controlled by the Ninth Circuit's decision in *USS-POSCO.*  Under *USS-POSCO* (which Judge Wright has repeatedly found to be the controlling standard on these facts), courts consider *Defendants'* subjective views of the merits of the underlying CEQA litigation. *See USS-POSCO Indus. v. Contra Costa Cnty. Bldg. & Constr. Trades Council, AFL-CIO*, 31 F.3d 800, 810-11 (9th Cir. 1994).  Nothing in *USS-POSCO* (or any other *Noerr Pennington* analysis) requires Plaintiffs to introduce evidence about *their* subjective views of the merits (or their attorneys') of the underlying CEQA litigation at trial.[7]  And Plaintiffs have opposed Defendants' summary judgment motion (brought under their *Noerr Pennington* defense) without relying on any privileged information.  Those motions are now pending before Judge Wright. ECF Nos. 121, 123, 124.

### 1.    **Plaintiffs Have Not Put Privileged Information at Issue.**

Implied waiver applies only where a party asserts a claim or defense that puts the content of its legal advice at issue. *Kaiser*, 552 F.3d at 1043; *Bittaker v. Woodford*, 331 F.3d 715, 719 (9th Cir. 2003) (implied waiver occurs "by asserting claims"). "Fairness" alone is not enough to create implied waiver; the privilege must "inhere in the controversy itself." *Hearn v. Rhay*, 68 F.R.D. 574, 582 (E.D. Wash. 1975).  Nor is waiver automatic.  It must be narrow, *Bittaker*, 331 F.3d at 722, and the party subject to the implied waiver must first be given a choice: "produce the privileged materials *if* [the party] wishes to go forward with its claims implicating them," *id.* at 720.

---

[7] The objective merits of Defendants' underlying CEQA litigations are addressed at length in the Expert Report of Ms. Thomas.  That report was disclosed to the Defendants at the agreed-upon time and Ms. Thomas has been offered for deposition.

Courts in this circuit rely upon a "three-part test" to determine implied waiver: *first*, whether the party invokes a "privilege as a result of some affirmative act, such as filing suit;" *second* whether "through this affirmative act, the asserting party puts the privileged information at issue;" and *third* whether "allowing the privilege would deny the opposing party access to information vital to its [case]." *Home Indem. Co. v. Lane Powell Moss & Miller*, 43 F.3d 1322, 1326 (9th Cir. 1995).

In arguing the second prong, Defendants mischaracterize Plaintiffs' theory of the case and the proof necessary to establish the claims.  A correct view of Plaintiffs' theory demonstrates there is no implied waiver here.  Plaintiffs allege that they were extorted by Defendants out of millions of dollars.  Those acts of extortion constitute the predicate acts for Plaintiffs' RICO claims against Defendants.  To prove extortion under the Hobbs Act, Plaintiffs must show (as relevant to this motion) that Defendants "obtain[ed] . . . property from [Plaintiffs], with his consent, induced by wrongful use of . . . fear." 18 U.S.C. § 1951(b)(2).  Nothing about these claims implicate Plaintiffs' views on the merits of the underlying CEQA claims.

Defendants, on the other hand, assert an *affirmative* defense that their conduct is immunized by the *Noerr-Pennington* doctrine.  Their defense is subject to *USS-POSCO* (*see* ECF No. 39; finding *USS-POSCO* applies to this case), which holds that *Noerr Pennington* is inapplicable where, as is the case here, Defendants followed a pattern of initiating legal claims "without regard to the merits and for the purpose of injuring a market rival."  *USS-POSCO*, 31 F.3d at 810-11.  So while Defendants' subjective motive is at issue, nothing about *USS-POSCO* puts Plaintiffs' subjective views of the merits at issue.  This argument is a red herring.

Defendants then argue that the "fear" element of Plaintiffs' RICO predicate claim "necessarily puts at issue Plaintiffs' communications with their CEQA lawyers."  Again, Defendants distort the nature of Plaintiffs' claims to create an implied waiver where none exists.  Plaintiffs are *not* using the contents of its

communications with counsel to prove the "fear" element.  Rather, Plaintiffs have testified as to their independent business concern without reference to any communications to or from its litigation counsel.  The Ninth Circuit recently held that is sufficient to satisfy Plaintiffs' claims.  *United States v. Koziol*, 993 F.3d 1160, 1182 (9th Cir. 2021), *cert. denied*, 142 S. Ct. 1372, 212 (Mar. 21, 2022).  Testimony of "reasonable fear of economic loss" due to threats of sham litigation can "sufficiently demonstrate[] . . . 'use of fear' under the Hobbs Act." *Id.* (evidence sufficient when victim testified that the mere "allegations [of the sham lawsuit] could damage his career," cause him to "lose corporate sponsors," and led him to fear "that he would not be hired for certain jobs . . . (which he described as the source of 'a lot of [his] income')" (alteration in original)).[8]  There is thus no requirement that Plaintiffs prove fear through resort to their view of the merits of the lawsuit. Instead of addressing the binding law on point, Defendants selectively quote from two cases to suggest that Plaintiffs must prove that the "lawsuits" instilled a subjective fear.  But neither case addresses extortion based on lawsuits, much less hold that "use of fear" in such cases must be based on a plaintiffs' subjective view of the merits of the underlying litigation.  *Cf. United States v. Marsh*, 26 F.3d 1496, 1500 (9th Cir. 1994); *United States v. Capo*, 817 F.2d 947, 951 (2d Cir. 1987).

Here, Plaintiffs intend to prove that Defendants' "use of fear" was its strategy of delay and disruption that put the entire financing structure of Plaintiffs' business at risk.  Plaintiffs have never hidden this fact. Nor should it come as a surprise to Defendants that Plaintiffs allege fear based on the economic consequences of

---

[8] Nor was the victim in *Koziol* required to waive privilege at trial to put on this testimony.  *See, e.g.*, *United States v. Koziol*, No. 2:18-cr-00022-CAS, 2018 WL 2721902 (C.D. Cal. June 1, 2018) (quashing trial subpoena as to one lawyer when "testimony likely fell within the attorney-client privilege" and denying as moot motion to quash trial subpoena as to second lawyer where parties agreed not to call the lawyer under agreement for "admission of certain correspondence between [other lawyer] and defendant").

Defendants' strategy of delay.  Plaintiffs' intent to rely upon the threat of delay and economic harm resulting therefrom is evident from the face of the Complaint:

- Defendants initiated reflexive litigation "for the sole purpose of **burdening and delaying developments until the competing developers have no choice but to cave to the enterprise's extortionate demands**" which resulted in projects "**delayed for years as the enterprise holds them up for ransom**."  ECF No. 89 ("TAC") ¶ 1[9]

- Defendants' "sole purpose [was] **delaying the development of competing properties.  Instilling fear of severe economic loss**, Nourmand Enterprise extracts ransom money and aesthetic concessions from its victims in exchange for their agreement to drop these sham lawsuits."  TAC ¶ 4;

- "The Silverstein Firm is a frequent player in the CEQA space, and well known for holding up developments, such as the much-anticipated Target store in Hollywood, which was **delayed for almost a decade**.  Silverstein partners with Nourmand to utilize environmental statutes to **delay** economically vitalizing developments—**often for years**—in order to secure rich monetary payouts and personal concessions."  TAC ¶ 5;

- "These actions **delay development** for years, **causing owners/developers to lose financial backing, to incur costs associated with holding undeveloped land for an extended time, and to incur escalating construction costs**."  TAC ¶ 39;

- "**Regardless of the merits (or lack thereof), the mere filing of the lawsuit delays funding, diverts resources, and pushes back the start**

---

[9] Unless otherwise stated, all emphasis added to the TAC.  The TAC is attached to the Balitzer Declaration as Ex. TT.

**date for construction, potentially by years.**  By filing these lawsuits, Nourmand Enterprise has **delayed, and in some instances completely obstructed,** development in areas that are in dire need of improvement. The enterprise then **exploits this economic pressure by demanding large sums of money** in order to drop their sham claims."  TAC ¶ 40;

- "The threats described above have instilled **reasonable fear of economic harm in Plaintiffs** and other developers, leading some developers to capitulate to Defendants' demands."  TAC ¶ 135.

In their depositions Plaintiffs explained that, regardless of the merits, the mere fact of litigation and Defendants' threats to continue tying their projects up through legal challenges would have dire consequences for their business.  For example, Plaintiffs testified that they rely heavily on EB-5 visa investors.  Ex. Y (King Tr.) at 261:22-25; Ex. BB (Heyman (4/19) Tr.) at 45:22-46:5, 46:20-47:17, 54:1-11. Those visas allow foreign investors to earn permanent residency, but only if their investments create a certain number of jobs within a certain period of time.  Ex. EE ¶ 3. Defendants knew that Relevant was vulnerable to project delays by virtue of the EB-5 funding structure. *Id.* ¶ 10; Ex. SS; Ex. MM.

Indeed, discovery confirmed that Defendants overtly threatened to use the legal process, without regard to the merits, in order to delay Plaintiffs' projects indefinitely.

> A    Because in one of our meetings with  Mr. Robert Silverstein, he made it very clear.
> Q    What did Mr. Silverstein say?
> A    That regardless of the outcome, if we -- if we win this case, and you are going back to start all over again, and you do an EIR, we'll continue  to -- well continue to fight it.
> Q    And did you understand Mr. Silverstein to be saying that the company -- that Sunset would continue to make objections at the City level during  the EIR process for Tommie Hotel?
> A    That's what I recall.

Ex. FF (Heyman (4/28) Tr.) at 311:13-312:22.

> Q:  Do you remember what you said during that meeting?

- 19 -

> A:  Yeah. Briefly.  I said something to the effect of you know, that these demands - - something to the effect that they needed to be more reasonable given the fact that you couldn't achieve any of these things in the CEQA lawsuit and that the best you could do in a CEQA lawsuit is an EIR. So something to that effect.
> Q:  Did someone at that meeting respond to that comment?
> A:  Yes.
> Q:  Who responded to that comment?
> A:  Mr. Silverstein.
> Q:  What did he say in response to your comment?
> A:  He said something to the effect of – his words were something like I'll just make something else up or I'll come up with something - - no.  "I'll come up with something else"  That's what it was.
> Q:  He said "I'll come up with something else"?

Ex. AA (Hinks Tr.) at 85:9-86:13.

Those threats of delay are likewise reflected in written settlement communications, where Defendants' counsel noted that even if Defendants won, and even if Plaintiffs received an EIR, an "additional two years" would be necessary and "many of the same challenges" between the parties would still remain.  Ex. U.  And Mr. S. Nourmand made clear, even after the settlements, that this strategy of delay would continue unabated:

> Q    What demands were made on Selma Wilcox in   particular?
> A    The only thing I remember was one day Richard came up to the office and there was a lot of talk.  We all went into the hallway and he said "You are not going to believe it." And I said "What do you mean?" He said "I just met with Saeed and he had said 'You know the drill.  Write the check.'"

Ex. Z (Shayne Tr.) at 182:22-183:18; *see also* Ex. HH  ¶¶ 6-7 (explaining that he met with Saeed after he filed the Selma Wilcox project in March 2018 and asked him why "he had filed this most recent appeal," to which Saeed responded "You know the deal.  It's going to take a check to make this go away."); Ex. Y (King Tr.) at 322:19-323:13.

Plaintiffs received Defendants' message loud and clear; "win, lose or draw" the delay would continue:

> 2      But at the end of the day -- you know, at
> 3  the end of the day which means everything to us was
> 4  win, lose or draw, there would continually be delay
> 5  regardless from
> 6  Mr. Saeed because was clear that Silverstein had
> 7  made that -- you know, made it clear to us that we

8   are just going to continue to appeal, and we are
9   going to continue to fight, and we are going to
10  continue to delay your projects.

Ex. FF (Heyman (4/28) Tr.) at 543:2-10.  Defendants' overt threats to indefinitely delay Plaintiffs' projects, harm the EB5 investors, and ruin Plaintiffs' business, reputations, and ability to secure future funding—have nothing to do with the merits of the lawsuits.  This is more than sufficient to satisfy Plaintiffs' claims under *Koziol*.

It is telling that despite three years of discovery and full rounds of briefing on three separate summary judgment motions, Defendants can only point to half a sentence in the Complaint and a single question in a deposition to imply that Plaintiffs have put their subjective belief in the merits of the CEQA suits at issue. They have not.  That is not Plaintiffs' theory of the case, or the "use of fear" they put at issue.[10]

### 2.   No Implied Waiver Has Occurred.

As discussed above, Plaintiffs do not need to put the contents of any privileged communications, or even subjective views of the merits of the lawsuits at

---

[10] Certainly, *Defendants* subjective views of the merits of the underlying CEQA litigations are put at issue by their *Noerr-Pennington* affirmative defense. *See USS-POSCO*, 31 F.3d at 810-11 (looking to whether series of improper legal actions were brought "without regards to the merits and for the purpose of injuring a market rival.").  Defendants had a similar choice: to waive privilege over their views of the merits of the underlying litigation, or to proceed to trial without that evidence.  *See Bittaker*, 331 F.3d at 720. They, like Plaintiffs, maintained the privilege. Defendants, for instance, objected and instructed Defendants' lawyers not to answer questions over 300 times in depositions, including regarding Defendants' motives and their views on the merits. By way of example, Defendants objected at deposition on privilege grounds to questions about the merits of the underlying CEQA suits. *See* Ex. PP (Silverstein Tr.) 47:11-23; Ex.  QQ (Wright Tr.) at 33:7-34:89. For reasons discussed elsewhere, Defendants are thus prevented from refuting the evidence of Defendants subjective motive that Plaintiffs have been able to accumulate.  *See* ECF No. 137 at 16.

1   issue in order to meet the elements of their claims.  Therefore, there is no implied
2   waiver.

3       The Ninth Circuit's decision in *Kaiser* is squarely on point. *Kaiser* was an
4   antitrust case between Kaiser Foundation (as plaintiff) and pharmaceutical company
5   defendants (as relevant, Abbott Labs and Geneva Pharmaceuticals).  552 F.3d 1033.
6   Abbott and Geneva had previously reached an agreement regarding a patent dispute
7   related to a generic drug.  In the agreement, Abbott agreed to pay Geneva $4.5
8   million a month to delay the sale of Geneva's generic drug until certain conditions
9   were met.  *Id.* at 1040.  One condition was if the litigated patent was found invalid.
10  *Id.*  Even after reaching agreement to delay the sale of its generic drug, Geneva
11  continued litigating the invalidity of that patent.  It eventually succeeded in securing
12  an invalidity ruling from the Federal Circuit.  *Id.* at 1041. Kaiser alleged that
13  Geneva's delay in selling its generic drug violated the Sherman Act, in no small part
14  because Geneva had agreed to it, for a significant amount of money, while alleging
15  (and eventually proving) that the underlying patent was invalid.  *Id.*

16      At trial, Geneva argued that the agreement with Abbott did not delay
17  introduction of its generic drug "because Geneva did not want to risk bringing its
18  product to market without the protection of an appellate decision" finding the patent
19  invalid.  *Id.* at 1042.  If the patent was found valid and "Geneva had already sold its
20  generic version of the drug, Geneva would have faced potentially disastrous
21  damages."  *Id.*  Kaiser argued that disclosure of Geneva's advice of counsel was
22  required, because the basis for entering into that settlement agreement—and
23  delaying entering the market on fear of "potentially disastrous damages"—must
24  have been based on advice of counsel.  *Id.*

25      The district court and the Ninth Circuit rejected that argument.  Focusing on
26  the evidence Geneva "actually rel[ied] on . . . at trial," the Ninth Circuit found that
27  "regardless of the assurances from Geneva's counsel . . . that Geneva would likely
28  prevail in the [patent] litigation, Geneva's Board of Directors did not want to

1  undertake the business risk of marketing its generic [drug]" prior to invalidity.  *Id.* at

2  1043.  It thus "acted without regard to, or even contrary to, what counsel advised"

3  and there was no waiver.  *Id.*

4       Here*,* like in *Kaiser*, Plaintiffs' discussions with counsel, or their subjective

5  views of the merits of the litigation are not necessary to prevail on their claims.

6  Because, like in *Kaiser*, Plaintiffs had independent business reasons for their

7  actions—which were acted upon without regard to, and perhaps even contrary to,

8  what counsel advised.  *See, e.g.*, Ex. FF (Heyman (4/28) Tr.) at 302:5-13 ("The

9  decision that was made by the company to settle on Tommie is the same decision

10  that we had no choice but to settle with Thompson. We had an issue and a concern --

11  deep concern of our reputation in our business, the investors and their visa

12  applications and getting them processed and approved.  The delays in the overall

13  was a threat to us, and we just could not afford that threat.")

14       Where a party "is not using the attorney-client privilege as a sword, it has not

15  relinquished its use as a shield."  *PostX Corp. v. Secure Data in Motion, Inc.*, No. C

16  02-04483 SI, 2004 WL 2663518, at *5 (N.D. Cal. Nov. 20, 2004) (finding no waiver

17  of privilege in assertion of good faith defense to willful patent infringement where

18  party "has expressly stated its intention not to use or introduce the advice of

19  counsel") Even in the context of settlement negotiations, and applying *Hearn*, the

20  Ninth Circuit has held that where a party can "prove the reasonableness of the

21  settlement [term] without relying on privileged communications" there is no waiver.

22  *Home Indem. Co. v. Lane Powell Moss & Miller*, 43 F.3d 1322, 1327 (9th Cir.

23  1995).

24       Thus, where, as here, the party is relying on business judgment *independent of*

25  *legal advice*, there is no waiver.  *Kaiser*, 552 F.3d at 1043; *see also Genentech, Inc.*

26  *v. Insmed Inc*., 236 F.R.D. 466, 469 (N.D. Cal. 2006) ("Advice is not in issue

27  merely because it is relevant, and does not necessarily become in issue merely

28  because the attorney's advice might affect the client's state of mind in a relevant

manner."). Defendants' own cases are in accord. For example, in *Lidoderm*, the court distinguished the case before it from the situation where the party relies on "business judgment and experience" and thus "the attorney-client privilege should be protected." *In re Lidoderm Antitrust Litig.*, No. 14-MD-02521-WHO, 2016 WL 4191612, at *1 (N.D. Cal. Aug. 9, 2016). Plaintiffs' theory of fear is that delay would be economically disastrous, regardless of the merits of the case (and not the least because Defendants threatened to continue their campaign of delay regardless of whether they won or lost).

Defendants' other cases are not analogous. The waiving parties in several of their cases affirmatively put at issue whether their understanding of federal law was reasonable. *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1162 (9th Cir. 1992) (waiver by asserting that its "tax position was reasonable and sound" while "claiming that its position was based upon advice from counsel and thus was protected by the attorney-client privilege"); *Phelps v. MC Commc'ns, Inc.*, No. 2:11-CV-00423-PMP, 2013 WL 3944268, at *19 (D. Nev. July 22, 2013) (defense based on reasonableness of understanding of Fair Labor Standards Act); *United States v. Bilzerian*, 926 F.2d 1285, 1291 (2d Cir. 1991) ("good faith attempt to comply with the securities laws"); *United States v. Exxon Corp.*, 94 F.R.D. 246, 249 (D.D.C. 1981) (good faith reliance on Department of Energy's legal interpretations).[11]

Because Plaintiffs have *not* put their communications with counsel, or even their subjective views of the merits of CEQA litigation at issue, there is no implied

---

[11] Defendants' cases regarding intent of contracting parties are similarly off-base. *See, e.g.*, *Pitney-Bowes, Inc. v. Mestre*, 86 F.R.D. 444, 447 (S.D. Fla.1980). Plaintiffs argue that, because releases in the settlement agreements were executed concurrently with an element of extortion, those releases are unenforceable under California Civil Code Section 1668. ECF Nos. 121, 153, 154. Section 1668 does not require showing duress or fraudulent intent, and thus does not put Plaintiffs' intent at issue.

waiver.[12]  *Kaiser*, 552 F.3d at 1043; *PostX*, 2004 WL 2663518, at *5; *cf. also Rich v. Bank of Am., N.A.*, 666 F. App'x 635, 641-42 (9th Cir. 2016) ("Contrary to Plaintiffs' assertions otherwise, BANA did not commit an affirmative act that put the protected information in its communications with Bryan Cave at issue. Although BANA discussed the existence of these communications, it did not use their contents as a basis for any claims or defenses.")

> 3. **The withheld communications are not "vital" to Defendants.**

Even assuming the privileged communications are implicated, and they are not, Defendants must still prove under the third prong of *Hearn* that the information it seeks is "vital" to its case (as it must under the third prong of *Hearn*).  It is not sufficient that the "testimony sought would be only 'one of several forms of indirect evidence' about an issue." *In re Geothermal Res. Int'l, Inc.*, 93 F.3d 648, 653 (9th Cir. 1996) (citation omitted).  Instead, Defendants must prove that the information sought is directly relevant and necessary for them to fully challenge the Plaintiffs' claims. *Id.*; *see also Home Indem.*, 43 F.3d at 1326 ("Even if plaintiffs affirmatively put into issue privileged information concerning their state of mind and motivations during the settlement negotiations, thus satisfying the first and second prongs of the *Hearn* test, we are not convinced that the information was sufficiently vital to [movant's] defense to fulfill the third prong of the test.").  "Mere relevance to defendant's case is not sufficient." *1st Sec. Bank of Wash. v. Eriksen*, No. CV06-1004RSL, 2007 WL 188881, at *3 (W.D. Wash. Jan. 22, 2007).  Where, as here "[n]early all the information defendants seek to obtain from privileged material can be determined from non-privileged sources" there is no waiver. *Id.*

---

[12] Defendants cannot provoke an implied waiver by exploring in deposition facts that Plaintiffs do not intend to present at trial. *See supra* citing ECF No. 89 at 83 & Ex. 4 ("Shayne Tr.") at 151:13-16. "When the opposing party rather than the party seeking to preserve the work product privilege, calls witnesses and questions them as to events that may be discussed in the work product, there is no waiver under *Nobles*." *See, e.g.*, *In re Murphy*, 560 F.2d 326, 339 n.24 (8th Cir. 1977).  Such an argument for waiver "is not even plausible and hence unsupportable." *Id.*

Plaintiffs' assertion that it was extorted does not "implicate[] Plaintiffs'
knowledge of the CEQA and litigation process in general." Plaintiffs are
experienced developers who independently understand the permitting, construction,
and financing process. Ex. BB (Heyman (4/19) Tr.) at 60:9-61:15 (When asked
about the five projects he was involved in prior to the Dream Hotel, Heyman
testified "I could say that yes, in fact, -- I was familiar with CEQA on projects that I
was developing that I had part ownership in."). Nor did Plaintiffs need to rely upon
advice of their counsel to determine that succeeding in CEQA litigations would not
alleviate delay and that appeals could "drag out" the process. Defendants
themselves made that clear through their actions and their threats. Ex. JJ; Ex, LL;
Ex. KK at 388; Ex. AA (Hinks Tr.) at 85:9-86:13 (stating that no matter the result
they would "come up with something else"); Ex. U at SUNSET_00001118 (stating
that the best-case scenario would involve a two-year delay). Nor were Defendants
blocked in discovery on the basis for Plaintiffs' fear of economic harm from the
delay. Ex. BB (Heyman (4/19) Tr.) at 245:2-246:10, 247:1-248:22, 249:23-251:13,
252:7-24; Ex. FF (Heyman (4/28) Tr.) at 301:17-302:13, 305:20-307:9-; Ex. BB
(Heyman (4/19) Tr.) at 253:2-254:1 ("We are not dictating the final terms from the
judge of what he's going to decide. It wasn't about that. It was about that we could
not afford any disruption or any harm to the investors"); Ex. Y (King Tr.) at 259:5-
261:25.

With respect to the Settlement Agreements, Defendants fail to explain how its
arguments regarding the contractual terms are central to this case or put at issue by
Plaintiffs. Those agreements were entered into concurrently with an act of extortion
and are therefore unenforceable as a matter of public policy under Section 1668—an
issue which is presently being litigated on summary judgment. *See* ECF Nos. 121,
153, 154. But Plaintiffs are not seeking recission of the agreements at all, much less
on an assertion of economic duress or fraudulent misrepresentation, so Defendants'
cases are inapposite.

Finally, Defendants suggest that privilege is waived because Plaintiffs' counsel communicated Defendants counsel's statements to Plaintiff. That is wrong. *See 1st Sec. Bank*, 2007 WL 188881, at *3 (collecting cases finding no implied waiver where motivations for settlement agreement are at issue). And Defendants' concern about "inflammatory" allegations misconstrues the record. Each of those statements occurred during discussions between opposing parties' lawyers. Such communications are not privileged. And regardless, Defendants had the opportunity to examine the individuals on those communications. *See, e.g.*, Ex. FF (Heyman (4/28) Tr.) at 311:13-312:22; Ex. AA (Hinks Tr.) at 85:9-86:13.

Thus, even considered under the third *Hearn* prong, Defendants have not shown that the privileged communications are "vital" to their case: most, if not all, of the information Defendants seek is available from non-privileged sources. The third prong thus weighs against implied waiver. *1st Sec. Bank*, 2007 WL 188881, at *3.

## II. SUNSET'S WAIVER GROUND 2: PLAINTIFFS VOLUNTARILY DISCLOSED PRIVILEGED COMMUNICATIONS WITH THEIR ATTORNEYS REGARDING SETTLEMENT NEGOTIATIONS [13]

### A. SUNSET'S POSITION

Throughout each iteration of the complaint, Plaintiffs repeatedly have claimed that some unidentified people have "described" Sunset's purported demands to Plaintiffs as "blood money." The "blood money" quote is parroted in the Third-Amended Complaint repeatedly, appearing a total of six times. ECF No. 89 at 1, 4, 9, 74, 81. However, on March 8, 2022, Plaintiffs produced the following heavily redacted communication showing that the person who described Sunset's purported demands as "blood money" was none other than Plaintiff's attorney, Matt Hinks:

---

[13] Privilege Log entries implicated: 1-23, 25-65, 68- 83, 88-90, 92, 96-115, 117-152, 159-238, 243-328, 330-375, 377-387, 391-407, 413-414, 416, 419, 424, 425, 429-452, 454, 456-459, 461-467, 473, 475, 480, 482-507, 514-558, 560-566, 568-589, 594-615

- 27 -

1
2
3
4
5

> The number is $2 million. I asked how much of that was attorney's fees and how much was pure blood money. He thought he and predecessor counsel had about $500K in fees into the matter. That's probably a bit overstated. He sounded willing to listen to counters for what it's worth.

6

> Thakor Decl., Ex. 11[14]

7
8
9
10

As a result, because Plaintiffs have both voluntarily disclosed Mr. Hinks' mental impressions of the settlement negotiations, and quoted it repeatedly in each of its pleadings, they have waived privilege over communications with its attorneys relating to the settlement negotiations of the CEQA lawsuits.

11
12
13
14
15
16
17
18
19
20
21
22

Both the attorney-client privilege and work product privilege may be waived by voluntary disclosure. *See United States v. Plache*, 913 F.2d 1375, 1379 (9th Cir. 1990) (attorney-client); *United States v. Nobles*, 422 U.S. 225, 239 (1975) (work product). Parties cannot seek to use a document as both a sword and a shield by "reveal[ing] a limited aspect of privileged communications in order to gain a tactical advantage in litigation." *Century Aluminum Co. v. AGCS Marine Ins. Co.*, 285 F.R.D. 468, 472 (N.D. Cal. 2012); *see also Sedco Int'l, S.A. v. Cory*, 683 F.2d 1201, 1206 (8th Cir. 1982). As a result, courts have found that when a party voluntarily discloses a privileged communication, such action "constitutes waiver of the privilege as to ***all other such communications on the same subject***." *Weil v. Inv./Indicators, Rsch. & Mgmt., Inc.*, 647 F.2d 18, 24 (9th Cir. 1981) (collecting cases and treatises) (emphasis added).

23
24
25
26

During meet and confer efforts, Plaintiffs suggested that email is not privileged because it only conveys unprivileged facts of a conversation between Mr. Hinks and Robert Silverstein, Sunset's lawyer. But this is neither legally nor factually true. Legally, the attorney-client privilege protects *communications* between attorneys and

27
28

---

[14] The "blood money" email was produced among 50,000 other pages of documents, and without any metadata.

- 28 -

their clients even when the communication from the lawyer is conveying facts that on

their own are not privileged.  *See, e.g., Upjohn Co. v. United States*, 449 U.S. 383,

395-96 (1981) ("A fact is one thing and a communication concerning that fact is an

entirely different thing.").  Factually, this email reveals more than just the "facts" of

the communication with Sunset's lawyers, and instead extends to Mr. Hink's mental

impressions and characterizations of what was discussed with Defendants' counsel

(*e.g.*, "blood money"; "That's probably a bit overstated.  He sounded willing to listen

to counters for what it's worth.").

Plaintiffs' cannot continue to brandish their lawyer's words in their pleadings

as a sword and then turn around to conceal related settlement communications behind

a privilege shield.   Fairness requires that all communications relating to these

settlement negotiations be compelled.  *See Weil*, 647 F.2d at 24.  According to the

description in Plaintiffs' privilege log, this includes: 1-23, 25-65, 68- 83, 88-90, 92,

96-115, 117-152, 159-238, 243-328, 330-375, 377-387, 391-407, 413-414, 416, 419,

424, 425, 429-452, 454, 456-459, 461-467, 473, 475, 480, 482-507, 514-558, 560-

566, 568-589, 594-615.

## B.     PLAINTIFFS' POSITION

Voluntary disclosure only applies if the information disclosed is, itself,

privileged or protected.  The unredacted portion of the document challenged by

Defendants, Thakor Decl. Ex. 11, contains no such information.  Rather, it contains

the contents of a non-privileged communication between opposing counsel relating

a factual inference based on statements made by opposing counsel.  Defendants cite

no authority suggestion such communications or information is privileged.  Indeed,

Defendants' attorney similarly forwarded the contents of settlement discussions to

Mr. S. Nourmand, but redacting portions of email chains on claims of privilege

when it produced the emails to Plaintiffs.  *See* Ex. U.  Defendants' motion should be

denied on that basis alone.

In addition, the scope of waiver urged by Defendants is legally untenable. The Ninth Circuit has granted writ of mandamus against similar blanket waivers in response to a "voluntary" disclosure.  An appropriate scope of waiver, if any, would be much narrower—and would not require any additional discovery.

        1.     **Background: Sunset and Relevant settlement negotiations**

On April 21, 2017, Matt Hinks (attorney for Relevant Group) and Mr. Silverstein (attorney for Sunset Landmark) had a phone conversation.  The conversation was prompted by a set of demands that Mr. Silverstein had provided to Relevant to settle the underlying CEQA litigations.  As discussed in Plaintiffs' motion for summary judgment.  ECF No. 121-1, and Plaintiffs' opposition to Defendants' motions for summary judgment, ECF Nos. 137 & 146, those demands included monetary concessions on the order of millions of dollars that Sunset did not—and legally, could not—seek through its CEQA suits.  At deposition, Mr. Hinks testified regarding this conversation as follows:

```
16    Q    So you found the money requests here in
17  paragraph 12 to be inappropriate.
18         Did you communicate that back to
19  Mr. Silverstein at some point?
20    A    That it's inappropriate?
21    Q    Yes.
22    A    I don't think I used that word.
23    Q    Do you remember using any words to
24  communicate to Mr. Silverstein your belief that he
25  was not entitled to ask for money, a payment of
1   money apart from compensation for attorneys fees?
2    A    I believe I called it "blood money."  So I
3   think that there's a -- I think a view being
4   expressed in that.
5    Q    Do you remember when you called it "blood
6   money"?
7    A    I think he invited a call.  Right.  He
8   didn't even want to put it in writing.  Right.  He
9    didn't put it in writing which it was -- I mean, it
10  was odd.  And he invited a call.  "Please call me."
11  Yeah.
12         And I -- and I'm pretty sure I called in
13  and it was during that call he told me what the
14  monetary demand was.  And I said "How much of that
15  is fees and how much of that is blood money?"
16    Q    And what was his response to that?
17    A    I think he told me the portion of it was
```

18 fees.
19    Q    Do you remember what portion he said of his
20 demand was fees?
21    A    About 500,000.
22    Q    Okay.  And do you recall what that
23 number -- well, did he -- did he specifically
24 articulate a number to you in terms of his money
25 demand in that phone call that you had after you
1 received this letter from him?
2    MS. LEADER:  Are you asking if he expressed a
3 number on the call that he's testifying to?
4    MR. PELHAM:  Yes.
5    THE WITNESS:  Yes.
6 BY MR. PELHAM:
7    Q    What was that number?
8    A    I recall it being $2 million.

Ex. AA (Hinks Tr.) at 61:16-63:8.

There is no question that what Mr. Hinks and Mr. Silverstein discussed is not privileged.  They were opposing counsel in ongoing litigation.  Mr. Hinks relayed this non-privileged conversation to his clients:

> Just spoke with Silverstein.  He was driving out for a weekend trip so it was a fairly quick call. The number is $2 million. I asked how much of that was attorney's fees and how much was pure blood money. He thought he and predecessor counsel had about $500k in fees into the matter. That's probably a bit overstated. He sounded willing to listen to counters for what it's worth.

Thakor Decl. Ex. 11.

Defendants contend that this contemporaneous written record of a non-privileged communication *became* privileged because it occurred in "*communications* between attorneys and their clients" and its disclosure thus *waives* privilege as to "all communications relating to these settlement negotiations."  They are wrong.

2.    **Defendants cannot show, as they must to prove voluntary waiver, that Plaintiffs disclosed privileged or protected information.**

Voluntary waiver requires, first, voluntary disclosure of privileged or protected information.  *See* Fed. R. Evid. 502 (applying "to disclosure of a

communication or information *covered by* the attorney-client privilege or work-product protection" (emphasis added)); *BofI Fed. Bank v. Erhart*, No. 15cv2353 BAS (NLS), 2016 WL 4169136, at *4 (S.D. Cal. Aug. 5, 2016) ("The issue of waiver does not apply to these documents because they were never privileged in the first place."); *see generally U.S. Ethernet Innovations LLC v. Acer Inc.*, No. C 10-03724 CW (LB), 2014 WL 3570749, at *3 (N.D. Cal. July 17, 2014) (purportedly privileged testimony "was merely descriptive of a due diligence process and did not involve disclosure of counsel's advice, and thus does not operate as a waiver of the attorney-client privilege"). As Defendants' own case recognizes, "no waiver can occur where privilege did not attach in the first place." *Century Aluminum Co. v. AGCS Marine Ins. Co.*, 285 F.R.D. 468, 471 (N.D. Cal. 2012). The other cases cited by Defendants are in accord. *See Alexis v. Rogers*, No. 15cv691-CAB (BLM), 2017 WL 1062590, at *4 (S.D. Cal. Mar. 20, 2017) (first finding that party had "intentionally testified about some of the privileged communications she had with [her lawyer]"); *Weil v. Inv./Indicators, Rsch. & Mgmt., Inc.*, 647 F.2d 18, 25 (9th Cir. 1981) (first analyzing whether party "ha[d] disclosed the content of a privileged communication").

Defendants attempt to sidestep the first prong of the analysis by contending that the communications must be privileged by virtue of being sent from a lawyer to his client. This is wrong. It is black-letter law that a "mere showing that the communication was from client to attorney does not suffice" to establish privilege. 1 McCormick on Evid. § 91 (8th Ed. 2020); The American Law Institute, *Protecting Confidential Legal Information*, SL081 ALI-ABA 889, 908 ("Although many communications from a lawyer to a client are protected by the privilege, there is an exception in instances where the lawyer acts merely as conduit for a third party's message to the client. Instances where the lawyer is acting only as a communicative link are not privileged"). Among other requirements, the content of the communication must be (and intend to remain) confidential; and the communication

- 32 -

1   must seek or provide legal advice.  *See id.*  Indeed, in the Ninth Circuit, the

2   application of attorney-client privilege is an **eight-part** test.  *United States v. Graf*,

3   610 F.3d 1148, 1156 (9th Cir. 2010).  The presence of legal advice and confidence

4   are at least two parts of that analysis.  *Id.*

5         Mr. Hinks' email does not meet either the requirement of confidentiality or

6   the requirement of advice.  The email relates to a discussion with opposing counsel,

7   which Mr. Silverstein no doubt wanted Mr. Hinks to relay to the Plaintiffs.  Mr.

8   Hinks also makes two factual inferences that he reports: that Mr. Silverstein

9   "sounded" willing to listen to a counter proposal and that Silverstein's fees estimate

10  seemed "a bit overstated."  Ex. AA (Hinks Tr.) at 79:17-81:2.  But neither inference

11  is based on confidential information; both were based on non-confidential

12  information regarding Mr. Silverstein's chosen words and demeanor on the call.

13  More importantly, these sentences do not contain legal advice.  There is no

14  discussion of trial strategy, no discussion of whether to accept or reject the proposal,

15  no analysis of the reasonableness of the proposal in light of the merits of the case,

16  nothing.  The sentences simply relate the contents of a non-privileged

17  communication.

18        The only case cited by Defendants in support of their position that the

19  communication is per se privileged as it was between an attorney and a client is

20  *Upjohn Co. v. United States*, 449 U.S. 383 (1983).  But *Upjohn* does not hold as

21  Defendants suggest.  *Upjohn* addresses whether privilege may extend beyond a

22  corporation's "control group."  *Id*. at 392.  In passing, the Supreme Court mentions

23  (without deciding, because the question was not presented) that a communication is

24  *necessary* for the privilege to attach.  *See id.* at 395 ("privilege only protects

25  disclosure of communications; it does not protect disclosure of the underlying

26  facts").  The Supreme Court did not decide that a communication was *sufficient* in

27  and of itself for the privilege to attach.  *Id.* (quoting *Philadelphia v. Westinghouse*

28  *Elec. Corp.*, 205 F. Supp. 830, 831 (E.D. Pa. 1962) (a party "may not refuse to

disclose any relevant fact . . . merely because he incorporated a statement of such fact into his communication to his attorney")).  For this reason, in applying *Upjohn*, courts have held that communications "sent to [a clients'] counsel that contain mere facts or data concerning [the other party] are not protected by attorney-client privilege." *BofI*, 2016 WL 4169136, at *4 (applying *Upjohn*, 449 U.S. at 395-96). Defendants' anomalous reading of *Upjohn* should be rejected.

The direction of the communication (i.e., that the attorney sent facts to the client; rather than client to attorney) further suggests that no privilege attached.  For example, although in *United States v. Ramirez*, the Ninth Circuit assumed that the privilege attached to subject testimony (because no party challenged the issue on appeal) the court noted: "it has been held that as to an attorney's communication with the client, the privilege extends only to those based on confidential information provided by the client or containing legal advice or opinions of the attorney. . . . Mere conveyance of an offer from the Government without any discussion of advice arguably does not fall within the scope of the privilege."  608 F.2d 1261, 1268 n.12 (9th Cir. 1979) (citations omitted).  The Ninth Circuit was right to be skeptical: the legal system could hardly function if a client's awareness of a settlement offer, communicated through counsel, constitutes waiver of privilege as to settlement negotiations.  The Ninth Circuit's hypothetical in *Ramirez* is now before this Court: Mr. Hinks merely conveyed a settlement position from the opposing party (exactly as Mr. Silverstein no doubt anticipated because he wanted a counter-offer) without any discussion of advice.  The result should be the same: no waiver, and no applicability of the privilege.

Defendants' view of privilege and waiver is not only wrong, it is also inconsistent with their own privilege claims.  As just one example, on June 27, 2017, Jayesh Patel (attorney for Sunset) forwarded to Mr. S. Nourmand (his client) settlement communications between Mr. Patel and Mr. Guy Maisnik (an attorney for Relevant).  *See* Ex. U.  Sunset has redacted that email on the basis of attorney-client

privilege, claiming that Mr. Patel was "providing legal advice" under the redaction. Ex. E at PRIV435.  However, Sunset did produce, underacted, the communications between Mr. Patel and Mr. Maisnik.  This is the same issue that Defendants claim waives privilege when done by the Plaintiffs: disclosing the contents of communications with opposing party through a communication with the client.  That Mr. Patel and Mr. Maisnik conferred via email while Mr. Silverstein and Mr. Hinks conferred over the phone is a distinction without a difference.  At base, both documents relate non-confidential communications with the opposing party, with advice or client confidences redacted. Defendants' motion must be denied.

> ### 3.  **Defendants' requested scope of waiver is overly broad and would constitute reversible error.**

Even if there was some incremental "advice" in Mr. Hinks' email regarding his discussion with Mr. Silverstein, any purported wavier could not, as a matter of law, reach "all communications relating to these settlement negotiations." Defendants entirely ignore the question of defining the scope of the waiver, and instead seek a blanket waiver of over 500 log entries (Plaintiff's log only has 615 entries).  That is inappropriate and unsupportable.

Rule 502(a)(2) requires a nexus between what was voluntarily disclosed, and the undisclosed communications or information sought to be compelled.  This inquiry focuses on what was *actually* disclosed, not what could be potentially implicated by disclosure.  *See Hernandez v. Tanninen*, 604 F.3d 1095, 1101 (9th Cir. 2010) (granting writ of mandamus where district court found broad waiver beyond what was actually disclosed); Fed. R. Evid. 502 advisory committee's note subdiv. a (disclosure "results in a waiver only of the communication or information disclosed").  Defendants' own case is in accord: voluntary disclosure waives "privilege only as to communications about the matter actually disclosed" (in that

case, pertaining to "the [disclosed] letter's contents"). *Weil*, 647 F.2d at 25 & n.14.[15]

Defendants do not engage with the question at all. Reviewing what Plaintiffs actually disclosed would require a much narrower waiver. At most, the email from Mr. Hinks discloses:

- A conversation between Mr. Hinks and Mr. Silverstein, including:
  - The settlement demand ($2 million);
  - A question ("how much of that was attorney's fees and how much was pure blood money");
  - A response from Silverstein (approximately "$500k" constituted fees);
- Mr. Hinks' statement that the fees number is "a bit overstated";
- Mr. Hinks' statement that Mr. Silverstein "sounded willing to listen to counters."

Thakor Decl. Ex. 11.

Any waiver must be limited to this disclosure and would constitute, at the most, communications and information revealing the conversation, the basis for Mr. Hinks impression that the fees were "overstated," and the basis of Mr. Hinks' impression that Mr. Silverstein "sounded willing to listen to counters." The unredacted sentences do not include settlement strategy; nor do they disclose views on the merits of the case, Mr. Hinks' legal opinion of the offer or an analysis of settlement positions, a recommendation regarding how to approach further discussions. There is nothing in the disclosure that goes beyond the single

---

[15] Defendants cite only one case decided after Congress, in 2008, imposed an explicit nexus requirement for waiver in Fed. R. Evid. 502. That case, *Century Aluminum*, applies Rule 502's nexus requirement, rejects the broad waiver requested by movant, and found waiver "only of the communication or information disclosed." 285 F.R.D. at 472 (quoting Fed. R. Evid. 502 advisory committee's note subdiv. a.). To the extent Defendants' cases are inconsistent with the narrow nexus requirement in Rule 502, they are abrogated by statute.

1   conversation between opposing counsel; certainly nothing that discloses or even

2   implicates all communications and information regarding settlement.  Indeed, how

3   could it: the CEQA litigation against Tommie had not even been filed yet.  *See* ECF

4   No. 143 (Defendants' Joint Statement of Genuine Material Facts on Summary

5   Judgment) ¶ 2 (Undisputed that the Tommie suit not filed until June 9, 2017).

6        Further, Defendants were allowed to inquire into the entire subject matter of

7   Mr. Hinks' email (because, again, it is not privileged).  Thus, Defendants asked him

8   about the conversation with Mr. Silverstein, his statements in that conversation, Mr.

9   Silverstein's response, the basis for his inference that the fees were "overstated,"

10  and his recollection of why Mr. Silverstein "sounded willing to listen to counters."

11  Ex. AA (Hinks Tr.) at 61:16-63:8, 79:17-81:2.  Thus, even if there were a "waiver"

12  of the matters in Mr. Hinks' email, Defendants have already had the opportunity to

13  examine Mr. Hinks on the subject.

14       Furthermore, the scope of waiver requested by the Defendants would amount

15  to a blanket waiver by plaintiffs over more than *500 entries* on Plaintiffs' privilege

16  log (which is only 615 entries long in any case).  Defendants seek this waiver based

17  on sixteen words in over 118,000 pages of material produced by the Plaintiffs.

18  Balitzer Decl. ¶ 50.  To obviate the issue, Plaintiffs suggested, multiple times, that

19  they would redact those sixteen words and not rely upon them at trial.  Ex. GG; Ex.

20  CC.  Yet Defendants persist in arguing not only waiver, but that well over 80% of

21  Plaintiffs privilege log must be disclosed.

22       It would be "clear error" to grant a broad waiver on such scant subject matter.

23  *Hernandez*, 604 F.3d at 1101.  In *Hernandez*, the district court found waiver of

24  privilege when the plaintiff brought a conspiracy claim based on his lawyer's

25  communications with a potential witness.  *Id.* at 1100.  The district court then

26  ordered the plaintiff to produce all thirty-five items on its privilege log.  *Id.*  Even in

27  view of the authority cited by Defendants in this motion (and noting the court's own

28  resolution was consistent with the "new Federal Rule of Evidence 502," *id.* at 1100

n.1), the Ninth Circuit granted a writ of mandamus against such a broad waiver and directed the district court to find waiver "only as to that matter" actually disclosed. *Id.* at 1100.  The "breadth of [such a] waiver finding, untethered to the subject-matter disclosed, constitutes a particularly injurious privilege ruling."  *Id.* at 1101.

No waiver should be found here. But if the Court reaches the question, it should likewise reject Sunset's argument for "blanket waiver of attorney-client . . . privilege" and limit waiver "only as to that matter" actually disclosed.  *Id.* at 1100-01.

## III.   SUNSET'S WAIVER GROUND 3: PLAINTIFFS WAIVED PRIVILEGE OVER COMMUNICATIONS DISCLOSED TO THIRD PARTIES

### A.   SUNSET'S POSITION

Plaintiffs have also waived privilege by disclosing otherwise privileged communications to third-parties. In particular, there are twelve separate third-parties that were included on communications listed on Plaintiffs' privilege log.[16]  Plaintiffs claim that the inclusion of these third-parties do not waive privilege because they are either (a) independent contractors that are a functional equivalent of an employee of Plaintiffs; or (b) share a common legal interest with Plaintiffs.

1.   Plaintiffs Have Not Demonstrated That The Third Parties Are The Functional Equivalent of An Employee

Plaintiffs claim that eight third parties appearing in their privilege log are independent contractors acting as "functional employees" of Plaintiffs.  These third parties include: Laurie Goldman, Scott Campbell, Zachary Andrews, Brad Perrine, Liz Culhane, Adrienne Rosca, Craig Fajnor, Christian Schulz.

---

[16] Privilege log entries implicated by Ground 3: 1-16, 46-53, 55, 57-59, 64, 69, 70, 73, 76-80, 86-87, 96-104, 106-111, 116-118, 127-128, 132, 134, 224-225, 229, 270, 273-274, 282, 304, 307, 309, 320, 355, 360, 362, 363, 384, 388-390, 401, 409-428, 430, 443-444, 446, 457-459, 462, 465-466, 474-481, 483, 498, 501-504, 545, 566, 569, 574-575, 581, 590-592, 601-606, 610-611, 614-615

Privilege is not waived when protected communications are disclosed to third-party consultants that are acting as the "functional equivalent" of employees of the client.  *United States v. Graf*, 610 F.3d 1148, 1158-59 (9th Cir. 2010).  To determine whether a third party or consultant is acting as a functionally equivalent employee, the Ninth Circuit applies the *Bieter* standard, which is a fact-intensive inquiry of whether (i) the communication was made for the purpose of securing legal advice; (ii) the person making the communication did so at the direction of a superior in the organization; (iii) the superior made the request so that the organization could secure legal advice; (iv) the subject matter of the communication is within the scope of the person's duties; and (v) the communication is not disseminated beyond those individuals who, because of the organization's structure, need to know its contents. *In re Morning Song Bird Food Litig*., No. 12CV1592 JAH(RBB), 2015 WL 12791473, at *6 (S.D. Cal. July 17, 2015).

Despite repeated requests from March 30 to May 2 for information relating to third-parties,  the only information Plaintiffs were willing to provide about these eight individuals can be found in the below paragraph which was provided on April 29, three days before the discovery cut-off.

> Regarding the individuals you identified, the following were outside consultants and retained experts relied upon by plaintiffs' attorneys in the administrative process and in preparation for and anticipation of litigation: Laurie Goldman, Scott Campbell, Zachary Andrews, Brad Perrine, Liz Culhane, Adrienne Rosca, Craig Fajnor, and Christian Schulz.  In that capacity, these individuals were also outside consultants serving as functional equivalents of employees during the relevant time period.

Thakor Decl., Ex. 20.

This one-sentence description – which has no individualized explanation of the third parties' involvement in the privileged communications - does not meet the required factual showing to determine whether these third parties are functional equivalents of employees.  See e.g., *Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, No. 16CV00236WHODMR, 2019 WL 1950381, at *5 (N.D. Cal.

May 1, 2019) (burden to establish "functional employee" not met when party asserting privilege did not "discuss each individual separately"). Given that Plaintiffs have the burden of establishing privilege, and have refused to provide any additional information beyond the above paragraph, they have failed to meet their burden of establishing privilege.

In any event, Sunset will discuss the individuals that it does have information on through depositions.

### a. Laurie Goldman

Sunset was able to depose Ms. Goldman and determine further information about her involvement. Ms. Goldman was a community organizer whose role was primarily to communicate with Hollywood community members about Relevant's projects. She testified that she does not consider anyone at Relevant Group to be her boss, cannot remember if she has an agreement with Relevant Group, did not play a role in legal strategy, and had no purpose to consult with Relevant's attorneys.[17] Thakor Decl., Ex. 7 (Goldman Tr.), 83, 92, 95:23-96:2.

### b. Scott Campbell

Scott Campbell is an employee of Nourmand & Associates, Inc., a defendant in this action, and one of the purported extorters of Plaintiffs. Plaintiffs admit they knew Mr. Campbell was an agent of Nourmand & Associates, Inc. from as early as 2015. King Tr., 20:18-21:8. Mr. Campbell at times worked as an independent contractor for the Goldman organization to help with community organizing. Plaintiffs have made no showing how communications involving an employee of Nourmand & Associates, Inc. – a defendant in this case – can remain privileged.

### c. Zachary Andrews, Brad Perrine, Liz Culhane, Adrienne Rosca, Craig Fajnor, Christian Schulz

Sunset simply has no information to evaluate Plaintiffs' claims that these

---

[17] A review of the Goldman transcript shows the efforts Plaintiffs' attorneys have gone to withhold information about these third-parties. *See* Goldman Tr. 90-100.

individuals are "functional employees."  Given that Plaintiffs have the burden of establishing privilege, Plaintiffs' one-sentence statement these individuals are independent contractors that are the functional equivalent of employees is insufficient to attach privilege.

> 2. Plaintiffs Do Not Share a Common Interest Privilege with the Third Parties

Plaintiffs allege that they share a common interest privilege with the following third parties: (1) Laurent Opman, (2) Jeff Reinstein, (3) Tom Gottlieb, and (4) Michael Logrande.  Each of these individuals are discussed below:

> a. Michael LoGrande:

Plaintiffs claim that communications with Michael LoGrande are privileged because "Michael LoGrande was the Director of the Department of City Planning, an entity which during the relevant time shared a common interest with one or more of the plaintiffs in anticipation of litigation stemming from the underlying projects."

However, this description is demonstrably false.  All of the entries on the privilege log are from May of 2016 – five months *after* Mr. LoGrande left the Department of City Planning.  As a result, even if the Department of City Planning did share a common interest with Plaintiffs, it would not protect communications with Mr. LoGrande in May of 2016.  *See* Thakor Decl., Ex 12 at 7.

This is a perfect example of Plaintiffs using the privilege as a sword and shield to hide relevant information.  In reality, at the time of the purportedly privileged communications, Plaintiffs hired LoGrande to unlawfully lobby the City to obtain a Q clarification to avoid a zoning change to build the Tommie Hotel. When the City learned LoGrande was illegally lobbying on behalf of Plaintiffs, the Q clarification was denied.  *Id*.  Despite the fact that they were unlawfully lobbying for the Q clarification in the first place, Plaintiffs are now somehow blaming the denial of the Q clarification on Sunset's purportedly sham litigation, all the while falsely claiming privilege over communications with LoGrande about the reasons Q clarification were

- 41 -

1  actually denied.

2                b.      Jeffrey Reinstein and Tom Gottlieb

3        Jeffrey Reinstein and Tom Gottlieb are principals at Geolo Capital, which is

4  an investor in 6516 Tommie Holdings, LLC, a parent company of Plaintiff 6516

5  Tommie Hotel, LLC. As an initial matter, investors, while having a common

6  *commercial* interest in the litigation, do not necessarily have a common *legal*

7  interest.  *See Finjan, Inc. v. SonicWall, Inc.*, No. 17-CV-04467-BLF (VKD), 2020

8  WL 4192285, *4–6 (N.D. Cal. July 21, 2020) (holding that patentee waived any

9  attorney-client privilege and work product protection since it had "voluntarily

10 disclosed the disputed materials to a third-party investor who merely observed its

11 board meetings" and the third-party investor, while having a common commercial

12 interest, did not have a common legal interest with the patentee).

13       Moreover, even assuming Geolo had a common legal interest in Tommie, that

14 interest does not extend to Thompson or Selma.  Geolo has no ownership interest in

15 the Thompson Hotel, or any parent company or subsidiary of  Plaintiff 1541 Wilcox,

16 LLC.  Similarly, Geolo has no ownership interest in the Selma Hotel, or any parent

17 company of the 6421 Selma Wilcox Hotel, LLC.  As a result, while otherwise

18 privileged communications with Reinstein and Gottlieb relating to the *Tommie*

19 litigation may be privileged, there is no privilege attached to communications

20 relating to the Thompson and Selma lawsuits.

21               c.     Laurent Opman

22       Plaintiffs claim that they have a common interest with Laurent Opman because

23 he was a principal of KOAR, an owner of the Schrader Hotel – a project  Sunset

24 initially objected to. As a result, they have withheld communications relating to

25 Sunset's litigation against the Selma Hotel.

26       As an initial matter, there are no attorneys on the withheld communications

27 with Mr. Opman, making the claim of privilege dubious.  Moreover, Plaintiffs have

28 already selectively disclosed some privileged communications with Opman relating

to Sunsets initial objections to the Schrader Hotel.  Accordingly, even if there was privilege attached to communications between Mr. Heyman and Laurent Opman relating to the Selma, that privileged was waived with Plaintiffs' voluntary disclosure. Thakor Decl., Ex. 13.

### B.    PLAINTIFFS' POSITION

Defendants' argument that Plaintiffs somehow waived the attorney-client privilege by including agents and outside consultants on otherwise privileged communications, is contradicted by their own positions in claiming privilege and well-established Ninth Circuit law.

### 1.    Communications with Agents of Plaintiffs' Counsel are Privileged

The Ninth Circuit has held that the attorney-client privilege protects communications between attorneys and third parties acting as their agents for the purpose of defending their clients. *United States v. Christensen*, 828 F.3d 763, 802-03 (9th Cir. 2015) (citations omitted); *see also United States v. Jacobs*, 322 F. Supp. 1299, 1303 (C.D. Cal. 1971) (holding that memo from lawyer to accountant "stating facts in confidence . . . for the purpose of the lawyer obtaining the accountant's assistance in rendering a legal opinion" was privileged).

Here, there can be no serious dispute that four of the individuals at issue—Zachary Andrews, Craig Fajnor, Brad Perrine, and Liz Culhane—were acting as agents of Plaintiffs' outside counsel at the time (Sheppard, Mullin, Richter & Hampton LLP ("Sheppard Mullin")) for the purpose of rendering legal advice to Plaintiffs in connection with the Thompson, Tommie, and Selma hotel projects.

Given the complexity of the administrative approval process and the potential for prospective litigation, developers and their attorneys often work closely with experts in various fields to ensure that the administrative record is accurate, consistent, and fully supports the proposed development.  Declaration of Kira Conlon ("Conlon Decl.") ¶ 6; Declaration of Richard Heyman ("Heyman Decl.") ¶ 5.  For

1  example, if a traffic consultant were to submit a document to a public agency, a draft
2  of that document would be reviewed by the legal team to ensure its accuracy,
3  consistency, and legal sufficiency.  Conlon Decl. ¶ 6.  In the same vein, developers
4  and their attorneys often hire consultants on various specialized topics, including
5  traffic considerations, noise ordinances, zoning and building codes, land use and
6  entitlements, architecture, design, and community outreach, to help develop and
7  provide fully-informed legal advice.  *Id.* ¶ 7; Heyman Decl. ¶ 6.

8       As discussed in greater detail below, each of the four individuals here was
9  retained by Sheppard Mullin on behalf of Plaintiffs to provide consulting services in
10  preparation for and in anticipation of the administrative approval process for these
11  development projects (the "Administrative Process") and the follow-on litigation
12  brought by Sunset (the "Sunset Litigation") that gave rise to this lawsuit.

13                          a.    **Zachary Andrews**

14       Plaintiffs' attorneys at Sheppard Mullin retained three6ixty, a land use and
15  entitlements consulting firm, to provide consulting services in connection with
16  Plaintiffs' development projects.  Conlon Decl. ¶ 11; Heyman Decl. ¶ 12.  Mr.
17  Andrews was a senior project manager at three6ixty.  Conlon Decl. ¶ 11.  Sheppard
18  Mullin relied on information and perspective from Mr. Andrews to provide fully-
19  formed legal advice to Plaintiffs in preparation for and in anticipation of the
20  Administrative Proceedings and the Sunset Litigation.  *Id.*

21       This is clearly reflected in the nine privilege log entries that include Mr.
22  Andrews.  *See* Thakor Decl. Ex. 1 (Relevant Priv. Log) Nos. 1, 32-38, 67.  Each of
23  these email communications was sent to or from a member of Plaintiffs' legal team at
24  Sheppard Mullin in connection with either the Administrative Proceedings or the
25  Sunset Litigation concerning Plaintiffs' hotel projects.  *Id.*  Accordingly, these
26  communications are protected by the attorney-client privilege. *See Christensen*, 828
27  F.3d at 802-03.

28

### b.   **Craig Fajnor and Brad Perrine**

Plaintiffs' attorneys at Sheppard Mullin also retained EcoTierra Consulting ("EcoTierra"), an environmental consulting firm that assists with CEQA compliance, to provide consulting services in connection with the administrative approval process for Plaintiffs' hotel projects.  Conlon Decl. ¶ 12; Heyman Decl. ¶ 13.  Mr. Fajnor is a principal at EcoTierra, and Mr. Perrine is a manager.  Conlon Decl. ¶ 12.  Sheppard Mullin relied on information and perspective from Mr. Fajnor and Mr. Perrine regarding CEQA and environmental issues to provide fully-formed legal advice to Plaintiffs in preparation for and in anticipation of the Administrative Proceedings and the Sunset Litigation.  *Id.*

Once again, this is clearly reflected in the seven privilege log entries that include Mr. Fajnor and Mr. Perrine.  *See* Thakor Decl. Ex. 1 (Relevant Priv. Log) Nos. 32-38.  Each of these email communications was sent to or from a member of Plaintiffs' legal team at Sheppard Mullin in connection with the Administrative Proceedings concerning the Tommie hotel project.  *Id.*  Therefore, these communications are also protected by the attorney-client privilege.  *See Christensen*, 828 F.3d at 802-03.

### c.   **Liz Culhane**

Lastly, Plaintiffs' attorneys at Sheppard Mullin retained Overland Traffic Consultants ("Overland Traffic"), a traffic consulting firm, to provide consulting services in connection with the administrative approval process for Plaintiffs' development projects.  Conlon Decl. ¶ 13; Heyman Decl. ¶ 14.  Ms. Culhane is a registered traffic engineer and a principal of Overland Traffic.  Conlon Decl. ¶ 13.  In that capacity, Sheppard Mullin relied on information from Ms. Culhane to give legal advice to Plaintiffs in preparation for and in anticipation of the Administrative Proceedings and the Sunset Litigation.  *Id.*

This is also reflected in the privilege log entries that include Ms. Culhane.  *See* Thakor Decl. Ex. 1 (Relevant Priv. Log) Nos. 32-38, 134, 410-412, 414-415, 417,

420-422, 426, 474.   Each of these email communications was sent to or from a member of Plaintiffs' legal team at Sheppard Mullin in connection with the Administrative Proceedings concerning Plaintiffs' hotel projects.  *Id.* Thus, these communications are also protected by the attorney-client privilege.  *See Christensen*, 828 F.3d at 802-03.

### 2.   Communications with Plaintiffs' Consultants are Privileged.

Similar to the agency rule, the Ninth Circuit has held that the attorney-client privilege extends to communications between a company's attorneys and its outside consultants, where the consultants are the "functional equivalent" of employees. *United States v. Graf*, 610 F.3d 1148, 1158 (9th Cir. 2010).   In making that determination, courts look to whether the consultant has information "necessary to allow [corporate] counsel to give the corporation fully informed legal advice." *Am. Fed'n of Musicians v. 212 Prods. LLC*, No. 20-cv-07255-JAK-KS, 2021 U.S. Dist. LEXIS 252718, at *25-26 (C.D. Cal. Sept. 27, 2021) (quoting *Graf*, 610 F.3d at 1159). Thus, when a person performs work "that is substantially intertwined with the subject matter of a corporation's legal concerns" and "provides information to the corporation's attorney to aid the attorney in advising the corporate client," the privilege applies to that person as a "functional employee." *Schaeffer v. Gregory Vill. Partners, L.P.*, No. 13-cv-04358-JST, 2015 WL 166860, at *4 (N.D. Cal. Jan. 12, 2015); *see also Gen-Probe Inc. v. Becton, Dickinson & Co.*, Nos. 09cv2319 BEN NLS, 10cv0602 BEN (NLS), 2012 WL 1155709, at *3 (S.D. Cal. Apr. 6, 2012) (communications with another company's employees privileged where that company was hired to help with defendant's project).

Relevant is a relatively small organization that depends on outside consultants to perform essential functions in obtaining approval and support for its development projects.  Heyman Decl. ¶ 5.  Five of the individuals at issue here—Laurie Goldman, Scott Campbell, Adrienne Rosca, Christian Shulz, and Michael LoGrande—acted as the "functional equivalent" of Plaintiffs' employees at various points in time.  As

- 46 -

discussed below, each of these five individuals provided consulting services in connection with the Thompson, Tommie, and Selma hotel projects. To gather the necessary facts and provide fully-informed legal advice regarding the Administrative Proceedings and the Sunset Litigation, Plaintiffs' attorneys had to communicate with and obtain information from each of these consultants. Accordingly, these communications are protected by the attorney-client privilege.

### a.   **Laurie Goldman**

Ms. Goldman conducts community outreach for development projects through Go! Goldman Organization. Ex. NN (Goldman Tr.) at 66:6-11. In 2006, Ms. Goldman began providing community outreach services to Richard Heyman, the former co-owner of Relevant. *Id.* at 75:3-76:10; Heyman Decl. ¶ 7. Since then, Ms. Goldman continued to work with Mr. Heyman, including through engagements with Plaintiffs to perform community outreach for the Thompson, Tommie, and Selma hotel projects, among others. Ex. NN (Goldman Tr.) at 77:21-81:19; Heyman Decl. ¶ 7.

In connection with her community outreach efforts for Plaintiffs, Ms. Goldman has had discussions with Plaintiffs' attorneys. Ex. NN (Goldman Tr.) at 95:8-13. Indeed, Plaintiffs' attorneys at Sheppard Mullin relied upon Ms. Goldman's information and perspective in giving legal advice to Plaintiffs in preparation for and in anticipation of the Administrative Proceedings and the Sunset Litigation. Conlon Decl. ¶ 9.

Defendants attempt to muddy this record by asserting that Ms. Goldman "does not consider anyone at Relevant Group to be her boss" and "cannot remember if she has an agreement with Relevant Group." The reason for this is simple and undisputed: Ms. Goldman served as an outside consultant for Plaintiffs, not an in-house employee. Likewise, Defendants contend that Ms. Goldman "did not play a role in legal strategy" and "had no purpose to consult with Relevant's attorneys." But this confuses the issue. Ms. Goldman was not one of Plaintiffs' attorneys, and therefore would not be

expected to play a role in legal strategy.  Rather, as this Court has previously held, the relevant consideration is whether an outside consultant had information "necessary to allow [corporate] counsel to give the corporation fully informed legal advice."  *Am. Fed'n of Musicians*, 2021 U.S. Dist. LEXIS 252718, at *25-26.  Based on the facts above, Ms. Goldman clearly satisfies this test.

Because Ms. Goldman served as the community outreach member of Plaintiffs' development team (*see, e.g.*, Ex. BB (Heyman (4/19) Tr.) at 117:10-118:17), she acted as a "functional employee" of Plaintiffs for privilege purposes and her communications with Plaintiffs' counsel are privileged.  *See Graf*, 610 F.3d at 1157-59; *Medversant Techs., LLC v. Morrisey Assocs., Inc.*, No. CV 09-05031 MMM (FFMx), 2011 WL 13124128, at *4-5 (C.D. Cal. July 20, 2011) (communication between attorney to third party public relations firm protected by the attorney-client privilege).[18]

### b.    **Scott Campbell**

Mr. Campbell also conducts community outreach for development projects as an independent contractor for Go! Goldman Organization.   Declaration of Scott Campbell ("Campbell Decl.") ¶ 2; *see also* Ex. NN (Goldman Tr.) at 14:22-15:7, 17:3-8.  In that capacity, Mr. Campbell has provided community outreach services and advice to Plaintiffs in connection with the Thompson, Tommie, and Selma hotel projects.  Campbell Decl. ¶ 3; *see also, e.g.*, Ex. NN (Goldman Tr.) at 160:23-161:10.  Contrary to Defendants' misleading assertion that Mr. Campbell is "an employee of Nourmand & Associates, Inc.," however, he has *never* been an employee of Nourmand & Associates.  Campbell Decl. ¶ 4.  While Mr. Campbell is an independent

---

[18] *See also* Thakor Decl. Ex. 1 (Relevant Priv. Log) Nos. 1-2, 4-19, 44-46, 48-55, 69-70, 72-74, 76-80, 86-87, 96-104, 106-111, 116-118, 127-128, 134, 224-225, 229, 259, 264, 270, 273-274, 281, 314-315, 320, 355, 362-363, 388-390, 401, 409-428, 443-444, 446, 457-459, 462, 465-466, 474, 476-481, 483, 498, 501-503, 516-518, 581, 590-592, 601-603, 605-606, 610-611.

contractor for Nourmand & Associates, his community outreach work for Plaintiffs was not done in that capacity.  *Id.* ¶ 5.

As with Ms. Goldman, Plaintiffs' attorneys at Sheppard Mullin relied upon Mr. Campbell's information and perspective as an expert in community outreach in giving legal advice to Plaintiffs in preparation for and in anticipation of the Administrative Proceedings and the Sunset Litigation.  Conlon Decl. ¶ 10.

Because Mr. Campbell has served as a community outreach member of Plaintiffs' development team along with Ms. Goldman, he also acted as a "functional employee" of Plaintiffs for privilege purposes and his communications with Plaintiffs' counsel are privileged.  *See Graf*, 610 F.3d at 1157-59; *Medversant*, 2011 WL 13124128, at *4-5 (communication between attorney to third party public relations firm protected by the attorney-client privilege).[19]

c.   **Adrienne Rosca**

Ms. Rosca is an associate at Steinberg Hart, an architectural design firm. Conlon Decl. ¶ 14; Heyman Decl. ¶ 9.  Plaintiffs retained Steinberg Hart to provide consulting services for building code compliance, planning, design, land use, entitlements, and neighborhood compatibility in connection with Plaintiffs' hotel projects.  *Id.*  In that capacity, Plaintiffs' attorneys at Sheppard Mullin relied upon information from Ms. Rosca to provide legal advice to Plaintiffs in preparation for and in anticipation of the Administrative Proceedings and the Sunset Litigation. Conlon Decl. ¶ 14.

Accordingly, Ms. Rosca acted as a "functional employee" of Plaintiffs for privilege purposes and her communications with Plaintiffs' counsel are privileged. *See Graf*, 610 F.3d at 1157-59; *see also* Thakor Decl. Ex. 1 (Relevant Priv. Log) Nos. 32-38.

---

[19] *See also* Thakor Decl. Ex. 1 (Relevant Priv. Log) Nos. 1-2, 4-16, 96-104, 106-111, 116-118, 127, 134, 224-225, 320, 388-390, 410-418, 420-422, 424-426, 474, 477-478, 480-481, 590-592.

### d. **Christian Shulz**

Mr. Schulz is a principal at Studio Collective, an interior design agency. Conlon Decl. ¶ 15. Plaintiffs retained Studio Collective to provide interior design consulting services in collaboration with and to assist Steinberg Hart and Ms. Rosca. Heyman Decl. ¶ 10. In that capacity, Plaintiffs' attorneys at Sheppard Mullin also relied upon information from Mr. Schulz to give legal advice to Plaintiffs in preparation for and in anticipation of the Administrative Proceedings and the Sunset Litigation. Conlon Decl. ¶ 15.

Accordingly, Mr. Schulz also acted as a "functional employee" of Plaintiffs for privilege purposes and her communications with Plaintiffs' counsel are privileged. *See Graf*, 610 F.3d at 1157-59; *see also* Thakor Decl. Ex. 1 (Relevant Priv. Log) Nos. 32-38.

### e. **Michael LoGrande**

Mr. LoGrande was formerly the Director of the Department of City Planning. Heyman Decl. ¶ 11. After Mr. LoGrande left his role at the City, Relevant retained him as a consultant in April 2016 to provide support in connection with the approval process for the Tommie hotel. *Id.* In connection with his consulting role for Plaintiffs, Mr. LoGrande worked with Plaintiffs' attorneys at Sheppard Mullin in preparation for a meeting with the City. *See id.*

While Defendants attempt to use a Los Angeles Ethics Commission Stipulation and Order against Mr. LoGrande as purported proof that communications with Mr. LoGrande are not protected by the attorney-client privilege, it demonstrates the opposite is true. The Stipulation and Order states that Plaintiffs "retained LoGrande as a consultant in April 2016, to discuss with the City the change in decision and the approval process for the project," and that LoGrande met with the City to discuss talking points prepared by Plaintiffs' consultants and attorneys. Thus, the Stipulation and Order only serves as further proof that Mr. LoGrande acted as a "functional

employee" of Plaintiffs.  *Graf*, 610 F.3d at 1157-59; *see also* Thakor Decl. Ex. 1 (Relevant Priv. Log) Nos. 59, 64, 612, 614-615.[20]

### 3. Communications with Principals of Geolo Capital are Privileged

Jeffrey Reinstein and Tom Gottlieb are principals of Geolo Capital ("Geolo"). Contrary to Defendants' assertion that Geolo was a mere investor in a parent company of Tommie, Geolo was, in fact, ███████████ of Tommie.  In June 2016, Geolo entered into a joint venture to ██████████████████████████████████ ███████████████ Ex. RR (Reinstein Rough Tr.) at 53:24-54:15, 65:13-18.  As such, Geolo was a █████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████ *Id.* at 68:3-16.  Indeed, Geolo had ██████████████████████████████████████████████████ ███████████████████████████ *Id.* at 69:7-19.  The joint venture also ████████ ████████████████████████████████████████████ *Id.* at 27:23-29:11 ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ █████████; *see also* Heyman Decl. ¶ 3.  Accordingly, the principals of Geolo (Mr. Reinstein and Mr. Gottlieb) were kept abreast, as necessary, of legal developments involving the Tommie hotel project.[21]

Defendants' reliance on *Finjan, Inc. v. SonicWall, Inc.* is, therefore, misplaced. No. 17-cv-04467-BLF (VKD), 2020 WL 4192285, at *4-6 (N.D. Cal. July 21, 2020). Unlike the third party shareholder at issue in *SonicWall*, which "did not own any

---

[20] Moreover, while not relevant to the privilege analysis here, Defendants' assertions that Plaintiffs somehow engaged in unlawful conduct by retaining Mr. LoGrande or that the Q clarification for the Tommie Hotel was denied because of Mr. LoGrande's role in the process, as opposed to Sunset's improper conduct, should be rejected as completely unsupported by the Stipulation and Order.

[21] *See* Thakor Decl. Ex. 1 (Relevant Priv. Log) Nos. 3, 57-58, 220-223, 282, 304, 307, 309, 316, 360, 384, 430, 504, 545, 566, 569, 574, 575.

interest" in the patents at issue (*id.* at \*4), Geolo had a ███████████████████ ███████████████ of the Tommie hotel project that Defendants' sham litigation threatened to derail.

Defendants' fallback argument that "there is no privilege attached to [Geolo's] communications relating to the Thompson and Selma lawsuits" likewise fails.  As Defendant Saeed Nourmand himself has recognized, the settlement between Plaintiffs and Defendants regarding the Tommie and Thompson hotel projects were part of the same deal.  Ex. UU (S. Nourmand Tr.) at 428:1-12 ("As far as I was concerned, it was the same one. . . . It was a settlement for both properties at the same time."); *see also* Ex. RR (Reinstein Rough Tr.) at 27:23-29:11 (████████████████████████ ████████████████████████████████████████████████████ ████████████████████).  Therefore, to the extent the principals of Geolo were included on communications related to the Thompson or Selma lawsuits, at a minimum the communications would be protected by the common interest doctrine. *See United States v. Gonzalez*, 669 F.3d 974, 980 (9th Cir. 2012) ("[P]arties in separate actions might nonetheless have reasons to work together toward a common objective, and there is no requirement that actual litigation even be in progress.").

### 4.   Communications with Laurent Opman are Protected by the Common Interest Doctrine

Relevant is not the only developer that has been victimized by Defendants' extortionate conduct.  As Defendants recognize, they made the same threats to initiate baseless CEQA litigation against KOAR, an owner of the Schrader Hotel.  However, when KOAR told Defendants that it would not agree to discuss or negotiate their demands, Defendants withdrew their CEQA challenge.  Accordingly, communications between Plaintiffs and Mr. Opman regarding Defendants' pattern

and practice of extortionate conduct are protected by the common interest privilege.[22] *Gonzalez*, 669 F.3d at 980 ("[P]arties in separate actions might nonetheless have reasons to work together toward a common objective, and there is no requirement that actual litigation even be in progress."); *see also* Thakor Decl. Ex. 1 ("Relevant Priv. Log") Nos. 132, 150.

## IV. SUNSET'S WAIVER GROUND 4: PLAINTIFFS UNREASONABLY DELAYED IN PRODUCING A PRIVILEGE LOG

### A. SUNSET'S POSITION

Plaintiffs unreasonably delayed in providing Defendants with a privilege log until just before the discovery cut off. This delay has prejudiced Defendants and should weigh in favor of a privilege waiver.

#### 1. Facts Relevant To Delay

Plaintiffs filed this action on June 10, 2019. The Original Complaint referred extensively to (1) negotiations involving Sunset and Plaintiffs' lawyers; and (2) Plaintiffs' attorneys' impressions that Sunset's demands were for "blood money." On August 7, 2020, Plaintiffs made initial disclosures to Defendants, including identifying its attorneys at the law firms Jeffers Mangel and Sheppard Mullin who represented Plaintiffs in the CEQA litigation as persons with information supporting Plaintiffs' extortion claims. *See* Thakor Decl., Ex. 9.

---

[22] With scant explanation, Defendants argue that Plaintiffs engaged in "voluntary disclosure" regarding Laurent Opman. Defendants misunderstand the requirements and scope of the voluntary waiver doctrine. *See supra* Section II.B. Defendants make no effort to prove that Ex. 13 was privileged and, if it was, what matter was disclosed. This argument should be flatly rejected, for the same reasons discussed in Section II.B: the disclosure was not privileged in the first place, nor is Defendants' requested scope appropriate. *See, e.g.*, 1 McCormick on Evid. § 91 (8th Ed. 2020) ("mere … communication" insufficient for privilege); The American Law Institute, *Protecting Confidential Legal Information*, SL081 ALI-ABA 889, 908 (no privilege when lawyer "merely [acting] as conduit" of information); *Hernandez*, 604 F.3d at 1101 (scope of waiver must have nexus to what was actually disclosed); Fed. R. Evid. 502 advisory committee's note subdiv. a (same).

On July 6, 2021, Defendants served its first set of requests for production on Plaintiffs. On August 6, 2021, Plaintiffs provided Defendants with its initial set of responses and objections to Defendants' requests for production. On September 17, 2021, Plaintiffs started making a rolling production of documents which was completed on March 15, 2022. That same day Plaintiffs produced a privilege log, identifying 615 communications withheld on the basis of attorney-client privilege and work product protection.

On March 30, 2022, Defendants sent a letter to Plaintiffs requesting the parties meet and confer over the privilege waiver and requested an informal discovery conference and that Plaintiffs stipulate to an expediting briefing schedule on a motion to compel. *Id.* The Parties agreed to meet in person on April 14, 2022. At Plaintiffs' request, Defendants further met and conferred regarding third-parties on April 19, 2022, however, when asked to provide a "complete factual basis" for why privilege was not destroyed, none was provided.

2. <u>Plaintiffs' Unreasonably Delayed, At Time Intentionally, In Producing A Privilege Log.</u>

Defendants did not receive a privilege log until March 15, 2022—nine months after Plaintiffs' first production and only seven weeks until the scheduled conclusion of discovery. This delay has prejudiced Defendants and is an independent ground for waiver.

Courts in the Ninth Circuit have found waiver of privilege if the party asserting privilege fails to timely provide a privilege log. *Burlington N. & Santa Fe Ry. Co. v. U.S. Dist. Ct. for Dist. of Mont.*, 408 F.3d 1142, 1149 (9th Cir. 2005) (privilege log filed five months after the Rule 34 time limit); *Burch v. Regents of Univ. of Cal.*, No. CV.S-04-0038 WBS (GGH), 2005 WL 6377313, at *1-2 (E.D. Cal. Aug. 30, 2005) (privilege log submitted "approximately six months after [the p]laintiffs served their first set of document requests" was "presumptively untimely absent mitigating circumstances"); *Nat'l Lab. Rels. Bd. v. Sanders-Clark & Co.*, No. 216-CV-02110-

CAS (AFMx), 2016 WL 2968014, at *8 (C.D. Cal. Apr. 25, 2016) ("[R]espondent's roughly year-long delay in producing an adequate privilege log [was] inexcusable" and therefore finding a waiver of privilege).

Here, Plaintiffs' privilege log arguably should have been disclosed 30-days after their initial disclosures in August 2020 given that the original complaint extensively quoted Plaintiffs' counsel description of the settlement as "blood money". *See* Fed. R. Civ. P. 26(b)(5)(A); *see also Aecon Bldgs., Inc. v. Zurich North America*, 253 F.R.D. 655, 661 (W.D. Wash. Aug. 15, 2008) ("if it withholds requested materials on the basis of privilege, a party is obligated to document those materials in a privilege log to give the requesting party an opportunity to assess the privilege asserted").  At the very least, Plaintiffs should have provided a privilege log—or even a partial log pertaining to that first production or for any of the following productions thereafter— within 30 days or a reasonable time thereafter.  *See A.J.C. v. San Diego Family Housing, LLC*, No. 2:21-cv-25010FMO (SKx), 2021 WL 6427651, at *3 (C.D. Cal. Oct. 15, 2021) ("privilege log(s) must be provided at the same time as the document production(s).").  Without any mitigating circumstances, Plaintiffs' delay is presumptively untimely.  *See Burch*, 2005 WL 6377313, at *1-2.

This delay has significantly prejudiced the Defendants ability to take discovery, prepare for summary judgment, and trial.  For example, the reason this briefing is being completed on an expedited basis is because Plaintiffs did not disclose whether they were withholding privileged communications until just a month before the discovery cut-off. Then, when Defendants asked for expedited briefing back in March of 2022, Plaintiffs delayed a resolution by requesting further meet and confer efforts only to take the same exact positions as before, and refuse to provide critical information with respect to the third-party waiver. Thakor Decl., Ex. 20.  Even when Defendants granted Plaintiffs' courtesies like not pursuing waiver on inadvertent disclosure, Plaintiffs attempted to capitalize on those efforts by shifting the burden on to Defendants' to conduct a review, and generally delaying in identifying what was

- 55 -

inadvertently disclosed and what was intentionally waived. Thakor Decl., Ex. 21. This delay, and prejudice to Defendants' are an independent ground for waiver.

### B.   **Plaintiffs' Position**

Defendants' final argument—that Plaintiffs have waived the entirety of their privilege log—is baseless and disingenuous.  Defendants first suggest that the privilege log was due in connection with Plaintiffs' initial disclosures in "August 2020."  Defendants' conclusory position is not only baseless but illogical.  Plaintiffs did not have a duty to provide a privilege log under Fed. R. Civ. P. 26(b)(5) until after they produced responsive documents in discovery and Defendants did not even serve written discovery until a year later in July 2021. Ex. V.

When Defendants finally served discovery responses, Plaintiffs timely objected to the scope of these requests, asserted privilege to the extent applicable, and made their first production in fall 2021.  *See* Ex. II.  During this same time frame, both parties changed firms: Defendants' counsel transitioned the case from Greenspoon Marder to Norton Rose and Plaintiffs' counsel transitioned from Akin Gump Strauss Hauer & Feld LLP to Wilson, Sonsini, Goodrich, & Rosati. Although there was a brief delay on both sides as new attorneys transitioned on the case,[23] the parties continued meeting and conferring regarding various discovery matters, including the scope of Plaintiffs' production and what type of communications should be included on any privilege log.  The parties reached the following agreement:  communications with litigation counsel in the RICO case need not be logged at all, and communications with litigation counsel in the underlying CEQA lawsuits only needed to be logged to the extent they pertained to the decision to file the underlying CEQA suits and/or settlement discussions.  Ex. W at 2.

---

[23] Partially for this reason, it appears that Defendants' responses to Plaintiffs' second requests for production were served late.  *Compare* Ex. G (served October 25, 2021), *with* Ex. H (responded December 20, 2021).

Then, when Plaintiffs began producing additional documents, Defendants served a second, and much broader, set of requests for production.  Once again, Plaintiffs timely objected, including on privilege, Ex. DD, and the parties began discussing the scope of Plaintiffs' production in light of these new requests. Talpas Decl. ¶ 5. During these discussions, Defendants asked that certain categories of documents, such as financial documents, be prioritized.  Plaintiffs agreed and did so. Talpas Decl. ¶ 6; Ex. X.  Before the parties had completed their meet and confer efforts on scope, Plaintiffs began making its rolling productions over the holidays in December 2021, which continued through March 15, 2022.  Talpas Decl. ¶ 6.  All told, Plaintiffs made eight productions comprising over 118,000 pages of documents. *Id.*

On February 15, 2022, Defendants' counsel proposed that the parties exchange privilege logs in late February 2022.  Ex. I. Plaintiffs served their privilege log on March 15, 2022.  Defendants still have not supplemented their own privilege log.

As the timeline makes clear, Plaintiffs did not "withhold" its privilege log for nine months.  Rather, Plaintiffs properly met and conferred on scope (including the contents of any log), and then worked diligently to collect, review, and produce a large volume of documents in a compressed timeline—a compression caused by Defendants' tactical decision to delay serving discovery in the first instance for a full year.  Plaintiffs also complied with Defendants' request to prioritize certain categories of documents for production, namely financial documents.  As is customary, Plaintiffs produced a privilege log when they substantially completed their document production.[24]  As this Court has recognized, "it is not uncommon for parties in complex civil litigation to produce a privilege log at or near the

---

[24] As of the date of the service of this responsive portion, Defendants still have not supplemented their privilege log (despite multiple agreements and requests to do so).

completion of their document production." *Am. Fed'n of Musicians v. 212 Prods. LLC*, No. 20-cv-07255-JAK-KS, 2021 U.S. Dist. LEXIS 252718, at *12 (C.D. Cal. Sept. 27, 2021) (no waiver where privilege log produced at end of document productions).

Apart from manufacturing a supposed "delay," Defendants do not engage at all with the controlling test on whether there was a waiver of the attorney client privilege.  Under *Burlington* the waiver analysis must be "holistic."  *See Burlington N. & Santa Fe Ry. Co. v. U.S. Dist. Ct.*, 408 F.3d 1142, 1149 (9th Cir. 2005) (rejecting any "bright-line" rule for to define timeliness of discovery responses). Instead, courts consider (1) "the degree to which the objection or assertion of privilege enables the litigant seeking discovery and the court to evaluate" whether the docs are privileged (a privilege log is presumptively sufficient); (2) timeliness (service within 30 days is sufficient by default); (3) "magnitude of the document production," and (4) "any other particular circumstances of the litigation" that make responding unusually easy or hard.  *Id.*

**Plaintiffs privilege log is presumptively sufficient**. There is no argument that Plaintiffs' privilege log is somehow deficient.  The log provides ample information to allow the defendants and the Court to evaluate the legitimacy of Plaintiffs' assertions.  Each entry contains details such as sender, recipients, and an overview of the content.  It is therefore presumptively sufficient.  *Carl Zeiss Vision Int'l GmbH v. Signet Armorlite Inc.*, No. 07-cv-0894-DMS (POR), 2009 WL 4642388, at *3 (S.D. Cal. Dec. 1, 2009) (finding no waiver and noting that plaintiff's objections were not merely boilerplate); *see Coal. for a Sustainable Delta v. Koch*, No. 1:08-CV-00397 OWW GSA, 2009 WL 3378974, at *4 (E.D. Cal. Oct. 15, 2009) (no waiver where defendant's privilege log contained the identities of senders and recipients and the subject matter of the communication and where defendant reviewed and produced over 83,000 pages of documents even with a lengthy M&C to narrow the scope of discovery).  This factor weighs against waiver.

*Timeliness*. In complex cases with many documents, where the parties engaged in substantial meet and confer efforts (including over the contents of the log itself) production near the end of the discovery is customary and appropriate. *Am. Fed'n of Musicians*, 2021 U.S. Dist. LEXIS 252718, at *12.  At most, Defendants can complain of two weeks' delay beyond their proposed date to exchange privilege logs at the end of production.  That is not untimely.  This factor weighs against waiver.

*Magnitude of document production*. As discussed above, Plaintiffs timely objected to Defendants' broad discovery requests (without seeking any extension), including on privilege grounds, and promptly met and conferred as to scope. Plaintiffs then collected, reviewed, and produced more than *100,000 pages* of documents in *three months* and provided a comprehensive substantial privilege log claiming hundreds of documents immediately thereafter.  The magnitude of document production weights against waiver.  *Koch*, 2009 WL 3378974, at *5. Indeed, as should be the case here, broad discovery requests weigh in favor of finding that the privilege was preserved.  *See Thomsen v. NaphCare, Inc.,* No. 3:19-CV-00969-AC, 2021 WL 839161, at *4 (D. Or. Mar. 5, 2021) ("Given the breadth of discovery in this case; NaphCare's initial, generalized preservation of privilege; and its subsequent, more detailed assertion of privilege with respect to specific documents uncovered during the discovery process, finding waiver of the privilege would be unreasonable and is not warranted here.").

*Other factors making responding unusually difficult*.  By its very nature, this case involves complex privilege issues which necessitated many levels of review by multiple attorneys.  Despite this complexity, Plaintiffs prepared and served a comprehensive and detailed privilege log that avoided shortcuts (such as categorical logging) and avoided any motion practice as to its sufficiency.

*Defendants are not prejudiced*. Defendants suggest that they were prejudiced in "discovery, prepar[ing] for summary judgment, and trial."  They fold into this

argument a suggestion that Plaintiffs are responsible for this late briefing.  As discussed above, Defendants inexplicably waited a year to serve initial written discovery and then served an even broader set of discovery requests midway through Plaintiffs' production.  Defendants then asked Plaintiffs to prioritize certain categories of documents, which Plaintiffs did.  And the parties worked cooperatively to reschedule certain lawyer depositions until after service of the privilege log.  With respect to the timing of this motion, Defendants' counsel proposed a June 8 hearing date on April 15.  Ex. CC (April 15, 2022 email from Thakor to Tucker).  Plaintiffs' counsel had initially proposed May 18 for the hearing date.  *Id.* (April 7, 2022 email from Tucker to Thakor). The hearing date is June 9, only a day later than by Defendants' own suggestion.

None of the factors weigh in favor of waiver; all weigh against.  Defendants have not been prejudiced but for their own actions.  This motion should be denied.

# V.   PLAINTIFFS REQUEST THAT DEFENDANTS SUPPLEMENT THEIR PRIVILEGE LOG

## A.   Defendants' Responses to Discovery Claiming Privilege

Defendants' privilege log, served on July 1, 2021, may be found at Ex. E.[25]  Defendants' objections to requests for production on the basis of privilege or work product after that date are reproduced below.

## REQUEST FOR PRODUCTION NO. 62:

All DOCUMENTS and COMMUNICATIONS that RELATE TO PLAINTIFFS.

## RESPONSE TO NO. 62:

Sunset Landmark incorporates by reference herein its General Objections. Sunset Landmark objects on the grounds that the terms "ALL DOCUMENTS and COMMUNICATIONS" and "RELATE TO" renders this Request

---

[25] Unless otherwise stated, "Ex." in Plaintiffs' Statements refer to the exhibits attached to the Declaration of Stephanie Balitzer attached hereto.

unlimited in scope, overbroad, unduly burdensome and not proportional to the needs of the case. Sunset Landmark further objects to this Request as it directly seeks documents protected by the attorney-client privilege and/or the attorney work-product doctrine. Sunset Landmark further objections to the Request on the grounds that it is duplicative of Plaintiff's First Set Of Requests For Production.

Subject to and without waiver of the foregoing objections, Sunset Landmark will conduct a reasonable search of its files and produce, electronic images of any responsive, non-privileged documents in its possession, custody or control, to the extent any exist which have not already been produced, from September 2014 to present day.

**REQUEST FOR PRODUCTION NO. 63:**

DOCUMENTS sufficient to show any monetary distributions made by YOU to NOURMAND or any member of NOURMAND's immediate family (or any trust or other similar entity established for estate planning purposes) during 2018.

**RESPONSE TO NO. 63:**

Sunset Landmark incorporates by reference herein its General Objections. Sunset Landmark objects to this Request because the terms "NOURMAND," "NOURMAND's immediate family," and "any trust or other similar entity established for estate planning purposes" are overly broad, vague and ambiguous. Sunset Landmark also objects to this Request on the grounds that it constitutes an invasion of privacy protections afforded by the U.S. and California Constitutions, applicable statutes and common law to both Sunset Landmark and NOURMAND. Sunset Landmark further objects to the Request because it seeks documents that are not relevant to any claims in this action or

proportional to the needs of the case. Sunset Landmark is withholding documents based on the foregoing objections

**REQUEST FOR PRODUCTION NO. 65:**

DOCUMENTS sufficient to show any plans for development projects (whether ultimately or actually pursued) on properties owned by SUNSET.

**RESPONSE TO NO. 65:**

Sunset Landmark incorporates by reference herein its General Objections. Sunset Landmark objects to the term "development projects" as vague and ambiguous as it is undefined. Sunset Landmark also objects to this Request because it calls for documents containing confidential financial or commercially sensitive information of which (1) constitutes an invasion of privacy protections afforded by the U.S. and California Constitutions, applicable statutes and common law, and (2) could result in substantial competitive injury to Sunset Landmark. Sunset Landmark further objects to this Request as it does not seek any information relevant to any claims in this action and not proportional to the needs of the case. Sunset Landmark further objects to this Request to the extent it seeks documents protected by the attorney-client privilege and/or the attorney work-product doctrine. Sunset Landmark is withholding documents on the foregoing objections.

**REQUEST FOR PRODUCTION NO. 66:**

All DOCUMENTS and COMMUNICATIONS that RELATE TO YOUR plans for a development project on the parking lot behind the Hollywood Athletic Club.

**RESPONSE TO NO. 66:**

Sunset Landmark incorporates by reference herein its General Objections. Sunset Landmark objects to the term "a development project" as vague and

ambiguous as it is undefined and it is unclear what "development project" this Request is referring to. Sunset Landmark objects that phrase "all DOCUMENTS and COMMUNICATIONS" and the term "RELATE TO" render this Request unlimited in scope, overbroad, unduly burdensome and not proportional to the needs of the case. Sunset Landmark also objects to this Request because it calls for documents containing confidential financial or commercially sensitive information of which (1) constitutes an invasion of privacy protections afforded by the U.S. and California Constitutions, applicable statutes and common law, and (2) could result in substantial competitive injury to Sunset Landmark. Sunset Landmark further objects to this Request as it does not seek any information relevant to any claims in this action and not proportional to the needs of the case. Sunset Landmark further objects to this Request as it directly seeks documents protected by the attorney-client privilege and/or the attorney work-product doctrine. Sunset Landmark is withholding documents based on the foregoing objections.

**REQUEST FOR PRODUCTION NO. 67:**

All DOCUMENTS and COMMUNICATIONS that RELATE TO the SCHRADER HOTEL PROJECT or the ownership of the SCHRADER HOTEL PROJECT.

**RESPONSE TO NO. 67:**

Sunset Landmark incorporates by reference herein its General Objections. Sunset Landmark objects to the term "ownership of the SCHRADER HOTEL PROJECT" as vague and ambiguous. Sunset Landmark objects that phrase "all DOCUMENTS and COMMUNICATIONS" and the term "RELATE TO" render this Request unlimited in scope, overbroad, unduly burdensome and not proportional to the needs of the case. Sunset Landmark further objects to this Request to the extent it seeks documents protected by the attorney-client

privilege and/or the attorney work-product doctrine. Sunset Landmark invites Relevant to meet and confer over the scope of this request. Sunset Landmark is withholding documents based on the foregoing objections.

**REQUEST FOR PRODUCTION NO. 68:**

All DOCUMENTS and COMMUNICATIONS that RELATE TO Bruce Rothman or KOAR Institutional Advisors LLC.

**RESPONSE TO NO. 68:**

Sunset Landmark incorporates by reference herein its General Objections. Sunset Landmark objects that phrase "all DOCUMENTS and COMMUNICATIONS" and the term "RELATE TO" render this Request unlimited in scope, overbroad, unduly burdensome and not proportional to the needs of the case. Sunset Landmark further objects to this Request as it seeks documents protected by the attorney-client privilege and/or the attorney work-product doctrine. Sunset Landmark further objects to this Request as it does not seek any information relevant to this case. Sunset Landmark invites Relevant to meet and confer over the scope of this request. Sunset Landmark is withholding documents based on the foregoing objections.

**REQUEST FOR PRODUCTION NO. 69:**

DOCUMENTS sufficient to show the expenditure, use, or other MOVEMENT of any funds obtained by YOU as a result of the THOMPSON SETTLEMENT AGREEMENT and/or the TOMMIE SETTLEMENT AGREEMENT.

**RESPONSE TO NO. 69:**

Sunset Landmark incorporates by reference its General Objections and Specific Objections to Definitions as if fully set forth herein. Defendant further objects to this Request on the grounds that it calls for an exhaustive financial audit of Sunset Landmark. As a result, the Request overly broad, unduly burdensome,

not proportional to the needs of the case, purports to impose a burden or expense that outweighs any likely benefit, and it seeks documents or information that are not relevant to any of the claims or defenses of the parties in this action. For the same reason, Sunset Landmark further objects to this Request on the grounds that it constitutes an invasion of privacy in violation of protections afforded by the U.S. and California Constitutions, applicable statutes, and common law as to Sunset Landmark. Sunset Landmark further objects to the terms "expenditure, use, or other MOVEMENT," as well as the term MOVEMENT, in and of itself, on the grounds that it is vague, and ambiguous particularly given the inclusion of the phrases "the accounting of inflows and outflows" as well as "any dispositions of such funds and the dates and recipients of such dispositions" in the definitions. Sunset Landmark further objects to this Request to the extent it calls for the production of documents protected from disclosure by the attorney-client privilege, the attorney work product doctrine, the common interest doctrine, or any other lawfully recognized privilege or immunity. Sunset Landmark is withholding documents based on the foregoing objections.

**REQUEST FOR PRODUCTION NO. 70:**

DOCUMENTS sufficient to show the status of the funds obtained as a result of the THOMPSON SETTLEMENT AGREEMENT and/or the TOMMIE SETTLEMENT AGREEMENT, such as the bank account in which the funds are currently held.

**RESPONSE TO NO. 70:**

Sunset Landmark incorporates by reference its General Objections and Specific Objections to Definitions as if fully set forth herein. Defendant further objects to this Request on the grounds that it calls for an exhaustive financial audit of Sunset Landmark. As a result, the Request overly broad,

unduly burdensome, not proportional to the needs of the case, purports to impose a burden or expense that outweighs any likely benefit, and it seeks documents or information that are not relevant to any of the claims or defenses of the parties in this action. For the same reason, Sunset Landmark further objects to this Request on the grounds that it constitutes an invasion of privacy in violation of protections afforded by the U.S. and California Constitutions, applicable statutes, and common law as to Sunset Landmark. Sunset Landmark further objects to the terms and phrases "the funds", "status of funds," and "bank account in which the funds are currently held" as vague, and ambiguous. Sunset Landmark further objects to this Request to the extent it calls for the production of documents protected from disclosure by the attorney-client privilege, the attorney work product doctrine, the common interest doctrine, or any other lawfully recognized privilege or immunity. Sunset Landmark is withholding documents based on the foregoing objections.

**B.    Plaintiffs' Statement**

Defendants Stephan Nourmand and Sunset Landmark ("S-Defendants") served their most recent privilege log on July 1, 2021.  Despite committing on multiple occasions to further supplement that log, S-Defendants have—after ten months—failed to do so.  S-Defendants have continued, however, to object to document requests served after the preparation of that log on the basis of privilege and stated it "is withholding documents based on the foregoing objections." Plaintiffs therefore seek an order of the Court compelling the S-Defendants to supplement their privilege log and verify that documents responsive to Plaintiffs' requests have been produced or logged.

***History of Dispute***. Plaintiffs served their first set of Requests for Production on July 21, 2020, Ex. A, to which Defendants responded on September 10, 2020, with, *inter alia*, multiple objections based on privilege and work product protection.

Ex. B.  Plaintiffs brought a motion to compel related to those requests.  Ex. C (*See also* ECF 59).  On April 29, 2021, this Court found various categories of documents withheld by Defendants to be relevant, and in connection therewith ordered Defendants to provide a privilege log for such documents they contended to be privileged.  Ex. D (ECF No. 65) at 21-22.  On June 4, 2021, S-Defendants served their first privilege log.  *See* Ex. J.  Plaintiffs identified deficiencies with that log, and S-Defendants served their First Supplemental Privilege Log on July 1, 2021.  Ex. E.  Plaintiffs again raised further issues with the First Supplemental Privilege Log, and on August 6, 2021, S-Defendants agreed to supplement their privilege log.  Ex. F.  The following month, in September 2021, representation of Plaintiffs transitioned from Akin Gump Strauss Hauer & Feld LLP to Wilson, Sonsini, Goodrich, & Rosati.  Plaintiffs then served their Second Set of Requests for Production on October 25, 2021, Ex. G, to which S-Defendants responded on December 20, 2021, again objecting based on privilege and work product protection.  Ex. H.  Early in 2022, after Plaintiffs again raised issues with S-Defendants' log, S-Defendants committed to "review [their] supplemental privilege log and make revisions." Ex. I. Plaintiffs reminded S-Defendants of that necessary supplementation shortly thereafter.  Ex. J.  Plaintiffs then served their Third Set of Requests for Production on March 9, 2022, Ex. K, to which S-Defendants responded on April 8, 2022, yet again objecting based on privilege and work product protection.  Ex. L.  Sunset's responses to certain of Plaintiffs' Second and Third Sets of Requests for Production explicitly state that Sunset "is withholding documents based on the foregoing objections."  Ex. H, Requests 63, 65, 66, 67, 68; Ex. L, Requests 69, 70.   During further meet-and-confer communications with S-Defendants, Plaintiffs again asked S-Defendants to supplement their privilege log.  Ex. M.  Despite being under an Order of this Court to provide a privilege log to certain documents, Ex. D, ECF 65 at 21-22, and agreeing to supplement, S-

1   Defendants have so far not supplemented their privilege log (to the date Plaintiffs

2   served their opening portion of this LR 37-2 Joint Stipulation).

3       ***Defendants must provide supplemental privilege log***.  There is no basis for

4   Defendants' continued refusal to supplement their privilege log.  They agreed to it in

5   August of 2021 and agreed to it again in February of 2022. In the meantime, in both

6   December of 2021 and April of 2022, they responded to further requests for

7   production by explicitly stating they were withholding documents based on privilege

8   and work product objections.  Yet they have not supplemented.

9       Defendants' refusal to supplement their privilege log, or explain their delay in

10  doing so, is unwarranted.  "[T]he Federal Rules have long required the production of

11  a privilege log when withholding responsive documents based on asserted

12  evidentiary privilege." *Infanzon v. Allstate Insurance Co.*, 335 F.R.D. 305, 309

13  (C.D. Cal. 2020); *Curtin v. Cnty. of Orange*, No. SACV16591SVWPLAX, 2017

14  WL 5593025, at *3 (C.D. Cal. Mar. 13, 2017) ("It is also well-established that an

15  entity that withholds discovery materials based on privilege must provide sufficient

16  information (i.e., a privilege log) to enable the requesting party to evaluate the

17  applicability of the privilege or other protection.").  Defendants have objected to

18  requests for production on privilege and stated they are withholding documents—

19  but they have not supplemented their log to reflect that. They must do so.

20      The federal rules mandate that privilege logs contain sufficient detail to

21  justify the basis for the privilege assertion. Fed. R. Civ. P. 26(b)(5) (privilege logs

22  must "describe the nature of the documents, communications, or tangible things not

23  produced or disclosed. . .  in a manner that, . . . will enable other parties to assess the

24  claim.").  Not surprisingly then, courts routinely order the supplementation of

25  deficient privilege logs. *See, e.g.*, *Dollar Tree Stores, Inc. v. Toyama Partners LLC*,

26  No. CV 10-0325 SI NJV, 2011 WL 3156971, at *3 (N.D. Cal. July 26, 2011)

27  (compelling production of a supplemental privilege log and explaining that all

28  "parties will be held to the same standard for their privilege logs"); *Curtin*, 2017

WL 5593025, at *3 (ordering defendant to supplement privilege log to include identities and titles of authors, recipients, and locations of documents, and, to provide more "detailed information that clearly establishes that the privilege or doctrine applies"); *V5 Techs. v. Switch, Ltd.*, No. 2:17-cv-02349-KJD-NJK, 2019 U.S. Dist. LEXIS 224484, at *5 (D. Nev. Dec. 20, 2019) (deficient privilege log ordered to be supplemented); *Flynn v. Love*, No. 3:19-CV-00239-MMD-CLB, 2021 U.S. Dist. LEXIS 201066, at *15 (D. Nev. Oct. 19, 2021) (ordering supplementation of privilege log and cautioning plaintiffs that "continued discovery issues and failures to follow the Court's orders may result in further sanctions under Rule 37"). And here Defendants' privilege log is deficient because it fails to account for Defendants' additionally withheld documents (from responses to two separate requests for production) and also because it has failed to address the multiple issues Plaintiffs have repeatedly raised (and, for some, Defendants have agreed to address).

Plaintiffs also request the Court to order Defendants to verify that after a diligent search for responsive documents, Defendants have produced any responsive documents within the agreed-upon scope of the requests, or have logged withheld documents.  Courts customarily grant such requests where one party has failed to fully respond to requests for production.  *See, e.g.*, *Lofton v. Verizon Wireless (VAW) LLC*, 308 F.R.D. 276, 283 (N.D. Cal. 2015) (requiring defendant to amend RFP responses "to indicate that it has produced all responsive documents" may be appropriate); *Billal v. Alere Health, LLC*, No. SACV 14-00390 AN, 2014 WL 12844179, at *3 (C.D. Cal. Dec. 4, 2014) (ordering a "verified supplemental response that certifies, for each RFP, Defendant has conducted a reasonably diligent search for all responsive documents, that Defendant has produced all responsive documents in its possession, custody, or under its control, and that no responsive documents have been withheld").  Plaintiffs therefore request that the Court order Defendants to serve, at the same time as their supplemental privilege log, verified supplemental responses to the requests for production stating that documents within the scope of the requests have been

produced or logged. Without such a verification, Plaintiffs fear that any further supplementation will result in a game of whack-a-mole on the eve of trial. This, unfortunately, is not the first time Plaintiffs have had to approach the Court to compel production of a privilege log in this action. *See* Ex. N, ECF 80 (compelling privilege log from Defendants' non-party attorney). But now, discovery has concluded. Summary judgment has been fully briefed. Trial is approaching. Defendants' log must be supplemented and confirmed to be complete. Thus, in light of Defendants' failure to provide a complete privilege log, it is (now) incumbent that they provide a final supplemental privilege log and verify the completeness of their productions.

Accordingly, this Court should compel Defendants to produce a supplemental privilege log and verify their responses to Plaintiffs' RFPs.

### C.   <u>Sunset's Statement</u>

Sunset will stipulate to the relief requested and provide revisions to its privilege log. However, there has been no prejudice to Plaintiffs – nor have they argued any -- because as stated in Sunset's February 15, 2022 letter, the revisions to the privilege log were largely to remove entries erroneously included that have *already* been produced (like legal invoices). Balitzer Decl., Ex. I.

Moreover, Sunset will verify that is not withholding any additional documents on the basis of the attorney-client privilege to Plaintiffs Requests for Production, Set 2 and 3. As stated in the objections pasted above, any responsive documents to the above requests are being withheld on the basis of an invasion of privacy, overbreadth, and burden objections. Those objections are not at issue in this joint stipulation. ECF No. 136 (limiting briefing on "privilege related issues").

In addition, there are two double standards in Plaintiffs' position that must be addressed.

First, Plaintiffs' complaint regarding verifications is misleading because Plaintiffs have not verified their discovery responses either. This includes responses to requests for production, interrogatories, and requests for admissions, making the

risk of "whack-a-mole" referenced by Plaintiffs equally applicable to Sunset.  *See e.g.*, Thakor Decl., ¶ 29, Ex. 23; 24.

Second, Plaintiffs have also not supplemented their privilege log despite responding to further discovery and asserting attorney client objections. See e.g., Thakor Decl., Ex. 22.  Moreover, after producing its privilege log, Plaintiffs also clawed back dozens of documents they claimed were inadvertently produced none of which were later included on any revised privilege log.  Thakor Decl., Ex. 21.  In addition, unlike in Sunset's privilege log, Plaintiffs did not identify the role or identity of any third-parties included on privileged communications. (*Compare* Thakor Decl., Ex. 1 to Balitzer Decl., Ex. E.)

As a result of the rush[26] to complete discovery and depositions in the past few months, both parties fell behind in some aspects of their written discovery, like providing verifications.  However, the key difference between Plaintiffs' delay in providing *any* privilege log, and Sunset not providing a *third* supplement to its privilege log is prejudice.  Plaintiffs do not argue any prejudice nor could they because they had in substance all the information they needed to evaluate Defendants' privilege positions since last year.  On the other hand, Sunset received its first privilege log on March 15, 2022, in the middle of depositions and too late to seek relief before the discovery cut-off.

## VI.   THE COURT SHOULD CONSISTENTLY RESOLVE THE ISSUE OF WHETHER AGENTS WAIVE PRIVILEGE ACROSS ALL PARTIES

### A.   Defendants' Privilege Log Entries Including its Agents

Defendants' privilege log, served on July 1, 2021, may be found at Ex. E. Log entries of individuals that Defendants argue were "acting in their capacity as Defendants' agents" and "were reasonably necessary to [Defendants] legal

---

[26] The rush to complete discovery was itself caused by the need to push depositions back until after Plaintiffs' completed their rolling production of 120,000 pages of documents.  This is why almost all depositions, with the exception of Grant King, were conducted after Plaintiffs' last production on March 15, 2022.

representation" include at least: 5, 15-17, 56, 59, 62, 72, 74, 76, 78, 81, 109, 111, 136, 144, 161, 176-77, 184, 196, 197, 202, 209, 211, 221, 231, 243-44, 271, 277-283, 286, 288, 290-94, 296, 298, 300, 302-04, 306, 308, 312, 314-15, 318-26, 329, 332, 335, 339-49, 351, 353-58, 360, 365, 369-70, 374, 378, 380, 382, 386-87, 389, 398, 399, 409, 468, 472-77, 487, 551, 588, 592, 608, 613, 626, 630, 633-35, 649, 655-60, 670-72, 678, 688, 704, 715, 727, 753, 754, 756, and any attachments thereto.

## B.   **Plaintiffs' Contentions**

Throughout the entire course of discovery in this matter, the parties have asserted attorney-client privilege and work-product protection over communications and documents based on principles announced by the Ninth Circuit for such purposes. Such principles include that privilege is not waived by the inclusion of outside consultants with information that corporation counsel needs to give fully informed legal advice. *See e.g.*, *United States v. Christensen*, 828 F.3d 763, 802-803 (9th Cir. 2015); *United States v. Graf*, 610 F.3d 1148, 1159 (9th Cir. 2010). Thus, Plaintiffs have withheld communications where, for example, experts in the construction and entitlement process (retained by Plaintiffs or Plaintiffs' outside counsel at the time, Sheppard, Mullin, Richter & Hampton LLP), were included in communications with Plaintiffs' attorneys. Likewise, Defendants have withheld communications with attorneys and documents shared by attorneys with Mr. Iravani (Nourmand & Associates' CFO who also served as an outside independent contractor of Defendant Sunset), *see* Ex. O, Ms. DeCastro (a Nourmand & Associates employee who sometimes functioned as an informal assistant of Mr. Saeed Nourmand, but employed by Nourmand & Associates) *see* Ex. P, and Ms. Gould (a Nourmand & Associates employee who sometimes served as an informal assistant of Mr. Saeed Nourmand, but employed by Nourmand & Associates), *see* Ex. Q.  In August of 2021, Defendants justified withholding these documents because Mr. Iravani, Ms. Gould, and Ms. DeCastro were, in their view, "acting as Defendants' agents when they communicated

with Defendants counsel" and thus "their communications with counsel are protected by attorney-client privilege."  *See* Ex. F. Defendants reiterated that justification in February of 2022, maintaining privilege was not waived because these individuals were "acting in their capacity as Defendants' agents" and "were reasonably necessary to the legal representation of Defendants' [*sic*]." *See* Ex. I.

Now, at the tail end of discovery, Defendants suggest that the line drawn by both parties during discovery should be unilaterally adjusted so that Plaintiffs' privilege is waived but Defendants' privilege is not.   That is wrong.   *First*, Defendants' newfound position is incorrect on the facts and the law, as discussed in Plaintiffs' response to Defendants' arguments. *Second*, as this issue implicates claims by both parties, Plaintiffs request that the Court issue an order that applies to and resolves any issues consistently as to both parties.  The Court has broad discretion to control discovery in such a manner. *Cf. Hallet v. Morgan*, 296 F.3d 732, 751 (9th Cir. 2002).

Defendants should not be allowed—on the eve of summary judgment—to switch their position as to Plaintiffs' agents yet retain their position as to Defendants' own agents. Without a consistent position applied to all parties, acceptance of Defendants' last-minute change in positions threatens to undermine the "dignity of the judicial process" by "playing fast and loose with the courts … by taking one position, then seeking to gain a second advantage by taking an incompatible one." *Cf. Bradley v. Harcourt, Brace & Co*., 104 F.3d 267, 272 (9th Cir. 1996) *citing and quoting Rissetto v. Plumbers and Steamfitters Local 343,* 94 F.3d 597, 600-01 (9th Cir. 1996). One consistent position is appropriate. Plaintiffs believe its position is correct; but if the Court disagrees, Plaintiffs respectfully request that privilege log entries of Defendants' "agents" be addressed in a consistent manner.

C.    **Sunset's Contentions**

Sunset is not taking any inconsistent positions in discovery regarding third-party waiver.  Third-party waiver is a fact based analysis that is based on the specific

1    role of each third party involved.

2         In Sunset's case, Rachelle DeCastro, Sarah Gould, and Mohamad Iravani – all

3    of which are assistants of Sunset– were all included on Sunset's communications to

4    transmit information to and from lawyers, keep records of communications, or other

5    ministerial purposes like paying legal bills.  Plaintiffs, on the other hand, are not

6    claiming their third-parties were performing any ministerial functions.  Instead, they

7    are claiming privilege over dozens of communications with people like Scott

8    Campbell, a person Plaintiffs understood to be the agent of one of Plaintiffs' purported

9    extorters, *Defendant* Nourmand & Associates.  *See e.g.*, Thakor Decl., Ex. 1, PLOG

10   Nos. 1-16; Ex. 2 ("King Tr.") 20:23-21:12.  There is a big difference in those

11   respective positions.[27]

12         Privilege is not destroyed by the inclusion of a client's secretary, assistant, or

13   administrative professional whose primary purpose on the communication is

14   ministerial. *Shopify Inc. v. Express Mobile, Inc.*, No. 20-MC-80091-JSC, 2020 WL

15   4732334, at *6 (N.D. Cal. Aug. 14, 2020) (finding that inclusion of "office manager"

16   whose duties were "general office support, [performing] tasks such as bookkeeping,

17   purchasing, making travel arrangements, and other ministerial activities" did not

18   waive privilege); *In re Adelphia Commc'ns Corp.*, 2005 WL 425498 at *8 (S.D.N.Y.

19   Feb.16, 2005) (receipt of privileged e-mail by secretary for purpose of passing it along

20   to intended recipient did not waive privilege); *Premier Dealer Servs., Inc. v. Duhon*,

21   No. CIV.A. 12-1498, 2013 WL 5966123, at *7 (E.D. La. Nov. 8, 2013) (naming

22   secretaries as the "most common example" of agents that do not destroy privilege);

23   *U.S. ex rel. Miller v. Bill Harbert Intern. Const., Inc*., No. 95–1231(RCL), 2007 WL

24   915235, at *2–3 (D.D.C. March 27, 2007) (presence of client's assistant did not waive

25   privilege when assistant's job was to witness documents and ensure a record of their

26   ───────────────

27   [27] The notion that Sunset somehow delayed by raising third-party waiver issues "at the tail-end of discovery" is incorrect.  The first time Sunset was notified of these third-party communications was on March 15, 2022 when Plaintiffs produced its privilege log.

28

creation); *United States v. Koerber*, No. 2:09-cr-302 CW, 2011 WL 2174355, at *9
(D. Utah June 2, 2011).[28]

As Sunset made clear back in June of 2021, Sarah Gould, Rachelle DeCastro
and Mohamad Iravani were included on attorney-client communications for
ministerial purposes like transmitting information. Sarah Gould signed a declaration
stating she was a secretary of Stephan Saeed Nourmand. Balitzer Decl., Ex. Q ("Gould
Decl."), ¶ 3. Mr. Iravani confirmed that fact by testifying Ms. Gould was Mr.
Nourmand's "calendar keeper." Thakor Decl., Ex. 8 ("Iravani Tr."), p. 31-32. Ms.
Gould herself signed her emails as the "Office of Saeed Nourmand." (See e.g.,
Thakor Decl., Ex. 26, stating "My name is Sarah Gould and I am Saeed Nourmand's
assistance (sic).").

Rachelle DeCastro also signed a declaration stating she was a secretary of Mr.
Nourmand. Mr. Iravani testified that Ms. DeCastro was also Mr. Iravani's assistant,
who he used for record keeping purposes for his work with Sunset Landmark. Balitzer
Decl., Ex. P ("DeCastro Decl."), ¶ 3; Iravani Tr., p. 61-63. Examples of
communications that Ms. DeCastro is included on without attorneys support the fact
she was used for secretarial purposes only. Thakor Decl., Ex. 27.

Mr. Iravani, on the other hand, was the property manager and assistant of The
Sunset Landmark Investment, LLC from 2008 to 2020, was paid by separately by
Sunset on a yearly salary, and was included on nearly "all communications" going in
and out of Sunset Landmark for record keeping purposes. Iravani Tr., p. 15-18, 22-
23, 32:17-22, 62, 81, 100-101. Many of the communications he was included on he
did not read. In his capacity as property manager, Mr. Iravani also collected rent, paid

---

[28] This is also true under California law. Cal. Evid. Code, § 952; see also, *Zurich American Ins. Co. v. Superior Court*, 155 Cal.App.4th 1485, 1501 (2007) ("attorney-client communications in the presence of, or disclosed to, clerks, secretaries, interpreters, physicians, spouses, parents, business associates, or joint clients, when made to further the interest of the client or when reasonably necessary for transmission or accomplishment of the purpose of the consultation, remain privileged")

the bills (including lawyer fees), and kept the books for Sunset Landmark. Iravani Tr., 32:17-22, 62, 81, 100-101. This is the exact type of agent that the "functional employee" test was intended to protect. *Shopify Inc.*, 2020 WL 4732334, at *6 (N.D. Cal. Aug. 14, 2020) (applying *Graf* to preserve privilege over privilege communications including office manager.)

As a result, there is no inconsistency in Sunset's position. As far as Plaintiffs have let on, none of Plaintiffs' third-parties were included on privileged communications for just ministerial functions. That is why the inclusion of Rachelle DeCastro, Sarah Gould and Mohamad Iravani does not destroy privilege for Sunset, while the inclusion of people like Scott Campbell and Laurie Goldman destroy privilege for Plaintiffs.

## VII.   **PLAINTIFFS REQUEST AND DEFENDANTS HAVE AGREED TO PROVIDE THE DEPOSITION OF S. NOURMAND FROM A PRIOR CASE.**

### A.   **Defendants' Responses to Discovery Claiming Privilege**

**REQUEST FOR PRODUCTION NO. 71:**

A copy of the transcript of the August 8, 2018 Deposition of Stephan Saeed Nourmand in the case captioned The *Sunset Landmark, LLC v. Chubb Custom Insurance Co.*, 2:17-cv-04021 (C.D. Cal.) and all exhibits introduced during the deposition.

**RESPONSE TO NO. 71:**

Sunset Landmark incorporates by reference its General Objections and Specific Objections to Definitions as if fully set forth herein. Sunset Landmark further objects to this Request on the grounds that it is overly broad, unduly burdensome, not proportional to the needs of the case, purports to impose a burden or expense that outweighs any likely benefit, and it seeks documents or information that are not relevant to any of the claims or defenses of the parties in this action. Sunset Landmark does not currently

1  have a copy of the August 8, 2018 Deposition of Stephan Saeed Nourmand in
2  the case captioned *The Sunset Landmark, LLC v. Chubb Custom Insurance*
3  *Co.*, 2:17-cv-04021 (C.D. Cal.). However, Sunset Landmark is undertaking
4  diligent efforts to obtain a copy of the transcript and/or the information of the
5  Court Reporter who will have a copy of the transcript to provide to Relevant
6  Group.

7  **B.      Plaintiffs' Statement**

8      Sunset agreed to undertake diligent efforts to obtain a copy of Mr. S.
9  Nourmand's deposition transcript in the case captioned *The Sunset Landmark LLC*
10 *v. Chubb Custom Insurance Co.*, 2:17-cv-04021 (C.D. Cal.) and all exhibits thereto.
11 Sunset's attorney indicated that upon that investigation they learned that the
12 deposition transcript can be procured from the court reporter, *see* Ex. T, but they
13 have so far not provided the transcript to Plaintiffs.  A party's prior deposition
14 transcripts may be relevant, particularly when the trial is related to matters
15 reasonably encompassed therein. *In re BofI Holding, Inc. Sec. Litig.*, No. 15-CV-
16 2324-GPC-KSC, 2021 WL 4460751, at *3–4 (S.D. Cal. Sept. 29, 2021). Since
17 Sunset is aware that the transcript exists and can be obtained, Sunset should be
18 compelled to provide that deposition transcript and its exhibits in this matter.
19 Additionally, the deposition testimony is relevant to issues involved in this
20 litigation, including because of Mr. Nourmand's previous statements. Indeed,
21 relevance should not be an issue. Defendants have agreed to search for it and have
22 already produced (in this action) the deposition transcript of Mr. M. Iravani (from
23 the same prior litigation).  There is also no burden.  But, Plaintiffs are willing to
24 split the cost of preparation of the transcript with Defendants, but understand that
25 they themselves are not able to request the transcript from the court reporter.
26 Plaintiffs therefore request this Court to order Defendants to obtain and disclose a
27 copy of Mr. S. Nourmand's deposition transcript in the case captioned *The Sunset*
28

*Landmark LLC v. Chubb Custom Insurance Co.*, 2:17-cv-04021 (C.D. Cal.) and all exhibits thereto.

On May 31, 2022, in response to the above, Defendants agreed to provide a copy of Mr. S. Nourmand's deposition transcript request.  Ex. 00.

### C.      Sunset's Statement

Sunset is willing to stipulate to this relief and in fact had already assumed Plaintiffs had obtained a copy of the transcript from the court reporter.

On April 28, 2022, Sunset emailed Plaintiffs' counsel stating the transcript could not be located from the client file from prior firms, that the transcript could be obtained from the court reporter, and that Sunset was "happy to discuss."  Balitzer Decl., Ex. T.  Sunset did not receive a response to that email and the April 28, 2022 email was the last correspondence on the topic.  *Id*.  As a result, Sunset had assumed the transcript was obtained by Plaintiffs from the court reporter.  Plaintiffs never informed Sunset it was unable to obtain the transcript from the reporter.

In any event, although it had no obligation to do so, Sunset purchased a copy of the requested transcript for $619.20 and provided it to Plaintiffs. Thakor Decl., Ex. 25.

## VIII. CONCLUDING STATEMENTS

### A.      SUNSET'S CONCLUDING STATEMENT

For the reasons discussed above, Sunset respectfully requests an order that Plaintiffs have waived privilege for four reasons. First, Plaintiffs put at issue communications with their lawyers regarding the underlying CEQA lawsuits and the settlement communications from Sunset that purportedly instilled fear in them. Second, Plaintiffs' selective disclosure of Matt Hink's impressions in the Third Amended Complaint and in discovery constitute a subject matter waiver over Plaintiffs' communications with its lawyers regarding the settlement communications they had with Sunset.  Third, Plaintiffs' inclusion of third-parties on communications with their lawyers also waive privilege, and Plaintiffs' have not made a factual

showing supporting any "functional employee" or "common interest" exception. Fourth, Plaintiffs unreasonably delayed in producing a privilege log on May 15, 2022, despite the fact that they knew since the inception of this lawsuit that privileged communications would be relevant to this dispute.

On the other hand, Sunset is largely willing to stipulate to the relief requested by Plaintiffs. It purchased the requested deposition transcript and will correct the non-prejudicial errors on its supplemental privilege log. The only relief Sunset objects to is the request for an adoption of a "bright line" rule regarding "agents," since third-party waiver is inherently fact based. In Sunset's case, its third-parties were performing ministerial functions and therefore their inclusion on communications do not waive privilege.

## B.   PLAINTIFFS' CONCLUDING STATEMENT

Defendants' motions should be denied. *First*, Plaintiffs claims do not put the advice of their counsel at issue and Defendants' mischaracterization of Plaintiffs' case cannot support waiver. *Second*, Plaintiffs did not disclose (selectively or otherwise) privileged communications in Ex. 11. That disclosure therefore cannot support waiver, and certainly not of the breadth demanded by Defendants. *Third*, the additional individuals included on communications with Plaintiffs' counsel do not waive privilege. *Fourth*, an appropriate "holistic" inquiry would not find waiver as to Plaintiffs' entire privilege log where production was made concurrently with the substantial completion of document discovery involving a significant volume of documents.

Defendants should, however, be compelled to supplement their privilege log and provide a verification that the log is complete and no other documents within the agreed-upon scope of production need to be produced. Additionally, Defendants have agreed to provide the deposition transcript requested by Plaintiffs. Finally, Plaintiffs respectfully request that the Court draw a consistent line regarding privilege in this case so that Defendants are precluded from taking positions in this briefing

1   inconsistent with their own claims of privilege.

2

3

4   Dated:  June 3,  2022                          **NORTON ROSE FULBRIGHT US LLP**

5

6

7                                       By  */s/ James H. Turken*
                                            JAMES H. TURKEN
8                                           Attorneys for Defendants
                                               THE SUNSET LANDMARK
9                                              INVESTMENT, LLC, and STEPHEN
                                               "SAEED" NOURMAND
10

11

12   Dated: June 3,  2022                     WILSON SONSINI GOODRICH & ROSATI
                                              Professional Corporation
13

14

15                                      By: */s/ Susan Kay Leader*
                                            Susan Kay Leader
16
                                        *Attorneys for Plaintiffs Relevant Group, LLC,*
17                                      *1541 Wilcox Hotel LLC, 6516 Tommie Hotel*
                                        *LLC and 6421 Selma Wilcox Hotel*
18

19

20   Dated: June 3, 2022                       **THE MALONEY FIRM, APC**
                                        By:
21
                                            */s/ Elizabeth Schaus*
22                                          Patrick M. Maloney, Esq.
                                            Gregory M. Smith, Esq.
23                                          Elizabeth T. Schaus, Esq.
                                            Attorneys for Defendant,
24                                          NOURMAND & ASSOCIATES

25

26

27

28

102695218.3                          - 80 -

1

## **ATTESTATION**

2  Pursuant to L.R. 5-4.3.4, Neil P. Thakor hereby attests that all other signatories

3  listed, and on whose behalf the filing is submitted, concur in the filing's content an

4  have authorized the filing.

5                                                       By:        /s/ Neil P. Thakor
                                                                   Neil P. Thakor
6
                                                              Attorneys for Defendants
7                                                             THE SUNSET LANDMARK
                                                              INVESTMENT, LLC, and
8                                                             STEPHEN "SAEED"
                                                              NOURMAND
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 81 -