O

# United States District Court
# Central District of California

| | |
|---|---|
| RELEVANT GROUP, LLC, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>STEPHAN "SAEED" NOURMAND, et al.,<br><br>Defendants. | Case № 2:19-cv-05019-ODW (KSx)<br><br>**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT [121] AND DENYING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT [123] [124]** |

## I.   INTRODUCTION

Plaintiffs Relevant Group, LLC; 1541 Wilcox Hotel LLC; 6516 Tommie Hotel LLC; and 6421 Selma Wilcox Hotel LLC (together, "Relevant") bring suit against Defendants Stephan "Saeed" Nourmand; his company, The Sunset Landmark Investment LLC ("Sunset Landmark"); his son, Michael Nourmand; and Nourmand & Associates ("N&A") under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968.  As alleged, Defendants operated an enterprise that reflexively initiated a series of legal challenges to Relevant's construction projects under the California Environmental Quality Act ("CEQA") in order to delay construction and pressure Relevant to pay money and make non-environmental alterations and concessions.

Three Motions for Summary Judgment are at issue.   First, Relevant seeks summary judgment on the issue of the effect of releases in its settlement agreements with Sunset Landmark.  (Pls.' Mot. Summ. J. ("Pl. Mot."), ECF No. 121.)  Second, Sunset Landmark and Saeed[1] ("Sunset Defendants") move for summary judgment as to Relevant's Third Amended Complaint and the three RICO claims asserted therein. (Sunset Defs.' Mot. Summ. J. ("S. Mot."), ECF No. 124.)  Finally, N&A moves for summary judgment, also as to Relevant's three RICO claims.  (N&A's Mot. Summ. J. ("N&A Mot."), ECF No. 123.)   Having carefully considered the papers filed in connection with the Motions, the Court deemed these matters appropriate for decision without oral argument.  Fed. R. Civ. P. 78; C.D. Cal. L.R. 7-15.  For the reasons that follow, the Court **GRANTS IN PART and DENIES IN PART** Relevant's Motion; **DENIES** the Sunset Defendants' Motion; and **DENIES** N&A's Motion.

## II.   EVIDENTIARY OBJECTIONS

The parties raise a host of evidentiary objections in support of and in opposition to the Motions.  (Pls.' Obj. re: S. Statement Uncontroverted Facts, ECF No. 141-1; Defs.' Joint Obj. re: Pls.' Statement Uncontroverted Facts ("Defs. Joint Obj."), ECF No. 143-1; Pls.' Obj. re: S. Joint Statement Uncontroverted Facts, ECF No. 155-1; S. Defs.' Obj. re: Pls.' Additional Material Facts re: S. Mot., ECF No. 157-3.)[2]  Having reviewed these objections, the Court notes that the many of the objections fall into four general categories, based on (1) relevance; (2) lack of foundation or improper legal conclusion; (3) "objections" that are not true evidentiary objections but are instead rejections of an offered fact on the grounds that the evidence does not support the fact, including objections that a citation to a particular item of evidence is incomplete; and (4) hearsay.  The Court addresses each of these categories in turn.

---

[1] First names of the Nourmands are used for clarity and efficiency.  No disrespect is intended.

[2] Any evidentiary objections not set forth in a separate memorandum are in violation of this Court's Scheduling and Case Management Order and are therefore disregarded.  (*See* Scheduling & Case Management Order 8, ECF No. 48 ("Evidentiary objections should be addressed in a separate memorandum to be filed with the opposition or reply brief of the party.").)

First, as a general rule, most relevance-based evidentiary objections are moot in the context of summary judgment motions.  This is because at summary judgment, the question is whether there are genuine disputes of *material* fact, and accordingly, the relevance inquiry inheres throughout the determination of summary judgment motions. *See Burch v. Regents of Univ. of Cal.*, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006) ("A court can award summary judgment only when there is no genuine dispute of material fact. It cannot rely on irrelevant facts, and thus relevance objections are redundant. Instead of *objecting* parties should simply *argue* that the facts are not material."). Accordingly, Defendants' relevance-based objections are all **OVERRULED**.

Second, the same is true of objections that an assertion lacks foundation or calls for a legal conclusion.  These objections are duplicative of the summary judgment standard itself and are accordingly **OVERRULED**.  *See id.; see also S.E.C. v. Criterion Wealth Mgmt. Svcs., Inc.*, --- F. Supp. 3d ---, 2022 WL 1215786, at *6 (C.D. Cal. Apr. 25, 2022).

As for the third category, these "objections" are merely arguments that certain assertions in a statement of facts do not follow from the cited evidence; they are not arguments that a particular piece of evidence is inadmissible because the declarant or deponent lacks personal knowledge of the subject matter.  Objections are to be made to individual items of evidence, not to non-evidentiary assertions.  (*See* Scheduling & Case Management Order 8 (providing an example of a properly submitted evidentiary objection).)  Accordingly, all such objections are **OVERRULED**.

As for the hearsay objections, a court may not *grant* a summary judgment motion on the basis of hearsay evidence, but it may *deny* a summary judgment motion on the basis of hearsay evidence "as long as a court finds that [the] hearsay evidence could be presented in an admissible form at trial."  *Cherewick v. State Farm Fire & Cas.*, --- F. Supp. 3d ---, 2022 WL 80429, at *14 (S.D. Cal. Jan. 7, 2022); *Burch*, 433 F. Supp. 2d at 1121 ("Material in a form not admissible in evidence may be used to avoid, but not to obtain summary judgment." (quoting *Tetra Techs. Inc. v. Harter*, 823 F. Supp. 1116,

1120 (S.D.N.Y. 1993))).   Therefore, hearsay objections raised by parties moving for summary judgment "are very unlikely to move the needle in a significant way unless the challenged evidence is key and no other admissible evidence on the matter is available." *Criterion*, 2022 WL 1215786, at *5; *see Burch*, 433 F. Supp. 2d at 1120 ("[W]hen evidence is not presented in an admissible form in the context of a motion for summary judgment, *but it may be presented in an admissible form at trial*, a court may still consider that evidence.").   Under this principle, the majority of hearsay-based objections raised in connection with these Motions are **DENIED**.

Moreover, the Court need not rule on objections to evidence the Court does not examine in ruling on the Motions, *see Burch*, 433 F. Supp. 2d at 1122 (proceeding with only necessary rulings on evidentiary objections); this rule applies to several more of the parties' objections, and those objections are **DENIED AS MOOT**.

This leaves a small number of specific objections to evidence the Court considers in ruling on these Motions.   These objections are analyzed in footnotes as they arise below.

### III.   FACTUAL BACKGROUND

Relevant Group, LLC is an umbrella entity that manages the three other LLC Plaintiffs.   (Third Am. Compl. ("TAC") ¶ 23, ECF No. 89.)   Each of these three LLC Plaintiffs is a special purpose entity formed to support the development of a hotel in the Hollywood area.   (*Id.*)   As the distinctions among the four Plaintiff entities are generally not germane to resolving these Motions, the Court refers to all four Plaintiffs as "Relevant," in the singular.

Sunset Landmark owns the historic Hollywood Athletic Club located at the intersection of Sunset Boulevard and Schrader Boulevard in Los Angeles, California.   (Sunset Defs.' Corrected Statement of Uncontroverted Facts ("S. SUF") 1, ECF No. 127-7.)   Saeed is Sunset Landmark's principal, (*id.*), and Sunset Landmark is represented by nonparty The Silverstein Law Firm and attorney Robert Silverstein, (Pls.' Statement of Uncontroverted Facts ("PSUF") 1, ECF No. 121-2).   The Sunset

Defendants aver that the Hollywood Athletic Club is used primarily as office space, (Mem. ISO S. Mot. ("S. Mem.") 15, ECF No. 124-1; *see* S. SUF 80), but Relevant disputes this contention, pointing out that the Club is also used as a nightlife and event space, (Pl. Resp. S. SUF 80, ECF No. 141).

N&A is a residential real estate brokerage. (N&A's Statement of Undisputed Facts ("N&A SUF") 39, ECF No. 123-2.) Saeed founded N&A over thirty years ago but has since sold his interest in N&A. (N&A SUF 41; Pls.' Additional Material Facts re: N&A Defs.' Mot. ("PAMF re: N&A") 74, ECF No. 148.) Saeed's son Michael currently serves as CEO and President of N&A, and Michael's mother is N&A's majority shareholder and sole director. (N&A SUF 42, 44; PAMF re: N&A 82.) N&A operates its Hollywood branch office in space leased to it by Sunset Landmark, and Saeed maintains his personal office in this office space. (PAMF re: N&A 81, 83.)

In 2007, Relevant began developing a series of hotels within a block of the Hollywood Athletic Club. (S. SUF 65.) The three special purpose entity Plaintiffs in this case correspond to three such hotels: the Thompson Hotel, associated with 1541 Wilcox Hotel LLC, (TAC ¶ 18); the Tommie Hotel, associated with 6516 Tommie Hotel LLC, (TAC ¶ 90); and the Selma Hotel, associated with 6421 Selma Wilcox Hotel LLC, (TAC ¶ 105). Relevant raised capital for these projects from several sources, including the EB-5 Immigrant Investor Program. (Pls.' Additional Material Facts re: S. Defs.' Mot. ("PAMF re: S.") 82–83, ECF No. 141.) Under the EB-5 program, foreign investors contribute capital to a specific project, and provided that the project creates ten local jobs per investor, the investors earn permanent residency visas. 8 U.S.C. § 1153(b)(5)(A); *see generally R.L. Inv. Ltd. Partners v. I.N.S.*, 86 F. Supp. 2d 1014, 1016–17 (D. Haw. 2000), *aff'd*, 273 F.3d 874 (9th Cir. 2001). This need to create jobs as planned pressured Relevant to meet its project timelines. (*See* PAMF re: S. 107.)

As this action involves Sunset Landmark's challenges to these hotels under CEQA, the Court pauses for a brief overview of CEQA.

## A.      General Principles of CEQA

"[T]he overriding purpose of CEQA is to ensure that agencies regulating activities that may affect the quality of the environment give primary consideration to preventing environmental damage." *Save Our Carmel River v. Monterey Peninsula Water Mgmt. Dist.*, 141 Cal. App. 4th 677, 687 (2006).   The statute and its implementing regulations, the CEQA Guidelines, "prescribe[] review procedures a public agency must follow before approving or carrying out certain projects." *Berkeley Hillside Pres. v. City of Berkeley*, 60 Cal. 4th 1086, 1091–92 (2015).

The CEQA review procedure is a "three-tiered process." *San Lorenzo Valley Cmty. Advocs. for Responsible Educ. v. San Lorenzo Unified Sch. Dist.*, 139 Cal. App. 4th 1356, 1372 (2006).   "The first tier requires an agency to conduct a preliminary review to determine whether CEQA applies to a proposed project." *Save Our Big Trees v. City of Santa Cruz*, 241 Cal. App. 4th 694, 704 (2015).   "If CEQA applies, the agency must proceed to the second tier of the process by conducting an initial study of the project." *Id.*   A principal purpose of this initial study is "to inform the choice between a negative declaration and an environmental impact report (EIR)." *San Lorenzo*, 139 Cal. App. 4th at 1373.

"CEQA excuses the preparation of an EIR and allows the use of a negative declaration when an initial study shows that there is no substantial evidence that the project may have a significant effect on the environment." *San Bernardino Valley Audubon Soc'y v. Metro. Water Dist.* 71 Cal. App. 4th 382, 389–390 (1999). Alternatively, if "the initial study identifies potentially significant effects on the environment but revisions in the project plans would avoid the effects or mitigate the effects to a point where clearly no significant effect on the environment would occur," then the agency may publish a mitigated negative declaration identifying the necessary revisions. *Architectural Heritage Assn. v. County of Monterey*, 122 Cal. App. 4th 1095, 1101 (2004) (internal quotation marks removed).   But "if the initial study uncovers 'substantial evidence that any aspect of the project, either individually or cumulatively,

may cause a significant effect on the environment,' the agency must proceed to the third tier of the review process and prepare a full EIR." *Save Our Big Trees*, 241 Cal. App. 4th at 705 (citing 14 Cal. Code Regs. § 15063(b)(1)); *see Gentry v. City of Murietta*, 36 Cal. App. 4th 1359, 1399–1400 (1995) ("A local agency ordinarily must prepare an EIR on any project which *may* have a significant effect on the environment. Conversely, an agency may adopt a negative declaration only if there is no substantial evidence that the project *may* have a significant effect on the environment." (cleaned up)).

When an agency issues a negative declaration or a mitigated negative declaration, third parties with standing may seek judicial review of the adoption of the negative declaration by filing a petition for writ of mandate in a California court. *See, e.g.*, *San Bernardino Valley Audubon Soc'y*, 71 Cal. App. 4th at 385. The challenger must submit "substantial evidence . . . supporting a fair argument that the [p]roject will significantly impact the environment; if there is, it was an abuse of discretion not to require an EIR." *Keep Our Mountains Quiet v. County of Santa Clara*, 236 Cal. App. 4th 714, 731 (2015). "This unusual 'fair argument' standard of review over a public agency's decision has been characterized as setting a 'low threshold requirement for initial preparation of an EIR and reflects a preference for resolving doubts in favor of environmental review when the question is whether any such review is warranted.'" *Id.* (quoting *Sierra Club v. County of Sonoma*, 6 Cal. App. 4th 1307, 1316–17 (1992)); *cf. Laurel Heights Improvement Assn. v. Regents of Univ. of Cal.*, 6 Cal. 4th 1112, 1123 (1993) ("[T]he EIR is the 'heart of CEQA.'" (quoting *Citizens of Goleta Valley v. Bd. of Supervisors*, 52 Cal. 3d 553, 564 (1990))). Standing to file a petition for writ of mandate exists where "a property owner, taxpayer, or elector . . . establishes a geographical nexus with the site of the challenged project." *Citizens Assn. for Sensible Dev. of Bishop Area v. County of Inyo*, 172 Cal. App. 3d 151, 158 (1985).

A litigant who successfully challenges an agency's issuance of a negative declaration in court may be entitled to attorneys' fees. *Friends of "B" St. v. City of*

*Hayward*, 106 Cal. App. 3d 988, 994–95 (1980) (explaining fees may be awarded "when the litigant, proceeding in a representative capacity, obtains a decision resulting in the conferral of a 'substantial benefit' of a pecuniary or nonpecuniary nature").  By contrast, compensatory and other monetary damages are not remedies under CEQA.

**B.    Thompson Hotel**

On February 23, 2015, Sunset Landmark learned of Relevant's plans to build a twelve-story building with a rooftop bar called the Thompson Hotel, to be located on Wilcox Avenue, one block east of the Hollywood Athletic Club. (S. SUF 9–10.)  In March 2015, Saeed and Mohamad Iravani, who at that time worked for both Sunset Landmark and N&A, met with Richard Heyman, Relevant's principal, and the parties discussed (1) increasing the Thompson's setback with the Sunset Landmark property, (2) making changes to the Thompson's rooftop amenities to decrease noise, and (3) lowering the height of the Thompson.  (PAMF re: S. 105; Corrected Decl. Neil Thakor ("Thakor Decl.") Ex. U ("Wilcox Design Package Email"), ECF No. 127-2.)  Relevant agreed to make certain changes with respect to these concerns.  (PAMF re: S. 106; *see* Wilcox Design Package Email.)

On October 19, 2015, the City of Los Angeles ("City") adopted a mitigated negative declaration and approved the Thompson Hotel.  (S. SUF 13.)   Sunset Landmark and others appealed that decision to the City, (S. SUF 16), and the City ultimately denied Sunset Landmark's appeal, (S. SUF 18).   During this and other proceedings before the City, Sunset Landmark would often file voluminous objections immediately before public hearings.  (Decl. Tina Thomas Ex. A ("Thomas Expert Rpt.") 15, ECF No. 137-3 ("Through the administrative process of the three projects, Sunset submitted more than 4,000 pages of comments, the overwhelming majority of which were submitted immediately before a hearing.").)[3]

---

[3] Defendants object to the use of the Thomas Expert Report on several grounds, including relevance, lack of authentication, improper expert opinion, and unfair prejudice.  In this particular context, these objections are unavailing and are **OVERRULED**.  Here, Relevant uses the report in opposition to the Sunset Defendants' Motion, to demonstrate that Sunset Landmark often filed voluminous objections

On March 6, 2016, Sunset Landmark filed its Petition for Writ of Mandate against the City, to challenge the Thompson Hotel's mitigated negative declaration and require the City to prepare a full EIR. (S. SUF 19.) As part of those proceedings, on June 2, 2017, the City moved to augment the Administrative Record. (Corrected Req. Judicial Notice Ex. 27 ("Tentative Ruling Mot. Augment"), ECF No. 127-6.)[4] The City sought to augment the Administrative Record by adding a hard copy of a PowerPoint presentation containing a set of floor plans for the Thompson Hotel. However, these plans differed from the original building plans; specifically, Relevant had rotated the building and redesigned and relocated the roof deck amenities, at least partially at the request or demand of the Sunset Defendants. (*See* Pl. Opp'n S. Mot. 13, ECF No. 137.)

On August 24, 2017, the court issued a tentative ruling on the City's Motion to Augment. (PAMF re: S. 70.) The court noted that Relevant changed the floor plans after the public comment period closed and explained that the issue came down to "whether the City's failure to tell the public of the design changes in the [p]roject as submitted to the [City Planning Commission] has prejudiced [Sunset Landmark's] rights under CEQA." (Tentative Ruling Mot. Augment 2.) That issue, in turn, depended on "whether the design changes may have significant environmental impacts that were not disclosed nor studied in the [mitigated negative declaration]." (*Id.*) Based on this reasoning, the court's tentative ruling was to deny the City's motion. (*Id.* at 4.) The parties dispute the import of this tentative ruling and its potential legal effect.

---

right before public hearings. If Relevant wishes to prove this fact at trial, Relevant will be able to do so by, among other things, introducing as evidence copies of the objections Sunset Landmark filed. Such documents are not made inadmissible by the rule against hearsay because they are records of a public agency and would not be offered for the truth of any matter asserted therein. *See, e.g.*, *Minor v. FedEx Off. & Print Servs. Inc.*, 78 F. Supp. 3d 1021, 1027 (N.D. Cal. 2015); Fed. R. Evid. 801.

[4] The Court **GRANTS** judicial notice of the Tentative Ruling issued in the Thompson matter. *See Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001) (authorizing judicial notice of "matters of public record," including court filings); Fed R. Evid. 201. "However, when a court takes judicial notice of another court's filings, it does so not for the truth of the facts recited therein, but for the existence of the opinion" and its undisputed legal effects. *Starks v. County of Los Angeles*, No. 2:21-cv-05209-ODW (GJSx), 2022 WL 1344986, at *1 (Mar. 28, 2022) (citing *S.B. by & through Kristina B. v. Cal. Dep't of Educ.*, 327 F. Supp. 3d 1218, 1229 n.1 (E.D. Cal. 2018)).

During the pendency of the Petition for Writ of Mandate regarding the Thompson Hotel, Sunset Landmark also filed a Request for Modification of Building Ordinances with the Los Angeles Department of Building and Safety ("LADBS") to challenge the demolition permits that had allowed the prior structure to be demolished before the Thompson was built.  (PAMF re: S. 101; Decl. Granville C. Kaufman ("Kaufman Decl.") Ex. 1 ("LADBS Request"), ECF No. 139-1.)   LADBS denied the request. (PAMF re: S. 102.)   Sunset appealed that denial to the Central Area Planning Commission and lost.  (PAMF re: S. 103; Kaufman Decl. Ex. 39 ("CAPC Letter"), ECF No. 139-39.)

## C.     Tommie Hotel

The Thompson was not the only hotel Relevant was building at the time.  In March 2017, while the Thompson Hotel litigation was pending, the City issued a notice of public comment for the approval of the Tommie Hotel.  (S. SUF 71.)   Sunset Landmark and members of the community submitted objections, without success, and on May 12, 2017, the City approved the Tommie Hotel project.  (S. SUF 36, 72–73.) Thereafter, on June 9, 2017, Sunset Landmark filed its second Petition for Writ of Mandate, this one seeking a full EIR for the Tommie.  (S. SUF 37.)  Two other persons each filed writ petitions raising their own CEQA challenges to the Tommie, and Relevant settled with both.  (S. SUF 38–42.)

The CEQA challenges to the Thompson and Tommie Hotels thus proceeded simultaneously.  During this time, in an April 2017 phone call, Relevant attorney Matt Hinks asked Sunset Landmark attorney Robert Silverstein what Sunset's legal fees were to date and how much of a recent $2 million demand was "blood money."[5]  (PAMF re:

---

[5] Defendants object to Relevant opposing summary judgment with this evidence "on the grounds that characterization of 'blood money' are [sic] being offered for the truth of the matter asserted."  (Defs. Joint Objs. 2.)   In the first place, this objection is conclusory and rather inscrutable and is **OVERRULED** on that basis.  (Scheduling & Case Management Order 8–9 ("Do not submit blanket or boilerplate objections to the opponent's statements of undisputed fact.  These will be disregarded and overruled.").)  Moreover, Silverstein's assertions in this conversation, even if they are offered for their truth, are not hearsay under one or more of the provisions of Federal Rule of Evidence 801(d)(2). In the alternative, the hearsay objection does not prevent the Court from considering the statement on

1  S. 109.)  Silverstein responded that $500,000 was meant to cover attorneys' fees.  (*Id.*;

2  Kaufman Decl. Ex. 47 ("Hinks Dep.") 484–85, ECF No. 139-47.)  Silverstein testified

3  that he has no recollection of this conversation.  (Defs. Joint SGI 15, ECF No. 143;

4  Opp'n Decl. Neil Thakor Ex. E ("Silverstein Dep.") 50–51, ECF No. 142-1 .)

5      Also during the pendency of the Tommie and Thompson proceedings, in May

6  2017, Heyman met with Silverstein.   Of this meeting, Heyman testified that

7  "Silverstein . . . made it very clear . . . [t]hat regardless of the outcome, if we -- if we

8  win this case, and you are going back to start all over again, and you do an EIR, we'll

9  continue to -- we'll continue to fight it."  (Kaufman Decl. Ex. 50 ("Heyman Dep.") 502,

10  ECF No. 139-50.)   Heyman's understanding at that time was that "Sunset would

11  continue to make objections at the City level during the EIR process."  (*Id.*)

12  **D.    Settlement**

13      On August 24, 2017, three hours after the court issued its tentative ruling in the

14  Thompson proceedings, following eighteen months of litigation regarding the

15  Thompson, (S. SUF 21), and with litigation for both the Thompson and Tommie Hotels

16  still pending, the parties reached a settlement of both matters, (S. SUF 27).   The

17  petitions for writ of mandate were vacated, and on January 8, 2018, Relevant and Sunset

18  Landmark formally executed their settlement.  (S. SUF 30.)

19      The settlement agreements were drafted by both parties and included a reduction

20  in building height, set-offs, delivery timeframes, and rooftop operation curfews.

21  (S. SUF 32.)  Both agreements contained release language, as follows:

22      [E]ffective from and after the Settlement Effective Date, [Relevant] fully,
        finally, and forever releases and discharges Sunset and its officers,
23      members, managers, agents, employees, subsidiaries, affiliates, parent
        companies, insurers, attorneys, accountants, heirs, executors, spouses,
24      predecessors, successors, and assigns from any and all claims, demands,
25      liens, actions, suits, causes of action, obligations, controversies, debts,

26  _____

27  summary judgment, because Defendants make no suggestion that Silverstein will be unavailable to
    testify regarding this conversation at trial. *See Burch*, 433 F. Supp. 2d at 1120.  Defendants also object
28  on prejudice grounds pursuant to Federal Rule of Civil Procedure 403, but these objections are
    boilerplate, and, in any case, are not well taken and are **OVERRULED**.

costs, attorneys' fees, expenses, damages, judgments, orders, subrogation, contribution, reimbursement, indemnity and liabilities of every kind or nature, in law, equity, or otherwise, whether now known or unknown, suspected or unsuspected, and whether concealed or hidden, related to, arising out of, or in any way stemming from the [Thompson] Action or any claim or cause of action alleged in the [Thompson] Action.

(Decl. Charles Talpas ("Talpas Decl.") Ex. 9 ("Thompson Release") § 5.1, ECF No. 121-12; Talpas Decl. Ex. 13 ("Tommie Release") § 6.1, ECF No. 121-13 (same, with respect to Tommie Hotel).)  Both settlement agreements contain a "knowing and voluntary waive[r]" of California Civil Code section 1542, releasing the parties from claims unknown to the other at the time of settlement.  (Thompson Release § 5.3; Tommie Release § 6.3.)

A key provision of these settlements was a payment of $5.5 million to Sunset Landmark.  (S. SUF 35.)  Relevant paid Sunset Landmark in full within three months. (*Id.*)

**E.   Selma Hotel**

On March 6, 2018, the City issued a notice of public comment for the approval of the Selma Hotel.  (S. SUF 43.)  The City approved the Selma, and on September 6, 2018, Sunset appealed the approval.  (S. SUF 47.)  Other persons also appealed.  (S. SUF 48.)

On March 29, 2018, Heyman and Saeed met with one another.   (PAMF re: S. 116.)  At deposition, Heyman testified the following with regard to this meeting:

THE WITNESS: I remember explaining, "Saeed, Saeed" -- basically or even specifically, "Saeed, what are we doing here? We just paid you five and a half million dollars. I have this appeal. What is going on? Why are we doing this again? Why are you doing this?"
BY MR. PELHAM:
Q What was his reply?
A "Richard, you know the drill. It's going to take a check" with his smile.
Q Okay.
A Can't forget it.

(Heyman Dep. 503.)   The Sunset Defendants aver that this is a "fabricated conversation."  (S re: PAMF 116, ECF No. 157-2.)

On March 6, 2019, the City denied all appeals related to the Selma, (S. SUF 49), and on April 2, 2019, Sunset filed its third petition for writ of mandate, this one seeking a full EIR for the Selma, (S. SUF 50).

On April 4, 2019, an individual named Casey Maddren also filed a Petition for Writ of Mandate against the Selma.  (S. SUF 51.)  The parties dispute the extent of Maddren's connection to Sunset Landmark.  The Sunset Defendants claim that Maddren has no connection to this controversy and point out that Maddren does not know and has never spoken to Saeed.  (S. SUF 52.)  Relevant, for its part, asserts a direct connection between Maddren and the Nourmand enterprise, arguing that the Silverstein Firm engaged Maddren for the express purpose of assisting Sunset Landmark and Saeed in interfering with Relevant's projects.  (Pl. Opp'n S. Mot. 25.)  Specifically, Maddren worked with Sunset Landmark's lawyers, the Silverstein Firm, to write a position letter to local, state, and federal prosecutors as part of a strategy to "make the City Council think twice before granting further approvals."  (Kaufman Decl. Ex. 50 ("Maddren/Silverstein Firm Emails"), ECF No. 139-40.)  Although the court that heard Maddren's CEQA challenge noted Maddren "raised a valid internal piecemealing[6] argument," the court ultimately denied Maddren's petition.  (N&A SUF 73; S. SUF 55.)

---

[6] "CEQA forbids 'piecemeal' review of the significant environmental impacts of a project." *Berkeley Keep Jets Over the Bay Comm. v. Bd. of Port Comm'rs*, 91 Cal. App. 4th 1344, 1358 (2001).  "Rather, CEQA mandates 'that environmental considerations do not become submerged by chopping a large project into many little ones—each with a minimal potential impact on the environment—which cumulatively may have disastrous consequences.'" *Cal. Clean Energy Comm. v. City of Woodland*, 225 Cal. App. 4th 173, 193 (2014) (citing *Bozung v. Local Agency Formation Comm.*, 13 Cal. 3d 263, 283–284 (1975)).  The Sunset Defendants argue that the piecemealing argument Maddren raised shows that the CEQA challenges to the Selma were meritorious.  Relevant insists that piecemealing was not a substantive problem because "the City could clarify the record and easily address the technicality."  (PAMF re: N&A Mot. 73.)  The record on the piecemealing issue in this case is incomplete; in any case, whether Maddren's piecemealing argument had merit appears to be quite tangential to the issues raised by these Motions, especially given that no Defendant contends it raised a piecemealing argument of its own in any CEQA proceeding.

On January 8, 2020, the trial court issued an interlocutory order remanding environmental assessment of the Selma Hotel to the City. (S. SUF 54.) The parties dispute the extent to which this order was a victory for either side. The Selma Hotel matter remains pending before the City. (N&A SUF 14.)

**F.    Schrader Hotel**

In March 2019, the City approved a hotel development called the Schrader Hotel, developed not by Relevant but by nonparty development company KoarGroup. (S. SUF 56.) Sunset Landmark met with KoarGroup's principal to discuss Sunset Landmark's concerns, and following the meeting, Sunset Landmark dropped its objections and did not pursue a CEQA challenge. (S. SUF 59.)

**G.    N&A's Disputed Role**

The parties agree that N&A is a residential real estate brokerage that operated in part out of Sunset Landmark's offices and that N&A is currently managed by Michael. Beyond that, N&A's role in this controversy remains hotly disputed. N&A asserts that it as an entity had nothing to do with any of the Sunset Defendants' efforts against Relevant. (Mem. ISO N&A Mot. ("N&A Mem.") 20, ECF No. 123-1.) From Relevant's point of view, N&A is separate from Saeed in name only, and Saeed continues to work with N&A and use its resources for his own purposes and those of Sunset Landmark. (Pl. Opp'n N&A Mot. 2–3, ECF No. 146.)

In 2015, in anticipation of a public hearing on the Thompson Hotel, Michael sent an email to a number of N&A employees, stating as follows:

> I spoke to my dad and he would like to have 15 people at this Public Hearing.
>
> Who can join us? Keep in mind that anyone can come – Management, Staff, Agents, Friends, Family.
>
> Sincerely, Mikey

(Decl. Kaufman Decl. Ex. 5 ("Hearing Attendance Email"), ECF No. 139-5.) Several N&A employees attended this meeting. Defendants argue that these employees

attended voluntarily and out of personal concerns, not because N&A, Michael, or Saeed required them to do so for Sunset Landmark's benefit. (N&A Reply 3, ECF No. 151.) Relevant disputes this characterization and insists the employees attended on behalf of N&A or Saeed or Sunset Landmark, pointing out that (1) N&A's office manager cancelled a meeting so that N&A employees could attend the hearing (PAMF re: N&A 88), (2) several of the employees who attended did not work or live in Hollywood, (PAMF re: N&A 87), and (3) when these individuals signed a petition opposing the Thompson, they each provided as their address that of N&A's Hollywood office, rather than their home addresses, (PAMF re: N&A 89–90).

Relevant points to several other facts to support its contention that there is a close relationship between N&A, on one hand, and the Sunset Defendants, on the other hand. At one point, Saeed directed Carolyn Rae Cole, an attorney employed by N&A, to review the plans for the Thompson and formulate objections under CEQA, even though Cole was not a CEQA specialist. (PAMF re: N&A 93–96.) As part of this effort, Cole generated an objection which Relevant characterizes as "frivolous to CEQA practitioners," and Sunset Landmark has repeatedly raised this objection with respect to Relevant's projects. (*See* Pl. Opp'n N&A Mot. 6 (citing Thomas Expert Rpt. 36–37).)[7]

Also in dispute is the role of Mohamad Iravani, N&A's Controller, who, until 2020, worked for both Sunset Landmark and N&A. (N&A re: PAMF 85, ECF No. 151-1; N&A SUF 45.)  In March 2015, when Saeed first learned of Relevant's plans to develop hotels near the Hollywood Athletic Club, Saeed wanted his son Michael—who was and is N&A's CEO—to attend a meeting with Relevant. (PAMF re: N&A 84; *see*

---

[7] Use of the Thomas Expert Report is not impermissible for the purpose of suggesting the frivolousness of Cole's CEQA objection.  Defendants do not currently suggest or argue that Thomas will not be able to testify at trial regarding her opinion that Cole's objection was "frivolous to CEQA practitioners." (Thomas Expert Rpt. 36–37); *see Burch*, 433 F. Supp. 2d at 1120.  Moreover, and in any case, Relevant, in its opposition papers, sufficiently engages with the details of the objection itself to explain to the Court why the objection was frivolous, and Defendants fail to eliminate the legal possibility that Cole's objection was frivolous.

*supra* Section III.B.)   When Michael was unavailable, Iravani attended in Michael's stead.  (PAMF re: N&A 85.)  Iravani was also involved in enforcing Sunset Landmark's settlement with Relevant in that he collected the initial amount due, was responsible for enforcing the settlement's terms, and worked with tax advisors to ensure favorable tax treatment of the proceeds.  (PAMF re: N&A 92.)  Moreover, in September 2015, after Attorney Cole formulated CEQA arguments on N&A's behalf, Iravani helped Saeed draft a letter to the City setting forth those arguments.  (PAMF re: N&A 96.)

Relevant argues that these facts about Iravani demonstrate N&A's participation in the Sunset Defendants' efforts against Relevant.  Factually, N&A does not dispute these assertions but insists that, in these and all other matters, Iravani acted on behalf of Sunset Landmark only, never as a representative of N&A.  (N&A re: PAMF 85; N&A SUF 46 ("Iravani's involvement in the CEQA suits stemmed solely from his work with Sunset, not his role with N&A.").)

Relevant also notes, without dispute from N&A, that "[a]lmost every document from Sunset Landmark's production and privilege log resides on N&A servers." (PAMF re: N&A Mot. 100.)

## IV.   PROCEDURAL BACKGROUND

On June 10, 2019, Relevant filed this suit against Defendants, alleging three causes of action under RICO against all four Defendants, alleging that they conspired to extort Relevant through the CEQA litigations.  (Compl. ¶¶ 67–118, ECF No. 1.) Following the Court's Order granting Defendants' Motion to Dismiss with leave to amend, Relevant filed a Second Amended Complaint omitting N&A and Michael, thereby dismissing N&A and Michael from the action.  (Second Am. Compl., ECF No. 41.)  Nevertheless, discovery later revealed to Relevant additional ways that N&A was involved in the alleged enterprise, and accordingly, the Court granted Relevant leave to reintroduce N&A to the action.  (Order Granting Leave File TAC 7, ECF No. 88.)  In granting leave to amend, the Court found that, during discovery, Defendants did not adequately communicate the extent and nature of N&A's involvement in Sunset

Landmark's CEQA litigation.  (*Id.* at 6–7.) N&A is once again a Defendant; Michael remains dismissed.

N&A moved to dismiss Relevant's claims against it, but the Court denied N&A's motion.  (Order Den. N&A Mot. Dismiss, ECF No. 114.)  These three Motions followed shortly thereafter.  After the parties filed their Motions, the Court issued a Minute Order with detailed instructions regarding coordinated briefing and filing.  (Min. Order, ECF No. 125.)  The parties proceeded to file their briefs in accordance with that Minute Order.

## V.   LEGAL STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A disputed fact is "material" where the resolution of that fact "might affect the outcome of the suit under the governing law," and the dispute is "genuine" where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The burden of establishing the absence of a genuine issue of material fact lies with the moving party, and the moving party may meet this burden with arguments or evidence or both.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once the moving party satisfies its burden, the nonmoving party cannot simply rest on the pleadings or argue that any disagreement or "metaphysical doubt" about a material issue of fact precludes summary judgment.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Cal. Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir. 1987).  The non-moving party must show that there are "genuine factual issues that . . . may reasonably be resolved in favor of either party."  *Franciscan Ceramics*, 818 F.2d at 1468 (quoting *Anderson*, 477 U.S. at 250) (emphasis omitted).  Provided the moving party has satisfied its burden, the court should grant summary judgment against a party who fails to present evidence establishing an essential element of its claim or defense when that

party will ultimately bear the burden of proof on that claim or defense at trial. *See Celotex*, 477 U.S. at 322.

In ruling on summary judgment motions, courts draw all reasonable inferences in the light most favorable to the nonmoving party, refraining from making credibility determinations or weighing conflicting evidence. *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Hous. Rts. Ctr. v. Sterling*, 404 F. Supp. 2d 1179, 1183 (C.D. Cal. 2004). However, "uncorroborated and self-serving" testimony will not create a genuine issue of material fact. *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (quoting *Kennedy v. Applause, Inc.*, 90 F.3d 1477, 1481 (9th Cir. 1996)). "Conclusory" or "speculative" testimony is likewise "insufficient to raise genuine issues of fact and defeat summary judgment." *See Sterling*, 404 F. Supp. 2d at 1183. The nonmoving party must provide more than a "scintilla" of contradictory evidence to avoid summary judgment. *Anderson*, 477 U.S. at 251–52; *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).

When parties file cross-motions for summary judgment, the court "evaluate[s] each motion separately, giving the nonmoving party in each instance the benefit of all reasonable inferences." *A.C.L.U. of Nev. v. City of Las Vegas*, 466 F.3d 784, 790–91 (9th Cir. 2006). In evaluating the motions, "the court must consider each party's evidence, regardless under which motion the evidence is offered." *Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 532 (9th Cir. 2011); *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1134 (9th Cir. 2001) ("[T]he court must consider the appropriate evidentiary material identified and submitted in support of both motions, and in opposition to both motions, before ruling on each of them."). To ensure it applies the proper presumptions and burdens to each party's showing, the Court analyzes each Motion separately.

## VI.   DISCUSSION

Relevant brings its first claim under subpart (c) of the civil RICO statute, which prohibits any person employed by or associated with an enterprise engaged in interstate

commerce to conduct, or participate in the conduct of, the enterprise's affairs through a pattern of racketeering activity.  18 U.S.C. § 1962(c).  The elements of this claim are (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (known as 'predicate acts') (5) causing injury to plaintiff's business or property."  *United Bhd. of Carpenters & Joiners of Am. v. Bldg. & Const. Trades Dep't, AFL-CIO*, 770 F.3d 834, 837 (9th Cir. 2014).  Relevant's second claim is a RICO conspiracy claim brought under 18 U.S.C. § 1962(d) for conspiracy to violate 18 U.S.C. § 1962(c).  Relevant asserts both these claims against all three Defendants.

"'[R]acketeering activity' includes, *inter alia*, 'any act which is indictable' under the Hobbs Act, 18 U.S.C. § 1951, or 'any act or threat involving . . . extortion, . . . which is chargeable under State law.'"  *Carpenters & Joiners*, 770 F.3d at 837 (quoting 18 U.S.C. § 1961(1)(A), (B)).  The racketeering activity must also form a pattern, which requires "at least two predicate acts of racketeering activity, as defined in 18 U.S.C. § 1961(1), within a period of ten years."  *Canyon County v. Syngenta Seeds, Inc.*, 519 F.3d 969, 972 (9th Cir. 2008).  At least two predicate acts are necessary to indicate a pattern, although two predicate acts are not necessarily sufficient.  *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 237 (1989) ("[RICO] does not so much define a pattern of racketeering activity as state a minimum necessary condition for the existence of such a pattern.").

Relevant brings a third claim against all Defendants, also a § 1962(d) conspiracy claim, for conspiracy to violate 18 U.S.C. § 1962(b).  This latter subdivision, § 1962(b), varies significantly from § 1962(c) and instead prohibits using a pattern of racketeering activity to "acquire or maintain, directly or indirectly, any interest in or control of" an enterprise engaged in interstate commerce.  As a preliminary matter, no party, in any brief, engages directly with § 1962(b), and instead all appear to focus their arguments on § 1962(c) and conspiracy to violate § 1962(c).  Specifically, no one addresses whether any Defendant did or did not acquire an interest in or control of a particular enterprise, nor does anyone address what the acquired interest was, how it was acquired,

or how it formed a part of any enterprise.  *See* 18 U.S.C. § 1962(b).  All parties therefore fail in their initial burdens with respect to this third cause of action, and accordingly, no party is entitled to summary judgment in its favor on the basis of any argument specific to the § 1962(b) cause of action.  The court proceeds by focusing its RICO analysis on the elements of Relevant's § 1962(c)-based claims and the presence or absence of genuine disputes about whether Defendants violated (or conspired to violate) § 1962(c).

**A.      Sunset Defendants' Motion**

In their Motion, the Sunset Defendants set forth four principal grounds for summary judgment: (1) that litigation activity cannot constitute a predicate act under RICO; (2) that the Sunset Defendants are immunized by the *Noerr-Pennington* doctrine; (3) that no genuine dispute exists regarding whether any qualifying extortion took place; and (4) that the signed releases in the settlement agreements preclude Sunset Defendants' liability.  None of these arguments provide a basis for summary judgment in the Sunset Defendants' favor.

*1.      Litigation Activity as Predicate Acts*

The Sunset Defendants first argue that "RICO liability cannot be based on a defendant's conduct in threatening, filing, or maintaining a lawsuit."  (S. Mem. 11.) More precisely, they argue that litigation-based extortion is not a predicate act for the purposes of RICO.   This argument is not well taken.

To support their argument, the Sunset Defendants quote *United States v. Koziol*, 993 F.3d 1160 (9th Cir. 2021), for the proposition that "RICO does not authorize suits by private parties . . . based on litigation activities," and cite several out-of-circuit cases purportedly suggesting the same.  (S. Mem 12.)   The Sunset Defendants' quote of *Koziol*, however, is impermissibly selective,[8] as the Ninth Circuit was merely observing what other circuits had written on the issue.  *Koziol*, 993 F.3d at 1174.  Two paragraphs later, the Ninth Circuit expressly "reject[s] Koziol's argument that these civil RICO

---

[8] This Court has already cautioned the Sunset Defendants regarding their use of incomplete quotations to make points of dubious merit.  (First Mot. Dismiss Order 16, ECF No. 39 ("Parties are cautioned that this Court shall not tolerate . . . the use of ellipses to mischaracterize statements.").)

cases from other circuits establish that threats of sham litigation can never constitute extortion under the Hobbs Act." *Id.* at 1174–75; *see also id.* at 1187 ("[T]here is no statutory, constitutional, or policy basis to exclude categorically threats of sham litigation from liability under the Hobbs Act.").  The Ninth Circuit has therefore left open the possibility that sham litigation may constitute extortion, which may in turn form a pattern of racketeering activity supporting a RICO claim.

The present case involves many allegedly sham legal objections and challenges raised in a complex regulatory space over many years, and accordingly, it appears to be exactly the type of case for which the Ninth Circuit left open that possibility.  The breadth of this case distinguishes it from the sort of single-lawsuit situations in which other circuits have expressed concern about expanding RICO liability.  *See Kim v. Kimm*, 884 F.3d 98, 104 (2d Cir. 2018) (describing concern that "every unsuccessful lawsuit could spawn a retaliatory action, which would inundate the federal courts with procedurally complex RICO pleadings")  Moreover, the Ninth Circuit is not alone in recognizing that litigation activity can constitute extortion and form the basis of RICO claims, especially when the allegations involve a multiplicity of wrongful suits.  *See La Suisse, Societe D'Assurances Sur La Vie v. Kraus*, No. 06 Civ. 4404(CM)(GWG), 2014 WL 3610890, at *10 (S.D.N.Y. July 21, 2014) (holding lawsuits had wrongful "ends" and constituted extortion for RICO purposes where defendants filed policyholder lawsuits solely to extract personal payouts and with no legitimate claim to the suits' proceeds); *Calabrese v. CSC Holdings, Inc.*, No. 2:02-CV-5171 JS ARL, 2004 WL 3186787, at *6–7 (E.D.N.Y. July 19, 2004) ("Plaintiffs here do not merely allege that Defendants instituted baseless lawsuits. Plaintiffs allege that Defendants entered into an agreement and formed an association for the purpose of compelling individuals to pay monies to them.").

The Sunset Defendants argue that, even if litigation activity may in theory lead to RICO liability, California's litigation privilege, which precludes liability arising from communications made in connection with any judicial proceeding, Cal. Civ. Code

§ 47(b), shields them from liability.  (S. Mem. 13–14.)  This argument is without merit; it is "settled precedent" in the Ninth Circuit that "the litigation privilege does not apply to RICO claims."  *Richards v. County of Los Angeles*, No. cv 17-400- BRO (AGRx), 2017 WL 7411159, at *4 (C.D. Cal. Mar. 31, 2017); *see Religious Tech. Ctr. v. Wollersheim*, 971 F.2d 367, 364 n.10 (9th Cir. 1992) ("[T]he federal courts will recognize state privileges only in cases in which '[s]tate law supplies the rule of decision.'" (citing Fed. R. Evid. 501)).

For these reasons, the Court does not find that the Sunset Defendants are exempt from liability under RICO merely because the liability arises from litigation activity. The Sunset Defendants are not entitled to summary judgment on this ground.

### 2. Noerr-Pennington *doctrine*

Next, the Sunset Defendants argue that the *Noerr-Pennington* doctrine immunizes them from liability.  "Under the *Noerr-Pennington* doctrine, those who petition any department of the government for redress are generally immune from statutory liability for their petitioning conduct."  *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 929 (9th Cir. 2006).   The *Noerr-Pennington* doctrine is a principle of statutory construction whose purpose is to ensure that the enforcement of statutory rights does not lead to violations of the First Amendment right to petition.  *See White v. Lee*, 227 F.3d 1214, 1231 (9th Cir. 2000) ("Noerr-Pennington is a label for a form of First Amendment protection; to say that one does not have Noerr-Pennington immunity is to conclude that one's petitioning activity is unprotected by the First Amendment.").   The Sunset Defendants argue that their entire challenged course of conduct constitutes constitutionally protected petition of the government for redress with respect to Relevant's projects, and accordingly, the *Noerr-Pennington* doctrine provides a complete defense to liability.  (S. Mem. 14–17.)

The Ninth Circuit has identified several exceptions to *Noerr-Pennington* immunity that apply when the petitioning activity is particularly improper.  The Sunset Defendants, in their moving papers, anticipate Relevant's opposition by addressing two

such exceptions.   However, Relevant concedes that one of those exceptions is "inapplicable" to its case, and clarifies that it pursues its case under the *USS-POSCO* exception only, named after *USS-POSCO Industries v. Contra Costa County Building & Construction Trades Council*, 31 F.3d 800, 810–11 (9th Cir. 1994).  (Pl. Opp'n S. Mot 19.)   Thus, the Court focuses on whether any genuine disputes of fact arise concerning the *USS-POSCO* exception.

Under the *USS-POSCO* exception, *Noerr-Pennington* immunity does not apply to conduct that involves a series of lawsuits "brought pursuant to a policy of starting legal proceedings without regard to the merits and for an unlawful purpose."  *USS-POSCO*, 31 F.3d at 811.  The exception arises from *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 513 (1972), in which the Supreme Court observed that "a pattern of baseless, repetitive claims may emerge which leads the factfinder to conclude that the administrative and judicial processes have been abused."  404 U.S. at 513.  The inquiry under *USS-POSCO* "is prospective: Were the legal filings made, not out of a genuine interest in redressing grievances, but as part of a pattern or practice of successive filings undertaken essentially for purposes of harassment?"  31 F.3d at 811.

The Sunset Defendants argue that Relevant may not avail itself of the *USS-POSCO* exception here for two reasons: (1) Relevant and Sunset Landmark are not market rivals; and (2) it is beyond genuine dispute that Sunset Landmark raised its challenges to Relevant's buildings *non*-reflexively and *with* regard for the merits of the challenges.  Both contentions fail at this stage.

                    a.    *Market Rivals*

The *USS-POSCO* exception applies when successive suits "are brought [1] pursuant to a policy of starting legal proceedings without regard to the merits and [2] for the purpose of injuring a market rival."  31 F.3d at 811.  The Sunset Defendants argue that Sunset Landmark is a commercial real estate investor that is in the business of leasing office space, not operating hotels, and accordingly, the *USS-POSCO*

exception fails on the second prong.  (S. Mem. 15.)  Relevant points out that both its buildings and the Sunset Defendants' buildings operate in the events and hospitality sector and are therefore market rivals.  (Pl. Opp'n S. Mot. 11.)

The Court finds that both parties read the "market rivals" requirement discussed in *USS-POSCO* too narrowly for the purpose of these Motions. Given that the *Noerr-Pennington* doctrine originated in the antitrust context, *White*, 227 F.3d at 1231, it is unsurprising that the doctrine remains couched in the language of competition and of antitrust law in general, even when it appears in other contexts.  Courts have expanded *Noerr-Pennington* and its exceptions to contexts beyond antitrust, *see, e.g.*, *Sosa*, 437 F.3d at 931 n.6, and the doctrine is now recognized as a generally applicable principle of statutory construction, *White*, 227 F.3d at 1231. Thus, the Court sees no reason why the fact that the parties are not direct competitors in the same industry should render any *Noerr-Pennington* exception, including *USS-POSCO*, inapplicable in the RICO context.  The parties in *USS-POSCO* were not market rivals; that case was brought by a general contractor against unions for antitrust violations arising from allegedly sham litigation.  *See* 31 F.3d at 804.  Moreover, the *USS-POSCO* opinion itself contains iterations of its own rule that do not refer to any sort of rival or competitor.  *See id.* at 811.  Here, for the purpose of these Motions, it is sufficient to observe that Relevant and Sunset Landmark are "competitors" in that they both own properties in the same one-block area in Hollywood.  This at least demonstrates a genuine dispute about the matter, and at this time the Court will not read anything more into the "market rivals" requirement of the *USS-POSCO* exception.

### b.    *Reflexively and Without Regard for Merits*

The Sunset Defendants further argue that the *USS-POSCO* exception does not save Relevant's claims because Relevant cannot show there is a genuine dispute about the first prong, whether Sunset Landmark brought its challenges pursuant to a policy of starting legal proceedings without regard to the merits and for an unlawful purpose.  (S. Mem. 14–19.)

This Court previously acknowledged that Relevant alleged sufficient facts to invoke the *USS-POSCO* exception, and the *Noerr-Pennington* doctrine thus did not bar Relevant's RICO claims at the pleading stage.  (First MTD Order 9.)  Here, the question is whether Relevant sufficiently substantiates those allegations with evidence.  As the burden will be on Relevant at trial to prove up the *USS-POSCO* exception, 31 F.3d at 811, it is likewise Relevant's burden on the Sunset Defendants' Motion to submit evidence demonstrating this issue is triable, *Celotex*, 477 U.S. at 322.

### i.      *"Batting Average" Analysis*

In *USS-POSCO*, the court addressed the prospective question—did the defendant file lawsuits without regard for their merits?—by looking retrospectively at the success rate of the defendant unions' lawsuits.  Out of the twenty-nine suits the plaintiff alleged, the union was successful in fifteen of them.  31 F.3d at 811.  The Ninth Circuit analogized these facts to a "batting average exceeding .500," which it found could not support the theory "that the unions were filing lawsuits and other actions willy-nilly without regard to success."  *Id.*  Accordingly, the plaintiff could not "sustain its burden of showing that the unions' conduct fell within the sham exception to the *Noerr–Pennington* doctrine," and the Ninth Circuit affirmed summary judgment in favor of the unions on that ground.  *Id.*

Taking their cue from *USS-POSCO*, the parties each present their own batting average argument.  The Sunset Defendants argue that they are batting a 1.000 because they achieved a substantial settlement in the Thompson and Tommie matters, and they succeeded at challenging the City's negative declaration in the Selma matter.  (S. Mem. 16.)  Relevant argues the exact opposite: that the Sunset Defendants are batting zero, having failed to obtain the relief they requested (a writ directing the City to prepare a full EIR) in any of their state-court CEQA challenges.  (Pl. Opp'n S. Mot. 18 ("[T]hey are still searching for a hit.").)

Before considering whether either side is right, a point of clarification is in order.  In reconciling the prospective nature of the *USS-POSCO* exception with the seemingly

retrospective analysis in that opinion, the reasoning in *Hanover 3201 Realty, LLC v. Village Supermarkets, Inc.*, 806 F.3d 162, 180 (3d Cir. 2015), is helpful.  In *Hanover*, the Third Circuit noted that a litigant's "win-loss percentage" is no more and no less than circumstantial evidence regarding whether the defendant had a policy of filing petitions without regard to their merits.  806 F.3d at 181.  It elaborated:

> If more than an insignificant number of filings have objective merit, a defendant likely did not have a policy of filing "willy-nilly without regard to success." *See USS–POSCO*, 31 F.3d at 811. A high percentage of meritless or objectively baseless proceedings, on the other hand, will tend to support a finding that the filings were not brought to redress any actual grievances. *See City of Columbia v. Omni Outdoor Adver.*, 499 U.S. 365, 380, 111 S.Ct. 1344, 113 L.Ed.2d 382 (1991) (explaining that "the filing of frivolous objections . . . simply in order to impose expense and delay" is the "classic example" of a sham). Courts should also consider other evidence of bad-faith as well as the magnitude and nature of the collateral harm imposed on plaintiffs by defendants' petitioning activity (e.g., abuses of the discovery process and interference with access to governmental agencies). *See Professional Real Estate* [*Inv'rs, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. [49,] 68, 113 S.Ct. 1920 [(1993)] (Stevens, J., concurring).

806 F.3d at 181.  The Court finds this reasoning to be persuasive and instructive, especially within the context of a lawsuit challenging CEQA litigation.  CEQA litigation is unlike most other forms of litigation due to its complexity; the "three-tiered" nature of the CEQA regime makes difficult the application of the batting average analogy.  *San Lorenzo Valley Cmty. Advocates*, 139 Cal. App. 4th at 1372.  To illustrate by example, the parties sharply dispute the import of the trial court's tentative ruling in the Thompson litigation and its potential legal effect.  The Sunset Defendants argue that the ruling was favorable to Sunset and portended ultimate success on the merits of its petition for writ of mandate.  (S. SUF 27, 76.)  Rejecting this position, Relevant notes that the Sunset Defendants never obtained a writ of mandate requiring an EIR in the Thompson matter or any of the related state-court actions, and Relevant argues that when courts did reach the merits, "they rejected the overwhelming majority of

challenges—describing many as meritless or lacking any evidentiary support."  (Pl. Opp'n S. Mot. 7.)  Similarly, with regard to the Selma CEQA challenge, the trial court ultimately disposed of that matter by issuing an order remanding the Selma matter to the City for further consideration.   (S. SUF 54.) The Sunset Defendants characterize this order as a substantive order with environmental findings, (S. Mem. 9), as does N&A, (N&A SUF 62), but Relevant disputes this characterization, arguing that the order was no more than a procedural remand to augment a deficient record, (PAMF re: N&A 62 ("[The] [c]ourt . . . rejected the vast majority of objections [and] found several arguments to be "baseless" . . . . [The] [c]ourt remanded to the City to 'clarify' and 'confirm' [the] record on two issues . . . .")).

In the face of these arguments, the Court cannot say that the ultimate result in the Thompson and Tommie litigations (the settling of the case three hours after the court issued the tentative ruling) or the Selma litigation (a remand to the City for further consideration) represented a complete win or a complete loss for the Sunset Defendants, and thus, any attempt to calculate a batting average at this phase falls flat.  These are querstions better suited for the jury, who is entitled to decide not only *how much* of a win each disposition was for the Sunset Defendants, but also *how compelling* a given disposition is in Relevant's required showing under *USS-POSCO*.

### ii.    Sunset Defendants' Rebuttals

The Sunset Defendants argue that, batting averages aside, the sheer number of legal challenges Relevant accuses it of raising are not sufficient to invoke the exception under *California Transport*, *USS-POSCO*, and their progeny.  (*See* S. Mem. 15–16 n.14.)  One court in the Eastern District of California suggested in the context of a motion to dismiss that "five or six lawsuits is on the lower end of what can constitute a pattern or series of harassing litigation." *Wonderful Real Estate Dev. LLC v. Laborers Int'l Union of N. Am.*, No. 1:19-cv-00416-LJO-SKO, 2020 WL 91998, at *10 (E.D. Cal. Jan. 8, 2020).  In this circuit, two individual suits are insufficient to invoke the *USS-*

*POSCO* exception, *Amarel v. Connell*, 102 F.3d 1494, 1519 (9th Cir. 1996), and in other circuits, four may be enough, *Hanover*, 806 F.3d at 181.

In a case such as the present one, where the plaintiff has only a certain number of projects that could be challenged and where a single lawsuit under CEQA could span many years and procedural phases, the raw number of challenges is less important than the nature and extent of each challenge. In particular, for the purpose of this Motion, in which the Court must draw all reasonable inferences in Relevant's favor, it does not appear appropriate to consider the entire Thompson matter (or the entire Tommie matter) to be one single putatively sham legal challenge; throughout each matter, the Sunset Defendants filed multiple objections and appeals with different government agencies, and viewing each suit as just one instance of sham litigation activity impermissibly oversimplifies the analysis. The overarching question remains whether "a pattern of baseless, repetitive claims [has] emerge[d] which leads the factfinder to conclude that the administrative and judicial processes have been abused." *Cal. Motor Transp.*, 404 U.S. at 513. Parsing and counting cases constitutes only one component of this question.

In any event, Relevant's theory of the case includes the challenge Sunset Landmark filed with LADBS; the petition letter to local, state, and federal prosecutors; and Defendants' participation in City hearings. Moreover, Relevant's evidence is sufficient to demonstrate that Maddren's connection to the enterprise is in genuine dispute—meaning the jury might ultimately find that Maddren's own petition counts as enterprise activity. When the Court accounts for these additional challenges, a genuine dispute remains regarding whether the number of sham legal challenges in this case is more than three.

The Sunset Defendants nevertheless argue that the evidence demonstrates they filed their suits for proper purposes because they did not file suit against each and every Relevant project. (S. Mem. 15.) In the first place, even if there are indeed Relevant properties the Sunset Defendants could have challenged but did not, this fact would, at

most, be a component of the Sunset Defendants' showing at trial; it does not compel the finding that, as a matter of law, the Sunset Defendants did not bring the suits for a proper purpose.  In any case, Relevant presents a credible and creditable argument that, for various reasons, the Sunset Defendants could not have raised CEQA challenges to Relevant's other projects, even if the Sunset Defendants had wanted to do so.  (Pl. Resp. S. SUF 2; PAMF re: S. 120–121.)

Undeterred, the Sunset Defendants refer to other CEQA challenges raised by other community members and argue that the success of those CEQA challenges means that Sunset Defendants' own challenges had merit.  This argument, however, suffers from two flaws.  For the purpose of summary judgment, the fact that other community members raised successful CEQA challenges does not imply as a matter of law that the Sunset Defendants had an innocent state of mind at the time the Sunset Defendants raised their CEQA challenges.  Second, the Sunset Defendants' argument is incomplete because they do not demonstrate that the challenges other community members successfully raised were the same challenges Sunset Landmark raised.  Absent such a showing, Defendants fail in their burden of demonstrating that the results of the other suits have any legal relevance to the factual question under *USS-POSCO*.  *See* Fed R. Evid. 401.

### iii.     Other Direct and Circumstantial Evidence

Beyond the number of allegedly sham lawsuits and the degree of success of each of them, Relevant submits direct and circumstantial evidence that bears on the Sunset Defendants' intent under *USS-POSCO*.  *Cf. Hanover*, 806 F.3d at 181 (directing courts to "consider other evidence of bad-faith as well as the magnitude and nature of the collateral harm imposed on plaintiffs by defendants' petitioning activity").  The $5.5 million settlement itself is one such piece of evidence; in Relevant's telling of the story, Sunset Landmark extorted Relevant by unreasonably demanding $5.5 million to withdraw the CEQA challenges (despite the fact that money damages are not available under CEQA), and Relevant ultimately succumbed.  The factual dispute underpinning

this argument is genuine and triable.  Viewing Relevant's facts and evidence favorably, a jury could reasonably find that the monetary settlement was not appropriate or proportional to the CEQA challenges the Sunset Defendants raised.  On that basis, the jury would be entitled to infer that the lawsuits were brought for the improper purpose of extracting a large monetary settlement from Relevant.

Similarly, Relevant notes that many of the objections Sunset Landmark filed with the City were the same boilerplate objections, repeated from building to building. (Thomas Expert Rpt. 14, 15, 24.)[9]  A trier of fact could infer from this information that the Sunset Defendants did not craft individualized, case-specific objections for each of Relevant's projects and instead filed objections by volume, without regard for whether each individual objection had merit.

Moreover, Relevant avers that Sunset Landmark initially believed that the Schrader was owned by Relevant, and it characterizes Sunset Landmark's attempts on the Schrader as an additional act of attempted extortion.  (PAMF re: S. 117; Pl. Opp'n S. Mot. 25.)  According to Relevant, Sunset Landmark dropped its opposition to the Schrader when it realized the property was owned by a different entity (KoarGroup). Unlike Relevant, KoarGroup was not pressured by the need of EB-5 investors to create jobs, and KoarGroup would otherwise suffer no consequence by allowing the property to rest undeveloped.  KoarGroup therefore was unlikely to succumb to any extortion attempts.  (*See* Pl. Resp. S. SUF 59.)  Although the Sunset Defendants dispute that this is the reason they dropped their objection to the Schrader, their demonstration does not eliminate the possibility that the factfinder will side with Relevant on this issue, thereby finding more evidence of improper behavior.  (*See* S. Mem. 9–10, 21–22.)  A reasonable jury could credit Relevant's characterization of these events and in so doing find more evidence of an improper purpose.

---

[9] The reasoning in footnote 3, *supra*, applies equally to the use of the Thomas Expert Report in this context.

Finally, the Court must not overlook what may be the most damaging evidence Relevant produces: the statement by Saeed about how it would "take a check" to make the Selma matter go away; Silverstein's suggestion that he would always find something else about Relevant's projects to challenge; and Silversten's unwillingness to explain the rationale behind the $2 million initially demanded, $1.5 million of which apparently did not constitute attorneys' fees.  A jury could reasonably view this evidence as directly demonstrating that the Sunset Defendants raised legal challenges to Relevant's developments "without probable cause, and regardless of the merits of the cases." *USS-POSCO*, 31 F.3d at 810 (quoting *Cal. Motor Transp.*, 404 U.S. at 512).

For these reasons, the Sunset Defendants do not show that the applicability of the *USS-POSCO* exception is beyond genuine dispute, and they are not entitled to summary judgment on this ground.

### 3.   Wrongful Means or Ends

Next, the Sunset Defendants move for summary judgment on the grounds that Relevant cannot establish that the CEQA challenges were "wrongful" under the Hobbs Act.  (S. Mem. 20.)  Absent wrongfulness, the argument goes, there was no extortion and therefore no pattern of racketeering activity.

The Hobbs Act defines extortion as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2).  In determining whether a use of force was "wrongful" for the purpose of extortion, the trier of fact considers whether the "means" used were wrongful and whether the "ends" demanded were wrongful. *Koziol*, 993 F.3d at 1176; *cf. Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1133 (9th Cir. 2014) ("[T]o state a claim of economic extortion under both federal and California law, a litigant must demonstrate either that he had a pre-existing right to be free from the threatened harm, or that the defendant had no right to seek payment for the service offered.").  These are separate inquiries; "certain 'means' to obtain property are 'wrongful' under the Hobbs Act without regard to the 'ends' sought by the defendant."

*United States v. Villalobos*, 748 F.3d 953, 957 (9th Cir. 2014) (citing *United States v. Daane*, 475 F.3d 1114, 1119–20 (9th Cir. 2007)).   Here, Relevant's theory is that Defendants used meritless litigation and threats of litigation (wrongful means) to obtain money and concessions from Relevant (wrongful ends).   *Cf. Sturm*, 870 F.3d at 773 ("[W]e do not rule out the possibility that the use of wrongful economic threats to obtain property to which the defendant is legally entitled may be prosecutable as extortion under the Hobbs Act.").

Under *Koziol*, "threats of sham litigation, which are made to obtain property to which the defendant knows he has no lawful claim, are 'wrongful' under the Hobbs Act."   993 F.3d at 1170.   The Court reads the phrase "sham litigation" in this quote broadly, as including sham litigation as defined in *USS-POSCO*.   Thus, the issue of Hobbs Act wrongfulness is intertwined with, and is substantially congruent to, the question whether Sunset Landmark brought its challenges reflexively and without regard for their merits.   As discussed in connection with the *USS-POSCO* exception, the trier of fact might reasonably find, based on the nature of the Sunset Defendants' CEQA challenges coupled with the course of the parties' settlement discussions, that Sunset Landmark brought its CEQA challenges without regard for their merits.[10]   If so, then then the trier of fact would also be entitled to reasonably infer, on the same factual basis, that the Sunset Defendants' settlement demands were wrongful.   Binding case law on extortion supports this conclusion; a plaintiff has a "pre-existing right to be free from" a series of legal challenges brought without regard for their merits (or threats to bring such challenges).   *Levitt*, 765 F.3d at 1133.

---

[10] Several of Relevant's objections go to emails and texts containing settlement discussions and are raised on hearsay grounds.   These objections are **OVERRULED** because Relevant fails to point to any particular assertion in the emails and texts that Defendants offer for its truth.   The material in the emails reveals the course of the parties' settlement discussions and consists primarily of opinions, offers, and other legally operative language, not assertions of facts Defendants claim to be true.

1    For these reasons, the papers do not resolve the question of wrongfulness
2    definitively in favor of either side, which means the issue remains in genuine dispute
3    and must be tried.

4         *4.    Release Defense*

5         The fourth and final ground on which the Sunset Defendants seek summary
6    judgment is that the Thompson and Tommie settlements contain express release
7    provisions.  The essence of Sunset Defendants' argument on this matter is that "the
8    effect of the plain language" in both releases "is that Plaintiffs are barred from asserting
9    any claims related to the Thompson and Tommie lawsuits at all, whether in the form of
10   standalone actions, predicates in a RICO action, or as evidence in a RICO action."  (S.
11   Mem. 23.)

12        The case the Sunset Defendants cite in support of this contention, *Howard v.*
13   *America Online Inc.*, 208 F.3d 741 (9th Cir. 2000), does not support so sweeping a
14   conclusion.  In *Howard*, the plaintiffs, who were America Online subscribers, sought to
15   hold America Online liable for RICO violations stemming from mail and wire fraud
16   committed in connection with allegedly fraudulent billing claims.  208 F.3d at 746.
17   However, those plaintiffs were part of a settlement class that had settled the underlying
18   mail and wire fraud claims in a separate action.  *Id.*  The district court held that the
19   plaintiffs could not "repackage" the claims asserted in the earlier case as predicate acts
20   under RICO, *id.* at 747, and the Ninth Circuit affirmed, *id.* at 748.  Key to the Ninth
21   Circuit's reasoning, however, was that, under the facts of that case, the settlement class
22   in the earlier case "could have claimed a RICO violation based on the billing fraud."
23   *Id.*  Therefore, the RICO plaintiffs were "barred from subsequently bringing a claim
24   that they could have made earlier."

25        Here, the Sunset Defendants make no attempt to show or suggest that the
26   elements of Relevant's RICO claims were complete at the time they signed the
27   settlement agreements, such that the RICO claims were in the parties' contemplation at
28   the time of settlement.  Moreover, in *Howard*, the prior settlement was an express

settlement of the predicate act claims themselves (the mail and wire fraud claims), whereas here, the prior settlement is not of the alleged predicate act claims (extortion) but is a settlement of something else entirely (CEQA challenges).   The Sunset Defendants thus fail to meet their initial burden on summary judgment.   And even if the Sunset Defendants do meet their initial burden on this issue, Relevant undoubtedly demonstrates a genuine dispute of material fact.   Relevant credibly points out that the settlement of the Thompson and the Tommie appeared to be the *end* of its dealings with the Sunset Defendants.   Because a pattern under RICO requires a showing of related predicate acts *and* "the threat of continuing activity," *Howard,* 208 F.3d at 746, Relevant has a colorable argument that there was *no* threat of continuing activity at that point and therefore no possible RICO claim.   And if the RICO claim did not exist at the time of the releases—that is, if it accrued *after* the parties signed the releases—then, under California law, the releases did not release the RICO claims.   Cal. Civ. Code § 1668; *SI 59 LLC v. Variel Warner Ventures, LLC*, 29 Cal. App. 5th 146, 148 (2018). For these reasons, the Sunset Defendants are not entitled to summary judgment in their favor based on the releases.[11]

In summary, none of the Sunset Defendants' proffered grounds for summary judgment have merit.   Moreover, in their Motion, the Sunset Defendants do not attempt to distinguish between Relevant's first claim for direct liability (under § 1962(c)) and its second claim for conspiracy liability (under § 1962(d), to violate § 1962(c)) or otherwise argue that the two claims should receive different dispositions.   The Sunset Defendants' Motion is accordingly **DENIED** in its entirety.

**B.   N&A's Motion**

N&A moves for summary judgment on Relevant's claims on two grounds: first, on the same *Noerr-Pennington* grounds as asserted by the Sunset Defendants, and second, on grounds that apply to N&A only.   N&A repeats the same *Noerr-Pennington*

---

[11] The Court finds that the Sunset Defendant's argument that Relevant lacks standing utterly lacks any basis and is borderline frivolous.  (S. Mem. 24–25.)

arguments the Sunset Defendants proffered, and they fail for the same reasons, as N&A is in a materially similar position as the Sunset Defendants with respect to the constitutional questions raised by *Noerr-Pennington*.  Therefore, the Court denies N&A's Motion to the extent it is premised on *Noerr-Pennington* grounds.

N&A also moves for summary judgment on grounds unique to it: namely, that it did not manage or operate the enterprise as required by RICO.  (N&A Mem. 19–24).  The Court considers these grounds first with respect to Relevant's claim for direct RICO liability under § 1962(c) followed by its claim for conspiracy to violate § 1962(c).

### 1.    *Direct Liability Under § 1962(c)*

A RICO plaintiff must allege and prove that a defendant "conduct[ed] or participat[ed], directly or indirectly, in the conduct of the enterprise's affairs." 18 U.S.C. § 1962(c).  The Supreme Court clarified that the word "conduct" requires an element of direction, and the word "participate" connotes "to take part in."  *Reeves v. Ernst & Young*, 507 U.S. 170, 177–79 (1993).  Thus, "to 'participate, directly or indirectly, in the conduct of [an] enterprise's affairs,' one must have some part in directing those affairs."  *Id.* at 179 (quoting 18 U.S.C. § 1962(c)).  In evaluating this "conduct" element under RICO, courts in the Ninth Circuit consider "whether that defendant (1) gave or took directions; (2) occupied a position in the 'chain of command' through which the affairs of the enterprise are conducted; (3) knowingly implemented decisions of upper management; or (4) was indispensable to the achievement of the enterprise's goal.  *Tatung Co., Ltd. v. Shu Tze Hsu*, 217 F. Supp. 3d 1138, 1152–53 (C.D. Cal. 2016) (quoting *Walter v. Drayson*, 538 F.3d 1244, 1249 (9th Cir. 2008)).

In satisfaction of its initial burden, N&A points to many of the undisputed facts about this case: it was not party to the CEQA suits; it did not participate in settlement discussions with respect to the CEQA suits; it was not party to the settlement agreements; and it did not directly receive the settlement proceeds.  (N&A Mem. 20.)

Even assuming that these facts are sufficient to meet N&A's initial burden, Relevant nevertheless submits sufficient evidence to demonstrate a genuine dispute

regarding whether N&A had "some part in directing [the] affairs" of the enterprise. *Reeves*, 507 U.S. at 179.  First, Iravani accompanied Saeed to an initial settlement meeting with Relevant's Heyman, and given that Saeed originally asked Michael, who is N&A's CEO, to attend, there is a genuine dispute as to whether Iravani attended in Michael's stead, as a representative of N&A.  (PAMF re: S 105; PAMF re: N&A 84–85.)  Second, N&A attorney Cole performed legal research and drafted objections for use in Sunset Landmark's legal challenges, and there are genuine disputes regarding the extent to which Cole was involved in developing and implementing the enterprise's strategy against Relevant.  (PAMF re: N&A 93–96.)  Moreover, the evidence suggests Saeed used N&A's offices, resources, and technology to support his efforts against Relevant. (PAMF re: N&A 83.)  This evidence inclues the email in which Michael appears to be both taking orders (from Saeed) and giving orders (to N&A employees) regarding creating the appearance of public opposition at a public hearing.

N&A makes a final attempt to distance itself from the enterprise by arguing that only its lower-level employees participated in the enterprise, and that, under Ninth Circuit precedent, there must be "pervasive" involvement of "high level officials," which, it argues, is not the case here.  (N&A Mem. 23 (quoting *Brady v. Dairy Fresh Prod. Co.*, 974 F.2d 1149, 1153 (9th Cir. 1992).)  However, Relevant's evidence shows that this issue remains triable.  The email from Michael to N&A employees asking for their participation in the public hearing allows a reasonable inference that N&A, at the direction of its highest officer, participated in the public hearing as part of an overall effort to exert pressure on Relevant and ultimately commit extortion.  Moreover, Iravani is N&A's Controller and Cole is N&A's legal counsel; N&A fails to show both (1) that these individuals are not "high level officials" of N&A, and (2) that their involvement was not germane to the enterprise's efforts against Relevant.  These questions remain in genuine dispute.

For these reasons, N&A is not entitled to summary judgment on Relevant's claim for direct RICO liability under § 1962(c).

### 2.   *Conspiracy Liability Under § 1962(d) to Violate § 1962(c)*

Finally, N&A argues that it did not conspire to violate RICO and that it is entitled to dismissal of Relevant's second claim, for RICO conspiracy under § 1962(d) to violate § 1962(c).  A conspiracy violation under § 1962(d) merely requires that the defendant "knew about and agreed to facilitate" the substantive racketeering scheme.  *United States v. Fiander*, 547 F.3d 1036, 1040–41 (9th Cir. 2008).  Thus, it is not a requirement for a RICO conspiracy that the defendant "participate personally in two predicate offenses."  *United States v. Blinder*, 10 F.3d 1468, 1477 (9th Cir. 1993).  Instead, it is sufficient if the defendant "agree[s] to conduct or participate in the affairs of an enterprise through a pattern of racketeering."  *Id.* (quoting  *United States v. Brooklier*, 685 F.2d 1208,1216 (9th Cir. 1982), *cert. denied*, 479 U.S. 827 (1986); *see Salinas v. United States*, 522 U.S. 52, 65 (1997) ("One can be a conspirator by agreeing to facilitate only some of the acts leading to the substantive offense."); *see also United States v. Tille*, 729 F.2d 615, 619 (9th Cir. 1984), *cert. denied,* 469 U.S. 845, 848 (1984).

Here, N&A's sole argument with respect to the conspiracy claim is: "[T]he undisputed evidence demonstrates, at most, that N&A is associated with Sunset and Saeed.  But that is not enough.  N&A has not carried out any of the predicate acts, nor did it agree to violate the law."  (N&A Mem. 25.)  N&A's argument lacks citations to evidence, and it addresses the law of conspiracy in only the most conclusory of ways.  It is therefore wholly insufficient to meet N&A's initial burden on summary judgment.  In any case, as discussed above, whether N&A committed a direct violation of RICO remains in genuine dispute, and so, in this case and for the purpose of N&A's Motion, there is also a genuine dispute regarding whether N&A conspired to violate RICO.

For these reasons, none of N&A's proffered grounds for summary judgment have merit, and the Court accordingly **DENIES** N&A's Motion in its entirety.

**C.    Relevant's Motion**

Finally, Relevant moves for summary judgment on the single issue of the effect of the releases found in the settlement agreements.  Specifically, Relevant seeks summary judgment "on the grounds that any releases . . . purporting to release Defendants . . . are inapplicable or unenforceable in this action and thus may not be relied upon by Defendants as defenses in this matter, including granting judgment at least against Defendants' Eighteenth and Twentieth causes of action."  (Pl. Notice Mot. 1, ECF No. 121.)

In its moving papers, Relevant offers several reasons why the releases are purportedly unenforceable as to *any* party.  It also argues that N&A, in particular, may not avail itself of the releases because it was not a party to the releases and no nonsignatory theory applies.  This latter argument has merit; to the extent Relevant moves for summary judgment against Defendants' release-based affirmative defenses, Relevant is entitled to summary judgment on that issue as against N&A.  By contrast, Relevant has not shown that, as a matter of law, the releases do not cover the Sunset Defendants; that dispute is intertwined with the fundamental dispute in this case surrounding whether Defendants' CEQA challenges and subsequent demands were "wrongful."  18 U.S.C. § 1951(b)(2).

*1.    N&A*

No one disputes that N&A was not a signatory to either of the settlement agreements.  (PSUF 22; Defs. Joint SGI 22.)  Relevant argues that N&A is not one of Sunset Landmark's "officers, members, managers, agents, employees, subsidiaries, affiliates, parent companies, insurers, attorneys, accountants, heirs, executors, spouses, predecessors, successors, and assigns," and it further points out that the releases do not contain any sweeping "all other persons"-type language that might otherwise bring N&A within the ambit of the release.  (Mem. ISO Pl. Mot. ("Pl. Mem.") 11–12, ECF No. 121-1.)  By making these arguments, Relevant meets its initial burden of demonstrating that N&A will not be able to establish its defense.  Accordingly, the

burden shifts to N&A to present evidence showing that its ability to invoke the release remains in genuine dispute.

N&A fails in this burden.  It presents no evidence of its own to support its contention that it falls under one of the categories found in the releases.  (*See* N&A Opp'n Pl. Mot. 13–17, ECF No. 138.)  Instead, it points repeatedly to Relevant's own allegations and theory of the case and argues that "Plaintiffs' contradictory positions regarding N&A defeats their argument that N&A lacks standing to enforce the settlement agreements."  (*Id.* at 13 (decapitalized).)

Thus, in making its argument, N&A relies entirely on Relevant's own allegations to demonstrate genuinely disputed issues.  In proper instances, an opposing party's allegations can constitute a judicial admission, *Sicor Ltd. v. Cetus Corp.*, 51 F.3d 848, 860 (9th Cir. 1995), and thereby provide evidence that genuinely disputed issues exist. This is not one of those instances, however, because Relevant's allegations about the details of the relationship between *Sunset Landmark and N&A* are worth nothing from an evidentiary perspective.  Those allegations are merely Relevant's theory of the case; they are not allegations made based on Relevant's principals' personal knowledge of the details of the Sunset Landmark-N&A relationship.

This evidentiary deficiency is, in this case, fatal to N&A's opposition.   The release is an affirmative defense for which N&A will bear the burden at trial.  As N&A fails to or offer any evidence in support of its entitlement to rely on the release, it fails to meet its burden of demonstrating a genuinely disputed issue.  *Celotex*, 477 U.S. at 325 ("Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves . . . .").  Relevant is entitled to summary judgment.

N&A also argues that because there is a genuine dispute as to whether N&A employees acted on Sunset Landmark's behalf, there is also a genuine dispute as to whether N&A acted as Sunset Landmark's agent or employee.  (N&A Opp'n Pl.

Mot. 14.)  But again, N&A submits no evidence of its own on this issue, so N&A does not carry its burden.

For these reasons, Relevant is entitled to summary judgment as against N&A's release-based affirmative defenses.

### 2.   Sunset Defendants

The remaining issue is whether Relevant shows that it is beyond genuine dispute that the Sunset Defendants cannot enforce the subject releases.  Part of Relevant's argument is based on provisions of the California Civil Code, raising the threshold question whether federal or California law applies in determining whether the releases are enforceable.  Relevant argues that California law applies.  (*See* Pl. Mem. 5.)  The Sunset Defendants argue that federal common law, not California law, applies, and they further argue that, regardless, neither body of law provides Relevant with a way to invalidate the releases.  (S. Opp'n Pl. Mot. 1–2, ECF No. 140.)

Under California law, a contract may be unenforceable under Civil Code section 1668, which provides that "[a]ll contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law."  This statute reflects California's policy of looking "with disfavor upon those who attempt to contract away their legal liability to others for the commission of torts."  *Blankenheim v. E.F. Hutton & Co.*, 217 Cal. App. 3d 1463, 1471 (1990).  Under section 1668, "a party may not contract away liability for fraudulent or intentional acts or for negligent violations of statutory law." *Id.* (cleaned up).   However, "section 1668 does not negate such a clause when all the elements are past events."  *SI 59*, 29 Cal. App. 5th at 148.  Instead, section 1668 renders contract provisions unenforceable "only when all or some of the elements of the tort are concurrent or future events at the time the contract is signed."  *Id.*  One federal court, in examining the effect of California Civil Code section 1668 on the purported release of RICO claims, noted that section 1668 renders a contract provision unenforceable when

the provision was a "key tool" of the RICO scheme.  *Monterey Bay Mil. Hous., LLC v. Pinnacle Monterey, LLC*, 116 F. Supp. 3d 1010, 1051 (N.D. Cal. 2015), *vacated in part on other grounds*, No. 14-cv-03953-BLF, 2015 WL 4624678 (N.D. Cal. Aug. 3, 2015).

Federal law, by contrast, does not provide a policy-based contract enforceability rule akin to California's Civil Code section 1668.  Instead, under both federal and state law, and pursuant to basic contract principles, releases, like all contractual agreements, may be invalidated if the agreement was the result of fraud, duress, or mistake.  *See Morta v. Korea Ins. Corp.*, 840 F.2d 1452, 1455 (9th Cir. 1988); *Kim v. CashCall, Inc.*, No. SA CV 17-0076-DOC (DFMx), 2017 WL 8186683, at *6 (C.D. Cal. June 8, 2017) ("Consent is not real or free when obtained through duress, menace, fraud, undue influence, or mistake." (citing Cal. Civ. Code § 1567).)  The Fifth Circuit, in considering whether a party was released from antitrust liability, noted that releases are not valid if they were procured as an "integral part" or "part and parcel" of a wrongful conspiracy.  *Ingram Corp. v. J. Ray McDermott & Co., Inc.*, 698 F.2d 1295, 1215 (5th Cir. 1983).

Here, the Court first finds that under basic principles of enforceability of contracts—principles that inhere in both state and federal law—whether the releases are enforceable remains in genuine dispute.  This issue is congruent to a finding that Relevant fails to demonstrate that, as a matter of law, the releases were the product of Relevant's "real" and "free" consent.  *CashCall*, 2017 WL 8186683, at *6.  That issue, in turn, corresponds to the fundamental issue in this case: whether Sunset Landmark is an engaged neighbor with sharp but acceptable business practices, or, as Relevant alleges, whether Saeed Nourmand is the "patriarch" of a local empire that forces its subjects to "kiss the ring" or face indefinite delay of their construction projects.  (TAC ¶¶ 2, 5.)  Both Relevant and the Sunset Defendants make a substantial showing on their respective sides of this question, such that the Court is persuaded that a reasonable jury could examine the totality of the evidence and find for either side.  *See Cal. Architectural Bldg. Prods.*, 818 F.2d at 1468.

This analysis also applies in considering the possible effect of California Civil Code section 1668.  That provision prevents parties from contracting away concurrent or future statutory liability.  *SI 59*, 29 Cal. App. 5th at 148.  So, in order for section 1668 to have any meaning in this context, there must be concurrent or future statutory liability.  But whether there is any such statutory liability—that is, whether Defendants violated RICO—is the fundamentally disputed issue in this case.  This case goes to trial on that fundamental issue, whether under federal law or California law.  In light of this finding, the Court need not and does not presently determine whether California or federal law applies in determining whether the releases are enforceable.

For these reasons, Relevant is not entitled to summary judgment in its favor as to the Sunset Defendants' release-based affirmative defenses.

To summarize the result of Relevant's Motion, Relevant is entitled to summary judgment in its favor on N&A's release-based affirmative defenses, but not the Sunset Defendants' release-based affirmative defenses.[12]

///
///
///
///
///
///
///
///
///
///
///

---

[12] Based on Relevant's Notice of Motion, it is not clear whether Relevant further seeks summary judgment on any release-based issues that would be Relevant's burden to bear at trial.  To the extent it does, it does not successfully demonstrate a lack of genuine dispute as to those issues, and summary judgment is denied to that extent.

## VII.   CONCLUSION

For the foregoing reasons, the Court:

(1)    **DENIES** Sunset Landmark's Motion for Summary Judgment, (ECF No. 124);

(2)    **DENIES** N&A's Motion for Summary Judgment, (ECF No. 123); and

(3)    **GRANTS IN PART AND DENIES IN PART** Relevant's Motion for Summary Judgment, (ECF No. 121).  Summary judgment as to N&A's Eighteenth and Twentieth Affirmative Defenses is granted in Relevant's favor to the extent those Defenses are based on the express release language in the settlement agreements.  Relevant's Motion is otherwise denied.

**IT IS SO ORDERED.**

July 25, 2022

_____

**OTIS D. WRIGHT, II**
**UNITED STATES DISTRICT JUDGE**