**WILSON SONSINI GOODRICH & ROSATI**
**Professional Corporation**
SUSAN K. LEADER, State Bar No. 216743
sleader@wsgr.com
MARK R. YOHALEM, State Bar No. 243596
myohalem@wsgr.com
MATTHEW A. MACDONALD, State Bar No. 255269
Matthew.Macdonald@wsgr.com
633 West Fifth Avenue, Suite Fifth 1550
Los Angeles, California 90071-2027
Telephone:  (323) 210-2900
Facsimile:   (323) 974-7329

**WILSON SONSINI GOODRICH & ROSATI**
**Professional Corporation**
DALE R. BISH, State Bar No. 235390
dbish@wsgr.com
650 Page Mill Road
Palo Alto, California 94304-1050
Telephone:  (650) 493-9300
Facsimile:   (650) 565-5100

Attorneys for Plaintiffs Relevant
Group, LLC; 1541 Wilcox Hotel LLC;
6516 Tommie Hotel LLC; and 6421
Selma Wilcox Hotel LLC

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RELEVANT GROUP, LLC, a Delaware limited liability company; 1541 WILCOX HOTEL LLC, a Delaware limited liability company; 6516 TOMMIE HOTEL LLC; a Delaware limited liability company; and 6421 SELMA WILCOX HOTEL LLC, a California limited liability company,<br><br>        Plaintiffs,<br><br>        v.<br><br>STEPHAN "SAEED" NOURMAND, an individual; THE SUNSET LANDMARK INVESTMENT LLC, a California limited liability company; NOURMAND & ASSOCIATES, a California corporation; and DOES 1-10,<br><br>        Defendants. | Case No.: 2:19-cv-05019-PSG-KSx<br><br>**PLAINTIFFS' SUPPLEMENTAL BRIEF IN RESPONSE TO THE COURT'S JANUARY 20, 2023 ORDER (ECF NO. 260)**<br><br>Date:     April 27, 2023<br>Time:    1:30 p.m.<br>Dept:    Courtroom 6A, 6th Fl.<br>Before:  Hon. Philip. S. Gutierrez |

**REDACTED VERSION OF DOCUMENT TO BE FILED UNDER SEAL**

# TABLE OF CONTENTS

**Page**

BACKGROUND ......................................................................................................4

LEGAL STANDARD ............................................................................................7

DISCUSSION.........................................................................................................8

I.     QUESTION 1:  WHICH SHAM LITIGATION TEST APPLIES? ..............8

II.    QUESTION 2: IS THERE A TRIABLE ISSUES OF FACT UNDER THE *USS-POSCO* TEST?............................................................................11

     A.     Defendants Reflexively Challenged Relevant's Projects ..................13

     B.     Defendants Had No Genuine Interest in the Merits of Their Claims or In Achieving a Successful CEQA Outcome .....................14

     C.     Defendants Did Not Succeed on the Merits and Demanded a Pay-Off They Could Not Have Achieved as a Litigation Outcome .................................................................................................16

III.    THERE ARE TRIABLE ISSUES OF FACT UNDER *PREI*......................20

IV.    QUESTION 4: HOW WOULD A RULING THAT "SOME OR ALL OF THE LAWSUITS CANNOT QUALIFY AS SHAM LITIGATION … AFFECT[] THE PREDICATE-ACT REQUIREMENT OF RICO"? .....23

V.    QUESTION 5: WHAT PREDICATE ACTS [DOES RELEVANT] INTEND TO PROVE AT TRIAL?...............................................................25

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Acosta v. FCE Benefit Adm'rs, Inc.*,
2018 WL 11447534 (N.D. Cal. Jan. 22, 2018) ...........................................22

*Amarel v. Connell*,
102 F.3d 1494 (9th Cir. 1996)..................................................................2, 11

*Bey v. Malec*,
2020 WL 3058336 (N.D. Cal. June 9, 2020),
*aff'd sub nom. Bey v. Cristiani*, 2021 WL 3743867
(9th Cir. Aug. 24, 2021) ...............................................................................8

*California Motor Transport Co. v. Trucking Unlimited*,
404 U.S. 508 (1972) ....................................................................................10

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ......................................................................................7

*Chevron Corp. v. Donziger*,
974 F. Supp. 2d 362 (S.D.N.Y. 2014),
*aff'd*, 833 F.3d 74 (2d Cir. 2016) ...............................................................24

*City of Columbia v. Omni Outdoor Advertising, Inc.*,
499 U.S. 365 (1991) .......................................................................1, 8, 9, 18

*Clicks Billiards Inc. v. Sixshooters, Inc.*,
251 F.3d 1252 (9th Cir. 2001)......................................................................7

*Clipper Express v. Rocky Mountain Motor Tariff Bureau, Inc.*,
690 F.2d 1240 (9th Cir. 1982).....................................................................10

*CSX Transp., Inc. v. Gilkison*,
2012 WL 5906716 (N.D. W.Va. Nov. 26, 2012)..................................18, 21

*Delta Savings Bank v. United States*,
265 F.3d 1017 (9th Cir. 2001)...................................................................1, 7

*Dooley v. Crab Boat Owners Ass'n*,
2004 WL 902361 (N.D. Cal. Apr. 26, 2004) ..............................................25

*ERBE Elektromedizin GmbH v. Canady Tech. LLC,*
    629 F.3d 1278 (Fed. Cir. 2010) ............................................................ 11, 14

*Fairbank v. Wunderman Cato Johnson,*
    212 F.3d 528 (9th Cir. 2000) ..................................................................... 7

*Flatley v. Mauro,*
    39 Cal. 4th 299 (2006) ............................................................................ 23

*Hanover 3201 Realty, LLC v. Village Supermarkets, Inc.,*
    806 F.3d 180 (3d Cir. 2015) ........................... 2, 4, 9, 10, 11, 12,
                                        14, 18, 20, 25

*Heritage Guitar, Inc. v. Gibson Brands, Inc.,*
    2022 WL 1954361 (W.D. Mich. June 6, 2022) ........................................ 21

*In re Wellbutrin XL Antitrust Litig. Indirect Purchaser Class,*
    868 F.3d 132 (3d Cir. 2017) .................................................................... 21

*Intel Corp. v. Via Techs., Inc.,*
    2001 WL 777085 (N.D. Cal. Mar. 20, 2001) ..................................... 21, 22

*La Suisse, Societe D'Assurances Sur La Vie v. Kraus,*
    2014 WL 3610890 (S.D.N.Y. July 21, 2014) .......................................... 25

*Livingston Downs Racing Ass'n Inc. v. Jefferson Downs Corp.,*
    192 F. Supp. 2d 519 (M.D. La. 2001) ......................................... 13, 14, 19, 20

*Primetime 24 Joint Venture v. Nat'l Broad., Co.,*
    219 F.3d 92 (2d Cir. 2000) ....................................................................... 9

*Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.,*
    508 U.S. 49 (1993) .......................................... 3, 8, 14, 20, 21,
                                              22, 23

*Rock River Commc'ns, Inc v. Universal Music Grp, Inc.,*
    745 F.3d 343 (9th Cir. 2014) ................................................................... 21

*Sanborn Library Llc v. Eris Info.,*
    2021 U.S. Dist. LEXIS 165496 (S.D.N.Y. Aug. 30, 2021) ...................... 22

*Sosa v. DIRECTV, Inc.,*
    437 F.3d 923 (9th Cir. 2006) .............................................................. 12, 24

*Theme Promotions, Inc. v. News Am. Mktg. FSI,*
    546 F.3d 991 (9th Cir. 2008)...................................................................18

*Theofel v. Farey-Jones,*
    359 F.3d 1066 (9th Cir. 2004)................................................................22

*United States v. Avenatti,*
    2020 WL 70951 (S.D.N.Y. Jan 6, 2020).............................................24

*United States v. Desert Gold Mining Co.,*
    433 F.2d 713 (9th Cir. 1970)..................................................................7

*United States v. Goodwin-Painter,*
    2015 WL 838501 (S.D. Ga. Oct. 6, 2015) ..........................................23

*United States v. Koziol,*
    993 F.3d 1160 (9th Cir. 2021)..............................3, 4, 12, 18, 23, 24

*United States v. Tobin,*
    155 F.3d 636 (3d Cir. 1998)..................................................................24

*United States v. Villalobos,*
    748 F.3d 953 (9th Cir. 2014)....................................................4, 23, 24

*USS-POSCO Indus. v. Contra Costa Cnty. Bldg. &*
    *Const. Trades Council,*
    31 F.3d 800 (9th Cir. 1994).....................................2, 8, 9, 10, 11,
                                                                    12, 18, 20, 23

*Waugh Chapel S., LLC v. United Food & Commercial*
    *Workers Union Local 27,*
    728 F.3d 354 (4th Cir. 2013)........................................................2, 10, 16

## STATUTES

18 U.S.C. § 1951..............................................................................................25

18 U.S.C. § 1951(a).........................................................................................25

18 U.S.C. § 1961(1)(B)....................................................................................25

Cal. Pen. Code § 518 .......................................................................................25

Cal. Pen. Code § 524 .......................................................................................25

This case is at the heartland of the sham exception to *Noerr-Pennington*. The First Amendment does not protect those who use "governmental process—as opposed to the outcome of that process—as [a] weapon." *City of Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365, 380 (1991). The "classic example" of such unprotected conduct is the "filing of frivolous objections to the license application of a competitor, with no expectation of achieving denial of the license but simply in order to impose expense and delay." *Id.* That is what happened here. Saeed Nourmand, in conjunction with his enterprise, waged a multi-year campaign of delay and obstruction against Relevant's projects. This campaign was not launched out of a genuine concern about environmental issues or development in Hollywood. Nor was it designed to persuade or win on the merits. As Defendants warned Relevant, it did not matter if Relevant overcame one set of objections because Defendants would just "find something else to challenge." The *process* itself was Defendants' weapon, because Relevant's financing would collapse if that process dragged out long enough. As the saying goes, "delay kills deals." Defendants used that fact—and the threat of continuing delay through appeals and future challenges—to obtain property to which they had no legal entitlement. That is extortion, and it is not rendered beyond the reach of law by calling it petitioning activity.

Three times, the Court rejected the argument that *Noerr-Pennington* bars this suit as a matter of law. ECF Nos. 39 at 6-9, 114 at 5-7, 167 at 22-31. While a new judge has discretion to revisit a prior judge's considered rulings where the prior ruling was "clearly erroneous and its enforcement would work a manifest injustice," that standard is not met here. *See Delta Savings Bank v. United States*, 265 F.3d 1017, 1027 (9th Cir. 2001). Judge Wright's rulings were correct and certainly not foreclosed by precedent. While courts have articulated different approaches for determining when a *Noerr-Pennington* defense fails, these tests all drive toward the same question: is the defendant *abusing process* to achieve its goal? Under none of the frameworks can that question be taken away from the trier of fact here.

***Question 1:  Which sham litigation test applies?*** *USS-POSCO* governs.  This case indisputably involves years of challenges at numerous levels of government, raising virtually every conceivable argument, and using virtually every conceivable procedural tool to delay and drag out proceedings—not a once-off civil suit.  That lengthy, multifarious "process" was the weapon Defendants abused.  Doctrinally, when determining whether a party has raised a "whole series" of challenges, the relevant unit is "proceedings" not "lawsuits."  Thus, Defendants' many administrative challenges must be included in the total.  As a result, this case involves nearly twenty "proceedings," making it more akin to *USS-POSCO Indus. v. Contra Costa Cnty. Bldg. & Const. Trades Council*, 31 F.3d 800 (9th Cir. 1994), than *Amarel v. Connell*, 102 F.3d 1494 (9th Cir. 1996) (which involved just two suits).  Furthermore, the *number* of proceedings is not the only issue.  Each underlying proceeding depends on its individual facts and the Court must conduct a "holistic" analysis of Defendants' conduct to determine whether legal process has been abused.  *Waugh Chapel S., LLC v. United Food & Commercial Workers Union Local 27*, 728 F.3d 354, 363–64 (4th Cir. 2013).  Where, as here, the defendants have engaged in a pattern of seeking to block a rival from obtaining relevant government approvals, just four administrative challenges have been held sufficient for the application of *USS-POSCO*.  *See Hanover 3201 Realty, LLC v. Village Supermarkets, Inc.*, 806 F.3d 180, 801 (3d Cir. 2015).

***Question 2:  Is there a triable issue of fact under the* USS-POSCO *test?*** Yes.  There is ample evidence for a jury to conclude that Defendants sought to extract property from Relevant through the use of governmental process without regard to the outcome of that process.  Defendants were not acting as environmental advocates hoping to attain more thorough environmental review by the City.  Their objections were boilerplate, pretextual, and voluminous, and the vast majority failed.  Defendants targeted Relevant's projects while ignoring similar and even significantly larger projects being built by other developers in the same area.  These facts are more than sufficient to allow a jury to conclude that Defendants had a policy of bringing

reflexive legal challenges against Relevant's projects without regard to their merits. That Defendants demanded a cash payment from Relevant (*not* an available outcome from a CEQA suit) in exchange for abandoning further environmental review by the City (the ostensible goal of the CEQA suits) merely underscores that these were sham challenges in which the CEQA process, and not the CEQA outcome, served as Defendants' weapon. *See United States v. Koziol*, 993 F.3d 1160, 1172 n.12 (9th Cir. 2021) (the "incongruity" between a person's settlement demands and the available recovery is "probative evidence" that litigation is a sham).

*Question 3:  Is there a triable issue of fact under the* **PREI** *test?*  Yes. Relevant will offer expert testimony at trial demonstrating that Defendants' claims were without legal merit, and detailing Defendants' extensive history of losing or abandoning arguments.  Defendants' administrative challenges were rejected by the administrative agencies that considered them.  The limited remand in the Selma litigation, by any measure, was a *defeat* for Defendants that they tellingly appealed. That Relevant paid the demanded ransom to stop Defendants' CEQA challenges is not evidence of the claims' merit, but rather confirms that Defendants *successfully* abused the legal process as a weapon to extort Relevant irrespective of the likely outcome.  Indeed, that is confirmed by the fact that Defendants unilaterally withdrew their challenge to a fourth project, the Schrader, once Defendants realized that Relevant was not involved and the project's owners could not be shaken down.  Based on this evidence a jury could find sham litigation under *Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49 (1993) (hereafter "*PREI*").

*Question No. 4:  If some or all of the lawsuits cannot qualify as sham litigation, how would that determination affect RICO liability in this case, i.e., how such a ruling affects the predicate-act requirement of RICO and the* **Noerr-Pennington** *defense?*  A finding that "some or all" of the lawsuits were not "sham" would not end the inquiry for Hobbs Act extortion (*i.e.*, the predicate acts for RICO) or the *Noerr Pennington* defense.  Under the applicable means/ends framework of the

Hobbs Act, otherwise First-Amendment-protected activity can nevertheless constitute extortion when used to achieve unlawful ends.  *See Koziol*, 993 F.3d at 1169-70; *United States v. Villalobos*, 748 F.3d 953, 956-57 (9th Cir. 2014).  Here, Defendants used purportedly public-interest CEQA claims to enrich themselves.  Because the CEQA claims could not give Defendants a legal entitlement to the property obtained, a jury could find extortion due to a lack of nexus under the "ends" aspect of extortion even if *Noerr-Pennington* protected the "means."

Even as to "means," the correct *Noerr-Pennington* analysis here is holistic not piecemeal:  whether the Defendants' overall course of conduct is protected, not whether any particular claim or act is defensible.  *Hanover*, 706 F.3d at 180 ("Even if a small number of the petitions turn out to have some objective merit, that should not automatically immunize defendants from liability.").  But if each predicate act were considered piecemeal and only "means" were considered for extortion (neither of which would be legally correct), RICO liability could be defeated if Defendants could knock out three of the four predicate acts via *Noerr-Pennington*.

***Question No. 5:  Clarification of the Predicate Acts***.  Relevant intends to prove four predicate acts: (1) extortion related to the Thompson Hotel development; (2) extortion related to the Tommie Hotel development; (3) attempted extortion related to the Selma-Wilcox Hotel development; and (4) attempted extortion related to the Schrader Hotel project.  As discussed below, the jury should also be instructed on conspiracy to commit extortion with respect to all four projects.

## BACKGROUND

We will briefly relate only the background facts that inform this supplemental brief.  In short, this case is about a pattern of abuse of California's environmental laws to extract or demand personally enriching cash settlements.

The architect of the extortion scheme is Saeed Nourmand ("Nourmand").  Nourmand is not an environmental activist or anti-development advocate.  SSF1-7, 27.  He has not been active in the Hollywood community or in local politics.  *Id.*

Rather, he is a real estate entrepreneur whose sole stake in the neighborhood is his ownership of a large plot of land (the "Sunset Property") in the heart of Hollywood's entertainment district. *Id.* The Sunset Property includes, among other things, a large event space (the Hollywood Athletic Club), a second event space permitted to operate as a 900-person-occupancy indoor/outdoor nightclub, multiple office buildings, and a large surface parking lot. SSF5-6. Contrary to his purported concerns about the harms of development, Nourmand has long had his own redevelopment plans. SSF8, 132. Indeed, in 2018 he appeared to be close to finalizing a lucrative deal to hand the property over to a group called the Harridge Group for redevelopment. SSF132.

Nourmand did not involve himself in the community until 2015, when he was informed about Relevant's plan to build a luxury, boutique hotel on an underutilized plot of land on the same block as the Sunset Property. His own lawyers repeatedly stated that his concern was that if *other people* secured government approvals, that might somehow "have a direct negative impact on [Nourmand's] ability to develop [his] own project on [the Sunset Property]." SSF27. That is not a legal basis to oppose development, so Nourmand and his enterprise began to craft pretextual arguments about environmental impacts. SSF20-26. They also retained The Silverstein Law Firm ("TSLF"), a firm with a reputation for causing delay through never-ending objections, scattershot pleadings, and vexatious litigation tactics.

Defendants' pressure campaign has now stretched over eight years, and five different projects. It has spawned three lawsuits against the City (concerning the Thompson, Tommie, and Selma developments), two more contemplated lawsuits (concerning the Schrader and Citizen News), more than a dozen administrative proceedings at various levels of the City of Los Angeles, and a letter to state and federal prosecutors—ghost written by Defendants' agents—designed to create fear of a potential investigation that would cause the City to ███████████████ ████████████. SSF13, 18, 36, 40, 41-43, 48, 71, 85, 107, 109, 120, 123, 126, 130.

The details of these challenges are amply set forth in our Separate Statement of

Facts ("SSF") and have been detailed in Judge Wright's prior orders. Suffice it to say that none of these challenges succeeded in getting the City to deny Relevant a permit, a court to order an EIR, or the prosecutors to open an investigation. But each of these challenges succeeded in delaying Relevant from getting the government approvals necessary to build its projects.

Defendants used that procedural delay—and the threat of further delay—as a weapon to extract financial and other concessions from Relevant. Defendants knew that Relevant was particularly vulnerable to delay because Relevant had (perhaps naively) answered a series of probing questions from Nourmand about its financial structure. SSF32. Defendants learned that a delay—if long enough—could cause Relevant's entire financial structure to collapse as investors pulled out. *Id.*

Defendants repeatedly made clear that they would drag out the process as long as possible and that even if Relevant asked the City to prepare the requested EIR, Defendants would just "find something else to challenge." SSF63-66, 77-78. Throughout the "settlement" discussions, Defendants refused to (1) discuss the relief that they actually could get as an outcome of the CEQA proceedings or (2) involve the City (the actual CEQA defendant) in the communications. SSF64, 82. Indeed, Sunset's General Counsel, Jayesh Patel, threatened to walk from settlement discussions if Relevant continued to focus on the relief available as an outcome of Defendants' CEQA suit. SSF82. Relevant ultimately agreed to two settlement agreements, covering the Thompson and the Tommie respectively, with Relevant paying a total of $5.5 million and making other costly concessions. SSF79-84.

Within days after the last payment had cleared, Richard Heyman reached out to Nourmand to host a meeting in the hope of avoiding future disputes. SSF84, 88-89. But before that meeting could take place, Defendants filed a copycat objection to the Selma project. SSF90-92; *see also* SSF49-51, 58, 105-107. At the meeting, Heyman asked what it would take to resolve the Selma challenge. Nourmand responded: "You know the drill, it's going to take a check." SSF94-96.

Several months later, Defendants filed yet another copycat objection to the Schrader Hotel project, which was then a Relevant project.  SSF105-107.  However, Relevant lost its rights to that project in late September 2018, and it reverted to the original owners at KOAR group, Bruce Rothman and Laurent Opman.  SSF97-99, 111.  Less than a week later, Nourmand met with Rothman and Opman.  SSF113, 115.  They will testify that they understood Defendants' filing to be meritless and part of a plan for Nourmand to "make money off his neighbors."  SSF114.  At the meeting, however, Rothman and Opman made clear that, unlike Relevant, delay was not a pain point for KOAR as it was *not* dependent on outside investors.  SSF114-116.  Thus, they could wait out whatever suit Defendants brought.  After this meeting, Defendants dropped their objections to the Schrader Hotel project entirely, confirming that Defendants had no use for CEQA when the process was not a weapon.  SSF117.

## **LEGAL STANDARD**

Defendants bear the burden of demonstrating an absence of a genuine dispute of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Evidence in opposition must be viewed in the light most favorable to Plaintiffs, and all reasonable inferences drawn in Plaintiffs' favor.  *Clicks Billiards Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001).

Furthermore, "one judge should not overrule the prior decisions of another sitting in the same case because of the 'principles of comity and uniformity [which] … preserve the orderly functioning of the judicial process.'"  *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 530 (9th Cir. 2000).  A prior judge's ruling should not be overruled except "for the most cogent reasons," *United States v. Desert Gold Mining Co.*, 433 F.2d 713, 715 (9th Cir. 1970), such as when "the decision is clearly erroneous and its enforcement would work a manifest injustice," *Delta Savings Bank*, 265 F.3d at 1027.

The substance of the "clearly erroneous" standard for a district court revisiting a prior ruling is best developed in the context of Rule 59.  There, "courts have

generally found that mere doubts or disagreement about the wisdom of a prior decision of the court will not suffice. Rather, for there to be clear error, the previous decision must strike a court as more than just maybe or probably wrong; it must be dead wrong." *Bey v. Malec*, 2020 WL 3058336, at *2 (N.D. Cal. June 9, 2020) (cleaned up; citations omitted), *aff'd sub nom. Bey v. Cristiani*, 2021 WL 3743867 (9th Cir. Aug. 24, 2021). Judge Wright's prior rulings were well-reasoned and correct. They were certainly not "dead wrong."

## DISCUSSION

## I.    QUESTION 1: WHICH SHAM LITIGATION TEST APPLIES?

A defendant enjoys no protection under the First Amendment when he uses "governmental process itself—as opposed to the *outcome* of that process—as a … weapon." *Omni*, 499 U.S. at 380. This is called "the 'sham' exception" to the *Noerr-Pennington* doctrine. *Id.* The exception recognizes that unscrupulous parties should not be permitted to wield the "costly, distracting, and time consuming" nature of administrative and judicial proceedings to get what they want. *See USS-POSCO*, 31 F.3d at 811. The bottom-line test for whether *Noerr-Pennington* protects a defendant is whether he is using process itself to achieve his ends.

Courts have identified different approaches for determining whether a defendant is weaponizing process. When the defendant's conduct consists only of initiating (or threatening to initiate) a "single" legal proceeding, the Ninth Circuit employs the two-step *PREI* approach to see whether that proceeding had merit, such that a favorable outcome (and not a protracted process) would justify bringing the action. *See USS-POSCO*, 31 F.3d at 812. But where a "whole series" of processes has been employed by the defendant—bearing the attendant risk of a "crushing burden"—the *USS-POSCO* approach governs. Both approaches seek to answer the ultimate question posed by *Omni*: was the defendant using *process* to achieve a goal by "impos[ing] expense and delay." 499 U.S. at 380. If so, the exception applies.

Here, a rational factfinder could—and indeed *should*—recognize that

Defendants availed themselves not of a "single" claim, but of a sprawling, multifarious process that spanned eight years and at least nine different tribunals, SSF13, 18, 36, 40, 41-43, 48, 71, 85, 107, 109, 120, 123, 126, 130, 137; and that Defendants churned out those "claims" by copying and pasting the same objections from one project to the next, SSF50-51, 58, 90-92, 105-107.

This is precisely the kind of scenario where the *volume* of process can inflict a "crushing burden," *USS-POSCO*, 31 F.3d at 811, and "impose expense and delay," *Omni*, 499 U.S. at 380. The evidence will show that the mere pendency of these challenges precluded Relevant from obtaining the funding necessary to complete its projects. In other words, the process itself (and not its outcome) put irresistible pressure on Relevant. A reasonable jury could find that Defendants deliberately wielded process as a weapon, as evidenced by TSLF's threat that even if Relevant prevailed on any given challenge, it could always "find something else to challenge." SSF64-65. It would be hard to script a statement more indicative of a defendant's intent to use "process itself—as opposed to the *outcome* of that process—as a . . . weapon." *Omni*, 499 U.S. at 380. As Judge Wright recognized, Defendants' automatic and reflexive opposition without regard to the merits puts this case squarely within *USS-POSCO*. ECF Nos. 39 at 7-9, 167 at 27-31.

*First*, even adopting a counting (rather than holistic) approach, what should be counted is not "lawsuits" filed but total "proceedings," which number nearly 20 here. *USS-POSCO*, 31 F.3d at 811; *see also* Rabbani Decl., Ex. A (Summary of Sham Petitioning Activity). "[P]roceedings" includes "lawsuits *and other legal actions*." *USS-POSCO*, 31 F.3d at 811 (emphasis added). Thus, administrative objections and challenges must be counted as well. Indeed, *Omni*'s paradigmatic example of weaponized process was not a lawsuit, but "objections to the license application of a competitor." 499 U.S. at 380; *see also, e.g.*, *Primetime 24 Joint Venture v. Nat'l Broad., Co.*, 219 F.3d 92, 101 (2d Cir. 2000) (FCC "signal strength challenges"); *Hanover*, 806 F.3d at 180 objections submitted to the New Jersey Environmental

Department).  And in *California Motor Transport Company v. Trucking Unlimited*, 404 U.S. 508 (1972)—from which *USS-POSCO* derived its approach—the "pattern" of petitioning activity included hearings, reviews, and appeals from agency decisions. As Judge Wright correctly recognized, "throughout each matter, the Sunset Defendants filed multiple objections and appeals with different government agencies, and viewing each suit as just one instance of sham litigation activity impermissibly oversimplifies the analysis."  ECF No. 167 at 28.

*Second*, determining the volume of process means more than just counting.  As the Court correctly recognized, there is no "bright line rule" in the Ninth Circuit about how many petitions must be filed before *USS-POSCO*'s framework applies.  ECF No. 167 at 27-29.  The overarching question is whether "a pattern of baseless, repetitive claims [has] emerge[d] which leads the factfinder to conclude that the administrative and judicial processes have been abused."  *Id.* at 28 (citing *Cal. Motor Transp.*, 404 U.S. at 513).  As the Ninth Circuit has explained, "it is not the number of claims which is controlling, but whether the evidence shows that the claim or claims filed constitute an abuse of process."  *Clipper Express v. Rocky Mountain Motor Tariff Bureau, Inc.*, 690 F.2d 1240, 1256 n.25 (9th Cir. 1982).  Put otherwise, "when purported sham litigation encompasses a series of legal proceedings rather than a singular legal action, . . . the focus is not on any single case.  Rather a district court should conduct a holistic evaluation of whether 'the administrative and judicial processes have been abused.'"  *Waugh Chapel*, 728 F.3d at 363–64 (quoting *Cal. Motor Transp.*, 404 U.S. at 513).  In conducting that "holistic evaluation," the number of proceedings is only one dimension—breadth and length matters, too.

Thus, even a small number of proceedings can show a pattern of baseless claims.  In *Hanover*, the Third Circuit held that four purely administrative proceedings brought to block a potential competitor from entering the subject market sufficed:

> Defendants argue as a threshold matter that the four actions they filed against Hanover Realty are too few to even qualify as a pattern or series. We are not convinced.  In so concluding, we do not set a minimum number requirement for the applicability of *California Motor* or find that

> four sham petitions will always support the use of *California Motor*. It is sufficient for our purposes that four petitions were filed against Hanover Realty and it alleges that Defendants filed these sham proceedings at every opportunity to obstruct Hanover Realty from obtaining all necessary government approvals.

806 F.3d at 162.

When considering length and breadth and not merely the number of proceedings, this case involves far more process than did *Hanover*, even if both are viewed as a four-count. In *Hanover*, one project was subjected to four administrative challenges. Here, *four projects* were subjected to multiple challenges and objections, including administrative challenges, letters to state and federal prosecutors in order to "scare" City officials into "delaying the project," and three separate lawsuits. *See infra* Section II. Moreover, Defendants attempted to challenge a fifth project (but missed the filing deadlines) and threatened to bring future CEQA and administrative challenges to a hypothetical EIR if one was prepared by the City. SSF130.

On these facts, the Court cannot rule as a matter of law that there was no "series" or "pattern" of objections. Neither *Amarel*, 102 F.3d 1494, nor *ERBE Elektromedizin GmbH v. Canady Tech. LLC*, 629 F.3d 1278 (Fed. Cir. 2010), involved this kind of systematic campaign designed to delay government authorization. *Amarel* involved two lawsuits, without any administrative activity, complaints to prosecutors, or threats of further challenges. 102 F.3d at 1519. *ERBE* similarly involved just three suits, and no other activity. 629 F.3d at 1291-92.

## II.   QUESTION 2: IS THERE A TRIABLE ISSUES OF FACT UNDER THE *USS-POSCO* TEST?

Yes. Under *USS-POSCO*, there is no immunity for challenges "brought pursuant to a policy of starting legal proceedings without regard for the merits and for the purpose of injuring a market rival." 31 F.3d at 811. The Court cannot grant summary judgment on a *Noerr-Pennington* defense if a factfinder could conclude that "the legal filings [were] made, not out of a genuine interest in redressing grievances, but as part of a pattern or practice of successive filings undertaken essentially for

purposes of harassment." *Id.* Again, the bottom-line determination is whether process, rather than the outcome of the process, served as the defendant's weapon. The jury must weigh all "evidence of bad-faith," including the outcomes of particular challenges, "the magnitude and nature of the collateral harm imposed," *Hanover*, 806 F.3d at 181, as well as any "incongruity" between the defendant's demands and the possible relief available in the litigation, *Koziol*, 993 F.3d at 1172 n.12. Such an incongruity speaks volumes, since a demand that exceeds any possible outcome of litigation almost inherently seeks a payoff based on "the litigation *process* rather than through [any] *result* of that process." *Koziol*, 993 at 1172 (citation omitted). Further, a defendant's "occasional success" on some of the challenges brought is "irrelevant"—and certainly insufficient to entitle a defendant to summary judgment— because even a "broken clock is right twice a day." *USS-POSCO*, 31 F.3d at 811.

Here, there is ample evidence creating triable issues of fact. A jury could find that Defendants used tactics to maximize the delay—and thus the collateral costs—of the process, and specifically that Defendants: (A) repeatedly and reflexively filed kitchen-sink, copycat objections to Relevant's projects; (B) had no actual interest in the merits of the positions they took, which were often hypocritical or entirely unfounded (as when Defendants threatened to object to environmental studies that they had not even seen), or in achieving a successful CEQA outcome; and (C) did not prevail on the merits and demanded a payoff that could not have been achieved as a litigation outcome.[1]

---

[1] Because this case arises in the context of an extortion claim rather than an antitrust claim, Relevant agrees with Judge Wright that it is not necessary to establish that Relevant and Defendants are economic competitors. ECF No. 167 at 24; *see also Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 938 (9th Cir. 2006) (holding that the relevant inquiry is whether the defendant's motive was unlawful). However, a rational factfinder could conclude that Defendants were also motivated by anticompetitive concerns because Relevant's developments included nightclubs and event spaces that could have competed with Defendants' properties. SSF5-8. Judge Wright correctly recognized that this was a jury question. *See* ECF No. 167 at 24.

## A. Defendants Reflexively Challenged Relevant's Projects

Beginning sometime in 2015 and continuing through to the filing of this suit, Defendants systematically challenged (or attempted to challenge) Relevant's hotel projects with a kitchen-sink approach that maximized the harm caused by process.[2] With the Thompson, Tommie, Selma, and Schrader, Defendants filed objections throughout the City's approval process, including at zoning administration hearings, the City Planning Commission, the Planning and Land Use Committee, and at the City Council itself. The objections consisted of reams of boilerplate arguments. Many ran into the ***hundreds of pages***, and simply copied and pasted the same form objections without regard for differences between the projects. SSF50-51, 58, 90-92, 105-107, 120-122. And Defendants did not stop there—for instance, they filed additional objections before the Department of Building Safety against a demolition permit for a building that had already been demolished (and then appealed that loss). SSF40-43.

Once the City rejected Defendants' objections (usually by unanimous vote) and approved Relevant's projects, Defendants simply filed suit using the same template and scattershot approach, alleging significant impacts under every environmental impact category listed in the CEQA Guidelines Checklist, without any supporting allegations. SSF36-39, 44-47, 71-74, 126-129, 135; *see also* ECF No. 137-3 at 17-18. Defendants then sought to protract these proceedings, *i.e.*, to *delay* any outcome.

---

[2] Defendants incorrectly argue that they could not possibly have had a "policy" of challenging projects because they did not challenge two 2015 applications for liquor licenses for two restaurants, because they did not challenge the redevelopment of the Citizen News Building (next to the Thompson), and because they did not challenge Defendants' applications to redevelop the Morrison Building in downtown Los Angeles. *See* ECF No. 167 at 28-29. A reasonable jury could conclude that these omissions did not disprove a wrongful strategy to reflexively challenge Relevant's projects. The two liquor license applications were filed very early in Nourmand's opposition to the Thompson, before he had hired TSLF, and there is no evidence he even knew about these applications. *See* ECF No. 141, SUF120. Defendants attempted to challenge the Citizen News Building redevelopment but missed relevant deadlines and then later tried to drum up opposition through third parties. SSF130 And Relevant applied for permissions for the Morrison after this lawsuit was filed. *See* ECF No. 141, SUF120.

SSF67-68, 122, 133-134, *see also* ECF No. 137-3 at 18-23; *Livingston Downs Racing Ass'n Inc. v. Jefferson Downs Corp.*, 192 F. Supp. 2d 519, 540 (M.D. La. 2001) (an "attempt to delay adjudication of their own lawsuits" was evidence of sham litigation).

Underscoring that process (not outcome) drove Defendants' strategy, Defendants dropped their objections to the Schrader Hotel project upon learning from Messrs. Opman and Rothman, the owners of KOAR, that Relevant no longer had an interest in the Schrader and that unlike Relevant, KOAR was self-funded and under no time pressure to start construction.  SSF105-109, 111-117.

## B.    Defendants Had No Genuine Interest in the Merits of Their Claims or In Achieving a Successful CEQA Outcome

Moreover, there is powerful evidence demonstrating that Defendants had no genuine interest in the arguments they were advancing or the outcome ostensibly sought by Defendants (additional environmental review).  This is not a case of a litigant asserting a potentially valid private right, such as a patent or copyright holder acting to protect its intellectual property.  *Cf.*, *e.g.*, *ERBE*, 629 F.3d at 1291-92 (patent); *PREI*, 508 U.S. at 50 (copyright); *see also id* at 69 (Stevens, J., concurring). Rather, Defendants raised pretextual environmental and public policy concerns as cover to inflict "collateral harm" on Relevant—delaying its projects and endangering its financing—and then demanded a payoff in order to remove the process-based knife Defendants had at Relevant's throat.  *See Hanover*, 806 F.3d at 181.

Nourmand has no record—either before or after beginning his campaign against Relevant—of any involvement in environmental issues or the Hollywood community.  SSF27.  And his arguments were plainly insincere.  For instance, even while owning and renting space to Boulevard3—one of the largest nightclubs in Hollywood, which featured live dancers and offered bottle service—Defendants railed against "party hotels" and nightclubs that would attract the wrong "kind of people."  SSF22, 25, 58-59, 75, 92, 107.  Defendants complained about the impact of development on the neighborhood while negotiating to have its own property

redeveloped by a large outside developer.  SSF25, 27, 132.  The pretextual nature of these objections were confirmed when Defendants challenged the Thompson project before they even saw the environmental study they claimed was inadequate and again three years later when they challenged the Schrader before even seeing the plans. SSF19-20, 105-107; *see also* ECF No. 141, SUF95.

In settlement, Defendants demanded concessions that would benefit their business interests, *at the expense of* the public they purported to represent in the CEQA litigation.  ECF No. 127-2, Ex. J at 179.  This included securing agreement from Relevant to forgo CEQA challenges to *Defendants'* future developments (*id.*, Ex. H at 116, Ex. I at 144), which is the antithesis of CEQA's policies.  SSF26, 81, 84.  Defendants pointedly *did not* ask for further environmental review or for Relevant to address dozens of purported environmental objections Defendants had advanced. And when Relevant offered to complete an EIR for the Thompson—the relief purportedly sought in the Thompson CEQA litigation—Defendants made clear that they would challenge, sight unseen, any EIR too.  As Defendants' attorney, Robert Silverstein, put it, he could always "find something else to challenge."  SSF64-65.

The pretextual nature of Defendants' objections is underscored by the fact that Defendants declined to bring such objections against other developers.  So, while claiming to care about traffic or climate change, Defendants did not challenge the nearby "Crossroads" project, a $1 billion, eight-acre development that would have been ten times larger than anything proposed by Relevant.  SSF131-132.  Not coincidentally, Nourmand was negotiating a lucrative deal with the Crossroads developer to develop the Sunset Property in the same time frame he was objecting to the Selma and Schrader hotel projects.  *Id.*; *see also* ECF No. 141, SUF118-119.

In short, a reasonable jury could find that Defendants pursued their objections to the projects not in order to achieve the outcome of ensuring an environmentally sound development, but to weaponize the *process* of protracted CEQA proceedings as leverage for extorting Relevant.

**C.    Defendants Did Not Succeed on the Merits and Demanded a Pay-Off They Could Not Have Achieved as a Litigation Outcome**

Defendants did not prevail at any level of the City's administrative process. Their objections were rejected by the Planning Commission, the PLUM Committee, and the City Council.   SSF35, 62, 124.   Their effort to invalidate Relevant's demolition permit for the Thompson Hotel was rejected twice, with the Central Area Planning Commission sharply criticizing the procedurally improper challenge. SSF41-43.  Defendants' effort to get prosecutors involved also failed.  SSF123.

Defendants were equally unsuccessful in litigation.  Between 2016 and 2019, Defendants filed three Petitions challenging Relevant's hotel projects.   In each Petition, Defendants sought injunctive and equitable relief to set aside the applicable MNDs and to order the City to prepare an EIR for each project.  *See, e.g.*, ECF No. 127-4, Ex. 8 at 236.  No court has *ever* ordered an EIR (the only outcome requested by Defendants).  *See* ECF No. 137-3 at 24-33.  Every court that reached the merits of Defendants' claims (or similar claims) expressly allowed Relevant to proceed with construction pursuant to the applicable MND.  *See, e.g.*, ECF No. 127-4, Exs. 14 (modifying injunction to allow construction to continue), 19 at 586.

Defendants' initial Petitions included generic, scattershot arguments brought without regard to their merit.  *See* ECF No. 137-3 at 13-17.  Later filings then merely parroted prior objections that had failed.  *Id.*  Despite the volume of its submissions, Defendants never provided any *evidence* of any specific environmental impacts, and instead simply recited all of the impact categories listed in CEQA guidelines.  *Id.* at 17-18, 24-33.  Defendants abandoned most of their allegations during the course of litigation, never even attempting to support them in briefing (let alone with proof). *Id.*; *see Waugh Chapel*, 728 F.3d at 363-64 (noting that withdrawal of arguments supports the conclusion that they were meritless).  As Relevant's expert will explain to the jury, these tactics bear the hallmarks of the abuse of the CEQA process.

Defendants repeatedly have attempted to claim success by pointing to various

interlocutory and procedural rulings on collateral issues.  But a rational factfinder could—indeed, almost certainly would—recognize that these were instances of Defendants protracting the process without achieving success on the merits.

In *Thompson*, the claimed "win" is a tentative ruling denying a motion by the City to augment the administrative record.  A year and a half into the litigation, Defendants claimed to "discover" that elements on the building rooftop (such as the location of the pool) had been moved during the planning process and necessitated a continuance to the trial date.  SSF67-68.  Never mind that these changes ***had been made at Nourmand's request*** and never mind that the plans had been made available to Nourmand years before.  *Id.*  The City sought to augment the administrative record to add evidence addressing this argument, but the motion was denied.  *See* ECF No. 137-3 at 20-21.  The tentative ruling impacted only the City's exhaustion defense, not the Petition's merits.  The *Thompson* court never granted any relief sought in the Petition or required an EIR to proceed.  ECF No. 141; SUF100.  This dubious motion practice hardly shows that the underlying claims were brought in good faith at the outset.

In *Tommie*, the claimed win is not even Defendants'—it involves a separate lawsuit brought by a union organizer named Elle Farmer.  This interlocutory decision was no victorious outcome for Ms. Farmer (let alone for Defendants).  The *Elle Farmer* court did not order the City to prepare an EIR; it ordered an interlocutory remand so the City could clarify the MND, and Relevant proceeded with construction.  ECF No. 127-5, Ex. 14.  That is not a win for CEQA petitioners.

In *Selma*, the court flatly rejected the overwhelming number of Defendants' and Casey Maddren's claims, describing many as meritless and wholly lacking evidentiary support.  ECF No. 127-5, Ex. 19.  On the two arguments as to which Defendants claim victory, the court remanded those issues to the City, again for "clarif[ication]," and allowed construction to proceed.  *Id.* at 586.  Tellingly, ***Defendants appealed*** the order it now calls a win—and then lost on appeal.  ECF No.

127-4, Ex. 5 at 78.  A rational factfinder could conclude that is not a victory.

Nor are the settlement agreements evidence that Defendants' claims had merit. If a victim's ransom payment precluded application of the sham litigation exception to *Noerr-Pennington*, successful extortioners would be immune while failed extortioners would not.  Such perversity has no grounding in the Supreme Court's or the Ninth Circuit's articulation of the policies underlying the exception.  The whole point of the sham exception is that a party can weaponize process "to impose expense and delay," *Omni*, 499 U.S. at 380, which can put a "crushing burden" on the victim, *USS-POSCO*, 31 F.3d at 811.  A victim facing ruin will pay anything to avoid it— and where the threat of ruin comes from the litigation process, that means settlement. *See, e.g.*, *CSX Transp., Inc. v. Gilkison*, 2012 WL 5906716, at *7 (N.D. W.Va. Nov. 26, 2012) (a settlement agreement is not conclusive evidence of merit).[3]  Indeed, far from *disproving* sham litigation, a settlement can *prove* sham when, as here, there is an "incongruity" between what the victim is paying and what the extortioner could achieve as a litigation outcome.  *See Koziol*, 993 F.3d at 1172 n.12.  That incongruity shows that the victim is paying to avoid "process—as opposed to the outcome of that process," *Omni*, 499 U.S. at 380, and that means *Noerr-Pennington* does not apply.

Here, the word "incongruity" does not even begin to capture the payoff Defendants sought and obtained.  Defendants demanded over a dozen concessions they could never get (and did not even seek) in a CEQA action.  ECF No. 127-2, Ex. N. Monetary damages are not available in CEQA cases.  And Defendants' naked weaponization of CEQA did not even have a fig leaf:  "You know the drill.  It will take a check to make this go away."  ECF No. 141, SUF116.  Defendants demanded

---

[3] *Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991 (9th Cir. 2008), does not hold that a settlement is *conclusive* evidence of merit.  The court held only that a settlement was "suggest[ive]" that an underlying case was meritorious.  *Id.* at 1008.  The jury is free to consider whether the settlements were evidence of merit or evidence of the collateral effect on Relevant.  But that evidence is merely circumstantial, and there remains a disputed issue of fact under the *prospective USS-POSCO* test.  *See* ECF No. 167 at 26 (citing *Hanover*, 806 F.3d at 181).

the extraordinary sum of $5.5 million, *none* of which was attorneys' fees (ECF No. 127-2, Exs. H at 116, I at 144), and all of which was claimed for tax purposes as "economic harm" (ECF No. 141, SUF115).  The settlement barred Relevant from challenging Defendants' development proposals in the future—something that is not only not obtainable in a CEQA case, but is contrary to the very premise of CEQA. *See* ECF No. 137-3 at 33-35.  Defendants also demanded a host of changes to the Tommie and Thompson hotels that did not reduce any purported environmental impacts on the public, but simply benefited Defendants' property. *Id*.  The settlements did not include typical CEQA provisions, such as mitigation efforts or an EIR—that is to say, they did not give Defendants the outcome they ostensibly sought in the CEQA suits.  *Id*.  And the City of Los Angeles, the actual party to the CEQA suits, was not involved in, or a party to, the settlements—indeed, the agreements prohibited Relevant from telling the City the terms of the settlements.  *Id.*

The evidence will make clear that this incongruous result was attained because Relevant faced ruin because of the *process* invoked by Defendants, not any potential outcome of it.  The mere pendency of the CEQA litigation prevented Relevant from securing financing and commencing construction.  *See* ECF No. 137-3 at 10-12  Existing investors threatened to pull out if construction did not begin.  *Id*.  As noted, Defendants knew of that vulnerability to delay and understood that it made the CEQA *process* a weapon.  *See Livingston Downs*, 192 F. Supp. 2d at 540 (evidence of knowledge that litigation would have impacts on opponent's ability to obtain financing supported a finding of sham litigation).  And they made clear they would do whatever they could to protract the process:  if Relevant won at trial, Defendants would appeal and thus drag the case out by another year to eighteen months; if Defendants prevailed and Relevant prepared an EIR, Defendants would challenge that too.  They put this threat in writing, making clear that *delay* was the reason to pay Defendants' demand:

> [I]f we are successful in the litigation, and assuming you [do] an EIR, the *developer needs an additional two years to process the project, with*

*many of the same challenges going forward.*  In the end … there is a balance that needs to be struck between the preferred construction outcome, and the economic impact we assess to have occurred on the HAC property. . . . My hope is that once there is a *hard-pencil costing assessment* done by the developer, that you will see what that balance looks like, and we will have a productive discussion going forward.

SSF77-78 (emphasis added).

It is (at a minimum) a question for the jury whether, in getting Relevant to give in to that threat and settle, Defendants were using process (rather than the process's ultimate outcome) as a weapon.  *Livingston Downs*, 192 F. Supp. 2d at 540 (evidence of knowledge that litigation would have impacts on opponent's ability to obtain financing supported a finding of sham litigation).

Finally, even if the settlement agreements could be seen as evidence of the merit of some particular claim or filing, that would not preclude the sham litigation exception.  As Judge Wright ruled, it would make no sense to calculate Defendants' "batting average" by looking at *cases* rather than *claims*.  ECF No. 167 at 25-27.  If a gambler places a chip on every number on the roulette table, the fact that the ball lands on one of those numbers does not mean the gambler made a successful bet.  *See USS-POSCO*, 31 F.3d at 812 (The "occasional success" of a sham claim is "irrelevant" because even a "broken clock is right twice a day."); *see also Hanover*, 806 F.3d at 180-81 (a claimant's batting average is only "circumstantial evidence").  Indeed, such a betting strategy would suggest some sham was afoot.  So too with Defendants' kitchen-sink objections.  Defendants' "win" had nothing to do with the merits of those objections and everything to do with their volume.

## III.   THERE ARE TRIABLE ISSUES OF FACT UNDER *PREI*

Under the two-step *PREI* test, courts first determine whether the underlying claims was objectively baseless and then proceed to examine the claimant's subjective intent to determine whether the claim "conceals an attempt to interfere directly with the business relationships" of another.  508 U.S. at 62-63.  The Court's January 20 order appears to ask about the first step of the *PREI* analysis, objective baselessness.

However, we note that the evidence detailed above (*supra* at "Background"; SSF20-27, 56-57, 59, 64-65, 77-78, 95-96) would allow a reasonable jury to find that Defendants acted with the requisite subjective intent.

Objective baselessness is a question of fact. *See CSX Transp.*, 2012 WL 5906716, at *7 (denying summary judgment under *PREI*). Courts may decide "probable cause" as a matter of law only if "there is no dispute over the predicate facts of the underlying legal proceeding . . . ." *PREI*, 508 U.S. at 63; *accord Rock River Commc'ns, Inc v. Universal Music Grp, Inc.*, 745 F.3d 343, 352-53 (9th Cir. 2014). As discussed in Relevant's opposition to summary judgment, and as set forth above, there are disputed issues of fact (including competing expert testimony) as to whether the underlying lawsuits were objectively baseless. ECF Nos. 137 at 19-20, 137-3.

Furthermore, while courts have reached different conclusions on this issue, *see Intel Corp. v. Via Techs., Inc.*, 2001 WL 777085, at *5-6 (N.D. Cal. Mar. 20, 2001) (noting the "uncertain state of the law"), when, as here, a single lawsuit contains multiple distinct claims, the fact that one claim might have some merit is insufficient to prove that suit is not baseless; rather, the factfinder must consider the complaint *as a whole*. *See, e.g.*, *In re Wellbutrin XL Antitrust Litig. Indirect Purchaser Class*, 868 F.3d 132, 156 n.34 (3d Cir. 2017) ("When considering whether a petition is entitled to immunity, courts should consider whether the petition as a whole is objectively baseless."); *Heritage Guitar, Inc. v. Gibson Brands, Inc.*, 2022 WL 1954361, at *8-9 (W.D. Mich. June 6, 2022). As the *Intel* court observed, "To immunize such bad-faith conduct because it is joined with good-faith conduct would eviscerate most of the sham litigation exception" particularly in contexts where it might be comparatively easy to "find a colorable claim to join with a baseless claims." 2001 WL 777085, at *5.[4] A contrary rule would immunize a party that bolted dozens of

---

[4] The *Intel* court also noted potential downsides with the mixed case approach, but ultimately declined to decide the issue on a motion to dismiss, stating "[d]iscovery may reveal that the incremental effects of the supposed sham components were negligible or may show that they dominated the original (continued...)

frivolous, misjoined, process-intensive claims onto a single, trivial but non-frivolous claim and then used the process to achieve an improper goal—while *not* immunizing a party that filed the exact same claims in separate actions.

We also submit that looking at the complaint as a whole would be consistent with results reached in the Ninth Circuit in cases involving allegations of sham *discovery* taking place in otherwise non-sham litigation. In *Theofel v. Farey-Jones*, 359 F.3d 1066, 1079 (9th Cir. 2004), the Circuit denied *Noerr-Pennington* immunity for discovery conduct inside an otherwise legitimate claim: "[Defendants] apparently think a litigant should have immunity for any and all discovery abuses so long as his lawsuit has some merit. Not surprisingly, they offer no authority for that implausible proposition. Assuming *Noerr–Pennington* applies at all, we hold that it is no bar where the challenged discovery conduct itself is objectively baseless." *See also Acosta v. FCE Benefit Adm'rs, Inc.*, 2018 WL 11447534, at *6 (N.D. Cal. Jan. 22, 2018) ("On at least two occasions, the Ninth Circuit has stated that objectively baseless discovery conduct, undertaken with an improper motive, can constitute sham litigation activity, even if it occurs in the context of a lawsuit that is otherwise protected by *Noerr-Pennington*."). It would make no sense to deny immunity to meritless discovery conduct inside a valid case while granting immunity to meritless causes of action simply because they are joined to a non-frivolous claim.

*PREI* itself is not to the contrary. There, the underlying allegedly sham proceeding was a simple claim for copyright infringement by a conceded copyright owner in a context where the law was "unsettled," such that the underlying plaintiff "plainly had probable cause to sue." *PREI*, 508 U.S. at 51-53, 64-65. It did not involve the kind of blunderbuss pleading involved here.

As set forth above, there is a factual dispute about whether Defendants'

---

complaint. Discovery may shed light on the actual factual pattern in need of a rule." *Id.* at *6. A court in the Southern District of New York recently reached a similar conclusion. *See Sanborn Library Llc v. Eris Info.*, 2021 U.S. Dist. LEXIS 165496 (S.D.N.Y. Aug. 30, 2021).

lawsuits (and other administrative challenges) were objectively baseless.  Defendants' administrative claims failed, and the jury will hear that their arguments were meritless and repeatedly rejected.  In the CEQA litigation, no court ever ordered an EIR, and the purported "wins" were not actually victorious outcomes.  And under either the *USS-POSCO* or *PREI*, a settlement is not conclusive evidence that a claim has merit, but can be evidence simply that the collateral consequences of litigation were so severe that it forced one side to settle a claim for reasons unrelated to the merits.

## IV.  QUESTION 4: HOW WOULD A RULING THAT "SOME OR ALL OF THE LAWSUITS CANNOT QUALIFY AS SHAM LITIGATION … AFFECT[] THE PREDICATE-ACT REQUIREMENT OF RICO"?

A finding that some or all of the underlying lawsuits were not "sham" would alone suffice to defeat any predicate act.  Obtaining property can constitute extortion, and thus constitute a RICO predicate (1) if the means are "inherently wrongful," (2) if the means are "wrongful under the circumstances," *or* (3) if "the ends were 'wrongful' because [the defendant] had no lawful claim to the property he demanded."  *Koziol*, 993 F.3d at 1169-70 (describing the "means-ends framework"); *Villalobos*, 748 F.3d at 956-57 (same).  A ruling in Defendants' favor as to the sham litigation exception would preclude a finding that Defendants' *means* were wrongful, but it would say nothing about whether the *ends* were wrongful.

It is settled that otherwise First Amendment-protected means can be wrongful—and thus constitute actionable extortion—when put to wrongful ends. Making a truthful report to the police is protected speech; demanding money to refrain from making such a report is actionable extortion.  *See, e.g.*, *Flatley v. Mauro*, 39 Cal. 4th 299, 330-32 (2006).  Truthfully exposing an embarrassing fact is protected speech; demanding money to hush it up is blackmail.  *See, e.g.*, *United States v. Goodwin-Painter*, 2015 WL 838501, at *1-2 (S.D. Ga. Oct. 6, 2015) (threat to release damaging information coupled with demand for $8 million settlement payment on unrelated malpractice claim).  "Wrongful ends" can also be established by showing "(1) the lack

1   of a plausible claim of entitlement to the property demanded, or (2) the lack of a good

2   faith belief of entitlement, or (3) the lack of a nexus between the threat and the claim

3   of right." *Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362, 579 (S.D.N.Y. 2014),

4   *aff'd*, 833 F.3d 74 (2d Cir. 2016); *accord, e.g.*, *Villalobos*, 748 F.3d at 958-59

5   (Watford, J., concurring in the judgment).

6        That the wrongful demand takes place in the context of litigation makes no

7   difference.  Indeed, there are individuals sitting in prison for making such improper

8   demands.  *See, e.g.*, *United States v. Avenatti*, 2020 WL 70951, at *8-9 & n.2

9   (S.D.N.Y. Jan 6, 2020) (lawyer-defendant demanded that Nike hire him to conduct a

10   $25M "internal investigation," as a condition to settling claims with lawyer-

11   defendant's client); *United States v. Tobin*, 155 F.3d 636, 640 (3d Cir. 1998)

12   (precluding claim-of-right defense where defendant sought to enforce an alleged oral

13   contract by threatening "lawsuits alleging sexual harassment").  Neither *Koziol* nor

14   *Sosa* had occasion to address the "wrongful ends" prong of the analysis; both instead

15   involved allegations that settlement demands were wrongful because of the *means*

16   employed (meritless litigation).  *Sosa* makes clear that settlement demands are not

17   "absolutely protected," and the relevant question is whether imposition of liability for

18   extortion would burden the exercise of First Amendment rights.  *Sosa*, 437 F.3d at

19   932, 938. We submit no such burden exists here.  A CEQA plaintiff, asserting public

20   rights, is not burdened by being unable to demand private financial concessions.

21        Thus, even if the Court were to reverse Judge Wright and rule as a matter of

22   law that Defendants were not employing sham litigation, that would only mean that

23   Defendants had *some* rightful claims *against the City*.  But even if Defendants had

24   won on every one of those claims, they would not have been able to obtain anything

25   like the property they extorted from Relevant.  CEQA does not support damages or

26   even vindicate private rights.  The sole form of monetary relief available would have

27   been attorneys' fees. SSF14-17.  Yet Defendants used those claims to demand (and

28   obtain) millions of dollars from Relevant (along with other concessions), money that

explicitly was *not* for attorney's fees.  SSF81-84.  Given the lack of nexus between Defendants' claim of right and the property they took, a rational jury could find that Defendants' ends were wrongful, even if an erroneous *Noerr-Pennington* ruling denied them the opportunity to find the means were wrongful.  *See La Suisse, Societe D'Assurances Sur La Vie v. Kraus*, 2014 WL 3610890, at *9 (S.D.N.Y. July 21, 2014) (extortion where defendants demanded personal payments from insurer to settle claims against insurer that defendants brought on behalf of third-party policy holders because defendants "could not have any claim of right to the proceeds").  Wrongful ends would establish extortion; extortion would serve as a predicate act; and two or more such predicate acts would suffice for RICO liability.

As discussed above, even as to the means prong, the *Noerr-Pennington* analysis must assess Defendants' overall course of conduct; it should not take each case individually.  *Hanover*, 706 F.3d at 180.  But if each predicate act is to be considered one at a time, and if the "ends" are excluded from the analysis, then Defendants can avoid RICO liability only if three of the four predicate acts are not based on "sham" litigation.

## V.     QUESTION 5: WHAT PREDICATE ACTS [DOES RELEVANT] INTEND TO PROVE AT TRIAL?

Relevant intends to prove four predicate acts of extortion and attempted extortion in violation of the Hobbs Act (18 U.S.C. § 1951) and California law (Cal. Pen. Code §§ 518, 524): (1) extortion related to the Thompson Hotel development; (2) extortion related to the Tommie Hotel development; (3) attempted extortion related to the Selma Hotel development; and (4) attempted extortion related to the Schrader Hotel project.  Defendants also conspired with each other, and other members of the alleged enterprise, to commit extortion with respect to Relevant's projects.  *See* 18 U.S.C. § 1951(a); 18 U.S.C. § 1961(1)(B); *see also Dooley v. Crab Boat Owners Ass'n*, 2004 WL 902361, at *5 (N.D. Cal. Apr. 26, 2004) ("conspiring to commit extortion … may be considered a predicate act for purposes of RICO").

1

Dated:  February 23, 2023

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation


By:   *s/Susan K. Leader*
       Susan K. Leader
Attorneys for Plaintiffs