1   **WILSON SONSINI GOODRICH & ROSATI**
    **Professional Corporation**
2   SUSAN K. LEADER, State Bar No. 216743
    sleader@wsgr.com
3   MARK R. YOHALEM, State Bar No. 243596
    myohalem@wsgr.com
4   MATTHEW A. MACDONALD, State Bar No. 255269
    Matthew.Macdonald@wsgr.com
5   633 West Fifth Avenue, Suite 1550
    Los Angeles, CA 90071-2027
6   Telephone:  (323) 210-2900
    Facsimile:   (866) 974.7329
7
8   **WILSON SONSINI GOODRICH & ROSATI**
    **Professional Corporation**
    DALE R. BISH, State Bar No. 235390
9   dbish@wsgr.com
    650 Page Mill Road
10  Palo Alto, CA 94304-1050
    Telephone:  (650) 493-9300
11  Facsimile:   (650) 565-5100

12  Attorneys for Plaintiffs Relevant Group, LLC,
    1541 Wilcox Hotel LLC, 6516 Tommie Hotel
13  LLC, and 6421 Selma Wilcox Hotel LLC

14              **UNITED STATES DISTRICT COURT**

15              **CENTRAL DISTRICT OF CALIFORNIA**

16

17  RELEVANT GROUP, LLC, a Delaware        ) Case No.: 2:19-cv-05019-PSG-KSx
    limited liability company; 1541 WILCOX )
18  HOTEL LLC, a Delaware limited liability ) **SEPARATE STATEMENT OF**
    company; 6516 TOMMIE HOTEL LLC; a      ) **FACTS IN SUPPORT OF**
19  Delaware limited liability company; and ) **PLAINTIFFS' SUPPLEMENTAL**
    6421 SELMA WILCOX HOTEL LLC, a         ) **BRIEF IN RESPONSE TO THE**
20  California limited liability company,   ) **COURT'S JANUARY 20, 2023**
                                            ) **ORDER (ECF NO. 260)**
                        Plaintiffs,          )
21                                          )
                 v.                         ) Date:    April 27, 2023
22                                          ) Time:    1:30 p.m.
    STEPHAN "SAEED" NOURMAND, an            ) Dept:    Courtroom 6A
23  individual; THE SUNSET LANDMARK        ) Before: Hon. Philip S. Gutierrez
    INVESTMENT LLC, a California limited    )
24  liability company; NOURMAND &          )
    ASSOCIATES, a California corporation;   )
25  and DOES 1-10,                          )
                                            )
26                      Defendants.          )
                                            )
27  ─────────────────────────────────────

    REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
28

PLTFS' SEP. STATEMENT OF FACTS
CASE NO. 2:19-cv-05019-PSG-KSx

Pursuant to the Court's Order for Supplemental Briefing (ECF No. 260), Plaintiffs Relevant Group, LLC ("Relevant Group"), 1541 Wilcox Hotel LLC ("Wilcox"), 6516 Tommie Hotel LLC ("Tommie") and 6421 Selma Wilcox Hotel LLC ("Selma") (collectively, "Relevant") submit this Separate Statement of Facts.

## PLAINTIFFS' SEPARATE STATEMENT OF FACTS

| | Fact | Supporting Evidence[1] |
|---|---|---|
| | **The Parties** | |
| 1. | Saeed Nourmand ("Nourmand") founded Nourmand & Associates ("N&A") in the 1970s. | Declaration of Saeed Nourmand, ECF No. 124-2 ¶ 3 |
| 2. | Saeed Nourmand's wife, Myra Nourmand, owns N&A. | Ex. 5 [JX291] ¶¶ 1-2 |
| 3. | N&A markets itself as a "family-run business." | Ex. 2 [M. Nourmand Depo Tr. (April 28, 2022)] at 25:14-16 |
| 4. | Through his company, The Sunset Landmark Investment LLC ("Sunset Landmark"), Nourmand owns five contiguous parcels of land in Hollywood, located at the northeast corner of Sunset Boulevard and Schrader Boulevard (the "Sunset Property"). | Declaration of Saeed Nourmand, ECF No. 124-2 ¶ 2; Ex. 6 [JX056] |
| 5. | The Sunset Property includes a parking lot, a nightclub, an outdoor courtyard and multiple structures, including a nine-story building known as the Hollywood Athletic Club ("HAC"). It also includes a residential structure that Sunset wants to demolish. | Ex. 3 [S. Nourmand Depo Tr. (April 22, 2022)] at 58:23-59:11, 68:4-6, 77:17-19, 78:23-79:12, 87:2-9; Kaufman Decl. Ex. 30, ECF No. 139-30 at 287, 303-04 (M. Iravani Tr. 19:17-21, 96:19-25, 97:20-22) |
| 6. | HAC is a former hotel that is used as an event space for weddings, banquets, business meetings and conferences. | Kaufman Decl. Ex. 30, ECF No. 139-30 at 289-90 (M. Iravani Tr. 21:9-22:9) |
| 7. | During the relevant time period, the nightclub on the Sunset Property, | Kaufman Decl. Ex. 30, ECF No. 139-30 at 288, 292-93 (M. Iravani |

[1] Unless otherwise specified, all references to "Ex." refer to those exhibits attached to the Declaration of Ali Rabbani filed concurrently herewith.

| | | | |
|---|---|---|---|
| | | known as Boulevard3, consisted of 13,900 square feet of indoor floor space, a dance hall and an outdoor courtyard with a full liquor license, live entertainment, and an approved occupancy load of 900 persons. Nourmand was an owner of Boulevard3 and received $10,000 to $60,000 in monthly profits from its operations. | Tr. 20:2-7, 25:1-26:9); Ex. 3 [S. Nourmand Depo Tr. (April 22, 2022)] at 83:1-5, 87:12-19, 87:2-9, 96:9-97:4 |
| 8. | | Nourmand has wanted to develop the Sunset Property, including the parking lot thereon, and he pursued various opportunities to do so. | Declaration of Guy Maisnik, filed concurrently herewith ("Maisnik Decl." ¶ 8; Ex. 7 [JX079] at JX079.0002 ("Developer" shall "agree not to oppose … any future development proposal that Sunset Landmark or any successor or assign may pursue"); Ex. 8 [JX093] ("you have all the conviction of someone with entitlements, and we have the substantial doubts of someone without entitlements" (emphasis omitted)), JX093.0003 ("Agreement to assist HAC" on "any project it undertakes" and "the HAC's own efforts to develop its property"); Ex. 9 [JX118] at JX118.0004 ("Assistance and Support for Sunset Development Proposals"); Ex. 10 [JX120]; Ex. 11 [JX134] |
| | | **Plaintiffs** | |
| 9. | | Richard Heyman and Grant King formed Relevant Group, LLC ("Relevant") in 2007 in order to develop a hotel in Hollywood, which eventually became known as the Dream Hotel Hollywood (the "Dream"). | King Decl., ECF No. 137-1 ¶ 2 |

| 10. | Relevant lost the Dream property to foreclosure during the financial crisis of 2008.  Subsequently, Relevant began raising funds through the EB-5 investment program, which it used to repurchase the property and resume development. | King Decl., ECF No. 137-1 ¶¶ 2-4 |
| 11. | After successfully funding its reacquisition of the Dream, Relevant sought to develop four other hotel projects in the heart of Hollywood, including the "Thompson Project" at 1541 Wilcox Avenue, the "Tommie Project" at 6516 Selma Avenue, the "Selma Project" at 6421 Selma Avenue, and the "Schrader Project" at 1600 Schrader Boulevard. | King Decl., ECF No. 137-1 ¶¶ 5, 11-12; Declaration of Richard Heyman, filed concurrently herewith ("Heyman Decl.") ¶¶ 2-3, 12, 13 |
| 12. | Relevant contributes capital to its project entities.  However, Relevant is largely dependent on outside funding for its projects, including through bank loans, construction loans, and capital raised through the EB-5 program.  Due to its funding structure, Relevant is particularly vulnerable to project delays. | Shayne Decl., ECF No. 137-2 ¶ 5; King Decl., ECF No. 137-1 ¶ 3; Kaufman Decl. Ex. 31, ECF No. 139-31 at 312-13, 316-318 (R. Heyman Tr. 46:23-47:4, 73:16-23, 76:14-16, 78:14-15) |
| 13. | Beginning in 2015, Defendants challenged and delayed Relevant's four hotel projects by, *inter alia*, opposing them during the entitlements process with the City of Los Angeles (the "City") and by filing CEQA lawsuits against the City in California Superior Court. | Thomas Decl., ECF No. 137-3 at 3; Declaration of Laurent Opman, filed concurrently herewith ("Opman Decl.") ¶¶ 9-17, Exs. A, B |
| **CEQA** | | |
| 14. | Defendants challenged Relevant's hotel projects under a statute called the California Environmental Quality Act ("CEQA"). | Thomas Decl., ECF No. 137-3 at 3-9 |

| | | | |
|---|---|---|---|
| 1<br>2<br>3<br>4<br>5<br>6 | | Under CEQA, a municipal agency is required to study the environmental impacts of a proposed development project before the agency can grant approvals.  To that end, during the entitlement process, the agency is required to prepare and publish a report that describes the project's environmental impacts. | |
| 7<br>8<br>9<br>10<br>11<br>12<br>13<br>14<br>15 | 15. | Under CEQA, there are different types of environmental reports that require varying levels of analysis. Negative declarations are the least onerous type of report, while an environmental impact report ("EIR") is the most.  A mitigated negative declaration ("MND") is between the two.  The lead agency overseeing a project must decide what type of environmental report is required by CEQA, based on the nature of the project in question. | Thomas Decl., ECF No. 137-3 at 3-9 |
| 16<br>17<br>18<br>19<br>20<br>21 | 16. | At issue here, the lead agency can prepare an MND if it determines that a project would not cause significant environmental impacts after certain mitigation measures are applied.  If a project would still cause significant environmental impacts, even after mitigation measures, then the lead agency is required to prepare an EIR. | Thomas Decl., ECF No. 137-3 at 3-9 |
| 22<br>23<br>24<br>25<br>26<br>27 | 17. | Under CEQA, a private citizen may bring a mandamus action against the lead agency if it relied on an MND despite "substantial evidence to support a fair argument" that a project would have "significant environmental impacts," even after mitigation. | Thomas Decl., ECF No. 137-3 at 3-9, 33-34 |
| 28 | | | |

| | | | |
|---|---|---|---|
| | | In such cases, if the CEQA litigant prevails, the Superior Court can order the lead agency to prepare an EIR and invalidate all project approvals relying on the MND. Also, a successful CEQA litigant may be entitled to recover attorneys' fees, under the California "private attorney general" doctrine (CCP § 1021.5), if he/she vindicates an important public interest.  However, aside from attorneys' fees, there is no form of monetary relief or monetary damages available to a litigant who brings such CEQA claims. | |
| |  | **Thompson Project** | |
| | 18. | The first project that Defendants challenged was the Thompson Project.  The City published the initial MND for the Thompson Project on March 5, 2015.  It was over 1,000 pages long, including its technical appendices. | Ex. 12 [JX184]; Ex. 13 [JX408]; Ex. 14 [JX060] at JX060.0003 |
| | 19. | Nourmand did not receive a copy of the MND until March 11, 2015. | Ex. 15 [JX024] |
| | 20. | Nourmand already had begun to brainstorm pretextual objections to the Thompson Project before the MND was published.  He decided to put his objections "into the record" before he received a copy of the MND.  Just two days after he received the MND, he told City officials that the "Mitigated Negative Declaration report should be rejected and instead the developer should be required to submit a full EIR." Thereafter, throughout the entitlements process, he sought to challenge and delay the project based on those pretextual concerns. | Ex. 16 [JX009]; Ex. 17 [JX014] ("I spoke with my consultant friend.  He suggested the same thing that I thought.  Simply enter our concerns into the record"); Ex. 18 [JX027] ("I handed out the letter below") ("20 – Due to the above and many more reasons that I did not get into the submitted Initial Study/Proposed Mitigated Negative Declaration report should be rejected and instead the developer should be required to submit a full EIR study showing the true impact of the project.") |

| 21. | For example, Nourmand purported to oppose the Thompson Project based on concerns about shade/shadow impacts.  The shadow study for the project made clear that it would not cause any negative shadow impacts to his property.  His concern was based on his false belief about the direction that shadows are cast in the northern hemisphere. | Ex. 18 [JX027] ("4 – The shadow of the building is unacceptable to the property-owner who will be affected the most"); Ex. 19 [JX043] ("This building is going to cast an unacceptable shadow on my property.  Where is the shadow study?"); Ex. 20 [JX057] at JX057.0003 ("by causing shadows to be cast over the Appellants' property"); Ex. 21 [JX202]; Ex. 3 [S. Nourmand Depo Tr. (April 22, 2022)] at 123:2-124:1, 284:4-16 |
| --- | --- | --- |
| 22. | Nourmand also purported to oppose the Thompson Project based on concerns about noise impacts and the project's party atmosphere, even though he was part owner of Boulevard3, a raucous nightclub that was operated on the Sunset Property. | Ex. 18 [JX027] ("15 – Noise problem from the rooftop is going to totally disrupt the peace and quiet enjoyment of neighboring residents"); Ex. 19 [JX043] ("The noise from the rooftop restaurant/ bar and the terrace is going to disrupt a good number of residents"); Ex. 3 [S. Nourmand Depo Tr. (April 22, 2022)] at 95:24-97:4, 161:10-18, 223:8-16; Ex. 22 [JX255]; Kaufman Decl. Ex. 30, ECF No. 139-30 at 292-93 (M. Iravani Tr.) at 25:1-26:9) |
| 23. | Nourmand also purported to oppose the Thompson Project based upon concerns about traffic impacts, but he never could articulate what his specific traffic concerns were, nor why the MND's voluminous traffic study was inadequate. | Ex. 20 [JX057] at JX057.0007 ("The Project will generate significant automobile traffic in and around the surrounding environs"); Ex. 23 [JX048] ("Saeed was also very concerned about traffic, but couldn't seem to articulate why"); Thomas Decl., ECF No. 137-3 at 24-25 |
| 24. | Nourmand expressed concerns about how the Thompson Project would impact the low-income tenant who occupied the duplex in the back of the Sunset Property parking lot.  The | Ex. 19 [JX043] at JX043.0006, 0014 ("The western boundary line abuts an existing one story low-income and rent-controlled residential property") ("The |

| | | |
|---|---|---|
| | duplex was located a few dozen feet from the Boulevard3 nightclub, and it was entirely shielded from sunlight by a large tree, a tight brick retaining wall and debris.  Nourmand admitted that the duplex was in a dilapidated condition, that he was cited by the City for its state of disrepair, and that he tried to evict the tenant and demolish the duplex. | project will adversely affect the residential neighbors specifically the low income rent controlled neighbor abutting to the west"); Ex. 24 [JX053] ("developer" has "failed to properly mitigate the environmental and noise damages that their project is going to have on the residence to the west of 1541 Wilcox"); Ex. 25 [JX181]; Ex. 26 [JX182]; Ex. 3 [S. Nourmand Depo Tr. (April 22, 2022)] at 198:1-203:4 |
| 25. | Nourmand expressed concerns about how the Thompson Project was out of character with the surrounding neighborhood, which he described as quiet and residential.  The Sunset Property is adjacent to the site of the Thompson Project.  In liquor license applications for Boulevard3, Nourmand described the Sunset Property as an ideal location for a nightclub because of its primarily commercial setting in the heart of Hollywood's entertainment district, with very few residential uses in the surrounding area. | Ex. 27 [JX040] ("it is out of character with the neighborhood" and "will be a noise and parking nuisance … on our largely residential streets"); Ex. 20 [JX057] at JX057.0008 ("Project is completely out of character for the neighborhood"); Ex. 28 [JX166] at JX166.0067-0082 ("The location is a thriving, pedestrian-oriented area that is designated for regional commercial land use and which serves as a regional entertainment and tourist destination"; "[The] nightclub appears to be both appropriate and desirable at this location"; "There are relatively few residential uses in close proximity to the subject site") |
| 26. | Nourmand also purportedly was concerned about the density of the Thompson Project, referred to as its floor-area-ratio ("FAR").  His FAR argument was based on a frivolous view that a decades-old zoning ordinance, which restricted the site's FAR, was "permanent."  Nourmand | Ex. 20 [JX057] at JX057.0004 ("the 'D' limitation under the Hollywood Community Plan of 1998 permits a floor area ratio on the site of 2:1"); Ex. 29 [JX065] ¶ 3; Ex. 30 [JX066] at JX066.0002 ("the permanent 'D' Development Limitation"); Thomas Decl., ECF |

| | | | |
|---|---|---|---|
| | | also demanded that Relevant not object to future development projects on the Sunset Property, including based on the same FAR argument. | No. 137-3 at 25-26; Ex. 31 [JX047] ("they will not object to future surrounding developments"); Ex. 7 [JX079] at JX079.0002 ("agree not to oppose in any forum" any "future development proposal that Sunset Landmark or any successor or assign may pursue") |
| | 27. | Nourmand has never been actively involved in environmental causes, nor is he anti-development. He stated that he opposed the Thompson Project because he did not want other projects to go forward on the same block where he intended to develop the Sunset Property one day. He also did not want a project to go forward with restaurant/bar uses that would compete with similar uses on the Sunset Property, namely the HAC and Boulevard3. | Ex. 32 [JX383] (Interrogatory No. 4); Ex. 3 [S. Nourmand Depo Tr. (April 22, 2022)] at 161:13-18; Ex. 33 [JX090] ("all of which will have a direct negative impact on our ability to develop our own project on the HAC land"); Ex. 8 [JX093] at JX093.0001 ("you have all the conviction of someone with entitlements, and we have the substantial doubts of someone without entitlements" (emphasis omitted)), JX093.003 ("Agreement to assist HAC" in "support of any project it undertakes" and "the HAC's own efforts to develop its property"); Ex. 10 [JX120]; Ex. 11 [JX134]; Ex. 4 [Patel Depo Tr.] at 78:12-79:8; Ex. 28 [JX166] at JX166.0067-0082; Maisnik Decl. ¶ 8 |
| | 28. | On March 11, 2015, Nourmand instructed N&A employees to attend a hearing for the Thompson Project, in order to present a false appearance of widespread opposition. N&A management circulated his directive to employees, stating that Nourmand "just wants some bodies there." | Ex. 34 [JX020]; Ex. 35 [JX190] |
| | 29. | At the public hearing on March 18, 2015, a number of N&A employees attended and signed a petition against | Ex. 27 [JX040]; Ex. 35 [JX190] |

| | | |
|---|---|---|
| | the Thompson Project. The petition falsely stated that the signatories were concerned about the impact that the Thompson Project would have on "our largely residential streets." | |
| 30. | N&A employees only attended the March 18, 2015 hearing because Nourmand instructed them to go. Of the N&A employees in attendance, none lived in Hollywood, and only a few actually worked out of N&A's Hollywood office, while the rest worked out of N&A's Beverly Hills and Brentwood offices. | Ex. 35 [JX190]; Ex. 34 [JX020]; Ex. 36 [JX022]; Ex. 37 [JX023] |
| 31. | Relevant met with Nourmand several times during 2015, at which he demanded certain design changes to the Thompson Project.<br><br>Relevant agreed to certain of his demands, fearing Nourmand would continue to challenge and delay the project if they did not. After one meeting, Relevant increased the setbacks for the project, eliminated the proposed nightclub from the roof, lowered the height of the building and reduced the number of rooms. Following another meeting, Relevant further reduced the height of the project and reoriented the rooftop layout, moving the structures on the roof (the bar, restaurant, and fitness center) to the east so that they were farther away from the Sunset Property. | Ex. 38 [JX030] ("it essentially gives you what you want with respect to that issue"; Ex. 39 [JX041] ("Revised Plans"); Ex. 23 [JX048] at JX048.0002 ("Make sure he knows about height"); Ex. 40 [JX049]; Ex. 41 [JX058] ("I pointed out that the whole design was different, the height was lowered, the roof massing was pushed to the front of the building away from him"); Ex. 42 [JX070] ("I recall the last request you had was to lower the building a few inches per floor and move all Roof top structures away from the west so as to minimize site lines from your property which we did") |
| 32. | During one meeting, Nourmand asked "myriad questions" about Relevant's financing. Relevant was candid about its financial position, revealing to Nourmand that Relevant | King Decl., ECF No. 137-1 ¶¶ 8-10; Ex. 23 [JX048] ("Saeed had myriad questions about financing") |

| | | |
|---|---|---|
| | was particularly vulnerable to project delays. | |
| 33. | A revised MND for the Thompson Project was published in July 2015. The revised MND, *inter alia*, added several new mitigation measures to further address noise impacts. | Grassetti Rep., ECF No. 147-31 ¶¶ 37-38, 40-41; Thomas Decl., ECF No. 137-3 at 24 |
| 34. | After Relevant made changes to appease Nourmand, Defendants never stopped trying to challenge and delay the project during the course of the entitlement process. Defendants objected to the project the Zoning Administrator hearing on March 18, 2015 and City Planning Commission hearing on September 10, 2015. They filed an administrative appeal on November 3, 2015, challenging the City Planning Commission's approval recommendation. Then, they objected at the Planning and Land Use Management ("PLUM") hearing on January 26, 2016 and City Council hearing on February 3, 2016. | Ex. 43 [JX034] at JX034.0020 (Zoning Administrator hearing), JX034.0104 (City Planning Commission hearing), JX034.0152 (PLUM Committee hearing), JX034.0180 (City Council hearing); Ex. 20 [JX057] (administrative appeal) |
| 35. | The Thompson Project was approved unanimously at every administrative level during the entitlements process, and the City granted final approvals for the project in early February 2016. | Ex. 43 [JX034] at JX034.0020 (Zoning Administrator hearing), JX034.0104 (City Planning Commission hearing), JX034.0152 (PLUM Committee hearing), JX034.0180 (City Council hearing); Ex. 44 [JX188]; Ex. 45 [JX196]; Ex. 46 [JX198] |
| **Thompson CEQA Litigation and Other Administrative Challenges** | | |
| 36. | Sunset engaged The Silverstein Law Firm ("TSLF"). Sunset filed a Petition for Writ of Mandamus (the "Thompson Writ Petition") against the City, challenging its approval of the Thompson Project. The lawsuit was filed on March 3, 2016, in the Superior Court of California, County | Ex. 29 [JX065] |

| | | |
|---|---|---|
| | of Los Angeles, and was captioned *The Sunset Landmark Investment, LLC v. City of Los Angeles, et al.*, Case No. BS160807 (the "Thompson Litigation"). | |
| 37. | In the Thompson Writ Petition, Sunset alleged that it was suing the City "on behalf of others who will be affected in the Hollywood area, as well as for all citizens of the City of Los Angeles." | Ex. 29 [JX065] ¶ 7 |
| 38. | In the Thompson Writ Petition, Sunset alleged that the City violated CEQA by failing to prepare an EIR for the Thompson Project. | Ex. 29 [JX065] ¶ 32 |
| 39. | In the Thompson Writ Petition, Sunset alleged that the City's reliance on the MND was inadequate under CEQA because the City ignored "substantial evidence to support a fair argument that the Project may cause significant, unmitigable impacts to the environment, including but not limited to land use, transportation, traffic operational, circulation, emergency response times, parking, pedestrian safety, noise, air quality and health risks, historic resources, shade/shadow, public services, cumulative impacts and growth inducing impacts." | Ex. 29 [JX065] ¶ 29 |
| 40. | On May 5, 2016, Sunset initiated a new administrative challenge against the Thompson Project—increasing the threat of delay on top of the already pending Thompson Litigation—by opposing an Owner Participation Agreement ("OPA") between Relevant and the City of Los Angeles Redevelopment | Ex. 30 [JX066]; Ex. 47 [JX199] |

| | | |
|---|---|---|
| | Authority ("CRA/LA").  Sunset argued that the CRA/LA could not "lawfully approve the OPA" based on the same meritless arguments that Sunset had advanced during the entitlement process: i.e., that the City could not amend a purportedly "permanent" FAR limitation and that noise from the project's "massive outdoor party space" rendered the MND invalid. | |
| 41. | On August 11, 2016, Sunset brought another administrative challenge against the project—threatening more delay on top of the pending Thompson Litigation—by filing an appeal with the Los Angeles Department of Building Safety ("LADBS"). In its appeal, Sunset asserted that LADBS had "no lawful basis" to process permits for the Thompson Project because its entitlements were invalid for the same reasons alleged in the Thompson Writ Petition. Thus, Sunset argued that LADBS was required to revoke a demolition permit, allowing Relevant to raze the existing structure at the project site, and that LADBS had to suspend its review of any building permit applications filed by Relevant. | Ex. 48 [JX068] at JX068.0035; Ex. 49 [JX088] at JX088.0009 |
| 42. | By the time Sunset filed the LADBS appeal, Relevant already had completed the authorized demolition work, meaning Sunset sought to invalidate a demolition permit for a building that was already torn down. | Ex. 49 [JX088] at JX088.0005 ("demolition and sewer cap work was completed, and a final inspection for these permits was approved on April 6, 2016") |
| 43. | On October 13, 2016, LADBS denied Sunset's appeal.  Five days | Ex. 49 [JX088] at JX088.0001, 0003, 0005, 0010-0012 |

| | | |
|---|---|---|
| | later, Sunset appealed the LADBS denial of its permit challenges to the Los Angeles Director of Planning.<br><br>On February 16, 2017, the Director of Planning denied Sunset's appeal and issued a report, which rejected the fundamental premise of Sunset's appeal, holding that LADBS had no "authority to invalidate discretionary entitlements already approved by Planning and City Council."<br><br>After the LBS denial, Sunset continued to challenge and delay the permitting process for the Thompson Project. Sunset appealed the Director of Planning decision to the Los Angeles Central Area Planning Commission, which ultimately denied Sunset's appeal as well on May 31, 2017. | |
| 44. | Meanwhile, trial in the Thompson Litigation was scheduled to begin on May 19, 2017. Sunset filed its merits brief on March 28, 2017. In its brief, Sunset addressed its allegations only with respect to land use, noise and traffic impacts. Sunset made no attempt to address—and completely abandoned—its allegations regarding the other eleven categories of environmental impacts. | Thomas Decl., ECF No. 137-3 at 23-27; Ex. 50 [JX204]; Ex. 29 [JX065] ¶ 29 |
| 45. | Regarding land use impacts, Sunset tried to turn a discretionary zoning matter into a CEQA issue by arguing that the project conflicted with the purportedly "permanent" FAR limitation. There was no conflict because the City replaced the FAR limitation with an increased | Thomas Decl., ECF No. 137-3 at 25-27; Ex. 50 [JX204] at JX204.0019 |

| | | | |
|---|---|---|---|
| | | allowance, a routine legislative change exercised under the City's general police power. | |
| | 46. | Regarding noise impacts, Sunset relied solely on an outdated and inapplicable letter by one noise consultant, Acentech.  The Acentech letter was prepared before significant design changes were made to the Thompson Project and before the revised MND was published, which included additional noise mitigation measure.  The Acentech letter ignored several substantial new design changes and mitigation measures related to noise, and Sunset never offered an updated study or other analysis regarding noise impacts following those changes. | Thomas Decl., ECF No. 137-3 at 24; Ex. 50 [JX204] at JX204.0014-17 |
| | 47. | Regarding traffic impacts, Sunset neither offered nor cited any competing traffic analysis.  Instead, Sunset argued that the City failed to address traffic questions, based on its mischaracterization of a single letter from Caltrans.<br><br>In the letter, Caltrans noted that it had not received any technical appendices to the MND and asked the City to prepare a traffic study, if one had not been prepared already.  Sunset failed to acknowledge that the City responded to Caltrans—later that same day—and provided the technical appendices, including the traffic study.  The City concluded that no further traffic analysis required because, after it received the traffic study, Caltrans never posed follow-up questions or provided | Thomas Decl., ECF No. 137-3 at 24-25; Ex. 50 [JX204] at JX204.0017-19; Ex. 51 [JX186]; Ex. 52 [JX187] |

| | | substantive comments regarding the City's traffic analysis. | |
|---|---|---|---|
| | | **Tommie Project** | |
| 48. | | The next project that Defendants challenged was the Tommie Project. The first public hearing for the Tommie Project was noticed for January 26, 2017. | Ex. 53 [JX072] |
| 49. | | The MND for the Tommie Project was circulated in December 2016.  It was over 1,000 pages long, including technical appendices. | Ex. 54 [JX206]; Ex. 55 [JX409] |
| 50. | | On January 25, 2017, Sunset submitted a letter objecting to the Tommie Project. | Ex. 56 [JX073] |
| 51. | | The vast majority of the content in Sunset's January 25, 2017 letter against the Tommie Project was copied and pasted from the letter that Sunset submitted on August 12, 2016 against the Thompson Project. | Thomas Decl., ECF No. 137-3 at 38 (In "Appendix D," the "letters are highlighted to show repetitions from comments on prior hotels"), 64-81 (highlighted version of Ex. 56 [JX073] (Tommie letter) showing content copied from Ex. 48 [JX068] (Thompson letter)) |
| 52. | | On January 26, 2017, TSLF spoke at the public hearing, on behalf of Sunset, in opposition to the Tommie Project. | Ex. 57 [JX074] at JX074.0021 |
| | | **April 21, 2017 Demand Letter** | |
| 53. | | On April 2, 2017, Nourmand sent a text message to Richard Heyman asking for a "new proposal" to end the Thompson Litigation. | Ex. 58 [JX076] at JX076.0003; Heyman Decl. ¶ 4, Ex. A |
| 54. | | On April 5, 2017, Heyman sent an email to Nourmand regarding an "Updated Proposal" to end the Thompson Litigation.  In the email, Heyman asked Nourmand for guidance regarding any issues that Nourmand wanted to be addressed in order to end the Thompson Litigation.  Heyman also offered to | Ex. 59 [JX0392] ("We are willing to cover your attorneys' fees and costs from this lawsuit, making you whole"); Heyman Decl. ¶ 5, Ex. B |

| | | | |
|---|---|---|---|
| | | "cover [Mr. Nourmand's] attorneys' fees and costs from [the Thompson Litigation]" in order to make him "whole." | |
| | 55. | On April 14, 2017, Heyman followed up with Nourmand via text message and asked when Nourmand expected to respond to the "Updated Proposal." Nourmand said that he was "planning to get back to [Mr. Heyman] hopefully before the end of next week." | Ex. 58 [JX076] at JX076.0011; Heyman Decl. ¶ 6, Ex. C |
| | 56. | On April 21, 2017, TSLF sent a letter, on behalf of Sunset, to Matt Hinks, a land use attorney for Relevant in connection with the Thompson Litigation. In the letter, TSLF listed a number of demands that Sunset sought in order to end the Thompson Litigation, including a monetary demand: "Mr. Heyman has also offered to pay some money in settlement of the case, based on legal fees incurred to date. That is not adequate. Please call me and I will inform you what figure is acceptable to my client." | Ex. 7 [JX079]; Declaration of Matthew Hinks, filed concurrently herewith ("Hinks Decl.") ¶¶ 5-6, Ex. A; Heyman Decl. ¶ 7, Ex. D |
| | 57. | Later on April 21, 2017, Hinks called Robert Silverstein of TSLF and asked what amount of money Sunset demanded to end the Thompson Litigation. Silverstein stated the amount was $2 million.<br><br>Hinks asked Silverstein how much of that was attorney's fees and how much was "blood money." Silverstein responded that attorneys' fees were approximately $500,000 and did not dispute that the remainder was "blood money." | Ex. 60 [JX080]; Hinks Decl. ¶ 7, Ex. B |

| | | Continued Opposition to the Tommie Project | |
|---|---|---|---|
| 58. | On April 25, 2017, Sunset submitted another objection letter in opposition to the Tommie Project.  In the letter, Sunset referred to the Tommie Project as a "nuisance-generating, 'party hotel,'" a "noise-generating party hotel" and "an ill-conceived, noise generating nuisance 'party hotel' that should have never come out of a planning department conference room." | Ex. 61 [JX081] at JX081.0002, 0007, 0034 | |
| 59. | Nourmand admitted that his main objection to the Tommie Project— and Relevant's other projects—was his belief that a "party hotel" would negatively impact the neighborhood, while acknowledging that he himself owns a raucous nightclub on the exact same block. | Ex. 3 [S. Nourmand Depo Tr. (April 22, 2022)] at 95:24-97:4, 161:10-18, 223:8-16; Ex. 22 [JX255] | |
| 60. | On April 25, 2017, TSLF spoke at a public hearing, on behalf of Sunset, in opposition to the Tommie Project and in support of the administrative appeal that Sunset filed against the Tommie Project. | Ex. 57 [JX074] at JX074.0075; | |
| 61. | On May 5, 2017, TSLF spoke at a public hearing, on behalf of Sunset, in opposition to the Tommie Project. | Ex. 57 [JX074] at JX074.0120 | |
| 62. | The City unanimously voted to approve the Tommie Project, over Sunset's objections, at every level during the entitlement process. | Ex. 62 [JX211]; Ex. 63 [JX215]; Ex. 64 [JX220] | |
| | | May 8, 2017 Meeting | |
| 63. | On May 8, 2017, Relevant and Sunset attended a meeting with their respective attorneys to further discuss a potential resolution to Sunset's CEQA litigation.  Heyman and Hinks attended on behalf of Relevant.  Nourmand, Silverstein, | Hinks Decl. ¶ 8; Heyman Decl. ¶ 8; Ex. 65 [JX084] | |

| | | |
|---|---|---|
| | and Jayesh Patel attended on behalf of Sunset. | |
| 64. | During the meeting, Hinks told Nourmand, Patel and Silverstein that their demands were far outside the scope of what Sunset could obtain through a successful CEQA lawsuit. Hinks suggested that the City could elect to prepare an EIR, and Sunset would be entitled to nothing.<br><br>In response, Silverstein commented that he would challenge the EIR, if the City elected to do that, and that he "could always find something else to challenge." | Hinks Decl. ¶ 9; Heyman Decl. ¶ 8 |
| 65. | Relevant understood Silverstein's comment to be a threat of indefinite delay against its projects, irrespective of the merits of any CEQA lawsuit, unless Relevant agreed to meet Defendants' demands, including the monetary payment and other costly design changes. | Hinks Decl. ¶¶ 9-10; Heyman Decl. ¶ 8 |
| 66. | At the time, Sunset was taking steps to challenge and delay both the Thompson Project (through the Thompson Litigation and permitting appeals) and the Tommie Project (through the entitlements process, and future litigation was expected). | *See supra* SSF41-44, 49-51, 58 |
| | **Continued Opposition and Delays Against the Thompson Project and Tommie Project** | |
| 67. | On May 9, 2017, Sunset filed an *Ex Parte* application to continue the date of trial in the Thompson Litigation. | Ex. 66 [JX086] |
| 68. | In the *Ex Parte* application, Sunset argued that the trial date needed to be continued to allow for supplemental briefing regarding a "stunning fact" that Sunset purportedly discovered | Ex. 66 [JX086] |

| | | |
|---|---|---|
| | on May 6, 2017. Specifically, Sunset claimed that—at the City Planning Commission hearing—the City approved an undisclosed change to the Thompson Project's rooftop orientation, which was different from the rooftop orientation included in the July 2015 MND. | |
| 69. | Sunset was informed about the rooftop orientation change on many occasions because Relevant only made the change in order to satisfy Nourmand's prior demands. | Ex. 67 [JX172]; Ex. 41 [JX058] ("I pointed out that the whole design was different, the height was lowered, the roof massing was pushed to the front of the building away from him"); Ex. 42 [JX070] ("I recall the last request you had was to lower the building a few inches per floor and move all Roof top structures away from the west so as to minimize site lines from your property which we did.") |
| 70. | On May 23, 2017, on behalf of Sunset, TSLF continued to challenge Relevant's efforts to obtain permits for the Thompson Project.<br><br>TSLF appeared before the Central Los Angeles Area Planning Commission (the "CLA APC") to argue that the LADBS erred or abused its discretion by "not suspending action" on pending construction permits for the Thompson Project and by issuing permits to demolish the existing structure at the site of the Thompson Project. The CLA APC voted to deny Sunset's appeals. | Ex. 49 [JX088] |
| 71. | On June 9, 2017, Sunset filed a Petition for Writ of Mandamus (the "Tommie Writ Petition") against the City challenging its approval of the | Ex. 68 [JX089] |

| | | | |
|---|---|---|---|
| | | Tommie Project. The lawsuit was filed in the Superior Court of California, County of Los Angeles and captioned *The Sunset Landmark Investment, LLC v. City of Los Angeles, et al.*, Case No. BS169821 (the "Tommie Litigation") | |
| | 72. | In the Tommie Writ Petition, Sunset alleged that it was suing "on behalf of others who will be affected in the Hollywood area, as well as for all citizens of the City of Los Angeles." | Ex. 68 [JX089] ¶ 11 |
| | 73. | In the Tommie Writ Petition, Sunset alleged that the City violated CEQA by failing to prepare an EIR for the Tommie Project. | Ex. 68 [JX089] ¶ 86 |
| | 74. | In the Tommie Writ Petition, Sunset alleged that the City's reliance on the MND was inadequate under CEQA because the City ignored "substantial evidence to support a fair argument that the Project may cause significant, unmitigable impacts to the environment, including but not limited to land use, transportation, traffic operational, circulation, emergency response times, parking, pedestrian safety, noise, air quality and health risks, greenhouse gasses, historic resources, shade/shadow, public services, cumulative impacts and growth inducing impacts." | Ex. 68 [JX089] ¶ 83 |
| | 75. | In the Tommie Writ Petition, Sunset alleged that the Tommie Project was "more accurately described as a youth hostel swimming in alcohol." | Ex. 68 [JX089] ¶ 2 |
| | **June 26, 2017 Email** | | |
| | 76. | By mid-June 2017, settlement negotiations between Relevant and Sunset were being led by Guy Maisnik (on behalf of Relevant and | Maisnik Decl. ¶¶ 2-4 |

| | | Jayesh Patel (on behalf of Sunset), rather than the parties' respective CEQA lawyers. | |
|---|---|---|---|
| | 77. | On June 26, 2017, Patel sent an email to Maisnik regarding settlement discussions.  Patel wrote: "Our perspective is that, if we are successful in the litigation, and assuming that you successful [*sic*] to move your project forward with an EIR, the developer needs an additional two years to process the project., [sic] with many of the same challenges to address going forward."  Patel also wrote: "My hope is that once there is a hard-pencil costing assessment done by the developer, that you will see what that balance looks like, and we will have a productive discussion going forward." | Ex. 33 [JX090]; Maisnik Decl. ¶¶ 5-6, Ex. A |
| | 78. | Relevant understood Patel's comments to be a threat of continued delay to its projects, and a suggestion that Relevant should calculate the financial cost of those further delays when considering Defendants' demands, including the monetary demand. | Maisnik Decl. ¶¶ 5-7 |
| | **Settlement of Thompson Litigation and Tommie Litigation** | | |
| | 79. | On July 13, 2017, Patel sent an email to Maisnik regarding settlement discussions.  In the letter, Patel wrote that Sunset would end the Thompson Litigation in exchange for, *inter alia*, a $4 million monetary payment. | Ex. 8 [JX093] at JX093.0003 |
| | 80. | On August 22, 2017, Patel proposed to have a "sit down [meeting] with all those involved in decision-making and hammering out a deal." Initially, Patel stated that the deal | Ex. 69 [JX097] at JX097.0002 |

| | | | |
|---|---|---|---|
| | | would include only the Thompson Litigation. However, later that day, Patel agreed that the scope of the deal could include the Tommie Litigation as well. The parties agreed to have the meeting the next day, on August 23, 2017. | |
| | 81. | At the August 23, 2017 meeting, the parties reached an agreement in principle to end the Thompson Litigation and the Tommie Litigation in exchange for a $5.5 million payment and other design changes. | Ex. 70 [JX099]; Ex. 4 [Patel Depo Tr.] at 163:19-164:19; 189:19-24 |
| | 82. | During the August 23, 2017 meeting, Patel refused to discuss CEQA with Relevant and threatened to end the meeting if Relevant wanted to discuss CEQA. | Ex. 4 [Patel Depo Tr.] at 241:20-242:13; 244:11-24; Maisnik Decl. ¶ 4 |
| | 83. | The parties finalized and executed the settlement agreements for the Thompson Litigation and Tommie Litigation in early January 2018. As part of the settlement agreements, Relevant was required to support any development plans that Sunset pursued on its own property | Ex. 9 [JX118]; Ex. 71 [JX119] |
| | 84. | Relevant made the final payment to Sunset for the $5.5 million on March 13, 2018. | Ex. 72 [JX421]; Ex. 58 [JX076] at JX076.0012 ("you have now been paid in full") |
| | **Selma Project** | | |
| | 85. | The next project that Defendants challenged was the Selma Project. The initial hearing for the Selma Project was scheduled for March 28, 2018. | Ex. 73 [JX128] at JX128.0001 |
| | 86. | The MND for the Selma Project was published on December 29, 2017. It was over 1,000 pages long, including its technical appendices. | Ex. 74 [JX221]; Ex. 75 [JX410] |
| | 87. | Unbeknown to Relevant, on behalf of Sunset, TSLF already had begun | Ex. 76 [JX179] at JX179.0002 |

| | | |
|---|---|---|
| | to work on challenging the Selma Project by March 8, 2018. | |
| 88. | On March 19, 2018, Heyman sent a text message to Nourmand. Heyman informed Nourmand that he had "been paid in full" and invited Nourmand to lunch at the Dream. | Ex. 58 [JX076] at JX076.0012; Heyman Decl. ¶ 11, Ex. E |
| 89. | On March 22, 2018, Nourmand responded to Heyman's text message and accepted the lunch invitation. The lunch meeting at the Dream was scheduled for March 29, 2018. | Ex. 58 [JX076] at JX076.0012-0013; Heyman Decl. ¶ 11, Ex. E |
| 90. | On March 23, 2018, Sunset submitted an objection letter against the Selma Project. | Ex. 77 [JX125]; Heyman Decl. ¶ 14, Ex. F |
| 91. | The vast majority of the content in Sunset's March 23, 2018 letter against the Selma Project was copied and pasted from the letter that Sunset submitted on April 25, 2017 against the Tommie Project. | Thomas Decl., ECF No. 137-3 at 38 (In "Appendix D," the "letters are highlighted to show repetitions from comments on prior hotels"), 82-105 (highlighted version of Ex. 77 [JX125] (Selma letter) showing content copied from Ex. 61 [JX081] (Tommie letter)) |
| 92. | In the March 23, 2018 letter, Sunset referred to the Selma Project as a "nuisance-generating, 'party hotel,'" an "alcohol-soaked 'Animal House' party hotel," a "noise-generating party hotel" and "an ill-conceived, noise generating nuisance 'party hotel' that should have never come out of a planning department conference room." | Ex. 77 [JX125] at JX125.0002, 0002, 0005, 0024 |
| 93. | On March 28, 2018, on behalf of Sunset, TSLF attended the public hearing for the Selma Project and spoke in opposition to the project. | Ex. 73 [JX128] at JX128.0022 |
| **March 29, 2018 Meeting** | | |
| 94. | On March 29, 2018, Heyman showed up to the roof of the Dream for his lunch meeting with Nourmand. | Heyman Decl. ¶ 15 |

| | | | |
|---|---|---|---|
| | | Heyman brought a copy of Sunset's March 23, 2018 letter opposing the Selma Project.  At the lunch meeting, Heyman referenced the letter and asked Nourmand why he was opposing Relevant's projects again. | |
| | 95. | In response to Heyman's question, Nourmand said: "you know the drill, it's going to take a check to make this go away." | Heyman Decl. ¶ 15 |
| | 96. | Heyman understood Nourmand's "you know the drill" comment as a threat that Nourmand would continue to challenge Relevant's projects going forward. | Heyman Decl. ¶ 15 |
| | | **Schrader Project** | |
| | 97. | By the time of Heyman's lunch meeting with Nourmand, aside from the Selma Project, Relevant had acquired an interest in another hotel project that was going through the entitlements process.  That project was known as the Schrader Project. | Heyman Decl. ¶ 13; Opman Decl. ¶¶ 4-5 ; Ex. 78 [JX113] |
| | 98. | On December 14, 2017, Relevant had entered into a Purchase Agreement with KOAR Institutional Advisors ("KOAR") to purchase the property for the Schrader Project for $21 million.  (The Purchase Agreement was between Hollywood International Regional Center LLC ("HIRC"), an affiliate of Relevant, and 1600 Hudson LLC, an affiliate of KOAR.) | Heyman Decl. ¶ 13; Opman Decl. ¶ 5, Ex. A; Ex. 78 [JX113] |
| | 99. | Pursuant to the Purchase Agreement, Relevant (HIRC) agreed to pay a $1 million nonrefundable deposit for the Schrader Project property, and the remainder of the closing price was due by no later than September 28, 2018. | Heyman Decl. ¶ 18; Opman Decl. ¶ 6; Ex. 78 [JX113] |

| 100. | KOAR already had submitted entitlement applications with the City for the Schrader Project in September 2016.  By the time the Purchase Agreement was executed, the entitlement process was underway. | Opman Decl. ¶¶ 4, 8 |
| --- | --- | --- |
| 101. | The MND for the Schrader Project was published in April 2018. | Ex. 79 [JX200] |
| | **Continued Opposition to the Selma Project and Schrader Project** | |
| 102. | On July 12, 2018, a public hearing for the Selma Project was held before the City Planning Commission. | Ex. 73 [JX128] at JX128.0083 |
| 103. | At the July 12, 2018 City Planning Commission hearing for the Selma Project, Grant King spoke on behalf of Relevant.  King stated:<br><br>"You're going to hear some nay-sayers here that come -- will come in front of you today.  And I want you to know what they're going to be saying.  You're going to be hearing from people like the Silverstein Law Firm that's representing a client that has sued us twice on other projects that were adjacent to his project.  Why he's here today is very clear, and it's for financial gain.  They want money from us.  I guess they want some more blood from us." | Ex. 73 [JX128] at JX128.0103 |
| 104. | Less than four minutes after King finished speaking at the July 12, 2018 hearing, TSLF spoke in opposition to the Selma Project, on behalf of Sunset.  TSLF did not address or deny any of the comments made by King regarding Sunset's purpose in opposing the Selma Project. | Ex. 73 [JX128] at JX128.0108-09 |

| 105. | On July 13, 2018, Sunset submitted an objection letter against the Schrader Project.  In the letter, Sunset noted that Relevant had an interest in the Schrader Project. | Ex. 80 [JX129] at JX129.0005-0006; Opman Decl. ¶ 9, Ex. B |
|------|------|------|
| 106. | The vast majority of the content in Sunset's July 13, 2018 letter against the Schrader Project was copied and pasted from the letter that Sunset submitted on March 23, 2018 against the Selma Project. | Thomas Decl., ECF No. 137-3 at 38 (In "Appendix D," the "letters are highlighted to show repetitions from comments on prior hotels"), 106-129 (highlighted version of Ex. 80 [JX129] (Schrader letter) showing content copied from Ex. 77 [JX125] (Selma letter)) |
| 107. | In the July 13, 2018 letter, Sunset referred to the Schrader Project as a "nuisance-generating, 'party hotel,'" an "alcohol-soaked 'Animal House' party hotel," a "noise-generating party hotel" and "an ill-conceived, noise generating nuisance 'party hotel' that should have never come out of a planning department conference room." | Ex. 80 [JX129] at JX129.0002, 0005, 0010, 0024 |
| 108. | On July 14, 2018, Laurent Opman, a managing member of KOAR, sent Heyman an email regarding Sunset's objection letter against the Schrader Project.  In his email, Opman said: "Looks like [Saeed's] business plan is to make money off his neighbors." | Opman Decl. ¶ 11, Ex. C; Ex. 81 [JX130] |
| 109. | On August 10, 2018, Sunset filed an administrative appeal against the Schrader Project. | Ex. 82 [JX133]; Opman Decl. ¶ 12, Ex. D |
| 110. | On September 6, 2018, Sunset filed an administrative appeal against the Selma Project. | Ex. 83 [JX234] |
| 111. | On September 28, 2018, Relevant failed to make the closing payment to complete its acquisition of the Schrader Project property.  Pursuant to the terms of the Purchase | Opman Decl. ¶ 13; Heyman Decl. ¶ 18; Ex. 84 [JX136] |

| | | Agreement, KOAR terminated the agreement and Relevant lost its $1 million deposit.  As of the date of the termination letter, Relevant no longer had any interest in the Schrader Project. | |
|---|---|---|---|
| | | **October 4, 2018 Meeting** | |
| | 112. | After the Purchase Agreement was terminated, Laurent Opman and Bruce Rothman (managing members of KOAR) decided to contact Nourmand to make clear that Relevant was no longer associated with the Schrader Project and that Nourmand would not be able to use Sunset's CEQA challenges to get money from the Schrader Project, since KOAR was not under financial pressure to begin construction. | Opman Decl. ¶ 13 |
| | 113. | Opman and Rothman scheduled a meeting with Nourmand and Patel for October 4, 2018 to discuss the Schrader project. | Opman Decl. ¶ 14; Ex. 85 [JX138] |
| | 114. | Prior to the meeting, Opman had concerns that Nourmand would try to extort money from the Schrader Project based on Nourmand's prior pattern of opposing projects associated with Relevant and Nourmand's belief that the Schrader Project was associated with Relevant. | Opman Decl. ¶¶ 10-11, Ex. C; Ex. 81 [JX130] ("Looks like [Saeed's] business plan is to make money off his neighbors") |
| | 115. | On October 4, 2018, Laurent Opman and Bruce Rothman (managing members of KOAR) met with Nourmand and Patel to discuss the Schrader Project. | Opman Decl. ¶ 14; Ex. 85 [JX138] |
| | 116. | At the October 4, 2018 meeting, Opman and Rothman told Nourmand and Patel that Relevant no longer had an interest in the Schrader Project | Opman Decl. ¶ 14 |

| | | |
|---|---|---|
| 1 2 3 4 5 | and that, unlike Relevant, KOAR was not dependent on outside investors.  Therefore, KOAR would be able to wait if Sunset decided to litigate its CEQA claims against the City in connection with the Schrader Project. | |
| 6 7 8 9 10 11 12 13 14 15 16 | 117. | After Opman and Rothman made those points clear, Nourmand agreed to withdraw Sunset's appeal against the Schrader Project if KOAR signed a separate agreement promising to abide by the conditions of approval that the City had imposed on the Schrader Project.  Opman said that he would have no problem signing the agreement, as long as the conditions were mutually binding in the event that Nourmand decided to develop the Sunset Property. Nourmand never pursued the agreement but shortly after the October 4, 2018 meeting, Sunset withdrew its appeal. | Opman Decl. ¶ 15; Ex. 86 [JX151] ("On October 19, 2018, The Sunset Landmark Investments, LLC, represented by Daniel R. Wright of The Silverstein Law Firm, formally withdrew their appeal") |
| 17 | **Continued Opposition to the Selma Project** | | |
| 18 19 20 21 | 118. | On November 27, 2018, on behalf of Sunset, TSLF attended a public hearing before the PLUM Committee to give comments in support of Sunset's administrative appeal challenging the Selma Project. | Ex. 73 [JX128] at JX128.0204; Ex. 83 [JX234] |
| 22 23 24 | 119. | On November 27, 2018, the same day as the PLUM Committee hearing, TSLF submitted a 468-page objection letter against the Selma Project, on behalf of Sunset. | Thomas Decl., ECF No. 137-3 at 13-15 |
| 25 26 27 28 | 120. | During the administrative processes for the Thompson Project, the Tommie Project and the Selma Project, Sunset submitted more than 4,000 pages of comment letters | Thomas Decl., ECF No. 137-3 at 13-15 |

| | | |
|---|---|---|
| | challenging Relevant's projects. Thirteen of those comment letters were submitted on the same day as a hearing or the day before. The average length of those thirteen comment letters was 297-pages. Seven comment letters were more than 300 pages long. The longest comment letter—submitted against the Selma Project on November 21, 2018—was 841-pages long. | |
| 121. | After Robert Silverstein of TSLF finished speaking on behalf of Sunset at the November 27, 2018 public hearing, a member of the PLUM Committee said to Silverstein:<br><br>"We are in receipt of your voluminous arguments that you just submitted. Just a thought for future because I know you've been before this body, many, many, many times and have submitted very similar stacks of paper. Just in the interest of the environment, if you could double-side these next time, that would will [sic] great." | Ex. 73 [JX128] at JX128.0208-0209 |
| 122. | During the administrative processes for the Thompson Project, Tommie Project and Selma Project, Sunset requested to postpone or delay administrative hearings on at least five occasions. | Thomas Decl., ECF No. 137-3 at 13-15 |
| 123. | During December 2018 and January 2019, TSLF drafted a letter to the Los Angeles County District Attorney's Office, the California Attorney General, and the U.S. Attorney for the Central District of California, requesting that the prosecutors open an investigation | Ex. 1 [Maddren Depo Tr.] at 24:1-5, 28:1-25, 32:20-24, 45:6-12, 46:14-23, 51:25-52:24, 63:2-18, 65:12-15, 71:15-72:9, 99:5-10; Ex. 87 [JX140]; Ex. 88 [JX144]; Ex. 89 [JX146] ("even if there was no investigation formally initiated, it could scare Council into ordering |

| | | |
|---|---|---|
| | into the City's approvals of Relevant projects in Hollywood.  The letter contained unsupported allegations that Relevant had bribed City officials in order to obtain favorable outcomes on their projects.<br><br>TSLF asked Casey Maddren, a member of a community group called United Neighborhoods for Los Angeles ("UN4LA") to send the letter on UN4LA letterhead, in order to conceal TSLF's involvement. Maddren and UN4LA agreed to do so as ███████ to TSLF, and UN4LA submitted the letter on January 14, 2019.  The purpose of the letter to prosecutors was to publicize the letter itself and thereby to make the City nervous about a potential investigation and to make the City ███████ about approving Relevant projects in the future.  No investigation materialized. | an EIR or delaying the project"); Ex. 90 [JX148] (███████████████████████████████████████████████████████████████████████████████████; Ex. 91 [JX149]; Ex. 92 [JX150] |
| 124. | TSLF asked Maddren to enter the UN4LA letter to prosecutors in the administrative record for the Selma Project and to email a copy of the letter to City staff prior to the next public hearing. | Ex. 91 [JX149] |
| 125. | At a hearing on March 5, 2019, the City Council voted to grant final approval for the Selma Project. | Ex. 93 [JX251] |
| 126. | On April 2, 2019, Sunset filed a Petition for Writ of Mandamus (the "Selma Writ Petition") against the City challenging its approval of the Selma Project.  The lawsuit was filed in the Superior Court of California, County of Los Angeles and captioned *The Sunset Landmark* | Ex. 94 [JX154] |

| | | |
|---|---|---|
| | *Investment, LLC v. City of Los Angeles, et al.*, Case No. 19STCP01027 (the "Selma Litigation") | |
| 127. | In the Selma Writ Petition, Sunset alleged that it was suing "on behalf of others who will be affected in the Hollywood area, as well as for all citizens of the City of Los Angeles." | Ex. 94 [JX154] ¶ 6 |
| 128. | In the Selma Writ Petition, Sunset alleged that the City violated CEQA by failing to prepare an EIR for the Tommie Project. | Ex. 94 [JX154] ¶ 33 |
| 129. | In the Selma Writ Petition, Sunset alleged that the City's reliance on the MND was inadequate under CEQA because the City ignored "substantial evidence to support a fair argument that the Project may cause significant, unmitigable impacts to the environment, including but not limited to land use, transportation, traffic, circulation, emergency response times, parking, pedestrian safety, noise, air quality, GHG, health risks, historic resources, shade/shadow, public services, cumulative impacts and growth inducing impacts." | Ex. 94 [JX154] ¶ 28 |
| | **Other Projects** | |
| 130. | In early June 2019, TSLF asked Maddren to help find someone who attended the hearing for another Relevant project, the "Citizen News Project," which sought approvals to rehabilitate the historic Citizen News Building for use as a restaurant and event space.<br><br>Maddren reached out to people who may have attended, noting that his | Ex. 95 [JX156]; Ex. 96 [JX157]; Ex. 1 [Maddren Depo Tr.] at 94:22-95:10 |

| | | |
|---|---|---|
| | "friend is a lawyer and I think he wants to challenge the approval of the Citizen News Conversion." Because no one had timely appealed, however, TSLF was not able to find someone to challenge the Citizen News Project. | |
| 131. | On September 13, 2018, the City Planning Commission held a hearing on the Crossroads development project, which proposed an 8.34-acre development that included over 1.3 million square feet of residential, hotel and commercial uses at a site that was just two blocks away from the Sunset Property.  Nourmand did not show up to the hearing to oppose the Crossroads project. | Ex. 97 [JX139]; Ex. 3 [S. Nourmand Depo Tr. (April 22, 2022)] at 149:20-22 |
| 132. | In or around August 2018, Nourmand was negotiating a deal with the Crossroads developers, Harridge Development Group, LLC ("Harridge"), to develop the Sunset Property that would have included $6 million rent payments from Harridge to Nourmand. | Ex. 11 [JX134]; Ex. 3 [S. Nourmand Depo Tr. (April 22, 2022)] at 150:19-151:22 |
| **Selma Litigation** | | |
| 133. | During the course of the Selma Litigation, on behalf of Sunset, TSFL filed at least four motions that delayed the certification of the administrative record, including on November 5, 2019 (motion to determine scope of the administrative record), January 27, 2019 (motion to compel documents for the administrative record), January 29, 2019 (objection to the City's certification of the administrative record), and February | Thomas Decl., ECF No. 137-3 at 21-23 |

| | | 25, 2019 (motion to augment the administrative record).<br><br>Sunset also filed at least two motions to delay merits briefing and the trial date, including on May 11, 2020 (objection to request for order setting briefing schedule) and January 6, 2021 (*ex parte* application to continue trial date). | |
|---|---|---|---|
| | 134. | As a result of Sunset's motion practice, the trial court did not issue an order on the merits in the Selma Litigation until January 11, 2021. | Thomas Decl., ECF No. 137-3 at 21-23; Ex. 98 [JX170] |
| | 135. | The trial court in the Selma Litigation issued an Interlocutory Writ and Order of Remand, which found that Sunset failed to raise fair argument that there were significant environmental impacts related to greenhouse gasses, noise, transportation, parking, public services, or external piecemealing.<br><br>The trial court issued an interlocutory remand for the City to clarify technical issues in the MND related to air quality impacts and the baseline used in its internal piecemealing analysis, rather than an order the City to prepare an EIR or a revocation of approvals. | Thomas Decl., ECF No. 137-3 at 29-33; Ex. 98 [JX170] |
| | 136. | On February 1, 2021, Sunset filed a post-judgment motion objecting to the trial court's interlocutory remand order.  The trial court entered the Interlocutory Writ and Order of Remand on February 8, 2021. | Thomas Decl., ECF No. 137-3 at 23 |
| | 137. | On March 26, 2021, in the Second Appellate District for the Court of Appeal of the State of California, | Ex. 99 [JX253]; Thomas Decl., ECF No. 137-3 at 33 |

| Sunset filed a notice of appeal of the February 8, 2021 order in the *Selma Litigation*.  On June 10, 2021, the Second Appellate District issued an order dismissing the appeal. | |
|---|---|

Dated:  February 23, 2023

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation


By: */s/ Susan K. Leader*
⠀⠀⠀⠀Susan K. Leader

Attorneys for Plaintiffs
Relevant Group, LLC, 1541 Wilcox Hotel LLC, 6516 Tommie Hotel LLC and 6421 Selma Wilcox Hotel LLC